Court of Appeals Case No. 24-1775

Lower Court Case No. Case No. 22-cv-11127

---

# UNITED STATES COURT OF APPEALS

# FOR THE SIXTH CIRCUIT

---

JALEELAH HASSAN AHMED,

*Plaintiff-Appellant*,

- V. -

HAMTRAMCK PUBLIC SCHOOLS; EVAN MAJOR; SALAH HADWAN; MOORTADHA OBAID; SHOWCAT CHOWDHURY; REGAN WATSON; HAMTRAMCK FEDERATION OF TEACHERS

*Defendants-Appellees.*

On Appeal from the United States District Court for
the Eastern District of Michigan Southern Division

---

## BRIEF OF PLAINTIFF-APPELLANT

---

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
*Counsel for Plaintiff-Appellant*
210 State St.
Mason, MI 48854
(517) 999-2626
eric@delaportelynch.com
gina@delaportelynch.com

Anne-Marie Vercruysse Welch (P70035)
CLARK HILL, PLC
*Counsel for School District Defendants-Appellees*
151 S. Old Woodward Ave. Ste, 200
Birmingham, MI 48009
(248) 988-1810
Welch@ClarkHill.com

Stephanie V. Romeo (P83079)
CLARK HILL, PLC
*Counsel for School District Defendants-Appellees*
500 Woodward Ave., Suite 3500
Detroit, MI 48226
(313) 309-4279
sromeo@clarkhill.com

Mark H. Cousens (P12273)
*Counsel for HFT Defendants-Appellants*
26261 Evergreen Road, Suite 110
Southfield, MI 48076
(248) 355-2150
cousens@cousenslaw.com

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

CORPORATE DISCLOSURE STATEMENT ........................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT.......................... ii

JURISDICTIONAL STATEMENT ............................................................ iii

STATEMENT OF ISSUES.......................................................................... 1

STATEMENT OF THE CASE ................................................................... 2

STATEMENT OF FACTS .......................................................................... 4

STANDARD OF REVIEW ....................................................................... 17

ARGUMENT................................................................................................ 18

    I.    THE HONORABLE DISTRICT COURT, RESPECTFULLY, ERRED IN DISMISSING COUNTS XII AND XIII AGAINST THE SCHOOL DISTRICT DEFENDANTS WHEN IT NEVER ARTICULATED THE REASONS FOR DISMISSAL................................................................. 18

    II.    THE HONORABLE DISTRICT COURT, RESPECTFULLY, ERRED IN GRANTING DEFENDANTS' MOTIONS TO DISMISS BY IMPOSING AN IMPROPERLY HEIGHTENED PLEADING STANDARD. ............... 19

        A.    In Dismissing Plaintiff-Appellant's Claims Against the Individual School Board Defendants, The District Court Misapplied the Pleading Standards Under *Twombly* and *Iqbal* and Failed to Credit the Specific Factual Allegations Asserted in the Amended Complaint. ......................................................................... 20

        B.    The District Court Improperly Imposed a Heightened Disability Pleading Standard in Response to Defendants' 12(b)(6) Motion to Dismiss as to Plaintiff-Appellant's Disability Discrimination Claims. .................................................................... 23

        C.    The District Court Erred in Dismissing Plaintiff-Appellant's Retaliation, Discrimination, and Due Process Claims Based on the Alleged Lack of an Adverse Employment Action........ 25

            i.   Plaintiff's Administrative Leave Altered the Conditions of Her Employment and Violated Her Right to Due Process.......................................... 27

i

ii.   Plaintiff Has Plausibly Alleged a Materially Adverse Employment Action Under Title VII, the ADA, and Related Laws ..................................... 29

III.   THE HONORABLE DISTRICT COURT, RESPECTFULLY, ABUSED ITS DISCRETION WHEN IT DENIED LEAVE TO AMEND BASED ON A MISAPPLICATION OF THE FUTILITY AND PLEADING STANDARDS. ...................................................................... 33

A.   The District Court Erred in Denying Plaintiff-Appellant's Motion to Amend the Complaint.................................... 33

i.   Plaintiff-Appellant's Proposed Amended Complaint (RE # 68) Plausibly Alleges Violations of the FMLA by Asserting Specific Facts Supporting Both Interference and Retaliation Claims. ................................................. 34

ii.   The District Court Erred in Dismissing Plaintiff-Appellant's Gender Discrimination under Title IX and the Elliott-Larsen Civil Rights When It Misapplied the Comparator Standard and Improperly Resolved Factual Disputes at the Pleading Stage........................................................ 37

B.   Further Discrimination and Retaliation Have Occurred, and Thus, Plaintiff-Appellant Should Be Permitted to Further Amend her Complaint. ........................................... 41

IV.   THE HONORABLE DISTRICT COURT, RESPECTFULLY, ERRED WHEN IT DIMISSED COUNTS XII (INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP) AND XIII (DEFAMATION) AGAINST THE UNION DEFENDANTS. ............................................... 42

A.   Plaintiff-Appellant Stated a Viable Claim of Intentional Interference in a Contractual Relationship Against the Union in her Original Complaint and Proposed Amended Complaint. 42

B.   Plaintiff Stated a Viable Claim of Defamation Against the Union in her Original and her Proposed Amended Complaint. 44

CONCLUSION .............................................................................................. 47

# TABLE OF AUTHORITIES

## STATUTES

28 U.S.C. § 1291 .......................................................................................... iv
28 U.S.C. § 1331 .......................................................................................... iv
28 U.S.C. § 1367 .......................................................................................... iv
29 U.S.C. § 2601 .......................................................................................... 34

## FEDERAL RULES OF CIVIL PROCEDURE

12 ...............................................................................................................
............................................................................................................ 17, 19
8  ............................................................................................................ 19

## CODE OF FEDERAL REGULATIONS

34 C.F.R. §§ 106.45 .................................................................................... 39

## U.S. SUPREME COURT CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................ 17, 21, 38
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................ 17, 21
*Cleveland Bd of Ed v Loudermill*, 470 US 532 (1985).................................. 29, 34
*Erickson v. Pardus*, 551 U.S. 89 (2007) ................................................ 21
*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).......................... passim
*Neitzke v. Williams*, 490 U.S. 319 (1989) .............................................. 22
*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)................................ 25, 26, 37

## DISTRICT COURT CASES

*Cole v. Knoll, Inc.*, 984 F. Supp. 1117 (W.D. Mich. 1997).............................. 49, 50
*DeLaughter v. U.S. Postal Serv.,* 3 F.3d 1522, 1524 (Fed. Cir. 1993) ................... 15
*Doe v. Centreville Pub. Sch.*, No. 1:17-cv-317, 2019 U.S. Dist. LEXIS 234091
  (W.D. Mich. Apr. 29, 2019) ...................................................... 42
*Est. of Moore v. City of Warren*, No. 21-12267, 2023 U.S. Dist. LEXIS 235018
  (E.D. Mich. Apr. 27, 2023)........................................................ 37
*Gordon v. Traverse City Area Pub. Sch.*, 182 F. Supp. 3d 715 (W.D. Mich. 2016) 42
*Hofferica v. St. Mary Med. Ctr.*, 817 F. Supp. 2d 569 (E.D. Pa. 2011)................... 25
*Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997)...................................... 44
*Neuren v. Adduci*, 43 F.3d 1507 (D.C. Cir. 1995)........................................ 44
*Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824 (E.D. Mich. 2017) . 40
*Sommer v. The Vanguard Group*, 461 F.3d 397 (3d Cir. 2006) ........................... 37

**SIXTH CIRCUIT COURT CASES**

*Back v. Hall*, 537 F.3d 552 (6th Cir. 2008) ................................................................ 38

*Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868 (6th Cir. 2024) ................... 29, 33

*Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247 (6th Cir. 2000) ........................... 25

*Byrd v. Ronayne*, 61 F.3d 1026 (1st Cir. 1995)......................................................... 41

*Chesbrough v. VPA, P.C.*, 655 F.3d 461 (6th Cir. 2011) ........................................ 20

*Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625 (6th Cir. 2009)................ 17

*Craighead v. E.F. Hutton & Co.*, 899 F.2d 485 (6th Cir. 1990)....................... 20

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998) ........... 32

*HDC, LLC v. City of Ann Arbor*, 675 F.3d 608 (6th Cir. 2012).............................. 39

*Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556 (6th Cir. 2011) ...................... 24

*Hopkins v. Canton City Board of Education,* 477 F. App'x 349 (6th Cir. 2012).... 31

*Keys v. Humana, Inc.*, 684 F.3d 605 (6th Cir. 2012) ........................................ 20, 37

*Klemencic v. Ohio State Univ.*, 263 F.3d 504 (6th Cir. 2001)................................. 40

*Marcilis v. Twp. of Redford*, 693 F.3d 589 (6th Cir. 2012) ...................................... 22

*Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419 (6th Cir. 2013) ............... 21

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)........................................ 41

*Patton v. Aerojet Ordnance Co.*, 765 F.2d 604 (6th Cir. 1985) .............................. 19

*Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722 (6th Cir. 2009) ... 38

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994)...................... 41

*Prado v. Thomas*, 804 F. App'x 332 (6th Cir. 2020) .............................................. 33

*Pucci v. Nineteenth Dist. Court*, 628 F.3d 752 (6th Cir. 2010)............................... 33

*Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150 (6th Cir. 1988) .. 19

*United States v. Beauchamp*, 659 F.3d 560, 569 n.3 (6th Cir. 2011)..................... 17

**MICHIGAN COURT OF APPEALS CASES**

*BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687
(1996) ...................................................................................................................... 42

*Feaheny v. Caldwell*, 175 Mich. App. 291 (1989)................................................. 42

*Mortimer v. Alpena Cty. Prob. Court*, No. 290958, 2010 WL 2016271 (Mich. Ct.
App. May 25, 2010)................................................................................................ 32

*Northland Wheels Roller Skating Ctr., Inc. v. Detroit Free Press, Inc.*, 213 Mich.
App. 317 (1995)...................................................................................................... 44

*Swenson-Davis v. Martel*, 135 Mich. App. 632 (1984) ........................................ 45

*Tomkiewicz v. Detroit News*, Inc., 246 Mich. App. 662 (2001) ............................ 45

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and Sixth Circuit Rule 26.1, counsel for Plaintiff-Appellant certifies that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in the outcome.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Sixth Circuit Rule 34(a), Plaintiff-Appellant respectfully requests oral argument.  The instant appeal represents an issue of first impression within the Sixth Circuit following the recent Supreme Court decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), and thus, would benefit from oral argument.  Oral argument will assist the Honorable Court in evaluating novel legal issues related to administrative leave post-*Muldrow*.

Resolving Plaintiff-Appellant's indefinite administrative leave, imposed without due process, will assist in defining the boundaries of *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) within the Sixth Circuit.  Oral argument will further assist with resolving any questions this Court may have regarding the facts of the case, procedural history, and associated legal arguments.  Further, Plaintiff-Appellant's appeal raises important questions concerning Plaintiff-Appellant's rights under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Due Process Clause of the Fourteenth Amendment, and would benefit from oral argument.

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Michigan Southern Division maintained subject matter jurisdiction over Plaintiff-Appellant's claims arising under the Constitution and laws of the United States pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff-Appellant's state-law claims pursuant to 28 U.S.C. § 1367.

This Honorable Court of Appeals maintains jurisdiction over Plaintiff-Appellant's claims pursuant to 28 U.S.C. § 1291, because Plaintiff-Appellant appeals from a final judgment entered on August 6, 2024, dismissing all claims against all Defendants-Appellees.  Plaintiff-Appellant timely filed a notice of appeal on September 10, 2024, in compliance with Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

**STATEMENT OF ISSUES**

I.    Whether the District Court erred in dismissing Counts XII and XIII against the School District Defendants when it did not address the reasoning for the dismissal of counts XII and XIII in RE # 105.

> Appellant Says: Yes
> Appellees Would Say: No
> Lower Court Said: No

II.   Whether the District Court erred in granting Defendants' Motion to Dismiss when (1) Plaintiff-Appellant's Complaint sufficiently identified the basis for individual Board Member liability, and (2) indefinite administrative leave satisfied the "some harm" standard articulated in *Muldrow* for an adverse employment action.

> Appellant Says: Yes
> Appellees Would Say: No
> Lower Court Said: No

III.  Whether the District Court erred in finding Plaintiff-Appellant's amendment futile, where the amendment contained well-pleaded factual allegations sufficient to survive a Rule 12(b)(6) motion.

> Appellant Says: Yes
> Appellees Would Say: No
> Lower Court Said: No

IV.   Whether the District Court erred in dismissing Counts XII and XIII against the Union Defendants in RE # 103.

> Appellant Says: Yes
> Appellees Would Say: No
> Lower Court Said: No

## STATEMENT OF THE CASE

Plaintiff-Appellant Superintendent Ahmed filed her Complaint on May 23, 2022, (hereinafter, "Original Complaint")[1], bringing thirteen causes of action. (*See*, RE # 1, Page ID #  15-36, ¶¶ 49-121).  Plaintiff-Appellant asserted claims for race, sex, national origin, and disability discrimination under Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act; the Rehabilitation Act; Michigan's Persons with Disabilities Civil Rights Act; and Michigan's Elliot–Larsen Civil Rights Act.  *Id.*  Plaintiff-Appellant also brought claims for intentional interference with contractual relations, defamation, and violations of her Due Process rights under the United States and Michigan Constitutions.  *Id.*  Plaintiff-Appellant sought monetary damages and an injunction prohibiting Defendants from interfering with the performance of her duties as Superintendent. (*See* RE # 1, Page ID # 37-38.)

In the lower court, Plaintiff-Appellant filed two motions to amend her Complaint (ECF Nos. 15, 37) after the School District Defendants and the HFT Union Defendants filed motions to dismiss (ECF Nos. 4, 19).  Magistrate Judge Curtis Ivy, Jr. denied Plaintiff-Appellant's first Motion to Amend as futile on

---

[1] It appears that the lower court had misnumbered or otherwise confused the sequence of the amended complaints in this matter.  For consistency, Plaintiff-Appellant will refer to the amended complaints primarily by their respective ECF numbers throughout this brief.

October 6, 2022.  RE # 30.  *See,* Order Denying Motion to Amend., RE # 105, Page ID # 889-890.

Plaintiff-Appellant filed her Second Motion to Amend the Complaint on November 21, 2022, adding five causes of action not contained in the Original Complaint.  RE # 37.  While the motion was pending, the Court held a status conference on March 16, 2023.  At the conference, the parties shared that Plaintiff-Appellant had been reinstated as Superintendent.  Because of this change in circumstances, the Court instructed the parties to withdraw their pending motions and instructed Plaintiff-Appellant to file an amended complaint that reflected the changed facts. She filed her Third Amended Complaint on March 23, 2023.  RE # 55.  She maintained each of her original claims and asserted five additional causes of action not asserted in the Original Complaint (Violations of FMLA, Title IX, False Light/Invasion of Privacy, Civil Conspiracy, and Conspiracy under 42 U.S.C. § 1985).  RE # 1; RE # 55.  Plaintiff-Appellant withdrew her second motion on March 24, 2023.  RE # 56.

Defendants filed a Motion to Strike Plaintiff-Appellant's Third Amended Complaint on April 6, 2023.  RE # 58.  Defendants argued that the pleading should be stricken because Plaintiff-Appellant allegedly expanded her claims for relief improperly without consent or leave from the Court.  *Id.* at Page ID # 1498–99. The Court ordered Plaintiff-Appellant to file an amended complaint; but required her to

3

either seek leave from the Court or consent from Defendants if she wished to add causes of action not alleged in the Original Complaint. RE # 67, Page ID # 1803. Plaintiff-Appellant then filed a Motion for Leave to File an Amended Complaint with the added causes of action, alongside her fourth proposed Amended Complaint. ECF Nos. 68, 69. The Court denied Plaintiff-Appellant's Motion as futile, which effectively reverted the case back to the Original Complaint. RE # 82.

On April 17, 2024, the School District Defendants and the Union Defendants filed respective Motions to Dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 87, 88. On May 1, 2024, Plaintiff-Appellant filed her Response to the Defendants' respective Motions. ECF Nos. 89, 90. On May 7, 2024, Union Defendants filed their Reply brief, and on May 8, 2024, School District Defendants filed their Reply brief. ECF Nos. 92, 94. On July 29, 2024, the district court granted the Union Defendants' Motion to Dismiss. RE # 103.

On August 6, 2024, the district court dismissed Counts I-XIII as to all Defendants, resolving all claims in this action and leading to the present appeal. RE # 105. The district court failed to articulate its reasons for dismissing Counts XII and XIII.

## STATEMENT OF FACTS

4

1. Mrs. Jaleelah Ahmed is an experienced educator with years of experience teaching and administering Michigan schools. RE # 55, Page ID # 1441, ¶15.

2. After becoming Superintendent in 2019, School Board members and union leaders treated her differently than her male predecessors—subjecting Mrs. Ahmed to heightened scrutiny. RE # 1, Page ID # 4-5, ¶¶15-19; RE # 81, Page ID # 1459, ¶8.

3. Individual Board members and union leaders repeatedly approached Mrs. Ahmed, pressuring her to fire staff, promote union members, and reverse key administrative decisions. *See*, RE # 1, Page ID # 8-11, ¶37, A-M.

4. Mrs. Ahmed accommodated requests from School Board members and union representatives when they were consistent with her professional judgment and legal obligations. RE # 55, Page ID # 1447, ¶42.

5. Defendants renewed Superintendent Ahmed's employment contract effective July 1, 2021, through June 30, 2024. The Contract provided that Mrs. Ahmed would serve as Chief Administrative Officer with authority to organize, reorganize, or arrange the School District's departments, including assigning and reassigning administrative and supervisory staff in a manner that, in her judgment, best served the District. RE # 1, Page ID # 5-6, ¶21, A-C; ¶28, RE # 55, Page ID # 1442.

5

6. Mrs. Ahmed's Contract was only terminable for just cause or if a disability prevented her from performing her job for an aggregate of Twelve (12) months. RE # 1, Page ID # 5-6, ¶21, A-C; RE # 55, Page ID # 1442-1443¶28, A-C.

7. COVID-19 forced Superintendent Ahmed to make tough decisions to protect students.  RE # 55, Page ID # 1443, ¶29.

8. Across Michigan, teachers retired early to avoid pandemic contagion and the related stresses. *Id*. at ¶30.  Vacancies in higher paying districts enticed many HPS teachers to leave for better salaries, benefit packages, and other perks.  *Id*. At ¶31.

9. Concurrently, the District experienced an influx of autistic students at understaffed campuses.  RE # 55, Page ID # 1449, ¶49.

10. To ensure autistic students were properly serviced, Superintendent Ahmed availed herself of the legislative right of teacher placement. RE # 55, Page ID # 1444, ¶34.

11. Mrs. Ahmed initiated involuntary special education teacher transfers.  ¶ 37, RE # 55, Page ID # 1445-1446; ¶ 49, RE # 55, Page ID # 1449.

12. The Union and friendly School Board members opposed the transfers and demanded their reversal, in violation of the IDEA.  HPS Board President Evan Major demanded Mrs. Ahmed capitulate.  RE # 89-1, Page ID # 2652.

6

13. When Mrs. Ahmed refused to acquiesce, the Union initiated a smear campaign against Mrs. Ahmed. See, RE # 1, Page ID # 8-11, ¶35-37; RE # 55, Page ID # 8-9, ¶¶36-37; RE # 68, Page ID # 1816 ¶45.

14. School Board members and the Union pushed union members to publish false messaging about the Superintendent.  Via social media, Mrs. Coral stated that she was coordinating with School Board Defendants.  RE # 1, Page ID # 8-11, ¶35-37; RE # 55, Page ID # 8-9, ¶¶36-37; RE # 68, ¶42.

15. School Board members yielded to the Union's demands to maintain the Union's political and financial support.  RE # 68, ¶42.

16. The Union publicly labeled Mrs. Ahmed as "indifferent," "insensitive," "exclusionary," and a "liar." RE # 68, Page ID # 1816, ¶45.

17. Both the Board and the Union treated Mrs. Ahmed differently than her similarly situated predecessor, a male.  RE # 1, Page ID # 4, ¶¶15-18,

18. The Union made false statements with reckless disregard as to the statements' truth to two local newspapers, the *Hamtramck Review* and the *Yemeni American*; two regional newspapers, *Deadline Detroit* and the *Arab American News*; and, a state-wide media outlet, *Capitol Confidential*.  RE # 55, Page ID # 1449, ¶47.

19. As part of their negative publicity campaign, the HFT falsely attributed teacher resignations to the Superintendent.  RE # 55, Page ID # 1447-1448, ¶44.

7

20. Despite receiving "highly effective" ratings during the 2019-2020 and 2020-2021 school years, Defendants sharply criticized Superintendent Ahmed. RE # 55, Page ID # 1442, ¶¶ 25-27. Defendants were frustrated that Mrs. Ahmed—a woman—did not passively accept their demands and instead asserted herself for the betterment of her students.

21. The School Board and the HFT further pressured Mrs. Ahmed to terminate the District's HR Director who had a pending lawsuit against the District and had advocated on behalf of special needs students. RE # 1, Page ID # 6, ¶27; Mrs. Ahmed refused; RE # 55 Page ID # 1445, ¶38.

22. The School Board Defendants responded by threatening to fire Mrs. Ahmed. RE # 55, Page ID # 1451, ¶55.

23. The Union's vitriolic public campaign and the School Board Defendants' threats to Mrs. Ahmed's career caused her severe emotional distress. RE # 1, Page ID # 11, ¶38; RE # 55, Page ID # 1450, ¶53.

24. Superintendent Ahmed's physician advised her to take a medical leave of absence to address debilitating symptoms of anxiety and post-traumatic stress disorder caused by the Defendants' actions. RE # 1, Page ID # 11, ¶39; RE # 55, Page ID #  1450-1451, ¶¶54-55. Accordingly, Mrs. Ahmed notified the Board of her medical leave from October 10, 2021, to January 10, 2022. RE # 1, Page ID #

8

11, ¶40; RE # 55, Page ID # 1450, ¶55. Her leave of absence was protected by the Family & Medical Leave Act (FMLA). RE # 55, Page ID # 1451, ¶56.

25. Despite her planned leave, the School Board forced Mrs. Ahmed to return her District gear. RE # 1, Page ID # 12-13, ¶41; ECF No.55, PageID 1452, ¶57, E.

26. The District then removed all references to Mrs. Ahmed from its website and replaced her picture, name, and title with Mr. Nabil Nagi's, who was identified as the School District's Superintendent (despite his "interim" status). RE # 1, Page ID # 13, ¶41, C; RE # 55, Page ID # 1452, ¶60.

27. On December 23, 2021, Superintendent Ahmed notified the School District in writing that she was released early to return to work from her FMLA leave on January 3, 2022. RE # 1, Page ID # 13, ¶42; RE # 55, Page ID # 1453, ¶63.

28. On December 29, 2021, Defendant Major emailed Mrs. Ahmed, prohibiting her from returning to work. Major informed Mrs. Ahmed the Board was placing her on administrative leave pending investigation into alleged "misconduct." Parts of the email were later leaked to the public. RE # 1, Page ID # 13, ¶63; RE # 55, Page ID # 1453, ¶64.

29. To date, Mrs. Ahmed has not been notified of the alleged misconduct the School District was ostensibly investigating. Mrs. Ahmed has never had an opportunity to respond to the allegations against her.

9

30. In early January 2022, Mrs. Ahmed filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC) and Department of Labor (DOL) for illegal discrimination and retaliation. Mrs. Ahmed notified the District of the charges of discrimination on January 12, 2022. RE # 1, Page ID # 13-14, ¶¶44; RE # 55, Page ID # 1454, ¶68.

31. After January 12, 2022, the School Board Defendants coordinated removal of Mrs. Ahmed's personal effects from her office, placed them in a box outside her door, and directed her to pick them up. RE # 1, Page ID # 12-13, ¶41,A-E; ECF No.55, Page ID # 1452, ¶57, E.

32. Despite her leave, Defendants scheduled an evaluation of Mrs. Ahmed performance as Superintendent during the 2021-2022 school year. RE # 55, Page ID # 1456, ¶¶73-74The evaluation was conducted on October 12, 2022, under conditions and in a manner inconsistent with Section 1249 and 1249b of the Revised School Code.

33. The School Board's legal counsel stated that the Board did not have the necessary information to complete Mrs. Ahmed's evaluation and that the Board should, instead, evaluate Mr. Nagi. *Id.* At 75-76. The advice was ignored at the direction of Defendant Major.

*34.* As required by Michigan law, 40% of Mrs. Ahmed's evaluation was to be based on student achievement. *Id.* At 77. Even though Mrs. Ahmed was not

10

present in the District for part of the year and should not have been evaluated during the period she was on leave, her performance rating in this criterion was at least "effective." *Id.*

35. When the Board of Education learned Mrs. Ahmed would still receive an "effective" rating, the evaluation was halted. *Id.* At 78. Mr. Major insisted the Board conduct the evaluation but adopt different criteria to create a basis for their unlawful treatment and discriminatory conduct. *Id.*

36. Mrs. Ahmed was treated disparately from the similarly situated male Interim Superintendent, Mr. Nagi. RE # 55, Page ID # 1457, ¶80.

37. Mr. Nagi was supported by individual Board members when he:

    A. refused to comply with federal and Michigan laws governing the education of the School District's disabled students;

    B. illegally retaliated against School District employees who complained that he refused to educate disabled students;

    C. discriminated against young females employed by the School for having children by telling them they need to pay more attention to their families and Mr. Nagi retaliating against them for making complaints; and

    D. prevented the investigation of sexual harassment complaints by directing Mr. Elhady, the human resources professional to stop; when Mr. Elhady insisted on doing his job, Nagi called the police to escort Mr. Elhady off School District premises. RE # 55, Page ID # 1457-1458, ¶80.

11

38. Mr. Nagi's incompetent or illegal acts or omissions, as described in A-D above, have resulted in at least seven multiple-count civil actions being filed against the School District and himself.  RE # 55, Page ID # 1458, ¶80, G.

39. Ultimately, the School District hired an outside investigator to investigate Mr. Nagi's incompetent or illegal acts or omissions.  *Id.* at ¶81.  The School District and the School Board Defendants did not suspend Mr. Nagi pending this investigation.  Conversely, Defendants suspended Mrs. Ahmed even though they never conducted an actual investigation.  RE # 55, Page ID # 1459-1460, ¶82.

40. In January 2023, the School District's Board of Education began discussing Mrs. Ahmed's reinstatement.  Board members admitted during one or more of these meetings that the School District had never undertaken an investigation undertaken against Mrs. Ahmed.  RE # 55, Page ID # 1460, ¶83.

41. HFT members warned Mrs. Ahmed to "watch her back" and described the HFT as a "cult" rather than a union.  *Id.* at ¶84.

12

**SUMMARY OF ARGUMENT**

Mrs. Jaleelah Ahmed was an experienced educator in the prime of her career. Since taking over the Hamtramck Public School District, Mrs. Ahmed had excelled at her position, twice being rated "highly effective." Her advocacy for special needs students, refusal to retaliate against those advocating for students with disabilities, and the exercise of her civil and constitutional rights resulted in discriminatory and retaliatory treatment initiated by the Board of Education and their allies. The Board, its individual members, and its allies began to attack her reputation, solicit false complaints, and plot her ultimate removal. The Board's actions ultimately resulted in the Board placing Mrs. Ahmed on paid administrative leave without justification, without due process, and without an end-date.

In theory, placing a superintendent on "administrative leave," is a neutral act. In practice, leave can become a powerful tool of vindictive punishment. In a profession where visibility, leadership, and continuity are critical to success, prolonged separation from the role strips administrators of more than just daily responsibilities. Leave denies them opportunities to gain professional achievements, to maintain credibility, and to build the very track record upon which their careers depend. It creates a vacuum that others can fill with doubt,

13

rumor, and reputational harm.  For someone like Superintendent Jaleelah Ahmed, who served in the public eye, that vacuum quickly became an abyss.

Defendants did not merely sideline Mrs. Ahmed—they erased her.  After years of stellar service and "highly effective" evaluations, Mrs. Ahmed availed herself of FMLA leave at the recommendation of her physician, citing debilitating symptoms from a hostile work environment.  When Mrs. Ahmed sought to return, Defendants placed her on paid administrative leave pending an "investigation" into unspecified misconduct.  To this day, Mrs. Ahmed has never been informed of the charges against her, been informed of the District's evidence, or given an opportunity to respond.  The District boxed her belongings and left them outside her office door.  Mrs. Ahmed's name and picture was deleted from the District website, replaced with the bio from her male interim replacement.  RE # 1, Page ID # 13, ¶41, C; RE # 55, Page ID # 1452, ¶60.  Meanwhile, Superintendent Ahmed's livelihood remained in limbo.  No investigation, no findings, no end in sight.

The costs of the District's so-called "leave" were significant.  As the Federal Circuit has acknowledged, "there are many benefits, both tangible and intangible, which may accrue to an employee who is actually present and working," including experience, advancement, recognition, and the dignity of earning rather than

14

passively receiving a paycheck.  *DeLaughter v. U.S. Postal Serv.,* 3 F.3d 1522, 1524 (Fed. Cir. 1993).

Superintendent Ahmed's involuntary absence was weaponized.  In violation of her contract, the District conducted a sham performance evaluation long after the school year ended, concluding—without evidence—that she was "minimally effective."  The rating was not based on her work product, but was instead a predetermined outcome intended to degrade her professional standing. Meanwhile, the union and certain Board members fueled a coordinated campaign of false public statements, attributing teacher resignations and district dysfunction to her leadership—all while she remained under a cloud she was never allowed to clear.

The Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) invites renewed scrutiny of employment actions previously assumed to be benign.  There, the Court rejected the notion that a reassignment or transfer must result in "significant" harm to be actionable under Title VII. Instead, the Court recognized that employment decisions which meaningfully alter the conditions of employment—by changing duties, prestige, or opportunities—can give rise to liability even in the absence of economic harm.

So too here.  Administrative leave, particularly when it functions as indefinite exile and public censure, is not a harmless placeholder.  It is a career-ending status.

15

It deprives a public servant of her voice, her role, her standing, and her ability to demonstrate the very competence she is accused of lacking.

Such tactics should not be allowed to evade review. The Constitution and our civil rights laws do not permit public employers to avoid accountability by simply repackaging adverse actions as "leave." The cloak of administrative neutrality cannot hide what is, in substance, a termination without process and a defamation without remedy. If equal protection, due process, and anti-discrimination laws mean anything, they must protect those who are silenced precisely because they stood firm. Superintendent Ahmed was punished for doing her job, for refusing to bend to political pressure, and for protecting disabled students and students with other special needs. She deserves more than bureaucratic exile. She deserves her good name back.

16

## STANDARD OF REVIEW

This Court reviews the district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo. *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009). The appellate court gives no deference to the district court's legal conclusions and reviews the complaint anew. *United States v. Beauchamp*, 659 F.3d 560, 569 n.3 (6th Cir. 2011). In conducting this review, the Court must construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

17

## ARGUMENT

## I. THE HONORABLE DISTRICT COURT, RESPECTFULLY, ERRED IN DISMISSING COUNTS XII AND XIII AGAINST THE SCHOOL DISTRICT DEFENDANTS WHEN IT NEVER ARTICULATED THE REASONS FOR DISMISSAL.

The lower court erred when it failed to articulate a basis for its dismissal. *Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir. 1985) (a court errs when "we cannot determine from the court's order the factual or legal basis for its decision . . . ."); *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 154 (6th Cir. 1988) (affirming *Patton*, 765 F.2d 604); *see, e.g., United States v. Presto*, 498 F.3d 415, 419 (6th Cir. 2007) (a lower court must "make the basis of its decision sufficiently clear on the record to permit 'reasonable appellate review . . . .'").

In RE # 105, the District Court dismissed *all* of Plaintiff-Appellant's Counts without discussing Counts XII (Intentional Interference with a Contractual Relationship) and XIII (Defamation and Defamation per se). RE # 105. The lower court's failure to articulate any factual or legal basis for dismissal of Counts XII and XIII creates uncertainty as to the basis for dismissal of such claims. Such an action undercuts both Plaintiff-Appellant's right to appeal under Rule 4(a) and this Court's ability to conduct an appellate review. Accordingly, this Honorable Court should reverse the lower court's decision as to counts XII and XIII and remand for further proceedings.

18

## II. THE HONORABLE DISTRICT COURT, RESPECTFULLY, ERRED IN GRANTING DEFENDANTS' MOTIONS TO DISMISS BY IMPOSING AN IMPROPERLY HEIGHTENED PLEADING STANDARD.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal, not factual, sufficiency of a complaint. When evaluating a complaint under Rule 12(b)(6), the court must accept all of Plaintiff-Appellant's allegations as true and "resolve every doubt in [Plaintiff-Appellant's] favor." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir. 1990).

In evaluating a 12(b)(6) motion, Courts look to the pleading standards articulated in Rule 8, which only require that the complaint contain a "short and plain statement" showing that the Plaintiff-Appellant is entitled to relief. *See, Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011); *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). The complaint need not include "detailed factual allegations," rather, it must provide enough information to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed. R. Civ. P. 8; *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424 (6th Cir. 2013). Accordingly, Plaintiff-Appellant need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

19

The court does not weigh the truth of the facts or require evidentiary support when determining whether Plaintiff-Appellant stated a claim; instead, the court must accept all well-pleaded factual allegations as true, even if they appear unlikely. *See*, *Twombly*, 550 U.S. at 555–56 (courts must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" and allow a claim to proceed "even if it strikes a savvy judge that actual proof of those facts is improbable"). *See also*, *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not permit dismissals based on a judge's disbelief of the complaint's factual allegations").

### A. In Dismissing Plaintiff-Appellant's Claims Against the Individual School Board Defendants, The District Court Misapplied the Pleading Standards Under *Twombly* and *Iqbal* and Failed to Credit the Specific Factual Allegations Asserted in the Amended Complaint.

While courts in the Sixth Circuit have cautioned against conclusory group pleading, a complaint may refer to a group of defendants collectively where the allegations plausibly support the inference that the individuals acted jointly or in concert—particularly where the alleged misconduct arises from official decision-making by a governing body. *See*, *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596–97 (6th Cir. 2012). Here, Plaintiff's complaint contains far more than generic, conclusory allegations against the School Board Defendants. It lays out specific conduct and adverse actions taken in furtherance of a common plan among the

20

individual Board members, including direct communications, instructions, and retaliatory measures that occurred both collectively and individually.

The Amended Complaint identifies individual acts taken by Defendant Evan Major who personally emailed Mrs. Ahmed on December 29, 2021, notifying her she was prohibited from returning to work and placing her on leave pending investigation. That email included numerous directives limiting her speech, communication with staff, and access to school property (RE # 68, Page ID # 1820–21, ¶¶ 12, 18). The complaint further alleges that the email or its contents were later disseminated publicly (¶ 19), and that other School Board Defendants took part in a pattern of retaliation through public statements, termination of access, removal of her personal effects, and the orchestration of a sham evaluation process targeting Mrs. Ahmed after she engaged in protected activity, including FMLA leave (¶¶ 12–34).  These allegations are not mere labels or formulaic recitations of a cause of action—they set forth a detailed chronology of retaliatory conduct tied to individual and collective actors.

The claim that individual Board members cannot be held liable under Michigan law because they lack unilateral authority misstates the relevant legal standard. Plaintiff does not allege that any individual defendant, acting alone, terminated her or unilaterally breached her rights. Rather, she alleges that individual School Board improperly used their positions as voting members to orchestrate her

21

removal and retaliate against her. The Sixth Circuit has made clear that individual liability can be sustained where each defendant's actions contributed to the alleged harm. *See, Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564–66 (6th Cir. 2011) (reversing dismissal of individual-capacity claims where the complaint alleged retaliatory acts by multiple school officials based on protected activity). The fact that some decisions were executed through collective Board votes does not preclude liability where individual members were directly involved in the retaliatory decisions.

The Amended Complaint tells a clear and specific story—naming individual and collective defendants, describing their actions, and grounding those actions in concrete facts. The pleadings identify named Board members who made or facilitated defamatory statements, directed retaliatory evaluations, and took steps that materially breached Plaintiff's contractual and statutory rights. For example, it alleges that Defendant Major pressured her to ignore legal obligations concerning special education teacher assignments and later retaliated when she refused. These allegations are sufficiently particularized to place each Defendant on notice of the conduct at issue and satisfy the *Twombly/Iqbal* standard.

Plaintiff has alleged that the actions taken by the School Board Defendants were not only adverse but retaliatory, and that they occurred after and because she exercised protected rights under the FMLA. Courts routinely hold that such

22

temporal proximity and retaliatory acts—including public reprimands, exclusion from duties, and false accusations—support plausible claims under the FMLA. *See, e.g.*, *Hofferica v. St. Mary Med. Ctr.*, 817 F. Supp. 2d 569, 577 (E.D. Pa. 2011). Plaintiff's complaint clearly satisfies this threshold. The District Court erred in dismissing these claims without crediting the detailed and non-conclusory allegations of each Defendant's role in the retaliation.

### B. The District Court Improperly Imposed a Heightened Disability Pleading Standard in Response to Defendants' 12(b)(6) Motion to Dismiss as to Plaintiff-Appellant's Disability Discrimination Claims.

In the context of disability discrimination claims under the ADA, Section 504, or Michigan's PWDCRA, a plaintiff need not identify a specific medical diagnosis or offer medical evidence at the pleading stage.  Rather, the complaint must merely allege facts supporting a plausible inference that the plaintiff has an impairment that substantially limits one or more major life activities.  *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 253 (6th Cir. 2000). Courts do not require plaintiffs to plead their claims with the specificity demanded at summary judgment. *See, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("This simplified notice pleading standard relies on liberal discovery rules... to define disputed facts and issues.").

In granting Defendants' motion to dismiss Plaintiff-Appellant's Disability Discrimination claims (Counts I-III of the Original Complaint), the district court

23

held that Plaintiff failed to plead a qualifying disability under the ADA, Section 504, or Michigan's PWDCRA. However, the District Court overlooked both the factual allegations in the Complaint and the extensive documentation offered in Plaintiff's opposition brief. Plaintiff stated in her Complaint that she took a "leave of absence for a serious health condition that made her unable to perform the functions of her position as the School District's Superintendent," that "Mrs. Ahmed's physician advised her, for the sake of her health, to take a medical leave of absence from work," and that "Mrs. Ahmed is a 'qualified individual' with a disability within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act of 1973." RE # 68, PageIDs.1831, 1818, and 1833. As Plaintiff explained, she was diagnosed with "severe major depression, generalized anxiety disorder, and post traumatic stress disorder," and took FMLA-protected leave on the advice of her physician. RE # 89, Page ID # 2636. She also attached contemporaneous documentation from her treating therapist describing how these impairments substantially limited major life activities, triggered functional limitations without accommodations, and required workplace supports. *Id*.

These allegations exceed the pleading threshold under Rule 12(b)(6). By demanding medical specificity at the motion-to-dismiss stage, the district court imposed a heightened standard that conflicts with binding precedent. *See*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002).

24

**C. The District Court Erred in Dismissing Plaintiff-Appellant's Retaliation, Discrimination, and Due Process Claims Based on the Alleged Lack of an Adverse Employment Action.**

The district court dismissed Plaintiff's remaining claims (Counts IV–IX), which alleged retaliation and discrimination under the ADA, Rehabilitation Act, Title VII, PWDCRA, and ELCRA, on the ground that Plaintiff failed to plead a cognizable adverse employment action. The court acknowledged that Plaintiff engaged in protected activity—namely, advocating for autistic students, taking disability leave (FMLA and/or ADA leave), and filing an EEOC complaint—but concluded that her placement on paid administrative leave pending investigation, following a voluntary FMLA and/or ADA leave, did not constitute an actionable adverse action under the relevant statutes.

While the court recognized the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), which lowered the bar for what constitutes an adverse employment action under Title VII, it held that *Muldrow* did not abrogate Sixth Circuit precedent holding that paid administrative leave, without loss of pay, benefits, or title, is not materially adverse. As an initial matter, the lower court's ruling relied upon numerous factual determinations which are prohibited in a 12(b)(6) motion. The court also rejected Plaintiff's comparison to her predecessor, finding her allegations failed to establish the former superintendent was similarly situated, given distinctions in employment contracts and directives from the Board

25

of Education. For these reasons, the court found no plausible claim of discrimination or retaliation and dismissed Counts IV–IX.

The district court's conclusion that Plaintiff suffered no cognizable harm rests on pre-*Muldrow* Sixth Circuit precedent that demanded a materially significant disadvantage—such as lost wages, benefits, or formal demotion—to sustain a claim. However, in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), the Supreme Court expressly rejected that heightened standard. The Court held that Title VII prohibits "discriminatory changes to employment terms and conditions—even if those harms are not significant." *Id*. at 972. Plaintiff's indefinite administrative leave—without an opportunity to return, without any resolution of alleged misconduct, and with a publicly repeated "minimally effective" rating untethered to actual performance—clearly altered the conditions of her employment in ways that affect her future career, professional reputation, and ability to perform the core duties of her role. That suffices to state a claim under Muldrow. The district court's contrary reasoning applies an outdated and overruled threshold of harm that Muldrow has now corrected.

The district court correctly acknowledged that Superintendent Ahmed had a constitutionally protected property interest in her continued employment, rooted in her just-cause contract. However, the district court erred in holding that her indefinite administrative leave did not implicate that interest, and that it did not

26

constitute an adverse employment action under federal anti-discrimination statutes. That conclusion relies on outdated precedent and ignores both the real-world impact of administrative leave and the Supreme Court's clarification in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).

### i.    *Plaintiff's Administrative Leave Altered the Conditions of Her Employment and Violated Her Right to Due Process.*

The district court concedes that Plaintiff was not an at-will employee. Her contract limited termination to "just cause," creating a legitimate expectation of continued employment.  Nonetheless, the court found no deprivation of that interest because Plaintiff was placed on paid leave and retained her title.  But this reasoning overlooks the *functional* and *reputational* impact of that leave.  As the Sixth Circuit recently affirmed in *Blick v. Ann Arbor Public Schools*, "a public employer's decision to pay an employee during a suspension does not create an automatic 'safe harbor' from all due-process scrutiny." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 886 (6th Cir. 2024).  Courts must look beyond the superficial retention of salary and title to assess whether the employee has been effectively removed from her role without the process that her contract and the Constitution require.

Public employees with a property right in continued employment cannot be terminated without due process of law. *Cleveland Bd of Ed v Loudermill*, 470 US 532,538 (1985).  In *Loudermill*, the Supreme Court held that a state-created property interest in public employment is protected by the Due Process Clause of

27

the Fourteenth Amendment, and that before termination, the employee must receive notice of the charges, an explanation of the employer's evidence, and an opportunity to respond. *Id*. This pre-termination process need not be elaborate, but it must provide the employee a meaningful opportunity to present their side of the story before being deprived of their job. Post-deprivation remedies do not excuse the absence of pre-deprivation process when the state has created a protected property interest. *Id*.

Here, Plaintiff was excluded from her professional duties without notice, without any explanation of the allegations against her, and without any opportunity to respond. Her office was cleared. Her authority was stripped. Her name and photo were removed from public-facing platforms. Her replacement was installed without input. She was banned from District property. She was silenced under threat of discipline and told not to speak to staff or the public. These actions did not simply place her on "neutral" leave—they rendered her functionally terminated, without the procedural protections her just-cause contract guarantees. The court's reliance on *Mortimer*—which involved a garden-variety suspension pending an opportunity to resign—fails to grapple with this broader context, where the leave became indefinite, isolating, and career-ending.

In *Hopkins v. Canton City Board of Education*, the Sixth Circuit recognized that certain job responsibilities, when tethered to a protected role, can give rise to a

property interest. *Hopkins v. Canton City Board of Education,* 477 F. App'x 349, 363 (6th Cir. 2012). While the district court distinguished *Hopkins* by arguing that Michigan law gives school boards broad discretion, it ignored contractual language granting Plaintiff the authority to assign and reorganize administrative staff. The fact that her decisions were subject to board policies does not nullify her protected role—any more than laws governing principals or superintendents in *Hopkins* did. At a minimum, the scope of her authority and whether her exclusion from core responsibilities constituted a deprivation of that authority is a factual question inappropriate for resolution on a motion to dismiss.

### ii. Plaintiff Has Plausibly Alleged a Materially Adverse Employment Action Under Title VII, the ADA, and Related Laws

The district court dismissed Plaintiff's claims of discrimination and retaliation by relying on pre-*Muldrow* Sixth Circuit precedent that narrowly defined adverse employment actions as those involving tangible losses like pay cuts or demotion. That is no longer the law. In *Muldrow*, the Supreme Court rejected the "significant harm" threshold and held that discriminatory changes to the terms and conditions of employment—such as duties, schedule, or prestige—can be actionable under Title VII even if they do not result in economic loss. 601 S. Ct. at 358.

Plaintiff's indefinite administrative leave meets this standard. She was barred from performing her duties, from communicating with staff, and from

publicly defending herself.  Her exclusion was accompanied by a retaliatory and retroactive "minimally effective" rating, manufactured months after the school year ended and untethered to actual performance. Meanwhile, the District installed a male former superintendent—who was not subject to similar scrutiny—despite Plaintiff's objections and subsequent evidence of misconduct. The reputational damage, exclusion from decision-making, and inability to demonstrate continued competence all materially altered the conditions of her employment; under *Muldrow*, that is sufficient.

Moreover, the court's comparator analysis—which rejected her claim because her predecessor had a different contract—applies a stricter standard than Sixth Circuit precedent requires. In *Ercegovich v. Goodyear Tire & Rubber Co.*, the Court explained that comparators must be "similarly situated in all relevant respects," not in every conceivable detail.  *Ercegovich v. Goodyear Tire & Rubber Co.*,154 F.3d 344, 352 (6th Cir. 1998). Here, both Plaintiff and her predecessor were appointed superintendents by the same Board, held comparable authority, and took leave during their tenure. Yet only Plaintiff was prevented from returning.  That disparate treatment—especially where the alleged basis for exclusion remains secret—raises a plausible inference of discriminatory or retaliatory motive.

As with the discrimination and retaliation claims, the district court dismissed Plaintiff's procedural due process claims brought under the Fourteenth Amendment

of the U.S. Constitution and Article I, § 17 of the Michigan Constitution, concluding that while Plaintiff established a protected property interest in continued employment under her contract, she failed to allege a deprivation of that interest. See *Compl.* ¶¶ 100–08; RE # 105, Page ID # 2990–96.

Relying on *Prado v. Thomas*, 804 F. App'x 332 (6th Cir. 2020), the court explained that a due process violation requires a protected interest, a deprivation of that interest, and inadequate procedural safeguards. Plaintiff's employment contract permitted termination only for just cause, which conferred a property interest in continued employment. See *RE* # 89-1, Page ID # 2675 ¶ 12; *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 766 (6th Cir. 2010).

However, the court held that Plaintiff failed to demonstrate a deprivation of that interest, reasoning that her placement on paid administrative leave did not amount to termination or suspension in violation of contract. Citing *Blick v. Ann Arbor Public Schools*, 105 F.4th 879, 886 (6th Cir. 2024), the court acknowledged that paid leave is no longer a "safe harbor" from due process scrutiny, but concluded that Plaintiff failed to show how her contract rights were actually infringed. The district court points to *Mortimer v. Alpena Cty. Prob. Court*, No. 290958, 2010 WL 2016271, at *3 (Mich. Ct. App. May 25, 2010) as an analogous case. In the Order Granting the Motion to Dismiss, the Court writes:

> Michigan courts have already considered a similar question. In *Mortimer v. Alpena Cty. Prob. Court &*

31

> *Alpena Cty.*, the plaintiff brought an action for whistleblower retaliation after she was suspended with pay as the probate register for the Alpena County Probate Court. No. 290958, 2010 Mich. App. LEXIS 987, at *1 (Ct. App. May 25, 2010). After being suspended, she cleaned out her office and never returned to work. *Id*. Per her suspension, she was offered the opportunity to resign subject to certain conditions and was later told that she was" terminated. *Id*. at *2. The dispute surrounded the applicable statute of limitations on her claim, as the parties argued about the date on which the plaintiff was truly terminated. The Court ruled that when Plaintiff was initially informed that she was suspended with pay, that was all that occurred: she was suspended. "'Suspended' does not equate with 'terminated' or 'discharged.' Thus, being suspended does not create a cause of action for discharge or termination.

Order Granting Motion to Dismiss, RE # 105, Page ID # 2996. Plaintiff respectfully submits that the honorable district court's reliance on *Mortimer* is misplaced. That case concerned the statute of limitations under the Michigan WPA—not whether administrative leave deprives a contractual employee of a protected property interest under the Fourteenth Amendment.   Unlike the plaintiff in *Mortimer*, Superintendent Ahmed was not an at-will employee.   Her leave was indefinite, punitive in character, and imposed without notice or opportunity to respond.

Thus, regardless of whether her leave constituted "termination," it was a deprivation of her protected interest that triggered due process protections. *See, Loudermill*, 470 U.S. at 538–39.   Plaintiff does not claim an inviolable right to perform every duty without review or input. Rather, she alleges that she was

32

effectively stripped of her core responsibilities in a manner that functionally removed her from office, violating her protected property interest in continued employment under her contract. Michigan law and Plaintiff's employment contract gave her a legitimate expectation of continued employment as Superintendent. While the Board may have ultimate authority under MCL 380.1229(2), it cannot nullify that interest by stripping her of all substantive duties or placing her on indefinite leave—especially under false or retaliatory pretenses—without affording basic procedural protections.

### III. THE HONORABLE DISTRICT COURT, RESPECTFULLY, ABUSED ITS DISCRETION WHEN IT DENIED LEAVE TO AMEND BASED ON A MISAPPLICATION OF THE FUTILITY AND PLEADING STANDARDS.

Under Federal Rule of Civil Procedure 15(a)(2), courts are instructed to "freely" grant leave to amend pleadings when doing so serves the interests of justice. An amendment is deemed futile only if it would not survive a motion to dismiss under Rule 12(b)(6). *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). Therefore, when evaluating futility, the court applies the same legal standard used in assessing a Rule 12(b)(6) motion. **Attachment 1 -** *Est. of Moore v. City of Warren*, No. 21-12267, 2023 U.S. Dist. LEXIS 235018, at *7 (E.D. Mich. Apr. 27, 2023).

### A. The District Court Erred in Denying Plaintiff-Appellant's Motion to Amend the Complaint.

33

### i.   *Plaintiff-Appellant's Proposed Amended Complaint (RE # 68) Plausibly Alleges Violations of the FMLA by Asserting Specific Facts Supporting Both Interference and Retaliation Claims.*

In the district court, Plaintiff-Appellant sought to amend her complaint to include a Family Medical Leave Act (FMLA) claim. The FMLA was enacted to protect exactly the type of employee at the heart of this case—one who temporarily steps away from work due to serious health needs and faces retaliation for doing so. Congress passed the Family and Medical Leave Act (FMLA) in 1993 to safeguard employees' ability to care for themselves and their families without risking their jobs or livelihoods. *Sommer v. The Vanguard Group*, 461 F.3d 397, 398–99 (3d Cir. 2006) (quoting S. Rep. No. 103-3, at 4, 1993 U.S.S.C.A.N. 6, 6–7). The statute's core purposes include balancing the demands of the workplace with the needs of families, ensuring reasonable medical leave, and accommodating the legitimate interests of employers. 29 U.S.C. § 2601(b)(1)–(3). To fulfill that purpose, the FMLA entitles eligible employees—like Plaintiff—to take up to 12 weeks of leave per year for qualifying health conditions that prevent them from performing their job. *Id*. § 2612(a)(1). Mrs. Ahmed did just that: she took leave for a documented health condition and fully expected to return to her position, as required by the statute. Her attempt to exercise this basic right was met, not with accommodation, but with exclusion, public embarrassment, and ultimately a refusal to reinstate

34

her—exactly the type of employer behavior Congress intended the FMLA to prohibit.

In denying Plaintiff-Appellant's motion to amend her complaint, the district court found the proposed FMLA retaliation claim futile because, in its view, Plaintiff-Appellant failed to establish a *prima facie* case under the *McDonnell Douglas* burden-shifting framework. *See*, RE # 82, Page ID # 2327. In assessing whether Plaintiff-Appellant's proposed amendment would be futile, the district court committed legal error by requiring her to plead a prima facie case of FMLA retaliation under the *McDonnell Douglas* framework. This approach is contrary to settled Supreme Court and Sixth Circuit precedent, which makes clear that the *McDonnell Douglas* standard is an evidentiary burden—not a pleading requirement. *See, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002); *Keys v. Humana, Inc.*, 684 F.3d 605, 609–10 (6th Cir. 2012).

In *Swierkiewicz*, the Supreme Court held unanimously that it is improper to require plaintiffs to plead facts establishing a prima facie case at the motion-to-dismiss stage. The Court explained that because *McDonnell Douglas* is merely one method of proving discrimination—and not applicable in all cases—it cannot serve as the standard for evaluating a complaint's sufficiency. 534 U.S. at 511–12. The Sixth Circuit reaffirmed this principle in *Keys*, holding that the district court erred in requiring the Plaintiff-Appellant to plead a prima facie case and emphasizing that

35

"the ordinary rules for assessing the sufficiency of a complaint apply." 684 F.3d at 610 (citing *Twombly*, 550 U.S. at 570). As *Twombly* itself clarified, *Swierkiewicz* "did not change the law of pleading," but reaffirmed that applying *McDonnell Douglas* at the pleading stage conflicts with the "liberal pleading requirements" of FRCP Rule 8. *Twombly*, 550 U.S. at 569–70.

Thus, under the proper standard, the court's futility analysis should have asked only whether the proposed amendment states a claim that is *plausible on its face*. *See*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is a "notice pleading" standard, not a proof standard. The Plaintiff-Appellant need only allege enough factual content to allow a reasonable court to infer discrimination, retaliation, or another actionable violation—not to prove causation, comparator similarity, or pretext at the outset. See *Keys*, 684 F.3d at 610; *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 728 (6th Cir. 2009); *Back v. Hall*, 537 F.3d 552, 558 (6th Cir. 2008).

The district court rejected her claim at the futility stage because she supposedly failed to establish a causal connection, an adverse action, and similarly situated comparators. This analysis veers into the realm of summary judgment. At the pleading stage, Plaintiff-Appellant's allegations that she was denied reinstatement immediately following her FMLA leave—under a pretextual investigation that may not have existed at all—are sufficient to support an inference

36

of retaliation. See *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824, 833 (E.D. Mich. 2017) (noting that causation must be separated from employer's proffered justification at prima facie stage). Whether Defendants ultimately prevail on pretext or comparator arguments is a matter for later stages of litigation, not Rule 12(b)(6).

The plausibility standard "occupies that wide space between 'possibility' and 'probability.'" *Iqbal*, 556 U.S. at 678. At minimum, Plaintiff-Appellant's proposed allegations support a plausible inference that she was denied reinstatement and subjected to reputational harm and marginalization for taking medical leave. That is enough to warrant discovery and render her amendment not futile. See *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012).

Accordingly, the district court applied the wrong standard in denying leave to amend Count I as futile.  Its insistence that Plaintiff-Appellant plead a prima facie case under *McDonnell Douglas* was legally erroneous and requires reversal.

> ### ii.    The District Court Erred in Dismissing Plaintiff-Appellant's Gender Discrimination under Title IX and the Elliott-Larsen Civil Rights When It Misapplied the Comparator Standard and Improperly Resolved Factual Disputes at the Pleading Stage.

In the district court, Plaintiff-Appellant sought to amend her complaint to include a Title IX claim, and a count for Retaliation under the Elliott-Larsen Civil Rights Act.  In evaluating sexual harassment claims under ELCRA, courts look to

the federal standards established under Title IX. *Gordon v. Traverse City Area Pub. Sch.*, 182 F. Supp. 3d 715, 725-26 (W.D. Mich. 2016)).

Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681 et seq., prohibits similar forms of sex-based mistreatment. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A funding recipient is liable under Title IX when it receives actual notice of sexual harassment and responds to the report with "deliberate indifference." *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 511 (6th Cir. 2001).

Once an allegation of sexual harassment is made, "the school's duty to investigate under Title IX is triggered…." **Attachment 2 -** *Doe v. Centreville Pub. Sch.*, No. 1:17-cv-317, 2019 U.S. Dist. LEXIS 234091, at *21 (W.D. Mich. Apr. 29, 2019). Title IX generally requires: (1) an objective investigation of the allegations in a formal complaint by a trained investigator who is free from conflict of interest or bias; (2) written notice of an investigation; (3) an objective evaluation of all evidence gathered during the investigation; and (4) a written determination regarding responsibility, based on the preponderance of the evidence or clear and convincing standard, as elected by the institution. *See* 34 C.F.R. §§ 106.45(b)(1)-(7).

When a Plaintiff-Appellant lacks direct evidence of sex-based discrimination, they must show that the individuals they compare themselves to "comparators;" individuals who are similarly situated in all respects, unless other circumstantial or statistical evidence supports an inference of discrimination. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). A perfect match between the Plaintiff-Appellant and the comparators across every employment detail is not required; a Plaintiff-Appellant need only show that the relevant aspects of their employment situation were "nearly identical" to those of the comparator. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). Other circuits have similarly held that plaintiffs must be comparable in all *relevant* respects—not necessarily every possible detail. *See*, *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Neuren v. Adduci*, 43 F.3d 1507, 1514 (D.C. Cir. 1995); *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995).

In *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992), the court focused on the context of alleged discriminatory discipline leading to termination. There, the relevant comparators were those who had the same supervisor, were subject to the same standards, and had engaged in the same conduct—without any meaningful differences that would explain different treatment. 964 F.2d at 583. Subsequent courts have pointed out that, while the *Mitchell* factors were appropriate for that disciplinary context in that case, other factors can be relevant in the analysis based

39

on the totality of the circumstances. *See, e.g., Pierce*, 40 F.3d at 802. Ultimately, a Plaintiff-Appellant does not need to demonstrate perfect identity with the comparator to survive scrutiny. Instead, the focus is on whether the Plaintiff-Appellant and the comparator are similarly situated in all relevant respects. *Id.*

In this case, Mrs. Ahmed and Mr. Nagi were both appointed by the same governing board to serve as superintendents of the School District. Both individuals held the same position, performed the same core responsibilities, and engaged in workplace conduct triggering scrutiny by the Board. Yet only Mrs. Ahmed—a woman of color—was summarily placed on administrative leave, removed from the District website, stripped of her access, and publicly accused of misconduct. RE # 1, Page ID # 13, ¶41, C; RE # 55, Page ID # 1452, ¶60. In contrast, when Mr. Nagi faced multiple allegations of wrongdoing, including discrimination and retaliation, the School Board permitted him to remain in his role pending an outside investigation. RE # 55, Page ID # 1458, ¶81. These allegations of disparate treatment go to the heart of the "relevant aspects" inquiry under *Mitchell* and *Pierce*, particularly in cases involving differential disciplinary action by a common decision-maker.

The District Court erred in denying Plaintiff-Appellant's motion to amend based on the Court's determination that Mr. Nagi was not a "comparator." The Court improperly seized on immaterial factual distinctions such as the broader political

40

climate or timing of their respective tenures, rather than confining the inquiry to whether she sufficiently pled her claim.  At the pleading stage, the Court is not tasked with resolving factual disputes—well-pleaded facts must be accepted as true. Because Mrs. Ahmed has alleged that she and her male comparator were similarly situated in all relevant respects—and that she received substantially worse treatment—her Title IX claim was adequately pled and should not have been dismissed.

### B. Further Discrimination and Retaliation Have Occurred, and Thus, Plaintiff-Appellant Should Be Permitted to Further Amend her Complaint.

Plaintiff-Appellant respectfully notes that developments occurring after the district court's decision undercut the inference that reinstatement reflected a lack of conspiratorial motive or shared unlawful purpose.  Following reinstatement, the District quickly issued a negative performance evaluation and engaged in a sustained pattern of reputational attacks that precipitated Plaintiff-Appellant's psychiatric hospitalization.  Mrs. Ahmed remains on her second indefinite administrative leave that was effectuated once again through unsubstantiated allegations it never investigated.  While these post-dismissal developments are not part of the record on appeal, Plaintiff-Appellant expressly reserves the right to pursue them in related proceedings.

41

## IV. THE HONORABLE DISTRICT COURT, RESPECTFULLY, ERRED WHEN IT DIMISSED COUNTS XII (INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP) AND XIII (DEFAMATION) AGAINST THE UNION DEFENDANTS.

### A. Plaintiff-Appellant Stated a Viable Claim of Intentional Interference in a Contractual Relationship Against the Union in her Original Complaint and Proposed Amended Complaint.

Under Michigan law, a claim for tortious interference with a contract or business expectancy requires the plaintiff to establish: (1) the existence of a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy by the defendant; (3) intentional interference by the defendant that induces or causes a breach or termination of the relationship; and (4) resulting damage to the plaintiff. *See*, *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 698–99 (1996). To satisfy the third element, the plaintiff must show that the defendant acted either with an improper purpose or used improper means—though not necessarily both—and that such conduct lacked legitimate business justification. *Id.* Michigan law expressly permits tortious interference claims against labor unions when they exceed their role in collective bargaining and engage in conduct that is independently wrongful or lacks business justification. *See*, *Feaheny v. Caldwell*, 175 Mich. App. 291, 305 (1989).

Here, Plaintiff had a valid and ongoing contractual relationship with the school district, serving as its superintendent under a publicly approved employment agreement. RE # 1, Page ID # 5-6, ¶21, A-C; ¶28, RE # 55, Page ID # 1442. The

42

Union—through its leadership—was fully aware of Plaintiff's role and responsibilities, having regularly engaged with her in collective bargaining and grievance-related matters. Despite this, the Union engaged in a campaign of pressure and retaliation, urging the school board to remove Plaintiff after she refused to capitulate to the Union's demands. RE # 55, Page ID # 1451, ¶55. This pressure culminated in Plaintiff-Appellant being placed on administrative leave and publicly sidelined, despite no formal finding of misconduct or performance deficiency.

The Union's interference was not motivated by legitimate labor objectives, but by an improper purpose: to retaliate against a superintendent who refused to subordinate student welfare and legal compliance to union loyalty. The Union's acts lacked any legitimate business justification and directly caused the disruption of Plaintiff's contractual relationship with the district, resulting in reputational harm, lost income, and damage to her future employment prospects. Crucially, the Union acted as a third-party by applying coordinated pressure, making demands, or otherwise obstructing the employment relationship through actions taken outside the bounds of its own contracts.

Accordingly, Plaintiff has satisfied the elements necessary to proceed with a claim for tortious interference under Michigan law.

43

### B. Plaintiff Stated a Viable Claim of Defamation Against the Union in her Original and her Proposed Amended Complaint.

Under Michigan law, a defamation claim requires: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting at least to negligence; and (4) either actionability without special harm or the existence of such harm. *Northland Wheels Roller Skating Ctr., Inc. v. Detroit Free Press, Inc*., 213 Mich. App. 317 (1995). Where the plaintiff is a public official, the claim also requires clear and convincing evidence of actual malice—knowledge of falsity or reckless disregard for the truth. *Cole v. Knoll, Inc*., 984 F. Supp. 1117, 1135 (W.D. Mich. 1997).

Plaintiff identified specific, repeated statements in both her Original Complaint and Amended Complaint made by HFT President Coral and other named HFT members alleging that Superintendent Ahmed's leadership caused "mass resignations," that she was a "liar," that she was "abusive" toward staff, and that she had misled the public and Board.  These statements were published to Board members, in the press, and at public forums such as the Michigan House Labor Committee.  Several of these statements were subsequently repeated and reprinted in local and regional media coverage. Id.  Unlike the plaintiff in *Cole v. Knoll, 984 F. Supp. 1117* (W.D. Mich. 1997), who could not identify specific statements, Plaintiff here has identified forums of publication, dates and contexts, and the falsity of the allegations—namely, that she had not engaged in misconduct, nor had any

44

substantiated complaints ever been documented against her to warrant such characterization.

The Amended Complaint satisfies the malice standard required for public officials.  It alleges that the HFT and its officers repeated a series of materially false claims without attempting to verify their accuracy, often based on hearsay or coordinated talking points. (RE # 68, ¶¶ 46, 71–72, 236).  These statements were part of a broader pressure campaign aimed at removing Plaintiff from office to serve HFT's institutional objectives—specifically, to oppose involuntary transfers (which they were prohibited from doing at that time pursuant to Section 15 of PERA, MCL 423.215).  The uniformity of the messaging, the absence of substantiating detail, and the speakers' positions as individuals without first-hand knowledge support a plausible inference of reckless disregard for the truth. *See, Tomkiewicz v. Detroit News*, Inc., 246 Mich. App. 662, 635 (2001) (malice may be inferred from purposeful avoidance of truth or deliberate distortion).

Although Michigan law recognizes a qualified privilege for employer communications about employee performance, that privilege does not apply where statements are made with malice, bad faith, or to those without a legitimate interest. In *Swenson-Davis v. Martel*, 135 Mich. App. 632 (1984), a private parent expressed concern about a teacher's grading decision in a confidential letter sent to a principal under the district's internal grievance process.  The court found the statements were

non-actionable expressions of opinion protected by qualified privilege, and there was no evidence of malice. Here, by contrast, the defamatory statements at issue were made by public officials and union representatives with institutional authority and wide access to media platforms. Unlike the vague criticisms in *Swenson-Davis*, the statements here include specific allegations of dishonesty, abuse, and misconduct—accusations that are easily capable of being verified as true or false. Moreover, these statements were not made in confidence but were disseminated widely to national media outlets without a legitimate interest.

**CONCLUSION**

This case is not simply about a superintendent placed on leave—it is about what happens when a woman of color in a position of public leadership exercises her rights, resists inappropriate pressure, and is punished for doing so. Superintendent Jaleelah Ahmed was not removed for misconduct. She was erased because she refused to yield.

At the pleading stage, she was not required to prove her claims—only to plausibly allege them. Both her Original and Amended Complaints did just that. Yet, the district court imposed standards more exacting than the law allows, disregarded the plausibility of the facts she alleged, and denied leave to amend based on a misapplied futility standard. In doing so, the lower court prematurely foreclosed relief under the very statutes meant to protect public servants from retaliation, discrimination, and due process violations.

For the reasons, Plaintiff-Appellant respectfully asks this Court to reverse the district court's dismissal of her claims and its denial of her motion to amend, and to remand for further proceedings on the merits.

WHEREFORE, Plaintiff-Appellant respectfully requests that this Honorable Court reverse the district court's grant of Defendants' Motions to Dismiss and remand this case to the lower court for further proceedings.

47

Dated: July 28, 2025                    Delaporte Lynch, PLLC


Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
Eric@DelaporteLynch.com
Gina@DelaporteLynch.com

48

## CERTIFICATE OF COMPLIANCE

The present brief is double-spaced, in proportionally spaced, Times New Roman, 14-point font. The word count from the Statement in Support of Oral Argument section through end of the Conclusion section contains ten thousand and four hundred and one (10,401) words, in compliance with Federal Rule of Appellate Procedure 32(a)(7)(B). This page and word count calculation was made on Microsoft Word for Mac, Version 16.99.1.

Dated: July 28, 2025                    Delaporte Lynch, PLLC


Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
Eric@DelaporteLynch.com
Gina@DelaporteLynch.com

49

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I filed a copy of Plaintiff-Appellant's Brief through the Court's Electronic Case Filing (ECF) System.  As such, Notice of this filing will be sent to the counsel of record for all Defendants-Appellees registered with the Court's ECF System.

Dated: July 28, 2025                    Delaporte Lynch, PLLC


Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
Eric@DelaporteLynch.com
Gina@DelaporteLynch.com

50

# ADDENDUM

| Record Entry | ECF No. | Description | PageID Range |
|---|---|---|---|
| RE 1 | 1 | Original Complaint | Page ID # 4–14, 15–38 |
| RE 4 | 4 | Motion to Dismiss by HFT | |
| RE 15 | 15 | Plaintiff-Appellant's First Motion to Amend/Correct Complaint | |
| RE 19 | 19 | Motion to Dismiss by All Defendants | |
| RE 30 | 30 | Order Denying Motion to Amend | Page ID # 889–890 |
| RE 37 | 37 | Plaintiff-Appellant's Second Motion to Amend | |
| RE 55 | 55 | Amended Complaint | Page ID # 1441–1460 |
| RE 56 | 56 | Notice of Withdrawal of Second Motion to Amend/Correct | |
| RE 58 | 58 | Motion to Strike Amended Complaint | Page ID # 1498–1499 |
| RE 67 | 67 | Order Granting Defendants' Motion to Strike | Page ID # 1803 |
| RE 68 | 68 | Amended Complaint | Page ID # 1816 |
| RE 69 | 69 | Plaintiff-Appellant's Third Motion to Amend/Correct Complaint | |
| RE 81 | 81 | Opinion and Order Denying HFT Motion to Strike | Page ID # 1459 |
| RE 82 | 82 | Order Denying Motion for Leave to Amend | |
| RE 87 | 87 | Motion to Dismiss by Union Defendants | |
| RE 88 | 88 | Motion to Dismiss by School District Defendants | |
| RE 89 | 89 | Plaintiff's Response to School District Defendants' Motion to Dismiss | |
| RE 89-1 | 89-1 | Exhibit from Plaintiff's Response to Defendants' Motion to Dismiss | Page ID # 2652 |
| RE 90 | 90 | Plaintiff's Response to Union Defendants' Motion to Dismiss | |
| RE 92 | 92 | Union Defendants' Reply in Support of Motion to Dismiss | |
| RE 94 | 94 | School District Defendants' Reply in Support of Motion to Dismiss | |
| RE 103 | 103 | Order Granting Union's Motion to Dismiss | |
| RE 105 | 105 | Order Granting School District Defendants' Motion to Dismiss and Denying Motion to Strike as Moot | Page ID # 889–890 |