Case No. 24-1775 Lower Court Case No. 22-cv-11127

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**On Appeal from the United States District Court
for the Eastern District of Michigan Southern Division**

Jaleelah Hassan Ahmed,

Plaintiff-Appellant,

       v.

Hamtramck Public Schools; Evan Major;
Salah Hadwan; Moortadha Obaid; Showcat Chowdhury;
Regan Watson; Hamtramck Federation of Teachers

Defendants-Appellees.

---

Mark H. Cousens (P12273)
Attorney for Hamtramck Federation
 of Teachers Defendant-Appellee
4933 Fairway Ridge Circle
West Bloomfield, MI 48323
248 877 4098
cousens@cousenslaw.com

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
Attorney for Plaintiff-Appellant
210 State St.
Mason, MI 48854
(517) 999-2626
eric@delaportelynch.com
gina@delaportelynch.com

Anne-Marie Vercruysse Welch
(P70035)
CLARK HILL, PLC
Attorney for School District
Defendants-Appellees
151 S. Old Woodward Ave. Ste, 200
Birmingham, MI 48009
(248) 988-1810
Welch@ClarkHill.com

Stephanie V. Romeo (P83079)
CLARK HILL, PLC
Attorney for School District
Defendants-Appellees
500 Woodward Ave., Suite 3500
Detroit, MI 48226
(313) 309-4279
sromeo@clarkhill.com

**BRIEF FOR APPELLEE
HAMTRAMCK FEDERATION OF TEACHERS**

## Corporate Disclosure

The Hamtramck Federation of Teachers is not incorporated and is not related to any parent corporation.

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Statement in Support of Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Counter Statement of Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Counter Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Case And Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.      The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.      The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.      Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.      The Decision of the District Court Dismissing
              The Complaint Against HFT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      E.      Issues Raised by Plaintiff in Her Appeal . . . . . . . . . . . . . . . . . . . . . 16

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      A.      Plaintiff's Failure to Plead Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      B.      No Evidence of Union Authorization, Ratification or Approval . . . 21

C.    Dismissal of the Plaintiff's Claim Regarding
      Contract Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

D.    Dismissal of Plaintiff's Complaint for Defamation . . . . . . . . . . . . . 32

E.    The District Court Correctly Denied Plaintiff's
      Motions to Amend Her  Complaint . . . . . . . . . . . . . . . . . . . . . . . . 35

F.    Responding to the Brief of the United States . . . . . . . . . . . . . . . . . 37

Conclusion and Relief Sought . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## Table of Authorities

### Decisions of the United States Supreme Court

*Ashcroft v. Iqbal*, 556 U.S. 662,
129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

### Federal Statutes

42 U.S.C. § 12117(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Americans With Disabilities Act, 42 U.S.C. 12111 . . . . . . . . . . . . . . . . . 4, 7, 10-13

Family and Medical Leave Act,
29 U.S.C. 2601, et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Individuals with Disabilities Education Act (IDEA),
84 Stat. 175, as amended, 20 U.S.C. § 1400 et seq . . . . . . . . . . . . . . . . . . . . . . . 7

Rehabilitation Act of 1973, 29 U.S.C. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b) . . . . . . . . 4, 8, 10-13

### Decisions by the U. S. Courts

*Booth Fam. Tr. v. Jeffries*,
640 F.3d 134 (6th Cir., 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*EEOC v. Frank's Nursery & Crafts, Inc.*,
177 F.3d 448 (6th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Franke v. Norfolk Southern Railway Co.*,
2023 WL 3413919 (6th Cir., 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gonzales v. Oil, Chemical & Atomic Workers
International Union*,
77 N.M. 61; 419 P.2d 257 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Greer v. Strange Honey Farm, LLC*,
114 F.4th 605 (6th Cir., 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*James R. Snyder Co., Inc. v. Edward Rose
& Sons, Inc.*,
546 F.2d 206 (6th Cir., 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. Sumser Retirement Village*,
209 F.3d 851 (6th Cir., 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kerry Coal Co. v. United Mine Workers
of America*,
637 F.2d 957 (3rd Cir., 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Klosowski v. City of Bay City*,
696 Fed. Appx. 707 (6th Cir., 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Krstovska v. Staunton Financial, Inc.*,
2025 WL 1524456 (E.D.Mich., 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lockhart v. Holiday Inn Exp. Southwind*,
531 Fed. Appx. 544 (6th Cir., 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Marks v. Newcourt Credit Group, Inc.*,
342 F.3d 444 (6th Cir., 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Marks v. Newcourt Credit Group, Inc.*,
342 F.3d 444 (6th Cir., 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Morgan v. Church's Fried Chicken*,
 829 F.2d 10 (6th Cir., 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Parry v. Mohawk Motors of Michigan, In*c.,
 236 F.3d 299 (6th Cir., 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Peabody Coal Co. v. Local Unions 1734*,
 543 F.2d 10 (6th Cir., 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Russ v. Memphis Light Gas & Water Div.*,
 720 Fed. Appx. 229 (6th Cir., 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ryniewicz v. Clarivate Analytics*,
 803 Fed. Appx. 858 (6th Cir., 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Sharp v. Ingham Cnty.*, 23 Fed. Appx. 496,
 2001 WL 1557062 (6th Cir., 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Tapply v. Whirlpool Corporation*,
 2025 WL 2237654 (6th Cir.,  2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Teagardener v. Republic–Franklin Inc. Pension Plan*,
 909 F.2d 947 (6th Cir., 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Townsend v. Rockwell Automation, Inc.*,
 852 Fed. Appx. 1011 (6th Cir., 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United Brotherhood of Carpenters &*
 *Joiners of America v. Humphreys*,
 203 Va. 781; 127 S.E.2d 98 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States ex rel. Sheldon v.*
 *Kettering Health Network*,
 816 F.3d 399 (6th Cir., 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williams v. City of Cleveland*,
 771 F.3d 945 (6th Cir., 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Yoder v. Bowen*, 2025 WL 2170165 (6th Cir., 2025) . . . . . . . . . . . . . . . . . . . . . . 18

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Statutes of the State of Michigan**

Elliott Larsen Civil Rights Act, M.C.L. 37.2101 . . . . . . . . . . . . . . . . . . 8, 15, 35, 36

Michigan Persons with Disabilities
 Civil Rights Act, M.C.L. 37.1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

**Decisions Made by the Michigan Court of Appeals**

*Collins v. Ham*, 2008 WL 2437259 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Everton v. Williams*,  270 Mich.App. 348,
 715 N.W.2d 320 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Feaheny v. Caldwell*, 175 Mich.App. 291,
 437 N.W.2d 358 (1989), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Health Call of Detroit v. Atrium Home &*
 *Health Care Services, Inc.*,
 268 Mich.App. 83, 706 N.W.2d 843 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kefgen v. Davidson*, 241 Mich.App 611,
 617 N.W.2d 351 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Piasecki v. Michigan Educ. Ass'n-NEA*,
 1999 WL 33434995 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Relative Time Films, LLC v.*
*Covenant House Michigan*,
  344 Mich.App. 155; 999 N.W.2d 64 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Sowels v. Laborers' Intern. Union of North America*,
  112 Mich. App. 616; 317 N.W.2d 195 (1981) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

**Citations to the Record**

Complaint, RE # 55, Page ID # 1451, 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Decision on HFT Motion to Dismiss,
 RE 103, ECF No. 103, PageID # 2934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Decision on HFT Motion to Dismiss,
 RE 103, Slip op. 20, ECF No. 103, Page ID # 2950 . . . . . . . . . . . . . . . . . . . . . 15

Decision on Motion to Amend,
 RE 82, ECF No. 82, Page ID # 2345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Decision on Motion to Dismiss, RE 103,
 Slip op., 28, ECF No. 103, Page ID # 2958 . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Decision on Motion to Dismiss,
 RE 103, Slip op., 9, ECF No. 103, Page ID # 2938 . . . . . . . . . . . . . . . . . . . . . . 23

Plaintiff's Brief Page # 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Plaintiff's Brief Page # 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Plaintiff's Brief Page # 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Plaintiff's Brief, Page # 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Plaintiff's Brief, Page # 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Plaintiff's Brief, Page # 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Plaintiff's Complaint, ECF No. 1, Page ID # 34,  paragraph 113 . . . . . . . . . . . . . 26

Plaintiff's Complaint, ECF No. 1, Page ID # 8, paragraph 36  . . . . . . . . . . . . . . . 28

Plaintiff's Complaint, RE  1, paragraph 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Proposed Amended Complaint, page 28,
 RE 68, ECF No. 68, Page ID # 1832, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Re 103, ECF No. 103, PageID # 2944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

RE 103, ECF No. 103, PageID # 2946 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

RE 103, ECF No. 103, PageID # 2953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Statement in Support of Oral Argument**

Appellee Federation of Teachers suggests that oral argument is appropriate to assist the Court in viewing the substantial distinctions in the claims made against the Federation of Teachers as opposed to claims made against the School District and individual Defendants. Plaintiff's complaint and her brief inappropriately conflates the parties and frequently fails to distinguish between the Federation of Teachers and the other Defendants. Argument will permit clarity with regard to questions to be decided that impact the Hamtramck Federation of Teachers.

## Statement of Jurisdiction

Appellee Hamtramck Federation of Teachers concurs with the Appellant's statement of jurisdiction.

## Counter Statement of Issues

1.  Whether the District Court erred in dismissing Plaintiff's claim against the Federation of Teachers alleging interference with her employment contract as Plaintiff has failed to plead facts showing that the Federation of Teachers authorized, ratified or endorsed any tortious conduct intended to procure breach of that agreement.

    Appellee Hamtramck Federation of Teachers says "no."

2.  Whether the District Court erred in dismissing Plaintiff's claim against the Federation of Teachers alleging defamation because Plaintiff failed to plead any facts with specificity identifying which persons allegedly made defamatory remarks, when those remarks were made or how they were published and whether the Federation of Teachers authorized, ratified or endorsed the remarks.

    Appellee Hamtramck Federation of Teachers says "no."

**Counter Statement of the Case**

1.      The District Court was correct to dismiss Plaintiff's claims against the Federation of Teachers. And Plaintiff has not appealed from the dismissal of any claims other than those related to her contention that the Federation of Teachers attempted to interfere with her contract of employment with the Hamtramck Board of Education and that it defamed Plaintiff by publishing comments critical of her performance.

2.      Plaintiff, the Superintendent of the Hamtramck, Michigan, Public Schools, filed suit against the School District, five individual members of the Board of Education and the Hamtramck Federation of Teachers, the labor organization representing a bargaining unit of employees of the Board of Education. Plaintiff's claim against the Federation of Teachers asserted that the Union conspired with the other Defendants to discriminate against Plaintiff in violation of various Michigan and federal civil rights statutes, retaliated against Plaintiff for her exercise of rights under these statutes and attempted to interfere with Plaintiff's contract of employment with the Board of Education. Plaintiff further alleges that the Defendants, including the Federation of

3

Teachers, defamed her through the publication of various criticisms of her performance as Superintendent.

3.      The District Court dismissed Plaintiff's claims against the Federation of Teachers because Plaintiff failed to plead facts supporting her conclusory claims of conspiracy. Further Plaintiff failed to exhaust her remedies with the Equal Employment Opportunity Commission under both Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act and therefore could not pursue claims against the Federation for discrimination or retaliation under either of these statutes. Further, Plaintiff failed to provide evidence that the Federation of Teachers authorized, ratified or endorsed actions of others which, Plaintiff claimed, sought to interfere with her employment contract; which defamed her. And Plaintiff failed to plead her claim of defamation with any specificity instead only pleading conclusions.

4.      The decision of the District Court was correct and should be affirmed because Plaintiff has never met even minimal pleading standards with regard to either claim. And she plead no facts whatsoever which asserted that the Federation of Teachers authorized, ratified or endorsed the conduct of others which had the effect of defaming her or interfering with her contract.

**Summary of Argument**

A.   Plaintiff has only appealed from the decision of the District Court to dismiss her claim that the Federation of Teachers interfered with her employment contract and made defamatory statements about her and has not raised any other issues against the Federation of Teachers.

B.   The District Court was right to dismiss Plaintiff's claim for interference with her employment contract as Plaintiff failed to plead facts which showed that the Federation of Teachers authorized, ratified or endorsed tortious conduct of others which was intended to cause the breach of her contract.

C.   The District Court was right to dismiss Plaintiff's claim for defamation as Plaintiff failed to plead facts which identified the purported defamatory statements, when they were made and by whom and whether the statements were authorized, ratified or endorsed by the Federation of Teachers.

D.   The District Court was right to deny Plaintiff's motion to amend her complaint because the proposed amendment failed to plead viable claims against the Federation of Teachers.

**The Case And Proceedings Below**

A.    The Parties

The Plaintiff is the Superintendent of the Hamtramck Public Schools. She is the ultimate supervisor of persons represented by the HFT.

Plaintiff filed suit against the School District of the City of Hamtramck and five individuals who were members of the Hamtramck Schools Board of Education. She also sued the Hamtramck Federation Teachers which she refers to as "The Teachers Union".

The Federation of Teachers is a labor organization. It is the bargaining agent for a unit of about 279 employees of the Hamtramck Board of Education. The Federation and the Board are parties to a collective bargaining agreement and have engaged in collective bargaining for decades. The parties are collaborative but still are occasionally in contest over issues pertaining to job security, wages, hours and working conditions.

B.    The Complaint

Plaintiff filed an original complaint and then attempted to amend her complaint on four separate occasions. The applications for leave to amend were, in turn, denied. The fourth request was denied as the proposed complaint was deemed to raise new

claims against the School District which were viewed as futile. The Court rightly concluded that the matter then rested on the Plaintiff's original complaint.

The complaint raised 13 separate claims: (Roman Numerals in original)

I.      Plaintiff asserted that the Hamtramck Schools, the School Board Defendants, and the Teachers Union conspired to discriminate and did discriminate against Plaintiff on the basis of disability in violation of the Americans with Disabilities Act (ADA).

II.     The Hamtramck Schools, the School Board Defendants, and the Teachers' Union, conspired to discriminate and did discriminate against Plaintiff on the basis of disability in violation of Title II of ADA and Section 504 of the Rehabilitation Act of 1973;

III.    The Hamtramck Schools, the School Board Defendants, and the Teachers' Union, conspired to discriminate and did discriminate against Plaintiff on the basis of disability;

IV.     In retaliation for Plaintiff's opposition to conduct made unlawful by IDEA (Individuals with Disabilities Education Act (IDEA), 84 Stat. 175, as amended, 20 U.S.C. § 1400 et seq), Michigan special education laws, Title II of the ADA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the

7

Michigan Persons With Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 et seq., Defendants conspired to and did retaliate against Plaintiff;

V.    Defendants violated the ADA by retaliating against Plaintiff for filing the charge of discrimination;

VI.   In violation of Title VII of the Civil Rights Act of 1964 the Hamtramck Schools, the School Board Defendants, and the Teachers Union conspired to discriminate and discriminated against Plaintiff on the basis of sex;

VII.  In violation of the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, the Hamtramck Schools, the School Board Defendants, and the Teachers Union conspired to and discriminated against Plaintiff on the basis of sex;

VIII. In violation of Title VII The Hamtramck Schools, the School Board Defendants, and the Teachers Union conspired to and discriminated against Plaintiff on the basis of national origin;

IX.   In violation of the Michigan Elliott Larsen Civil Rights Act the Hamtramck Schools, the School Board Defendants, and the Teachers Union conspired to and discriminated against Plaintiff on the basis of sex;

X. In violation of the Constitution of the United States, the Hamtramck Schools and the School Board Defendants deprived Plaintiff of these property rights without any process, much less due process;

XI. In violation of the Constitution of the State of Michigan the Hamtramck Schools and the School Board Defendants deprived Plaintiff of these property rights without any process, much less due process;

XII. The School Board Defendants and the Teachers Union intentionally and improperly interfered with Plaintiff's employment contract with the Hamtramck Schools;

XIII. The School Board Defendants and the Teacher's Union made the materially false statements that damaged Plaintiff's reputation.

C.    Proceedings Below

1.    Appellee Federation of Teachers filed a motion to dismiss Plaintiff's complaint against it pursuant to F.R.C.P. 12(b)(6). The District Court granted the motion. The Court was right to dismiss Plaintiff's case against the Hamtramck Federation of Teachers ("HFT" or "the Union") because Plaintiff's complaint failed to plead facts which asserted that the Federation of Teachers authorized, ratified or endorsed conduct which Plaintiff claims to be tortious or unlawful. Rather, Plaintiff lumped

together accusations and argued that they were evidence of a "conspiracy" between the Union and the other Defendants.

Ignoring the fact that the labor organization and the School Board members are not partners but technically adversaries (the parties can have a collaborative relationship but still disagree on some issues), Plaintiff accuses the individual Board members of reaching some agreement with the Union although Plaintiff provides no facts to remotely support this accusation. And Plaintiff continuously asserts that "the Union" acted in violation of the law or conspired with other Defendants but provides no facts whatsoever to show just who did what or whether whatever was done was undertaken with the authorization or approval of the labor organization as an institution.

2.

(a)     Plaintiff played fast and loose with the District Court by ignoring fundamental principles of law and then attempting to fudge the facts to avoid dismissal. Principal among these events is Plaintiff's many claims submitted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5 et seq. ("Title VII"), and the Americans with Disabilities Act 42 U.S.C. §§ 12102, et seq. ("ADA"). Plaintiff claimed that the Federation of Teachers somehow violated her rights under both statutes. However, Plaintiff did not file a charge against the Federation of Teachers with the Equal

Employment Opportunity Commission (EEOC) and failed to exhaust her remedies with that agency. That was fatal to her claims under both the ADA and Title VII.

"To pursue a Title VII action, a plaintiff must file a timely charge of employment discrimination with the EEOC or the appropriate state agency, obtain a right-to-sue letter from the EEOC, and file a timely complaint in federal court." *Townsend v. Rockwell Automation, Inc.*, 852 Fed. Appx. 1011, 1013 (6th Cir., 2021) (citing 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir., 2018)). 'Only claims that are included in the charge or are 'reasonably related to or grow out of the factual allegations in the EEOC charge' may be heard in federal court.' *Russ v. Memphis Light Gas & Water Div.*, 720 Fed. Appx. 229, 234 (6th Cir., 2017) [quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361-62 (6th Cir., 2010)]. This exhaustion requirement "serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion."].

*Krstovska v. Staunton Financial, Inc.*, 2025 WL 1524456, at *2 (E.D.Mich., 2025)

Similarly, under the ADA, a claimant who wishes to bring a lawsuit claiming a violation of the ADA must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination. See 42 U.S.C. § 12117(a); 42 U.S.C. §

2000e–5(e)(1); *Jones v. Sumser Retirement Village*, 209 F.3d 851, 853 (6th Cir., 2000). An employee may not file a suit under the ADA if he or she does not possess a right-to-sue letter from the EEOC because he or she has not exhausted his or her remedies. See 42 U.S.C. § 2000e–5(f)(1); 42 U.S.C. § 12117(a) (procedures from § 2000e–5 apply to ADA claims); see also *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 456 (6th Cir.1999). See *Parry v. Mohawk Motors of Michigan, In*c., 236 F.3d 299, 309 (6th Cir., 2000).

(b)     Although Plaintiff did not file a charge against the Federation of Teachers, she nonetheless attempted to persuade the District Court that the charge she filed against the school district had, in fact, named the Federation of Teachers as a Respondent. It did not and the District Court rejected the contention as the Union had no "identity of interest" with the Board of Education. See *Lockhart v. Holiday Inn Exp. Southwind*, 531 Fed. Appx. 544, 546 (6th Cir., 2013). The District Court therefore dismissed all of Plaintiff's claims tied to either Title VII or the ADA. Plaintiff rightly does not contest that part of the decision of the District Court in her brief. Still, the argument she presented to the Trial Court is exemplary of the manner in which she attempted to litigate this claim. The aggregation of claims without regard to facts cannot support a cause of action and the decision of the District Court with regard to claims against HFT was correct and should be affirmed.

D.    The Decision of the District Court Dismissing The Complaint Against HFT

The District Court dismissed all claims made against the Federation of Teachers. The Federation was not charged in Counts X and XI as they raised claims under the Constitutions of the State of Michigan and of the United States which Plaintiff correctly conceded do not provide for a cause of action against a labor organization. However, Plaintiff included the Union in her charges in the remaining counts. None of these claims was supported by facts sufficient to state a cause of action.

1.

The Court dismissed counts V, VI and VIII which raised claims under Title VII of the Civil Rights Act of 1964 because Plaintiff had failed to exhaust her administrative remedy with the Equal Employment Opportunity Commission. See Decision on HFT Motion to Dismiss, RE 103, ECF No. 103, PageID # 2934. The Court correctly concluded that Plaintiff had to secure a "right to sue letter" from EEOC before she could pursue a claim against the Federation. The Court held that Plaintiff had not filed a charge against the Union, rejecting Plaintiff's assertion that her charge named the Union simply by including the term "union" in the text. Relying on *Lockhart Holiday Inn Express Southwind*, 531 Fed. Appx. 544, 546 (6th Cir., 2013) the Court rejected Plaintiff's argument that her charge sufficiently implicated the

Federation of Teachers. It rightly decided that the failure to exhaust remedies with EEOC was fatal to her claims alleging violations of Title VII.

2.

The Court dismissed counts I, II, IV and V which raised claims under the Americans with Disabilities Act because the Plaintiff failed to exhaust her administrative remedy with EEOC. See Decision on HFT Motion to Dismiss, Re 103, ECF No. 103, PageID # 2944. The Court's decision was consistent with its decision to dismissed claims raised under Title VII.

3.

The Court dismissed counts II and IV which raised claims under the Rehabilitation Act of 1973. That statute applies only to entities which receive federal funding. Plaintiff did not plead facts which suggest that the Hamtramck Federation of Teachers is in any manner a recipient of federal funding. Decision on HFT Motion to Dismiss, RE 103, ECF No. 103, PageID # 2946.

4.

The Court dismissed counts III and IV which raised claims under the Michigan Persons with Disabilities Civil Rights Act (PWDCRA). Plaintiff's complaint was devoid of any facts which supported her assertion that the Federation of Teachers

somehow conspired with the Board of Education to discriminate against Plaintiff based on disability.

> "This allegation is accompanied by a laundry list of allegedly conspiratorial acts unattributed to any individual, Defendant, or group of Defendants. *Id.* at  37.2 As stated previously, these conclusory assertions of conspiracy are not nearly enough. Even though such claims need not always contain the utmost specificity, a Plaintiff must offer more than an assertion of the conclusion she wishes to prove."

Decision on HFT Motion to Dismiss, RE 103, Slip op. 20, ECF No. 103, Page ID # 2950.

5.

The Court dismissed counts VII and IX which raised claims under the Michigan Elliott Larsen Civil Rights Act for the same reasons it dismissed claims under the Michigan PWDCRA. Plaintiff had failed to plead any facts to support the claim other than the bare allegation of "conspiracy."

6.

The Court dismissed Count XII because Plaintiff failed to plead facts sufficient to support a claim for interference with contract. Plaintiff plead no facts which suggested that the Federation of Teachers authorized, endorsed or ratified any conduct which was itself intended to result in a breach of Plaintiff's contract. Decision on HFT Motion to Dismiss, RE 103, ECF No. 103, Page ID # 2953.

7.

The Court dismissed count XIII which raised a claim for defamation because Plaintiff failed to plead facts which showed who made what statements, when they were made or whether they were authorized or endorsed by the Federation of Teachers. The failure to plead defamation with specificity required dismissal of the count.

E.    Issues Raised by Plaintiff in Her Appeal

1.

Plaintiff has limited her appeal regarding the dismissal of her case against the Federation of Teachers to the dismissal of counts XII and XIII, only. Her brief does not address the dismissal of any of the other claims which included the Federation of Teachers. The failure to argue an issue in an appellate brief waives the issue.

Plaintiff argues (1) that the District Court erred by dismissing counts XII and XIII. She argues (2) that the Court erred in denying Plaintiff's motion to amend her complaint. Plaintiff also states that the "District Court erred in granting Defendants' Motion to Dismiss when (1) Plaintiff-Appellant's Complaint sufficiently identified the basis for individual Board Member liability, and (2) indefinite administrative leave satisfied the "some harm" standard articulated in *Muldrow* for an adverse employment action." The reference to the "Defendants' motion" is sloppy at best. But

16

the statement of issue refers to "individual board member(s)." Given that, it seems clear that Plaintiff argues only the dismissal of claims against individual board members and does not include the Federation of Teachers in this statement of issue.

2.

> The failure to brief an issue waives that issue for appellate review:

> "We need not review the district court's grant of summary judgment on Marks's claim that Newcourt fraudulently induced him to buy stock options because Marks did not raise it before this court. According to the Federal Rules of Appellate Procedure, an "appellant's brief must contain ... a statement of the issues presented for review" and an argument on each issue presented. Fed. R.App. P. 28(a); see *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir.1996), cert. denied, 519 U.S. 1093, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997). An appellant waives an issue when he fails to present it in his initial briefs before this court. *Thaddeus–X v. Blatter*, 175 F.3d 378, 403 n. 18 (6th Cir., 1999) (*en banc*); *Bickel*, 96 F.3d at 153–54"

*Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 461–62 (6th Cir., 2003)

Plaintiff has not argued the dismissal of any claims made against the Federation of Teachers other than Count XII and XIII. In light of her failure to argue any other issues, the sole questions before the Court are related to the dismissal of her claims for contract interference (Count XII) and defamation (Count XIII). Both claims are made under Michigan law.

**Standard of Review**

1.

The District Court dismissed Plaintiff's complaint against the Federation of Teachers for failure to state a claim. This Court reviews the district court's grant of a motion to dismiss for failure to state a claim *de novo*. *Booth Fam. Tr. v. Jeffries*, 640 F.3d 134, 139 (6th Cir., 2011)

> "To survive a Rule 12(b)(6) motion to dismiss, a 'complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.' *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir., 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In determining whether a complaint meets that standard, the Court must 'construe the complaint in the light most favorable to the plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in the complaint as true.' *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir., 2021). But we may disregard "naked assertions devoid of further factual enhancement" and "formulaic recitation[s] of the elements of a cause of action."

*Yoder v. Bowen*, 2025 WL 2170165, at *2 (6th Cir., 2025)

2.

The District Court denied Plaintiff's motion to amend her complaint on the grounds that the amendment would not survive a motion to dismiss and therefore the amendment was futile. Decision on Motion to Amend, RE 82, ECF No. 82, Page ID # 2345. When a district court denies a motion to amend a complaint because the

proposed amendment would be futile (i.e., that it would not withstand a motion to dismiss), the Court applies a *de novo* standard of review. *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 407 (6th Cir., 2016) citing *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596 (6th Cir., 2013)). See also *Franke v. Norfolk Southern Railway Co.*, 2023 WL 3413919, at *4 (6th Cir., 2023)

**Argument**

A.    Plaintiff's Failure to Plead Facts

Although the Court reviews the decision of the District Court *de novo*, here the District Court was correct to decide that Plaintiff failed to come close to pleading facts to support the numerous conclusions in her complaint. "To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts that, taken as true, state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). A complaint states a plausible claim for relief where its alleged facts "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937."

*Tapply v. Whirlpool Corporation*, 2025 WL 2237654, at *2–3 (6th Cir.,  2025)

Plaintiff's complaint pleads no facts to support her conclusions. Rather, the pleading is replete with conclusions without a factual basis. The District Court was not "...bound to accept as true unwarranted factual inferences  or legal conclusions unsupported by well-pleaded facts."

*Teagardener v. Republic–Franklin Inc. Pension Plan*, 909 F.2d 947, 950 (6th Cir., 1990) citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir., 1987). See also *Sharp v. Ingham Cnty.*, 23 Fed. Appx. 496, 498; 2001 WL 1557062, at *1 (6th Cir., 2001).

Plaintiff's complaint consists almost entirely of conclusions. For example paragraph 113 states "The School Board Defendants and the Teachers Union intentionally and improperly interfered with Mrs. Ahmed's employment contract with the Hamtramck Schools in the manner described in this Complaint." No facts are stated to explain just how the "Teachers Union" "interfered" or whether it authorized, ratified or endorsed the actions of others to interfere with Plaintiff's employment contract.

Similarly, paragraph 118 states "The School Board Defendants and the Teacher's Union made the following materially false statements that damaged Mrs. Ahmed's reputation..." None of the purportedly defamatory statements are identified as to speaker, place of publication or whether the publication was authorized, ratified or endorsed by the "Teachers Union."

A complaint which merely pleads conclusions should be dismissed and the District Court was right to dismiss this one. Plaintiff failed to come close to meeting the requirements of pleading facts sufficient to support a cause of action.

B.    No Evidence of Union Authorization, Ratification or Approval

1.

Despite a complaint of 121 paragraphs, the Plaintiff pleads no facts which, if true, suggest that the Hamtramck Federation of Teachers as an institution authorized, ratified or endorsed any conduct of its members (or anyone else) which Plaintiff claims to have been tortious. The Federation of Teachers is not a monolith. It functions through its official actions, resolutions of its Board and the votes of its members. Recognizing this fundamental fact, Michigan law makes clear that a labor organization is not per se liable for the actions of persons it represents unless the Union authorized the conduct, ratified it or expressed approval of it.

In *Sowels v. Laborers' Intern. Union of North America*, 112 Mich. App. 616, 622; 317 N.W.2d 195, 197 (1981) the Michigan Court of Appeals explained that a labor organization is not liable for the conduct of affiliates or individual members "..under a theory of agency and even where agency is alleged, there must be a showing that the union participated in, authorized or ratified the tortious conduct." *Sowels* at 622, citing *Kerry Coal Co. v. United Mine Workers of America*, 637 F.2d 957 (3rd Cir., 1981); *James R. Snyder Co., Inc. v. Edward Rose & Sons, Inc.*, 546 F.2d 206 (6th Cir., 1976), *Gonzales v. Oil, Chemical & Atomic Workers International*

*Union*, 77 N.M. 61, 419 P.2d 257 (1966); *United Brotherhood of Carpenters & Joiners of America v. Humphreys*, 203 Va. 781, 127 S.E.2d 98 (1962).

In *Piasecki v. Michigan Educ. Ass'n-NEA*, 1999 WL 33434995, at *8 (1999) the Michigan Court of Appeals relied on *Sowels* to reject a claim of vicarious liability in the absence of evidence that the labor organization had "participated" in the purported tort:

> "Under *Sowels*, unions and their officers and members participating or interested in a labor dispute cannot be held liable for unlawful acts of union officers, members, or agents, except on clear proof of actual participation in or authorization of the acts, or ratification of the acts after actual knowledge thereof. "Participation" means to take part in, to receive or have a part or share of, or to be engaged in an activity. See *Burrell v. Ford Motor Co*, 386 Mich. 486, 494; 192 NW2d 207 (1971). "Ratification" is the affirmance by a person of a prior act which did not bind him, but which was done or professed to be done on his account. Restatement Agency, 2d, § 82, p 210; *Cudahy Bros Co v West Michigan Dock & Market Corp*, 285 Mich. 18, 25; 280 NW 93 (1938).

*Piasecki v. Michigan Educ. Ass'n-NEA*, 1999 WL 33434995, at *8 (1999)

Plaintiff refers to "the Union" some 33 times in her complaint yet fails to acknowledge that a labor organization can only be liable for purported misconduct of its members if the union as an institution adopts or ratifies the conduct. Plaintiff has failed to present a single fact which suggests, much less proves, that the Federation of Teachers as an entity authorized, endorsed or ratified any of the conduct of which Plaintiff complains.

23

2.

Citing *Peabody Coal Co. v. Local Unions 1734, 1508, 1548*, 543 F.2d 10, 12–13 (6th Cir., 1976) the District Court agreed that Plaintiff had to provide facts which showed that the labor organization authorized or endorsed the unlawful behavior of others:

> "Though the HFT is a union, the generic reference "union . . . members" does not indicate that the HFT itself committed a discriminatory act, and it does not distinguish the HFT from other potential unions. Identifying "union members" does not put the HFT on notice of allegations against it since, as has long been the law of this Circuit, a union is not liable for the unauthorized actions of its members. *Peabody Coal Co. v. Local Unions* etc., 543 F.2d 10, 12 (6th Cir., 1976) ("[A] union may only be held responsible for the authorized or ratified actions of its officers and agents. There is no precedent in this circuit to support the contention that the 'mass action' of union members is, in and of itself, sufficient to bind the union.") (citation omitted). Plaintiff does not identify any individual union member in her charge, making it impossible for the HFT to have known whether one of its agents authorized to speak on its behalf had been implicated. Moreover, the most she charges against the union members is the fact that they made "statements," which alone also does not give rise to an allegation of discrimination. In sum, Plaintiff had two opportunities, between the heading and body of her charge, to properly name the HFT and neglected to do so."

Decision on Motion to Dismiss Slip op. 9, RE 103, ECF No. 103, Page ID # 2938

3.

Plaintiff attempts to side step the unequivocal rulings of the Michigan Court of Appeals and of this Court by citing to an irrelevant case. At Plaintiff's Brief Page

24

# 42, Plaintiff cites *Feaheny v. Caldwell*, 175 Mich.App. 291 (1989) and writes that "Michigan law expressly permits tortious interference claims against labor unions when they exceed their role in collective bargaining and engage in conduct that is independently wrongful or lacks business justification." *Brief, Id. Feaheny says nothing of the sort*. The case did not involve a labor organization. Rather, a former corporation officer brought suit against corporate officers of an automobile manufacturer, alleging conspiracy, tortious interference with employment contract and tortious interference with economic expectancy. The Court of Appeals affirmed the decision of the Trial Court vacating a jury verdict on one aspect of the Plaintiff's claim. None of Plaintiff's claims succeeded nor did the Court of Appeals apply any part of its reasoning to labor organizations.

In addition to being irrelevant to this case, a key part of the decision in *Feaheny* was overruled. In *Everton v. Williams*, 270 Mich.App. 348, 350; 715 N.W.2d 320, 321 (2006) the Michigan Court of Appeals noted that in *Health Call of Detroit v. Atrium Home & Health Care Services, Inc*., 268 Mich.App. 83; 706 N.W.2d 843 (2005) then current law limiting recovery to nominal damages in actions involving at-will contracts was overruled.

*Feaheny* has been cited for the proposition that a party to an at-will employment contract may assert that a party tortuously interfered with that contract.

25

*Klosowski v. City of Bay City*, 696 Fed. Appx. 707, 711 (6th Cir., 2017) (Although at-will contracts such as *Klosowski's* are "actionable under a tortious interference theory of liability," *Feaheny v. Caldwell*, 175 Mich.App. 291, 437 N.W.2d 358, 364 (1989), *Klosowski* has not shown that there was a breach of contract in this instance.) However, *Feaheny* has nothing whatsoever to do with the role of labor organizations or their potential liability.

It is stunning that a party would so misrepresent the holding of a case and cite a case to this Court which has nothing whatsoever to do with the issue being considered. The claim that the cases supports ". . . permits tortious interference claims against labor unions . . ." is simply false.

4.

No part of Plaintiff's complaint pleads facts which, if true, showed that the Hamtramck Federation of Teachers as an institution authorized, ratified or approved of the conduct of which she complains. Instead, Plaintiff cites only conclusions by repeatedly stating that "the Teacher's Union" conspired with unknown persons on the Board of Education  or discriminated against Plaintiff.  No facts are plead which provide any evidence that the Federation of Teachers as an institution authorized, ratified or endorsed the conduct of anyone. Plaintiff has failed to present even a scintilla of evidence to support any of her claims against "the Teacher's Union."

26

C.    Dismissal of the Plaintiff's Claim Regarding Contract Interference

The District Court correctly dismissed Plaintiff's claim for contract interference because Plaintiff's claim fails to plead facts which show that the Federation of Teachers authorized, endorsed or ratified the behavior of which she complains. Plaintiff argues that "Despite this, the Union engaged in a campaign of pressure and retaliation, urging the school board to remove Plaintiff after she refused to capitulate to the Union's demands. Plaintiff's Complaint, RE 55, Page ID # 1451, 55. This pressure culminated in Plaintiff-Appellant being placed on administrative leave and publicly sidelined, despite no formal finding of misconduct or performance deficiency." Plaintiff's Brief Page # 43. Despite this bold assertion, none of Plaintiff's allegations supports a cause of action against the Federation of Teachers.

1.

Plaintiff's complaint asserts that "The School Board Defendants and the Teachers Union intentionally and improperly interfered with Plaintiff's employment contract with the Hamtramck Schools in the manner described in this Complaint." Plaintiff's Complaint, ECF No. 1, Page ID # 34 paragraph 113. The complaint does not articulate any facts which explain what the Federation of Teachers might have done to interfere with Plaintiff's contract.

> "In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 89, 706 N.W.2d 843 (2005). "The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Id.* at 89-90, 706 N.W.2d 843. Damage is an element as well. See *id.* at 90, 706 N.W.2d 843."

*Relative Time Films, LLC v. Covenant House Michigan*, 344 Mich.App. 155, 162, 999 N.W.2d 64, 68 (2022)

And:

> "With regard to the third element, "[o]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 382, 689 N.W.2d 145 (2004) (quotation marks and citation omitted). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Knight Enterprises, Inc v RPF Oil Co*, 299 Mich App 275, 280, 829 N.W.2d 345 (2013) (quotation marks and citations omitted). "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference."

*Id.*, 163

2.

 Plaintiff fails to plead facts which demonstrate that the Federation of Teachers authorized, ratified or endorsed the conduct which of which she complains. She

28

repeats her conclusions that "...the teachers who were or might be involuntarily transferred and the Teachers Union conspired with the Hamtramck Schools and School Board Defendants to terminate the employment of Mrs. Ahmed and Ms. Imbrunone." Plaintiff's Complaint, RE 1, ECF No. 1, Page ID # 8, paragraph 36.

Plaintiff's complaint does not plead any facts which suggest that the Federation of Teachers authorized, endorsed or ratified the conduct of any person who had an unlawful purpose or who engaged in any per se wrongful act which was designed to cause the breach of Plaintiff's contract. Instead, Plaintiff said only that "(T)he School Board Defendants, and the Teachers Union took the following additional overt steps in furtherance of their conspiracy to terminate the employment of Plaintiff and Ms. Imbrunone." Plaintiff's Complaint, RE 1, paragraph 38. The actions listed as evidence of this effort is said to have been:

- Posting information on the Teachers Unions' Facebook account impugning Plaintiff's professional reputation;

- Providing information to a local newspaper, The Hamtramck Review, which ran articles impugning Plaintiff's professional reputation;

- Providing information to a local newspaper, the Yemeni American, which ran an article impugning Plaintiff's professional reputation;

29

- Providing information to a state-wide media outlet, Capitol Confidential, which ran an article impugning Plaintiff's professional reputation;

- Providing information to other news sources impugning Plaintiff's professional reputation;

- Repeatedly appearing in Plaintiff's office to demand Mrs. Imbrunone's dismissal, in breach of Plaintiff's contractual right to manage Hamtramck Schools' personnel decisions;

- Stating they would terminate Plaintiff's employment unless she relinquished her contractual right to manage Hamtramck Schools' personnel decisions and terminated Mrs. Imbrunone's employment;

- Demanding Teachers Union members be promoted to administrative positions in violation of Mrs. Ahmed's contractual right to manage Hamtramck Schools' administrative personnel decisions;

- Refusing to permit Plaintiff to bring the Hamtramck Schools in conformity with federal and Michigan law by involuntarily transferring properly certified teachers to instruct the influx of autistic students who enrolled in the Hamtramck Schools at the beginning of the 2021-2022 school year;

- Harassing Plaintiff in an effort to force her to dismiss Mrs. Imbrunone, contrary to Plaintiff's contractual right to manage Hamtramck Schools' personnel decisions;

- Blaming Plaintiff and Ms. Imbrunone for teacher retirements and resignations that were not attributable to their acts or omissions, including teacher retirements and resignations attributable to the decision of the Hamtramck Schools that resulted in the resignation of a popular tenured teacher;

- Placing Ms. Imbrunone on a paid leave of absence on October 28, 2021 and terminating Ms. Imbrunone's employment effective June 30, 2022.

- Soliciting complaints against Ms. Imbrunone;

- Contrary to applicable Michigan law, notifying Ms. Imbrunone the Board of Education was considering not renewing her employment at the end of the 2021-2022 school year, and terminating her employment effective June 30, 2022.

First, no part of Plaintiff's complaint identifies who made these statements or whether they were made with the authorization or approval of the Federation of Teachers. Second, Plaintiff does not plead any facts which suggest that the Federation of Teachers itself engaged in any unlawful or tortious conduct or authorized, ratified or endorsed the conduct of persons who, themselves, committed a tort. At most Plaintiff

31

complains that someone, not identified, posted remarks that were critical of her. As is argued ahead, these comments were not defamatory or tortious.

3.

Superintendents of schools are public figures. As such Plaintiff is subject to criticism of her performance. The statements she cites are legitimate opinion with regard to Plaintiff's competence as a school leader.  See *Kefgen v. Davidson*, 241 Mich.App 611, 623-624, 617 N.W.2d 351 (2000) ("A superintendent of a school district is a public figure. A city manager should likewise be considered a public figure.") A public figure claiming defamation must prove by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth "Remarks that were critical of Plaintiff as a school leader require proof . . . by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth. . ."

*Collins v. Ham*, 2008 WL 2437259 (2008)

The complaint does not plead any facts which provide evidence of any tortious conduct of the Federation of Teachers itself or facts which show that the Federation of Teachers authorized, ratified or endorsed the tortious conduct of others.  At most,

32

Plaintiff complains about criticism of her performance. But as a public figure she is

subject to public criticism. She may dispute the accuracy of the remarks but cannot

claim them to be tortious.

D.   Dismissal of Plaintiff's Complaint for Defamation

1.   The District Court correctly dismissed Plaintiff's complaint for defamation

because Plaintiff

> "...does not provide the exact statements made that allegedly defamed
> her. In Michigan, a claim for defamation must be pled with specificity
> and include "the exact language that the plaintiff contends is
> defamatory, the connection of the defamatory words to the plaintiff
> where such words are not clear or are ambiguous, and the publication of
> the alleged defamatory words." *Bhan v. Battle Creek Health Systems*,
> 579 F. App'x 438, 446 (6th Cir. 2014) (citing *Ledl v. Quik Pik Food
> Stores, Inc.*, 349 N.W.2d 529, 532 (Mich. Ct. App. 1984))."

Decision on Motion to Dismiss, RE 103, Slip op. 28, ECF No. 103, Page ID # 2958

In this the District Court was correct. In Michigan claims for defamation must be

plead with specificity. A Plaintiff must identify the exact statement which is alleged

to be defamatory.

> "In Michigan, a "plaintiff claiming defamation must plead a defamation
> claim with specificity by identifying the exact language that the plaintiff
> alleges to be defamatory." *Ghanam v. Does*, 303 Mich.App. 522, 845
> N.W.2d 128, 142 (2014) (citation omitted). The elements of the
> defamation claim "must be specifically pleaded, including the
> allegations with respect to the defamatory words, the connection
> between the plaintiff and the defamatory words, and the publication of
> the alleged defamatory words." *Gonyea v. Motor Parts Fed. Credit*

33

*Union*, 192 Mich.App. 74, 480 N.W.2d 297, 299 (1991) (per curiam) (citing *Ledl v. Quik Pik Food Stores, Inc.*, 133 Mich.App. 583, 349 N.W.2d 529, 532 (1984)). "[A] defamation plaintiff must plead with specificity who published the defamatory statement, when it was published, and, most importantly, a plaintiff must identify the precise materially false statement published." *Rouch v. Enquirer & News of Battle Creek Michigan*, 440 Mich. 238, 487 N.W.2d 205, 220 (1992) (Riley, J., concurring) (citing *MacGriff v. Van Antwerp*, 327 Mich. 200, 41 N.W.2d 524, 526 (1950))."

*Ryniewicz v. Clarivate Analytics*, 803 Fed. Appx. 858, 867 (6th Cir., 2020)

2.

Plaintiff's complaint fails to meet this standard. Rather, she provides either a summary of the disputed statement or a precis of it. She provides no information about who made the statement, when the statement was published or where it was published. Further, she presents no evidence to show that the comments were authorized, ratified or endorsed by the Federation of Teachers or were only the comments of another person. Her complaint states:

The School Board Defendants and the Teacher's Union made the following materially false statements that damaged Plaintiff's reputation:

A.    Plaintiff was collecting her salary even though she refused to work;

B.    There was no legitimate reason for Plaintiff's medical leave of absence;

C.    It was necessary for the Hamtramck Schools to replace her;

34

D.     It was necessary for the Hamtramck Schools to ban her from her job, official responsibilities, and access to work-related materials;

E.     It was necessary for Hamtramck Schools employees not to contact her;

F.     It was necessary Plaintiff not contact Hamtramck Schools employees;

G.     The Hamtramck Schools was going "backward" under her leadership;

H.     The Hamtramck Schools were "chaotic" under her leadership;

I.     All teacher resignations during the 2021-2022 school year were caused by or related to her involuntary transfer decisions; and,

H.     Her professional decisions were inconsistent.

No part of the complaint explains who made which statement, when it was made or in what manner it was made. The absence of anything remotely resembling specific pleading fully justifies the dismissal of this count of the complaint.

3.

Plaintiff's brief to this Court repeats the failings of her complaint. It recites statements without identifying when they were said or by whom. Plaintiff argues that "Plaintiff identified specific, repeated statements in both her Original Complaint and Amended Complaint made by HFT President Coral and other named HFT members. . ." Plaintiff's Brief, Page # 44. But her brief does not provide specifics; it repeats the conclusions recited in the complaint. And it again fails to explain whether the

35

disputed statements were made on behalf of the labor organization or with its authorization or approval. Merely attributing remarks to "HFT members" does not provide evidence of authorization or endorsement by the Federation of Teachers.

The District Court correctly dismissed Plaintiff's claim for defamation because her complaint was entirely devoid of the facts necessary to plead a cause of action.

E.    The District Court Correctly Denied Plaintiff's Motions to Amend Her Complaint

The District Court denied Plaintiff's repeated motions to amend her complaint because the proposed amendments would be futile.

Plaintiff's brief only argues two issues, both relating to requests to amend her complaint to add claims *against the School District only*. First, she claims that she should have been able to amend the complaint to include a claim under the Family and Medical Leave Act, 29 U.S.C. 2601, et seq. Count I of the proposed amendment (paragraphs 88-99) is plead against the school district only. The requested remedy asked the Court to "...enter a declaration the School District and the School District Defendants violated the FMLA..." Proposed Amended Complaint, p. 28, RE 68, ECF No. 68, Page ID # 1832.

Second, Plaintiff's brief argues that "...Plaintiff-Appellant sought to amend her complaint to include a Title IX claim, and a count for Retaliation under the

36

Elliott-Larsen Civil Rights Act." Plaintiff's Brief Page # 37. However, Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq*. does not apply to the Federation of Teachers. The statute by its terms applies only to entities that receive federal assistance:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Sex, 20 U.S.C.A. § 1681

Plaintiff's proposed amendment did not include any claims against the Federation of Teachers for violation of this statute. And count VIII of the proposed amended complaint seeks relief against the school district alone.

Third, Plaintiff argues that the District Court erred by denying amendments relating to the Michigan Elliott Larsen Civil Rights Act. However Count XIV of the proposed amended complaint at paragraph 212, makes the same bare conclusions Plaintiff had made in her original complaint (The HFT caused or attempted to cause the School District and the School Board Defendants to violate the ELCRA as described in this Third Amended Complaint, including paragraphs 15-18, 38-48, 44-48, 57-67, and 69-79, and 80-84.).

Plaintiff does not address her failure to plead facts. Instead, she limits her argument to the Court's application of the "Comparator Standard." See Plaintiff's Brief, Page # 30. But Plaintiff does not address her complete failure to plead facts which, if true, show how the Federation of Teachers, as an institution, authorized, endorsed or ratified conduct of others which had the effect of causing the Board of Education as an employer to discriminate against Plaintiff.

The District Court did not err in denying Plaintiff's fourth motion to amend her complaint. Although leave to amend should be "freely give[n] ... when justice so requires," Fed. R. Civ. P. 15(a)(2), courts may deny a request if the amendment would be futile. *Williams v. City of Cleveland*, 771 F.3d 945, 949 (6th Cir., 2014). An amendment is futile if, even with the proposed changes, the complaint still fails to state a claim under Rule 12(b)(6). *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 617 (6th Cir., 2024). Plaintiff's motion to amend her complaint was properly denied as regards the Federation of Teachers because the proposed amendment, like the original complaint, failed to plead a viable cause of action. The Court was right to deny the motion as presenting a futile complaint.

F.     Responding to the Brief of the United States

The brief of amicus the United States noted that the United States "...takes no position on any other issue, nor on Ahmed's claims against any defendants other than

38

the School District." HFT acknowledges this concession and therefore will not respond to any of the arguments presented in that brief; HFT neither supports nor opposes the contentions of the United States.

However HFT objects to the reference by the United States of Plaintiff's contention that "...the teachers' union, school board members, and the School District itself began a public campaign to intimidate and harass her..." (Brief of Amicus Curiae United States Brief, Page # 4) as unfounded and based upon bare accusations not supported by Plaintiff in any part of her complaint.

## Conclusion And Relief Sought

The Court should affirm the decision of the District Court dismissing claims against the Federation of Teachers because the Court was correct to conclude that Plaintiff-Appellant failed to present facts which would support a cause of action against the Federation and the Plaintiff-Appellant has failed a legitimate argument for reversal of the decision of the District Court.

/s/  Mark H. Cousens
Mark H. Cousens, P12273
4933 Fairway Ridge Circle
West Bloomfield, MI 48323
Telephone: 248 877 4098
E-mail: cousens@cousenslaw.com
Attorney for HFT Defendant-Appellee

## Certificate of Compliance

I certify that this brief complies with the Federal Rules of Appellate Procedure and the Rules of this Court with respect to type and volume limitation and from the Statement of Jurisdiction through Relief Sought contains 7923 words as computed by the WordPerfect word processing program.

Mark H. Cousens

Addendum (unpublished cases)

41

2008 WL 2437259

2008 WL 2437259
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Cecil A. COLLINS, Jr., Plaintiff-Appellant,
v.
Wilmer Jones HAM, Carol Cottrell, and Darnell Earley, Defendants-Appellees.
Cecil A. Collins, Jr., Plaintiff-Appellant,
v.
City of Saginaw, Defendant-Appellee.

Docket Nos. 275494, 275493.
|
June 17, 2008.

Saginaw Circuit Court; LC No. 05-058461-CK, 06-059867-CK.

Before: GLEICHER, P.J., and FITZGERALD AND HOEKSTRA, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff filed two separate actions arising from his termination as the city manager for the city of Saginaw, one against the city and the other against various individual defendants. The actions were consolidated below and the trial court granted defendants' joint motion for summary disposition, dismissing plaintiff's various claims under MCR 2.116(C)(7), (8), and (10). Plaintiff appeals as of right. Because the trial court did not err in dismissing plaintiff's claims, we affirm.

I. Underlying Facts

Plaintiff was hired as the city manager for the city of Saginaw. His written employment contract contained the following term regarding termination of the agreement:

**3.** *TERM OF AGREEMENT.* This Agreement is for an indefinite term as required by Section 25 of the City Charter. The Agreement may be terminated by either party at any time for any reason

subject to the requirements of Section 27 of the City Charter and as provided in Paragraphs 4 and 5 below.

Section 27 of the city charter provides:

**Removal**

Section 27. The manager may be removed by a majority vote of the members of the council as herein provided, except that no manager who has been in the service of the city for one (1) year or more prior to a regular city election shall be removed within the ninety (90) days subsequent to such election unless by a two-thirds vote of the members of the council. At least thirty (30) days before removal of the manager, the council shall adopt a resolution stating its intention to remove him and the reasons therefor, a copy of which shall be served forthwith on the manager, who may within ten (10) days demand a public hearing, in which event the final resolution removing the manager shall not be adopted until such public hearing has been held. Upon passage of a resolution stating the council's intention to remove the manager, the council may suspend him from duty, but his pay shall continue until his removal. The action of the council in removing the manager shall be final.

At a meeting on September 12, 2005, the city council voted to terminate plaintiff's employment by a vote of five to four. A written resolution, dated September 16, 2005, provided:

Whereas, Councilwoman Cottrell stated it was her opinion that the relationship between Council and the Manager had irreparably deteriorated, she moved to terminate the employment relationship with the City Manager effective immediately.

Adopted by the following vote:

Ayes: Councilpersons Cottrell, Coulouris, Federspiel, Coleman and Mayor Ham-5.

Nays: Councilpersons Haynes, O'Neal, Soza and Thurin-4.

Plaintiff was later notified that he was suspended as city manager, effective September 12, 2005, subject to his right to request a public hearing. Defendant Darnell Earley replaced plaintiff as interim city manager. Following a public hearing on November 3, 2005, the council voted to terminate plaintiff's employment.

Plaintiff filed an action against three city officials, Wilmer Jones Ham, the city's mayor, Carol Cottrell, a city council member and mayor pro tem, and Earley, who had been the deputy city manager until July 2005, when plaintiff decided to eliminate that position. Earley declined reassignment as the city's director of finance and agreed to the termination of his employment on August 31, 2005. Plaintiff's complaint against these individual defendants included a claim for tortious interference with a contract or advantageous business relationship or expectancy, alleging that Ham, Cottrell, and Earley conspired to terminate his employment in order to appoint Earley

as city manager, contrary to the terms of plaintiff's employment agreement, the city charter, and the Open Meetings Act (OMA), MCL 15.261 *et seq.*

**\*2** Plaintiff filed a separate action against the city, asserting claims for (1) breach of contract, (2) breach of fiduciary duty, (3) defamation, and (4) violation of the OMA. Plaintiff alleged that the city breached his employment agreement by failing to comply with § 27 of the city charter. Plaintiff also alleged that he was defamed by the city counsel's attorney and others at the November 3, 2005, public hearing. Plaintiff alleged that the city violated the OMA when Mayor Ham and Councilperson Cottrell conferred with other council members in private and took a vote to terminate plaintiff's employment and appoint Earley as the city manager.[1]

After the trial court consolidated the two cases, defendants jointly moved for summary disposition under MCR 2.116(C)(7), (8), and (10). The trial court dismissed the breach of contract claim under MCR 2.116(C)(10), finding that the evidence showed that the city substantially complied with the requirements of § 27 of the city charter and, therefore, plaintiff could not establish a breach of his employment contract. The court dismissed the defamation claim under MCR 2.116(C)(7) and (8), concluding (1) that any statements made by the city's attorney at the public hearing were not defamatory, and (2) that the challenged comments were made at a legislative hearing regarding government activity, entitling the city to immunity. The court dismissed the OMA claim under MCR 2.116(C)(10), because the evidence showed that the city council voted to terminate plaintiff's employment at duly noticed meetings, and the record established that only informal discussions were held among council members, which was insufficient to establish a violation of the OMA. Lastly, the court dismissed the tortious interference claim against the individual defendants under MCR 2.116(C)(10), because plaintiff failed to establish that defendants, in terminating plaintiff's employment, committed any per se wrongful act or committed a lawful act with malice.

## II. Standard of Review

This Court reviews a trial court's summary disposition decision de novo. *Spiek v. Dep't. of Transportation,* 456 Mich. 331, 337; 572 NW2d 201 (1998). The trial court granted summary disposition under MCR 2.116(C)(7), (8), and (10).

Summary disposition may be granted under MCR 2.116(C)(7) when a claim is barred by governmental immunity.

> A defendant who files a motion for summary disposition under MCR 2.116(C)(7) may (but is not required to) file supportive material such as affidavits, depositions, admissions, or other documentary evidence. MCR 2.116(G)(3); *Patterson v. Kleiman,* 447 Mich. 429, 432; 526 NW2d 879 (1994). If such documentation is submitted, the court must consider it. MCR

2.116(G)(5). If no such documentation is submitted, the court must review the plaintiff's complaint, accepting its well-pleaded allegations as true and construing them in a light most favorable to the plaintiff. [*Turner v. Mercy Hosps. & Health Services of Detroit,* 210 Mich.App 345, 348; 533 NW2d 365 (1995).]

**\*3** A motion under MCR 2.116(C)(8) tests the legal sufficiency of the plaintiff's complaint by the pleadings alone. *Gillie v. Genesee Co. Treasurer,* 277 Mich.App 333, 344; 745 NW2d 137 (2007). All well-pleaded factual allegations are taken as true, as well as any reasonable inferences or conclusions that can be drawn from the allegations. *Peters v. Dep't. of Corrections,* 215 Mich.App 485, 486; 546 NW2d 668 (1996). The motion should be granted only if a claim is so clearly unenforceable as a matter of law that no factual development could justify recovery. *Id.* at 487.

A motion under MCR 2.116(C)(10) tests the factual support for a claim. *Farm Bureau Ins Co v. Abalos,* 277 Mich.App 41, 44; 746 NW2d 886 (2008). The court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in a light most favorable to the nonmoving party. MCR 2.116(G)(5); *Abalos, supra* at 44. Summary disposition should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Babula v. Robertson,* 212 Mich.App 45, 48; 536 NW2d 834 (1995).

III. Tortious Interference with a Business Relationship or Contract

"The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Services, Inc .,* 268 Mich.App 83, 89-90; 706 NW2d 843 (2005). A claim for tortious interference with a business relationship or expectancy requires proof of

> (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted. [*PT Today, Inc. v. Comm.'r of the Office of Financial & Ins. Services,* 270 Mich.App 110, 148; 715 NW2d 398 (2006).]

Tortious interference with a business relationship or expectancy need not be predicated on an enforceable contract. *Health Call of Detroit, supra* at 90.

Regardless of the theory, plaintiff must prove improper interference by defendants:

> In order to establish tortious interference with a contract or business relationship, plaintiffs must establish that the interference was improper. *Patillo v. Equitable Life Assurance Society of the*

*United States,* 199 Mich.App 450, 457; 502 NW2d 696 (1992). In other words, the intentional act that defendants committed must lack justification and purposely interfere with plaintiffs' contractual rights or plaintiffs' business relationship or expectancy. *Winiemko v. Valenti,* 203 Mich.App 411, 418 n 3; 513 NW2d 181 (1994) (citations omitted); *Feldman v. Green,* 138 Mich.App 360, 369; 360 NW2d 881 (1984). The "improper" interference can be shown either by proving (1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiffs' contractual rights or business relationship. *Id.* [*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n.,* 257 Mich.App 365, 383; 670 NW2d 569 (2003), aff'd 472 Mich. 91 (2005).]

**\*4** Actions motivated by legitimate business reasons do not constitute improper motive or interference. *Badiee v. Brighton Area Schools,* 265 Mich.App 343, 366; 695 NW2d 521 (2005).

It appears that plaintiff's claim is based exclusively on defendants' alleged tortious interference with a contract. First, as discussed in part IV of this opinion, *infra,* plaintiff failed to show that his employment contract was breached.

Second, plaintiff failed to show that there was an unjustified interference with his contract. Plaintiff's employment relationship with the city was at will, subject only to the requirements of § 27 of the city charter, and plaintiff's removal as city manager was within the scope of defendant Cottrell's and defendant Ham's authority as city officials.

Under a claim of tortious interference with an at-will employment contract, where the defendant is an officer of the employer, a plaintiff has the particularly heavy burden of proving that the officer was acting outside the scope of her authority. *Feaheny v. Caldwell,* 175 Mich.App 291, 304-305; 437 NW2d 358 (1989). Further, such a claim requires "proof, with specificity, of affirmative acts by the defendants which corroborated the unlawful purpose of the interference." *Id.* at 305. [*Coleman-Nichols v. Tixon Corp.,* 203 Mich.App 645, 657; 513 NW2d 441 (1994).]

Such proof is required because the actions of officers, when serving as agents on behalf of a corporation, are privileged, as opposed to acting to further strictly personal motives. *Feaheny v.. Caldwell,* 175 Mich.App 291, 305; 437 NW2d 358 (1989), overruled in part on other grounds in *Health Call, supra.*

Plaintiff failed to show that defendants Cottrell or Ham were acting solely for their own benefit. Although plaintiff alleges that defendants Cottrell and Ham conspired to remove him as city manager, it was within the scope of their authority to do so. Even if plaintiff could offer admissible evidence that Cottrell was involved in a personal relationship with Earley, plaintiff failed to refute defendants' evidence that numerous other city employees had complained about plaintiff's management style, providing justification for the city council's decision. Further, the decision to terminate plaintiff's employment was made by the city council as a body whole, and plaintiff failed to show that the other council members who voted to terminate plaintiff's employment were wrongfully motivated or that either Cottrell or Ham falsified any evidence that was used to

convince their fellow council members to vote to terminate plaintiff's contract. Also, the fact that Cottrell wanted to replace plaintiff with Earley is not a per se wrongful or malicious act. The city needed to have an acting manager in place if plaintiff's employment was terminated or suspended.

Defendant Earley was not an elected city official, but plaintiff also failed to establish support for the tortious interference claim against him. Plaintiff relies on a letter that Earley wrote to city council members about plaintiff and the circumstances surrounding Earley's termination as deputy city manager. But nowhere in the letter did Earley state that plaintiff should be terminated from his position. Further, plaintiff has not shown that the letter constitutes a wrongful act, e.g., by containing false or defamatory statements, and nothing in the letter supports a finding that it was written with malice or without justification. Thus, the letter does not support plaintiff's tortious interference claim against Earley.

**\*5** For these reasons, the trial court did not err in dismissing plaintiff's tortious interference claim against the individual defendants.

## IV. Breach of Contract

Next, plaintiff argues that the trial court erred in dismissing his breach of contract claim against the city, because his employment contract required the city to comply with § 27 of the city charter and the city failed to comply with those requirements.

Plaintiff's employment contract specified that his employment could be terminated at any time, subject to the requirements of § 27 of the city charter. Under § 27, the city council was required to comply with the following procedures before plaintiff's employment could be terminated:

(1) adopt a resolution at least 30 days before the manager's removal, stating its intention to remove him and why,

(2) approve the resolution by a majority vote,

(3) serve a copy of the resolution on the manager,

(4) upon passage of the resolution to remove the manager, the council could suspend the manager with pay until his removal,

(5) within ten days of receiving the resolution, the manager must make a request for a public hearing, if one is desired, and

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(6) if a public hearing is requested by the manager, the final resolution removing the manager shall not be adopted until that hearing is held.

First, it is undisputed that the city council voted to terminate plaintiff's employment at a meeting on September 12, 2005, by a vote of five to four. That vote was reflected in a written resolution that was approved on September 16, 2005, which provided that "Councilwoman Cottrell stated it was her opinion that the relationship between Council and the Manager had irreparably deteriorated, she moved to terminate the employment relationship with the City Manager effective immediately." It is undisputed that plaintiff was served with a copy of the resolution. Thus, the evidence showed that the city council adopted and approved a resolution reflecting its intent to terminate plaintiff's employment and the reason why, that the resolution was served on plaintiff, and that the resolution was adopted at least 30 days before the public hearing was held in November 2005.

Plaintiff argues that the fourth requirement was not followed because the language of the September 12, 2005, resolution indicated that he was terminated immediately, rather than suspended pending his right to request a hearing. Although the resolution indicates that the council voted to "terminate" plaintiff's employment, it is undisputed that the city notified plaintiff that he had been suspended, effective September 12. Additionally, it is undisputed that plaintiff continued to be paid during the interim period before the public hearing, as required by § 27. Thus, despite the language of the September 12, 2005, resolution, the procedures required by § 27 were complied with. See *Gibson v. Group Ins. Co. of Michigan,* 142 Mich.App 271, 275-276; 369 NW2d 484 (1985) ("Michigan follows the substantial performance of contract rule").[2] Thus, there is no merit to plaintiff's argument that the city's actions amounted to an amendment of § 27's requirements. Rather, the city amended its actions to conform to § 27's requirements.

 **\*6** We also reject plaintiff's argument within this issue that his right to due process was violated. "A public employee does not have a property interest in continued employment when the position is held at the will of the employee's superiors and the employee has not been promised termination only for just cause." *Manning v. Hazel Park,* 202 Mich.App 685, 694; 509 NW2d 874 (1993). Public employment alone is not a property interest automatically entitling the employee to procedural due process. *Id.* A public employer need not comply with procedural due process protections unless the employee has a property right in his employment. *Id.;* see also *James v. City of Burton,* 221 Mich.App 130, 134; 560 NW2d 668 (1997). A property right can arise by contract or statute. *Manning, supra* at 694.

Plaintiff's employment was at the will of the city council. The council was permitted to terminate plaintiff's employment "at any time," subject only to the requirements of § 27 of the city charter. Contrary to what plaintiff argues, he was an at-will employee because there were no promises

that his employment would be terminated only for just cause. See *Rood v. Gen. Dynamics Corp.,* 444 Mich. 107, 116-117; 507 NW2d 591 (1993) ("To overcome the presumption of employment at will, a party must present sufficient proof ... of ... a provision forbidding discharge absent just cause"). Although the city council was obligated by § 27 to provide reasons for its decision, those reasons were not required to meet the just-cause standard. Thus, for purposes of procedural due process, the city was only obligated to follow the requirements of § 27, because that is all it agreed to do in its contract with plaintiff.

Plaintiff also argues that, under § 27, only he could request a public hearing and that he withdrew his request for a public hearing after the city council refused to allow a full adversarial hearing before the council. The record does not support plaintiff's claim.

It is undisputed that plaintiff requested a public hearing. After plaintiff's attorney raised issues concerning the nature and scope of the public hearing, however, the city's attorney responded in a letter dated October 21, 2005, requesting clarification whether plaintiff was withdrawing his request for a public hearing. Plaintiff has not submitted any evidence showing that he contacted the city after October 21, 2005, to indicate that he did not desire a public hearing. Absent a clear indication by plaintiff that he was withdrawing his request for a public hearing, the city properly proceeded with the scheduled hearing. Plaintiff has not demonstrated an error on this basis.

Plaintiff also argues that his right to due process, U.S. Const, Am XIV; Const 1963, art 1, § 17, was violated because of the lack of notice regarding specific reasons for his removal and because an adversarial hearing was not permitted. Plaintiff complains that he was not permitted to confront the city council about the reasons for his removal. As the trial court found, § 27 only required a "public hearing," and the hearing in this case satisfied the due process requirements of notice and an opportunity to be heard. *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 546; 105 S Ct 1487; 84 L.Ed.2d 494 (1985); *Tomiak v. Hamtramck School Dist.,* 426 Mich. 678, 700-701; 397 NW2d 770 (1986). The city council's written resolution provided the reason for its decision, and plaintiff had the opportunity to address that reason at the public hearing. Plaintiff cannot establish a violation of his due process rights on the basis of his own decision not to appear and participate in the hearing. See *Mollett v. City of Taylor,* 197 Mich.App 328, 345; 494 NW2d 832 (1992) (no violation of the plaintiff's due process rights when the plaintiff failed to avail himself of the available remedial procedures and the available procedures comported with due process). Plaintiff has not established that he was entitled to a full evidentiary hearing as a matter of due process.

**\*7** For these reasons, we affirm the trial court's dismissal of plaintiff's breach of contract claim.

V. Open Meetings Act Claim

Plaintiff argues that the city violated the OMA because Ham and Cottrell met with other council members before the September 12, 2005, meeting at which the council voted to terminate plaintiff's employment.

Plaintiff relies on MCL 15.263, which provides, in relevant part:

> (1) All meetings of a public body shall be open to the public and shall be held in a place available to the general public. All persons shall be permitted to attend any meeting except as otherwise provided in this act....

> (2) All decisions of a public body shall be made at a meeting open to the public.

> (3) All deliberations of a public body constituting a quorum of its members shall take place at a meeting open to the public except as provided in this section and sections 7 and 8.

A public body that purposely divides itself into subquorum groups to deliberate on public policy violates the OMA. *Booth Newspapers, Inc. v. Univ. of Michigan Bd. of Regents,* 192 Mich.App 574, 581; 481 NW2d 778 (1992), aff 'd in part and rev'd in part on other grounds 444 Mich. 211 (1993); *Booth Newspapers, Inc. v. Wyoming City Council,* 168 Mich.App 459, 471-473; 425 NW2d 695 (1988). However, in *St. Aubin v. Ishpeming City Council,* 197 Mich.App 100, 102-103; 494 NW2d 803 (1992), this Court held that the OMA was not violated when a mayor held individual discussions with each council member on whether the plaintiff should be retained as the city manager. Because the mayor was only polling the members to get their opinions about the plaintiff, rather than attempting to avoid the OMA, his informal canvassing of the members to determine the status of the votes on a particular issue did not violate MCL 15.263(2). *Id.*

Plaintiff relies principally on testimony from Kenneth Gamble about what Cottrell told him of her efforts to have plaintiff removed. However, Gamble only testified that Cottrell told him that she was attempting to line up votes to remove plaintiff. Gamble did not know how she was going about doing this. Gamble's testimony does not support plaintiff's claim that Cottrell organized subquorum meetings of council members to discuss plaintiff's removal.[3]

Plaintiff also argues that the OMA was violated when Ham, Cottrell, and Councilperson Coleman met with him just before the September 12, 2005, meeting and asked him to resign because they had five votes to terminate his employment. In *St. Aubin,* the OMA was violated when the entire city council privately met with the city manager, expressed their dissatisfaction with the manager, and asked her to resign or face termination at the subsequent council meeting. *Id.* at 101, 103. This Court held that the meeting violated the OMA because a decision was made at that time to terminate the manager's employment. *Id.* at 103.

This case is distinguishable from *St. Aubin,* because here there was no quorum present to constitute a meeting. Without a quorum, the council members were unable to make any decision concerning plaintiff's employment with the city. MCL 15.263(2), (3). They could only advise plaintiff that they believed they would have the necessary votes to support his termination. Accordingly, plaintiff failed to establish a violation of the OMA.

VI. Defamation

**\*8** Plaintiff also challenges the trial court's dismissal of his defamation claim. Plaintiff alleges that defamatory statements about him were made by the city council's attorney and others at the November 3, 2005, public hearing. The trial court determined that the alleged statements were not capable of a defamatory meaning, and further, that governmental immunity precluded liability for the statements.

In general, a governmental agency is immune from tort liability when engaged in the exercise or discharge of a governmental function. *Rowland v. Washtenaw Co. Rd. Comm.,* 477 Mich. 197, 202; 731 NW2d 41 (2007); MCL 691.1407(1).[4] A governmental function "is an activity that is either expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(f); *Mack v. Detroit,* 467 Mich. 186, 204; 649 NW2d 47 (2002). There is no dispute that the city was authorized by its city charter to hold the November 3, 2005, public hearing before terminating plaintiff's employment. Therefore, the city is immune from liability for any statements alleged to have been made by either the city council's attorney or other members of the public at the hearing.

Furthermore, apart from governmental immunity, the trial court did not err in determining that plaintiff failed to demonstrate the existence of an actual defamatory statement. To establish a claim for defamation, plaintiff was required to offer proof of

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *[Mitan v. Campbell,* 474 Mich. 21, 24; 706 NW2d 420 (2005).]

"A court may determine, as a matter of law, whether a statement is actually capable of defamatory meaning." *Kevorkian v. American Medical Ass'n.,* 237 Mich.App 1, 9; 602 NW2d 233 (1999). "Where no such meaning is possible, summary disposition is appropriate." *Id.*

A superintendent of a school district is a public figure. *Kefgen v. Davidson,* 241 Mich.App 611, 623-624; 617 NW2d 351 (2000). A city manager should likewise be considered a public

figure.[5] "A public figure claiming defamation must prove by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth." *Id.* at 624; see also MCL 600.2911(6). Ill will, spite, and hatred, standing alone, do not prove actual malice. *Kefgen, supra* at 624.

To the extent that plaintiff's claim relies on the city council's attorney's statements at the public hearing that she had not heard from plaintiff and did not know whether plaintiff would be attending the hearing, the trial court properly determined that the statements did not support a claim for defamation. The submitted evidence established that the city council's attorney sent a letter to plaintiff's attorney requesting clarification whether plaintiff was withdrawing his request for the public hearing. There is no indication that plaintiff ever responded to this request. Thus, plaintiff failed to demonstrate that there was a genuine issue of material fact whether the city council's statements at the public hearing were inaccurate. To the extent that plaintiff argues that defamatory statements about him were made by other unidentified persons at the public hearing, plaintiff's failure to offer any evidence of the actual content of these statements is fatal to his claim. See *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.,* 197 Mich.App 48, 52-54; 495 NW2d 392 (1992) (a plaintiff who claims defamation must allege and identify with specificity the statements he believes form the basis for his claim). The trial court did not err in dismissing plaintiff's defamation claim.

**\*9** Affirmed.

**All Citations**

Not Reported in N.W.2d, 2008 WL 2437259

Footnotes

1    Plaintiff does not challenge the dismissal of his claim for breach of fiduciary duty.

2    "A contract is substantially performed when all the essentials necessary to the full accomplishment of the purposes for which the thing contracted has been performed with such approximation that a party obtains substantially what is called for by the contract." *Gibson, supra* at 275.

3    In addition, the testimony of Cottrell and Ham does not support plaintiff's OMA claim. Cottrell testified that she contacted Ham and councilpersons Coulouris and Coleman by telephone before the September 12, 2005, meeting to inform them of her intent to make a motion to terminate plaintiff's employment. She denied asking them to support her motion. Ham testified that councilperson Thurin came to her home to discuss plaintiff's employment, but she denied contacting any council members.

4    Although there are exceptions to governmental immunity, plaintiff does not address the applicability of any exception and he did not plead any facts demonstrating that his claim arose out of a nongovernmental or proprietary function. *Mack v. Detroit,* 467 Mich. 186, 204; 649 NW2d 47 (2002).

**Collins v. Ham, Not Reported in N.W.2d (2008)**

2008 WL 2437259

5      Plaintiff does not dispute that he was at least a limited-purpose public figure at the time the alleged defamatory statements were made.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Franke v. Norfolk Southern Railway Co., Not Reported in Fed. Rptr. (2023)

2023 WL 3413919

2023 WL 3413919
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Jeff FRANKE, et al., Plaintiffs-Appellants,
v.
NORFOLK SOUTHERN RAILWAY CO., et al., Defendants-Appellees.

No. 21-3848
|
FILED May 12, 2023

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**Attorneys and Law Firms**

E.J. Leizerman, E.J. Leizerman & Associates, Sylvania, OH, for Plaintiffs-Appellants.

John B. Lewis, Dustin M. Dow, Lauren Theresa Stuy, Bakerhostetler, Cleveland, OH, for Defendant-Appellee Norfolk Southern Railway Company.

Dimitre James Petroff, Joshua McInerney, Wentz, McInerney, Peifer & Petroff, Columbus, OH, for Defendant-Appellee Brotherhood of Locomotive Engineers and Trainmen.

George Henry Faulkner, Jonah Daniel Grabelsky, Joseph Daniel Mando, Faulkner, Hoffman & Phillips, Cleveland, OH, for Defendants-Appellees International Brotherhood of Teamsters, Norfolk Southern Northern Lines, Wheeling and Lake Erie General Committee of Adjustment.

John T. McLandrich, Frank H. Scialdone, Mazanec, Raskin & Ryder, Cleveland, OH, for Defendant-Appellee David Ray.

Before: MOORE, CLAY, and NALBANDIAN, Circuit Judges.

OPINION

CLAY, Circuit Judge.

**\*1** Plaintiffs Jeff Franke, Steven Frye, and Greg Fish appeal the district court's order granting Defendants' motion to dismiss, which addressed whether removal to federal court was proper,

whether Plaintiffs' fraud claims were preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, and whether Plaintiffs properly pleaded fraud. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Factual Background

Franke, Frye, and Fish worked as locomotive engineers for Norfolk Southern Railway Company ("Norfolk Southern"). (Compl., R. 1-1, Page ID #14, 20, 26). Plaintiffs were each disciplined and discharged by Norfolk Southern. (*Id.* at Page ID #14, 20, 27). Each Plaintiff was represented by the International Brotherhood of Teamsters ("IBT"), IBT's subdivision the Brotherhood of Locomotive Engineers and Trainmen ("BLET"), and BLET's subdivision, the Norfolk and Southern Northern Lines Wheeling and Lake Erie General Committee of Adjustment ("GCA") (collectively, "Union Defendants" or "Union") under 45 U.S.C. §§ 151 *et seq.*, the RLA, and a Collective Bargaining Agreement ("CBA"). (*Id.*, Page ID #12–14, 20–21, 26–27).

Following the internal company hearing that resulted in Plaintiffs' termination, the Union appealed Norfolk Southern's determination to a Public Law Board (the "Board") for arbitration pursuant to the RLA and in accordance with the CBA. (*Id.* at Page ID #14, 20–21, 27). As agreed upon by Norfolk Southern and the Union, Defendant David Ray served as the sole neutral arbitrator in each Board arbitration. (*Id.* at Page ID #15, 21, 27). The Board upheld Plaintiffs' terminations. (Board Arbitration Awards; R. 28-3, R. 28-4, R. 28-5; Page ID #440–42).

### B. Procedural History

Plaintiffs sued Norfolk Southern, the Union, and Ray in the Court of Common Pleas for Lucas County, Ohio on August 20, 2020. (Compl., R. 1-1, Page ID # 9–10). In their complaint, Plaintiffs allege that they were deprived of a fair and neutral arbitration process, because Ray, who presided over each matter, was a former employee of Norfolk Southern, and thus, had a bias toward Defendant Norfolk Southern, as well as a conflict-of-interest. (*Id.* at Page ID ## 15–16, 21–22, 28). Plaintiffs further allege that Defendants colluded in a scheme where Board arbitrations conducted before Ray would not be decided on their merits, but rather based on the Union's political preferences. (*Id.* at Page ID # 17, 23, 29–30).

Under the terms of the RLA and CBA, either Norfolk Southern or the Union could reject any arbitrator. (*Id.* at Page ID #15, 21, 28). Plaintiffs assert that Norfolk Southern and the Union

knew of Ray's alleged bias and conflict-of-interest and "acted in bad faith, collusively, with corrupt and fraudulent intent" when selecting him to arbitrate the grievances. (*Id.* at Page ID #16, 22, 28–29). According to Plaintiffs, this is evidenced by Defendants' knowledge of: (1) Ray's prior employment at Norfolk Southern; and (2) Ray's potentially "undisclosed conflict-of-interest with the existence of pension and retirement benefits and stock holdings with [ ] Norfolk Southern." (*Id.*). As noted above, Plaintiffs contend Defendants "concocted a scheme" where Ray would give favorable appeals for grievances that came from local divisions whose local chairman would vote for Dewayne Dehart to be General Chairman of Adjustment for the Union, and would deny appeals from divisions whose local chairmen would not. (*Id.* at Page ID # 17, 23, 29–30). Plaintiffs assert that the Union benefited by gaining political favor through the favorable resolution of certain arbitrations, Ray benefited because he would be hired more frequently, and thus have a more lucrative arbitration practice, and Norfolk Southern benefited because it would win a disproportionate number of arbitrations conducted in front of Ray. (*Id.*).

**\*2** Plaintiffs assert that Union Defendants owed them a duty of fair representation, which they failed to fulfill when they did not represent Plaintiffs fairly, impartially, and in good faith. (*Id.* at Page ID #15, 21, 27–28). Plaintiffs further allege that Ray owed Plaintiffs "a duty to comply with the federal statutes[,] regulations, [and] the National Mediation Board policy requiring him to have no bias between the parties and to have no financial interest in any party while acting as a neutral arbitrator." (*Id.*). Plaintiffs contend that all Defendants had a duty to "allow [Plaintiffs'] appeals to be decided on the merits with an unbiased neutral arbitrator that had no conflicts-of-interest and without engaging in an appeal fixing scheme." (*Id.* at Page ID #18, 24, 30–31). They also aver that "Defendants had a duty to inform [Plaintiffs] that [the] arbitration[s] had been compromised because of David Ray's bias and conflict-of-interest, and the appearance of an appeals fixing scheme Defendants were engaged in." (*Id.* at Page ID #18, 24, 30–31). Based on this purported conduct, each Plaintiff alleged fraud claims against Defendants. (*See generally id.*).

We pause here to note the unique nature of the claims before us. On the one hand, Plaintiffs argue that their complaint alleges only state fraud claims under Ohio law. (*Id.* at Page ID #13, 20, 26). On the other hand, their complaint is riddled with references to federal-statutory frameworks and federal obligations, and they seek federal relief by stating Plaintiffs' "entitle[ment] to judicial review of the Public Law Board decisions upholding [their] termination[s]," by asking that a court award "damages for fraud under state and federal statutes and common law," and by seeking "reinstatement to [their] prior employment position[s] with all rights, benefits and status as [they] maintained" previously "as well as past wage loss," and "expungement and removal of any and all references to the adverse actions, charges and discipline which formed the basis of the arbitration related to" Plaintiffs. (*Id.* at Page ID #18–19, 24–25, 31; *see also* Page ID #12, 15–18, 21–24, 27–31). Defendants removed the case on the basis that Plaintiffs' action "arises under the laws of the United States and invokes the federal question jurisdiction." (Notice of Removal, R. 1, Page ID #2). The removal notice asserted that Plaintiffs' allegations of common law fraud in connection with

the RLA arbitral decisions arise under federal law. (*Id.*, Page ID #2–5). Defendants also asserted that Plaintiffs' claims are preempted by the RLA. (*Id.*, Page ID #4).

On October 16, 2020, the Parties submitted a joint proposed preliminary case schedule, which included a proposed briefing schedule for a motion to remand. (Joint Proposed Case Schedule, R. 16, Page ID #134). Three days later, having reviewed the preliminary case schedule, the district court ordered the parties to "exchange letters (two-page limit) with each other and confer regarding the merits of such a motion." (Case Schedule Order, R. 17, Page ID #137). The district court instructed counsel to forward the letters to the district court, and then convened a phone conference with counsel to discuss potential briefing of the motion. (*Id.*).

The district court, following the telephone conference and review of the letters, denied Plaintiffs' proposed motion to remand, holding that although Plaintiffs assert state law fraud claims, "Defendants correctly note that the Railway Labor Act ("RLA") preempts[1] Plaintiffs' attempts to limit the scope of their claims and those claims must necessarily arise under federal law." (Remand Order, R. 19, Page ID #159).

On December 2, 2020, the case was transferred to Judge James R. Knepp. After the transfer, Judge Knepp approved the new joint proposed scheduling order. Defendants filed their motions to dismiss the original complaint based on Federal Rule of Civil Procedure 12(b)(6) on January 21, 2021, in accordance with that schedule. (Mots. to Dismiss, R. 22, 23). On February 11, 2021, Plaintiffs attempted to file an amended complaint. (Am. Compl., R. 24). Defendants moved to strike the amended complaint as: (1) untimely and filed without leave or consent; (2) futile as to pending motions to dismiss, and (3) an ineffective attempt to divest the court of jurisdiction. (*See* Mots. to Strike, R. 25–27). On August 24, 2021, the district court granted Defendants' motions to dismiss and motions to strike. *See Franke v. Norfolk S. Ry. Co.*, No. 3:20 CV 2152, 2021 WL 3737913, at *1 (N.D. Ohio Aug. 24, 2021). Because the district court correctly struck Plaintiffs' amended complaint, the facts summarized in this section derive from the original complaint. The two complaints differ only slightly in ways that are not material to this Court's decision. (*Compare* Compl., R. 1-1, *with* Am. Compl., R. 24).

**\*3** Plaintiffs appeal the district court's order: (1) denying Plaintiffs' request to file a formal motion to remand; (2) granting Defendants' motion to strike; (3) denying Plaintiffs' request to remand; and (4) granting Defendants' motion to dismiss. (Pls.' Br., ECF No. 41, 30.) This Court affirms the district court's judgment and addresses each argument in turn.

## II. DISCUSSION

## A. Motion to Remand

### 1. Standard of Review

This Court has not addressed the standard of review for a denial of formal briefing on a motion to remand. But the Court has applied the abuse of discretion standard when evaluating a district court's denial of a counsel's request for supplemental briefing. *See AES-Apex Emp. Servs., Inc. v. Rotondo,* 924 F.3d 857, 866–67 (6th Cir. 2019); *Jomaa v. United States,* 940 F.3d 291, 299 (6th Cir. 2019). Moreover, Plaintiffs and Defendants argued their positions using abuse of discretion standards in their briefs. (*See* Pls.' Br., ECF No. 41, 22; Defs.' Br., ECF No. 49, 25–27.) Accordingly, the Court reviews the district court's denial of Plaintiffs' request to file a formal motion to remand for abuse of discretion. When this Court reviews for abuse of discretion, it will reverse only when it "is firmly convinced that a mistake has been made." *Bush v. Rauch,* 38 F.3d 842, 848 (6th Cir. 1994).

### 2. Analysis

Plaintiffs argue that the district court abused its discretion by not allowing Plaintiffs to fully brief a motion to remand under 28 U.S.C. § 1447(c) after the parties submitted their two-page letters. (Pls.' Br., ECF No. 41, 22–24.) We disagree.

This Court follows the general principle that "a district court has broad discretion to manage its docket." *Am. C.L. Union of Ky. v. McCreary County,* 607 F.3d 439, 451 (6th Cir. 2010) (citation omitted) ("[T]he [district] court had ample discretion to strike Defendants' late renewed motion for summary judgment."); *see also AES-Apex Emp. Servs., Inc.,* 924 F.3d at 867 (finding no abuse of discretion in the district court's denial of defendant's motion for supplemental summary judgment briefing); *Jomaa,* 940 F.3d at 299 (finding no abuse of discretion in district court's denial of a motion to file supplemental briefing, based on the district court's finding that additional briefing would be unnecessary to resolve the pertinent issue).

In this case, Plaintiffs were within their rights to challenge the district court's subject matter jurisdiction. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). The district court gave Plaintiffs the opportunity to be heard on the matter; and requested for counsel to confer, and exchange letters outlining their potential arguments regarding jurisdiction. (Case Schedule Order, ECF No. 17, Page ID # 137). Following a telephone conference and review of the letters, the district court denied Plaintiffs' proposed motion to remand, holding that Plaintiffs' state law claims arise under federal law and were preempted by the RLA. (Remand Order, R. 19, Page ID #159).

Plaintiffs argue that counsel had no "warning" that the letters would be used to decide the issue of remand, and the letters were mere outlines of the parties' positions, not a thorough briefing of Plaintiffs' arguments. (Pls.' Br., ECF No. 41, 22–23). However, Plaintiffs do not present an argument that counsel was deprived of *any* opportunity to be heard on the matter, or that the letter misrepresented their argument. Given the broad discretion district courts possess in managing their dockets and the Plaintiffs' opportunity to be heard on the matter, the district court did not abuse its discretion when it held that additional briefing was unnecessary, and that the letters and conference were sufficient to decide the matter. *See Am. C.L. Union of Ky.*, 607 F.3d at 451. Moreover, the district court extensively addressed Plaintiffs' remand arguments in its order granting Defendants' motion to dismiss, noting that "[i]n response to Defendants' Motions to Dismiss, Plaintiffs expend significant effort arguing for a remand to state court," and affirmed the court's previous decision to deny Plaintiffs' request to remand. *Franke*, 2021 WL 3737913, at *3.

**\*4** In sum, Plaintiffs were twice given the opportunity to present their arguments regarding subject matter jurisdiction, and the court twice arrived at the same conclusion. (*See* Remand Order, ECF No. 19); *Franke*, 2021 WL 3737913, at *3. Accordingly, the district court's decision to deny additional formal briefing of the motion to remand, after parties had been heard, was not an abuse of discretion. The Court affirms the ruling of the district court.

## B. Defendants' Motions to Strike Plaintiffs' Amended Complaint

### 1. Standard of Review

When a district court denies a motion to amend a complaint because the proposed amendment would be futile (*i.e.*, that it would not withstand a motion to dismiss), the Court applies a *de novo* standard of review. *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 407 (6th Cir. 2016) (citing *Seaton v. TripAdvisor LLC,* 728 F.3d 592, 596 (6th Cir. 2013)).

### 2. Analysis

Plaintiffs, having focused their appellate argument almost exclusively on arguing the RLA does not apply, have not substantively addressed the district court's decision to strike their amended complaint. The entirety of Plaintiffs' argument in their opening brief as to the motion to strike the amended complaint reads:

> Plaintiffs believe that their case should be remanded to state court. Should the Court agree, then the motion to strike is moot, because the district court had no jurisdiction. If the Court disagrees, the district court is likely correct that attempts to amend the complaint would be futile.

(Pls.' Br., ECF No. 41, 28). Plaintiffs do not attempt to argue that the district court was wrong in finding that their amended complaint was futile, and instead, assert that if their state law claims

are preempted, the district court was correct. To preserve an issue for appellate review, a party must develop its argument in its appellate briefing; Plaintiffs do not meet this requirement on this issue. *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 610–11 (6th Cir. 2016); *see also Bolden v. City of Euclid*, 595 F. App'x 464, 468 (6th Cir. 2014) (finding that in addressing an issue on appeal, "a party is required to do more than advert to an issue in a perfunctory manner"). Having failed to argue the merits of the district court's rulings on the motion to strike in their opening brief, Plaintiffs forfeited these issues on appeal.

Moreover, even if this Court found that the issue was not forfeited, the district court did not err in striking Plaintiffs' amended complaint. When Plaintiffs filed their amended complaint, they were already on notice that their complaint was subject to federal pleading standards. (*See* Remand Order, R. 19; Am. Compl., ECF No. 24). Additionally, Plaintiffs' amended complaint was offered for filing subsequent to Defendants' motions to dismiss. (*See* Mot. to Dismiss, R. 22, 23). Thus, Plaintiffs were in possession of Defendants' arguments relating to the deficiencies of the claims before filing their amended complaint. Even with pertinent information at hand, Plaintiffs' amended complaint did not address RLA preemption and did not address the fundamental deficiencies in their fraud claims identified in Defendants' Motions. (*See* Am. Compl., R. 24).

Federal Rule of Civil Procedure 15 "instructs courts to " 'freely give leave' to amend." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (quoting Fed. R. Civ. P. 15). However, "Plaintiffs are not entitled to a directive from the district court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." *Graham v. Fearon*, 721 F. App'x 429, 439 (6th Cir. 2018) (citation and quotation marks omitted) (finding no abuse of discretion when the court denied the plaintiffs' motion to amend "because Plaintiffs' request was perfunctory and did not point to any additional factual allegations that would cure the complaint"). In this case, because Plaintiffs' amended complaint was nearly identical to their original complaint and did not point to any additional factual allegations that would cure the original complaint's deficiencies, the district court did not abuse its discretion in granting Defendants' motions to strike. The Court affirms the district court's ruling striking Plaintiffs' amended complaint.

## C. Subject Matter Jurisdiction

### 1. Standard of Review

**\*5** The Court reviews a denial of a motion to remand *de novo. Ahearn v. Charter Twp. of Bloomfield*, 100 F.3d 451, 453 (6th Cir. 1996). To determine whether the action was properly removed, we examine the complaint as it existed at the time of removal. *Id.*; *see also Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004).

## 2. Analysis

Because Plaintiffs' complaint expressly pleads federal claims and thus federal question jurisdiction exists, this Court affirms the district court's ruling denying Plaintiffs' request to remand. "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction[ ] may be removed by the defendant" to federal court. 28 U.S.C. § 1441(a). "Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). Importantly, a case "may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.* at 393.

Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Both to determine (1) whether a plaintiff's case arises under federal law and (2) whether removal is proper on that basis, federal courts look at the face of the plaintiff's "well-pleaded complaint." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004) (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–10, 10 n.9 (1983)); *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 757–58 (6th Cir. 2000) ("In determining removal jurisdiction under § 1441, as in determining original 'arising under' jurisdiction, federal courts apply the 'well-pleaded complaint' rule." (quoting *Caterpillar*, 482 U.S. at 392)). The well-pleaded complaint rule "directs us to look only to 'what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose.' " *Hogan v. Jacobson*, 823 F.3d 872, 878 (6th Cir. 2016) (quoting *Aetna*, 542 U.S. at 207).

Alongside their state fraud claims, two plaintiffs seek "judicial review of the Public Law Board[2] decisions upholding [their] termination[s]," and all plaintiffs seek "reinstatement" of their employment "as well as past wage loss," and "expungement and removal of any and all references to the adverse actions, charges and discipline which formed the basis of the arbitration related to" Plaintiffs. (*Id.* at Page ID #18–19, 24–25, 31). The express requests for judicial review alongside the demanded relief of reinstatement of their employment and record expungement (which appears to require the setting aside of their arbitration awards) fairly demonstrate an RLA fraud claim. The RLA permits a party to seek review of (i.e., essentially to appeal) an arbitration award from a division of the Adjustment Board by filing "a petition for review of the division's order" in the appropriate federal district court. 45 U.S.C. § 153 First (q). The federal district court's "[j]udicial review of the arbitral decision is limited." *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 304 (1989); 45 U.S.C. § 153 First (q). "On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division," (1) "for failure of the division to comply with the requirements of this chapter," (2) "for failure of the order to conform, or confine itself, to matters

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 73

Franke v. Norfolk Southern Railway Co., Not Reported in Fed. Rptr. (2023)
2023 WL 3413919

within the scope of the division's jurisdiction," or (3) "for fraud or corruption by a member of the division making the order." 45 U.S.C. § 153 First (q). Thus, the request for judicial review and the setting aside of Plaintiffs' arbitration award established that the case properly belongs in federal court. Further, all three plaintiffs "seek[ ] damages for fraud under state and *federal* statutes and common law," (Compl., R. 1-1, Page ID # 18, 24, 31 (emphasis added)). Therefore federal question subject matter jurisdiction exists, and this Court affirms the district court's ruling denying Plaintiffs' request to remand.

## D. Preemption

**\*6** Both before this court and the district court, the parties argued for and against removal by invoking (1) the merits-based defense of ordinary preemption and/or (2) the jurisdictional doctrine of complete preemption. "Ordinary preemption, [which] flows from the Supremacy Clause of the United States Constitution[,] ... provides only a defense that can be invoked in state or federal court." *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 852 (6th Cir. 2023). Ordinary preemption is distinct from the "jurisdictional" and " 'misleadingly named doctrine' of complete preemption." *Id.* (quoting *Hogan*, 823 F.3d at 879); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608 (6th Cir. 2004) ("[Ordinary] [p]reemption ... does not ... concern the subject-matter jurisdiction of a court to hear a claim."). Ordinary preemption "concerns the merits of the claim itself—namely, whether it is viable and which sovereign's law will govern its resolution. That is why litigants typically invoke preemption as a defense to state-law claims asserted in state or federal court, not as a jurisdictional defect." *Trollinger*, 370 F.3d at 608. In this case, preemption is only posed as an argument to establish federal jurisdiction and not as a merits-based defense. Accordingly, we decline to decide whether the RLA completely preempts Plaintiffs' state law fraud claims because, as explained above, this action nonetheless arises under federal law.

## E. Motion to Dismiss

### 1. Standard of Review

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6). *Majestic Bldg. Maint., Inc. v. Huntington Bancshares Inc.*, 864 F.3d 455, 458 (6th Cir. 2017). A motion to dismiss is properly granted if the plaintiff "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss, the plaintiff must allege facts that are sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 74

Franke v. Norfolk Southern Railway Co., Not Reported in Fed. Rptr. (2023)
2023 WL 3413919

556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The reviewing court must accept the factual allegations in the complaint "as true and construe the complaint in the light most favorable to the [p]laintiff[ ]." *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005). This Court may affirm the district court's dismissal of the plaintiff's claims "on any ground supported by the record," including grounds not relied upon by the district court. *Insight Commc'ns*, 804 F.3d at 794; *In re Comshare Inc.*, 183 F.3d at 547–48.

### 2. Analysis

Plaintiffs focused their appellate argument on jurisdiction and preemption, and as a consequence, neglected to address the district court's holding on Defendants' motion to dismiss. *See supra* Part II(B)(2). The entirety of Plaintiffs' opening brief with respect to Defendants' motion to dismiss, reads:

> Plaintiffs believe that their suit should be remanded to state court, making the issue of the district court's dismissal moot. The motions to dismiss would be determined by the same analysis of whether Plaintiffs' claims require the interpretation of the CBA.

(Pls.' Br., ECF No. 41, 27–28). Plaintiffs have not preserved this issue for appeal. Having failed to argue the merits of the district court's rulings on the motion to dismiss regarding whether they have sufficiently pleaded fraud claims upon which relief can be granted, Plaintiffs have forfeited these issues on appeal. *See Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) ("[T]ime, time, and time again, we have reminded litigants that we will treat an argument as forfeited when it was not raised in the opening brief." (quoting *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018))). Given the extent of this forfeiture, we need not address the merits of the district court's decision to grant Defendants' motion to dismiss under Rule 12(b)(6) and dismissal of Plaintiffs' claims and affirm.

**\*7** Accordingly, this Court affirms the district court's dismissal.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment.

### All Citations

Not Reported in Fed. Rptr., 2023 WL 3413919

## Footnotes

1    The district court considered Defendants' argument that federal jurisdiction existed because complete preemption applied, which Defendants supported with citation to cases applying ordinary preemption. (Defs.' Letter, R. 19-2, Page ID #162–63 (citing *Wellons v. Nw. Airlines, Inc.*, 25 F. App'x 214, 218 (6th Cir. 2001))).

2    A Public Law Board, which is a type of Special Adjustment Board, is an arbitration tribunal. *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 899 (6th Cir. 2012).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 76

2025 WL 1524456
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan, Southern Division.

Kalina KRSTOVSKA, Plaintiff,
v.
STAUNTON FINANCIAL, INC., Defendant.

Case No. 24-12903
|
Signed May 27, 2025

**Attorneys and Law Firms**

Hannah Rachael Fielstra, Ernst Charara & Lovell, Detroit, MI, for Plaintiff.

Jack Kirkendall Mahon, James F. Hermon, Dykema Gossett PLLC, Detroit, MI, for Defendant.

**OPINION AND ORDER GRANTING DEFENDANT STAUNTON FINANCIAL, INC.'S PARTIAL MOTION TO DISMISS [#4]**

GERSHWIN A. DRAIN, United States District Judge

## I. INTRODUCTION
 **\*1**  Presently before the Court is Defendant Staunton Financial, Inc.'s Partial Motion to Dismiss. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant seeks dismissal of Counts I, III, and IV of Plaintiff's complaint. This matter is fully briefed. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of this matter. Accordingly, the Court will resolve this motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, Defendant's Partial Motion to Dismiss is GRANTED.

## II. BACKGROUND
This is an employment discrimination case. Plaintiff, a Macedonian woman who speaks English with an accent, was allegedly employed by Defendant in a managerial role for nearly a decade. She claims she was suddenly demoted, experienced a pay cut, and was replaced by two younger, white men. Soon thereafter, Plaintiff contends, she was terminated without warning. Plaintiff maintains that she met all performance goals and faced no disciplinary action during her tenure with Defendant.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 5, 2023, alleging that Defendant discriminated against her based on her national origin. The narrative of Plaintiff's EEOC charge states:

> On July 15, 2013, I began working for [Defendant]. I last held the position of Production Worker. During my employment I was demoted from Operations Team lead to Production Worker. On October 6, 2023, I was terminated. I believe that I have been discriminated against due to my national origin Macedonian, in violation of Title VII of the Civil Rights Act of 1964, as amended.

ECF No. 4-2, PageID.45. The EEOC issued a right to sue letter on August 30, 2024, authorizing Plaintiff to file a lawsuit against Defendant within 90 days of receipt of the notice. The EEOC made no determination regarding the merits of Plaintiff's claim.

Plaintiff initiated the present lawsuit against Defendant on November 1, 2024. Her complaint alleges (1) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII") (Count I); (2) disparate treatment in violation of Title VII (Count II); (3) hostile work environment in violation of Title VII (Count III); (4) retaliation in violation of Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* ("ELCRA"), (Count IV); (5) disparate treatment in violation of ELCRA (Count V); and (6) hostile work environment in violation of ELCRA (Count VI). Defendant filed the Partial Motion to Dismiss that is presently before the Court on December 16, 2024, seeking dismissal of Counts I, III, and IV. Defendant claims dismissal of Counts I and III is appropriate because Plaintiff failed to exhaust her administrative remedies as to these claims prior to filing suit. Defendant also argues that Counts I and IV should be dismissed because Plaintiff's complaint fails to plead essential elements of these claims. Plaintiff filed a Response on January 13, 2025, and Defendant filed a Reply on January 23, 2025.

### III. LEGAL STANDARD

**\*2** "Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted." *Ashh, Inc. v. All About It, LLC,* 475 F. Supp. 3d 676, 678 (E.D. Mich. 2020). When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (citation omitted). Dismissal is appropriate if the plaintiff's complaint fails to offer sufficient factual allegations that make the alleged claim plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Assessment of the facial sufficiency of the complaint must ordinarily be undertaken without resort to matters outside the pleadings." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citation omitted). A court may, however, "consider exhibits attached to the complaint, public records, items appearing in the record

of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Id.*

## IV. <u>DISCUSSION</u>

**A. Plaintiff's Title VII Retaliation and Hostile Work Environment Claims (Counts I and III)**

Defendant claims dismissal of Counts I and III is appropriate because Plaintiff failed to exhaust her administrative remedies as to these claims prior to filing suit. "To pursue a Title VII action, a plaintiff must file a timely charge of employment discrimination with the EEOC or the appropriate state agency, obtain a right-to-sue letter from the EEOC, and file a timely complaint in federal court." *Townsend v. Rockwell Automation, Inc.*, 852 F. App'x 1011, 1013 (6th Cir. 2021) (citing 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018)). "Only claims that are included in the charge or are 'reasonably related to or grow out of the factual allegations in the EEOC charge' may be heard in federal court." *Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229, 234 (6th Cir. 2017) (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361-62 (6th Cir. 2010)). This exhaustion requirement "serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *Younis*, 610 F.3d at 361 (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)).

First, Plaintiff concedes that her EEOC charge "does not include a retaliation claim." ECF No. 8, PageID.82. Accordingly, Plaintiff's Title VII retaliation claim is dismissed for failure to exhaust administrative remedies.

Second, it is undisputed that Plaintiff's EEOC charge does not expressly include a hostile work environment claim. As such, this claim may proceed only if it is reasonably related to or grows out of the factual allegations contained therein. Under Title VII, a workplace is hostile if it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (cleaned up). The Sixth Circuit has held that "the inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion." *Younis*, 610 F.3d at 362. Here, Plaintiff's EEOC charge does not allege facts suggesting the type of ongoing, pervasive conduct necessary to give rise to a hostile work environment claim. It instead alleges only two discrete incidents—her demotion and subsequent termination—which standing alone are insufficient to establish a hostile work environment claim.

**\*3** Plaintiff contends that her response to Defendant's position statement, which she submitted to the EEOC during its investigation, alleges facts that give rise to a hostile work environment claim. Consideration of this submission, however, is improper. The expected scope of the EEOC's investigation is determined by the allegations in the charge itself, rather than those contained in responsive documents. *See Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229, 237 (6th Cir. 2017); *Tobias v. Terex, USA Inc.*, No. 20-13333, 2022 WL 3686423, at \*9 (E.D. Mich. Aug. 25, 2022). This is because Sixth Circuit precedent "consistently refers to the *charge of discrimination* as the guiding document." *Tobias*, 2022 WL 3686423, at \*9 (emphasis in original) (citing *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 854 (6th Cir. 2000); *Perry v. Am. Red Cross Blood Servs.*, 651 F. App'x 317, 324 (6th Cir. 2016); *Younis*, 610 F.3d at 361; *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 308-81 (6th Cir. 2002)). Furthermore, consideration of this submission would undermine a key purpose of the exhaustion requirement: providing the employer with notice of the allegations against it and a meaningful opportunity to resolve the dispute through conciliation. The EEOC does not share a charging party's response to the employer's position statement with the employer.[1] While Plaintiff served a copy of her response to Defendant, she did so after Defendant had already submitted its position statement to the EEOC, thereby depriving it of meaningful notice of her allegations and an opportunity to respond. For these reasons, consideration of Plaintiff's response to Defendant's position statement is improper for purposes of determining the expected scope of the EEOC's investigation. As such, the Court concludes that Plaintiff's EEOC charge does not allege a hostile work environment claim.

In conclusion, the Court finds that Plaintiff failed to exhaust her administrative remedies as to her Title VII retaliation and hostile work environment claims. Therefore, Counts I and III are dismissed.

**B. Plaintiff's Retaliation Claims (Counts I and IV)**

Next, Defendant claims dismissal of Plaintiff's retaliation claims, brought pursuant to Title VII and ELCRA, is appropriate because her complaint does not plead essential elements of these claims. In light of the Court's finding that dismissal of Plaintiff's Title VII retaliation claim is appropriate due to failure to exhaust administrative remedies, the Court addresses this argument only as to Plaintiff's ELCRA retaliation claim.

First, the Court acknowledges that Plaintiff's response to Defendant's motion to dismiss does not address Defendant's position that dismissal of this claim is appropriate. "It is well understood ... that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Rouse v. Caruso*, No. 06-cv-10961, 2011 WL 918327, at \*18 (E.D. Mich. Feb. 18, 2011) (citation omitted).

Even if Plaintiff had addressed Defendant's argument, her complaint fails to allege facts that make her ELCRA retaliation claim plausible on its face. ELCRA retaliation claims are analyzed under the same standard as Title VII retaliation claims. *Johnson v. Farmington Public Schools*, 728 F. Supp. 3d 723, 750-51 (E.D. Mich. 2024). The plaintiff has the initial burden of establishing that "(1) [she] engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 488-89 (6th Cir. 2020) (cleaned up).

In her complaint, Plaintiff alleges that the "act of filing with the EEOC regarding Defendants' employees' conduct was a protected activity under the ELCRA." ECF No. 1, PageID.16. But Plaintiff did not file her EEOC charge until *after* she was terminated. As such, she did not engage in a protected activity while employed by Defendant. Therefore, Plaintiff's complaint fails to allege a plausible ELCRA retaliation claim against Defendant.

## V. **CONCLUSION**

Based on the foregoing, Defendant's Partial Motion to Dismiss is GRANTED. Counts I, III, and IV of Plaintiff's complaint are dismissed with prejudice.

 **\*4**  SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1524456

Footnotes

1       https://www.eeoc.gov/employers/questions-and-answers-respondents-eeocs-position-statement-procedures.

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775 Document: 45-1 Filed: 09/17/2025 Page: 81

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)

1999 WL 33434995

1999 WL 33434995
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Marlene PIASECKI, Personal Representative of the Estate
of Joseph K. Piasecki, Deceased, Plaintiff-Appellant,
v.
MICHIGAN EDUCATION ASSOCIATION-NEA, Washtenaw-Livingston Education
Association-MEA/NEA, and Chelsea Education Association, Defendants-Appellants.

No. 208757.
|
Oct. 15, 1999.

Before: FITZGERALD, P.J., and DOCTOROFF and WHITE, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff appeals of right the circuit court's orders granting summary disposition to defendants pursuant to MCR 2.116(C)(8) and (C)(10), clarifying its ruling on defendants' motion, and denying plaintiff's cross-motion for reconsideration, in this wrongful death action alleging negligence, vicarious liability, and breach of a third-party beneficiary contract. We affirm the dismissal of the vicarious liability and third-party beneficiary contract claims, and reverse the dismissal of the negligence claim.

I

This case arises from the shooting death of Joseph Piasecki (Piasecki), the Superintendent of the Chelsea School District, by Stephen Leith, a teacher at Chelsea High School, on December 16, 1993. Leith was a member of defendant Michigan Education Association (MEA), which was a party to a collective bargaining agreement (CBA) with the Chelsea School District Board of Education. The shooting occurred during the course of a grievance proceeding against the school administration, instituted by the MEA on Leith's behalf.

Plaintiff's complaint alleged that sometime before January 1992, Leith began to experience depression and a tendency toward anti-social behavior, for which he sought psychiatric treatment. The complaint alleged that as a result of Leith's behavior on the job, the school administration pursued various disciplinary proceedings against him, at which various MEA agents represented him, including Mark Jenkins, an employee of the MEA and MEA's representative for the Chelsea School District, Phillip Jones and Joseph Beard. The complaint alleged that at all pertinent times, Jenkins was the MEA's agent and acting within the scope of his employment with the MEA. The complaint further alleged that in early November 1993, the administration summoned Leith to a disciplinary proceeding based on inappropriate conduct toward students. On November 23, 1993, Leith, Jenkins, Jones, and Beard traveled to Lansing to meet with an attorney to consider Leith's legal rights with regard to these disciplinary proceedings. Plaintiff's complaint alleged that the MEA agents at the Lansing meeting either knew or should reasonably have known that Leith was armed with a gun at the meeting, that the MEA had notice that Leith was considering a dangerous and perhaps lethal criminal attack in connection with his grievance, and that he had the means to carry out such an attack.

The complaint alleged that on the afternoon of December 16, 1993, after school, a proceeding on Leith's grievance against the administration was held in Piasecki's office, and attended by Piasecki, Leith and Jones. The complaint alleged that the grievance proceeding was a protected concerted union activity and that during the course of the proceeding, Leith became upset and left the meeting. The complaint alleged that while the proceeding continued, Leith drove home with his wife, Alice Leith. It further alleged that while at home, Leith reviewed documents relating to the grievance; became enraged, grabbed a loaded gun from the second story of his home, and charged down the stairs past his wife and into his car, heading back to Chelsea High School. The complaint alleged that during or after Leith's review of the grievance documents, Mrs. Leith called Jenkins at his MEA office. The complaint alleged that because Jenkins was unavailable, Mrs. Leith spoke with Caroll Sypniewski, an MEA agent with duties similar to Jenkins', telling her that her husband was headed back to the grievance proceeding, armed with a gun, and with the intention of doing serious if not fatal harm to Piasecki, and perhaps other grievance participants. The complaint further alleged that Sypniewski asked a secretary to contact Jenkins, and after Jenkins was located in Hartland, Sypniewski informed Jenkins that Leith was headed to Piasecki's office with a gun, with the apparent intention of shooting him. Plaintiff's complaint alleged that neither Jenkins nor Sypniewski made any attempt to contact law enforcement, and that Sypniewski did not contact anyone in the Chelsea School District Administration (administration) to warn of Leith's apparent intentions and approach. It further alleged that after concluding his telephone conversation with Sypniewski, Jenkins made an unsuccessful attempt to contact the administration, had to again call Sypniewski to verify the proper phone number, and then called Piasecki's office. The complaint alleged that

**\*2** 33. When Jenkins finally reached [Piasecki], he informed him that Leith had become angry and threatened Piasecki.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 83

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

34. During their telephone conversation, Jenkins did not give Mr. Piasecki any specific details regarding the nature of Leith's threat, did not mention the fact that Leith was armed with a gun, and did not mention Leith's apparent intent to shoot Mr. Piasecki, instead suggesting, after initially "beating around the bush" for a while, that if it were left up to Jenkins, "Maybe I'd leave the office and see what happened."

Plaintiff's complaint alleged that, prior to the shooting, the MEA had knowledge that Leith was dangerous and could foresee that Leith would injure the grievance procedure participants, that Jenkins was in a unique position to prevent the harm to Piasecki by communicating the urgency and the severity of the impending danger from Leith, and was in the position to contact law enforcement officials who could intervene and protect the participants in the grievance proceeding.

Plaintiff's complaint also alleged that defendant was vicariously liable for the battery perpetrated by Leith on Piasecki. The third-party beneficiary claim alleged that the MEA owed a number of the duties stated above to the administration, as a participant in the grievance proceeding, and breached them, and that Piasecki was an intended and anticipated third-party beneficiary of the duties defendant owed the Administration.

A

In lieu of fling an answer to plaintiff's complaint, defendants moved for summary disposition, seeking dismissal of the negligence and vicarious liability claims pursuant to MCR 2.116(C)(8), and the breach of third-party beneficiary contract claim under MCR 2.116(C)(10). Plaintiff's response to defendants' motion requested leave to amend should the circuit court conclude the claims were inadequately pleaded.

The circuit court granted summary disposition of the negligence and vicarious liability claims under (C)(8) and the third-party beneficiary contract claim under (C)(10):

When all of this is boiled down, it seems to me that plaintiff must first establish that there is this duty on the part of the union to warn or intervene between Mr. Leith and Mr. Piasecki. And in order to do so they must establish either that there is a special relationship, special circumstances or assumption of this duty.

The circuit court noted:

.... *Murdock* [*v Higgins,* 454 Mich. 46; 559 NW2d 639 (1997),*]* talks about the rationale behind imposing a duty to protect in special relationships again is based on control.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 84

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

In those situations it is always where one person entrusts himself to the control and protection of another with a consequent loss of the control to protect themselves.

Under these, [sic] facts, even in the light most favorable to the non-moving party, it cannot be said that the decedent lost control to protect himself. He was given a warning, and chose not to heed that warning and went back into the situation he was told was dangerous. And, clearly, by his own actions it was not a situation where he had lost the control of himself.

**\*3** The Court is not persuaded with the argument that because he had agreed to a collective bargaining discussion or a disciplinary hearing that he could not, under a situation of warning, go back into a situation or lost control to protect himself.

Secondarily, I'm not persuaded that the union had a duty to protect the-Mr. Piasecki, that that relationship existed where there had been that degree of entrustment between the two.

As to the assumption of risk [sic duty], there is no question that there may be situations when a person voluntarily attempts to aid the victim and takes control of the situation that there can be an assumption of risk.

Again, there was no-no indication here that, in fact, the control had transferred over and that they had, in fact, by doing that somehow increased the risk. If anything, regardless of what we say about the degree of the warning, the risk was decreased.

There are, of course, all these issues of proximate cause. Even if there was a duty, even if the-we can all surmise what might have happened had Mr. Piasecki attempted to leave, etcetera. But the focus of the motion today is what duty, if any, existed.

Under both C-8 and C-10 this Court finds that under the facts in this case in the light most favorable to the non-moving party that the union owed no duty to Mr. Piasecki, had not exerted sufficient control such that this court can impose liability on the union.

B

Defendants filed a motion for clarification requesting the basis of the circuit court's ruling on the claims other than the negligence claim. Plaintiff filed a cross-motion for reconsideration, arguing that the circuit court invaded the jury's province by making the factual determination that Piasecki had not lost control to protect himself and the determination that "regardless of what we say about the degree of warning, the risk was decreased." Plaintiff argued that this was error for two reasons: because the plaintiff was not legally required to demonstrate increased risk and, second, because even if plaintiff were required to prove increased risk, that would be a question for the jury:

Case: 24-1775 Document: 45-1 Filed: 09/17/2025 Page: 85

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

The question before this Court is whether a union which has knowledge that a specific union member is headed to a specific administrator's office at a specific time and date, *with a gun,* is required to communicate that information to the intended victim. Marlene Piasecki is confident that the public policy of this State does require a union to affirmatively reveal its specific knowledge that an employee is immediately headed into his employer's office with a gun. She is also confident that even if no such affirmative duty were to exist, once the union begins to talk to the intended victim about what might happen, it must reveal that which it knows to be imminent, and specifically, the crucial fact that the impending attack involves a firearm. "Under these circumstances, to say that" the MEA "had no duty ... would be 'shocking to humanitarian considerations' and fly-in-the-face of 'the commonly accepted code of social conduct"." *Farwell v. Keaton, supra,* 396 Mich. at 291, 292, citing *Hutchinson v. Dickie,* 162 F.2d 103, 106 (6th Cir1947); *Prosser, supra,* § 53, p. 327. This Court should have found, and is now asked to find that the MEA could owe a duty to Joseph Piasecki, because "reasonable men would recognize and agree that it exists." *Id.* It should be for the jury to determine whether the necessary elements for a duty to be imposed are present, whether the duty was breached, and whether Joseph Piasecki's death was the proximate result of that breach.

 **\*4** Plaintiff argued that even in the absence of a special relationship which would give rise to a legal duty, plaintiff's negligence claim sufficiently rested on duties which arise from special circumstances or defendants' own assumption of duty.

Regarding the contract claim, plaintiff's motion for reconsideration argued that the pertinent allegations were based on the CBA, which, it argued, was made for the benefit of teachers, through the MEA, on one side, and administrators, through the District, on the other side. Plaintiff argued that the express purpose of the CBA was "promoting harmonious relations" between the parties, furthering "their mutual aim(s)," and asserted:

> The Union failed to warn Joseph Piasecki that its own grievant was headed into the grievance with a loaded gun, failed to promote harmonious relations, failed to further the mutual aims of the parties, and acted inconsistently with the terms of the Agreement... it breached the Agreement, the main purpose of which was to provide peaceful relations between the Union and the Administration. Joseph Piasecki was an intended beneficiary of that Agreement, and suffered as a result of the breach.

The circuit court's order of clarification dismissed the negligence and vicarious liability claims pursuant to MCR 2.116(C)(8), and the breach of third-party beneficiary contract claim pursuant to MCR 2.116(C)(10). This appeal ensued.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 86

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

II

Plaintiff argues that the circuit court improperly dismissed her negligence claim under MCR 2.116(C)(8). Plaintiff alleged that defendants were negligent by virtue of the existence of special circumstances, which include a special relationship between defendants and Piasecki and defendants and Leith, and defendants' assumption of a duty by undertaking performance, i.e., making a call to Piasecki to warn him of danger, and performing the duty negligently.

We review the circuit court's grant of summary disposition de novo. *Beaty v. Hertzberg & Golden, PC,* 456 Mich. 247, 253; 571 NW2d 716 (1997). A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone. *Spiek v. Dep't of Transportation,* 456 Mich. 331, 337; 572 NW2d 201 (1998). The factual allegations in the complaint must be accepted as true, as well as any inferences that can reasonably be drawn therefrom. *Blackwell v. Citizens Ins Co,* 457 Mich. 662; 579 NW2d 889 (1998). Summary disposition is proper only if the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. *Simko v. Blake,* 448 Mich. 648, 654; 532 NW2d 842 (1995).

In order to state an action for negligence, the plaintiff has the burden of adequately alleging that the defendant owed a legal duty to plaintiff, a breach of that duty, that plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered. *Schneider v Nectarine Ballroom Inc, (On Remand),* 204 Mich.App 1, 4; 514 NW2d 486 (1994). "In negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk." *Sponkowski v. Ingham Road Comm,* 152 Mich.App 123, 127-128; 393 NW2d 579 (1986), citing Prosser, Torts (4th ed), § 37, p 206.

 **\*5**  As a general rule, a private person has no duty to protect another from a criminal attack by a third person absent some special relationship or circumstance. *Murdock v. Higgins,* 454 Mich. 46, 54; 559 NW2d 639 (1997); *Roberts v. Pinkins,* 171 Mich.App 648, 652; 430 NW2d 808 (1988); see also Anno: *Comment note-Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person,* 10 ALR3d 619, § 2, p 623, (noting that "[i]n the absence of special circumstances, such as a special relationship between the parties or knowledge by the defendant of an extraordinary danger, there is no duty to protect another from criminal attack."). " 'Duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Buczkowski v. McKay,* 441 Mich. 96, 100-101; 490 NW2d 330 (1992). In determining whether a special circumstance or relationship exists it is necessary to:

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 87

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

... balance the societal interests involved, the severity of the risk, the burden upon the defendant, the likelihood of occurrence, and the relationship between the parties. Other factors which may give rise to a duty include the foreseeability of the criminal activity, the defendant's ability to comply with the proposed duty, the victim's inability to protect himself from the criminal activity, the costs of providing protection, and whether the plaintiff had bestowed some economic benefit on the defendant. [*Roberts v. Pinkins,* 171 Mich.App 648, 652-653; 430 NW2d 808 (1988).]

A special relationship can be either between the defendant and the victim or the defendant and the third party who caused the injury. *Murdock,* 454 Mich. at 54.

Plaintiff's complaint alleged:

35. Although he undertook a duty to warn Mr. Piasecki that Leith posed a threat to the grievance participants, Jenkins' warning was inadequate, incomplete, and left out the crucial detail that Leith was returning to the grievance with a lethal weapon.

36. The incomplete and untruthful character of the warning was motivated in part by a desire to protect the MEA's own member, Stephen Leith, from possible professional and/or criminal culpability.

37. After getting off the phone with Jenkins, Mr. Piasecki reported that Jenkins had "suggested that Steve was going to do some harm to me," and had "basically made a threat to me," although nothing in Mr. Piasecki's demeanor suggested a threat of immediate harm or knowledge of a gun being involved.

38. Approximately five minutes after the telephone call between Jenkins and [Piasecki], Leith returned to the grievance with a fully-loaded weapon and opened fire on [Piasecki], hitting him with four bullets, one of which was fatal.

39. After shooting Mr. Piasecki, Leith then opened fire on Ronald Mead and Phillip Jones, wounding both of them.

40. The first telephone call that day to the Chelsea Police Department ... was received by the Chelsea dispatcher from employees of the Chelsea High School sometime immediately after the shooting had occurred.

**\*6** 41. Neither the MEA nor its agents took any action whatsoever, except the limited and inadequate actions described above, to intervene in the impending attack by Leith upon the grievance participants.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 88

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

44. Prior to the above-described shooting, the MEA had knowledge that Leith was dangerous and could foresee that Leith would injure some or all of the remaining participants in the grievance proceeding.

45. The MEA was in a unique position to prevent the harm done to [Piasecki] by communicating the urgency and the severity of the impending danger from Leith, including the fact that Leith was returning to the grievance proceeding armed and with an apparent intent to shoot the participants, and further was in the position of taking steps to contact law enforcement officials who could intervene and protect the participants in the grievance proceeding.

46. *Based upon the special relationship which exists between a labor union and an employer, in this case the District Administration, and based upon the special circumstances which exist during the course of protected concerted activities such as grievance proceedings, and based upon the assumption of duties already undertaken through partial action by its agents, the MEA owed the following duties to [Piasecki]:*

a. A duty to warn of the impending danger with immediacy and without delay;

b. A duty to refrain from unnecessary discussion and conferencing within the ranks of the union prior to taking protective action;

c. A duty to provide an adequate, complete, and detailed warning, relaying to the intended victims all crucial and pertinent facts regarding Leith's threat, including the fact that he was seen carrying a gun, the fact that he was known to be headed to Joseph K. Piasecki's office, the fact that he appeared intent upon shooting participants in the grievance proceeding, and including but not limited to the fact that Leith's threat and the danger which he posed was an urgent matter which appeared immediate and imminent;

f. A duty to avoid unnecessary delay in placing the telephone call to Joseph K. Piasecki;

g. A duty to avoid unnecessary delay in communicating the fact and explicit details of the threat to [Piasecki] after telephone contact had finally been established, rather than down-playing the immediacy and lethal nature of the impending harm;

h. A duty to contact law enforcement officials and to seek intervention upon receiving knowledge of the threat. [Emphasis added .]

The pleadings alleged that Jenkins was aware before the shooting of Leith's mental problems and alleged misconduct toward students, and had knowledge that the administration had initiated disciplinary proceedings against Leith for the alleged inappropriate conduct. Defendants were

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 89

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

Leith's bargaining representative, and Jenkins, the MEA's representative for the Chelsea District, had a relationship with Leith as to the specific grievance which was the subject of the grievance proceeding on the day of the shooting. Jenkins had driven with Leith to Lansing several weeks before the shooting to determine Leith's legal rights regarding a grievance the MEA instituted on his behalf against the administration, of which Piasecki was the head. The grievance at issue in the Lansing meeting arose out of the disciplinary proceedings resulting from Leith's misconduct toward students, incidents which were the subject of the December 16th grievance proceeding. *Plaintiff's complaint further alleged that Jenkins had actual knowledge of Leith's imminent arrival at Piasecki's office with a gun and Leith's intent to harm Piasecki.* When Mrs. Leith called Jenkins on the afternoon of December 16, 1993, Piasecki, Mead, the principal of Chelsea High School, and Jones, an MEA representative were continuing Leith's grievance proceeding in Piasecki's office. Under the CBA, there was an ongoing relationship between defendants and Piasecki in that the union and administration had to comply with the provisions of the CBA regarding grievance proceedings; Piasecki, as the Superintendent, or his designee, was obligated to be present at the second level of grievance proceedings and meet with the grievant and a union representative;[1] and no grievance could be adjusted absent prior notice and opportunity given for a union representative to be present.

**\*7** Under these circumstances, the severity of the risk, the likelihood of occurrence, and the foreseeability of the harm were high, while the burden on defendant was minimal, as was Piasecki's ability to protect himself without adequate warning. *Roberts, supra* at 652-653. Jenkins had actual knowledge of an identified imminent threat of catastrophic harm to a particular individual at a particular location from a particular person. He also knew that there was no reason to believe that Piasecki knew of the danger. He had the ability to promptly and adequately warn Piasecki of Leith's imminent attack and the ability to promptly contact law enforcement. Thus he had the ability to discharge the proposed duty at little or no cost. Piasecki was unable to protect himself from the harm posed by Leith given that he was unaware that Leith was armed with a gun. Further, while Piasecki was conferring no direct economic benefit on defendant, Piasecki and Jenkins, as designated representatives of the union and the administration, were involved in a joint undertaking for the mutual economic and other benefit of their principals. This joint undertaking involved the face-to-face resolution of grievances outside of a courtroom setting, and the attendant possibility that some grievants might lose control of their emotions and become violent. Where such an event occurred and defendant had actual knowledge that the subject of an ongoing grievance procedure was about to attack the participants in this joint undertaking with a gun, there is a special relationship or circumstance so as to lead the law to say that Piasecki was entitled to the protection of being informed by defendant that Leith was returning to the meeting with a gun and with an apparent intent to do physical harm. A balancing of the societal interests involved weighs in Piasecki's favor. He was an administrator required by the CBA to attend the instant grievance proceeding. Persons required under CBA's to participate in such proceedings as part of a joint

undertaking must be able to do so with a sense that actual, specific, imminent threats to their lives by other participants in the process will not be inadequately communicated to them.

We conclude that plaintiff's negligence claim was improperly dismissed pursuant to MCR 2.116(C)(8). Plaintiff's complaint alleged the requisite elements of negligence and adequately stated a claim that a special relationship existed between Piasecki and defendants, and that defendants' agents assumed the duty to warn Piasecki of the danger Leith posed, and performed the duty negligently by cloaking the gravity of the impending danger by being indirect and by failing to inform Piasecki that Leith was armed with a gun.

We therefore conclude that the circuit court improperly dismissed plaintiff's negligence claim on the basis of failure to state a claim.

III

Plaintiff also argues that the circuit court erred in dismissing her claim that defendants were vicariously liable for Leith's battery.

**\*8** The parties agree that in order to survive summary disposition, plaintiff must have adequately alleged that the MEA participated in, authorized, or ratified Leith's criminal conduct. *Sowels v Laborers' Int'l Union of N America,* 112 Mich.App 616, 622; 317 NW2d 195 (1981). Plaintiff alleged that Jenkins' and Sypniewski's willfully shielding the grievance participants from knowledge of Leith's impending attack and willfully choosing not to intervene or seek help from law enforcement established that defendants effectively participated, ratified, or authorized the shooting.

Under *Sowels,* unions and their officers and members participating or interested in a labor dispute cannot be held liable for unlawful acts of union officers, members, or agents, except on clear proof of actual participation in or authorization of the acts, or ratification of the acts after actual knowledge thereof. "Participation" means to take part in, to receive or have a part or share of, or to be engaged in an activity. See *Burrell v. Ford Motor Co,* 386 Mich. 486, 494; 192 NW2d 207 (1971). "Ratification" is the affirmance by a person of a prior act which did not bind him, but which was done or professed to be done on his account. Restatement Agency, 2d, § 82, p 210; *Cudahy Bros Co v West Michigan Dock & Market Corp,* 285 Mich. 18, 25; 280 NW 93 (1938).

We conclude that plaintiff did not sufficiently allege facts from which it could be inferred that defendants actually participated, authorized, or ratified Leith's actions. We find no error in the circuit court's dismissal of the vicarious liability claim.

Case: 24-1775   Document: 45-1   Filed: 09/17/2025   Page: 91

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

IV

Plaintiff's final argument is that the circuit court erred in dismissing her breach of third-party beneficiary contract claim. We review the circuit court's grant of summary disposition de novo. *Baker v. Arbor Drugs,* 215 Mich.App 198, 202; 544 NW2d 727 (1996). A motion for summary disposition under MCR 2.116(C)(10) tests the factual basis of a plaintiff's allegations. *Id.* The circuit court must consider and view the pleadings, affidavits, depositions, admissions, and any documentary evidence in favor of the nonmoving party. The moving party has the initial burden of supporting its position by affidavits, depositions, admissions or other documentary evidence. *Smith v. Globe Life Ins,* 460 Mich. 446, 455; 597 NW2d 28 (1994), citing *Quinto v. Cross & Peters Co,* 451 Mich. 358, 362-363; 547 NW2d 314 (1996). The burden then shifts to the nonmovant to establish that a genuine issue of material fact exists. *Id.*

The rights of third-party beneficiaries are addressed in M.C.L. § 600.1405; MSA 27A.1405, which provides:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something directly to or for said person.

**\*9** The law presumes that a contract has been executed for the benefit of the parties, and plaintiff has the burden of proving that Piasecki was an intended beneficiary of the contract between defendant and the Chelsea School District Board of Education. *Oja v. Kin,* 229 Mich.App 184, 193; 581 NW2d 739 (1998). When determining whether the parties to the contract intended to make a third person a third-party beneficiary, a court should examine the contract using an objective standard. *Dynamic Construction Co v. Barton Malow Co,* 214 Mich.App 425, 427; 543 NW2d 31 (1995). A person who may be incidentally benefited by the contract does not have rights as a third-party beneficiary. *Alcona Schools v. Michigan,* 216 Mich.App 202, 205; 549 NW2d 356 (1996). Calamari & Perillo, Contracts (3d ed), Third Party Beneficiaries, ch 17, p 701, states that in order to qualify as an intended beneficiary, the third party must meet two requirements, otherwise he is an incidental beneficiary:

> .... (1) The third party must show that recognition of a right to performance in the beneficiary "is appropriate to effectuate the intention of the parties." (2)(a) "[T]he performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or (b)

"the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

Plaintiff's complaint alleged in pertinent part:

61. Upon information and belief, the MEA was party to a collective bargaining agreement between it and the Chelsea District Administration which gave rise to certain express and implied contractual duties, upon information and belief including but not limited to the following:

a. A duty to take steps to insure the safe and efficient handling of protected concerted union activities, including grievance proceedings;

b. A duty to warn the Administration of violent threats made by union members;

c. A duty to maintain a policy placing the personal safety of Administrators over the labor-related interests of any other individual;

d. A duty to contact law enforcement officials and/or take such other action to intervene in situations which would foreseeably jeopardize the safety of participants to grievance proceedings;

e. A duty to take whatever steps were necessary to insure and protect participants in a grievance proceeding once it learned of a specific threat posed by a particular union member; and

f. Such other duties as may appearing during the course of discovery and trial of this matter.

Plaintiff asserts that the CBA was made for his benefit since the Board of Education employs the administration of which he was a part, and the union members on one side and the administration on the other side were the respective intended beneficiaries of the CBA, which had the express purpose of "promoting harmonious relations" between them and furthering "their mutual aim(s).[2]

**\*10** Plaintiff failed to establish that he was more than an incidental beneficiary of the promise to promote harmonious relations. Further, the express provision in the CBA upon which plaintiff relies-the preamble's recitation of an interest in promoting harmonious relations between the teaching staff and administration-- is not tantamount to a contractual commitment to undertake the duties set forth in paragraph 61 of plaintiff's complaint. While the CBA and Piasecki's status as administrator are facts relevant to the determination whether there was a special relationship sufficient to support a duty under the facts of this case, as discussed in section II, *supra,* Piasecki's status does not establish him a a third party beneficiary of the CBA.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 93

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

## All Citations

Not Reported in N.W.2d, 1999 WL 33434995

## Footnotes

1    Article XIX of the CBA, entitled "Grievance Procedure," provided in pertinent part:

    *Paragraph A:* A grievance shall be an alleged violation of the terms of this contract or written Board policy which concerns teachers' wages, hours, and working conditions.

    No grievance shall be adjusted without prior notification to the Association and opportunity for an Association representative to be present, *nor shall any adjustment of a grievance be inconsistent with the terms of this agreement...*

    LEVEL TWO: If the Grievant and/or the Association is not satisfied with the disposition at Level One ... the Grievant and/or the Association may appeal the grievance within five (5) additional school days by *filing it with the Superintendent.* Within three (3) school days from the receipt of the written grievance, the *Superintendent or his designee shall meet with the grievant* and a representative of the Association to attempt to resolve the grievance. The *Superintendent or his designee shall render his/her decision* within three (3) days after such meeting.

    If an individual teacher has a personal complaint which he desires to discuss with a supervisor, he/she is free to do so without recourse in the grievance procedure. However, no grievance shall be adjusted without prior notification to the Association and opportunity for an Association representative to be present, *nor shall any adjustment of a grievance by inconsistent with the terms of this agreement.* In the administration of the grievance procedure, the interests of the teachers shall be the sole responsibility of the Association. [Emphasis added.]

2    The preamble of the collective bargaining agreement provided in pertinent part:

    WHEREAS, The Board and the Association recognize and declare that providing a quality education for the children of the Chelsea School District is their mutual aim, and that the character of such education is influenced by the quality and morale of the teaching service, and

    WHEREAS, *The parties hereto are interested in promoting harmonious relations among the teaching staff, administration, Association and the Board,* and

    WHEREAS, Pursuant to the Provisions of Act 336 of the Michigan Public Acts of 1947, as amended by Act 379 of the Michigan Public Acts of 1965, the Association and the Board desire to contract in respect to wages, hours, or other conditions of employment.

    NOW, THEREFORE, in consideration of the premises and the respective agreement of the Board and the Association herein contained, the Board and the Association agree as follows ... [Emphasis added.]

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2237654
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Jodi TAPPLY, Jeannette Buschman, Michael Partipilo, Barbara Lester, and Vicki Meyerholz, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
WHIRLPOOL CORPORATION, Defendant-Appellee.

No. 23-1666
|
Argued: October 29, 2024
|
Decided and Filed: August 6, 2025

**Synopsis**

**Background:** Consumers brought putative class action on behalf of nationwide class and subclasses against manufacturer of ovens with front-mounted burner knobs, alleging fraud by omission and breach of state consumer protection statutes for not disclosing defect in which stovetop burners were capable of unintended actuation whereby stovetops ignited inadvertently. The United States District Court for the Western District of Michigan, Jane M. Beckering, J., 2023 WL 4678789, granted in part and denied in part manufacturer's motion to dismiss. Consumers appealed.

**Holdings:** The Court of Appeals, Cole, Circuit Judge, held that:

[1] consumers had standing;

[2] consumers plausibly alleged manufacturer's knowledge of defect so as to support common law fraud claims;

[3] consumers plausibly alleged manufacturer had duty to disclose under Michigan law;

[4] consumers did not plausibly allege a duty to disclose under Illinois law;

[5] consumers plausibly alleged a duty to disclose under Oklahoma law;

[6] consumers plausibly pleaded claims under Michigan consumer protection law; and

[7] consumers' plausible allegations of manufacturer's pre-sale knowledge were sufficient to state claims under states' consumer protection statutes.

Affirmed in part and reversed in part.

Larsen, Circuit Judge, filed dissenting opinion.

West Headnotes (26)

**[1]   Federal Courts** 🔑 Pleading

Court of Appeals applies de novo review to the legal conclusions reached by the federal district court in its dismissal for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[2]   Federal Courts** 🔑 Dismissal for failure to state a claim

In reviewing dismissal for failure to state a claim, Court of Appeals construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. Fed. R. Civ. P. 12(b)(6).

**[3]   Federal Civil Procedure** 🔑 Insufficiency in general

**Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient facts that, taken as true, state a plausible claim for relief. Fed. R. Civ. P. 12(b)(6).

**[4]   Federal Civil Procedure** 🔑 Claim for relief in general

A complaint states a plausible claim for relief where its alleged facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

**[5]   Federal Civil Procedure** 🔑 In general; injury or interest

2025 WL 2237654

Standing is a prerequisite to bringing claims in federal court. U.S. Const. art. 3, § 2, cl. 1.

**[6]    Federal Civil Procedure** 🔑 In general;  injury or interest

**Federal Civil Procedure** 🔑 Causation;  redressability

To have Article III standing, plaintiffs must demonstrate that (1) they suffered an injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would redress their injury. U.S. Const. art. 3, § 2, cl. 1.

**[7]    Federal Civil Procedure** 🔑 In general;  injury or interest

An injury in fact, as required for Article III standing, must be both concrete and particularized, and actual or imminent. U.S. Const. art. 3, § 2, cl. 1.

**[8]    Federal Civil Procedure** 🔑 Consumers, purchasers, borrowers, and debtors

**Products Liability** 🔑 Persons Entitled to Sue

**Products Liability** 🔑 Cooking or heating food;  ovens and stoves

Consumers' allegations that they suffered a concrete economic injury from overpaying for allegedly defective oven ranges with front-mounted burner knobs that were capable of igniting inadvertently satisfied requirements of Article III standing, in products liability class action against oven manufacturer; consumers alleged they were deprived of the benefit of the bargain because they reasonably expected their range to turn through only deliberate action rather than through inadvertent contact with burner knobs, and their range did not conform to their expectations because of the defect. U.S. Const. art. 3, § 2, cl. 1.

**[9]    Products Liability** 🔑 Representations or concealment;  fraud

**Products Liability** 🔑 Cooking or heating food;  ovens and stoves

Consumers plausibly alleged manufacturers' knowledge of defect in oven ranges equipped with front-mounted control knobs that allowed stovetop burners to actuate unintentionally and the related safety risks, so as to support common law fraud claims under multiple states' laws, where manufacturer received consumer complaints, sent by a governmental agency pursuant to federal law, and those complaints identified a safety defect. Consumer Product Safety Act § 6A, 15 U.S.C.A. § 2055a(c)(1); 16 C.F.R. § 1102.20.

**[10] Products Liability** ⟜ Representations or concealment;  fraud

Under Michigan law, highly misleading actions give rise to a duty to disclose product defects.

**[11] Products Liability** ⟜ Representations or concealment;  fraud

Under Michigan law, where a manufacturer has superior knowledge of a defect, not readily available to the consumer, the manufacturer has a duty to disclose.

**[12] Products Liability** ⟜ Representations or concealment;  fraud

**Products Liability** ⟜ Cooking or heating food;  ovens and stoves

Consumers plausibly alleged that manufacturer had superior knowledge, not readily available to consumers, of defect in oven ranges equipped with front-mounted control knobs that allowed stovetop burners to actuate unintentionally, such that manufacturer had duty to disclose under Michigan law, consumer complaints about the defect being publicly available online, where manufacturer received incident reports directly from a governmental agency, and consumers did not receive any similar notice from the government.

**[13] Fraud** ⟜ Fraudulent Concealment

Under Illinois law, in order to state a claim for fraudulent concealment, a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff.

**[14] Fraud** ⟜ Duty to disclose facts

Mere silence in a transaction does not amount to fraud, but if a party is silent while suppressing material facts or deceiving another, a duty to disclose arises under Illinois law.

**[15] Products Liability** ⟜ Representations or concealment;  fraud

**Products Liability** ⟜ Cooking or heating food;  ovens and stoves

Consumers did not plausibly allege that there was a fiduciary or confidential relationship with oven range manufacturer, or that manufacturer was in position of influence and

superiority over them, as would trigger duty under Illinois law to disclose defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently; consumers instead argued that manufacturer concealed material facts about safety, and did not specify how manufacturer concealed those facts.

**[16]    Fraud** 👉 Duty to disclose facts

Under Oklahoma law, a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction; such circumstances exist where the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party.

**[17]    Fraud** 👉 Duty to disclose facts

Where someone knows of a fact peculiarly within their knowledge and the other person is not in a position to discover it, they have a duty under Oklahoma law to disclose that material fact.

**[18]    Products Liability** 👉 Representations or concealment; fraud

**Products Liability** 👉 Cooking or heating food; ovens and stoves

Consumers plausibly alleged that oven range manufacturer had superior knowledge over the ordinary consumer, such that manufacturer had duty under Oklahoma law to disclose defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently; consumers alleged that manufacturer created a false impression regarding the defect, specifically, that they expected a two-part actuation system but received a range with defect wherein range would actuate with a single motion.

**[19]    Products Liability** 👉 Representations or concealment; fraud

**Products Liability** 👉 Cooking or heating food; ovens and stoves

Consumers plausibly pleaded oven range manufacturer's knowledge of defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently and thus plausibly pleaded manufacturer's duty to disclose under New Hampshire law.

**[20]** **Fraud** 🔑 Duty to disclose facts

Under New Hampshire law, a duty to disclose arises when a seller knows of a concealed defect which is unknown to the buyer and not capable of detection by the buyer, provided the defect is dangerous to life or property.

**[21]** **Antitrust and Trade Regulation** 🔑 Other particular products

Consumers plausibly alleged that they could not discover defect in oven ranges equipped with front-mounted burner knobs that made stovetops capable of igniting inadvertently prior to buying ranges through online or visual inspection and thus pleaded plausible claims under the Michigan Consumer Protection Act; defect was purely physical, and manufacturer allegedly had superior knowledge. Mich. Comp. Laws Ann. § 445.901 et seq.

**[22]** **Antitrust and Trade Regulation** 🔑 Other particular products

Consumers were not required to plead a duty to disclose material facts in order to state a claim under Illinois Consumer Fraud and Deceptive Business Practices Act against manufacturer related to defect in oven ranges equipped with front-mounted burner knobs that made stovetops capable of igniting inadvertently. 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[23]** **Antitrust and Trade Regulation** 🔑 Other particular products

Consumers plausibly alleged manufacturer's pre-sale knowledge of defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently, and thus, they pleaded plausible claims alleging that manufacturer violated the Oklahoma Consumer Protection Act based on manufacturer's alleged deception in sale of the ovens. 15 Okla. Stat. Ann. § 753.

**[24]** **Antitrust and Trade Regulation** 🔑 Other particular products

Consumers plausibly alleged manufacturer's pre-sale knowledge of defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently, and thus, they plausibly alleged claims under New Hampshire Consumer Protection Act based on manufacturer's alleged deception in sale of the ovens. N.H. Rev. Stat. Ann. § 358-A:1 et seq.

**[25]    Antitrust and Trade Regulation** ← Fraud;  deceit;  knowledge and intent

New Hampshire's consumer protection statute requires pre-sale knowledge of a defect. N.H. Rev. Stat. Ann. § 358-A:1 et seq.

**[26]    Antitrust and Trade Regulation** ← Other particular products

Consumers plausibly alleged manufacturer's pre-sale knowledge of defect in front-mounted knobs that made burners capable of igniting inadvertently, and thus, they plausibly alleged claims under the Nevada Deceptive Trade Practices Act based on manufacturer's alleged deception in sale of the ovens. Nev. Rev. St. § 598.0999 et seq.

Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 1:22-cv-00758—Jane M. Beckering, District Judge.

**Attorneys and Law Firms**

ARGUED: Jennifer Bennett, GUPTA WESSLER, San Francisco, California, for Appellants. Aileen M. McGrath, MORRISON & FOERSTER LLP, San Francisco, California, for Appellee. ON BRIEF: Jennifer Bennett, GUPTA WESSLER LLP, San Francisco, California, Robert Friedman, GUPTA WESSLER LLP, Washington, D.C., Alan M. Feldman, Edward S. Goldis, Zachary Arbitman, FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP, Philadelphia, Pennsylvania, Michael F. Ram, Marie N. Appel, MORGAN & MORGAN, San Francisco, California, David H. Fink, Nathan J. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellants. Aileen M. McGrath, Joel F. Wacks, MORRISON & FOERSTER LLP, San Francisco, California, Joseph R. Palmore, MORRISON & FOERSTER LLP, Washington, D.C., Alexandra Avvocato, MORRISON & FOERSTER LLP, New York, New York, for Appellee. Terri S. Reiskin, NELSON MULLINS RILEY & SCARBOROUGH LLP, Washington, D.C., Christopher Shaun Polston, NELSON MULLINS RILEY & SCARBOROUGH LLP, Atlanta, Georgia, Brian D. Schmalzbach, MCGUIREWOODS LLP, Richmond, Virginia, Philip S. Goldberg, SHOOK HARDY & BACON L.L.P., Washington, D.C., for Amici Curiae.

Before: MOORE, COLE, and LARSEN, Circuit Judges.

COLE, J., delivered the opinion of the court in which MOORE, J., concurred. LARSEN, J. (pp. —— – ——), delivered a separate dissenting opinion.

**OPINION**

COLE, Circuit Judge.

**\*1** Plaintiffs own ovens with front-mounted burner knobs manufactured by Whirlpool Corporation. In their class-action complaint, they allege that their ovens' stovetop burners are capable of "unintended actuation," whereby the stovetops ignite inadvertently. After plaintiffs sued Whirlpool, the district court found that plaintiffs had Article III standing to pursue their claims but dismissed the amended complaint for failure to state plausible claims for relief. Plaintiffs now appeal dismissal of their state common law and statutory claims, while Whirlpool argues the district court erred by not dismissing plaintiffs' amended complaint for lack of Article III standing. We affirm in part and reverse in part.

I.

Plaintiffs Jodi Tapply, Jeannette Buschman, Michael Partipilo, Barbara Lester, and Vicki Meyerholz span five states—Michigan, Illinois, Oklahoma, New Hampshire, and Nevada—and allege common law fraud and consumer protection claims under each state's laws. Plaintiffs purchased ovens with stovetop ranges, all of which were manufactured by defendant Whirlpool Corporation. The products are single-device ovens with stovetop burners, each containing front-mounted control knobs that actuate the burners atop the stove (the Range), which plaintiffs claim acuate unintentionally (the Defect). These front-mounted knobs—including (A) the Range's alleged Defect and (B) what Whirlpool knew about the Defect prior to sale—are the focus of plaintiffs' amended complaint.[1]

A.

Plaintiffs purchased their respective Ranges between November 2018 and August 2021. Each plaintiff experienced their Range actuating unintentionally, noticing the Range was on only once they smelled gas in their home.

The front-mounted knobs were designed to turn the stovetop burners on with two discrete actions: the user pushes the knob inwards, then rotates it to the "on" position to actuate the burner. Because of the low level of force required to push the knobs in and the slight distance the knobs must turn to actuate the burners, however, plaintiffs' Ranges often turn on with one continuous motion. As such, their burners could be accidentally actuated with "the slightest touch, bump, or brush." (Am. Compl., R. 13, PageID 109, 111, 113, 114–15, 116, ¶¶ 27, 37, 46, 56, 65).

Plaintiffs allege that consumers, including themselves, expect their Ranges to be actuated by intentional and deliberate action and not by this inadvertent contact with the burner knobs. So, the unintended actuation has caused plaintiffs to be more cautious around the Range and constantly check the knobs to ensure they had not been switched on. For example, one plaintiff would have to pay particularly close attention to the Range if her grandchild with special needs would come to visit.

**\*2** Additionally, the Range does not have any guards over the knobs to reduce the risk of unintentional actuation, nor does the oven door handle act as an effective barrier between a user and the knobs. Plaintiffs allege that the Defect is hazardous and renders the Range unsafe for use, though plaintiffs continue to use theirs. The Range's user manual states that failing to turn off all controls while not cooking "can result in death or fire." (*Id.* at PageID 122, ¶ 73.)

Plaintiffs further allege that, due to the Defect, they paid far more than the reasonable value of the Range and would have paid substantially less—or foregone purchase altogether—had Whirlpool disclosed the Defect.

B.

Plaintiffs' amended complaint alleges that, while plaintiffs did not know about the Defect at the point of sale, Whirlpool has known that the Range is inherently defective and unfit for its intended use due to unintentional actuation. These allegations of knowledge arise from incident reports submitted to the United States Consumer Product Safety Commission (CPSC) and consumer reviews on Whirlpool's website.

Plaintiffs include eight CPSC reports in their amended complaint, each of which CPSC sent to Whirlpool. These reports all involved consumers who accidentally actuated their Range burners consistent with the Defect. Dated between January 2017 and February 2020, each incident report discusses the Defect and the date the consumer's incident occurred, and the website plaintiffs cite lists the date CPSC sent each report to Whirlpool. Although plaintiffs cite only eight incident reports in their amended complaint, they allege these eight incident reports represent just a

"sample" of numerous reports consumers submitted to CPSC and forwarded to Whirlpool. (*Id.* at PageID 126, ¶ 80.)

Consumers also posted reviews directly to Whirlpool's website. Plaintiffs include several reviews wherein consumers complained of unintended actuation from the alleged Defect and the resulting gas odor.

## C.

Plaintiffs brought a class action complaint on behalf of a purported nationwide class of persons who purchased a Range with the Defect, as well as sub-classes for residents of Michigan, Illinois, Nevada, Oklahoma, and New Hampshire. Their amended complaint brings ten counts alleging violations of federal warranty law, fraud by omission, breach of express warranty, breach of the implied warranty of merchantability, unjust enrichment, and violation of state consumer protection statutes.

Whirlpool argued that the amended complaint should be dismissed for two reasons. First, Whirlpool argued that plaintiffs lacked Article III standing to bring their claims. Second, Whirlpool argued that plaintiffs' amended complaint failed to state a plausible claim for relief. The district court rejected Whirlpool's first argument and found that plaintiffs alleged a sufficiently concrete injury to satisfy Article III's standing requirements. Nevertheless, the district court dismissed each of plaintiffs' claims for failure to state a claim.

Plaintiffs timely appealed the district court's dismissal of their state common law fraud and statutory consumer protection claims. In its response, Whirlpool argues that the court should reverse the district court's finding of Article III standing and dismiss plaintiffs' case on jurisdictional grounds, or, alternatively, affirm the district court's dismissal of plaintiffs' claims on the merits.

## II.

[1]   [2]   We apply de novo review to the legal conclusions reached by the federal district court in its dismissal of complaints under Federal Rule of Civil Procedure 12(b)(6). *Mattera v. Baffert*, 100 F.4th 734, 739 (6th Cir. 2024) (citing *United Food & Com. Workers Union-Emp. Pension Fund v. Rubber Assocs., Inc.*, 812 F.3d 521, 524 (6th Cir. 2016)). We "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 456 (6th Cir. 2011) (citation omitted).

**\*3** **[3]** **[4]** To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts that, taken as true, state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A complaint states a plausible claim for relief where its alleged facts "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

## III.

To survive Whirlpool's motion to dismiss, plaintiffs here must have plausibly alleged that (A) they suffered a concrete injury in fact to confer Article III standing; (B) Whirlpool knew of the Defect; (C) Whirlpool had a duty to disclose the Defect; and (D) Whirlpool violated several state-specific consumer protection statutes.

## A.

**[5]** **[6]** **[7]** Standing is a prerequisite to bringing claims in federal court. *United States v. Texas*, 599 U.S. 670, 675, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023); U.S. Const. art. III, § 2, cl. 1. To have Article III standing, plaintiffs must demonstrate that (1) they suffered an injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would redress their injury. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024). An injury in fact must be both concrete and particularized, and actual or imminent. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021). Although Whirlpool does not contest that plaintiffs' claims are traceable and redressable, it argues the district court erred by finding that plaintiffs suffered a concrete injury-in-fact.

This court, sitting en banc, recently considered whether named plaintiffs in a consumer class action had suffered a concrete injury-in-fact. *See Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 314–15 (6th Cir. 2025) (en banc). In *Speerly*, the plaintiffs purchased vehicles that shuddered and shifted due to transmission issues, and each named plaintiff's vehicle suffered from the defect. *Id.* at 315. The court concluded that when a consumer buys a defective product and the defect manifests, the consumer has suffered a concrete injury-in-fact. *Id.* That is, the consumer has paid for something which they have not received—a defect-free product.[2]

**[8]** Here, each of the named plaintiffs alleges that they suffered a concrete economic injury because they were deprived of the benefit of their bargain—a Range that turns on through only

intentional and deliberate action. Each plaintiff alleges that their Range turned on unexpectedly, causing gas fumes to fill their homes. And each plaintiff alleges that, had Whirlpool disclosed the Defect, they would have paid far less for their Range or foregone the purchase altogether. Thus, the amended complaint alleges that plaintiffs reasonably expected their Range to turn on through only deliberate action, and that their Range deviates from this expected benefit. Therefore, plaintiffs suffered concrete injuries that satisfy the requirements of Article III.

 **\*4** Whirlpool's arguments to the contrary are unpersuasive. Whirlpool concedes that overpayment for an allegedly defective product can satisfy Article III standing requirements, so long as a plaintiff properly pleads it. (Oral Arg. Rec. at 11:45–12:10.) Nevertheless, Whirlpool argues that, here, plaintiffs have not plausibly alleged they suffered a benefit of the bargain injury because they allege a perceived risk of *future* harm, rather than harm arising from a defect they bargained for. (*Id.* at 12:10–12:47.) In other words, Whirlpool argues that plaintiffs must have bargained for something that differs from the product they received at the point of sale. (*Id.* at 12:50–13:27.)

But that is precisely what plaintiffs allege. Plaintiffs allege that, at the point of sale, they reasonably expected that a Range would turn on through only deliberate action, rather than through inadvertent contact with the burner knobs. (Am. Compl., R. 13, PageID 119–20, ¶¶ 70–71 ("Consumers reasonably expect that Ranges can only be actuated by intentional and deliberate action.... The Ranges do not conform ... to a reasonable consumer's expectation, because the knobs are susceptible to unintentional actuation rendering the Ranges dangerously defective.").) Thus, plaintiffs plausibly allege the Range did not conform to their expectations because of the Defect. As such, plaintiffs have standing.

B.

To properly bring a common law fraud claim, plaintiffs must plausibly allege Whirlpool knew of the Defect. *Smith v. Gen. Motors LLC*, 988 F.3d 873, 883–84 (6th Cir. 2021). The parties dispute whether plaintiffs must also allege that Whirlpool had pre-sale knowledge of the Defect's safety implications. Because we conclude that plaintiffs plausibly pleaded that the Defect has inherent safety risks, we need not address the parties' arguments regarding whether a safety-risk knowledge requirement applies. *See id.* at 888–89 (Stranch, J., concurring) (expressing concern with requiring knowledge requirement not only of a defect, but of a defect's safety risk at the motion to dismiss stage).

Before assessing the plausibility of plaintiffs' allegations, we must determine which pleading standard applies. Federal Rule of Civil Procedure 8 imposes a general pleading standard, whereas Rule 9(b) imposes a heightened "particularity" standard for fraud claims. Fed. R. Civ. P. 8, 9(b). Although Rule 9(b)'s text permits general allegations regarding knowledge, this court has

previously imposed a particularity requirement to the knowledge element. *Compare Smith*, 988 F.3d at 883 ("Rule 9(b) ... permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss."), *with id.* at 884 ("In the context of this case under the standard in *Mross*, that means that Plaintiffs needed to 'state with particularity' factual allegations supporting the assertion that GM knew about the safety implications of the dashboard defect.").

*Smith* does not raise the pleading standard for knowledge in product defect claims. Rule 9(b) specifically excludes "knowledge" from heightened pleading requirements for fraud. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). *Smith* was a unique vehicle defect case involving invited error, and we required the plaintiffs to state their knowledge allegations with particularity "under the standard in *Mross*." 988 F.3d at 879–80, 884 (discussing that the parties specifically requested the district court follow the standards in *Mross*, a related class action involving the same vehicle defect). *Mross*, however, explicitly declined to apply Rule 9(b)'s heightened pleading requirements to the knowledge element of fraud claims. *Mross v. Gen. Motors Co., LLC*, No. 15-C-0435, 2016 WL 4497300, at *6 (E.D. Wis. Aug. 25, 2016) ("I note that my conclusion that the plaintiffs have not adequately alleged GM's knowledge of the defect and of the safety risk is not based on the pleading requirement that the circumstances constituting fraud be stated with particularity. [ ] Rather, even when necessary to support a fraud claim, 'knowledge' may be alleged generally."). We will not impose a particularity requirement for knowledge allegations, as doing so would contravene the explicit text of Rule 9(b).

 **\*5** Here, although plaintiffs need not allege Whirlpool's knowledge with particularity, they nevertheless must allege sufficient facts to show Whirlpool plausibly knew of the Defect. Plaintiffs must allege more than conclusory statements that, upon information and belief, a manufacturer reads third-party websites and monitors report databases. *See Smith*, 988 F.3d at 885.

Both plaintiffs and Whirlpool primarily analogize to *Smith*. In *Smith*, the plaintiffs alleged that consumer complaints of safety defects were posted on online vehicle websites and that customers had sent complaints to the National Highway Traffic Safety Administration (NHTSA) database. *Id.* The plaintiffs alleged that GM monitored those online forums and the NHTSA database, so GM must have known about the defects. *Id.*

This court rejected the *Smith* plaintiffs' arguments, holding that allegations of GM reading public message boards and monitoring the online NHTSA database were speculative absent supporting facts. *Id.* The allegations were not " 'frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day.' " *Id.* (quoting *Roe v. Ford Motor Co.*, No. 2:18-cv-12528, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019)). Further, the alleged safety defect was a cracked dashboard which, if an airbag malfunctioned, "could turn the plastic dashboards into deadly projectiles during a crash." *Id.* at 875. Thus, the danger could only materialize if the

dashboard cracked, the driver crashed, and the airbag malfunctioned. The defect's potential to harm consumers was therefore too attenuated. *See id.*

This case differs from *Smith* for two key reasons which, viewed together, demonstrate that plaintiffs plausibly allege Whirlpool's knowledge of the Defect and its safety risks. First, *Smith* involved allegations of constructive knowledge, whereas plaintiffs here pleaded actual knowledge arising from direct government communication made pursuant to federal law, rather than online public forums. Second, the Defect poses inherent safety risks, unlike the cracked dashboard in *Smith*.

First, *Smith* concerned constructive knowledge, and the necessary allegations absent in *Smith* are present here. The *Smith* plaintiffs never alleged that GM "engaged with or received complaints about the defective dashboard and its safety risk." *Smith,* 988 F.3d at 885. They merely offered allegations upon "information and belief" that GM monitored online forums and databases. *Id.*

By contrast, plaintiffs here allege that CPSC sent incident reports directly to Whirlpool pursuant to its obligation under federal law. Whereas the *Smith* plaintiffs alleged that GM knew of the defects from publicly available websites and the NHTSA databases—and included no allegation that the manufacturer had received such complaints directly—plaintiffs here plausibly allege that CPSC sent product harm reports directly to Whirlpool consistent with their reporting obligations. *See* 15 U.S.C. § 2055a(c)(1); 16 C.F.R. § 1102.20.

 **[9]**   Plaintiffs' allegations are far more specific than those in *Smith*. They allege the precise dates on which consumers sent complaints to CPSC, the contents of those complaints, and the dates on which CPSC forwarded the incident reports to Whirlpool. The amended complaint cites CPSC's database showing the dates CPSC sent consumer complaints about the Defect to Whirlpool. Accordingly, plaintiffs' allegations are more specific than the mere "information and belief" allegations in *Smith*. Therefore, plaintiffs plausibly allege that Whirlpool received CPSC incident reports concerning the Defect, giving rise to actual knowledge of the Defect.

 **\*6**  Second, the CPSC complaints sent to Whirlpool plausibly demonstrate that Whirlpool knew of the Defect's safety risks. Here, the Defect is that a Range may actuate unintentionally. And, if a Range actuates, gas will emanate from the user's stove. Accordingly, the Defect poses a safety risk inherent to the use of the Ranges. The CPSC incident reports and consumer complaints cited in the amended complaint discuss these concerns. (*See, e.g.,* Am. Compl., R. 13, PageID 126–128, 132–34, ¶¶ 81–85, 97–99.) These complaints plausibly demonstrate that Whirlpool knew the Defect poses a safety risk. *Contra Smith,* 988 F.3d at 885–86 (explaining that the customer complaints "might have put GM on notice about the cracked dashboard"—the defect—but not the safety risk associated with an event that had never manifested). Moreover, Whirlpool's own Range user manual contemplates the Range's safety concerns when it warns that failing to turn off all controls while not cooking "can result in death or fire." (Am. Compl., R. 13, PageID 122,

¶ 73.) And CPSC's involvement underscores the safety risks involved in this case, as Congress established CPSC due to its concern that consumers faced "unreasonable risks of injury" from products. 15 U.S.C. §§ 2051(a), 2053(a).

We conclude that a plaintiff plausibly alleges that a manufacturer knew of the alleged product defect when a government agency, required by law to transmit consumer complaints about a safety defect to a manufacturer, indeed transmits those complaints to the manufacturer. Online chatter is fundamentally different from direct government notice. Contrary to the dissent's characterization, this is not "a rule without a limitation," nor is it a new rule to distinguish *Smith*. (Dissent at —— – ——.) The limitation is apparent: a plaintiff must plausibly allege that the federal government notified a company of a safety defect, not merely that a consumer complained to the government or some other third party. *Cf. Smith*, 988 F.3d at 885.

This conclusion is consistent with the rules governing inferences in a Rule 12(b)(6) motion to dismiss. Assessing whether Whirlpool "engaged with or received" complaints requires us to draw inferences. *Smith*, 988 F.3d at 885. Here, plaintiffs assert that Whirlpool knew of the Defect because it received notice of the Defects from a governmental agency. The amended complaint goes on to provide, as examples, eight complaints identifying the safety concern and the dates CPSC sent each complaint to Whirlpool. If we concluded that Whirlpool did not "engage[ ] with or receive[ ]" these complaints despite CPSC having sent them, we would be drawing an inference in Whirlpool's favor. Rule 12(b)(6) requires us to do the opposite at the motion to dismiss stage. Fed. R. Civ. P. 12(b)(6); *see VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 399 (6th Cir. 2025).

The dissenting opinion concludes that plaintiffs fail to plausibly plead that Whirlpool engaged with or examined the consumer complaints, citing a lack of explanation of Whirlpool's process for engaging with the complaints. (Dissent at ——.) But plaintiffs could not know such information at this stage. Without discovery, plaintiffs cannot plausibly allege Whirlpool's processes for reviewing CPSC complaints. Through discovery, plaintiffs may determine whether Whirlpool examined or engaged with the complaints. At the motion to dismiss stage, where plaintiffs lack information about Whirlpool's internal process for reviewing government-produced consumer reports, plaintiffs have met their burden to allege that Whirlpool plausibly knew of the Defect.

At oral argument, counsel for Whirlpool argued that *Smith* requires three sets of allegations lacking in plaintiffs' amended complaint: plausible allegations that (1) Whirlpool engaged with or received consumer complaints; (2) the complaints were frequent enough that they constituted more than a "blip" on a manufacturer's radar; and (3) the complaints identify a safety defect. As discussed above, the amended complaint plausibly alleges that Whirlpool received consumer complaints and that those complaints identify a safety defect. Whether the CPSC reports were sufficiently frequent in number, however, requires further discussion.

**\*7** In *Smith*, we reasoned that the plaintiffs did not allege sufficiently frequent online complaints to infer constructive knowledge. There, the plaintiffs alleged that consumers posted on public forums but did not allege that any complaint was made—or sent—directly to GM. *Smith*, 988 F.3d at 885. We held that the plaintiffs failed to allege facts in support of their allegations that GM reads online message boards and NHTSA databases. *Id.* This distinction is key. Complaints made online to third parties, without any allegations that the complaints were received by the manufacturer, must be sufficiently frequent to plausibly infer that the manufacturer had learned of the issue. *Id.* (quoting *Roe*, 2019 WL 3564589, at \*7).

This reasoning makes sense in the constructive knowledge context. To infer constructive knowledge, the *Smith* plaintiffs had to allege that despite never directly receiving notice of the consumer complaints, the complaints were so frequent that GM must have heard the online chatter. *See id.* But here, we need not infer constructive knowledge because the complaints were plausibly sent to and received by Whirlpool pursuant to federal law.

We also cannot assess whether these CPSC incident reports were lost in a sea of complaints, *see Smith*, 988 F.3d at 885, because there is no record yet of the number of CPSC complaints Whirlpool receives. Plaintiffs cannot, at this preliminary stage of litigation, allege who at Whirlpool processes, stores, or reads complaints sent by CPSC. Nor can they allege how many CPSC complaints Whirlpool receives, making it difficult to determine whether these eight "examples" are an anomaly.[3]

Because knowledge can be alleged generally and only plausibility is required at the motion to dismiss stage, we reject Whirlpool's "number-of-complaints" argument. And we note that in its motion to dismiss before the district court, Whirlpool did not advance this number-of-complaints based argument. (*See* Br. in Support of Mot. to Dismiss, R. 26, PageID 490.) Instead, Whirlpool argued that the complaints failed to allege personal injury or property damage. (*Id.* ("Taken together, these complaints cited by Plaintiffs establish, at most, knowledge of a minor inconvenience, which is insufficient to support Plaintiffs' consumer fraud and warranty claims.").) Regardless, these eight incidents are cited as examples, and discovery may reveal how many complaints raised safety concerns.[4]

**\*8** For these reasons, plaintiffs plausibly alleged knowledge of the Defect and its related safety risks. The district court erred in ruling to the contrary.[5]

C.

The district court found that, even if plaintiffs had plausibly alleged pre-sale knowledge, plaintiffs' claims should be dismissed for failing to plausibly allege that Whirlpool had a duty to disclose the Defect. Because these claims arise under five states' laws, we consider each state's law below.

[10] [11] *Michigan*. Under Michigan law, highly misleading actions give rise to a duty to disclose product defects. *M&D, Inc. v. W.B. McConkey*, 231 Mich.App. 22, 585 N.W.2d 33, 39 (1998). And where a manufacturer has superior knowledge of a defect, not readily available to the consumer, the manufacturer has a duty to disclose. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021) (citing *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 553 (W.D. Mich. 1998)); *Estate of Pilgrim v. Gen. Motors LLC*, 596 F. Supp. 3d 808, 824–25 (E.D. Mich. 2022) (finding plaintiffs sufficiently alleged a duty to disclose under Michigan law where the manufacturer had superior knowledge of a defect causing engine parts to explode).

Consumers are not, as Whirlpool argues, required to inquire about a defect to trigger a manufacturer's duty to disclose. Though Whirlpool correctly notes that plaintiffs cite no Michigan state court case applying the "superior knowledge" rule, *M&D* did not hold that consumer inquiry was the *sole* circumstance imposing a duty to disclose. *See M&D*, 585 N.W.2d at 39 (noting that highly misleading actions give rise to a duty to disclose product defects). Indeed, we have held that the duty arises "*most commonly* in a situation where inquiries are made by the plaintiff," but not that an inquiry is always required. *See MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 666 (6th Cir. 2013) (quoting *Hord v. Env't Rsch. Inst. of Michigan*, 463 Mich. 399, 617 N.W.2d 543, 550 (2000)).

Whirlpool contends that, even if a duty to disclose arises out of superior knowledge, they lack such superior knowledge here. Because consumer complaints about the Defect were publicly available online, Whirlpool argues that plaintiffs had access to the same information as Whirlpool. But the Michigan Supreme Court has held otherwise when assessing fraud claims. *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 817 N.W.2d 562, 569 (2012) ("[A]lthough the doctrines of actionable fraud, innocent misrepresentation, and silent fraud each contain separate elements, none of these doctrines requires that the party asserting fraud prove that the fraud could not have been discovered through the exercise of reasonable diligence.").

*9 Moreover, we are reluctant to impose a duty of discovery on plaintiffs or defendants in this context. Doing so would contravene our reasoning in *Smith*. In *Smith*, we concluded that allegations of a manufacturer monitoring online message boards or public databases was insufficient to plausibly demonstrate knowledge. *See* 988 F.3d at 885–86. But here, Whirlpool asks us to conclude that, because plaintiffs could access similar information online, plaintiffs had the same knowledge as Whirlpool. (Appellee Br. 42 ("Plaintiffs cannot rely on these complaints to plead Whirlpool's knowledge while ignoring their relevance to their own knowledge.").)

 **[12]**  Whirlpool's knowledge is superior not because it read the publicly available online forums, but because it received incident reports directly from CPSC. Plaintiffs have not alleged that they received any similar notice from the government. Whirlpool thus had superior knowledge of the Defect, so plaintiffs adequately pleaded a duty to disclose the Defect under Michigan law. We reverse the district court's decision to the contrary.

 **[13]**    **[14]**  *Illinois*. Under Illinois law, "[i]n order to state a claim for fraudulent concealment, a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (1996) (citations omitted). The Illinois Supreme Court has held that a duty to disclose material facts may arise out of several situations, such as a fiduciary or confidential relationship or a situation where the defendant is in a position of "influence and superiority" over a plaintiff. *Id.* Illinois courts have since clarified that, in addition to those two examples, concealing or suppressing material facts can give rise to a duty to disclose. *See, e.g.*, *RWJ Mgmt. Co. v. BP Prods. N. Am. Inc.*, No. 09 L 7891, 2012 WL 11140385, at *8–9 (Ill. Cir. Ct. May 2, 2012) (collecting cases). "Mere silence in a transaction does not amount to fraud," but if a party is silent while suppressing material facts or deceiving another, a duty to disclose arises under Illinois law. *Id*.

These requirements are "fairly rigorous." *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 260 Ill.Dec. 735, 762 N.E.2d 1, 13 (2001), *as modified on denial of reh'g* (Nov. 27, 2001). And courts have disagreed regarding whether a safety risk imposes a duty to disclose under Illinois law. *Compare O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 965 (N.D. Ill. 2021) (rejecting the plaintiffs' argument that Illinois law imposes a duty to disclose safety defects), *with In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 414 (S.D.N.Y. 2017) (discussing that at least two other courts had found a duty to disclose safety defects under Illinois law), *modified on reconsideration*, No. 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).

 **[15]**  Here, plaintiffs do not plausibly allege that Whirlpool had a duty to disclose under Illinois law. Plaintiffs concede they lacked a confidential or fiduciary relationship with Whirlpool but argue that Whirlpool concealed material facts. Their allegations do not, however, specify how Whirlpool concealed those facts, seeming instead to rely on a few courts' decisions finding that a safety risk imposes a duty to disclose under Illinois common law.

Plaintiffs' reliance on the "safety risk" duty to disclose argument lacks a strong basis in Illinois law. The two cases cited in *In re General Motors LLC Ignition Switch Litigation* were from district courts in New Jersey and Florida, and neither contained a thorough analysis of Illinois law. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-CV-2765, 2017 WL 1902160, at *20 (D.N.J. May 8, 2017); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-CV-24009, 2017 WL 2406711, at *5 (S.D. Fla. June 1, 2017).

**\*10**  Accordingly, we affirm the district court's determination that plaintiffs did not sufficiently plead a duty to disclose the Defect under Illinois law.

[16]    [17]  *Oklahoma*. Under Oklahoma law, "a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction." *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 854 (Okla. 2020) (citation omitted). Such circumstances exist where the "offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party." *Id.* And, where someone knows of a fact "peculiarly within [their] knowledge and the other person is not in a position to discover [it,]" they have a duty to disclose that material fact. *Seay v. Weaver*, No. 19-CV-00474-GKF-JFJ, 2021 WL 3686695, at \*6 (N.D. Okla. July 23, 2021) (citing Oklahoma Uniform Jury Instructions – Civil 18.5). The district court erred by requiring that plaintiffs allege a confidential or fiduciary relationship to establish a duty to disclose.

[18]  Plaintiffs argue that Whirlpool created a false impression regarding the Defect. Specifically, they argue that they each expected a two-part actuation system but received a Range with the Defect—where the Range would actuate with a single motion. Because the amended complaint plausibly alleges that Whirlpool had superior knowledge over the ordinary consumer, plaintiffs plausibly alleged a duty to disclose under Oklahoma law. We reverse the district court's decision finding otherwise.

[19]    [20]  *New Hampshire*. Under New Hampshire law, "[a] duty to disclose arises when a seller knows of a concealed defect which is unknown to the buyer and not capable of detection by the buyer, provided the defect is dangerous to life or property." *Univ. Sys. of New Hampshire v. U.S. Gypsum Co.*, 756 F. Supp. 640, 651 (D.N.H. 1991) (citing *Ingaharro v. Blanchette*, 122 N.H. 54, 440 A.2d 445, 447 (1982)). The district court found that Whirlpool had no duty to disclose because Whirlpool lacked the requisite knowledge. Because plaintiffs plausibly pleaded Whirlpool's knowledge, however, they plausibly pleaded Whirlpool's duty to disclose under New Hampshire law. Therefore, we reverse the district court's decision dismissing plaintiffs' claim under New Hampshire law.

*Nevada*. Whirlpool did not move to dismiss plaintiffs' Nevada fraud claim for lack of a duty to disclose. (*See* Reply, R. 32, PageID 586–87.) Accordingly, plaintiffs' Nevada claim will be reinstated.

D.

Finally, we consider whether the district court erred by dismissing plaintiffs' state consumer protection claims. We address each state claim in turn.

*Michigan*. Plaintiffs allege Whirlpool violated the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*

Plaintiffs argue that they need not prove that Whirlpool knowingly made false statements or had a duty to disclose the Defect. Whirlpool counters that, even if the Michigan Act does not require Whirlpool's knowledge of the defect, plaintiffs' claim fails because "where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff," a plaintiff cannot maintain a claim. *Evans v. Ameriquest Mortg. Co.*, No. 233115, 2003 WL 734169, at *3 (Mich. Ct. App. Mar. 4, 2003) (per curiam) (citation omitted).

 **\*11**  **[21]**  For the reasons stated previously, Whirlpool's argument lacks merit. Plaintiffs could not discover the Defect prior to purchasing their Ranges through an online or visual inspection— the Defect is purely physical, and plaintiffs plausibly alleged Whirlpool had superior knowledge. Accordingly, plaintiffs plead plausible claims under the Michigan Act.

*Illinois*. Plaintiffs allege Whirlpool violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1, *et seq.* While the parties argue about whether the district court incorrectly analyzed the Illinois common law and statutory claims together because of Federal Rule 9(b)'s heightened pleading requirements, the district court erred for a separate reason. The district court incorrectly required plaintiffs to plead a duty to disclose under the Illinois Act. The district court should have recognized that "[t]he [Illinois Act] generally does require that sellers engaged in trade or commerce disclose any material facts to consumers, regardless of the existence of a common law duty." *Miller*, 260 Ill.Dec. 735, 762 N.E.2d at 14; *Celex Grp., Inc. v. Exec. Gallery, Inc.*, 877 F. Supp. 1114, 1130 (N.D. Ill. 1995).

 **[22]**  Thus, while plaintiffs' claim under Illinois common law fails for failure to plausibly allege a duty to disclose, no such duty is required under the Illinois Act. They, therefore, plausibly allege a claim under the Illinois Act.

 **[23]** *Oklahoma*. Plaintiffs allege Whirlpool violated the Oklahoma Consumer Protection Act, Okla. Stat. tit. 5, §§ 751, *et seq.* Claims under the Oklahoma Act must plausibly allege pre-sale knowledge. Okla. Stat. Ann. tit. 15, § 753 (prohibiting "[m]ak[ing] a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction"). Because plaintiffs plausibly allege Whirlpool's pre-sale knowledge, they allege plausible claims under the Oklahoma Act.

**[24]    [25]** *New Hampshire*. Plaintiffs allege Whirlpool violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* New Hampshire's consumer protection statute requires pre-sale knowledge of a defect. *See Kelton v. Hollis Ranch, LLC*, 155 N.H. 666, 927 A.2d 1243, 1246 (2007) (explaining that "[t]he plain language of" New Hampshire's consumer-protection statute "indicates that some element of knowledge on the part of the defendant is required"). Because plaintiffs plausibly alleged pre-sale knowledge, they plausibly allege claims under the New Hampshire Act.

**[26]** *Nevada*. Plaintiffs allege Whirlpool violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0999, *et seq.* Plaintiffs charge that Whirlpool did not argue, and the district court did not hold, that their Nevada statutory claims failed for a lack of duty to disclose. As such, they reiterate that their Nevada statutory claim should be reinstated. Because plaintiffs plausibly alleged pre-sale knowledge, they plausibly allege claims under the Act.

## III.

For the foregoing reasons, we affirm in part and reverse in part the district court's order granting Whirlpool's motion to dismiss plaintiffs' amended complaint. Plaintiffs' common law fraud and consumer protection claims—aside from plaintiffs' Illinois common law fraud claim—shall be reinstated.

COLE, J., delivered the opinion of the court in which MOORE, J., concurred. LARSEN, J. (pp. 20–24), delivered a separate dissenting opinion.

**DISSENT**

LARSEN, Circuit Judge, dissenting.

**\*12** I agree with the majority's conclusion that the named plaintiffs have Article III standing to pursue their claims against Whirlpool. I disagree, however, that plaintiffs have sufficiently alleged that Whirlpool had knowledge of the defect. Because the lack of knowledge dooms plaintiffs' claims, I would affirm the district court in its entirety. I respectfully dissent.

## I.

First, standing. Article III allows courts to decide only "Cases" and "Controversies." U.S. Const., art III, § 2. For standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021).

The question here focuses on the first standing requirement—injury in fact. To satisfy this requirement, the injury must be "concrete—that is, real, and not abstract." *Id.* at 424, 141 S.Ct. 2190 (citation omitted). "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only the rights of individuals, and that federal courts exercise their proper function in a limited and separate government." *Id.* at 423, 141 S.Ct. 2190 (citations omitted). "[T]raditional tangible harms, such as physical harms and monetary harms," suffice. *Id.* at 425, 141 S.Ct. 2190. Where a party seeks monetary relief, such as damages, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm." *Id.* at 436, 141 S.Ct. 2190.

At this stage in the case, "we take as true the well-pleaded allegations in the complaint and ask whether plaintiffs plausibly alleged their standing to sue." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022). The named plaintiffs here have each alleged that the ranges they purchased have a defect—that is, they turn on inadvertently. Each of the named plaintiffs experienced the unintended actuation. They allege that the unintended actuations resulted in the ranges omitting gas into their homes without warning and, in one instance, causing a fire. As such, the alleged defect in the ranges manifested for each of the named plaintiffs. Those allegations are sufficient to confer standing. *See Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 315 (6th Cir. 2025) (en banc).

II.

Although I agree with the majority's conclusion that the plaintiffs have standing, I depart from the majority opinion on the question of Whirlpool's knowledge. Plaintiffs' claims for fraud by omission, and for violation of the relevant state consumer protection statutes, cannot succeed unless Whirlpool had knowledge of the defect. Plaintiffs have failed to adequately allege Whirlpool's knowledge, and that is fatal to plaintiffs' complaint.[1]

 **\*13** Generally, when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Even under generalized pleading rules, however, plaintiffs' amended complaint fails to adequately plead Whirlpool's knowledge of the defect.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

In *Smith v. General Motors, LLC*, we examined whether General Motors (GM) had knowledge of a defect that led to cracked dashboards in vehicles that it had sold. 988 F.3d 873, 885 (6th Cir. 2021). There, "[p]laintiffs only offered 'information and belief' that GM knew of the complaints." *Id.* at 885. We held that such allegations were insufficient because there was no factual basis for them. *Id.* According to the complaint in *Smith*, GM should have been aware of a flood of customer complaints, which "came as online posts on car websites ... and complaints on the [National Highway Traffic Safety Administration (NHTSA)] database about the cracks, including 239 NHTSA safety complaints related to the cracked dashboards." *Id.* We held that this was insufficient to allege GM's knowledge. The allegations were too speculative to show knowledge because they would have been "a blip" on GM's "complaints-and-repairs radar considering the millions of ... cars in use." *Id.* (citation omitted). "[N]othing show[ed] that the complaints about GM's cracked dashboards were frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day." *Id.* (citation omitted). So, "[w]ithout supporting facts that GM engaged with or received complaints about the defective dashboard and its safety risk, the consumer complaints [were] insufficient to allege that GM knew about the defective dashboard under the 12(b)(6) pleading standard." *Id.*

The allegations here are even less substantial than those found insufficient in *Smith*. Plaintiffs attempt to show Whirlpool's knowledge through two categories of consumer complaints; but whether taken alone or together, they fail to adequately allege knowledge. First, according to the amended complaint, "[c]onsumers have submitted numerous incident reports about the Defect to the U.S. Consumer Product Safety Commission ('CPSC')." R. 13, Amended Complaint, PageID 126. The complaint then provides eight examples. Two of those reports were made in 2016, one in 2017, two in 2018, two in 2019, and one in 2020. Eight complaints over a five-year span are not enough to have put Whirlpool on notice by the time the last plaintiff bought her range in 2021. And it's even more true that three complaints over two years could not have been enough to put Whirlpool on notice when the first plaintiff bought her range in 2018.

Plaintiffs next identify online consumer complaints, which they allege were submitted "directly to Whirlpool via reviews posted to its website." *Id.* at 129. But like the CPSC complaints, only a handful came before the alleged purchases here.[2] Our holding in *Smith* compels the conclusion that the handful of consumer complaints alleged here fall far short of showing Whirlpool's knowledge of the defect. In *Smith*, we deemed 239 complaints to be a "blip" on GM's radar, given the millions of GM cars in use. 988 F.3d at 885. Here, plaintiffs offer only a few complaints that allegedly should have put Whirlpool on notice that several models of the ranges they made were defective.

**\*14** Further, as in *Smith*, there is no plausible allegation here that Whirlpool engaged with the alleged consumer complaints. The closest the complaint comes is the allegation that the CPSC "transmitted all th[e] complaints to" Whirlpool. R. 13, Amended Complaint, PageID 126. But

without further explanation of the process by which Whirlpool examined those few complaints, the allegations are insufficient to establish that Whirlpool engaged with or actually knew of the alleged defect, such that it thought it needed to do something about it. *Smith*, 988 F.3d at 885. Accordingly, plaintiffs have failed to plausibly allege that Whirlpool had sufficient knowledge of the alleged defect.

The majority opinion creates a new rule in an attempt to distinguish *Smith*: "a plaintiff plausibly alleges that a manufacturer knew of the alleged product defect when a government agency, required by law to transmit consumer complaints about a safety defect to a manufacturer, indeed transmits those complaints to the manufacturer." Maj. Op. at ——–——. That is a rule without a limitation. Is one consumer complaint sufficient to give a company the size of Whirlpool knowledge that it must act to investigate and fix a defect in a product or else face a potential class-action lawsuit? If not, then why is eight (at most) sufficient? What about when multiple product models are involved, as here? The amended complaint lists sixteen models and purports to include "all other models (discontinued or still available for sale) containing substantially similar front-mounted burner controls." R. 13, Amended Complaint, PageID 119. Even if we disregard the dates of the complaints and countenance all eight provided in the pleading, they encompass only four of the sixteen models identified in plaintiffs' amended complaint, with five of the eight complaints pertaining to the same model.[3] What's more, five of the complaints pertain to the range model purchased by two of the named plaintiffs; the rest of the complaints aren't related to the models purchased by the remaining plaintiffs at all. The majority opinion offers no case to show that such a miniscule number of complaints, even if transmitted directly to Whirlpool, is sufficient to put a company of this size on notice that it must investigate and fix an alleged defect in sixteen or more different range models.

The majority opinion also faults Whirlpool for not raising its "number-of-complaints based argument" in its motion to dismiss. Maj. Op. at ——. But Whirlpool's brief in support of the issue at least touched on that issue. *See* R. 26, PageID 489 ("Plaintiffs fail to plausibly allege Whirlpool's pre-sale knowledge of a safety defect about which it did not warn."); *id.* ("[T]o establish these claims, Plaintiffs must plead Whirlpool's pre-sale knowledge of the defect."). And, in any event, the district court expressly discussed this issue in its opinion and order. R. 40, Dist. Ct. Order, PageID 726–27. That is sufficient to make the issue live for our review. *See Raines v. United States*, 898 F.3d 680, 687 (6th Cir. 2018) ("There can be no forfeiture where the district court, despite a party's failure to press an argument, nevertheless addressed the merits on the issue." (cleaned up)).

Plaintiffs' failure to adequately allege knowledge is fatal to their claims for fraud by omission and violation of the relevant state consumer protection statutes. For that reason, I would affirm the district court's grant of the motion to dismiss in Whirlpool's favor in its entirety. I respectfully dissent.

## All Citations

--- F.4th ----, 2025 WL 2237654

Footnotes

1    Plaintiffs' putative class action also alleges a sub-class of consumers who purchased an electric Range. Plaintiffs, however, never owned an electric Range. The district court held that plaintiffs had standing at the Rule 12(b)(6) stage to assert claims on behalf of the sub-class of electric Range owners. Whirlpool has not appealed that ruling, and the parties do not address the electric Range in their briefing. Accordingly, issues regarding the putative electric Range sub-class are not before us.

2    This is not to say that a consumer who purchases a product with an unmanifested defect has not suffered an Article III injury. Indeed, this court in *Speerly* recognized that "[m]ost of our sister circuits" to confront this issue—the First, Fifth, Seventh, Ninth, and Eleventh —have permitted consumers to proceed with unmanifested defect claims under an overpayment theory of liability. 143 F.4th at 314 (collecting cases). Our precedent similarly supports a theory of standing for economic injuries where a product's defect has not yet manifested. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 856–57 (6th Cir. 2013); *see also Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 581 (6th Cir. 2013) (concluding that paying more for a product because of a company's misrepresentations was enough to demonstrate a concrete injury-in-fact). Regardless, *Speerly* made certain that each consumer whose product has manifested a defect has suffered a concrete Article III injury.

3    The dissenting opinion contends that *Smith*'s number-of-complaints reasoning controls here due to the few examples of complaints cited compared to the size of Whirlpool. (Dissent at ——.) But the dissenting opinion's reasoning would create a sliding scale of protection for larger companies, requiring courts to ascertain whether a certain number of complaints was sufficient to put a company of a certain size on notice that its product had a defect. Such a sliding scale approach would be unworkable.

4    The dissenting opinion asserts that the district court expressly discussed the "number-of-complaints" issue in its opinion and order. (Dissent at —— – ——.) It did not. The district court focused on the safety implications of the defect, concluding that "[p]laintiffs neither allege facts nor provide information to support the conclusory assertion that the complaints were sent to [Whirlpool] by the CPSC, nor that the complaints contained sufficient information to put [Whirlpool] on notice of the alleged safety implications of the Defect." (Op. and Order, R. 40, PageID 726.) To be sure, it cited *Roe v. Ford Motor Co.*, No. 2:18-cv-12528, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019), which discussed whether a complaint had identified enough complaints. But the district court's reasoning plainly relied on whether the complaints identified a safety concern, not the number of complaints made.

5    Whirlpool's brief and the dissenting opinion note that no CPSC complaints in the amended complaint pertained to the Range models purchased by plaintiffs Buschman, Lester, and Meyerholz. Because Whirlpool did not make this argument below and instead argued that plaintiffs' allegations "establish, at most, knowledge of a minor inconvenience," (Mot. to Dismiss, R. 26, PageID 490), plaintiffs never had the opportunity to seek leave to amend and address this deficiency. On remand, plaintiffs should seek leave to include such examples.

1    The district court also dismissed plaintiffs' claims for violation of the Magnuson-Moss Warranty Act, for breach of express and implied warranty, and for unjust enrichment. Plaintiffs don't challenge the dismissal of those claims on appeal. *See* Appellants Br. at 20 ("Plaintiffs appeal the district court's dismissal of their claims for common law fraud by omission and the violation of several state consumer protections statutes."). So they have abandoned them. *See Castellon-Vogel v. Int'l Paper Co.*, 829 F. App'x 100, 102 (6th Cir. 2020).

2    The amended complaint also alleges that "certified Whirlpool appliance technicians have observed unintentional actuation in Ranges in the field." R. 13, Amended Complaint, PageID 134. Plaintiffs have abandoned any such reliance on that allegation before this court by not addressing it. So that leaves only the CPSC complaints and the complaints posted to Whirlpool websites.

3    Four of the complaints reference Model No. WGG745S0FS02, while one references Model No. WGG745S0FS. The amended complaint lists only the former as among the models at issue, so I proceed under the assumption that they are the same. Even if not, the point remains the same.

**Tapply v. Whirlpool Corporation, --- F.4th ---- (2025)**

2025 WL 2237654

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2437259
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Cecil A. COLLINS, Jr., Plaintiff-Appellant,
v.
Wilmer Jones HAM, Carol Cottrell, and Darnell Earley, Defendants-Appellees.
Cecil A. Collins, Jr., Plaintiff-Appellant,
v.
City of Saginaw, Defendant-Appellee.

Docket Nos. 275494, 275493.
|
June 17, 2008.

Saginaw Circuit Court; LC No. 05-058461-CK, 06-059867-CK.

Before: GLEICHER, P.J., and FITZGERALD AND HOEKSTRA, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff filed two separate actions arising from his termination as the city manager for the city of Saginaw, one against the city and the other against various individual defendants. The actions were consolidated below and the trial court granted defendants' joint motion for summary disposition, dismissing plaintiff's various claims under MCR 2.116(C)(7), (8), and (10). Plaintiff appeals as of right. Because the trial court did not err in dismissing plaintiff's claims, we affirm.

I. Underlying Facts

Plaintiff was hired as the city manager for the city of Saginaw. His written employment contract contained the following term regarding termination of the agreement:

**3. *TERM OF AGREEMENT.*** This Agreement is for an indefinite term as required by Section 25 of the City Charter. The Agreement may be terminated by either party at any time for any reason

2008 WL 2437259

subject to the requirements of Section 27 of the City Charter and as provided in Paragraphs 4 and 5 below.

Section 27 of the city charter provides:

**Removal**

Section 27. The manager may be removed by a majority vote of the members of the council as herein provided, except that no manager who has been in the service of the city for one (1) year or more prior to a regular city election shall be removed within the ninety (90) days subsequent to such election unless by a two-thirds vote of the members of the council. At least thirty (30) days before removal of the manager, the council shall adopt a resolution stating its intention to remove him and the reasons therefor, a copy of which shall be served forthwith on the manager, who may within ten (10) days demand a public hearing, in which event the final resolution removing the manager shall not be adopted until such public hearing has been held. Upon passage of a resolution stating the council's intention to remove the manager, the council may suspend him from duty, but his pay shall continue until his removal. The action of the council in removing the manager shall be final.

At a meeting on September 12, 2005, the city council voted to terminate plaintiff's employment by a vote of five to four. A written resolution, dated September 16, 2005, provided:

Whereas, Councilwoman Cottrell stated it was her opinion that the relationship between Council and the Manager had irreparably deteriorated, she moved to terminate the employment relationship with the City Manager effective immediately.

Adopted by the following vote:

Ayes: Councilpersons Cottrell, Coulouris, Federspiel, Coleman and Mayor Ham-5.

Nays: Councilpersons Haynes, O'Neal, Soza and Thurin-4.

Plaintiff was later notified that he was suspended as city manager, effective September 12, 2005, subject to his right to request a public hearing. Defendant Darnell Earley replaced plaintiff as interim city manager. Following a public hearing on November 3, 2005, the council voted to terminate plaintiff's employment.

Plaintiff filed an action against three city officials, Wilmer Jones Ham, the city's mayor, Carol Cottrell, a city council member and mayor pro tem, and Earley, who had been the deputy city manager until July 2005, when plaintiff decided to eliminate that position. Earley declined reassignment as the city's director of finance and agreed to the termination of his employment on August 31, 2005. Plaintiff's complaint against these individual defendants included a claim for tortious interference with a contract or advantageous business relationship or expectancy, alleging that Ham, Cottrell, and Earley conspired to terminate his employment in order to appoint Earley

as city manager, contrary to the terms of plaintiff's employment agreement, the city charter, and the Open Meetings Act (OMA), MCL 15.261 *et seq.*

**\*2** Plaintiff filed a separate action against the city, asserting claims for (1) breach of contract, (2) breach of fiduciary duty, (3) defamation, and (4) violation of the OMA. Plaintiff alleged that the city breached his employment agreement by failing to comply with § 27 of the city charter. Plaintiff also alleged that he was defamed by the city counsel's attorney and others at the November 3, 2005, public hearing. Plaintiff alleged that the city violated the OMA when Mayor Ham and Councilperson Cottrell conferred with other council members in private and took a vote to terminate plaintiff's employment and appoint Earley as the city manager.[1]

After the trial court consolidated the two cases, defendants jointly moved for summary disposition under MCR 2.116(C)(7), (8), and (10). The trial court dismissed the breach of contract claim under MCR 2.116(C)(10), finding that the evidence showed that the city substantially complied with the requirements of § 27 of the city charter and, therefore, plaintiff could not establish a breach of his employment contract. The court dismissed the defamation claim under MCR 2.116(C)(7) and (8), concluding (1) that any statements made by the city's attorney at the public hearing were not defamatory, and (2) that the challenged comments were made at a legislative hearing regarding government activity, entitling the city to immunity. The court dismissed the OMA claim under MCR 2.116(C)(10), because the evidence showed that the city council voted to terminate plaintiff's employment at duly noticed meetings, and the record established that only informal discussions were held among council members, which was insufficient to establish a violation of the OMA. Lastly, the court dismissed the tortious interference claim against the individual defendants under MCR 2.116(C)(10), because plaintiff failed to establish that defendants, in terminating plaintiff's employment, committed any per se wrongful act or committed a lawful act with malice.

II. Standard of Review

This Court reviews a trial court's summary disposition decision de novo. *Spiek v. Dep't. of Transportation,* 456 Mich. 331, 337; 572 NW2d 201 (1998). The trial court granted summary disposition under MCR 2.116(C)(7), (8), and (10).

Summary disposition may be granted under MCR 2.116(C)(7) when a claim is barred by governmental immunity.

> A defendant who files a motion for summary disposition under MCR 2.116(C)(7) may (but is not required to) file supportive material such as affidavits, depositions, admissions, or other documentary evidence. MCR 2.116(G)(3); *Patterson v. Kleiman,* 447 Mich. 429, 432; 526 NW2d 879 (1994). If such documentation is submitted, the court must consider it. MCR

2.116(G)(5). If no such documentation is submitted, the court must review the plaintiff's complaint, accepting its well-pleaded allegations as true and construing them in a light most favorable to the plaintiff. [*Turner v. Mercy Hosps. & Health Services of Detroit,* 210 Mich.App 345, 348; 533 NW2d 365 (1995).]

**\*3** A motion under MCR 2.116(C)(8) tests the legal sufficiency of the plaintiff's complaint by the pleadings alone. *Gillie v. Genesee Co. Treasurer,* 277 Mich.App 333, 344; 745 NW2d 137 (2007). All well-pleaded factual allegations are taken as true, as well as any reasonable inferences or conclusions that can be drawn from the allegations. *Peters v. Dep't. of Corrections,* 215 Mich.App 485, 486; 546 NW2d 668 (1996). The motion should be granted only if a claim is so clearly unenforceable as a matter of law that no factual development could justify recovery. *Id.* at 487.

A motion under MCR 2.116(C)(10) tests the factual support for a claim. *Farm Bureau Ins Co v. Abalos,* 277 Mich.App 41, 44; 746 NW2d 886 (2008). The court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in a light most favorable to the nonmoving party. MCR 2.116(G)(5); *Abalos, supra* at 44. Summary disposition should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Babula v. Robertson,* 212 Mich.App 45, 48; 536 NW2d 834 (1995).

III. Tortious Interference with a Business Relationship or Contract

"The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Services, Inc .,* 268 Mich.App 83, 89-90; 706 NW2d 843 (2005). A claim for tortious interference with a business relationship or expectancy requires proof of

(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted. [*PT Today, Inc. v. Comm.'r of the Office of Financial & Ins. Services,* 270 Mich.App 110, 148; 715 NW2d 398 (2006).]

Tortious interference with a business relationship or expectancy need not be predicated on an enforceable contract. *Health Call of Detroit, supra* at 90.

Regardless of the theory, plaintiff must prove improper interference by defendants:

In order to establish tortious interference with a contract or business relationship, plaintiffs must establish that the interference was improper. *Patillo v. Equitable Life Assurance Society of the*

*United States,* 199 Mich.App 450, 457; 502 NW2d 696 (1992). In other words, the intentional act that defendants committed must lack justification and purposely interfere with plaintiffs' contractual rights or plaintiffs' business relationship or expectancy. *Winiemko v. Valenti,* 203 Mich.App 411, 418 n 3; 513 NW2d 181 (1994) (citations omitted); *Feldman v. Green,* 138 Mich.App 360, 369; 360 NW2d 881 (1984). The "improper" interference can be shown either by proving (1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiffs' contractual rights or business relationship. *Id.* [*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n.,* 257 Mich.App 365, 383; 670 NW2d 569 (2003), aff'd 472 Mich. 91 (2005).]

**\*4** Actions motivated by legitimate business reasons do not constitute improper motive or interference. *Badiee v. Brighton Area Schools,* 265 Mich.App 343, 366; 695 NW2d 521 (2005).

It appears that plaintiff's claim is based exclusively on defendants' alleged tortious interference with a contract. First, as discussed in part IV of this opinion, *infra,* plaintiff failed to show that his employment contract was breached.

Second, plaintiff failed to show that there was an unjustified interference with his contract. Plaintiff's employment relationship with the city was at will, subject only to the requirements of § 27 of the city charter, and plaintiff's removal as city manager was within the scope of defendant Cottrell's and defendant Ham's authority as city officials.

Under a claim of tortious interference with an at-will employment contract, where the defendant is an officer of the employer, a plaintiff has the particularly heavy burden of proving that the officer was acting outside the scope of her authority. *Feaheny v. Caldwell,* 175 Mich.App 291, 304-305; 437 NW2d 358 (1989). Further, such a claim requires "proof, with specificity, of affirmative acts by the defendants which corroborated the unlawful purpose of the interference." *Id.* at 305. [*Coleman-Nichols v. Tixon Corp.,* 203 Mich.App 645, 657; 513 NW2d 441 (1994).]

Such proof is required because the actions of officers, when serving as agents on behalf of a corporation, are privileged, as opposed to acting to further strictly personal motives. *Feaheny v.. Caldwell,* 175 Mich.App 291, 305; 437 NW2d 358 (1989), overruled in part on other grounds in *Health Call, supra.*

Plaintiff failed to show that defendants Cottrell or Ham were acting solely for their own benefit. Although plaintiff alleges that defendants Cottrell and Ham conspired to remove him as city manager, it was within the scope of their authority to do so. Even if plaintiff could offer admissible evidence that Cottrell was involved in a personal relationship with Earley, plaintiff failed to refute defendants' evidence that numerous other city employees had complained about plaintiff's management style, providing justification for the city council's decision. Further, the decision to terminate plaintiff's employment was made by the city council as a body whole, and plaintiff failed to show that the other council members who voted to terminate plaintiff's employment were wrongfully motivated or that either Cottrell or Ham falsified any evidence that was used to

convince their fellow council members to vote to terminate plaintiff's contract. Also, the fact that Cottrell wanted to replace plaintiff with Earley is not a per se wrongful or malicious act. The city needed to have an acting manager in place if plaintiff's employment was terminated or suspended.

Defendant Earley was not an elected city official, but plaintiff also failed to establish support for the tortious interference claim against him. Plaintiff relies on a letter that Earley wrote to city council members about plaintiff and the circumstances surrounding Earley's termination as deputy city manager. But nowhere in the letter did Earley state that plaintiff should be terminated from his position. Further, plaintiff has not shown that the letter constitutes a wrongful act, e.g., by containing false or defamatory statements, and nothing in the letter supports a finding that it was written with malice or without justification. Thus, the letter does not support plaintiff's tortious interference claim against Earley.

 **\*5**  For these reasons, the trial court did not err in dismissing plaintiff's tortious interference claim against the individual defendants.

IV. Breach of Contract

Next, plaintiff argues that the trial court erred in dismissing his breach of contract claim against the city, because his employment contract required the city to comply with § 27 of the city charter and the city failed to comply with those requirements.

Plaintiff's employment contract specified that his employment could be terminated at any time, subject to the requirements of § 27 of the city charter. Under § 27, the city council was required to comply with the following procedures before plaintiff's employment could be terminated:

(1) adopt a resolution at least 30 days before the manager's removal, stating its intention to remove him and why,

(2) approve the resolution by a majority vote,

(3) serve a copy of the resolution on the manager,

(4) upon passage of the resolution to remove the manager, the council could suspend the manager with pay until his removal,

(5) within ten days of receiving the resolution, the manager must make a request for a public hearing, if one is desired, and

(6) if a public hearing is requested by the manager, the final resolution removing the manager shall not be adopted until that hearing is held.

First, it is undisputed that the city council voted to terminate plaintiff's employment at a meeting on September 12, 2005, by a vote of five to four. That vote was reflected in a written resolution that was approved on September 16, 2005, which provided that "Councilwoman Cottrell stated it was her opinion that the relationship between Council and the Manager had irreparably deteriorated, she moved to terminate the employment relationship with the City Manager effective immediately." It is undisputed that plaintiff was served with a copy of the resolution. Thus, the evidence showed that the city council adopted and approved a resolution reflecting its intent to terminate plaintiff's employment and the reason why, that the resolution was served on plaintiff, and that the resolution was adopted at least 30 days before the public hearing was held in November 2005.

Plaintiff argues that the fourth requirement was not followed because the language of the September 12, 2005, resolution indicated that he was terminated immediately, rather than suspended pending his right to request a hearing. Although the resolution indicates that the council voted to "terminate" plaintiff's employment, it is undisputed that the city notified plaintiff that he had been suspended, effective September 12. Additionally, it is undisputed that plaintiff continued to be paid during the interim period before the public hearing, as required by § 27. Thus, despite the language of the September 12, 2005, resolution, the procedures required by § 27 were complied with. See *Gibson v. Group Ins. Co. of Michigan,* 142 Mich.App 271, 275-276; 369 NW2d 484 (1985) ("Michigan follows the substantial performance of contract rule").[2] Thus, there is no merit to plaintiff's argument that the city's actions amounted to an amendment of § 27's requirements. Rather, the city amended its actions to conform to § 27's requirements.

**\*6** We also reject plaintiff's argument within this issue that his right to due process was violated. "A public employee does not have a property interest in continued employment when the position is held at the will of the employee's superiors and the employee has not been promised termination only for just cause." *Manning v. Hazel Park,* 202 Mich.App 685, 694; 509 NW2d 874 (1993). Public employment alone is not a property interest automatically entitling the employee to procedural due process. *Id.* A public employer need not comply with procedural due process protections unless the employee has a property right in his employment. *Id.;* see also *James v. City of Burton,* 221 Mich.App 130, 134; 560 NW2d 668 (1997). A property right can arise by contract or statute. *Manning, supra* at 694.

Plaintiff's employment was at the will of the city council. The council was permitted to terminate plaintiff's employment "at any time," subject only to the requirements of § 27 of the city charter. Contrary to what plaintiff argues, he was an at-will employee because there were no promises

that his employment would be terminated only for just cause. See *Rood v. Gen. Dynamics Corp.,* 444 Mich. 107, 116-117; 507 NW2d 591 (1993) ("To overcome the presumption of employment at will, a party must present sufficient proof ... of ... a provision forbidding discharge absent just cause"). Although the city council was obligated by § 27 to provide reasons for its decision, those reasons were not required to meet the just-cause standard. Thus, for purposes of procedural due process, the city was only obligated to follow the requirements of § 27, because that is all it agreed to do in its contract with plaintiff.

Plaintiff also argues that, under § 27, only he could request a public hearing and that he withdrew his request for a public hearing after the city council refused to allow a full adversarial hearing before the council. The record does not support plaintiff's claim.

It is undisputed that plaintiff requested a public hearing. After plaintiff's attorney raised issues concerning the nature and scope of the public hearing, however, the city's attorney responded in a letter dated October 21, 2005, requesting clarification whether plaintiff was withdrawing his request for a public hearing. Plaintiff has not submitted any evidence showing that he contacted the city after October 21, 2005, to indicate that he did not desire a public hearing. Absent a clear indication by plaintiff that he was withdrawing his request for a public hearing, the city properly proceeded with the scheduled hearing. Plaintiff has not demonstrated an error on this basis.

Plaintiff also argues that his right to due process, U.S. Const, Am XIV; Const 1963, art 1, § 17, was violated because of the lack of notice regarding specific reasons for his removal and because an adversarial hearing was not permitted. Plaintiff complains that he was not permitted to confront the city council about the reasons for his removal. As the trial court found, § 27 only required a "public hearing," and the hearing in this case satisfied the due process requirements of notice and an opportunity to be heard. *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 546; 105 S Ct 1487; 84 L.Ed.2d 494 (1985); *Tomiak v. Hamtramck School Dist.,* 426 Mich. 678, 700-701; 397 NW2d 770 (1986). The city council's written resolution provided the reason for its decision, and plaintiff had the opportunity to address that reason at the public hearing. Plaintiff cannot establish a violation of his due process rights on the basis of his own decision not to appear and participate in the hearing. See *Mollett v. City of Taylor,* 197 Mich.App 328, 345; 494 NW2d 832 (1992) (no violation of the plaintiff's due process rights when the plaintiff failed to avail himself of the available remedial procedures and the available procedures comported with due process). Plaintiff has not established that he was entitled to a full evidentiary hearing as a matter of due process.

**\*7** For these reasons, we affirm the trial court's dismissal of plaintiff's breach of contract claim.

V. Open Meetings Act Claim

2008 WL 2437259

Plaintiff argues that the city violated the OMA because Ham and Cottrell met with other council members before the September 12, 2005, meeting at which the council voted to terminate plaintiff's employment.

Plaintiff relies on MCL 15.263, which provides, in relevant part:

> (1) All meetings of a public body shall be open to the public and shall be held in a place available to the general public. All persons shall be permitted to attend any meeting except as otherwise provided in this act....
>
> (2) All decisions of a public body shall be made at a meeting open to the public.
>
> (3) All deliberations of a public body constituting a quorum of its members shall take place at a meeting open to the public except as provided in this section and sections 7 and 8.

A public body that purposely divides itself into subquorum groups to deliberate on public policy violates the OMA. *Booth Newspapers, Inc. v. Univ. of Michigan Bd. of Regents,* 192 Mich.App 574, 581; 481 NW2d 778 (1992), aff 'd in part and rev'd in part on other grounds 444 Mich. 211 (1993); *Booth Newspapers, Inc. v. Wyoming City Council,* 168 Mich.App 459, 471-473; 425 NW2d 695 (1988). However, in *St. Aubin v. Ishpeming City Council,* 197 Mich.App 100, 102-103; 494 NW2d 803 (1992), this Court held that the OMA was not violated when a mayor held individual discussions with each council member on whether the plaintiff should be retained as the city manager. Because the mayor was only polling the members to get their opinions about the plaintiff, rather than attempting to avoid the OMA, his informal canvassing of the members to determine the status of the votes on a particular issue did not violate MCL 15.263(2). *Id.*

Plaintiff relies principally on testimony from Kenneth Gamble about what Cottrell told him of her efforts to have plaintiff removed. However, Gamble only testified that Cottrell told him that she was attempting to line up votes to remove plaintiff. Gamble did not know how she was going about doing this. Gamble's testimony does not support plaintiff's claim that Cottrell organized subquorum meetings of council members to discuss plaintiff's removal.[3]

Plaintiff also argues that the OMA was violated when Ham, Cottrell, and Councilperson Coleman met with him just before the September 12, 2005, meeting and asked him to resign because they had five votes to terminate his employment. In *St. Aubin,* the OMA was violated when the entire city council privately met with the city manager, expressed their dissatisfaction with the manager, and asked her to resign or face termination at the subsequent council meeting. *Id.* at 101, 103. This Court held that the meeting violated the OMA because a decision was made at that time to terminate the manager's employment. *Id.* at 103.

This case is distinguishable from *St. Aubin,* because here there was no quorum present to constitute a meeting. Without a quorum, the council members were unable to make any decision concerning plaintiff's employment with the city. MCL 15.263(2), (3). They could only advise plaintiff that they believed they would have the necessary votes to support his termination. Accordingly, plaintiff failed to establish a violation of the OMA.

VI. Defamation

**\*8** Plaintiff also challenges the trial court's dismissal of his defamation claim. Plaintiff alleges that defamatory statements about him were made by the city council's attorney and others at the November 3, 2005, public hearing. The trial court determined that the alleged statements were not capable of a defamatory meaning, and further, that governmental immunity precluded liability for the statements.

In general, a governmental agency is immune from tort liability when engaged in the exercise or discharge of a governmental function. *Rowland v. Washtenaw Co. Rd. Comm.,* 477 Mich. 197, 202; 731 NW2d 41 (2007); MCL 691.1407(1).[4] A governmental function "is an activity that is either expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(f); *Mack v. Detroit,* 467 Mich. 186, 204; 649 NW2d 47 (2002). There is no dispute that the city was authorized by its city charter to hold the November 3, 2005, public hearing before terminating plaintiff's employment. Therefore, the city is immune from liability for any statements alleged to have been made by either the city council's attorney or other members of the public at the hearing.

Furthermore, apart from governmental immunity, the trial court did not err in determining that plaintiff failed to demonstrate the existence of an actual defamatory statement. To establish a claim for defamation, plaintiff was required to offer proof of

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *[Mitan v. Campbell,* 474 Mich. 21, 24; 706 NW2d 420 (2005).]

"A court may determine, as a matter of law, whether a statement is actually capable of defamatory meaning." *Kevorkian v. American Medical Ass'n.,* 237 Mich.App 1, 9; 602 NW2d 233 (1999). "Where no such meaning is possible, summary disposition is appropriate." *Id.*

A superintendent of a school district is a public figure. *Kefgen v. Davidson,* 241 Mich.App 611, 623-624; 617 NW2d 351 (2000). A city manager should likewise be considered a public

figure.[5] "A public figure claiming defamation must prove by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth." *Id.* at 624; see also MCL 600.2911(6). Ill will, spite, and hatred, standing alone, do not prove actual malice. *Kefgen, supra* at 624.

To the extent that plaintiff's claim relies on the city council's attorney's statements at the public hearing that she had not heard from plaintiff and did not know whether plaintiff would be attending the hearing, the trial court properly determined that the statements did not support a claim for defamation. The submitted evidence established that the city council's attorney sent a letter to plaintiff's attorney requesting clarification whether plaintiff was withdrawing his request for the public hearing. There is no indication that plaintiff ever responded to this request. Thus, plaintiff failed to demonstrate that there was a genuine issue of material fact whether the city council's statements at the public hearing were inaccurate. To the extent that plaintiff argues that defamatory statements about him were made by other unidentified persons at the public hearing, plaintiff's failure to offer any evidence of the actual content of these statements is fatal to his claim. See *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.,* 197 Mich.App 48, 52-54; 495 NW2d 392 (1992) (a plaintiff who claims defamation must allege and identify with specificity the statements he believes form the basis for his claim). The trial court did not err in dismissing plaintiff's defamation claim.

**\*9** Affirmed.

**All Citations**

Not Reported in N.W.2d, 2008 WL 2437259

Footnotes

1       Plaintiff does not challenge the dismissal of his claim for breach of fiduciary duty.

2       "A contract is substantially performed when all the essentials necessary to the full accomplishment of the purposes for which the thing contracted has been performed with such approximation that a party obtains substantially what is called for by the contract." *Gibson, supra* at 275.

3       In addition, the testimony of Cottrell and Ham does not support plaintiff's OMA claim. Cottrell testified that she contacted Ham and councilpersons Coulouris and Coleman by telephone before the September 12, 2005, meeting to inform them of her intent to make a motion to terminate plaintiff's employment. She denied asking them to support her motion. Ham testified that councilperson Thurin came to her home to discuss plaintiff's employment, but she denied contacting any council members.

4       Although there are exceptions to governmental immunity, plaintiff does not address the applicability of any exception and he did not plead any facts demonstrating that his claim arose out of a nongovernmental or proprietary function. *Mack v. Detroit,* 467 Mich. 186, 204; 649 NW2d 47 (2002).

**Collins v. Ham, Not Reported in N.W.2d (2008)**

2008 WL 2437259

5       Plaintiff does not dispute that he was at least a limited-purpose public figure at the time the alleged defamatory statements were made.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1524456

2025 WL 1524456
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan, Southern Division.

Kalina KRSTOVSKA, Plaintiff,
v.
STAUNTON FINANCIAL, INC., Defendant.

Case No. 24-12903
|
Signed May 27, 2025

**Attorneys and Law Firms**

Hannah Rachael Fielstra, Ernst Charara & Lovell, Detroit, MI, for Plaintiff.

Jack Kirkendall Mahon, James F. Hermon, Dykema Gossett PLLC, Detroit, MI, for Defendant.

**OPINION AND ORDER GRANTING DEFENDANT STAUNTON FINANCIAL, INC.'S PARTIAL MOTION TO DISMISS [#4]**

GERSHWIN A. DRAIN, United States District Judge

## I. INTRODUCTION

**\*1** Presently before the Court is Defendant Staunton Financial, Inc.'s Partial Motion to Dismiss. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant seeks dismissal of Counts I, III, and IV of Plaintiff's complaint. This matter is fully briefed. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of this matter. Accordingly, the Court will resolve this motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, Defendant's Partial Motion to Dismiss is GRANTED.

## II. BACKGROUND

This is an employment discrimination case. Plaintiff, a Macedonian woman who speaks English with an accent, was allegedly employed by Defendant in a managerial role for nearly a decade. She claims she was suddenly demoted, experienced a pay cut, and was replaced by two younger, white men. Soon thereafter, Plaintiff contends, she was terminated without warning. Plaintiff maintains that she met all performance goals and faced no disciplinary action during her tenure with Defendant.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 5, 2023, alleging that Defendant discriminated against her based on her national origin. The narrative of Plaintiff's EEOC charge states:

On July 15, 2013, I began working for [Defendant]. I last held the position of Production Worker. During my employment I was demoted from Operations Team lead to Production Worker. On October 6, 2023, I was terminated. I believe that I have been discriminated against due to my national origin Macedonian, in violation of Title VII of the Civil Rights Act of 1964, as amended.

ECF No. 4-2, PageID.45. The EEOC issued a right to sue letter on August 30, 2024, authorizing Plaintiff to file a lawsuit against Defendant within 90 days of receipt of the notice. The EEOC made no determination regarding the merits of Plaintiff's claim.

Plaintiff initiated the present lawsuit against Defendant on November 1, 2024. Her complaint alleges (1) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII") (Count I); (2) disparate treatment in violation of Title VII (Count II); (3) hostile work environment in violation of Title VII (Count III); (4) retaliation in violation of Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* ("ELCRA"), (Count IV); (5) disparate treatment in violation of ELCRA (Count V); and (6) hostile work environment in violation of ELCRA (Count VI). Defendant filed the Partial Motion to Dismiss that is presently before the Court on December 16, 2024, seeking dismissal of Counts I, III, and IV. Defendant claims dismissal of Counts I and III is appropriate because Plaintiff failed to exhaust her administrative remedies as to these claims prior to filing suit. Defendant also argues that Counts I and IV should be dismissed because Plaintiff's complaint fails to plead essential elements of these claims. Plaintiff filed a Response on January 13, 2025, and Defendant filed a Reply on January 23, 2025.

### III. LEGAL STANDARD

**\*2** "Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted." *Ashh, Inc. v. All About It, LLC,* 475 F. Supp. 3d 676, 678 (E.D. Mich. 2020). When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). The court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (citation omitted). Dismissal is appropriate if the plaintiff's complaint fails to offer sufficient factual allegations that make the alleged claim plausible on its face. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "Assessment of the facial sufficiency of the complaint must ordinarily be undertaken without resort to matters outside the pleadings." *Gavitt v. Born,* 835 F.3d 623, 640 (6th Cir. 2016) (citation omitted). A court may, however, "consider exhibits attached to the complaint, public records, items appearing in the record

of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Id.*

## IV. DISCUSSION

**A. Plaintiff's Title VII Retaliation and Hostile Work Environment Claims (Counts I and III)**

Defendant claims dismissal of Counts I and III is appropriate because Plaintiff failed to exhaust her administrative remedies as to these claims prior to filing suit. "To pursue a Title VII action, a plaintiff must file a timely charge of employment discrimination with the EEOC or the appropriate state agency, obtain a right-to-sue letter from the EEOC, and file a timely complaint in federal court." *Townsend v. Rockwell Automation, Inc.*, 852 F. App'x 1011, 1013 (6th Cir. 2021) (citing 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018)). "Only claims that are included in the charge or are 'reasonably related to or grow out of the factual allegations in the EEOC charge' may be heard in federal court." *Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229, 234 (6th Cir. 2017) (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361-62 (6th Cir. 2010)). This exhaustion requirement "serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *Younis*, 610 F.3d at 361 (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)).

First, Plaintiff concedes that her EEOC charge "does not include a retaliation claim." ECF No. 8, PageID.82. Accordingly, Plaintiff's Title VII retaliation claim is dismissed for failure to exhaust administrative remedies.

Second, it is undisputed that Plaintiff's EEOC charge does not expressly include a hostile work environment claim. As such, this claim may proceed only if it is reasonably related to or grows out of the factual allegations contained therein. Under Title VII, a workplace is hostile if it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (cleaned up). The Sixth Circuit has held that "the inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion." *Younis*, 610 F.3d at 362. Here, Plaintiff's EEOC charge does not allege facts suggesting the type of ongoing, pervasive conduct necessary to give rise to a hostile work environment claim. It instead alleges only two discrete incidents—her demotion and subsequent termination—which standing alone are insufficient to establish a hostile work environment claim.

**\*3** Plaintiff contends that her response to Defendant's position statement, which she submitted to the EEOC during its investigation, alleges facts that give rise to a hostile work environment claim. Consideration of this submission, however, is improper. The expected scope of the EEOC's investigation is determined by the allegations in the charge itself, rather than those contained in responsive documents. *See Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229, 237 (6th Cir. 2017); *Tobias v. Terex, USA Inc.*, No. 20-13333, 2022 WL 3686423, at \*9 (E.D. Mich. Aug. 25, 2022). This is because Sixth Circuit precedent "consistently refers to the *charge of discrimination* as the guiding document." *Tobias*, 2022 WL 3686423, at \*9 (emphasis in original) (citing *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 854 (6th Cir. 2000); *Perry v. Am. Red Cross Blood Servs.*, 651 F. App'x 317, 324 (6th Cir. 2016); *Younis*, 610 F.3d at 361; *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 308-81 (6th Cir. 2002)). Furthermore, consideration of this submission would undermine a key purpose of the exhaustion requirement: providing the employer with notice of the allegations against it and a meaningful opportunity to resolve the dispute through conciliation. The EEOC does not share a charging party's response to the employer's position statement with the employer.[1] While Plaintiff served a copy of her response to Defendant, she did so after Defendant had already submitted its position statement to the EEOC, thereby depriving it of meaningful notice of her allegations and an opportunity to respond. For these reasons, consideration of Plaintiff's response to Defendant's position statement is improper for purposes of determining the expected scope of the EEOC's investigation. As such, the Court concludes that Plaintiff's EEOC charge does not allege a hostile work environment claim.

In conclusion, the Court finds that Plaintiff failed to exhaust her administrative remedies as to her Title VII retaliation and hostile work environment claims. Therefore, Counts I and III are dismissed.

**B. Plaintiff's Retaliation Claims (Counts I and IV)**

Next, Defendant claims dismissal of Plaintiff's retaliation claims, brought pursuant to Title VII and ELCRA, is appropriate because her complaint does not plead essential elements of these claims. In light of the Court's finding that dismissal of Plaintiff's Title VII retaliation claim is appropriate due to failure to exhaust administrative remedies, the Court addresses this argument only as to Plaintiff's ELCRA retaliation claim.

First, the Court acknowledges that Plaintiff's response to Defendant's motion to dismiss does not address Defendant's position that dismissal of this claim is appropriate. "It is well understood ... that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Rouse v. Caruso*, No. 06-cv-10961, 2011 WL 918327, at \*18 (E.D. Mich. Feb. 18, 2011) (citation omitted).

Even if Plaintiff had addressed Defendant's argument, her complaint fails to allege facts that make her ELCRA retaliation claim plausible on its face. ELCRA retaliation claims are analyzed under the same standard as Title VII retaliation claims. *Johnson v. Farmington Public Schools*, 728 F. Supp. 3d 723, 750-51 (E.D. Mich. 2024). The plaintiff has the initial burden of establishing that "(1) [she] engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 488-89 (6th Cir. 2020) (cleaned up).

In her complaint, Plaintiff alleges that the "act of filing with the EEOC regarding Defendants' employees' conduct was a protected activity under the ELCRA." ECF No. 1, PageID.16. But Plaintiff did not file her EEOC charge until *after* she was terminated. As such, she did not engage in a protected activity while employed by Defendant. Therefore, Plaintiff's complaint fails to allege a plausible ELCRA retaliation claim against Defendant.

## V. **CONCLUSION**

Based on the foregoing, Defendant's Partial Motion to Dismiss is GRANTED. Counts I, III, and IV of Plaintiff's complaint are dismissed with prejudice.

**\*4**  SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1524456

Footnotes

1    https://www.eeoc.gov/employers/questions-and-answers-respondents-eeocs-position-statement-procedures.

---

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    5

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 137

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)

1999 WL 33434995

1999 WL 33434995
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Marlene PIASECKI, Personal Representative of the Estate
of Joseph K. Piasecki, Deceased, Plaintiff-Appellant,
v.
MICHIGAN EDUCATION ASSOCIATION-NEA, Washtenaw-Livingston Education
Association-MEA/NEA, and Chelsea Education Association, Defendants-Appellants.

No. 208757.
|
Oct. 15, 1999.

Before: FITZGERALD, P.J., and DOCTOROFF and WHITE, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff appeals of right the circuit court's orders granting summary disposition to defendants pursuant to MCR 2.116(C)(8) and (C)(10), clarifying its ruling on defendants' motion, and denying plaintiff's cross-motion for reconsideration, in this wrongful death action alleging negligence, vicarious liability, and breach of a third-party beneficiary contract. We affirm the dismissal of the vicarious liability and third-party beneficiary contract claims, and reverse the dismissal of the negligence claim.

I

This case arises from the shooting death of Joseph Piasecki (Piasecki), the Superintendent of the Chelsea School District, by Stephen Leith, a teacher at Chelsea High School, on December 16, 1993. Leith was a member of defendant Michigan Education Association (MEA), which was a party to a collective bargaining agreement (CBA) with the Chelsea School District Board of Education. The shooting occurred during the course of a grievance proceeding against the school administration, instituted by the MEA on Leith's behalf.

Plaintiff's complaint alleged that sometime before January 1992, Leith began to experience depression and a tendency toward anti-social behavior, for which he sought psychiatric treatment. The complaint alleged that as a result of Leith's behavior on the job, the school administration pursued various disciplinary proceedings against him, at which various MEA agents represented him, including Mark Jenkins, an employee of the MEA and MEA's representative for the Chelsea School District, Phillip Jones and Joseph Beard. The complaint alleged that at all pertinent times, Jenkins was the MEA's agent and acting within the scope of his employment with the MEA. The complaint further alleged that in early November 1993, the administration summoned Leith to a disciplinary proceeding based on inappropriate conduct toward students. On November 23, 1993, Leith, Jenkins, Jones, and Beard traveled to Lansing to meet with an attorney to consider Leith's legal rights with regard to these disciplinary proceedings. Plaintiff's complaint alleged that the MEA agents at the Lansing meeting either knew or should reasonably have known that Leith was armed with a gun at the meeting, that the MEA had notice that Leith was considering a dangerous and perhaps lethal criminal attack in connection with his grievance, and that he had the means to carry out such an attack.

The complaint alleged that on the afternoon of December 16, 1993, after school, a proceeding on Leith's grievance against the administration was held in Piasecki's office, and attended by Piasecki, Leith and Jones. The complaint alleged that the grievance proceeding was a protected concerted union activity and that during the course of the proceeding, Leith became upset and left the meeting. The complaint alleged that while the proceeding continued, Leith drove home with his wife, Alice Leith. It further alleged that while at home, Leith reviewed documents relating to the grievance; became enraged, grabbed a loaded gun from the second story of his home, and charged down the stairs past his wife and into his car, heading back to Chelsea High School. The complaint alleged that during or after Leith's review of the grievance documents, Mrs. Leith called Jenkins at his MEA office. The complaint alleged that because Jenkins was unavailable, Mrs. Leith spoke with Caroll Sypniewski, an MEA agent with duties similar to Jenkins', telling her that her husband was headed back to the grievance proceeding, armed with a gun, and with the intention of doing serious if not fatal harm to Piasecki, and perhaps other grievance participants. The complaint further alleged that Sypniewski asked a secretary to contact Jenkins, and after Jenkins was located in Hartland, Sypniewski informed Jenkins that Leith was headed to Piasecki's office with a gun, with the apparent intention of shooting him. Plaintiff's complaint alleged that neither Jenkins nor Sypniewski made any attempt to contact law enforcement, and that Sypniewski did not contact anyone in the Chelsea School District Administration (administration) to warn of Leith's apparent intentions and approach. It further alleged that after concluding his telephone conversation with Sypniewski, Jenkins made an unsuccessful attempt to contact the administration, had to again call Sypniewski to verify the proper phone number, and then called Piasecki's office. The complaint alleged that

*2 33. When Jenkins finally reached [Piasecki], he informed him that Leith had become angry and threatened Piasecki.

---

34. During their telephone conversation, Jenkins did not give Mr. Piasecki any specific details regarding the nature of Leith's threat, did not mention the fact that Leith was armed with a gun, and did not mention Leith's apparent intent to shoot Mr. Piasecki, instead suggesting, after initially "beating around the bush" for a while, that if it were left up to Jenkins, "Maybe I'd leave the office and see what happened."

Plaintiff's complaint alleged that, prior to the shooting, the MEA had knowledge that Leith was dangerous and could foresee that Leith would injure the grievance procedure participants, that Jenkins was in a unique position to prevent the harm to Piasecki by communicating the urgency and the severity of the impending danger from Leith, and was in the position to contact law enforcement officials who could intervene and protect the participants in the grievance proceeding.

Plaintiff's complaint also alleged that defendant was vicariously liable for the battery perpetrated by Leith on Piasecki. The third-party beneficiary claim alleged that the MEA owed a number of the duties stated above to the administration, as a participant in the grievance proceeding, and breached them, and that Piasecki was an intended and anticipated third-party beneficiary of the duties defendant owed the Administration.

A

In lieu of fling an answer to plaintiff's complaint, defendants moved for summary disposition, seeking dismissal of the negligence and vicarious liability claims pursuant to MCR 2.116(C)(8), and the breach of third-party beneficiary contract claim under MCR 2.116(C)(10). Plaintiff's response to defendants' motion requested leave to amend should the circuit court conclude the claims were inadequately pleaded.

The circuit court granted summary disposition of the negligence and vicarious liability claims under (C)(8) and the third-party beneficiary contract claim under (C)(10):

When all of this is boiled down, it seems to me that plaintiff must first establish that there is this duty on the part of the union to warn or intervene between Mr. Leith and Mr. Piasecki. And in order to do so they must establish either that there is a special relationship, special circumstances or assumption of this duty.

The circuit court noted:

.... *Murdock* [*v Higgins,* 454 Mich. 46; 559 NW2d 639 (1997),] talks about the rationale behind imposing a duty to protect in special relationships again is based on control.

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)

1999 WL 33434995

In those situations it is always where one person entrusts himself to the control and protection of another with a consequent loss of the control to protect themselves.

Under these, [sic] facts, even in the light most favorable to the non-moving party, it cannot be said that the decedent lost control to protect himself. He was given a warning, and chose not to heed that warning and went back into the situation he was told was dangerous. And, clearly, by his own actions it was not a situation where he had lost the control of himself.

**\*3** The Court is not persuaded with the argument that because he had agreed to a collective bargaining discussion or a disciplinary hearing that he could not, under a situation of warning, go back into a situation or lost control to protect himself.

Secondarily, I'm not persuaded that the union had a duty to protect the-Mr. Piasecki, that that relationship existed where there had been that degree of entrustment between the two.

As to the assumption of risk [sic duty], there is no question that there may be situations when a person voluntarily attempts to aid the victim and takes control of the situation that there can be an assumption of risk.

Again, there was no-no indication here that, in fact, the control had transferred over and that they had, in fact, by doing that somehow increased the risk. If anything, regardless of what we say about the degree of the warning, the risk was decreased.

There are, of course, all these issues of proximate cause. Even if there was a duty, even if the-we can all surmise what might have happened had Mr. Piasecki attempted to leave, etcetera. But the focus of the motion today is what duty, if any, existed.

Under both C-8 and C-10 this Court finds that under the facts in this case in the light most favorable to the non-moving party that the union owed no duty to Mr. Piasecki, had not exerted sufficient control such that this court can impose liability on the union.

B

Defendants filed a motion for clarification requesting the basis of the circuit court's ruling on the claims other than the negligence claim. Plaintiff filed a cross-motion for reconsideration, arguing that the circuit court invaded the jury's province by making the factual determination that Piasecki had not lost control to protect himself and the determination that "regardless of what we say about the degree of warning, the risk was decreased." Plaintiff argued that this was error for two reasons: because the plaintiff was not legally required to demonstrate increased risk and, second, because even if plaintiff were required to prove increased risk, that would be a question for the jury:

The question before this Court is whether a union which has knowledge that a specific union member is headed to a specific administrator's office at a specific time and date, *with a gun,* is required to communicate that information to the intended victim. Marlene Piasecki is confident that the public policy of this State does require a union to affirmatively reveal its specific knowledge that an employee is immediately headed into his employer's office with a gun. She is also confident that even if no such affirmative duty were to exist, once the union begins to talk to the intended victim about what might happen, it must reveal that which it knows to be imminent, and specifically, the crucial fact that the impending attack involves a firearm. "Under these circumstances, to say that" the MEA "had no duty ... would be 'shocking to humanitarian considerations' and fly-in-the-face of 'the commonly accepted code of social conduct'." *Farwell v. Keaton, supra,* 396 Mich. at 291, 292, citing *Hutchinson v. Dickie,* 162 F.2d 103, 106 (6th Cir1947); *Prosser, supra,* § 53, p. 327. This Court should have found, and is now asked to find that the MEA could owe a duty to Joseph Piasecki, because "reasonable men would recognize and agree that it exists." *Id.* It should be for the jury to determine whether the necessary elements for a duty to be imposed are present, whether the duty was breached, and whether Joseph Piasecki's death was the proximate result of that breach.

**\*4** Plaintiff argued that even in the absence of a special relationship which would give rise to a legal duty, plaintiff's negligence claim sufficiently rested on duties which arise from special circumstances or defendants' own assumption of duty.

Regarding the contract claim, plaintiff's motion for reconsideration argued that the pertinent allegations were based on the CBA, which, it argued, was made for the benefit of teachers, through the MEA, on one side, and administrators, through the District, on the other side. Plaintiff argued that the express purpose of the CBA was "promoting harmonious relations" between the parties, furthering "their mutual aim(s)," and asserted:

> The Union failed to warn Joseph Piasecki that its own grievant was headed into the grievance with a loaded gun, failed to promote harmonious relations, failed to further the mutual aims of the parties, and acted inconsistently with the terms of the Agreement... it breached the Agreement, the main purpose of which was to provide peaceful relations between the Union and the Administration. Joseph Piasecki was an intended beneficiary of that Agreement, and suffered as a result of the breach.

The circuit court's order of clarification dismissed the negligence and vicarious liability claims pursuant to MCR 2.116(C)(8), and the breach of third-party beneficiary contract claim pursuant to MCR 2.116(C)(10). This appeal ensued.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 142

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

## II

Plaintiff argues that the circuit court improperly dismissed her negligence claim under MCR 2.116(C)(8). Plaintiff alleged that defendants were negligent by virtue of the existence of special circumstances, which include a special relationship between defendants and Piasecki and defendants and Leith, and defendants' assumption of a duty by undertaking performance, i.e., making a call to Piasecki to warn him of danger, and performing the duty negligently.

We review the circuit court's grant of summary disposition de novo. *Beaty v. Hertzberg & Golden, PC,* 456 Mich. 247, 253; 571 NW2d 716 (1997). A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone. *Spiek v. Dep't of Transportation,* 456 Mich. 331, 337; 572 NW2d 201 (1998). The factual allegations in the complaint must be accepted as true, as well as any inferences that can reasonably be drawn therefrom. *Blackwell v. Citizens Ins Co,* 457 Mich. 662; 579 NW2d 889 (1998). Summary disposition is proper only if the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. *Simko v. Blake,* 448 Mich. 648, 654; 532 NW2d 842 (1995).

In order to state an action for negligence, the plaintiff has the burden of adequately alleging that the defendant owed a legal duty to plaintiff, a breach of that duty, that plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered. *Schneider v Nectarine Ballroom Inc, (On Remand),* 204 Mich.App 1, 4; 514 NW2d 486 (1994). "In negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk." *Sponkowski v. Ingham Road Comm,* 152 Mich.App 123, 127-128; 393 NW2d 579 (1986), citing Prosser, Torts (4th ed), § 37, p 206.

 **\*5** As a general rule, a private person has no duty to protect another from a criminal attack by a third person absent some special relationship or circumstance. *Murdock v. Higgins,* 454 Mich. 46, 54; 559 NW2d 639 (1997); *Roberts v. Pinkins,* 171 Mich.App 648, 652; 430 NW2d 808 (1988); see also Anno: *Comment note-Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person,* 10 ALR3d 619, § 2, p 623, (noting that "[i]n the absence of special circumstances, such as a special relationship between the parties or knowledge by the defendant of an extraordinary danger, there is no duty to protect another from criminal attack."). " 'Duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Buczkowski v. McKay,* 441 Mich. 96, 100-101; 490 NW2d 330 (1992). In determining whether a special circumstance or relationship exists it is necessary to:

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 143

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

... balance the societal interests involved, the severity of the risk, the burden upon the defendant, the likelihood of occurrence, and the relationship between the parties. Other factors which may give rise to a duty include the foreseeability of the criminal activity, the defendant's ability to comply with the proposed duty, the victim's inability to protect himself from the criminal activity, the costs of providing protection, and whether the plaintiff had bestowed some economic benefit on the defendant. [*Roberts v. Pinkins,* 171 Mich.App 648, 652-653; 430 NW2d 808 (1988).]

A special relationship can be either between the defendant and the victim or the defendant and the third party who caused the injury. *Murdock,* 454 Mich. at 54.

Plaintiff's complaint alleged:

35. Although he undertook a duty to warn Mr. Piasecki that Leith posed a threat to the grievance participants, Jenkins' warning was inadequate, incomplete, and left out the crucial detail that Leith was returning to the grievance with a lethal weapon.

36. The incomplete and untruthful character of the warning was motivated in part by a desire to protect the MEA's own member, Stephen Leith, from possible professional and/or criminal culpability.

37. After getting off the phone with Jenkins, Mr. Piasecki reported that Jenkins had "suggested that Steve was going to do some harm to me," and had "basically made a threat to me," although nothing in Mr. Piasecki's demeanor suggested a threat of immediate harm or knowledge of a gun being involved.

38. Approximately five minutes after the telephone call between Jenkins and [Piasecki], Leith returned to the grievance with a fully-loaded weapon and opened fire on [Piasecki], hitting him with four bullets, one of which was fatal.

39. After shooting Mr. Piasecki, Leith then opened fire on Ronald Mead and Phillip Jones, wounding both of them.

40. The first telephone call that day to the Chelsea Police Department ... was received by the Chelsea dispatcher from employees of the Chelsea High School sometime immediately after the shooting had occurred.

**\*6** 41. Neither the MEA nor its agents took any action whatsoever, except the limited and inadequate actions described above, to intervene in the impending attack by Leith upon the grievance participants.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 144

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

44. Prior to the above-described shooting, the MEA had knowledge that Leith was dangerous and could foresee that Leith would injure some or all of the remaining participants in the grievance proceeding.

45. The MEA was in a unique position to prevent the harm done to [Piasecki] by communicating the urgency and the severity of the impending danger from Leith, including the fact that Leith was returning to the grievance proceeding armed and with an apparent intent to shoot the participants, and further was in the position of taking steps to contact law enforcement officials who could intervene and protect the participants in the grievance proceeding.

46. *Based upon the special relationship which exists between a labor union and an employer, in this case the District Administration, and based upon the special circumstances which exist during the course of protected concerted activities such as grievance proceedings, and based upon the assumption of duties already undertaken through partial action by its agents, the MEA owed the following duties to [Piasecki]:*

a. A duty to warn of the impending danger with immediacy and without delay;

b. A duty to refrain from unnecessary discussion and conferencing within the ranks of the union prior to taking protective action;

c. A duty to provide an adequate, complete, and detailed warning, relaying to the intended victims all crucial and pertinent facts regarding Leith's threat, including the fact that he was seen carrying a gun, the fact that he was known to be headed to Joseph K. Piasecki's office, the fact that he appeared intent upon shooting participants in the grievance proceeding, and including but not limited to the fact that Leith's threat and the danger which he posed was an urgent matter which appeared immediate and imminent;

f. A duty to avoid unnecessary delay in placing the telephone call to Joseph K. Piasecki;

g. A duty to avoid unnecessary delay in communicating the fact and explicit details of the threat to [Piasecki] after telephone contact had finally been established, rather than down-playing the immediacy and lethal nature of the impending harm;

h. A duty to contact law enforcement officials and to seek intervention upon receiving knowledge of the threat. [Emphasis added .]

The pleadings alleged that Jenkins was aware before the shooting of Leith's mental problems and alleged misconduct toward students, and had knowledge that the administration had initiated disciplinary proceedings against Leith for the alleged inappropriate conduct. Defendants were

Leith's bargaining representative, and Jenkins, the MEA's representative for the Chelsea District, had a relationship with Leith as to the specific grievance which was the subject of the grievance proceeding on the day of the shooting. Jenkins had driven with Leith to Lansing several weeks before the shooting to determine Leith's legal rights regarding a grievance the MEA instituted on his behalf against the administration, of which Piasecki was the head. The grievance at issue in the Lansing meeting arose out of the disciplinary proceedings resulting from Leith's misconduct toward students, incidents which were the subject of the December 16th grievance proceeding. *Plaintiff's complaint further alleged that Jenkins had actual knowledge of Leith's imminent arrival at Piasecki's office with a gun and Leith's intent to harm Piasecki.* When Mrs. Leith called Jenkins on the afternoon of December 16, 1993, Piasecki, Mead, the principal of Chelsea High School, and Jones, an MEA representative were continuing Leith's grievance proceeding in Piasecki's office. Under the CBA, there was an ongoing relationship between defendants and Piasecki in that the union and administration had to comply with the provisions of the CBA regarding grievance proceedings; Piasecki, as the Superintendent, or his designee, was obligated to be present at the second level of grievance proceedings and meet with the grievant and a union representative;[1] and no grievance could be adjusted absent prior notice and opportunity given for a union representative to be present.

**\*7** Under these circumstances, the severity of the risk, the likelihood of occurrence, and the foreseeability of the harm were high, while the burden on defendant was minimal, as was Piasecki's ability to protect himself without adequate warning. *Roberts, supra* at 652-653. Jenkins had actual knowledge of an identified imminent threat of catastrophic harm to a particular individual at a particular location from a particular person. He also knew that there was no reason to believe that Piasecki knew of the danger. He had the ability to promptly and adequately warn Piasecki of Leith's imminent attack and the ability to promptly contact law enforcement. Thus he had the ability to discharge the proposed duty at little or no cost. Piasecki was unable to protect himself from the harm posed by Leith given that he was unaware that Leith was armed with a gun. Further, while Piasecki was conferring no direct economic benefit on defendant, Piasecki and Jenkins, as designated representatives of the union and the administration, were involved in a joint undertaking for the mutual economic and other benefit of their principals. This joint undertaking involved the face-to-face resolution of grievances outside of a courtroom setting, and the attendant possibility that some grievants might lose control of their emotions and become violent. Where such an event occurred and defendant had actual knowledge that the subject of an ongoing grievance procedure was about to attack the participants in this joint undertaking with a gun, there is a special relationship or circumstance so as to lead the law to say that Piasecki was entitled to the protection of being informed by defendant that Leith was returning to the meeting with a gun and with an apparent intent to do physical harm. A balancing of the societal interests involved weighs in Piasecki's favor. He was an administrator required by the CBA to attend the instant grievance proceeding. Persons required under CBA's to participate in such proceedings as part of a joint

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 146

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)

1999 WL 33434995

undertaking must be able to do so with a sense that actual, specific, imminent threats to their lives by other participants in the process will not be inadequately communicated to them.

We conclude that plaintiff's negligence claim was improperly dismissed pursuant to MCR 2.116(C)(8). Plaintiff's complaint alleged the requisite elements of negligence and adequately stated a claim that a special relationship existed between Piasecki and defendants, and that defendants' agents assumed the duty to warn Piasecki of the danger Leith posed, and performed the duty negligently by cloaking the gravity of the impending danger by being indirect and by failing to inform Piasecki that Leith was armed with a gun.

We therefore conclude that the circuit court improperly dismissed plaintiff's negligence claim on the basis of failure to state a claim.

III

Plaintiff also argues that the circuit court erred in dismissing her claim that defendants were vicariously liable for Leith's battery.

 **\*8**  The parties agree that in order to survive summary disposition, plaintiff must have adequately alleged that the MEA participated in, authorized, or ratified Leith's criminal conduct. *Sowels v Laborers' Int'l Union of N America,* 112 Mich.App 616, 622; 317 NW2d 195 (1981). Plaintiff alleged that Jenkins' and Sypniewski's willfully shielding the grievance participants from knowledge of Leith's impending attack and willfully choosing not to intervene or seek help from law enforcement established that defendants effectively participated, ratified, or authorized the shooting.

Under *Sowels,* unions and their officers and members participating or interested in a labor dispute cannot be held liable for unlawful acts of union officers, members, or agents, except on clear proof of actual participation in or authorization of the acts, or ratification of the acts after actual knowledge thereof. "Participation" means to take part in, to receive or have a part or share of, or to be engaged in an activity. See *Burrell v. Ford Motor Co,* 386 Mich. 486, 494; 192 NW2d 207 (1971). "Ratification" is the affirmance by a person of a prior act which did not bind him, but which was done or professed to be done on his account. Restatement Agency, 2d, § 82, p 210; *Cudahy Bros Co v West Michigan Dock & Market Corp,* 285 Mich. 18, 25; 280 NW 93 (1938).

We conclude that plaintiff did not sufficiently allege facts from which it could be inferred that defendants actually participated, authorized, or ratified Leith's actions. We find no error in the circuit court's dismissal of the vicarious liability claim.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 147

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

IV

Plaintiff's final argument is that the circuit court erred in dismissing her breach of third-party beneficiary contract claim. We review the circuit court's grant of summary disposition de novo. *Baker v. Arbor Drugs,* 215 Mich.App 198, 202; 544 NW2d 727 (1996). A motion for summary disposition under MCR 2.116(C)(10) tests the factual basis of a plaintiff's allegations. *Id.* The circuit court must consider and view the pleadings, affidavits, depositions, admissions, and any documentary evidence in favor of the nonmoving party. The moving party has the initial burden of supporting its position by affidavits, depositions, admissions or other documentary evidence. *Smith v. Globe Life Ins,* 460 Mich. 446, 455; 597 NW2d 28 (1994), citing *Quinto v. Cross & Peters Co,* 451 Mich. 358, 362-363; 547 NW2d 314 (1996). The burden then shifts to the nonmovant to establish that a genuine issue of material fact exists. *Id.*

The rights of third-party beneficiaries are addressed in M.C.L. § 600.1405; MSA 27A.1405, which provides:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something directly to or for said person.

**\*9** The law presumes that a contract has been executed for the benefit of the parties, and plaintiff has the burden of proving that Piasecki was an intended beneficiary of the contract between defendant and the Chelsea School District Board of Education. *Oja v. Kin,* 229 Mich.App 184, 193; 581 NW2d 739 (1998). When determining whether the parties to the contract intended to make a third person a third-party beneficiary, a court should examine the contract using an objective standard. *Dynamic Construction Co v. Barton Malow Co,* 214 Mich.App 425, 427; 543 NW2d 31 (1995). A person who may be incidentally benefited by the contract does not have rights as a third-party beneficiary. *Alcona Schools v. Michigan,* 216 Mich.App 202, 205; 549 NW2d 356 (1996). Calamari & Perillo, Contracts (3d ed), Third Party Beneficiaries, ch 17, p 701, states that in order to qualify as an intended beneficiary, the third party must meet two requirements, otherwise he is an incidental beneficiary:

> .... (1) The third party must show that recognition of a right to performance in the beneficiary "is appropriate to effectuate the intention of the parties." (2)(a) "[T]he performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or (b)

"the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

Plaintiff's complaint alleged in pertinent part:

61. Upon information and belief, the MEA was party to a collective bargaining agreement between it and the Chelsea District Administration which gave rise to certain express and implied contractual duties, upon information and belief including but not limited to the following:

a. A duty to take steps to insure the safe and efficient handling of protected concerted union activities, including grievance proceedings;

b. A duty to warn the Administration of violent threats made by union members;

c. A duty to maintain a policy placing the personal safety of Administrators over the labor-related interests of any other individual;

d. A duty to contact law enforcement officials and/or take such other action to intervene in situations which would foreseeably jeopardize the safety of participants to grievance proceedings;

e. A duty to take whatever steps were necessary to insure and protect participants in a grievance proceeding once it learned of a specific threat posed by a particular union member; and

f. Such other duties as may appearing during the course of discovery and trial of this matter.

Plaintiff asserts that the CBA was made for his benefit since the Board of Education employs the administration of which he was a part, and the union members on one side and the administration on the other side were the respective intended beneficiaries of the CBA, which had the express purpose of "promoting harmonious relations" between them and furthering "their mutual aim(s).[2]

**\*10** Plaintiff failed to establish that he was more than an incidental beneficiary of the promise to promote harmonious relations. Further, the express provision in the CBA upon which plaintiff relies-the preamble's recitation of an interest in promoting harmonious relations between the teaching staff and administration-- is not tantamount to a contractual commitment to undertake the duties set forth in paragraph 61 of plaintiff's complaint. While the CBA and Piasecki's status as administrator are facts relevant to the determination whether there was a special relationship sufficient to support a duty under the facts of this case, as discussed in section II, *supra,* Piasecki's status does not establish him a a third party beneficiary of the CBA.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 149

Piasecki v. Michigan Educ. Ass'n-NEA, Not Reported in N.W.2d (1999)
1999 WL 33434995

## All Citations

Not Reported in N.W.2d, 1999 WL 33434995

## Footnotes

1    Article XIX of the CBA, entitled "Grievance Procedure," provided in pertinent part:

*Paragraph A:* A grievance shall be an alleged violation of the terms of this contract or written Board policy which concerns teachers' wages, hours, and working conditions.

No grievance shall be adjusted without prior notification to the Association and opportunity for an Association representative to be present, *nor shall any adjustment of a grievance be inconsistent with the terms of this agreement...*

LEVEL TWO: If the Grievant and/or the Association is not satisfied with the disposition at Level One ... the Grievant and/or the Association may appeal the grievance within five (5) additional school days by *filing it with the Superintendent.* Within three (3) school days from the receipt of the written grievance, the *Superintendent or his designee shall meet with the grievant* and a representative of the Association to attempt to resolve the grievance. The *Superintendent or his designee shall render his/her decision* within three (3) days after such meeting.

If an individual teacher has a personal complaint which he desires to discuss with a supervisor, he/she is free to do so without recourse in the grievance procedure. However, no grievance shall be adjusted without prior notification to the Association and opportunity for an Association representative to be present, *nor shall any adjustment of a grievance by inconsistent with the terms of this agreement.* In the administration of the grievance procedure, the interests of the teachers shall be the sole responsibility of the Association. [Emphasis added.]

2    The preamble of the collective bargaining agreement provided in pertinent part:

WHEREAS, The Board and the Association recognize and declare that providing a quality education for the children of the Chelsea School District is their mutual aim, and that the character of such education is influenced by the quality and morale of the teaching service, and

WHEREAS, *The parties hereto are interested in promoting harmonious relations among the teaching staff, administration, Association and the Board,* and

WHEREAS, Pursuant to the Provisions of Act 336 of the Michigan Public Acts of 1947, as amended by Act 379 of the Michigan Public Acts of 1965, the Association and the Board desire to contract in respect to wages, hours, or other conditions of employment.

NOW, THEREFORE, in consideration of the premises and the respective agreement of the Board and the Association herein contained, the Board and the Association agree as follows ... [Emphasis added.]

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 150

2025 WL 2237654
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Jodi TAPPLY, Jeannette Buschman, Michael Partipilo, Barbara Lester, and Vicki Meyerholz, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
WHIRLPOOL CORPORATION, Defendant-Appellee.

No. 23-1666
|
Argued: October 29, 2024
|
Decided and Filed: August 6, 2025

**Synopsis**
**Background:** Consumers brought putative class action on behalf of nationwide class and sub-classes against manufacturer of ovens with front-mounted burner knobs, alleging fraud by omission and breach of state consumer protection statutes for not disclosing defect in which stovetop burners were capable of unintended actuation whereby stovetops ignited inadvertently. The United States District Court for the Western District of Michigan, Jane M. Beckering, J., 2023 WL 4678789, granted in part and denied in part manufacturer's motion to dismiss. Consumers appealed.

**Holdings:** The Court of Appeals, Cole, Circuit Judge, held that:

[1] consumers had standing;

[2] consumers plausibly alleged manufacturer's knowledge of defect so as to support common law fraud claims;

[3] consumers plausibly alleged manufacturer had duty to disclose under Michigan law;

[4] consumers did not plausibly allege a duty to disclose under Illinois law;

[5] consumers plausibly alleged a duty to disclose under Oklahoma law;

[6] consumers plausibly pleaded claims under Michigan consumer protection law; and

[7] consumers' plausible allegations of manufacturer's pre-sale knowledge were sufficient to state claims under states' consumer protection statutes.

Affirmed in part and reversed in part.

Larsen, Circuit Judge, filed dissenting opinion.

West Headnotes (26)

**[1]** **Federal Courts** 🔑 Pleading

Court of Appeals applies de novo review to the legal conclusions reached by the federal district court in its dismissal for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[2]** **Federal Courts** 🔑 Dismissal for failure to state a claim

In reviewing dismissal for failure to state a claim, Court of Appeals construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. Fed. R. Civ. P. 12(b)(6).

**[3]** **Federal Civil Procedure** 🔑 Insufficiency in general

**Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient facts that, taken as true, state a plausible claim for relief. Fed. R. Civ. P. 12(b)(6).

**[4]** **Federal Civil Procedure** 🔑 Claim for relief in general

A complaint states a plausible claim for relief where its alleged facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

**[5]** **Federal Civil Procedure** 🔑 In general; injury or interest

2025 WL 2237654

Standing is a prerequisite to bringing claims in federal court. U.S. Const. art. 3, § 2, cl. 1.

**[6]**    **Federal Civil Procedure** 🔑 In general;  injury or interest

**Federal Civil Procedure** 🔑 Causation;  redressability

To have Article III standing, plaintiffs must demonstrate that (1) they suffered an injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would redress their injury. U.S. Const. art. 3, § 2, cl. 1.

**[7]**    **Federal Civil Procedure** 🔑 In general;  injury or interest

An injury in fact, as required for Article III standing, must be both concrete and particularized, and actual or imminent. U.S. Const. art. 3, § 2, cl. 1.

**[8]**    **Federal Civil Procedure** 🔑 Consumers, purchasers, borrowers, and debtors

**Products Liability** 🔑 Persons Entitled to Sue

**Products Liability** 🔑 Cooking or heating food;  ovens and stoves

Consumers' allegations that they suffered a concrete economic injury from overpaying for allegedly defective oven ranges with front-mounted burner knobs that were capable of igniting inadvertently satisfied requirements of Article III standing, in products liability class action against oven manufacturer; consumers alleged they were deprived of the benefit of the bargain because they reasonably expected their range to turn through only deliberate action rather than through inadvertent contact with burner knobs, and their range did not conform to their expectations because of the defect. U.S. Const. art. 3, § 2, cl. 1.

**[9]**    **Products Liability** 🔑 Representations or concealment;  fraud

**Products Liability** 🔑 Cooking or heating food;  ovens and stoves

Consumers plausibly alleged manufacturers' knowledge of defect in oven ranges equipped with front-mounted control knobs that allowed stovetop burners to actuate unintentionally and the related safety risks, so as to support common law fraud claims under multiple states' laws, where manufacturer received consumer complaints, sent by a governmental agency pursuant to federal law, and those complaints identified a safety defect. Consumer Product Safety Act § 6A, 15 U.S.C.A. § 2055a(c)(1); 16 C.F.R. § 1102.20.

**[10] Products Liability** 🔑 Representations or concealment; fraud

Under Michigan law, highly misleading actions give rise to a duty to disclose product defects.

**[11] Products Liability** 🔑 Representations or concealment; fraud

Under Michigan law, where a manufacturer has superior knowledge of a defect, not readily available to the consumer, the manufacturer has a duty to disclose.

**[12] Products Liability** 🔑 Representations or concealment; fraud

**Products Liability** 🔑 Cooking or heating food; ovens and stoves

Consumers plausibly alleged that manufacturer had superior knowledge, not readily available to consumers, of defect in oven ranges equipped with front-mounted control knobs that allowed stovetop burners to actuate unintentionally, such that manufacturer had duty to disclose under Michigan law, consumer complaints about the defect being publicly available online, where manufacturer received incident reports directly from a governmental agency, and consumers did not receive any similar notice from the government.

**[13] Fraud** 🔑 Fraudulent Concealment

Under Illinois law, in order to state a claim for fraudulent concealment, a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff.

**[14] Fraud** 🔑 Duty to disclose facts

Mere silence in a transaction does not amount to fraud, but if a party is silent while suppressing material facts or deceiving another, a duty to disclose arises under Illinois law.

**[15] Products Liability** 🔑 Representations or concealment; fraud

**Products Liability** 🔑 Cooking or heating food; ovens and stoves

Consumers did not plausibly allege that there was a fiduciary or confidential relationship with oven range manufacturer, or that manufacturer was in position of influence and

superiority over them, as would trigger duty under Illinois law to disclose defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently; consumers instead argued that manufacturer concealed material facts about safety, and did not specify how manufacturer concealed those facts.

**[16]    Fraud ⚷ Duty to disclose facts**

Under Oklahoma law, a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction; such circumstances exist where the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party.

**[17]    Fraud ⚷ Duty to disclose facts**

Where someone knows of a fact peculiarly within their knowledge and the other person is not in a position to discover it, they have a duty under Oklahoma law to disclose that material fact.

**[18]    Products Liability ⚷ Representations or concealment; fraud**

**Products Liability ⚷ Cooking or heating food; ovens and stoves**

Consumers plausibly alleged that oven range manufacturer had superior knowledge over the ordinary consumer, such that manufacturer had duty under Oklahoma law to disclose defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently; consumers alleged that manufacturer created a false impression regarding the defect, specifically, that they expected a two-part actuation system but received a range with defect wherein range would actuate with a single motion.

**[19]    Products Liability ⚷ Representations or concealment; fraud**

**Products Liability ⚷ Cooking or heating food; ovens and stoves**

Consumers plausibly pleaded oven range manufacturer's knowledge of defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently and thus plausibly pleaded manufacturer's duty to disclose under New Hampshire law.

**[20]  Fraud** 🔑 Duty to disclose facts

Under New Hampshire law, a duty to disclose arises when a seller knows of a concealed defect which is unknown to the buyer and not capable of detection by the buyer, provided the defect is dangerous to life or property.

**[21]  Antitrust and Trade Regulation** 🔑 Other particular products

Consumers plausibly alleged that they could not discover defect in oven ranges equipped with front-mounted burner knobs that made stovetops capable of igniting inadvertently prior to buying ranges through online or visual inspection and thus pleaded plausible claims under the Michigan Consumer Protection Act; defect was purely physical, and manufacturer allegedly had superior knowledge. Mich. Comp. Laws Ann. § 445.901 et seq.

**[22]  Antitrust and Trade Regulation** 🔑 Other particular products

Consumers were not required to plead a duty to disclose material facts in order to state a claim under Illinois Consumer Fraud and Deceptive Business Practices Act against manufacturer related to defect in oven ranges equipped with front-mounted burner knobs that made stovetops capable of igniting inadvertently. 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[23]  Antitrust and Trade Regulation** 🔑 Other particular products

Consumers plausibly alleged manufacturer's pre-sale knowledge of defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently, and thus, they pleaded plausible claims alleging that manufacturer violated the Oklahoma Consumer Protection Act based on manufacturer's alleged deception in sale of the ovens. 15 Okla. Stat. Ann. § 753.

**[24]  Antitrust and Trade Regulation** 🔑 Other particular products

Consumers plausibly alleged manufacturer's pre-sale knowledge of defect in front-mounted burner knobs that made stovetops capable of igniting inadvertently, and thus, they plausibly alleged claims under New Hampshire Consumer Protection Act based on manufacturer's alleged deception in sale of the ovens. N.H. Rev. Stat. Ann. § 358-A:1 et seq.

**[25]** **Antitrust and Trade Regulation** 🔑 Fraud; deceit; knowledge and intent

New Hampshire's consumer protection statute requires pre-sale knowledge of a defect. N.H. Rev. Stat. Ann. § 358-A:1 et seq.

**[26]** **Antitrust and Trade Regulation** 🔑 Other particular products

Consumers plausibly alleged manufacturer's pre-sale knowledge of defect in front-mounted knobs that made burners capable of igniting inadvertently, and thus, they plausibly alleged claims under the Nevada Deceptive Trade Practices Act based on manufacturer's alleged deception in sale of the ovens. Nev. Rev. St. § 598.0999 et seq.

Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 1:22-cv-00758—Jane M. Beckering, District Judge.

**Attorneys and Law Firms**

ARGUED: Jennifer Bennett, GUPTA WESSLER, San Francisco, California, for Appellants. Aileen M. McGrath, MORRISON & FOERSTER LLP, San Francisco, California, for Appellee. ON BRIEF: Jennifer Bennett, GUPTA WESSLER LLP, San Francisco, California, Robert Friedman, GUPTA WESSLER LLP, Washington, D.C., Alan M. Feldman, Edward S. Goldis, Zachary Arbitman, FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP, Philadelphia, Pennsylvania, Michael F. Ram, Marie N. Appel, MORGAN & MORGAN, San Francisco, California, David H. Fink, Nathan J. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellants. Aileen M. McGrath, Joel F. Wacks, MORRISON & FOERSTER LLP, San Francisco, California, Joseph R. Palmore, MORRISON & FOERSTER LLP, Washington, D.C., Alexandra Avvocato, MORRISON & FOERSTER LLP, New York, New York, for Appellee. Terri S. Reiskin, NELSON MULLINS RILEY & SCARBOROUGH LLP, Washington, D.C., Christopher Shaun Polston, NELSON MULLINS RILEY & SCARBOROUGH LLP, Atlanta, Georgia, Brian D. Schmalzbach, MCGUIREWOODS LLP, Richmond, Virginia, Philip S. Goldberg, SHOOK HARDY & BACON L.L.P., Washington, D.C., for Amici Curiae.

Before: MOORE, COLE, and LARSEN, Circuit Judges.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

COLE, J., delivered the opinion of the court in which MOORE, J., concurred. LARSEN, J. (pp. —— – ——), delivered a separate dissenting opinion.

**OPINION**

COLE, Circuit Judge.

**\*1** Plaintiffs own ovens with front-mounted burner knobs manufactured by Whirlpool Corporation. In their class-action complaint, they allege that their ovens' stovetop burners are capable of "unintended actuation," whereby the stovetops ignite inadvertently. After plaintiffs sued Whirlpool, the district court found that plaintiffs had Article III standing to pursue their claims but dismissed the amended complaint for failure to state plausible claims for relief. Plaintiffs now appeal dismissal of their state common law and statutory claims, while Whirlpool argues the district court erred by not dismissing plaintiffs' amended complaint for lack of Article III standing. We affirm in part and reverse in part.

I.

Plaintiffs Jodi Tapply, Jeannette Buschman, Michael Partipilo, Barbara Lester, and Vicki Meyerholz span five states—Michigan, Illinois, Oklahoma, New Hampshire, and Nevada—and allege common law fraud and consumer protection claims under each state's laws. Plaintiffs purchased ovens with stovetop ranges, all of which were manufactured by defendant Whirlpool Corporation. The products are single-device ovens with stovetop burners, each containing front-mounted control knobs that actuate the burners atop the stove (the Range), which plaintiffs claim acuate unintentionally (the Defect). These front-mounted knobs—including (A) the Range's alleged Defect and (B) what Whirlpool knew about the Defect prior to sale—are the focus of plaintiffs' amended complaint.[1]

A.

Plaintiffs purchased their respective Ranges between November 2018 and August 2021. Each plaintiff experienced their Range actuating unintentionally, noticing the Range was on only once they smelled gas in their home.

The front-mounted knobs were designed to turn the stovetop burners on with two discrete actions: the user pushes the knob inwards, then rotates it to the "on" position to actuate the burner. Because of the low level of force required to push the knobs in and the slight distance the knobs must turn to actuate the burners, however, plaintiffs' Ranges often turn on with one continuous motion. As such, their burners could be accidentally actuated with "the slightest touch, bump, or brush." (Am. Compl., R. 13, PageID 109, 111, 113, 114–15, 116, ¶¶ 27, 37, 46, 56, 65).

Plaintiffs allege that consumers, including themselves, expect their Ranges to be actuated by intentional and deliberate action and not by this inadvertent contact with the burner knobs. So, the unintended actuation has caused plaintiffs to be more cautious around the Range and constantly check the knobs to ensure they had not been switched on. For example, one plaintiff would have to pay particularly close attention to the Range if her grandchild with special needs would come to visit.

**\*2** Additionally, the Range does not have any guards over the knobs to reduce the risk of unintentional actuation, nor does the oven door handle act as an effective barrier between a user and the knobs. Plaintiffs allege that the Defect is hazardous and renders the Range unsafe for use, though plaintiffs continue to use theirs. The Range's user manual states that failing to turn off all controls while not cooking "can result in death or fire." (*Id.* at PageID 122, ¶ 73.)

Plaintiffs further allege that, due to the Defect, they paid far more than the reasonable value of the Range and would have paid substantially less—or foregone purchase altogether—had Whirlpool disclosed the Defect.

## B.

Plaintiffs' amended complaint alleges that, while plaintiffs did not know about the Defect at the point of sale, Whirlpool has known that the Range is inherently defective and unfit for its intended use due to unintentional actuation. These allegations of knowledge arise from incident reports submitted to the United States Consumer Product Safety Commission (CPSC) and consumer reviews on Whirlpool's website.

Plaintiffs include eight CPSC reports in their amended complaint, each of which CPSC sent to Whirlpool. These reports all involved consumers who accidentally actuated their Range burners consistent with the Defect. Dated between January 2017 and February 2020, each incident report discusses the Defect and the date the consumer's incident occurred, and the website plaintiffs cite lists the date CPSC sent each report to Whirlpool. Although plaintiffs cite only eight incident reports in their amended complaint, they allege these eight incident reports represent just a

"sample" of numerous reports consumers submitted to CPSC and forwarded to Whirlpool. (*Id.* at PageID 126, ¶ 80.)

Consumers also posted reviews directly to Whirlpool's website. Plaintiffs include several reviews wherein consumers complained of unintended actuation from the alleged Defect and the resulting gas odor.

C.

Plaintiffs brought a class action complaint on behalf of a purported nationwide class of persons who purchased a Range with the Defect, as well as sub-classes for residents of Michigan, Illinois, Nevada, Oklahoma, and New Hampshire. Their amended complaint brings ten counts alleging violations of federal warranty law, fraud by omission, breach of express warranty, breach of the implied warranty of merchantability, unjust enrichment, and violation of state consumer protection statutes.

Whirlpool argued that the amended complaint should be dismissed for two reasons. First, Whirlpool argued that plaintiffs lacked Article III standing to bring their claims. Second, Whirlpool argued that plaintiffs' amended complaint failed to state a plausible claim for relief. The district court rejected Whirlpool's first argument and found that plaintiffs alleged a sufficiently concrete injury to satisfy Article III's standing requirements. Nevertheless, the district court dismissed each of plaintiffs' claims for failure to state a claim.

Plaintiffs timely appealed the district court's dismissal of their state common law fraud and statutory consumer protection claims. In its response, Whirlpool argues that the court should reverse the district court's finding of Article III standing and dismiss plaintiffs' case on jurisdictional grounds, or, alternatively, affirm the district court's dismissal of plaintiffs' claims on the merits.

II.

 [1]    [2]   We apply de novo review to the legal conclusions reached by the federal district court in its dismissal of complaints under Federal Rule of Civil Procedure 12(b)(6). *Mattera v. Baffert,* 100 F.4th 734, 739 (6th Cir. 2024) (citing *United Food & Com. Workers Union-Emp. Pension Fund v. Rubber Assocs., Inc.,* 812 F.3d 521, 524 (6th Cir. 2016)). We "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.,* 648 F.3d 452, 456 (6th Cir. 2011) (citation omitted).

**\*3** **[3]** **[4]** To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts that, taken as true, state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A complaint states a plausible claim for relief where its alleged facts "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

## III.

To survive Whirlpool's motion to dismiss, plaintiffs here must have plausibly alleged that (A) they suffered a concrete injury in fact to confer Article III standing; (B) Whirlpool knew of the Defect; (C) Whirlpool had a duty to disclose the Defect; and (D) Whirlpool violated several state-specific consumer protection statutes.

## A.

**[5]** **[6]** **[7]** Standing is a prerequisite to bringing claims in federal court. *United States v. Texas*, 599 U.S. 670, 675, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023); U.S. Const. art. III, § 2, cl. 1. To have Article III standing, plaintiffs must demonstrate that (1) they suffered an injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would redress their injury. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024). An injury in fact must be both concrete and particularized, and actual or imminent. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021). Although Whirlpool does not contest that plaintiffs' claims are traceable and redressable, it argues the district court erred by finding that plaintiffs suffered a concrete injury-in-fact.

This court, sitting en banc, recently considered whether named plaintiffs in a consumer class action had suffered a concrete injury-in-fact. *See Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 314–15 (6th Cir. 2025) (en banc). In *Speerly*, the plaintiffs purchased vehicles that shuddered and shifted due to transmission issues, and each named plaintiff's vehicle suffered from the defect. *Id.* at 315. The court concluded that when a consumer buys a defective product and the defect manifests, the consumer has suffered a concrete injury-in-fact. *Id.* That is, the consumer has paid for something which they have not received—a defect-free product.[2]

**[8]** Here, each of the named plaintiffs alleges that they suffered a concrete economic injury because they were deprived of the benefit of their bargain—a Range that turns on through only

intentional and deliberate action. Each plaintiff alleges that their Range turned on unexpectedly, causing gas fumes to fill their homes. And each plaintiff alleges that, had Whirlpool disclosed the Defect, they would have paid far less for their Range or foregone the purchase altogether. Thus, the amended complaint alleges that plaintiffs reasonably expected their Range to turn on through only deliberate action, and that their Range deviates from this expected benefit. Therefore, plaintiffs suffered concrete injuries that satisfy the requirements of Article III.

**\*4** Whirlpool's arguments to the contrary are unpersuasive. Whirlpool concedes that overpayment for an allegedly defective product can satisfy Article III standing requirements, so long as a plaintiff properly pleads it. (Oral Arg. Rec. at 11:45–12:10.) Nevertheless, Whirlpool argues that, here, plaintiffs have not plausibly alleged they suffered a benefit of the bargain injury because they allege a perceived risk of *future* harm, rather than harm arising from a defect they bargained for. (*Id.* at 12:10–12:47.) In other words, Whirlpool argues that plaintiffs must have bargained for something that differs from the product they received at the point of sale. (*Id.* at 12:50–13:27.)

But that is precisely what plaintiffs allege. Plaintiffs allege that, at the point of sale, they reasonably expected that a Range would turn on through only deliberate action, rather than through inadvertent contact with the burner knobs. (Am. Compl., R. 13, PageID 119–20, ¶¶ 70–71 ("Consumers reasonably expect that Ranges can only be actuated by intentional and deliberate action.... The Ranges do not conform ... to a reasonable consumer's expectation, because the knobs are susceptible to unintentional actuation rendering the Ranges dangerously defective.").) Thus, plaintiffs plausibly allege the Range did not conform to their expectations because of the Defect. As such, plaintiffs have standing.

B.

To properly bring a common law fraud claim, plaintiffs must plausibly allege Whirlpool knew of the Defect. *Smith v. Gen. Motors LLC*, 988 F.3d 873, 883–84 (6th Cir. 2021). The parties dispute whether plaintiffs must also allege that Whirlpool had pre-sale knowledge of the Defect's safety implications. Because we conclude that plaintiffs plausibly pleaded that the Defect has inherent safety risks, we need not address the parties' arguments regarding whether a safety-risk knowledge requirement applies. *See id.* at 888–89 (Stranch, J., concurring) (expressing concern with requiring knowledge requirement not only of a defect, but of a defect's safety risk at the motion to dismiss stage).

Before assessing the plausibility of plaintiffs' allegations, we must determine which pleading standard applies. Federal Rule of Civil Procedure 8 imposes a general pleading standard, whereas Rule 9(b) imposes a heightened "particularity" standard for fraud claims. Fed. R. Civ. P. 8, 9(b). Although Rule 9(b)'s text permits general allegations regarding knowledge, this court has

previously imposed a particularity requirement to the knowledge element. *Compare Smith*, 988 F.3d at 883 ("Rule 9(b) ... permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss."), *with id.* at 884 ("In the context of this case under the standard in *Mross*, that means that Plaintiffs needed to 'state with particularity' factual allegations supporting the assertion that GM knew about the safety implications of the dashboard defect.").

*Smith* does not raise the pleading standard for knowledge in product defect claims. Rule 9(b) specifically excludes "knowledge" from heightened pleading requirements for fraud. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). *Smith* was a unique vehicle defect case involving invited error, and we required the plaintiffs to state their knowledge allegations with particularity "under the standard in *Mross*." 988 F.3d at 879–80, 884 (discussing that the parties specifically requested the district court follow the standards in *Mross*, a related class action involving the same vehicle defect). *Mross*, however, explicitly declined to apply Rule 9(b)'s heightened pleading requirements to the knowledge element of fraud claims. *Mross v. Gen. Motors Co., LLC*, No. 15-C-0435, 2016 WL 4497300, at *6 (E.D. Wis. Aug. 25, 2016) ("I note that my conclusion that the plaintiffs have not adequately alleged GM's knowledge of the defect and of the safety risk is not based on the pleading requirement that the circumstances constituting fraud be stated with particularity. [ ] Rather, even when necessary to support a fraud claim, 'knowledge' may be alleged generally."). We will not impose a particularity requirement for knowledge allegations, as doing so would contravene the explicit text of Rule 9(b).

**\*5** Here, although plaintiffs need not allege Whirlpool's knowledge with particularity, they nevertheless must allege sufficient facts to show Whirlpool plausibly knew of the Defect. Plaintiffs must allege more than conclusory statements that, upon information and belief, a manufacturer reads third-party websites and monitors report databases. *See Smith*, 988 F.3d at 885.

Both plaintiffs and Whirlpool primarily analogize to *Smith*. In *Smith*, the plaintiffs alleged that consumer complaints of safety defects were posted on online vehicle websites and that customers had sent complaints to the National Highway Traffic Safety Administration (NHTSA) database. *Id.* The plaintiffs alleged that GM monitored those online forums and the NHTSA database, so GM must have known about the defects. *Id.*

This court rejected the *Smith* plaintiffs' arguments, holding that allegations of GM reading public message boards and monitoring the online NHTSA database were speculative absent supporting facts. *Id.* The allegations were not " 'frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day.' " *Id.* (quoting *Roe v. Ford Motor Co.*, No. 2:18-cv-12528, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019)). Further, the alleged safety defect was a cracked dashboard which, if an airbag malfunctioned, "could turn the plastic dashboards into deadly projectiles during a crash." *Id.* at 875. Thus, the danger could only materialize if the

dashboard cracked, the driver crashed, and the airbag malfunctioned. The defect's potential to harm consumers was therefore too attenuated. *See id.*

This case differs from *Smith* for two key reasons which, viewed together, demonstrate that plaintiffs plausibly allege Whirlpool's knowledge of the Defect and its safety risks. First, *Smith* involved allegations of constructive knowledge, whereas plaintiffs here pleaded actual knowledge arising from direct government communication made pursuant to federal law, rather than online public forums. Second, the Defect poses inherent safety risks, unlike the cracked dashboard in *Smith*.

First, *Smith* concerned constructive knowledge, and the necessary allegations absent in *Smith* are present here. The *Smith* plaintiffs never alleged that GM "engaged with or received complaints about the defective dashboard and its safety risk." *Smith*, 988 F.3d at 885. They merely offered allegations upon "information and belief" that GM monitored online forums and databases. *Id.*

By contrast, plaintiffs here allege that CPSC sent incident reports directly to Whirlpool pursuant to its obligation under federal law. Whereas the *Smith* plaintiffs alleged that GM knew of the defects from publicly available websites and the NHTSA databases—and included no allegation that the manufacturer had received such complaints directly—plaintiffs here plausibly allege that CPSC sent product harm reports directly to Whirlpool consistent with their reporting obligations. *See* 15 U.S.C. § 2055a(c)(1); 16 C.F.R. § 1102.20.

 **[9]**  Plaintiffs' allegations are far more specific than those in *Smith*. They allege the precise dates on which consumers sent complaints to CPSC, the contents of those complaints, and the dates on which CPSC forwarded the incident reports to Whirlpool. The amended complaint cites CPSC's database showing the dates CPSC sent consumer complaints about the Defect to Whirlpool. Accordingly, plaintiffs' allegations are more specific than the mere "information and belief" allegations in *Smith*. Therefore, plaintiffs plausibly allege that Whirlpool received CPSC incident reports concerning the Defect, giving rise to actual knowledge of the Defect.

 **\*6**  Second, the CPSC complaints sent to Whirlpool plausibly demonstrate that Whirlpool knew of the Defect's safety risks. Here, the Defect is that a Range may actuate unintentionally. And, if a Range actuates, gas will emanate from the user's stove. Accordingly, the Defect poses a safety risk inherent to the use of the Ranges. The CPSC incident reports and consumer complaints cited in the amended complaint discuss these concerns. (*See, e.g.*, Am. Compl., R. 13, PageID 126–128, 132–34, ¶¶ 81–85, 97–99.) These complaints plausibly demonstrate that Whirlpool knew the Defect poses a safety risk. *Contra Smith*, 988 F.3d at 885–86 (explaining that the customer complaints "might have put GM on notice about the cracked dashboard"—the defect—but not the safety risk associated with an event that had never manifested). Moreover, Whirlpool's own Range user manual contemplates the Range's safety concerns when it warns that failing to turn off all controls while not cooking "can result in death or fire." (Am. Compl., R. 13, PageID 122,

¶ 73.) And CPSC's involvement underscores the safety risks involved in this case, as Congress established CPSC due to its concern that consumers faced "unreasonable risks of injury" from products. 15 U.S.C. §§ 2051(a), 2053(a).

We conclude that a plaintiff plausibly alleges that a manufacturer knew of the alleged product defect when a government agency, required by law to transmit consumer complaints about a safety defect to a manufacturer, indeed transmits those complaints to the manufacturer. Online chatter is fundamentally different from direct government notice. Contrary to the dissent's characterization, this is not "a rule without a limitation," nor is it a new rule to distinguish *Smith*. (Dissent at ——— – ———.) The limitation is apparent: a plaintiff must plausibly allege that the federal government notified a company of a safety defect, not merely that a consumer complained to the government or some other third party. *Cf. Smith*, 988 F.3d at 885.

This conclusion is consistent with the rules governing inferences in a Rule 12(b)(6) motion to dismiss. Assessing whether Whirlpool "engaged with or received" complaints requires us to draw inferences. *Smith*, 988 F.3d at 885. Here, plaintiffs assert that Whirlpool knew of the Defect because it received notice of the Defects from a governmental agency. The amended complaint goes on to provide, as examples, eight complaints identifying the safety concern and the dates CPSC sent each complaint to Whirlpool. If we concluded that Whirlpool did not "engage[ ] with or receive[ ]" these complaints despite CPSC having sent them, we would be drawing an inference in Whirlpool's favor. Rule 12(b)(6) requires us to do the opposite at the motion to dismiss stage. Fed. R. Civ. P. 12(b)(6); *see VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 399 (6th Cir. 2025).

The dissenting opinion concludes that plaintiffs fail to plausibly plead that Whirlpool engaged with or examined the consumer complaints, citing a lack of explanation of Whirlpool's process for engaging with the complaints. (Dissent at ———.) But plaintiffs could not know such information at this stage. Without discovery, plaintiffs cannot plausibly allege Whirlpool's processes for reviewing CPSC complaints. Through discovery, plaintiffs may determine whether Whirlpool examined or engaged with the complaints. At the motion to dismiss stage, where plaintiffs lack information about Whirlpool's internal process for reviewing government-produced consumer reports, plaintiffs have met their burden to allege that Whirlpool plausibly knew of the Defect.

At oral argument, counsel for Whirlpool argued that *Smith* requires three sets of allegations lacking in plaintiffs' amended complaint: plausible allegations that (1) Whirlpool engaged with or received consumer complaints; (2) the complaints were frequent enough that they constituted more than a "blip" on a manufacturer's radar; and (3) the complaints identify a safety defect. As discussed above, the amended complaint plausibly alleges that Whirlpool received consumer complaints and that those complaints identify a safety defect. Whether the CPSC reports were sufficiently frequent in number, however, requires further discussion.

**\*7**  In *Smith*, we reasoned that the plaintiffs did not allege sufficiently frequent online complaints to infer constructive knowledge. There, the plaintiffs alleged that consumers posted on public forums but did not allege that any complaint was made—or sent—directly to GM. *Smith*, 988 F.3d at 885. We held that the plaintiffs failed to allege facts in support of their allegations that GM reads online message boards and NHTSA databases. *Id.* This distinction is key. Complaints made online to third parties, without any allegations that the complaints were received by the manufacturer, must be sufficiently frequent to plausibly infer that the manufacturer had learned of the issue. *Id.* (quoting *Roe*, 2019 WL 3564589, at \*7).

This reasoning makes sense in the constructive knowledge context. To infer constructive knowledge, the *Smith* plaintiffs had to allege that despite never directly receiving notice of the consumer complaints, the complaints were so frequent that GM must have heard the online chatter. *See id.* But here, we need not infer constructive knowledge because the complaints were plausibly sent to and received by Whirlpool pursuant to federal law.

We also cannot assess whether these CPSC incident reports were lost in a sea of complaints, *see Smith*, 988 F.3d at 885, because there is no record yet of the number of CPSC complaints Whirlpool receives. Plaintiffs cannot, at this preliminary stage of litigation, allege who at Whirlpool processes, stores, or reads complaints sent by CPSC. Nor can they allege how many CPSC complaints Whirlpool receives, making it difficult to determine whether these eight "examples" are an anomaly.[3]

Because knowledge can be alleged generally and only plausibility is required at the motion to dismiss stage, we reject Whirlpool's "number-of-complaints" argument. And we note that in its motion to dismiss before the district court, Whirlpool did not advance this number-of-complaints based argument. (*See* Br. in Support of Mot. to Dismiss, R. 26, PageID 490.) Instead, Whirlpool argued that the complaints failed to allege personal injury or property damage. (*Id.* ("Taken together, these complaints cited by Plaintiffs establish, at most, knowledge of a minor inconvenience, which is insufficient to support Plaintiffs' consumer fraud and warranty claims.").) Regardless, these eight incidents are cited as examples, and discovery may reveal how many complaints raised safety concerns.[4]

**\*8**  For these reasons, plaintiffs plausibly alleged knowledge of the Defect and its related safety risks. The district court erred in ruling to the contrary.[5]

C.

The district court found that, even if plaintiffs had plausibly alleged pre-sale knowledge, plaintiffs' claims should be dismissed for failing to plausibly allege that Whirlpool had a duty to disclose the Defect. Because these claims arise under five states' laws, we consider each state's law below.

 **[10]** **[11]** *Michigan*. Under Michigan law, highly misleading actions give rise to a duty to disclose product defects. *M&D, Inc. v. W.B. McConkey*, 231 Mich.App. 22, 585 N.W.2d 33, 39 (1998). And where a manufacturer has superior knowledge of a defect, not readily available to the consumer, the manufacturer has a duty to disclose. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021) (citing *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 553 (W.D. Mich. 1998)); *Estate of Pilgrim v. Gen. Motors LLC*, 596 F. Supp. 3d 808, 824–25 (E.D. Mich. 2022) (finding plaintiffs sufficiently alleged a duty to disclose under Michigan law where the manufacturer had superior knowledge of a defect causing engine parts to explode).

Consumers are not, as Whirlpool argues, required to inquire about a defect to trigger a manufacturer's duty to disclose. Though Whirlpool correctly notes that plaintiffs cite no Michigan state court case applying the "superior knowledge" rule, *M&D* did not hold that consumer inquiry was the *sole* circumstance imposing a duty to disclose. *See M&D*, 585 N.W.2d at 39 (noting that highly misleading actions give rise to a duty to disclose product defects). Indeed, we have held that the duty arises "*most commonly* in a situation where inquiries are made by the plaintiff," but not that an inquiry is always required. *See MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 666 (6th Cir. 2013) (quoting *Hord v. Env't Rsch. Inst. of Michigan*, 463 Mich. 399, 617 N.W.2d 543, 550 (2000)).

Whirlpool contends that, even if a duty to disclose arises out of superior knowledge, they lack such superior knowledge here. Because consumer complaints about the Defect were publicly available online, Whirlpool argues that plaintiffs had access to the same information as Whirlpool. But the Michigan Supreme Court has held otherwise when assessing fraud claims. *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 817 N.W.2d 562, 569 (2012) ("[A]lthough the doctrines of actionable fraud, innocent misrepresentation, and silent fraud each contain separate elements, none of these doctrines requires that the party asserting fraud prove that the fraud could not have been discovered through the exercise of reasonable diligence.").

 **\*9** Moreover, we are reluctant to impose a duty of discovery on plaintiffs or defendants in this context. Doing so would contravene our reasoning in *Smith*. In *Smith*, we concluded that allegations of a manufacturer monitoring online message boards or public databases was insufficient to plausibly demonstrate knowledge. *See* 988 F.3d at 885–86. But here, Whirlpool asks us to conclude that, because plaintiffs could access similar information online, plaintiffs had the same knowledge as Whirlpool. (Appellee Br. 42 ("Plaintiffs cannot rely on these complaints to plead Whirlpool's knowledge while ignoring their relevance to their own knowledge.").)

**[12]**  Whirlpool's knowledge is superior not because it read the publicly available online forums, but because it received incident reports directly from CPSC. Plaintiffs have not alleged that they received any similar notice from the government. Whirlpool thus had superior knowledge of the Defect, so plaintiffs adequately pleaded a duty to disclose the Defect under Michigan law. We reverse the district court's decision to the contrary.

**[13]**    **[14]**  *Illinois*. Under Illinois law, "[i]n order to state a claim for fraudulent concealment, a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (1996) (citations omitted). The Illinois Supreme Court has held that a duty to disclose material facts may arise out of several situations, such as a fiduciary or confidential relationship or a situation where the defendant is in a position of "influence and superiority" over a plaintiff. *Id.* Illinois courts have since clarified that, in addition to those two examples, concealing or suppressing material facts can give rise to a duty to disclose. *See, e.g.*, *RWJ Mgmt. Co. v. BP Prods. N. Am. Inc.*, No. 09 L 7891, 2012 WL 11140385, at *8–9 (Ill. Cir. Ct. May 2, 2012) (collecting cases). "Mere silence in a transaction does not amount to fraud," but if a party is silent while suppressing material facts or deceiving another, a duty to disclose arises under Illinois law. *Id.*

These requirements are "fairly rigorous." *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 260 Ill.Dec. 735, 762 N.E.2d 1, 13 (2001), *as modified on denial of reh'g* (Nov. 27, 2001). And courts have disagreed regarding whether a safety risk imposes a duty to disclose under Illinois law. *Compare O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 965 (N.D. Ill. 2021) (rejecting the plaintiffs' argument that Illinois law imposes a duty to disclose safety defects), *with In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 414 (S.D.N.Y. 2017) (discussing that at least two other courts had found a duty to disclose safety defects under Illinois law), *modified on reconsideration*, No. 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).

**[15]**  Here, plaintiffs do not plausibly allege that Whirlpool had a duty to disclose under Illinois law. Plaintiffs concede they lacked a confidential or fiduciary relationship with Whirlpool but argue that Whirlpool concealed material facts. Their allegations do not, however, specify how Whirlpool concealed those facts, seeming instead to rely on a few courts' decisions finding that a safety risk imposes a duty to disclose under Illinois common law.

Plaintiffs' reliance on the "safety risk" duty to disclose argument lacks a strong basis in Illinois law. The two cases cited in *In re General Motors LLC Ignition Switch Litigation* were from district courts in New Jersey and Florida, and neither contained a thorough analysis of Illinois law. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-CV-2765, 2017 WL 1902160, at *20 (D.N.J. May 8, 2017); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-CV-24009, 2017 WL 2406711, at *5 (S.D. Fla. June 1, 2017).

**\*10** Accordingly, we affirm the district court's determination that plaintiffs did not sufficiently plead a duty to disclose the Defect under Illinois law.

[16]  [17]  *Oklahoma*. Under Oklahoma law, "a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction." *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 854 (Okla. 2020) (citation omitted). Such circumstances exist where the "offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party." *Id.* And, where someone knows of a fact "peculiarly within [their] knowledge and the other person is not in a position to discover [it,]" they have a duty to disclose that material fact. *Seay v. Weaver*, No. 19-CV-00474-GKF-JFJ, 2021 WL 3686695, at \*6 (N.D. Okla. July 23, 2021) (citing Oklahoma Uniform Jury Instructions – Civil 18.5). The district court erred by requiring that plaintiffs allege a confidential or fiduciary relationship to establish a duty to disclose.

[18]  Plaintiffs argue that Whirlpool created a false impression regarding the Defect. Specifically, they argue that they each expected a two-part actuation system but received a Range with the Defect—where the Range would actuate with a single motion. Because the amended complaint plausibly alleges that Whirlpool had superior knowledge over the ordinary consumer, plaintiffs plausibly alleged a duty to disclose under Oklahoma law. We reverse the district court's decision finding otherwise.

[19]  [20]  *New Hampshire*. Under New Hampshire law, "[a] duty to disclose arises when a seller knows of a concealed defect which is unknown to the buyer and not capable of detection by the buyer, provided the defect is dangerous to life or property." *Univ. Sys. of New Hampshire v. U.S. Gypsum Co.*, 756 F. Supp. 640, 651 (D.N.H. 1991) (citing *Ingaharro v. Blanchette*, 122 N.H. 54, 440 A.2d 445, 447 (1982)). The district court found that Whirlpool had no duty to disclose because Whirlpool lacked the requisite knowledge. Because plaintiffs plausibly pleaded Whirlpool's knowledge, however, they plausibly pleaded Whirlpool's duty to disclose under New Hampshire law. Therefore, we reverse the district court's decision dismissing plaintiffs' claim under New Hampshire law.

*Nevada*. Whirlpool did not move to dismiss plaintiffs' Nevada fraud claim for lack of a duty to disclose. (*See* Reply, R. 32, PageID 586–87.) Accordingly, plaintiffs' Nevada claim will be reinstated.

D.

Finally, we consider whether the district court erred by dismissing plaintiffs' state consumer protection claims. We address each state claim in turn.

*Michigan*. Plaintiffs allege Whirlpool violated the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*

Plaintiffs argue that they need not prove that Whirlpool knowingly made false statements or had a duty to disclose the Defect. Whirlpool counters that, even if the Michigan Act does not require Whirlpool's knowledge of the defect, plaintiffs' claim fails because "where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff," a plaintiff cannot maintain a claim. *Evans v. Ameriquest Mortg. Co.*, No. 233115, 2003 WL 734169, at *3 (Mich. Ct. App. Mar. 4, 2003) (per curiam) (citation omitted).

**\*11** **[21]** For the reasons stated previously, Whirlpool's argument lacks merit. Plaintiffs could not discover the Defect prior to purchasing their Ranges through an online or visual inspection—the Defect is purely physical, and plaintiffs plausibly alleged Whirlpool had superior knowledge. Accordingly, plaintiffs plead plausible claims under the Michigan Act.

*Illinois*. Plaintiffs allege Whirlpool violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1, *et seq.* While the parties argue about whether the district court incorrectly analyzed the Illinois common law and statutory claims together because of Federal Rule 9(b)'s heightened pleading requirements, the district court erred for a separate reason. The district court incorrectly required plaintiffs to plead a duty to disclose under the Illinois Act. The district court should have recognized that "[t]he [Illinois Act] generally does require that sellers engaged in trade or commerce disclose any material facts to consumers, regardless of the existence of a common law duty." *Miller*, 260 Ill.Dec. 735, 762 N.E.2d at 14; *Celex Grp., Inc. v. Exec. Gallery, Inc.*, 877 F. Supp. 1114, 1130 (N.D. Ill. 1995).

**[22]** Thus, while plaintiffs' claim under Illinois common law fails for failure to plausibly allege a duty to disclose, no such duty is required under the Illinois Act. They, therefore, plausibly allege a claim under the Illinois Act.

**[23]** *Oklahoma*. Plaintiffs allege Whirlpool violated the Oklahoma Consumer Protection Act, Okla. Stat. tit. 5, §§ 751, *et seq.* Claims under the Oklahoma Act must plausibly allege pre-sale knowledge. Okla. Stat. Ann. tit. 15, § 753 (prohibiting "[m]ak[ing] a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction"). Because plaintiffs plausibly allege Whirlpool's pre-sale knowledge, they allege plausible claims under the Oklahoma Act.

**[24]    [25]**  *New Hampshire*. Plaintiffs allege Whirlpool violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* New Hampshire's consumer protection statute requires pre-sale knowledge of a defect. *See Kelton v. Hollis Ranch, LLC*, 155 N.H. 666, 927 A.2d 1243, 1246 (2007) (explaining that "[t]he plain language of" New Hampshire's consumer-protection statute "indicates that some element of knowledge on the part of the defendant is required"). Because plaintiffs plausibly alleged pre-sale knowledge, they plausibly allege claims under the New Hampshire Act.

**[26]**  *Nevada*. Plaintiffs allege Whirlpool violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0999, *et seq.* Plaintiffs charge that Whirlpool did not argue, and the district court did not hold, that their Nevada statutory claims failed for a lack of duty to disclose. As such, they reiterate that their Nevada statutory claim should be reinstated. Because plaintiffs plausibly alleged pre-sale knowledge, they plausibly allege claims under the Act.

III.

For the foregoing reasons, we affirm in part and reverse in part the district court's order granting Whirlpool's motion to dismiss plaintiffs' amended complaint. Plaintiffs' common law fraud and consumer protection claims—aside from plaintiffs' Illinois common law fraud claim—shall be reinstated.

COLE, J., delivered the opinion of the court in which MOORE, J., concurred. LARSEN, J. (pp. 20–24), delivered a separate dissenting opinion.

**DISSENT**

LARSEN, Circuit Judge, dissenting.

**\*12**  I agree with the majority's conclusion that the named plaintiffs have Article III standing to pursue their claims against Whirlpool. I disagree, however, that plaintiffs have sufficiently alleged that Whirlpool had knowledge of the defect. Because the lack of knowledge dooms plaintiffs' claims, I would affirm the district court in its entirety. I respectfully dissent.

I.

First, standing. Article III allows courts to decide only "Cases" and "Controversies." U.S. Const., art III, § 2. For standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021).

The question here focuses on the first standing requirement—injury in fact. To satisfy this requirement, the injury must be "concrete—that is, real, and not abstract." *Id.* at 424, 141 S.Ct. 2190 (citation omitted). "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only the rights of individuals, and that federal courts exercise their proper function in a limited and separate government." *Id.* at 423, 141 S.Ct. 2190 (citations omitted). "[T]raditional tangible harms, such as physical harms and monetary harms," suffice. *Id.* at 425, 141 S.Ct. 2190. Where a party seeks monetary relief, such as damages, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm." *Id.* at 436, 141 S.Ct. 2190.

At this stage in the case, "we take as true the well-pleaded allegations in the complaint and ask whether plaintiffs plausibly alleged their standing to sue." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022). The named plaintiffs here have each alleged that the ranges they purchased have a defect—that is, they turn on inadvertently. Each of the named plaintiffs experienced the unintended actuation. They allege that the unintended actuations resulted in the ranges omitting gas into their homes without warning and, in one instance, causing a fire. As such, the alleged defect in the ranges manifested for each of the named plaintiffs. Those allegations are sufficient to confer standing. *See Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 315 (6th Cir. 2025) (en banc).

II.

Although I agree with the majority's conclusion that the plaintiffs have standing, I depart from the majority opinion on the question of Whirlpool's knowledge. Plaintiffs' claims for fraud by omission, and for violation of the relevant state consumer protection statutes, cannot succeed unless Whirlpool had knowledge of the defect. Plaintiffs have failed to adequately allege Whirlpool's knowledge, and that is fatal to plaintiffs' complaint.[1]

**\*13**  Generally, when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Even under generalized pleading rules, however, plaintiffs' amended complaint fails to adequately plead Whirlpool's knowledge of the defect.

In *Smith v. General Motors, LLC*, we examined whether General Motors (GM) had knowledge of a defect that led to cracked dashboards in vehicles that it had sold. 988 F.3d 873, 885 (6th Cir. 2021). There, "[p]laintiffs only offered 'information and belief' that GM knew of the complaints." *Id.* at 885. We held that such allegations were insufficient because there was no factual basis for them. *Id.* According to the complaint in *Smith*, GM should have been aware of a flood of customer complaints, which "came as online posts on car websites ... and complaints on the [National Highway Traffic Safety Administration (NHTSA)] database about the cracks, including 239 NHTSA safety complaints related to the cracked dashboards." *Id.* We held that this was insufficient to allege GM's knowledge. The allegations were too speculative to show knowledge because they would have been "a blip" on GM's "complaints-and-repairs radar considering the millions of ... cars in use." *Id.* (citation omitted). "[N]othing show[ed] that the complaints about GM's cracked dashboards were frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day." *Id.* (citation omitted). So, "[w]ithout supporting facts that GM engaged with or received complaints about the defective dashboard and its safety risk, the consumer complaints [were] insufficient to allege that GM knew about the defective dashboard under the 12(b)(6) pleading standard." *Id.*

The allegations here are even less substantial than those found insufficient in *Smith*. Plaintiffs attempt to show Whirlpool's knowledge through two categories of consumer complaints; but whether taken alone or together, they fail to adequately allege knowledge. First, according to the amended complaint, "[c]onsumers have submitted numerous incident reports about the Defect to the U.S. Consumer Product Safety Commission ('CPSC')." R. 13, Amended Complaint, PageID 126. The complaint then provides eight examples. Two of those reports were made in 2016, one in 2017, two in 2018, two in 2019, and one in 2020. Eight complaints over a five-year span are not enough to have put Whirlpool on notice by the time the last plaintiff bought her range in 2021. And it's even more true that three complaints over two years could not have been enough to put Whirlpool on notice when the first plaintiff bought her range in 2018.

Plaintiffs next identify online consumer complaints, which they allege were submitted "directly to Whirlpool via reviews posted to its website." *Id.* at 129. But like the CPSC complaints, only a handful came before the alleged purchases here.[2] Our holding in *Smith* compels the conclusion that the handful of consumer complaints alleged here fall far short of showing Whirlpool's knowledge of the defect. In *Smith*, we deemed 239 complaints to be a "blip" on GM's radar, given the millions of GM cars in use. 988 F.3d at 885. Here, plaintiffs offer only a few complaints that allegedly should have put Whirlpool on notice that several models of the ranges they made were defective.

**\*14**  Further, as in *Smith*, there is no plausible allegation here that Whirlpool engaged with the alleged consumer complaints. The closest the complaint comes is the allegation that the CPSC "transmitted all th[e] complaints to" Whirlpool. R. 13, Amended Complaint, PageID 126. But

without further explanation of the process by which Whirlpool examined those few complaints, the allegations are insufficient to establish that Whirlpool engaged with or actually knew of the alleged defect, such that it thought it needed to do something about it. *Smith*, 988 F.3d at 885. Accordingly, plaintiffs have failed to plausibly allege that Whirlpool had sufficient knowledge of the alleged defect.

The majority opinion creates a new rule in an attempt to distinguish *Smith*: "a plaintiff plausibly alleges that a manufacturer knew of the alleged product defect when a government agency, required by law to transmit consumer complaints about a safety defect to a manufacturer, indeed transmits those complaints to the manufacturer." Maj. Op. at —— – ——. That is a rule without a limitation. Is one consumer complaint sufficient to give a company the size of Whirlpool knowledge that it must act to investigate and fix a defect in a product or else face a potential class-action lawsuit? If not, then why is eight (at most) sufficient? What about when multiple product models are involved, as here? The amended complaint lists sixteen models and purports to include "all other models (discontinued or still available for sale) containing substantially similar front-mounted burner controls." R. 13, Amended Complaint, PageID 119. Even if we disregard the dates of the complaints and countenance all eight provided in the pleading, they encompass only four of the sixteen models identified in plaintiffs' amended complaint, with five of the eight complaints pertaining to the same model.[3] What's more, five of the complaints pertain to the range model purchased by two of the named plaintiffs; the rest of the complaints aren't related to the models purchased by the remaining plaintiffs at all. The majority opinion offers no case to show that such a miniscule number of complaints, even if transmitted directly to Whirlpool, is sufficient to put a company of this size on notice that it must investigate and fix an alleged defect in sixteen or more different range models.

The majority opinion also faults Whirlpool for not raising its "number-of-complaints based argument" in its motion to dismiss. Maj. Op. at ——. But Whirlpool's brief in support of the issue at least touched on that issue. *See* R. 26, PageID 489 ("Plaintiffs fail to plausibly allege Whirlpool's pre-sale knowledge of a safety defect about which it did not warn."); *id.* ("[T]o establish these claims, Plaintiffs must plead Whirlpool's pre-sale knowledge of the defect."). And, in any event, the district court expressly discussed this issue in its opinion and order. R. 40, Dist. Ct. Order, PageID 726–27. That is sufficient to make the issue live for our review. *See Raines v. United States*, 898 F.3d 680, 687 (6th Cir. 2018) ("There can be no forfeiture where the district court, despite a party's failure to press an argument, nevertheless addressed the merits on the issue." (cleaned up)).

Plaintiffs' failure to adequately allege knowledge is fatal to their claims for fraud by omission and violation of the relevant state consumer protection statutes. For that reason, I would affirm the district court's grant of the motion to dismiss in Whirlpool's favor in its entirety. I respectfully dissent.

## All Citations

--- F.4th ----, 2025 WL 2237654

Footnotes

1     Plaintiffs' putative class action also alleges a sub-class of consumers who purchased an electric Range. Plaintiffs, however, never owned an electric Range. The district court held that plaintiffs had standing at the Rule 12(b)(6) stage to assert claims on behalf of the sub-class of electric Range owners. Whirlpool has not appealed that ruling, and the parties do not address the electric Range in their briefing. Accordingly, issues regarding the putative electric Range sub-class are not before us.

2     This is not to say that a consumer who purchases a product with an unmanifested defect has not suffered an Article III injury. Indeed, this court in *Speerly* recognized that "[m]ost of our sister circuits" to confront this issue—the First, Fifth, Seventh, Ninth, and Eleventh —have permitted consumers to proceed with unmanifested defect claims under an overpayment theory of liability. 143 F.4th at 314 (collecting cases). Our precedent similarly supports a theory of standing for economic injuries where a product's defect has not yet manifested. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 856–57 (6th Cir. 2013); *see also Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 581 (6th Cir. 2013) (concluding that paying more for a product because of a company's misrepresentations was enough to demonstrate a concrete injury-in-fact). Regardless, *Speerly* made certain that each consumer whose product has manifested a defect has suffered a concrete Article III injury.

3     The dissenting opinion contends that *Smith*'s number-of-complaints reasoning controls here due to the few examples of complaints cited compared to the size of Whirlpool. (Dissent at ——.) But the dissenting opinion's reasoning would create a sliding scale of protection for larger companies, requiring courts to ascertain whether a certain number of complaints was sufficient to put a company of a certain size on notice that its product had a defect. Such a sliding scale approach would be unworkable.

4     The dissenting opinion asserts that the district court expressly discussed the "number-of-complaints" issue in its opinion and order. (Dissent at —— – ——.) It did not. The district court focused on the safety implications of the defect, concluding that "[p]laintiffs neither allege facts nor provide information to support the conclusory assertion that the complaints were sent to [Whirlpool] by the CPSC, nor that the complaints contained sufficient information to put [Whirlpool] on notice of the alleged safety implications of the Defect." (Op. and Order, R. 40, PageID 726.) To be sure, it cited *Roe v. Ford Motor Co.*, No. 2:18-cv-12528, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019), which discussed whether a complaint had identified enough complaints. But the district court's reasoning plainly relied on whether the complaints identified a safety concern, not the number of complaints made.

5     Whirlpool's brief and the dissenting opinion note that no CPSC complaints in the amended complaint pertained to the Range models purchased by plaintiffs Buschman, Lester, and Meyerholz. Because Whirlpool did not make this argument below and instead argued that plaintiffs' allegations "establish, at most, knowledge of a minor inconvenience," (Mot. to Dismiss, R. 26, PageID 490), plaintiffs never had the opportunity to seek leave to amend and address this deficiency. On remand, plaintiffs should seek leave to include such examples.

1     The district court also dismissed plaintiffs' claims for violation of the Magnuson-Moss Warranty Act, for breach of express and implied warranty, and for unjust enrichment. Plaintiffs don't challenge the dismissal of those claims on appeal. *See* Appellants Br. at 20 ("Plaintiffs appeal the district court's dismissal of their claims for common law fraud by omission and the violation of several state consumer protections statutes."). So they have abandoned them. *See Castellon-Vogel v. Int'l Paper Co.*, 829 F. App'x 100, 102 (6th Cir. 2020).

2     The amended complaint also alleges that "certified Whirlpool appliance technicians have observed unintentional actuation in Ranges in the field." R. 13, Amended Complaint, PageID 134. Plaintiffs have abandoned any such reliance on that allegation before this court by not addressing it. So that leaves only the CPSC complaints and the complaints posted to Whirlpool websites.

3     Four of the complaints reference Model No. WGG745S0FS02, while one references Model No. WGG745S0FS. The amended complaint lists only the former as among the models at issue, so I proceed under the assumption that they are the same. Even if not, the point remains the same.

**Tapply v. Whirlpool Corporation, --- F.4th ---- (2025)**

2025 WL 2237654

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775     Document: 45-1     Filed: 09/17/2025     Page: 176

2025 WL 2170165
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Mike YODER; Drone Deer Recovery LLC, identified on initiating documents
as Drone Deer Recovery Media, Inc.; Jeremy Funke, Plaintiffs-Appellants,
v.
Scott BOWEN, in his official capacity as Director of the Michigan Department of Natural
Resources, identified on initiating document as Shannon Lott, Defendant-Appellee.

No. 24-1593
|
Argued: January 29, 2025
|
Decided and Filed: July 31, 2025

**Synopsis**
**Background:** Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter filed § 1983 action alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause. The United States District Court for the Western District of Michigan, Paul L. Maloney, J., dismissed complaint, and plaintiffs appealed.

**Holdings:** The Court of Appeals held that:

[1] plaintiffs satisfied injury-in-fact requirement for standing;

[2] plaintiffs satisfied traceability requirement for standing;

[3] plaintiffs satisfied redressability requirement for standing;

[4] law was not content-based restriction on speech;

[5] operation of drone to locate game animals was not inherently expressive conduct; and

[6] law did not violate Free Speech Clause as applied to plaintiffs.

Affirmed.

Mathis, Circuit Judge, concurred in judgment and filed opinion.

West Headnotes (22)

**[1]    Federal Courts** 🔑 Pleading

Court of Appeals reviews district court's grant of motion to dismiss for failure to state claim de novo. Fed. R. Civ. P. 12(b)(6).

**[2]    Federal Civil Procedure** 🔑 Insufficiency in general

To survive motion to dismiss for failure to state claim, complaint must present sufficient facts to state claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[3]    Federal Civil Procedure** 🔑 Construction of pleadings

**Federal Civil Procedure** 🔑 Matters deemed admitted;  acceptance as true of allegations in complaint

In ruling on motion to dismiss for failure to state claim, court must construe complaint in light most favorable to plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in complaint as true, but it may disregard naked assertions devoid of further factual enhancement and formulaic recitations of elements of cause of action. Fed. R. Civ. P. 12(b)(6).

**[4]    Federal Courts** 🔑 Jurisdiction

**Federal Courts** 🔑 Standing

Court of Appeals reviews de novo dismissals for lack of subject matter jurisdiction, including dismissals for lack of standing. Fed. R. Civ. P. 12(b)(1).

**[5]    Federal Civil Procedure** 🔑 In general;  injury or interest

Article III standing is prerequisite to federal jurisdiction. U.S. Const. art. 3, § 2, cl. 1.

**[6]**    **Federal Civil Procedure** 🔑 In general;  injury or interest

**Federal Civil Procedure** 🔑 Causation;  redressability

Irreducible constitutional minimum of Article III standing contains three elements: (1) plaintiff must have suffered actual past injury, or will suffer imminent future injury, that is concrete and particularized, (2) plaintiff's injury must be fairly traceable to or causally connected to challenged conduct, rather than result of independent action of some third party not before court, and (3) favorable ruling on requested relief must be likely to redress plaintiffs' injury. U.S. Const. art. 3, § 2, cl. 1.

**[7]**    **Constitutional Law** 🔑 Criminal Law

To show imminent future injury required for Article III standing in pre-enforcement context, plaintiff must plausibly allege: (1) intention to engage in course of conduct that is (2) arguably affected with constitutional interest but (3) is proscribed by statute, and (4) that there is credible threat of prosecution under that statute. U.S. Const. art. 3, § 2, cl. 1.

**[8]**    **Civil Rights** 🔑 Injury and Causation

Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter satisfied injury-in-fact requirement for Article III standing to bring pre-enforcement § 1983 action alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause; company did business in other states and plausibly alleged intention to bring its business model to Michigan, but had refrained from doing so because of law, state had published guidance addressing company's intended conduct, state officials had not disavowed enforcement, use of drones did not necessarily put their creation of information beyond bounds of First Amendment protections, and statute proscribed plaintiffs' intended conduct. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Mich. Comp. Laws Ann. § 324.40111c.

**[9]**    **Constitutional Law** 🔑 What is "speech"

Creation and dissemination of information are speech within meaning of First Amendment. U.S. Const. Amend. 1.

**[10]**    **Constitutional Law** 🔑 First Amendment in General

Plaintiffs show credible threat of enforcement, as required to satisfy injury-in-fact requirement for Article III standing to bring pre-enforcement First Amendment challenge, where they allege subjective chill and point to some combination of following four factors: (1) history of past enforcement; (2) receipt of enforcement warning letters regarding their specific conduct; (3) attribute of challenged statute that makes enforcement easier or more likely, such as provision allowing any member of public to initiate enforcement action; and (4) whether defendant has disavowed enforcement of challenged statute against particular plaintiff. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1.

**[11]    Constitutional Law**  ⚷  Freedom of Speech, Expression, and Press

Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter satisfied traceability requirement for Article III standing to bring pre-enforcement § 1983 action against Michigan Department of Natural Resources (MDNR) alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause; MDNR conservation officers could patrol to enforce laws and regulations, and could issue citations for violating challenged law. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Mich. Comp. Laws Ann. § 324.40111c.

**[12]    Civil Rights**  ⚷  Injury and Causation

Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter satisfied redressability requirement for Article III standing to bring pre-enforcement § 1983 action against Michigan Department of Natural Resources (MDNR) alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause, despite MDNR's contention that plaintiffs' requested injunction would not redress their injury because MDNR officials could issue citation to plaintiffs even if they did not communicate location information; injunctive relief would allow plaintiffs to provide and receive drone-based game-recovery services—thus removing impediment to exercise of their asserted First Amendment rights. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Mich. Comp. Laws Ann. § 324.40111c.

**[13]    Constitutional Law**  ⚷  Viewpoint or idea discrimination

**Constitutional Law**  ⚷  Content-Based Regulations or Restrictions

First Amendment prohibits government from restricting expression, including conduct, because of its message, its ideas, its subject matter, or its content; content-based restrictions on expression must therefore satisfy strict scrutiny. U.S. Const. Amend. 1.

**[14]    Constitutional Law** ⚷ Content-Neutral Regulations or Restrictions

**Constitutional Law** ⚷ Content-Based Regulations or Restrictions

For First Amendment purposes, distinction between content-based and content-neutral restrictions is whether law is justified without reference to content of regulated speech. U.S. Const. Amend. 1.

**[15]    Aviation** ⚷ Operation of Aircraft; Flying

**Constitutional Law** ⚷ Particular Issues and Applications in General

**Game** ⚷ Power to protect and regulate

Michigan law that banned use of drones to hunt or collect downed game was not content-based restriction on speech, for First Amendment purposes; on its face, law applied equally to hunters who wanted to recover downed game, anti-hunting activists who wanted to find injured animals to nurse them back to health, and anyone else who wanted to use drone to "follow" animal, legislators enacted law specifically to prevent drone use by both hunters and persons wishing to disrupt hunting, and state officials did not need to examine contents of transmissions to determine whether pilot was violating law because using drone to locate injured animal violated law even if pilot never shared location pin with anyone else. U.S. Const. Amend. 1; Mich. Comp. Laws Ann. §§ 324.40104(1), 324.40111c.

**[16]    Constitutional Law** ⚷ Conduct, protection of

To be inherently expressive conduct under First Amendment, conduct must convey particularized message that someone viewing conduct would most likely understand. U.S. Const. Amend. 1.

**[17]    Constitutional Law** ⚷ Particular Issues and Applications in General

Operation of drone to locate game animals was not inherently expressive conduct, and thus law prohibiting use of drone to locate animals was not subject to strict scrutiny under First Amendment; operating drone sent no particularized message, and certainly not one that viewer could understand from conduct alone without any accompanying speech explaining reasons behind it. U.S. Const. Amend. 1.

**[18]** **Constitutional Law** 🔑 Narrow tailoring requirement; relationship to governmental interest

Intermediate scrutiny under First Amendment applies to regulations that are content-neutral and do not rise to level requiring strict scrutiny. U.S. Const. Amend. 1.

**[19]** **Constitutional Law** 🔑 Narrow tailoring requirement; relationship to governmental interest

Under intermediate scrutiny, content-neutral statute comports with First Amendment if it is within constitutional power of government; if it furthers important or substantial governmental interest; if governmental interest is unrelated to suppression of free expression; and if incidental restriction on alleged First Amendment freedoms is no greater than is essential to furtherance of that interest. U.S. Const. Amend. 1.

**[20]** **Aviation** 🔑 Operation of Aircraft; Flying

**Constitutional Law** 🔑 Website content

**Game** 🔑 Power to protect and regulate

Michigan law that banned use of drones to hunt or collect downed game did not violate Free Speech Clause as applied to company that operated website connecting hunters with thermal drone operators, company's owner, and hunter; Michigan had constitutional and statutory authority to enact law, which conserved and preserved its natural resources, state passed law to preserve fair-chase principles and prevent anti-hunting activists from disrupting hunting, any burden on expression was incidental, law restricted First Amendment expression no more than necessary, and it would be harder for Michigan to achieve its stated interests without banning use of drones to take game. U.S. Const. Amend. 1; Mich. Const. art. 4, § 52; Mich. Comp. Laws Ann. §§ 324.40111c, 324.40113a(3).

**[21]** **Constitutional Law** 🔑 Narrow tailoring requirement; relationship to governmental interest

Content-neutral statute regulating speech is sufficiently narrowly tailored to survive intermediate scrutiny under First Amendment when adequate relationship exists between means and ends as long as interest would be achieved less effectively without ban; in other words, statute need only further government's interest. U.S. Const. Amend. 1.

**[22]    Constitutional Law** 👉 Narrow tailoring requirement;  relationship to governmental interest

First Amendment does not bar application of neutral regulation that incidentally burdens speech merely because party contends that allowing exception in particular case will not threaten important government interests. U.S. Const. Amend. 1.

Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 1:23-cv-00796—Paul Lewis Maloney, District Judge.

**Attorneys and Law Firms**

ARGUED: Andrew R. Quinio, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellant. Nathan A. Gambill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. ON BRIEF: Andrew R. Quinio, Donna G. Matias, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellant. Nathan A. Gambill, Echo Aloe, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

Before: COLE, WHITE, and MATHIS, Circuit Judges.

The court delivered a PER CURIAM opinion. MATHIS, J. (pp. ——–——), delivered a separate opinion concurring in the judgment.

**OPINION**

PER CURIAM.

 **\*1**  Plaintiffs-Appellants Mike Yoder; Yoder's company, Drone Deer Recovery, LLC (DDR); and life-long hunter Jeremy Funke (collectively, Plaintiffs) appeal the district court's dismissal of their complaint challenging a Michigan law that bans the use of drones to hunt or collect downed game. Because we find that Plaintiffs have standing but fail to state a claim on which relief can be granted, we AFFIRM.

# I. Background

## A. Factual Background

After a hunter shoots a game animal, such as a deer, the animal often runs away and dies in another location. Tracking dogs and trail cameras are two ways of finding the animal. DDR offers a third option—one that it says is less environmentally intrusive and more effective than dogs or trail cameras. A hunter in an area where DDR does business can use DDR's website to connect with a nearby drone operator. The drone operator then searches for the downed animal's heat signature using the drone's infrared camera and thermal imaging technology. Upon finding a heat signature, the drone operator activates the drone's camera and search lights to identify the downed deer.

If the drone operator determines that the animal is dead or will die by the next morning, the operator creates a Global Positioning System (GPS) location pin for the animal's location and sends that information to the hunter. The hunter can then find the downed animal using Google Maps or a similar application.

Plaintiffs allege that a Michigan law prohibiting the use of drones to hunt or take downed game (the Drone Statute) prevents DDR from doing business in Michigan. *See* Mich. Comp. Laws § 324.40111c(2) (2015). The Michigan State Legislature enacted the law to prevent the use of drones and unmanned submersibles—by either anti-hunting activists attempting to disrupt hunting or hunters seeking an unfair advantage—because such conduct "would violate fair-chase principles and take away from the spirit and tradition of ethical hunting and fishing." R. 25-1, PID 123.

As relevant here, the Drone Statute proscribes "tak[ing] game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight." Mich. Comp. Laws § 324.40111c(2). The statute defines "take" as "to hunt with any weapon, dog, raptor, or other wild or domestic animal trained for that purpose; kill; chase; follow; harass; harm; pursue; shoot; rob; trap; capture; or collect animals, or to attempt to engage in such an activity." *Id.* § 324.40104(1). "Game" is any animal from an enumerated list of 39 wild animals. *Id.* § 324.40103(1). Violating the Drone Statute is a misdemeanor punishable by fine of $50–500 and/or up to ninety days' imprisonment. *Id.* § 324.40118.

The Michigan Department of Natural Resources (the MDNR) has regulatory authority over "managing animals" in Michigan, which includes determining "lawful methods of taking game." Mich. Comp. Laws § 324.40107(1). Accordingly, it is responsible for enforcing the Drone Statute. It has issued public guidance explaining that the Drone Statute prohibits individuals from using drones to locate or recover injured game, specifically stating that "[a]ttempting to locate and/

or recover game, either dead or wounded, is an act which falls within the definition of 'take.' " Mich. Dep't of Nat. Res., *After the Harvest*, Mich. Small Game Hunting Reguls. Summ. (2024), https://perma.cc/WN87-9FRY (the "Hunting Regulations Summary"). Plaintiffs also allege that the MDNR informed two persons who sent the MDNR inquiries about using drones to locate downed deer in Michigan that such drone use is illegal.

## B. Procedural History

**\*2** Based on the facts described above, Plaintiffs sued the MDNR under 42 U.S.C. § 1983, alleging that the Drone Statute, as applied to them, violates their First Amendment right to create, disseminate, and receive location information for downed game. They sought both declaratory and injunctive relief, including a permanent injunction "restraining [the MDNR] ... from enforcing [the Drone Statute] against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information." R. 23, PID 93.

The MDNR moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). It argued that the Drone Statute does not infringe on First Amendment-protected speech because the text of the statute prohibits only using a drone to locate a deer—something the MDNR argues is not speech—and does not prohibit telling another person a deer's location, which would be speech. Accordingly, the MDNR contended that Plaintiffs had not shown a cognizable injury and, even if they had, they still lacked standing because the requested injunction would not allow DDR to operate in Michigan. It also argued that the Eleventh Amendment precluded Plaintiffs' lawsuit.

The district court granted the MDNR's motion, holding that Plaintiffs both lacked standing and failed to state a claim on which relief could be granted. It first "separated [Plaintiffs' conduct] into two elements: flying a drone to track downed game (illegal and regulated) and relaying the location of the game to patron hunters (legal and unregulated)." R. 28, PID 170. It then determined that the Drone Statute does not prohibit Plaintiffs from sending or receiving location information, and that "[n]othing in the Drone Statute contemplates speech or its regulation." *Id.* The court also concluded that Plaintiffs' alleged injury was not redressable because the Drone Statute would still prohibit flying a drone to locate downed game even if the court granted Plaintiffs' requested injunction, which would "enjoin 'Defendant from enforcing Mich. Comp. Laws § 324.40111c against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information.' " *Id.* (quoting R. 1, PID 9).

The district court determined that Plaintiffs had not stated a claim for similar reasons. Because the court determined that using drones to track downed game and relaying location information to a hunter were separable, it examined only whether using a drone to search the wilderness for

downed game constituted protected speech—a question it answered in the negative. Accordingly, it granted the MDNR's motion to dismiss based on both Rule 12(b)(1) and Rule 12(b)(6).

This appeal followed.

## II. Standard of Review

**[1]** **[2]** **[3]** We review the district court's grant of a motion to dismiss for failure to state a claim de novo. *Booth Fam. Tr. v. Jeffries*, 640 F.3d 134, 139 (6th Cir. 2011). To survive a Rule 12(b)(6) motion to dismiss, a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.' " *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In determining whether a complaint meets that standard, we must "construe the complaint in the light most favorable to the plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But we may disregard "naked assertions devoid of further factual enhancement" and "formulaic recitation[s] of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (cleaned up).

**\*3** **[4]** We also review de novo dismissals for lack of subject-matter jurisdiction, including dismissals for lack of standing. *Phillips v. DeWine*, 841 F.3d 405, 413 (6th Cir. 2016). A challenge to the court's subject-matter jurisdiction under Rule 12(b)(1) can be either facial or factual. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Because the MDNR questions the sufficiency of the pleadings and does not dispute jurisdictional facts, it presents a facial attack on subject-matter jurisdiction. *See Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861 (6th Cir. 2022). We therefore accept the well-pleaded factual allegations as true and construe the Complaint in Plaintiffs' favor. *Id.*

## III. Analysis

For the reasons discussed below, we find that Plaintiffs have standing. We nonetheless affirm the district court's dismissal of their Complaint because Plaintiffs do not state a claim on which relief can be granted.

## A. Standing

**[5]** **[6]** "Standing stems from the Constitution's mandate that federal courts may decide only 'Cases' or 'Controversies,' " *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 400–01 (6th Cir. 2018) (citing U.S. Const. art. III, § 2, cl. 1), and is a prerequisite to federal jurisdiction, *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). "The irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

First, Plaintiffs must have suffered an actual past injury, or will suffer imminent future injury, that is concrete and particularized. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). "Particularized" means that "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130. "[A] 'generalized grievance,' no matter how sincere, is insufficient ...." *Hollingsworth v. Perry*, 570 U.S. 693, 706, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013).

Second, Plaintiffs' injury must be "fairly traceable to" or causally connected to the challenged conduct, rather than "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (cleaned up). Third, a favorable ruling on the requested relief must be likely to redress Plaintiffs' injury. *Id.* at 561, 112 S.Ct. 2130.

## 1. Injury

**[7]** In the pre-enforcement context, showing an imminent future injury requires plausibly alleging: (1) "an intention to engage in a course of conduct" that is (2) "arguably affected with a constitutional interest" but (3) is "proscribed by a statute," and (4) that there is "a credible threat of prosecution" under that statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014). Plaintiffs have done so.

**[8]** First, Plaintiffs have plausibly alleged an intention to bring DDR's business model to Michigan. In addition to alleging that DDR does business in other states, they allege that they receive "frequent requests for deer recovery services in Michigan," which they reject for "fear" that the MDNR will enforce the Drone Statute against them, but "are ready, willing, and able to operate in Michigan" absent a threat of enforcement. R. 23, PID 87. That is enough to plausibly allege an intention to do business in Michigan. *See Kiser v. Reitz*, 765 F.3d 601, 608 (6th Cir. 2014) (finding that the plaintiff had plausibly alleged an intent to advertise his general surgery services where he "alleged that he has advertised ... services in the past and that he intends to do so in the future").

**[9]** Second, Plaintiffs' proposed course of conduct is arguably affected with a constitutional interest. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570, 131 S.Ct. 2653, 180 L.Ed.2d

544 (2011). Accordingly, everything from prescriber information, *id.* at 570–71, 131 S.Ct. 2653, to credit reports, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 753, 759–61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), and information on beer can labels, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), may be speech for First Amendment purposes. And Plaintiffs' use of drones—a novel medium—does not necessarily put their creation of information beyond the bounds of First Amendment protections. *See, e.g., Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (extending First Amendment protections to video games); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (extending First Amendment protections to movies); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 783, 789–90 (5th Cir. 2024) (finding First Amendment interest in using a drone to take images while conducting aerial surveillance).

**\*4** The MDNR makes three arguments to the contrary. It first argues that flying a drone is distinct from creating a location pin, and that the only allegedly protected activity is creating and sharing location pins, not operating a drone. But Plaintiffs specifically argue that the MDNR violated their First Amendment rights by preventing them from using drones to create and share location information, as opposed to flying drones for another purpose or creating location pins without using drones. Thus, for purposes of this specific as-applied challenge, we do not agree that flying drones is separable from creating and disseminating location information.

The MDNR also points out that the text of the Drone Statute itself prohibits conduct, not speech. Again, the case before us is an as-applied challenge. The question is whether the Drone Statute is unconstitutional as applied to Plaintiffs' intended conduct, not whether the Drone Statute is unconstitutional on its face. *Ross v. Duggan*, 402 F.3d 575, 582 n.3 (6th Cir. 2004). And, as discussed above, Plaintiffs have alleged that the MDNR's interpretation and proposed enforcement of the Drone Statute burdens their First Amendment right to create and share information.

Finally, the MDNR points out that Plaintiffs can create location information for downed game without violating the Drone Statute because they need not use drones. But the availability of other ways of creating and sharing location information does not negate Plaintiffs' First Amendment interest in using drones to do so. *See Meyer v. Grant*, 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) ("That appellees remain free to employ other means to disseminate their ideas does not take their speech through [their preferred means] outside the bounds of First Amendment protection.").

The Drone Statute also proscribes Plaintiffs' intended conduct—the third *Susan B. Anthony List* element. 573 U.S. at 159, 134 S.Ct. 2334. "[A]t the pre-enforcement stage, [Plaintiffs] need not prove conclusively that [their] intended course of conduct violates the [statute] but only that it is *arguably* proscribed by the statute." *Friends of George's Inc., v. Mulroy*, 108 F.4th 431, 437 (6th Cir. 2024). Plaintiffs make that showing here. Again, the Drone Statute prohibits "tak[ing]

game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight." Mich. Comp. Laws § 324.40111c(2). The MDNR's own publicly issued guidance explains that using drones to locate dead or wounded game falls within the definition of "take." Hunting Reguls. Summ. ¶ 1. And Plaintiffs cannot use drones to create location information for downed game without using drones to locate the animal. *See Brown v. Kemp*, 86 F.4th 745, 763 (7th Cir. 2023) ("A statutory prohibition on a particular medium inevitably affects expression by restricting communication within and through the medium." (internal quotation marks and citation omitted)). The Drone Statute thus effectively prohibits Plaintiffs from creating location information using drones, even though the statutory text itself does not expressly prohibit creating location information. *Cf. W. Watersheds Project v. Michael*, 869 F.3d 1189, 1195, 1197 (10th Cir. 2017) (holding that statutes that prohibited crossing private property to collect "resource data" such as photographs, notes, and audio recordings if the individual also recorded the geographic coordinates where the data was gathered implicated First Amendment interests).

 **[10]**  With respect to the final *Susan B. Anthony List* element, Plaintiffs have shown a credible threat of prosecution. 573 U.S. at 159, 134 S.Ct. 2334. We have previously found that plaintiffs show a credible threat of enforcement where they allege "a subjective chill *and* point to some combination" of the following four factors: (1) "a history of past enforcement"; (2) receipt of "enforcement warning letters ... regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) whether the defendant has "disavow[ed] enforcement of the challenged statute against a particular plaintiff." *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). A plaintiff need not satisfy all the *McKay* factors to establish a credible threat. *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024).

 **\*5**  Taken together, the *McKay* factors cut in Plaintiffs' favor. First, Plaintiffs allege that they have neither operated in Michigan (Yoder and DDR) nor requested drone recovery services in Michigan (Funke) due to "fear that if they [do so] within the state, they will be subject to enforcement action and its consequences." R. 23, PID 91. We have previously found credible fear where a plaintiff had to "censor himself to avoid violating" the statutes at issue. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014) (cleaned up).

Second, Plaintiffs allege that the MDNR "actively enforces" the Drone Statute, R. 23, PID 89, and the MDNR asserts in its briefing that it can issue citations for violating the Drone Statute.

Third, although Plaintiffs did not receive warning letters addressed to them individually, Defendants have publicly issued guidance that "addresses the central issue of" Plaintiffs' intended conduct. *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 417 (6th Cir. 2025) (finding that the "argument [that an advisory opinion directly addressing the

plaintiffs' conduct was not a warning letter for purposes of the *McKay* factors] elevates form over substance").

Fourth, the Drone Statute contains no potential for exemptions that make the threat of enforcement remote. *See McKay*, 823 F.3d at 869–70.

Finally, MDNR officials have not disavowed enforcement. True, the MDNR says it has no plans "to prosecute Plaintiffs or anyone else for creating or disseminating location pins." Appellee's Br. at 23. But again, Plaintiffs specifically want to use drones to create location information—conduct for which the MDNR has not clearly disavowed enforcement. By contrast, MDNR has specifically advised the public that "the use of drones to pursue wildlife in any manner ... is illegal." Hunting Reguls. Summ. Moreover, the MDNR has not represented that it disavowed enforcement in a non-litigation context, and "the government's disavowal must be more than a mere litigation position." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010).

Accordingly, Plaintiffs have shown a credible threat of enforcement sufficient to meet their burden for demonstrating a pre-enforcement injury. *See Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1027 (6th Cir. 2024) (finding a credible threat of enforcement where the plaintiff faced imprisonment for violating the statute at issue, the defendant stated that the plaintiff's intended conduct was illegal and did not disavow enforcement, and the defendant had previously told an individual to not engage in the same conduct the plaintiff intended). Although Plaintiffs have not shown that the MDNR has previously enforced the Drone Statute, "past enforcement is not necessary to establish a credible threat of enforcement." *Id.* at 1025.

In short, Plaintiffs have shown that they intend to engage in conduct that is at least "arguably affected with a constitutional interest," that their intended conduct is "proscribed by a statute," and that they face "a credible threat of prosecution" if DDR begins doing business in Michigan. *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334. Although this is a close question, "First Amendment standards ... must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 327, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (quotation marks and citation omitted)). We thus find that Plaintiffs have plausibly alleged an injury-in-fact.

### 2. Traceability

**\*6** **[11]** Causation—the second prong—requires that the injury be "fairly ... trace[able] to the challenged action of the defendant." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (quotation omitted). Here, Plaintiffs have alleged that the MDNR enforces the Drone Statute, and that it has statutory authority to do so. Further, MDNR conservation officers can patrol to enforce laws and regulations,

Mich. Dep't of Nat. Res., *Conservation officers*, https://perma.cc/LXN3-LRRY,[1] and the MDNR acknowledges on appeal that it can issue citations for violating the Drone Statute.[2]

Because the MDNR "play[s] a direct role in enforcing" the Drone Statute, *Somberg v. McDonald*, 117 F.4th 375, 381 (6th Cir. 2024) (explaining that plaintiffs must sue the state actor "with power to inflict the penalty" to show causation in a pre-enforcement action); *Kareem*, 95 F.4th at 1027, the alleged violation of Plaintiffs' First Amendment rights can be fairly traced to the MDNR.

### 3. Redressability

Redressability means that it is "likely," not "speculative," that a favorable decision will redress the plaintiff's injury. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quotation omitted). Again, Plaintiffs allege that the MDNR's threatened actions chill their ability to create, disseminate, and receive information about downed game using drones. And they seek "[a] declaration that the [MDNR's] interpretation of [the Drone Statute], as applied to Plaintiffs, violates" their constitutional rights, along with a permanent injunction preventing the MDNR and its officers and agents from enforcing the Drone Statute "against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information." R. 23, PID 93. That injunctive relief would allow Plaintiffs to provide and receive drone-based game-recovery services—thus removing the impediment to the exercise of their asserted First Amendment rights. *See Kareem*, 95 F.4th at 1027 (finding redressability met when the plaintiff's requested relief was "substantially likely to remedy her alleged injury").

 **[12]** The MDNR argues that Plaintiffs' requested injunction would not redress their injury because MDNR "officials could still issue a citation to Plaintiffs if they use a drone to chase, follow, or pursue a deer that had been shot." Appellee's Br. at 25. But this argument is unpersuasive unless we agree that Plaintiffs' intended conduct can be separated into two distinct elements: flying drones and creating location information. As discussed above, in this as-applied challenge, we do not. Accordingly, Plaintiffs have shown redressability.

### B. Merits[3]

 ***7** Turning to the merits of Plaintiffs' First Amendment claims, we conclude that intermediate scrutiny applies. And because Plaintiffs have not shown that the Drone Statute fails intermediate scrutiny, their challenge must fail.

## 1. Level of Scrutiny

Plaintiffs offer three arguments in favor of applying strict scrutiny—that the Drone Statute is content-based, that the statute involves "speech inputs," and that their intended conduct is inherently expressive conduct. None persuades.

*a. The Drone Statute is not content-based.*

 **[13]**   **[14]**   Content-based laws "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). The First Amendment prohibits the government from "restrict[ing] expression"—including conduct—"because of its message, its ideas, its subject matter, or its content." *Id.* (quotation omitted). Content-based restrictions on expression must therefore satisfy strict scrutiny. *Id.* at 163–64, 135 S.Ct. 2218. The distinction between content-based and content-neutral restrictions is "whether the law is justified without reference to the content of the regulated speech." *McCullen v. Coakley*, 573 U.S. 464, 480, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) (internal quotation marks omitted).

 **[15]**   The Drone Statute is content-neutral. The statute makes it a crime to "take" game—a term defined to include "hunt[ing]," "chas[ing]," "follow[ing]," "pursu[ing]," and "trap[ping]" or "captur[ing]" animals—using drones. Mich. Comp. Laws § 324.40104(1). On its face, that prohibition applies equally to hunters who want to recover downed game, anti-hunting activists who want to find injured animals to nurse them back to health, and anyone else who wants to use a drone to "follow" an animal. The legislative history of the Drone Statute confirms that legislators enacted the law specifically to prevent drone use by both hunters and persons wishing to disrupt hunting.[4] And the MDNR need not examine the contents of transmissions to determine whether a pilot is violating the Drone Statute because using a drone to locate an injured animal violates the Drone Statute even if the pilot never shares a location pin with anyone else. Plaintiffs' contention that the statute is a content-based restriction because it singles out location information of downed game, and because the MDNR must look at the contents of drones' transmissions to determine whether drone users are violating the Drone Statute, is therefore unpersuasive.

Plaintiffs' argument that the Drone Statute is content-based because the MDNR allows drone use for other purposes—like assessing forest health—fares no better. Again, the relevant inquiry is "whether the law is justified without reference to the content of the regulated speech." *McCullen*, 573 U.S. at 480, 134 S.Ct. 2518 (internal quotation marks omitted). As discussed above, the Drone Statute does not ban the use of drones for taking game based on the message conveyed or the information created. *See Nat'l Press Photographers Ass'n*, 90 F.4th at 790 (finding that a statute prohibiting the use of drones to surveil others did "not directly or even primarily regulate speech and expression—nor [did it] target any particular message, idea, or subject matter"). The statute

therefore does not regulate drone use based on the information the drone might create in the process, but because "of the action it entails"—pursuing injured animals. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

**\*8** In short, the Drone Statute incidentally burdens Plaintiffs' ability to create location information, rather than targeting expression. The law is thus content-neutral. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see also Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 645, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (finding regulations content-neutral because they "distinguish between speakers in the television programming market" but do so "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry").

### b. Drones are not speech inputs.

Plaintiffs next argue that, because drones have recording and information-creation capabilities, drones create speech and are inputs entitled to heightened protections. In support of this argument, they point to *Lichtenstein v. Hargett,* 83 F.4th 575, 584 (6th Cir. 2023). In *Lichtenstein,* we examined several Supreme Court cases—*Sorrell,* 564 U.S. at 571, 131 S.Ct. 2653 (explaining that a regulation prohibiting trade magazines from purchasing ink would be a speaker- and content-based restriction); *Buckley v. Valeo,* 424 U.S. 1, 44–45, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (applying heightened scrutiny to a statute limiting the amount of money individuals could contribute to political candidates because it limited "core First Amendment ... rights"); *Meyer,* 486 U.S. at 421–22, 25, 108 S.Ct. 1886 (applying heightened scrutiny to a statute that prohibited paying circulators to gather signatures to place an amendment on a state ballot); and *Buckley v. American Constitutional Law Foundation, Inc,* 525 U.S. 182, 188, 195, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (applying heightened scrutiny to a regulation that allowed only registered votes to act as petition circulators). 83 F.4th at 585–86. Relying on these cases, we suggested that regulations of certain "inputs" that create speech, such as money or ink, must survive strict scrutiny. *Id.* at 586.

*Lichtenstein* is not as broad as Plaintiffs suggest. Rather, *Lichtenstein's* discussion of "speech inputs" refers to "inputs" that create traditional "political speech." *Id.* at 586–87. Three of the four cases *Lichtenstein* cites for the "speech inputs" proposition involved restrictions on "core" political speech—something no party contends applies here. *Buckley,* 424 U.S. at 44–45, 96 S.Ct. 612; *Meyer,* 486 U.S. at 420, 108 S.Ct. 1886; *Am. Const. L. Found.,* 525 U.S. at 204, 210, 119 S.Ct. 636. And *Sorell*—the fourth case *Lichtenstein* cites—is inapposite because the restriction at issue in that case was a content-based restriction. 564 U.S. at 571, 131 S.Ct. 2653. We therefore find that Plaintiffs have not shown that drones used to create location information for downed game are "speech inputs" meriting strict scrutiny.

### c. Flying a drone is not inherently expressive conduct.

**[16]** That leaves Plaintiffs' third and final argument in favor of strict scrutiny: that drone use is inherently expressive conduct. Conduct that is "sufficiently imbued with elements of communication" implicates the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)). To be "inherently expressive" conduct, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006), the conduct must "convey a particularized message" that someone viewing the conduct would most likely understand, *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (quotation omitted). Examples of inherently expressive conduct include wearing armbands to protest a war or displaying a flag in support of a political party. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388–89 (6th Cir. 2005).

**\*9** **[17]** We agree with the Fifth Circuit that "the operation of a drone is not inherently expressive." *Nat'l Press Photographers Ass'n*, 90 F.4th at 787. Operating a drone sends no "particularized message," *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (quotation omitted), and certainly not one that a viewer could understand "from the conduct *alone* without any accompanying speech explaining the reasons behind it," *Lichtenstein*, 83 F.4th at 594. And because flying a drone itself does not send any kind of message, Plaintiffs cannot convert drone use into expressive conduct "simply by talking about it." *Rumsfeld*, 547 U.S. at 66, 126 S.Ct. 1297.

Plaintiffs resist this conclusion by pointing to several out-of-circuit cases finding that making an audio or video recording is expressive activity: *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018); *Kemp*, 86 F.4th at 779; and *360 Virtual Drone Services LLC v. Ritter*, No. 5:21-CV-137, 2023 WL 2759032, at \*9 (E.D.N.C. Mar. 31, 2023). But none of those cases are on point because Plaintiffs allege that they capture only location information, not audio or video recordings. *See FCC v. Pacifica Found.*, 438 U.S. 726, 748, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) ("We have long recognized that each medium of expression presents special First Amendment problems."). Additionally, the Ninth Circuit has since clarified that *Wasden* does not stand for the proposition that all recording is expressive activity. *Project Veritas v. Schmidt*, 125 F.4th 929, 946 (9th Cir. 2025) (en banc) ("*Wasden* reasoned that it defied common sense to disaggregate the creation of the video, which may involve expressive decisions, from the video or audio recording itself .... *Wasden* did not conclude that every act of recording requires expressive decisions, nor that every act of recording implicates the First Amendment." (cleaned up)). Accordingly, we decline to treat the proposed drone operation in this case as expressive conduct requiring the application of strict scrutiny.

## 2. Application of Intermediate Scrutiny

**[18]** Intermediate scrutiny applies to regulations that are content-neutral and do not rise to a level requiring strict scrutiny. *Turner Broad. Sys., Inc.*, 512 U.S. at 662, 114 S.Ct. 2445;

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (intermediate scrutiny applies when "speech and nonspeech elements are combined in the same course of conduct" (internal quotation marks and citation omitted)); *Johnson*, 491 U.S. at 407, 109 S.Ct. 2533 (1989) (intermediate scrutiny applies to regulations of conduct "unrelated to the suppression of free expression" (quotation omitted)). We therefore apply it here. *Accord Nat'l Press Photographers Ass'n*, 90 F.4th at 788 (applying intermediate scrutiny to a facial challenge to a prohibition on capturing images using a drone while conducting surveillance).

 **[19]** Under intermediate scrutiny, a statute is constitutional "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). "[H]ighly general interests that are obviously important" can satisfy the governmental interest prong. *Lichtenstein,* 83 F.4th at 596–97.

 **[20]** Michigan has constitutional and statutory authority to enact the Drone Statute, which conserves and preserves its natural resources. Michigan's constitution empowers the Michigan legislature to "provide for the protection of ... natural resources of the state." Mich. Const. art. IV, § 52. That includes regulating the taking of game. *People v. Zimberg*, 321 Mich. 655, 33 N.W.2d 104, 106–07 (1948). Moreover, the Michigan Legislature has previously determined that "hunting, fishing, and the taking of game are "a valued part of the cultural heritage of [Michigan] [that] should be forever preserved." Mich. Comp. Laws § 324.40113a(3).

 **\*10** The Drone Statute furthers those important conservation and preservation interests. Again, the legislative history of the Drone Statute demonstrates that the Michigan Legislature passed the Drone Statute to preserve fair-chase principles and prevent anti-hunting activists from disrupting hunting. And managing how hunters can hunt Michigan's wild animals is an important state interest. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (observing that conserving park property is a substantial interest under *O'Brien*).

As explained above, the Drone Statute incidentally burdens expression, rather than targeting it. It is thus "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673.

 **[21]** Finally, the Drone Statute restricts First Amendment expression no more than necessary. A statute is sufficiently narrowly tailored to survive intermediate scrutiny when "an adequate relationship exists between the means (the conduct ban) and the ends (the government interest) as long as the interest 'would be achieved less effectively' without the ban." *Lichtenstein*, 83 F.4th at 598 (quoting *Rumsfeld*, 547 U.S. at 67, 126 S.Ct. 1297). In other words, the statute "need only

'further' the [government's] interest." *Id.* (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 301, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion)); *see also Clark*, 468 U.S. at 297, 104 S.Ct. 3065 ("[I]f the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment ....").

 **[22]**   The Drone Statute is narrowly tailored because it would be harder for Michigan to achieve its stated interests—protecting its natural resources and preserving fair-chase principles in hunting—without banning the use of drones to take game. Making an exception for using drones to create location information for downed game might not necessarily threaten those interests. But "[t]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests." *United States v. Albertini*, 472 U.S. 675, 688, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985); *see also FTC v. Superior Ct. Trial L. Ass'n*, 493 U.S. 411, 430, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Accordingly, it is enough for the MDNR to show that prohibiting the use of drones to take game furthers Michigan's stated, important interests. Plaintiffs therefore have failed to state a claim on which relief can be granted.

\* \* \*

For the reasons set out above, we AFFIRM.

## CONCURRENCE

**MATHIS, Circuit Judge, concurring in the judgment.**

Michigan law bars the use of drones to hunt or collect game animals. This creates a problem for Mike Yoder and his company, Drone Deer Recovery LLC. As the name of the company suggests, Drone Deer Recovery uses drones to help hunters locate and recover downed deer. Drone Deer Recovery operates in several states and it now seeks to expand to Michigan, as its potential customer, Jeremy Funke, lives and hunts there.

Yoder, Drone Deer Recovery, and Funke sued the director of the Michigan Department of Natural Resources. They argue that the prohibition on using drones to hunt or collect downed deer violates their free-speech rights because it prevents Drone Deer Recovery from using a drone to communicate location information about a downed deer to a hunter such as Funke. The district court dismissed their complaint for lack of subject-matter jurisdiction and for failure to state a claim. I would affirm the district court's decision because Plaintiffs have not established Article III standing.

## I.

## A.

 **\*11**  The Michigan Constitution declares that "[t]he conservation and development of the natural resources of the state are ... of paramount public concern." Mich. Const. art. IV, § 52. It authorizes the Michigan legislature to "provide for the protection of the ... natural resources of the state." *Id.* Under this authority, the Michigan legislature has acted to regulate the hunting of game. The Michigan legislature has determined that hunting, fishing, and the taking of game are: (1) "a valued part of the cultural heritage of [Michigan] [that] should be forever preserved"; (2) important to the state's economy; and (3) vital to the conservation and preservation of its natural resources. Mich. Comp. Laws § 324.40113a(3).

One such regulation is at issue. In 2015, the Michigan legislature passed the Drone Statute, which provides, in pertinent part: "An individual shall not take game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight[.]" *Id.* § 324.40111c(2). " 'Take' means to hunt with any weapon, dog, raptor, or other wild or domestic animal trained for that purpose; kill; chase; follow; harass; harm; pursue; shoot; rob; trap; capture; or collect animals, or to attempt to engage in such an activity." *Id.* § 324.40104(1). And "game" includes 39 wild animals, including deer. *Id.* § 324.40103(1). A violation of the Drone Statute is a misdemeanor punishable by a fine or imprisonment. *Id.* § 324.40118(1).

The Michigan legislature created the Michigan Department of Natural Resources to "protect and conserve" Michigan's "natural resources." *Id.* §§ 324.501(1); 324.503(1). MDNR has regulatory authority over "manag[ing] animals" in Michigan, which includes determining "lawful methods of taking game." *Id.* § 324.40107(1)(e). It requires anyone who kills or wounds a game animal to make a reasonable attempt to retrieve the animal. Mich. Dep't of Nat. Res., Wildlife Conservation Ord., ch. IV, § 4.1(2). MDNR has explained that the Drone Statute prohibits individuals from using drones to locate or recover injured game:

> The use of drones to pursue wildlife in any manner, either during legal hunting hours or after, is illegal. You may not take game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight or using an unmanned vehicle or unmanned device that operates on the surface of water or underwater.... Attempting to locate and/or recover game, either dead or wounded, is an act which falls within the definition of "take."

*See* Mich. Dep't of Nat. Res., 2023 Mich. Hunting Reguls. Summary, 25.[1]

**B.**

Plaintiffs seek to challenge the constitutionality of the Drone Statute. Jeremy Funke hunts deer and other game on private and public land in Michigan. After a hunter (like Funke) shoots an animal, it often runs away and dies in a distant location, making it difficult for the hunter to locate and retrieve it. This is where Mike Yoder and Drone Deer Recovery come in. Yoder, who is also a hunter, developed Drone Deer Recovery to use drones to locate downed deer.

Drone Deer Recovery's service is straightforward. Using its website, a hunter can find a drone operator (like Yoder) in the area to locate a lost deer. The operator will dispatch a drone to the area. The drone then uses an infrared camera and thermal imaging to search for the downed animal's heat signature. Once the drone finds a heat signature, the operator activates the camera and searchlights to identify the animal. If the operator confirms it is dead or dying, he uses the drone to create a location pin with the animal's coordinates. The operator then sends the location information to the hunter, who can then retrieve the animal.

**\*12** Yoder and Drone Deer Recovery allege that the Drone Statute prevents them from operating in Michigan. "DNR officials have advised Drone Deer Recovery that it is unlawful under state law to use drones in any manner related to hunting." R. 23, PageID 89. So Yoder and Drone Deer Recovery do not operate in Michigan (and Funke does not use their services) for fear of violating Michigan law.

**II.**

Federal courts have subject-matter jurisdiction over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. So before considering a claim's merits, a plaintiff must establish that it has standing to sue. *Kitchen v. Whitmer*, 106 F.4th 525, 533 (6th Cir. 2024).

Standing requires the plaintiff to "have a personal stake in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (citation modified). "The doctrine of standing gives meaning" to Article III "by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (citation modified). "[A] citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024). To establish standing, a plaintiff must show that: (1) he "has suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief." *Id.* at 380, 144 S.Ct. 1540.

Plaintiffs bear the burden of proving standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). They must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because the district court dismissed this case at the pleading stage, Plaintiffs needed to "clearly allege facts demonstrating" standing. *Spokeo*, 578 U.S. at 338, 136 S.Ct. 1540 (citation modified).

Typically, "a statute must be enforced against the plaintiff before he may challenge its constitutionality." *Phillips v. DeWine*, 841 F.3d 405, 415 (6th Cir. 2016). That said, a plaintiff can bring a pre-enforcement challenge "under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334. Indeed, "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007).

Plaintiffs bring a pre-enforcement challenge against MDNR. "In a pre-enforcement challenge, whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact' before the state has actually commenced an enforcement proceeding against him." *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014). Plaintiffs cannot show that they will likely suffer an injury in fact.

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (citation modified). A plaintiff establishes an injury in fact in a pre-enforcement action if "he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334 (citation modified). I assume that Plaintiffs have alleged their intent to engage in constitutionally protected conduct proscribed by the Drone Statute.

**\*13** Still, Plaintiffs needed to show a credible threat of enforcement of the Drone Statute against them by MDNR. To that end, Plaintiffs must have "an actual and well-founded fear that the law will be enforced against them." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). But "mere allegations of a subjective chill on protected speech are insufficient." *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016) (citation modified). Instead, the plaintiff must show subjective chill and a combination of the factors below (the *McKay* factors):

(1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; (3) an attribute of the challenged statute

that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) the defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

*Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (citation modified). The "*McKay* factors are not exhaustive," and a plaintiff need not satisfy all the factors to establish a credible threat. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).

Plaintiffs allege subjective chill here. They do not operate in Michigan because they "fear enforcement action and its consequences." R. 23, PageID 91 (citation modified). So I turn to whether Plaintiffs have pleaded sufficiently a combination of the *McKay* factors.

*Past Enforcement*. Plaintiffs have not established a history of past enforcement of the Drone Statute by MDNR. The Supreme Court has explained "that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." *Susan B. Anthony List*, 573 U.S. at 164, 134 S.Ct. 2334 (citation modified). "A threat of enforcement is most credible when the *same conduct* has drawn enforcement actions or threats of enforcement in the past." *Christian Healthcare Ctrs.*, 117 F.4th at 848 (citation modified).

Plaintiffs say that MDNR "actively enforces the ban on drones" under the Drone Statute. R. 23, PageID 89. In support, they point to emails MDNR enforcement officials sent to Mike Cassells and Daniel Schultz, two individuals "interested in using drone location." *Id.* Plaintiffs allege that the emails stated that "using drones to locate downed deer in Michigan is illegal," and that "the use of drones related to locating wildlife in any manner is illegal." *Id.* But general statements that MDNR "actively enforces the ban on drones" or that an action is illegal are not enforcement actions or threats. *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 416 (6th Cir. 2025) ("generalized contention" that the defendant "actively enforces" a statute "offers little support for the argument that the [defendant] will enforce here").

Indeed, Plaintiffs never alleged that MDNR enforced the Drone Statute against them or any other drone operators. *See Fischer v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022) (per curiam) ("[W]e allow [plaintiffs] to meet this factor by pointing to past enforcement against others."). True enough, "a plaintiff need not always show that the statute has been enforced previously against the precise conduct it wishes to undertake." *Christian Healthcare Ctrs.*, 117 F.4th at 849. But Plaintiffs fail to allege *any* instances of enforcement since the legislature enacted the Drone Statute in 2015.

**\*14** *Warning Letter*. Plaintiffs have not alleged that MDNR sent them a warning letter. They do allege, however, that MDNR's "agents or employees have recently explicitly articulated the DNR's position on the legality of [Drone Deer Recovery]'s business," presumably through the emails to Cassells and Schultz. R. 23, PageID 91. Plaintiffs also noted in their briefing that MDNR issued guidance stating that "[t]he use of drones to pursue wildlife in any manner, either during legal

hunting hours or after, is illegal," and that "[a]ttempting to locate and/or recover game, either dead or wounded, is an act which falls within the definition of 'take.' " *See* Mich. Dep't of Nat. Res., 2023 Mich. Hunting Reguls. Summary, 25. But neither the emails nor the guidance is an "enforcement warning letter[ ] *sent to the plaintiffs* regarding their specific conduct." *McKay,* 823 F.3d at 869 (emphasis added).

To begin, neither was directed at Plaintiffs. *See id.* The guidance addresses the public at large. And MDNR emailed Cassells and Schultz, not Plaintiffs. The complaint also fails to allege that MDNR's emails addressed Plaintiffs specifically. *See id.* (signs threatening enforcement did not show credible threat of enforcement in part because they "address the general public, not [the plaintiff] specifically or any of his past conduct").

Consider the warning letters in *Fischer*. There, this court found a credible enforcement threat when the letters "warned that [the defendant] had launched a preliminary investigation into [the plaintiffs'] conduct." 52 F.4th at 308; *see also Winter v. Wolnitzek,* 834 F.3d 681, 687 (6th Cir. 2016) (finding credible threat of enforcement when letter stated that the defendant had "probable cause for action" against the plaintiff for her conduct (quotation omitted)). Plaintiffs make no similar allegations here. As a result, this factor weighs against them.

*Ease of Enforcement*. Plaintiffs point to nothing about the Drone Statute "that makes enforcement easier or more likely." *See McKay,* 823 F.3d at 869. The credibility of a threat of enforcement increases when the statute allows "any member of the public to initiate an enforcement action," *id.*, rather than when it is "limited to a prosecutor or an agency," *Susan B. Anthony List,* 573 U.S. at 164, 134 S.Ct. 2334. A violation of the Drone Statute can lead to criminal penalties, Mich. Comp. Laws § 324.40118(1), which means a prosecutor can enforce the statute. *See Friends of George's, Inc. v. Mulroy,* 108 F.4th 431, 440 (6th Cir. 2024) (concluding criminal statute was "a standard criminal law with no attributes making enforcement easier or more likely"). And MDNR has conceded that it can issue a citation for a violation of the statute. But Plaintiffs do not allege that members of the public can file complaints or initiate enforcement. *See, e.g.*, *Wallace,* 132 F.4th at 417; *Fischer,* 52 F.4th at 308–09. So this factor weighs against Plaintiffs too.

*Disavowal*. MDNR asserts in its brief that it has no "plan to prosecute Plaintiffs or anyone else for creating or disseminating location[ ] pins." D. 21 at p.30. This purported disavowal falls flat. Plaintiffs intend to create location information *using a drone*. And MDNR has not disavowed prosecuting them for such conduct. So this factor weighs in Plaintiffs' favor.

* * *

Plaintiffs have established only one of the *McKay* factors—refusal to disavow enforcement. Yet disavowal "is just one data point among many on the question [of] whether a credible threat of

enforcement exists." *Davis v. Colerain Township*, 51 F.4th 164, 174 (6th Cir. 2022). The other *McKay* factors confirm that Plaintiffs have alleged no "circumstances that render ... threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334. They fail to identify a history of enforcement of the Drone Statute, that they received a warning letter, or that an attribute of the Drone Statute makes enforcement easier.

**\*15** With no credible threat of enforcement, Plaintiffs cannot show an injury in fact. Plaintiffs therefore lack standing.

## All Citations

--- F.4th ----, 2025 WL 2170165

## Footnotes

1     Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Demis v. Sniezek*, 558 F.3d 508, 513 n. 2 (6th Cir. 2009) (taking notice of government website); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("Under Federal Rule of Evidence 201(b) ... [t]his court and numerous others routinely take judicial notice of information contained on state and federal government websites." (collecting cases)).

2     The MDNR's website also suggests that conservation officers issue citations for violations of Michigan's natural resources laws. *See, e.g.*, Mich. Dep't of Nat. Res., *CO Biweekly Reports* (12/12/2023–1/6/2024) (Jan. 6, 2025), https://perma.cc/U3CP-3JRA(describing multiple incidents where conservation officers issued citations).

3     The MDNR argued below, and continues to argue on appeal, that the Eleventh Amendment bars Plaintiffs' suit. The district court did not address the MDNR's sovereign immunity arguments because other issues were dispositive. Because the same is true on appeal, we also do not reach the sovereign immunity issue.

4     Lawmakers' stated rationale for enacting the Drone Statute was two-fold. They were concerned that persons opposed to hunting, such as those affiliated with People for the Ethical Treatment of Animals (PETA), might use drones to "disrupt" or "interfere with lawful hunting or fishing." R. 25-1, PID 123. They were also concerned that hunters and fishermen could use drones "to aid in taking game or fish," thus "violat[ing] fair-chase principles and tak[ing] away from the spirit and tradition of ethical hunting and fishing." *Id.*

1     https://cms2.revize.com/revize/washingtonmi/2023% 20Michigan% 20Hunting% 20Regulations% 20Summary.pdf.

---

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775    Document: 45-1    Filed: 09/17/2025    Page: 202

2025 WL 2170165
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Mike YODER; Drone Deer Recovery LLC, identified on initiating documents
as Drone Deer Recovery Media, Inc.; Jeremy Funke, Plaintiffs-Appellants,
v.
Scott BOWEN, in his official capacity as Director of the Michigan Department of Natural
Resources, identified on initiating document as Shannon Lott, Defendant-Appellee.

No. 24-1593
|
Argued: January 29, 2025
|
Decided and Filed: July 31, 2025

**Synopsis**
**Background:** Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter filed § 1983 action alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause. The United States District Court for the Western District of Michigan, Paul L. Maloney, J., dismissed complaint, and plaintiffs appealed.

**Holdings:** The Court of Appeals held that:

[1] plaintiffs satisfied injury-in-fact requirement for standing;

[2] plaintiffs satisfied traceability requirement for standing;

[3] plaintiffs satisfied redressability requirement for standing;

[4] law was not content-based restriction on speech;

[5] operation of drone to locate game animals was not inherently expressive conduct; and

[6] law did not violate Free Speech Clause as applied to plaintiffs.

Affirmed.

Mathis, Circuit Judge, concurred in judgment and filed opinion.

West Headnotes (22)

**[1]**    **Federal Courts** ⟜ Pleading

Court of Appeals reviews district court's grant of motion to dismiss for failure to state claim de novo. Fed. R. Civ. P. 12(b)(6).

**[2]**    **Federal Civil Procedure** ⟜ Insufficiency in general

To survive motion to dismiss for failure to state claim, complaint must present sufficient facts to state claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[3]**    **Federal Civil Procedure** ⟜ Construction of pleadings

**Federal Civil Procedure** ⟜ Matters deemed admitted;  acceptance as true of allegations in complaint

In ruling on motion to dismiss for failure to state claim, court must construe complaint in light most favorable to plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in complaint as true, but it may disregard naked assertions devoid of further factual enhancement and formulaic recitations of elements of cause of action. Fed. R. Civ. P. 12(b)(6).

**[4]**    **Federal Courts** ⟜ Jurisdiction

**Federal Courts** ⟜ Standing

Court of Appeals reviews de novo dismissals for lack of subject matter jurisdiction, including dismissals for lack of standing. Fed. R. Civ. P. 12(b)(1).

**[5]**    **Federal Civil Procedure** ⟜ In general;  injury or interest

Article III standing is prerequisite to federal jurisdiction. U.S. Const. art. 3, § 2, cl. 1.

**[6]** **Federal Civil Procedure** 🔑 In general;  injury or interest

**Federal Civil Procedure** 🔑 Causation;  redressability

Irreducible constitutional minimum of Article III standing contains three elements: (1) plaintiff must have suffered actual past injury, or will suffer imminent future injury, that is concrete and particularized, (2) plaintiff's injury must be fairly traceable to or causally connected to challenged conduct, rather than result of independent action of some third party not before court, and (3) favorable ruling on requested relief must be likely to redress plaintiffs' injury. U.S. Const. art. 3, § 2, cl. 1.

**[7]** **Constitutional Law** 🔑 Criminal Law

To show imminent future injury required for Article III standing in pre-enforcement context, plaintiff must plausibly allege: (1) intention to engage in course of conduct that is (2) arguably affected with constitutional interest but (3) is proscribed by statute, and (4) that there is credible threat of prosecution under that statute. U.S. Const. art. 3, § 2, cl. 1.

**[8]** **Civil Rights** 🔑 Injury and Causation

Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter satisfied injury-in-fact requirement for Article III standing to bring pre-enforcement § 1983 action alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause; company did business in other states and plausibly alleged intention to bring its business model to Michigan, but had refrained from doing so because of law, state had published guidance addressing company's intended conduct, state officials had not disavowed enforcement, use of drones did not necessarily put their creation of information beyond bounds of First Amendment protections, and statute proscribed plaintiffs' intended conduct. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Mich. Comp. Laws Ann. § 324.40111c.

**[9]** **Constitutional Law** 🔑 What is "speech"

Creation and dissemination of information are speech within meaning of First Amendment. U.S. Const. Amend. 1.

**[10]** **Constitutional Law** 🔑 First Amendment in General

Plaintiffs show credible threat of enforcement, as required to satisfy injury-in-fact requirement for Article III standing to bring pre-enforcement First Amendment challenge, where they allege subjective chill and point to some combination of following four factors: (1) history of past enforcement; (2) receipt of enforcement warning letters regarding their specific conduct; (3) attribute of challenged statute that makes enforcement easier or more likely, such as provision allowing any member of public to initiate enforcement action; and (4) whether defendant has disavowed enforcement of challenged statute against particular plaintiff. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1.

**[11]    Constitutional Law** 🔑 Freedom of Speech, Expression, and Press

Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter satisfied traceability requirement for Article III standing to bring pre-enforcement § 1983 action against Michigan Department of Natural Resources (MDNR) alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause; MDNR conservation officers could patrol to enforce laws and regulations, and could issue citations for violating challenged law. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Mich. Comp. Laws Ann. § 324.40111c.

**[12]    Civil Rights** 🔑 Injury and Causation

Company that operated website connecting hunters with thermal drone operators, company's owner, and hunter satisfied redressability requirement for Article III standing to bring pre-enforcement § 1983 action against Michigan Department of Natural Resources (MDNR) alleging that Michigan law that banned use of drones to hunt or collect downed game violated Free Speech Clause, despite MDNR's contention that plaintiffs' requested injunction would not redress their injury because MDNR officials could issue citation to plaintiffs even if they did not communicate location information; injunctive relief would allow plaintiffs to provide and receive drone-based game-recovery services—thus removing impediment to exercise of their asserted First Amendment rights. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Mich. Comp. Laws Ann. § 324.40111c.

**[13]    Constitutional Law** 🔑 Viewpoint or idea discrimination

**Constitutional Law** 🔑 Content-Based Regulations or Restrictions

Case: 24-1775     Document: 45-1     Filed: 09/17/2025     Page: 206

First Amendment prohibits government from restricting expression, including conduct, because of its message, its ideas, its subject matter, or its content; content-based restrictions on expression must therefore satisfy strict scrutiny. U.S. Const. Amend. 1.

[14]  **Constitutional Law** 🔑 Content-Neutral Regulations or Restrictions

**Constitutional Law** 🔑 Content-Based Regulations or Restrictions

For First Amendment purposes, distinction between content-based and content-neutral restrictions is whether law is justified without reference to content of regulated speech. U.S. Const. Amend. 1.

[15]  **Aviation** 🔑 Operation of Aircraft; Flying

**Constitutional Law** 🔑 Particular Issues and Applications in General

**Game** 🔑 Power to protect and regulate

Michigan law that banned use of drones to hunt or collect downed game was not content-based restriction on speech, for First Amendment purposes; on its face, law applied equally to hunters who wanted to recover downed game, anti-hunting activists who wanted to find injured animals to nurse them back to health, and anyone else who wanted to use drone to "follow" animal, legislators enacted law specifically to prevent drone use by both hunters and persons wishing to disrupt hunting, and state officials did not need to examine contents of transmissions to determine whether pilot was violating law because using drone to locate injured animal violated law even if pilot never shared location pin with anyone else. U.S. Const. Amend. 1; Mich. Comp. Laws Ann. §§ 324.40104(1), 324.40111c.

[16]  **Constitutional Law** 🔑 Conduct, protection of

To be inherently expressive conduct under First Amendment, conduct must convey particularized message that someone viewing conduct would most likely understand. U.S. Const. Amend. 1.

[17]  **Constitutional Law** 🔑 Particular Issues and Applications in General

Operation of drone to locate game animals was not inherently expressive conduct, and thus law prohibiting use of drone to locate animals was not subject to strict scrutiny under First Amendment; operating drone sent no particularized message, and certainly not one that viewer could understand from conduct alone without any accompanying speech explaining reasons behind it. U.S. Const. Amend. 1.

**[18]  Constitutional Law** ⬤ Narrow tailoring requirement;  relationship to governmental interest

Intermediate scrutiny under First Amendment applies to regulations that are content-neutral and do not rise to level requiring strict scrutiny. U.S. Const. Amend. 1.

**[19]  Constitutional Law** ⬤ Narrow tailoring requirement;  relationship to governmental interest

Under intermediate scrutiny, content-neutral statute comports with First Amendment if it is within constitutional power of government; if it furthers important or substantial governmental interest; if governmental interest is unrelated to suppression of free expression; and if incidental restriction on alleged First Amendment freedoms is no greater than is essential to furtherance of that interest. U.S. Const. Amend. 1.

**[20]  Aviation** ⬤ Operation of Aircraft; Flying

**Constitutional Law** ⬤ Website content

**Game** ⬤ Power to protect and regulate

Michigan law that banned use of drones to hunt or collect downed game did not violate Free Speech Clause as applied to company that operated website connecting hunters with thermal drone operators, company's owner, and hunter; Michigan had constitutional and statutory authority to enact law, which conserved and preserved its natural resources, state passed law to preserve fair-chase principles and prevent anti-hunting activists from disrupting hunting, any burden on expression was incidental, law restricted First Amendment expression no more than necessary, and it would be harder for Michigan to achieve its stated interests without banning use of drones to take game. U.S. Const. Amend. 1; Mich. Const. art. 4, § 52; Mich. Comp. Laws Ann. §§ 324.40111c, 324.40113a(3).

**[21]  Constitutional Law** ⬤ Narrow tailoring requirement;  relationship to governmental interest

Content-neutral statute regulating speech is sufficiently narrowly tailored to survive intermediate scrutiny under First Amendment when adequate relationship exists between means and ends as long as interest would be achieved less effectively without ban; in other words, statute need only further government's interest. U.S. Const. Amend. 1.

**[22]    Constitutional Law** 🔑 Narrow tailoring requirement;  relationship to governmental interest

First Amendment does not bar application of neutral regulation that incidentally burdens speech merely because party contends that allowing exception in particular case will not threaten important government interests. U.S. Const. Amend. 1.

Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 1:23-cv-00796—Paul Lewis Maloney, District Judge.

**Attorneys and Law Firms**

ARGUED: Andrew R. Quinio, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellant. Nathan A. Gambill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. ON BRIEF: Andrew R. Quinio, Donna G. Matias, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellant. Nathan A. Gambill, Echo Aloe, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

Before: COLE, WHITE, and MATHIS, Circuit Judges.

The court delivered a PER CURIAM opinion. MATHIS, J. (pp. —— – ——), delivered a separate opinion concurring in the judgment.

**OPINION**

PER CURIAM.

 **\*1**  Plaintiffs-Appellants Mike Yoder; Yoder's company, Drone Deer Recovery, LLC (DDR); and life-long hunter Jeremy Funke (collectively, Plaintiffs) appeal the district court's dismissal of their complaint challenging a Michigan law that bans the use of drones to hunt or collect downed game. Because we find that Plaintiffs have standing but fail to state a claim on which relief can be granted, we AFFIRM.

## I. Background

### A. Factual Background

After a hunter shoots a game animal, such as a deer, the animal often runs away and dies in another location. Tracking dogs and trail cameras are two ways of finding the animal. DDR offers a third option—one that it says is less environmentally intrusive and more effective than dogs or trail cameras. A hunter in an area where DDR does business can use DDR's website to connect with a nearby drone operator. The drone operator then searches for the downed animal's heat signature using the drone's infrared camera and thermal imaging technology. Upon finding a heat signature, the drone operator activates the drone's camera and search lights to identify the downed deer.

If the drone operator determines that the animal is dead or will die by the next morning, the operator creates a Global Positioning System (GPS) location pin for the animal's location and sends that information to the hunter. The hunter can then find the downed animal using Google Maps or a similar application.

Plaintiffs allege that a Michigan law prohibiting the use of drones to hunt or take downed game (the Drone Statute) prevents DDR from doing business in Michigan. *See* Mich. Comp. Laws § 324.40111c(2) (2015). The Michigan State Legislature enacted the law to prevent the use of drones and unmanned submersibles—by either anti-hunting activists attempting to disrupt hunting or hunters seeking an unfair advantage—because such conduct "would violate fair-chase principles and take away from the spirit and tradition of ethical hunting and fishing." R. 25-1, PID 123.

As relevant here, the Drone Statute proscribes "tak[ing] game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight." Mich. Comp. Laws § 324.40111c(2). The statute defines "take" as "to hunt with any weapon, dog, raptor, or other wild or domestic animal trained for that purpose; kill; chase; follow; harass; harm; pursue; shoot; rob; trap; capture; or collect animals, or to attempt to engage in such an activity." *Id.* § 324.40104(1). "Game" is any animal from an enumerated list of 39 wild animals. *Id.* § 324.40103(1). Violating the Drone Statute is a misdemeanor punishable by fine of $50–500 and/or up to ninety days' imprisonment. *Id.* § 324.40118.

The Michigan Department of Natural Resources (the MDNR) has regulatory authority over "managing animals" in Michigan, which includes determining "lawful methods of taking game." Mich. Comp. Laws § 324.40107(1). Accordingly, it is responsible for enforcing the Drone Statute. It has issued public guidance explaining that the Drone Statute prohibits individuals from using drones to locate or recover injured game, specifically stating that "[a]ttempting to locate and/

or recover game, either dead or wounded, is an act which falls within the definition of 'take.' " Mich. Dep't of Nat. Res., *After the Harvest*, Mich. Small Game Hunting Reguls. Summ. (2024), https://perma.cc/WN87-9FRY (the "Hunting Regulations Summary"). Plaintiffs also allege that the MDNR informed two persons who sent the MDNR inquiries about using drones to locate downed deer in Michigan that such drone use is illegal.

## B. Procedural History

**\*2** Based on the facts described above, Plaintiffs sued the MDNR under 42 U.S.C. § 1983, alleging that the Drone Statute, as applied to them, violates their First Amendment right to create, disseminate, and receive location information for downed game. They sought both declaratory and injunctive relief, including a permanent injunction "restraining [the MDNR] ... from enforcing [the Drone Statute] against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information." R. 23, PID 93.

The MDNR moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). It argued that the Drone Statute does not infringe on First Amendment-protected speech because the text of the statute prohibits only using a drone to locate a deer—something the MDNR argues is not speech—and does not prohibit telling another person a deer's location, which would be speech. Accordingly, the MDNR contended that Plaintiffs had not shown a cognizable injury and, even if they had, they still lacked standing because the requested injunction would not allow DDR to operate in Michigan. It also argued that the Eleventh Amendment precluded Plaintiffs' lawsuit.

The district court granted the MDNR's motion, holding that Plaintiffs both lacked standing and failed to state a claim on which relief could be granted. It first "separated [Plaintiffs' conduct] into two elements: flying a drone to track downed game (illegal and regulated) and relaying the location of the game to patron hunters (legal and unregulated)." R. 28, PID 170. It then determined that the Drone Statute does not prohibit Plaintiffs from sending or receiving location information, and that "[n]othing in the Drone Statute contemplates speech or its regulation." *Id.* The court also concluded that Plaintiffs' alleged injury was not redressable because the Drone Statute would still prohibit flying a drone to locate downed game even if the court granted Plaintiffs' requested injunction, which would "enjoin 'Defendant from enforcing Mich. Comp. Laws § 324.40111c against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information.' " *Id.* (quoting R. 1, PID 9).

The district court determined that Plaintiffs had not stated a claim for similar reasons. Because the court determined that using drones to track downed game and relaying location information to a hunter were separable, it examined only whether using a drone to search the wilderness for

downed game constituted protected speech—a question it answered in the negative. Accordingly, it granted the MDNR's motion to dismiss based on both Rule 12(b)(1) and Rule 12(b)(6).

This appeal followed.

## II. Standard of Review

**[1]** **[2]** **[3]** We review the district court's grant of a motion to dismiss for failure to state a claim de novo. *Booth Fam. Tr. v. Jeffries*, 640 F.3d 134, 139 (6th Cir. 2011). To survive a Rule 12(b)(6) motion to dismiss, a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.' " *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In determining whether a complaint meets that standard, we must "construe the complaint in the light most favorable to the plaintiff, draw all reasonable inferences in its favor, and accept all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But we may disregard "naked assertions devoid of further factual enhancement" and "formulaic recitation[s] of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (cleaned up).

**\*3** **[4]** We also review de novo dismissals for lack of subject-matter jurisdiction, including dismissals for lack of standing. *Phillips v. DeWine*, 841 F.3d 405, 413 (6th Cir. 2016). A challenge to the court's subject-matter jurisdiction under Rule 12(b)(1) can be either facial or factual. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Because the MDNR questions the sufficiency of the pleadings and does not dispute jurisdictional facts, it presents a facial attack on subject-matter jurisdiction. *See Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861 (6th Cir. 2022). We therefore accept the well-pleaded factual allegations as true and construe the Complaint in Plaintiffs' favor. *Id.*

## III. Analysis

For the reasons discussed below, we find that Plaintiffs have standing. We nonetheless affirm the district court's dismissal of their Complaint because Plaintiffs do not state a claim on which relief can be granted.

## A. Standing

**[5]    [6]** "Standing stems from the Constitution's mandate that federal courts may decide only 'Cases' or 'Controversies,'" *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 400–01 (6th Cir. 2018) (citing U.S. Const. art. III, § 2, cl. 1), and is a prerequisite to federal jurisdiction, *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). "The irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

First, Plaintiffs must have suffered an actual past injury, or will suffer imminent future injury, that is concrete and particularized. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). "Particularized" means that "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130. "[A] 'generalized grievance,' no matter how sincere, is insufficient ...." *Hollingsworth v. Perry*, 570 U.S. 693, 706, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013).

Second, Plaintiffs' injury must be "fairly traceable to" or causally connected to the challenged conduct, rather than "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (cleaned up). Third, a favorable ruling on the requested relief must be likely to redress Plaintiffs' injury. *Id.* at 561, 112 S.Ct. 2130.

## 1. Injury

**[7]** In the pre-enforcement context, showing an imminent future injury requires plausibly alleging: (1) "an intention to engage in a course of conduct" that is (2) "arguably affected with a constitutional interest" but (3) is "proscribed by a statute," and (4) that there is "a credible threat of prosecution" under that statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014). Plaintiffs have done so.

**[8]** First, Plaintiffs have plausibly alleged an intention to bring DDR's business model to Michigan. In addition to alleging that DDR does business in other states, they allege that they receive "frequent requests for deer recovery services in Michigan," which they reject for "fear" that the MDNR will enforce the Drone Statute against them, but "are ready, willing, and able to operate in Michigan" absent a threat of enforcement. R. 23, PID 87. That is enough to plausibly allege an intention to do business in Michigan. *See Kiser v. Reitz*, 765 F.3d 601, 608 (6th Cir. 2014) (finding that the plaintiff had plausibly alleged an intent to advertise his general surgery services where he "alleged that he has advertised ... services in the past and that he intends to do so in the future").

**[9]** Second, Plaintiffs' proposed course of conduct is arguably affected with a constitutional interest. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570, 131 S.Ct. 2653, 180 L.Ed.2d

544 (2011). Accordingly, everything from prescriber information, *id.* at 570–71, 131 S.Ct. 2653, to credit reports, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 753, 759–61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), and information on beer can labels, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), may be speech for First Amendment purposes. And Plaintiffs' use of drones—a novel medium—does not necessarily put their creation of information beyond the bounds of First Amendment protections. *See, e.g., Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (extending First Amendment protections to video games); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (extending First Amendment protections to movies); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 783, 789–90 (5th Cir. 2024) (finding First Amendment interest in using a drone to take images while conducting aerial surveillance).

 **\*4** The MDNR makes three arguments to the contrary. It first argues that flying a drone is distinct from creating a location pin, and that the only allegedly protected activity is creating and sharing location pins, not operating a drone. But Plaintiffs specifically argue that the MDNR violated their First Amendment rights by preventing them from using drones to create and share location information, as opposed to flying drones for another purpose or creating location pins without using drones. Thus, for purposes of this specific as-applied challenge, we do not agree that flying drones is separable from creating and disseminating location information.

The MDNR also points out that the text of the Drone Statute itself prohibits conduct, not speech. Again, the case before us is an as-applied challenge. The question is whether the Drone Statute is unconstitutional as applied to Plaintiffs' intended conduct, not whether the Drone Statute is unconstitutional on its face. *Ross v. Duggan*, 402 F.3d 575, 582 n.3 (6th Cir. 2004). And, as discussed above, Plaintiffs have alleged that the MDNR's interpretation and proposed enforcement of the Drone Statute burdens their First Amendment right to create and share information.

Finally, the MDNR points out that Plaintiffs can create location information for downed game without violating the Drone Statute because they need not use drones. But the availability of other ways of creating and sharing location information does not negate Plaintiffs' First Amendment interest in using drones to do so. *See Meyer v. Grant*, 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) ("That appellees remain free to employ other means to disseminate their ideas does not take their speech through [their preferred means] outside the bounds of First Amendment protection.").

The Drone Statute also proscribes Plaintiffs' intended conduct—the third *Susan B. Anthony List* element. 573 U.S. at 159, 134 S.Ct. 2334. "[A]t the pre-enforcement stage, [Plaintiffs] need not prove conclusively that [their] intended course of conduct violates the [statute] but only that it is *arguably* proscribed by the statute." *Friends of George's Inc., v. Mulroy*, 108 F.4th 431, 437 (6th Cir. 2024). Plaintiffs make that showing here. Again, the Drone Statute prohibits "tak[ing]

game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight." Mich. Comp. Laws § 324.40111c(2). The MDNR's own publicly issued guidance explains that using drones to locate dead or wounded game falls within the definition of "take." Hunting Reguls. Summ. ¶ 1. And Plaintiffs cannot use drones to create location information for downed game without using drones to locate the animal. *See Brown v. Kemp*, 86 F.4th 745, 763 (7th Cir. 2023) ("A statutory prohibition on a particular medium inevitably affects expression by restricting communication within and through the medium." (internal quotation marks and citation omitted)). The Drone Statute thus effectively prohibits Plaintiffs from creating location information using drones, even though the statutory text itself does not expressly prohibit creating location information. *Cf. W. Watersheds Project v. Michael*, 869 F.3d 1189, 1195, 1197 (10th Cir. 2017) (holding that statutes that prohibited crossing private property to collect "resource data" such as photographs, notes, and audio recordings if the individual also recorded the geographic coordinates where the data was gathered implicated First Amendment interests).

 **[10]**  With respect to the final *Susan B. Anthony List* element, Plaintiffs have shown a credible threat of prosecution. 573 U.S. at 159, 134 S.Ct. 2334. We have previously found that plaintiffs show a credible threat of enforcement where they allege "a subjective chill *and* point to some combination" of the following four factors: (1) "a history of past enforcement"; (2) receipt of "enforcement warning letters ... regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) whether the defendant has "disavow[ed] enforcement of the challenged statute against a particular plaintiff." *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). A plaintiff need not satisfy all the *McKay* factors to establish a credible threat. *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024).

 **\*5**  Taken together, the *McKay* factors cut in Plaintiffs' favor. First, Plaintiffs allege that they have neither operated in Michigan (Yoder and DDR) nor requested drone recovery services in Michigan (Funke) due to "fear that if they [do so] within the state, they will be subject to enforcement action and its consequences." R. 23, PID 91. We have previously found credible fear where a plaintiff had to "censor himself to avoid violating" the statutes at issue. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014) (cleaned up).

Second, Plaintiffs allege that the MDNR "actively enforces" the Drone Statute, R. 23, PID 89, and the MDNR asserts in its briefing that it can issue citations for violating the Drone Statute.

Third, although Plaintiffs did not receive warning letters addressed to them individually, Defendants have publicly issued guidance that "addresses the central issue of" Plaintiffs' intended conduct. *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 417 (6th Cir. 2025) (finding that the "argument [that an advisory opinion directly addressing the

plaintiffs' conduct was not a warning letter for purposes of the *McKay* factors] elevates form over substance").

Fourth, the Drone Statute contains no potential for exemptions that make the threat of enforcement remote. *See McKay*, 823 F.3d at 869–70.

Finally, MDNR officials have not disavowed enforcement. True, the MDNR says it has no plans "to prosecute Plaintiffs or anyone else for creating or disseminating location pins." Appellee's Br. at 23. But again, Plaintiffs specifically want to use drones to create location information—conduct for which the MDNR has not clearly disavowed enforcement. By contrast, MDNR has specifically advised the public that "the use of drones to pursue wildlife in any manner ... is illegal." Hunting Reguls. Summ. Moreover, the MDNR has not represented that it disavowed enforcement in a non-litigation context, and "the government's disavowal must be more than a mere litigation position." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010).

Accordingly, Plaintiffs have shown a credible threat of enforcement sufficient to meet their burden for demonstrating a pre-enforcement injury. *See Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1027 (6th Cir. 2024) (finding a credible threat of enforcement where the plaintiff faced imprisonment for violating the statute at issue, the defendant stated that the plaintiff's intended conduct was illegal and did not disavow enforcement, and the defendant had previously told an individual to not engage in the same conduct the plaintiff intended). Although Plaintiffs have not shown that the MDNR has previously enforced the Drone Statute, "past enforcement is not necessary to establish a credible threat of enforcement." *Id.* at 1025.

In short, Plaintiffs have shown that they intend to engage in conduct that is at least "arguably affected with a constitutional interest," that their intended conduct is "proscribed by a statute," and that they face "a credible threat of prosecution" if DDR begins doing business in Michigan. *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334. Although this is a close question, "First Amendment standards ... must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 327, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (quotation marks and citation omitted)). We thus find that Plaintiffs have plausibly alleged an injury-in-fact.

### 2. Traceability

**\*6** **[11]** Causation—the second prong—requires that the injury be "fairly ... trace[able] to the challenged action of the defendant." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (quotation omitted). Here, Plaintiffs have alleged that the MDNR enforces the Drone Statute, and that it has statutory authority to do so. Further, MDNR conservation officers can patrol to enforce laws and regulations,

Mich. Dep't of Nat. Res., *Conservation officers*, https://perma.cc/LXN3-LRRY,[1] and the MDNR acknowledges on appeal that it can issue citations for violating the Drone Statute.[2]

Because the MDNR "play[s] a direct role in enforcing" the Drone Statute, *Somberg v. McDonald*, 117 F.4th 375, 381 (6th Cir. 2024) (explaining that plaintiffs must sue the state actor "with power to inflict the penalty" to show causation in a pre-enforcement action); *Kareem*, 95 F.4th at 1027, the alleged violation of Plaintiffs' First Amendment rights can be fairly traced to the MDNR.

### 3. Redressability

Redressability means that it is "likely," not "speculative," that a favorable decision will redress the plaintiff's injury. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quotation omitted). Again, Plaintiffs allege that the MDNR's threatened actions chill their ability to create, disseminate, and receive information about downed game using drones. And they seek "[a] declaration that the [MDNR's] interpretation of [the Drone Statute], as applied to Plaintiffs, violates" their constitutional rights, along with a permanent injunction preventing the MDNR and its officers and agents from enforcing the Drone Statute "against Plaintiffs in a manner that prevents the creation, dissemination, and receipt of certain information." R. 23, PID 93. That injunctive relief would allow Plaintiffs to provide and receive drone-based game-recovery services—thus removing the impediment to the exercise of their asserted First Amendment rights. *See Kareem*, 95 F.4th at 1027 (finding redressability met when the plaintiff's requested relief was "substantially likely to remedy her alleged injury").

 **[12]**   The MDNR argues that Plaintiffs' requested injunction would not redress their injury because MDNR "officials could still issue a citation to Plaintiffs if they use a drone to chase, follow, or pursue a deer that had been shot." Appellee's Br. at 25. But this argument is unpersuasive unless we agree that Plaintiffs' intended conduct can be separated into two distinct elements: flying drones and creating location information. As discussed above, in this as-applied challenge, we do not. Accordingly, Plaintiffs have shown redressability.

### B. Merits[3]

 **\*7**  Turning to the merits of Plaintiffs' First Amendment claims, we conclude that intermediate scrutiny applies. And because Plaintiffs have not shown that the Drone Statute fails intermediate scrutiny, their challenge must fail.

## 1. Level of Scrutiny

Plaintiffs offer three arguments in favor of applying strict scrutiny—that the Drone Statute is content-based, that the statute involves "speech inputs," and that their intended conduct is inherently expressive conduct. None persuades.

*a. The Drone Statute is not content-based.*

[13]  [14]  Content-based laws "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). The First Amendment prohibits the government from "restrict[ing] expression"—including conduct—"because of its message, its ideas, its subject matter, or its content." *Id.* (quotation omitted). Content-based restrictions on expression must therefore satisfy strict scrutiny. *Id.* at 163–64, 135 S.Ct. 2218. The distinction between content-based and content-neutral restrictions is "whether the law is justified without reference to the content of the regulated speech." *McCullen v. Coakley*, 573 U.S. 464, 480, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) (internal quotation marks omitted).

[15]  The Drone Statute is content-neutral. The statute makes it a crime to "take" game—a term defined to include "hunt[ing]," "chas[ing]," "follow[ing]," "pursu[ing]," and "trap[ping]" or "captur[ing]" animals—using drones. Mich. Comp. Laws § 324.40104(1). On its face, that prohibition applies equally to hunters who want to recover downed game, anti-hunting activists who want to find injured animals to nurse them back to health, and anyone else who wants to use a drone to "follow" an animal. The legislative history of the Drone Statute confirms that legislators enacted the law specifically to prevent drone use by both hunters and persons wishing to disrupt hunting.[4] And the MDNR need not examine the contents of transmissions to determine whether a pilot is violating the Drone Statute because using a drone to locate an injured animal violates the Drone Statute even if the pilot never shares a location pin with anyone else. Plaintiffs' contention that the statute is a content-based restriction because it singles out location information of downed game, and because the MDNR must look at the contents of drones' transmissions to determine whether drone users are violating the Drone Statute, is therefore unpersuasive.

Plaintiffs' argument that the Drone Statute is content-based because the MDNR allows drone use for other purposes—like assessing forest health—fares no better. Again, the relevant inquiry is "whether the law is justified without reference to the content of the regulated speech." *McCullen*, 573 U.S. at 480, 134 S.Ct. 2518 (internal quotation marks omitted). As discussed above, the Drone Statute does not ban the use of drones for taking game based on the message conveyed or the information created. *See Nat'l Press Photographers Ass'n*, 90 F.4th at 790 (finding that a statute prohibiting the use of drones to surveil others did "not directly or even primarily regulate speech and expression—nor [did it] target any particular message, idea, or subject matter"). The statute

therefore does not regulate drone use based on the information the drone might create in the process, but because "of the action it entails"—pursuing injured animals. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

**\*8** In short, the Drone Statute incidentally burdens Plaintiffs' ability to create location information, rather than targeting expression. The law is thus content-neutral. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (finding regulations content-neutral because they "distinguish between speakers in the television programming market" but do so "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry").

*b. Drones are not speech inputs.*

Plaintiffs next argue that, because drones have recording and information-creation capabilities, drones create speech and are inputs entitled to heightened protections. In support of this argument, they point to *Lichtenstein v. Hargett*, 83 F.4th 575, 584 (6th Cir. 2023). In *Lichtenstein*, we examined several Supreme Court cases—*Sorrell*, 564 U.S. at 571, 131 S.Ct. 2653 (explaining that a regulation prohibiting trade magazines from purchasing ink would be a speaker- and content-based restriction); *Buckley v. Valeo*, 424 U.S. 1, 44–45, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (applying heightened scrutiny to a statute limiting the amount of money individuals could contribute to political candidates because it limited "core First Amendment ... rights"); *Meyer*, 486 U.S. at 421–22, 25, 108 S.Ct. 1886 (applying heightened scrutiny to a statute that prohibited paying circulators to gather signatures to place an amendment on a state ballot); and *Buckley v. American Constitutional Law Foundation, Inc*, 525 U.S. 182, 188, 195, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (applying heightened scrutiny to a regulation that allowed only registered votes to act as petition circulators). 83 F.4th at 585–86. Relying on these cases, we suggested that regulations of certain "inputs" that create speech, such as money or ink, must survive strict scrutiny. *Id.* at 586.

*Lichtenstein* is not as broad as Plaintiffs suggest. Rather, *Lichtenstein's* discussion of "speech inputs" refers to "inputs" that create traditional "political speech." *Id.* at 586–87. Three of the four cases *Lichtenstein* cites for the "speech inputs" proposition involved restrictions on "core" political speech—something no party contends applies here. *Buckley*, 424 U.S. at 44–45, 96 S.Ct. 612; *Meyer*, 486 U.S. at 420, 108 S.Ct. 1886; *Am. Const. L. Found.*, 525 U.S. at 204, 210, 119 S.Ct. 636. And *Sorell*—the fourth case *Lichtenstein* cites—is inapposite because the restriction at issue in that case was a content-based restriction. 564 U.S. at 571, 131 S.Ct. 2653. We therefore find that Plaintiffs have not shown that drones used to create location information for downed game are "speech inputs" meriting strict scrutiny.

*c. Flying a drone is not inherently expressive conduct.*

**[16]** That leaves Plaintiffs' third and final argument in favor of strict scrutiny: that drone use is inherently expressive conduct. Conduct that is "sufficiently imbued with elements of communication" implicates the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)). To be "inherently expressive" conduct, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006), the conduct must "convey a particularized message" that someone viewing the conduct would most likely understand, *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (quotation omitted). Examples of inherently expressive conduct include wearing armbands to protest a war or displaying a flag in support of a political party. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388–89 (6th Cir. 2005).

**\*9** **[17]** We agree with the Fifth Circuit that "the operation of a drone is not inherently expressive." *Nat'l Press Photographers Ass'n*, 90 F.4th at 787. Operating a drone sends no "particularized message," *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (quotation omitted), and certainly not one that a viewer could understand "from the conduct *alone* without any accompanying speech explaining the reasons behind it," *Lichtenstein*, 83 F.4th at 594. And because flying a drone itself does not send any kind of message, Plaintiffs cannot convert drone use into expressive conduct "simply by talking about it." *Rumsfeld*, 547 U.S. at 66, 126 S.Ct. 1297.

Plaintiffs resist this conclusion by pointing to several out-of-circuit cases finding that making an audio or video recording is expressive activity: *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018); *Kemp*, 86 F.4th at 779; and *360 Virtual Drone Services LLC v. Ritter*, No. 5:21-CV-137, 2023 WL 2759032, at \*9 (E.D.N.C. Mar. 31, 2023). But none of those cases are on point because Plaintiffs allege that they capture only location information, not audio or video recordings. *See FCC v. Pacifica Found.*, 438 U.S. 726, 748, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) ("We have long recognized that each medium of expression presents special First Amendment problems."). Additionally, the Ninth Circuit has since clarified that *Wasden* does not stand for the proposition that all recording is expressive activity. *Project Veritas v. Schmidt*, 125 F.4th 929, 946 (9th Cir. 2025) (en banc) ("*Wasden* reasoned that it defied common sense to disaggregate the creation of the video, which may involve expressive decisions, from the video or audio recording itself .... *Wasden* did not conclude that every act of recording requires expressive decisions, nor that every act of recording implicates the First Amendment." (cleaned up)). Accordingly, we decline to treat the proposed drone operation in this case as expressive conduct requiring the application of strict scrutiny.

## 2. Application of Intermediate Scrutiny

**[18]** Intermediate scrutiny applies to regulations that are content-neutral and do not rise to a level requiring strict scrutiny. *Turner Broad. Sys., Inc.*, 512 U.S. at 662, 114 S.Ct. 2445;

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (intermediate scrutiny applies when "speech and nonspeech elements are combined in the same course of conduct" (internal quotation marks and citation omitted)); *Johnson*, 491 U.S. at 407, 109 S.Ct. 2533 (1989) (intermediate scrutiny applies to regulations of conduct "unrelated to the suppression of free expression" (quotation omitted)). We therefore apply it here. *Accord Nat'l Press Photographers Ass'n*, 90 F.4th at 788 (applying intermediate scrutiny to a facial challenge to a prohibition on capturing images using a drone while conducting surveillance).

[19]  Under intermediate scrutiny, a statute is constitutional "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). "[H]ighly general interests that are obviously important" can satisfy the governmental interest prong. *Lichtenstein,* 83 F.4th at 596–97.

[20]  Michigan has constitutional and statutory authority to enact the Drone Statute, which conserves and preserves its natural resources. Michigan's constitution empowers the Michigan legislature to "provide for the protection of ... natural resources of the state." Mich. Const. art. IV, § 52. That includes regulating the taking of game. *People v. Zimberg*, 321 Mich. 655, 33 N.W.2d 104, 106–07 (1948). Moreover, the Michigan Legislature has previously determined that "hunting, fishing, and the taking of game are "a valued part of the cultural heritage of [Michigan] [that] should be forever preserved." Mich. Comp. Laws § 324.40113a(3).

*10  The Drone Statute furthers those important conservation and preservation interests. Again, the legislative history of the Drone Statute demonstrates that the Michigan Legislature passed the Drone Statute to preserve fair-chase principles and prevent anti-hunting activists from disrupting hunting. And managing how hunters can hunt Michigan's wild animals is an important state interest. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (observing that conserving park property is a substantial interest under *O'Brien*).

As explained above, the Drone Statute incidentally burdens expression, rather than targeting it. It is thus "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673.

[21]  Finally, the Drone Statute restricts First Amendment expression no more than necessary. A statute is sufficiently narrowly tailored to survive intermediate scrutiny when "an adequate relationship exists between the means (the conduct ban) and the ends (the government interest) as long as the interest 'would be achieved less effectively' without the ban." *Lichtenstein*, 83 F.4th at 598 (quoting *Rumsfeld*, 547 U.S. at 67, 126 S.Ct. 1297). In other words, the statute "need only

'further' the [government's] interest." *Id.* (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 301, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion)); *see also Clark*, 468 U.S. at 297, 104 S.Ct. 3065 ("[I]f the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment ....").

 **[22]**  The Drone Statute is narrowly tailored because it would be harder for Michigan to achieve its stated interests—protecting its natural resources and preserving fair-chase principles in hunting—without banning the use of drones to take game. Making an exception for using drones to create location information for downed game might not necessarily threaten those interests. But "[t]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests." *United States v. Albertini*, 472 U.S. 675, 688, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985); *see also FTC v. Superior Ct. Trial L. Ass'n*, 493 U.S. 411, 430, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Accordingly, it is enough for the MDNR to show that prohibiting the use of drones to take game furthers Michigan's stated, important interests. Plaintiffs therefore have failed to state a claim on which relief can be granted.

\* \* \*

For the reasons set out above, we AFFIRM.

## CONCURRENCE

**MATHIS, Circuit Judge, concurring in the judgment.**

Michigan law bars the use of drones to hunt or collect game animals. This creates a problem for Mike Yoder and his company, Drone Deer Recovery LLC. As the name of the company suggests, Drone Deer Recovery uses drones to help hunters locate and recover downed deer. Drone Deer Recovery operates in several states and it now seeks to expand to Michigan, as its potential customer, Jeremy Funke, lives and hunts there.

Yoder, Drone Deer Recovery, and Funke sued the director of the Michigan Department of Natural Resources. They argue that the prohibition on using drones to hunt or collect downed deer violates their free-speech rights because it prevents Drone Deer Recovery from using a drone to communicate location information about a downed deer to a hunter such as Funke. The district court dismissed their complaint for lack of subject-matter jurisdiction and for failure to state a claim. I would affirm the district court's decision because Plaintiffs have not established Article III standing.

## I.

## A.

 **\*11** The Michigan Constitution declares that "[t]he conservation and development of the natural resources of the state are ... of paramount public concern." Mich. Const. art. IV, § 52. It authorizes the Michigan legislature to "provide for the protection of the ... natural resources of the state." *Id.* Under this authority, the Michigan legislature has acted to regulate the hunting of game. The Michigan legislature has determined that hunting, fishing, and the taking of game are: (1) "a valued part of the cultural heritage of [Michigan] [that] should be forever preserved"; (2) important to the state's economy; and (3) vital to the conservation and preservation of its natural resources. Mich. Comp. Laws § 324.40113a(3).

One such regulation is at issue. In 2015, the Michigan legislature passed the Drone Statute, which provides, in pertinent part: "An individual shall not take game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight[.]" *Id.* § 324.40111c(2). " 'Take' means to hunt with any weapon, dog, raptor, or other wild or domestic animal trained for that purpose; kill; chase; follow; harass; harm; pursue; shoot; rob; trap; capture; or collect animals, or to attempt to engage in such an activity." *Id.* § 324.40104(1). And "game" includes 39 wild animals, including deer. *Id.* § 324.40103(1). A violation of the Drone Statute is a misdemeanor punishable by a fine or imprisonment. *Id.* § 324.40118(1).

The Michigan legislature created the Michigan Department of Natural Resources to "protect and conserve" Michigan's "natural resources." *Id.* §§ 324.501(1); 324.503(1). MDNR has regulatory authority over "manag[ing] animals" in Michigan, which includes determining "lawful methods of taking game." *Id.* § 324.40107(1)(e). It requires anyone who kills or wounds a game animal to make a reasonable attempt to retrieve the animal. Mich. Dep't of Nat. Res., Wildlife Conservation Ord., ch. IV, § 4.1(2). MDNR has explained that the Drone Statute prohibits individuals from using drones to locate or recover injured game:

> The use of drones to pursue wildlife in any manner, either during legal hunting hours or after, is illegal. You may not take game or fish using an unmanned vehicle or unmanned device that uses aerodynamic forces to achieve flight or using an unmanned vehicle or unmanned device that operates on the surface of water or underwater.... Attempting to locate and/or recover game, either dead or wounded, is an act which falls within the definition of "take."

*See* Mich. Dep't of Nat. Res., 2023 Mich. Hunting Reguls. Summary, 25.[1]

**B.**

Plaintiffs seek to challenge the constitutionality of the Drone Statute. Jeremy Funke hunts deer and other game on private and public land in Michigan. After a hunter (like Funke) shoots an animal, it often runs away and dies in a distant location, making it difficult for the hunter to locate and retrieve it. This is where Mike Yoder and Drone Deer Recovery come in. Yoder, who is also a hunter, developed Drone Deer Recovery to use drones to locate downed deer.

Drone Deer Recovery's service is straightforward. Using its website, a hunter can find a drone operator (like Yoder) in the area to locate a lost deer. The operator will dispatch a drone to the area. The drone then uses an infrared camera and thermal imaging to search for the downed animal's heat signature. Once the drone finds a heat signature, the operator activates the camera and searchlights to identify the animal. If the operator confirms it is dead or dying, he uses the drone to create a location pin with the animal's coordinates. The operator then sends the location information to the hunter, who can then retrieve the animal.

 **\*12**  Yoder and Drone Deer Recovery allege that the Drone Statute prevents them from operating in Michigan. "DNR officials have advised Drone Deer Recovery that it is unlawful under state law to use drones in any manner related to hunting." R. 23, PageID 89. So Yoder and Drone Deer Recovery do not operate in Michigan (and Funke does not use their services) for fear of violating Michigan law.

**II.**

Federal courts have subject-matter jurisdiction over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. So before considering a claim's merits, a plaintiff must establish that it has standing to sue. *Kitchen v. Whitmer*, 106 F.4th 525, 533 (6th Cir. 2024).

Standing requires the plaintiff to "have a personal stake in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (citation modified). "The doctrine of standing gives meaning" to Article III "by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (citation modified). "[A] citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024). To establish standing, a plaintiff must show that: (1) he "has suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief." *Id.* at 380, 144 S.Ct. 1540.

Plaintiffs bear the burden of proving standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). They must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because the district court dismissed this case at the pleading stage, Plaintiffs needed to "clearly allege facts demonstrating" standing. *Spokeo*, 578 U.S. at 338, 136 S.Ct. 1540 (citation modified).

Typically, "a statute must be enforced against the plaintiff before he may challenge its constitutionality." *Phillips v. DeWine*, 841 F.3d 405, 415 (6th Cir. 2016). That said, a plaintiff can bring a pre-enforcement challenge "under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334. Indeed, "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007).

Plaintiffs bring a pre-enforcement challenge against MDNR. "In a pre-enforcement challenge, whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact' before the state has actually commenced an enforcement proceeding against him." *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014). Plaintiffs cannot show that they will likely suffer an injury in fact.

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (citation modified). A plaintiff establishes an injury in fact in a pre-enforcement action if "he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334 (citation modified). I assume that Plaintiffs have alleged their intent to engage in constitutionally protected conduct proscribed by the Drone Statute.

**\*13** Still, Plaintiffs needed to show a credible threat of enforcement of the Drone Statute against them by MDNR. To that end, Plaintiffs must have "an actual and well-founded fear that the law will be enforced against them." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). But "mere allegations of a subjective chill on protected speech are insufficient." *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016) (citation modified). Instead, the plaintiff must show subjective chill and a combination of the factors below (the *McKay* factors):

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; (3) an attribute of the challenged statute

that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) the defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

*Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (citation modified). The "*McKay* factors are not exhaustive," and a plaintiff need not satisfy all the factors to establish a credible threat. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).

Plaintiffs allege subjective chill here. They do not operate in Michigan because they "fear enforcement action and its consequences." R. 23, PageID 91 (citation modified). So I turn to whether Plaintiffs have pleaded sufficiently a combination of the *McKay* factors.

*Past Enforcement.* Plaintiffs have not established a history of past enforcement of the Drone Statute by MDNR. The Supreme Court has explained "that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." *Susan B. Anthony List*, 573 U.S. at 164, 134 S.Ct. 2334 (citation modified). "A threat of enforcement is most credible when the *same conduct* has drawn enforcement actions or threats of enforcement in the past." *Christian Healthcare Ctrs.*, 117 F.4th at 848 (citation modified).

Plaintiffs say that MDNR "actively enforces the ban on drones" under the Drone Statute. R. 23, PageID 89. In support, they point to emails MDNR enforcement officials sent to Mike Cassells and Daniel Schultz, two individuals "interested in using drone location." *Id.* Plaintiffs allege that the emails stated that "using drones to locate downed deer in Michigan is illegal," and that "the use of drones related to locating wildlife in any manner is illegal." *Id.* But general statements that MDNR "actively enforces the ban on drones" or that an action is illegal are not enforcement actions or threats. *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 416 (6th Cir. 2025) ("generalized contention" that the defendant "actively enforces" a statute "offers little support for the argument that the [defendant] will enforce here").

Indeed, Plaintiffs never alleged that MDNR enforced the Drone Statute against them or any other drone operators. *See Fischer v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022) (per curiam) ("[W]e allow [plaintiffs] to meet this factor by pointing to past enforcement against others."). True enough, "a plaintiff need not always show that the statute has been enforced previously against the precise conduct it wishes to undertake." *Christian Healthcare Ctrs.*, 117 F.4th at 849. But Plaintiffs fail to allege *any* instances of enforcement since the legislature enacted the Drone Statute in 2015.

**\*14** *Warning Letter.* Plaintiffs have not alleged that MDNR sent them a warning letter. They do allege, however, that MDNR's "agents or employees have recently explicitly articulated the DNR's position on the legality of [Drone Deer Recovery]'s business," presumably through the emails to Cassells and Schultz. R. 23, PageID 91. Plaintiffs also noted in their briefing that MDNR issued guidance stating that "[t]he use of drones to pursue wildlife in any manner, either during legal

hunting hours or after, is illegal," and that "[a]ttempting to locate and/or recover game, either dead or wounded, is an act which falls within the definition of 'take.' " *See* Mich. Dep't of Nat. Res., 2023 Mich. Hunting Reguls. Summary, 25. But neither the emails nor the guidance is an "enforcement warning letter[ ] *sent to the plaintiffs* regarding their specific conduct." *McKay*, 823 F.3d at 869 (emphasis added).

To begin, neither was directed at Plaintiffs. *See id.* The guidance addresses the public at large. And MDNR emailed Cassells and Schultz, not Plaintiffs. The complaint also fails to allege that MDNR's emails addressed Plaintiffs specifically. *See id.* (signs threatening enforcement did not show credible threat of enforcement in part because they "address the general public, not [the plaintiff] specifically or any of his past conduct").

Consider the warning letters in *Fischer*. There, this court found a credible enforcement threat when the letters "warned that [the defendant] had launched a preliminary investigation into [the plaintiffs'] conduct." 52 F.4th at 308; *see also Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (finding credible threat of enforcement when letter stated that the defendant had "probable cause for action" against the plaintiff for her conduct (quotation omitted)). Plaintiffs make no similar allegations here. As a result, this factor weighs against them.

*Ease of Enforcement*. Plaintiffs point to nothing about the Drone Statute "that makes enforcement easier or more likely." *See McKay*, 823 F.3d at 869. The credibility of a threat of enforcement increases when the statute allows "any member of the public to initiate an enforcement action," *id.*, rather than when it is "limited to a prosecutor or an agency," *Susan B. Anthony List*, 573 U.S. at 164, 134 S.Ct. 2334. A violation of the Drone Statute can lead to criminal penalties, Mich. Comp. Laws § 324.40118(1), which means a prosecutor can enforce the statute. *See Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 440 (6th Cir. 2024) (concluding criminal statute was "a standard criminal law with no attributes making enforcement easier or more likely"). And MDNR has conceded that it can issue a citation for a violation of the statute. But Plaintiffs do not allege that members of the public can file complaints or initiate enforcement. *See, e.g.*, *Wallace*, 132 F.4th at 417; *Fischer*, 52 F.4th at 308–09. So this factor weighs against Plaintiffs too.

*Disavowal*. MDNR asserts in its brief that it has no "plan to prosecute Plaintiffs or anyone else for creating or disseminating location[ ] pins." D. 21 at p.30. This purported disavowal falls flat. Plaintiffs intend to create location information *using a drone*. And MDNR has not disavowed prosecuting them for such conduct. So this factor weighs in Plaintiffs' favor.

* * *

Plaintiffs have established only one of the *McKay* factors—refusal to disavow enforcement. Yet disavowal "is just one data point among many on the question [of] whether a credible threat of

enforcement exists." *Davis v. Colerain Township*, 51 F.4th 164, 174 (6th Cir. 2022). The other *McKay* factors confirm that Plaintiffs have alleged no "circumstances that render ... threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334. They fail to identify a history of enforcement of the Drone Statute, that they received a warning letter, or that an attribute of the Drone Statute makes enforcement easier.

**\*15** With no credible threat of enforcement, Plaintiffs cannot show an injury in fact. Plaintiffs therefore lack standing.

## All Citations

--- F.4th ----, 2025 WL 2170165

## Footnotes

1   Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Demis v. Sniezek*, 558 F.3d 508, 513 n. 2 (6th Cir. 2009) (taking notice of government website); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("Under Federal Rule of Evidence 201(b) ... [t]his court and numerous others routinely take judicial notice of information contained on state and federal government websites." (collecting cases)).

2   The MDNR's website also suggests that conservation officers issue citations for violations of Michigan's natural resources laws. *See, e.g.*, Mich. Dep't of Nat. Res., *CO Biweekly Reports* (12/12/2023–1/6/2024) (Jan. 6, 2025), https://perma.cc/U3CP-3JRA(describing multiple incidents where conservation officers issued citations).

3   The MDNR argued below, and continues to argue on appeal, that the Eleventh Amendment bars Plaintiffs' suit. The district court did not address the MDNR's sovereign immunity arguments because other issues were dispositive. Because the same is true on appeal, we also do not reach the sovereign immunity issue.

4   Lawmakers' stated rationale for enacting the Drone Statute was two-fold. They were concerned that persons opposed to hunting, such as those affiliated with People for the Ethical Treatment of Animals (PETA), might use drones to "disrupt" or "interfere with lawful hunting or fishing." R. 25-1, PID 123. They were also concerned that hunters and fishermen could use drones "to aid in taking game or fish," thus "violat[ing] fair-chase principles and tak[ing] away from the spirit and tradition of ethical hunting and fishing." *Id.*

1   https://cms2.revize.com/revize/washingtonmi/2023% 20Michigan% 20Hunting% 20Regulations% 20Summary.pdf.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.