**Case No. 24-1775**

_____

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

**JALEELAH HASSAN AHMED,**

*Plaintiff/Appellant,*

**V.**

**HAMTRAMCK PUBLIC SCHOOLS, EVAN MAJOR, SALAH HADWAN, MOORTADHA OBAID, SHOWCAT CHOWDHURY, REGAN WATSON, HAMTRAMCK FEDERATION OF TEACHERS**

*Defendants/Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION
Honorable Gershwin A. Drain
CIVIL ACTION NO. 2:22-cv-11127

_____

<u>**DEFENDANTS-APPELLEES' BRIEF ON APPEAL**</u>

Anne-Marie Vercruysse Welch (P70035)
Stephanie V. Romeo (P83079)
Clark Hill PLC
Attorneys for Defendants-Appellees
220 Park St. Ste. 200
Birmingham, Michigan 48009
(248) 988-1810
awelch@clarkhill.com
sromeo@clarkhill.com

# DISCLOSURE OF
# <u>CORPORATE AFFILIATIONS AND FINANCIAL INTEREST</u>

Pursuant to Fed. R. App. P. 26.1 and 6th Cir. R. 26.1, Defendants-Appellees make the following disclosure:

1.     Are said parties a subsidiary or affiliate of a publicly-owned corporation?

<u>Defendants-Appellees</u>: No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

<u>Defendants-Appellees</u>: No.

Respectfully submitted,

s/*Anne-Marie V. Welch*
Anne-Marie Vercruysse Welch (P70035)
Stephanie V. Romeo (P83079)
Clark Hill PLC
Attorneys for Defendants-Appellees
220 Park St. Ste. 200
Birmingham, Michigan 48009
(248) 988-1810
awelch@clarkhill.com
sromeo@clarkhill.com

**TABLE OF CONTENTS**

**Page**

DISCLOSURE OF CORPRATE AFFILATIONS ...................................................... 1

TABLE OF AUTHORITIES ............................................................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................ix

COUNTER-STATEMENT OF ISSUES PRESENTED ........................................ 1

STATEMENT OF THE CASE .............................................................................. 3

COUNTER-STATEMENT OF FACTS AS ALLEGED ....................................... 6

SUMMARY OF THE ARGUMENT ................................................................... 10

ARGUMENT ...................................................................................................... 14

    I.    Standards Of Review ............................................................................... 14

    II.    The District Court Denied Plaintiff's Motion to Amend ....................... 15

        A.    The District Court Properly Dismissed Plaintiff's FMLA Claim as Futile ...................................................................................... 16

            1.    Plaintiff Abandoned Any Interference Claim ........................ 16
            2.    Plaintiff Fails to State Retaliation ......................................... 17

        B.    The District Court Properly Dismissed Plaintiff's Title IX Claim as Futile ...................................................................................... 23

        C.    Plaintiff's Motion to Amend Should Be Denied for Undue Delay, Repeated Failure to Cure Deficiencies, and Prejudice ...... 24

    III.    The District Court Properly Dismissed All Claims Against the Individual Defendants ........................................................................... 25

    IV.    Plaintiff Abandoned Her Tort Claims Against Defendants ................... 27

A.   The District Court Properly Dismissed Intentional Interference and Defamation Which Plaintiff Abandoned on Appeal ............... 27

B.   Plaintiff Abandoned any Conspiracy Claim ................................... 28

V.    Plaintiff's Tort Claims are Barred by Governmental Immunity ............ 28

VI.   The District Court Properly Granted Defendant's Motion to Dismiss .. 29

A.   The District Court Properly Dismissed Plaintiff's Disability Discrimination Claims .................................................................. 30

1.   Plaintiff Failed to Plead A Qualifying Disability ................... 30

2.   Plaintiff Failed to Plead Causation ......................................... 34

B.   Plaintiff's Fails to State Title II ADA and Rehab Act Claims ....... 35

C.   Plaintiff Abandoned her National Origin Discrimination Claims .. 35

D.   The District Court Properly Dismissed Plaintiff's Discrimination and Retaliation Claims Under Title VII, ELCRA, the ADA, Rehab Act, and the PWDCRA (Counts I-IX) ........................................... 36

1.   The District Court Properly Analyzed *Muldrow* .................... 37

2.   Plaintiff Failed to Plead She Suffered an Adverse Action, Even Under the Standard in *Muldrow* ................................... 42

3.   Plaintiff Failed to Plead She Was Treated Differently than Similarly Situated Employees .................................................. 46

4.   Plaintiff Fails to Plead Causation to State Retaliation Claims ................................................................ 49

E.   The District Court Properly Dismissed Plaintiff's Due Process Claims ....................................................................... 52

1.   Plaintiff Has Not Alleged a Protected Property Interest ......... 52

2.   Plaintiff Was Not Deprived of Any Particular Due Process ... 54

3.   The Individual Defendants are Entitled to Qualified Immunity Which Also Bars District Liability ........................ 56

CONCLUSION ................................................................................................. 56

CERTIFICATE OF COMPLIANCE ..................................................................... 59

# TABLE OF AUTHORITIES

**Page**

CASES

*A.C. v. Shelby Cty. Bd. of Educ.*
711 F.3d 687 (6th Cir.) 2013 ........................................................................... 36

*Akno 1010 Mkt. St. St. Louis Mo. LLC v. Pourtaghi*
2019 WL 3943042 (E.D. Mich. Aug. 21, 2019) .............................................. 34

*Al-Janabi v. Wayne State Univ.*
2021 WL 8264677, at \*2 (6th Cir. Dec. 15, 2021) ......................................... 32

*Ansonia Bd. of Educ. v. Philbrook*
479 U.S. 60 (1986) ........................................................................................... 45

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ......................................................................................... 14

*Bachman v. Swan Harbour Ass'n*
252 Mich. App. 400 (2002) .............................................................................. 36

*Bailey v. City of Ann Arbor*
860 F.3d 382 (6th Cir. 2017) ........................................................................... 20

*Bates v. Green Farms Condo. Ass'n*
958 F.3d 470 (6th Cir. 2020) ........................................................................... 44

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) ................................................................................... 14, 37

*Blackwell v. Nocerini*
123 F.4th 479 (6th Cir. 2024) .......................................................................... 57

*Blick v. Ann Arbor Pub. Sch. Dist.*
105 F.4th 868 (6th Cir. 2024) .............................. 15, 28, 38, 54, 56, 57

*Brumbalough v. Camelot Care Ctrs., Inc.*
427 F.3d 996 (6th Cir. 2005) ..................................................................... 15, 17

*Burlington Northern v. White*
548 U.S. 53 (2006) ........................................................................................... 50

*Burns v. Coca Cola Enters. Inc.*
222 F.3d 247 (6th Cir. 2000) ........................................................................... 30

*Crawford v. Benzie-Leelanau Dist. Health Dep't Bd. of Health*
636 F. App'x 261 (6th Cir. 2016) ..................................................................... 52

*Davis v. Legal Services of Alabama.*
19 F.4th 1261 (11th Cir. 2021) ................................................................... 46, 50

*Dendinger v. Ohio*
207 F. App'x 521 (6th Cir. 2006) ..................................................................... 41

*Edgar v. JAC Prod., Inc.*
443 F.3d 501 (6th Cir. 2006) ........................................................................... 17

*Ehrlich v. Kovack*
710 F. App'x 646 (6th Cir. 2017) ..................................................................... 41

*Ercegovich v. Goodyear Tire & Rubber Co.*
  154 F.3d 344 (6th Cir. 1998) ...................................................................... 47
*Fritz v. Michigan*
  747 F. App'x 402 (6th Cir. 2018) ............................................................... 31
*Fulakis v. Columbus Pub. Schs.*
  53 F. App'x 340 (6th Cir. 2002) ................................................................ 31
*Galaxy Foods LLC v. Aryz Trading LLC*
  2023 WL 8025818, at *3-4 (E.D. Mich. Nov. 20, 2023)............................... 33
*Gardner v. Wayne Cnty.*
  520 F. Supp. 2d 858 (E.D. Mich. 2007)....................................................... 36
*General Elec. Co. v. Sargent & Lundy*
  916 F.2d 1119 (6th Cir. 1990) ................................................................... 15
*Genesee Cty Drain Comm'r v Genesee Cty*
  309 Mich App 317 (2015) ......................................................................... 29
*Giles v. Norman Noble, Inc.*
  88 F. App'x 890 (6th Cir. 2004) ................................................................ 20
*Greason, v. Auburn Pharmaceutical Co.*
  2025 WL 2649607, at *5 (Mich. Ct. App. Sept. 15, 2025) ........................... 39
*Hasanaj v. Detroit Pub. Sch. Cmty. Dist.*
  35 F.4th 437 (6th Cir. 2022), *cert denied* 143 S. Ct. 2560 (2023) ............... 54
*Hazle v. Ford Motor Co.*
  464 Mich. 456 (2001) .............................................................................. 37
*HDC, LLC v. City of Ann Arbor*
  675 F.3d 608 (6th Cir. 2012) .................................................................... 19
*Hedrick v. W. Rsrv. Care Sys.*
  355 F.3d 444 (6th Cir. 2004) .................................................................... 36
*Henderson v. Chrysler Grp., LLC*
  610 F. App'x 488 (6th Cir. 2015) ............................................................... 18
*Heyne v. Metro Nashville Pub. Sch.*
  655 F.3d 556 (2011)................................................................................. 26
*Hopkins v. Canton City Board of Education*
  477 F. App'x 349 (6th Cir. 2012) ............................................................... 53
*Hrdlicka v. Gen. Motors, LLC*
  63 F. 4th at 566 (6th Cir. 2023) ................................................................ 36
*Huguley v. General Motors Corp.*
  52 F.3d 1364 (6th Cir. 1995) .................................................................... 46
*Ingram v. Regano*
  2025 WL 488618, at *5 (Feb. 13, 2025)...................................................... 49
*Jackson v. City of Columbus*
  194 F.3d 737 (6th Cir. 1999) .......................................................... 15, 40, 41
*James v. Hampton*
  592 F. App'x 449 (6th Cir. 2015) ............................................................... 37

*Jenkins v. Foot Locker Inc.*
598 F. App'x 346 (6th Cir. 2015) ................................................................. 31

*Johnson v. Moseley*
790 F.3d 649 (6th Cir. 2015) ...................................................................... 56

*Johnson v. Univ. of Cincinnati*
215 F.3d 561, 572 (6th Cir. 2000) ........................................................ 36, 37

*Hurtt v. Int'l Servs., Inc.*
627 Fed. Appx. 414 (6th Cir. 2015) ............................................................. 51

*Jones v. Johnson*
707 F. App'x 321 (6th Cir. 2017) ........................................................... 23, 47

*Kelley v. Shelby Cty. Bd. of Educ.*
751 F App'x 650 (6th Cir. 2018) ................................................................. 54

*Keys v. Humana, Inc.*
684 F.3d 605 (6th Cir. 2012) ...................................................................... 19

*Lewis v. Humboldt Acquisition Corp.*
681 F.3d 312 (6th Cir. 2012) ...................................................................... 34

*Lichtenstein v. Hargett*
83 F.4th 575 (6th Cir. 2023) ....................................................................... 14

*Luis v. Zang*
833 F.3d 619 (6th Cir. 2016) ...................................................................... 33

*Marcilis v. Twp. of Redford*
693 F.3d 589 (6th Cir. 2012) ................................................................. 25, 26

*Martin v. Associated Truck Lines, Inc.*
801 F.2d 246 (6th Cir. 1986) ...................................................................... 15

*McNeal v. City of Blue Ash*
117 F.4th 887 (6th Cir. 2024) ..................................................................... 40

*McPherson v. Kelsey*
125 F.3d 989 (6th Cir. 1997), *cert denied* 523 U.S. 1050 (1998) ................... 20

*Mellentine v. Ameriquest Mortg. Co.*
515 F. App'x 419 (6th Cir. 2013) ................................................................ 14

*Michael v. Caterpillar Fin. Servs Corp.*
496 F.3d 584 (6th Cir. 2007), *cert denied* 552 U.S. 1258 (2008) ................... 50

*Milczak v. Gen. Motors, LLC*
102 F.4th 772 (6th Cir. 2024) ..................................................................... 51

*Mitchell v. Toledo Hosp.*
964 F.2d 577 (6th Cir. 1992) ...................................................................... 23

*Morris v. Metriyakool*
418 Mich. 423 (1984) ............................................................................ 52, 54

*Mortimer v. Alpena Cty. Prob. Court*
2010 WL 2077147 (Mich. App. May 25, 2010 at *3) ..................................... 55

*Muldrow v. City of St. Louis*
601 U.S. 346 (2024) ..................................................... 37-42, 44, 45. 46, 49

vi

*Nieves v. Envoy Air, Inc.*
  760 F. App'x 421 (6th Cir. 2019) ................................................................................. 18
*Parker v. Metro. Life Ins. Co.*
  121 F.3d 1006 (6th Cir. 1997); *cert denied* 522 U.S. 1084 (1998) .............................. 35
*Pedreira v. Kentucky Baptist Homes*
  579 F.3d 722 (6th Cir. 2009), *cert denied* 563 U.S. 935 (2011).................................... 19
*Peltier v. United States*
  388 F.3d 984 (6th Cir. 2004) ....................................................................................... 41
*Pernak v. Ashland, Inc.*
  330 F. Supp. 2d 890 (E.D. Mich. 2004)........................................................................ 31
*Peterson v. City of Detroit*
  76 Fed. App'x 601 (6th Cir. 2003), *cert denied* 540 U.S. 1108 (2004) ........................ 16
*Prado v. Thomas*
  804 F. App'x 332 (6th Cir. 2020) .................................................................................54
*Robbins v. Saturn Corp.*
  532 F. App'x 623 (6th Cir. 2013) ................................................................................. 31
*Rondigo, L.L.C. v. Twp. of Richmond*
  641 F.3d 673 (6th Cir. 2011) ....................................................................................... 47
*Rorrer v. City of Stow*
  743 F.3d 1025 (6th Cir. 2014) ..................................................................................... 36
*Rose v. Hartford Underwriters Ins. Co.*
  203 F.3d 417 (6th Cir. 2000) ....................................................................................... 15
*Ryan v. Aurora City Bd. of Ed.*
  540 F.2d 222 (6th Cir. 1976) ....................................................................................... 52
*Sango v. Johnson*
  2014 WL 8186701, at *8 (E.D. Mich. Oct. 29, 2014) .................................................... 34
*Santiago v. Meyer Tool Inc.*
  2023 WL 3886405, at *7 (6th Cir. June 8, 2023) .......................................................... 22
*Seay v. TVA*
  339 F.3d 454 (6th Cir. 2003) ....................................................................................... 48
*Shrivastava v. RBS Citizens Bank, N.A.*
  227 F. Supp. 3d 824 (E.D. Mich. 2017)........................................................................ 19
*Stambaugh v. Corrpro Companies, Inc.*
  116 F. App'x 592 (6th Cir. 2004).................................................................................. 29
*Tanney v. Boles*
  400 F. Supp. 2d 1027 (E.D. Mich. 2005)...................................................................... 35
*Tennial v. United Parcel Serv., Inc.*
  840 F.3d 292 (6th Cir. 2016) ....................................................................................... 18
*Tepper v. Potter*
  505 F.3d 508 (6th Cir. 2007) ....................................................................................... 45
*Threat v. City of Cleveland, Ohio*
  6 F.4th 672 (6th Cir. 2021) .......................................................................................... 43

*United States v. Johnson*
  440 F.3d 832 (6th Cir. 2006) ................................................................. 16
*United States v. State of Mich.*
  940 F.2d 143 (6th Cir. 1991) ................................................................. 49
*Wathen v. Gen. Elec. Co.*
  115 F.3d 400 (6th Cir. 1997) ................................................................. 26
*White v. Anchor Motor Freight, Inc.*
  899 F.2d 555 (6th Cir. 1990) ................................................................. 44
*White v. Burlington*
  2000 WL 35448693 (Nov. 16, 2000)...................................................... 41
*Wysocki v. Int'l Bus. Mach. Corp.*
  607 F.3d 1102 (6th Cir. 2010) ............................................................... 33
*Young v. CSL Plasma, Inc.*
  2016 WL 1259103, at *2-*5 (E.D. Mich. 2016) .................................... 37

## STATUTES

29 U.S.C. 705(20)(B) ................................................................................ 31
29 U.S.C. 794(a) ....................................................................................... 37
42 U.S.C. 12112(a) ................................................................................... 37
42 U.S.C. 2000e-2(a) ................................................................................ 37
MCL §380.1201 ........................................................................................ 25
MCL 37.1202(1) ....................................................................................... 37
MCL 380.1229(2) ..................................................................................... 53
MCL 691.1407 .......................................................................................... 29
MCL 691.1407(1) ..................................................................................... 28

## RULES

Fed. R. Civ. P. 8(a)(2) ............................................................................. 19
Fed. R. Civ. P. 12(b)(6) ...................................................................... 14, 15
Fed. R. Civ. P. 15.................................................................................... 15

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendants-Appellees respectfully request oral argument because it would aid in the decisional process and may help the Court to better understand the shortcomings of Plaintiff-Appellant's Original Complaint and Fourth Amended Complaint and where Plaintiff-Appellant has waived argument or abandoned her claims.  Fed. R. App. P. 34(a)

**COUNTER-STATEMENT OF ISSUES PRESENTED**

1. **WHETHER PLAINTIFF ABANDONED HER INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, DEFAMATION/DEFAMATION PER SE, INVASION OF PRIVACY/FALSE LIGHT, CONSPIRACY TO DEPRIVE PLAINTIFF OF CIVIL RIGHTS, CONSPIRACY, NATIONAL ORIGIN DISCRIMINATION, AND ELCRA RETALIATION CLAIMS ON APPEAL?**

   Defendants-Appellees state:  Yes.

2. **WHETHER THE DISTRICT COURT PROPERLY DENIED PLAINTIFF'S MOTION TO AMEND AND DISMISSED PLAINTIFF'S FMLA AND TITLE IX CLAIMS AS FUTILE WHERE PLAINTIFF SUFFERED NO ECONOMIC DAMAGES, FAILED TO PLEAD A CAUSAL CONNECTION BETWEEN FMLA ACTIVITY AND ALLEGED ADVERSE ACTION, AND FAILED TO PLEAD PLAINTIFF WAS TREATED DIFFERENTLY THAN SIMILARLY SITUATED NON-PROTECTED EMPLOYEES?**

   Defendants-Appellees state:  Yes.

3. **WHETHER THE DISTRICT COURT PROPERLY DISMISSED ALL CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS WHERE PLAINTIFF FAILED TO PLEAD FACTS DEMONSTRATING WHAT ACTIONS EACH INDIVIDUAL TOOK TO VIOLATE HER RIGHTS?**

   Defendants-Appellees state: Yes.

4. **WHETHER THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS' MOTION TO DISMISS AND DISMISSED PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS WHERE PLAINTIFF FAILED TO PLEAD A QUALIFYING DISABILITY, THAT SHE SUFFERED AN ADVERSE ACTION, THAT SHE WAS TREATED DIFFERENTLY THAN SIMILARLY**

1

**SITUATED NON-PROTECTED EMPLOYEES, OR A CAUSAL CONNECTION BETWEEN PROTECTED ACTIVITY AND ALLEGED RETALIATORY ACTIONS?**

Defendants-Appellees state:  Yes.

5. **WHETHER THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS' MOTION TO DISMISS AND DISMISSED PLAINTIFF'S DUE PROCESS CLAIMS WHERE SHE FAILED TO PLEAD SHE WAS DEPRIVED OF A PROPERTY INTEREST AND THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY?**

Defendants-Appellees state:  Yes.

## STATEMENT OF THE CASE

This Court should affirm the District Court in all respects as the District Court correctly held Plaintiff's claims failed to state a cognizable action.

While on a paid leave of absence, Plaintiff filed a 13-count complaint ("Original Complaint") on May 23, 2022 asserting claims for race, sex, national origin, and disability discrimination under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("Rehab Act"), Michigan's Persons with Disabilities Act ("PWDCRA"), Title VII of the Civil Rights Act ("Title VII"), Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), as well as claims for intentional interference with contractual relations ("intentional interference"), defamation and defamation per se, and violations of federal and Michigan Due Process rights. Given the widespread deficiencies in the Original Complaint, both the School District Defendants and Defendant Hamtramck Federation of Teachers ("the Union") filed motions to dismiss the Original Complaint.[1]

Plaintiff subsequently filed numerous Rule 15 motions to amend her complaint. Magistrate Judge Ivy denied Plaintiff's first motion to amend as futile on

---

[1] School District Defendants include the Hamtramck Public School District ("HPS" or the "District"), Evan Major, Salah Hadwan, Moortadha Obaid, Showcat Chowdhury, and Regan Watson, who are collectively referred to as "Defendants" in this Brief. The individually named Defendants are referred to collectively as the "Individual Defendants."

October 6, 2022. Plaintiff filed her second motion to amend on November 21, 2022 adding five new meritless counts, none of which stated a claim.

Plaintiff returned from leave in February 2023, which mooted much of the relief requested in her Original Complaint. On March 16, 2023, the parties alerted the District Court to this fact; and the court instructed Plaintiff to withdraw her second motion to amend and file her Third Amended Complaint considering these changed facts. Plaintiff instead filed a Third Amended Complaint on March 23, 2023 improperly adding multiple factual allegations unrelated to her reinstatement and five new causes of action without Defendants' consent or seeking leave to amend. The District Court struck the complaint, and ordered Plaintiff to file another amended complaint and reminded her of her obligation to either seek leave or consent if she wished to add causes of action not alleged in the Original Complaint. In the interim, Plaintiff and HPS entered into a new contract, which significantly increased Plaintiff's pay and benefits.

On December 14, 2023, Plaintiff filed her proposed Fourth Amended Complaint ("Amended Complaint") and corresponding Motion for Leave to Amend ("Motion to Amend"). Plaintiff's Amended Complaint added five new causes of action – Violation of Family Medical Leave Act ("FMLA"), Violation of Title IX, Conspiracy to Deprive Plaintiff of Civil Rights, Invasion of Privacy/False Light, and Conspiracy. Plaintiff also withdrew her National Origin discrimination claims.

4

The District Court denied Plaintiff's Motion to Amend in its entirety and dismissed each of the new claims as futile. The District Court determined Plaintiff failed to state her FMLA claim as she failed to plead causation, her Title IX claim as she failed to identify a similarly situated person outside of her protected class treated better than her, her conspiracy claims as lacking the required specificity and suffering from contradiction, and her invasion of privacy/false light claims, which stated mere conclusions and lacked the required specificity.

At the April 10, 2024 scheduling conference to set pretrial deadlines, Plaintiff moved to amend the operative Original Complaint to add factual allegations proposed in the most recent Motion to Amend. On April 11, 2024, the District Court entered an Order denying the request, stating that "the proposed new facts are not so substantial as to warrant further delay in this matter or to bolster the Counts originally alleged." *[Order_R.84_PageID_#2347].* Plaintiff did not appeal this Order.

HPS and the Union filed renewed motions to dismiss the Original Complaint on April 17, 2024. The District Court granted each motion to dismiss in its entirety. In pertinent part, the District Court found Plaintiff failed to: (1) plead sufficient facts to support any claim against the Individual Defendants, including intentional interference and defamation; (2) plead facts alleging a qualifying disability to state disability discrimination claims; (3) allege an adverse action or that she was treated

differently than similarly situated persons outside of her protected class to state discrimination and retaliation claims; and (4) allege she was deprived of a property interest in her employment contract or job responsibilities to state due process claims.

## COUNTER-STATEMENT OF FACTS AS ALLEGED

HPS' Board of Education ("Board") hired Plaintiff in 2016 and promoted her to Superintendent beginning the 2019-2020 school year. *[Complaint_R.1_PageID_#2, 4-5, ¶¶1, 14, 19].* The COVID-19 pandemic became acute in March 2020. Students and teachers did not return to the classroom until the beginning of the 2021-2022 school year. *[MTD-Ex. 2_R.88-3_PageID_#2480].* COVID adversely affected the physical, social, and emotional well-being of HPS' teachers and staff. *[Complaint_R.1_PageID_#6, ¶23; MTD-Ex. 1_R.88-2_PageID_#2478].*

The Board renewed Plaintiff's contract just prior to the 2021-2022 school year. *[MTD Response-Ex. A_R.89-1_PageID_#2672-2676].* Plaintiff agreed that as Chief Administrative Officer, her actions "shall not contravene the policies or directives of the Board of Education." *[Id. at PageID_#2668-69, ¶10].*

In 2021, Michigan law permitted schools to involuntarily transfer teachers without bargaining with the union. *[Complaint_R.1_PageID_#7, ¶33].* Before the beginning of the 2021-2022 school year, Plaintiff ordered HPS' HR Director to

6

*involuntarily* transfer nine teachers and a popular teacher resigned due to a legal process initiated by HPS. *[Id. at PageID_#6-7, ¶¶25-26, 32].* Shortly thereafter, more teachers retired and resigned in protest. *[Id. at PageID_#10, ¶37(j)].*

Despite the tension caused by the first round of involuntary transfers, Plaintiff directed HPS' HR Director to involuntarily transfer two more teachers with special education certifications due to an influx of autistic students. *[Id. at PageID_#7, ¶¶29, 32].* The Board intervened and used its express ability to direct that no more teachers be involuntarily transferred. *[Id. at PageID_#7, ¶30-31].* Plaintiff alleges she "opposed the Hamtramck Schools [sic] failure to provide disabled students with teachers who were properly certified." *[Id.].* Plaintiff does not detail how or to whom she expressed her opposition. The teachers who were, or might be, involuntarily transferred and the Union were upset with these personnel actions, but Plaintiff admits they "had no legal recourse." *[Id. at PageID_#6, 8, ¶27, 35].* So, Plaintiff alleges they conspired with Defendants to terminate her and the HR Director. *[Id. at PageID_#8, ¶36].*

Due to the stress that "all educators suffered during the COVID pandemic," coupled with the stress caused by dissatisfaction with Plaintiff, Plaintiff's physician advised her "for the sake of her health," to take a medical leave. Plaintiff thereafter advised the Board she was taking a voluntary medical leave for three months, starting October 10, 2021. *[Id. at PageID_#11, ¶¶38-40].*

Plaintiff issued a letter to the HPS Community citing her need to address her "own personal well-being" as the reason for leave and stating the Board would appoint an interim superintendent in her absence. *[MTD-Ex. 1_R.88-2_PageID_#2478]*. The Board likewise issued a letter to the HPS Community advising that the "Board must appoint a person or persons to *temporarily* perform the duties of the Superintendent." *[MTD-Ex. 2_R.88-3_PageID_#2480; Complaint_R.1_PageID_#12, ¶41]*. The Board appointed Nabil Nagi, Yemeni, and Sherry Lynem, female, as interim Superintendents. *[Complaint_R.1_PageID_#11-12, ¶41(A)(1))*. While Plaintiff was on this leave, the Board placed the HR Director on leave pending investigation. *[Id. at PageID_#13, ¶41(D)]*.

On December 23, 2021, Plaintiff notified HPS that she planned to return early from her voluntary leave. *[Id. at PageID_#13, ¶42]*. On January 3, 2022, HPS advised Plaintiff that she was being placed on paid leave with full benefits pending investigation. HPS, via Trustee Evan Major, wrote:

> The reason for this decision is that certain information has been received that must be and is being investigated and which includes complaints concerning you and others. Accordingly and for the protection of all concerned with respect to the investigation, **including you**, you have been placed on paid administrative leave pending further notice and while the investigation is pending. You are directed to cooperate with the investigation. *[MTD-Ex. 3_R.88-4_PageID_#2482-83]*.

8

The letter directs Plaintiff to contact the Interim Superintendent should she need to retrieve any personal items and closes by stating, "These steps and directives are necessary to protect the privacy of all concerned, the confidentiality and security of District information and records, and to ensure that District operations function in an orderly fashion during your leave." *[Id.; Complaint_R.1_PageID_#13 ¶43, PageID_#37(D)].*

On January 4, 2022, one day *after* Plaintiff was notified of her placement on paid leave, Plaintiff alleges she "had begun the process of filing a charge of discrimination with the EEOC." *[Id. at PageID_#14, ¶45].* On January 12, 2022, Plaintiff alleges she told HPS that she had asked the EEOC to investigate. *[Id. at PageID_#13-14, ¶44].*

She alleges Defendants (without specifying who) then furthered their conspiracy to replace her and impugn her reputation by "stating publicly the Hamtramck schools is investigating Mrs. Ahmed," and putting her personal property in a box outside her office. *[Complaint_R.1_PageID_#14, ¶47].* Yet, on January 24, 2022, the District issued the following official update to the HPS Community, "As you may recall, Mrs. Ahmed went on leave earlier this school year. As we begin the second half of the school year, we wanted to inform you that Mr. Nagi will continue to serve as Interim Superintendent, as Mrs. Ahmed remains on leave[.]" *[MTD-Ex. 4_R.88-5_PageID_#2485].*

9

Plaintiff did not file an EEOC Charge until March 29, 2022. She filed the instant lawsuit in May 2022. *[Complaint_R.1_PageID_#14, ¶¶45-46].*

While the Board terminated the HR Director, it is undisputed that even after Plaintiff filed the instant lawsuit, the Board publicly endorsed Plaintiff as Superintendent on February 22, 2023; and prior to the expiration of her 2021 contract, entered into a new contract with Plaintiff that does not expire until February 2027. *[Id. at PageID_#13, ¶41(D); MTD Response-Ex. A_R.89-1_PageID_#2672-76].*[2] The contract includes significant increases in pay and benefits and was not conditioned on the dismissal of the instant suit. *[MTD Response-Ex. A, R.89-1_PageID_#2672-76].* Plaintiff returned to the District in a *better* position than when she started her paid leave.

## SUMMARY OF ARGUMENT

The District Court correctly held none of Plaintiff's claims, either in the Amended or Original Complaint, can survive a motion to dismiss. The District Court's decisions should be affirmed.

As an initial matter, Plaintiff does not raise any argument in her appeal regarding her claims for Intentional Interference, Defamation, Invasion Of Privacy/False Light, Conspiracy To Deprive Plaintiff Of Civil Rights, Conspiracy,

---

[2] *See* Board Meeting Minutes, February 22, 2023 and June 14, 2023, *available at* https://www.hamtramckschools.org/downloads/_news_/cow_minutes_2-22-23.pdf and www.hamtramckschools.org/downloads/_news_/regular_meeting_minutes_6-14-23.pdf.

10

National Origin Discrimination, and ELCRA Retaliation as pled against Defendants. As such, these claims have been abandoned and are not part of this appeal.

Plaintiff identified only two claims from her Motion to Amend for appeal – FMLA and Title IX. The District Court correctly denied Plaintiff's Motion to Amend and dismissed these claims as futile. Plaintiff suffered no economic damages that entitle her to a claim for relief under the FMLA and she failed to plead a causal connection between her FMLA activity and any adverse action. Plaintiff's Title IX claim was futile as she failed to identify a similarly situated employee outside of her protected class who was treated differently.

The District Court also properly dismissed Plaintiff's claims for discrimination and retaliation. Plaintiff's failure to plead any facts that support or allege her paid leave plausibly caused harm precluded her ability to state a claim for relief. In other words, Plaintiff has failed to plead an adverse action. In an attempt to allege some harm, Plaintiff avers in her appeal, without any citation to the record, that her "indefinite administrative leave – without an opportunity to return, without any resolution of alleged misconduct, and with a publicly repeated 'minimally effective' rating untethered to actual performance – clearly altered the conditions of her employment in ways that affect her future career, professional reputation, and ability to perform the core duties of her role." Yet, Plaintiff's Complaint did not allege her leave was indefinite, she was returned without a finding of misconduct

11

subject to a more favorable contract,[3] and she did not allege a publicly repeated minimally effective rating.

Plaintiff's discrimination and retaliation claims also fail on other grounds. First, other than a conclusory allegation, Plaintiff did not plausibly allege she was disabled, and the Court is not permitted to consider factual allegations or documents presented for the first time in response to a motion to dismiss. Second, Plaintiff failed to plead causation. Plaintiff's own allegations state the teachers and Union conspired to disempower Plaintiff because they wanted administrators who would not involuntarily transfer teachers. Each allegation pointed to as an adverse action was pled in "furtherance of that conspiracy" or "common goal." Plaintiff's conclusory claims simply refer back to these allegations, negating causation. *[Complaint_R.1_PageID_#8-11, 15-20 ¶¶54, 60, 67]*. Plaintiff also fails to identify similarly situated non-protected employees who were treated differently. And, she pleads alleged retaliatory actions occurred *before* she engaged in protected activity. In sum, Plaintiff's allegations consist of mere conclusory statements without any facts to support a plausible inference that Defendants acted against her because of a protected characteristic or protected activity.

---

[3] As the District Court acknowledged, it is appropriate to consider Plaintiff's employment contract in assessing Defendants' Motion to Dismiss as the contract was mentioned in her Complaint and is integral to her claims. *[Order_R.105_PageID_#2991]; See also Section I, infra.*

Finally, the District Court properly held Plaintiff failed to plead a deprivation of a property interest in her employment contract or job responsibilities and dismissed her Due Process claims accordingly.

The District Court also correctly dismissed Plaintiff's action to the extent claims were brought against the Individual Defendants as she did not plead facts demonstrating what actions each individual took to violate her rights.

Throughout her Appellant-Brief, Plaintiff relies on allegations pled in both her Third and Fourth amended complaints. Plaintiff's reliance on these facts is inappropriate and misplaced. The Third Amended Complaint *[R.55_PageID_#1437-1488]* was stricken by the District Court and Plaintiff did not appeal that order. *[R.67_PageID_#1778-1804].* Nor did she appeal the District Court's April 11, 2024 Order denying Plaintiff's request to further amend the Original Complaint after her Motion to Amend was denied. *[R.84_PageID_#2347].* While Plaintiff may rely on facts alleged in the Fourth Amended Complaint *[R.68_PageID_#1805-1860]* to support her appeal of the District Court's decision denying her Motion to Amend, she cannot rely on these same allegations to support her appeal of the District Court's decision granting Defendants' Motion to Dismiss. This appeal is not an opportunity to correct Plaintiff's shortcomings before the lower court.

13

## ARGUMENT

### I.     STANDARDS OF REVIEW

This Court reviews the grant of a motion to dismiss *de novo*. *Lichtenstein v. Hargett,* 83 F.4th 575, 582 (6th Cir. 2023).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must "assert sufficient facts to provide the defendant with fair notice of what the claim is and the ground upon which it rests" and the plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424 (6th Cir. 2013). This plausibility standard asks "for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 662. If plaintiffs do "not nudge [] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly,* 550 U.S. at 555, 570. "[C]ourts are not bound to accept as true a legal conclusion couched as factual allegation." *Id.* at 555.

When resolving a Rule 12 motion to dismiss, the Court may consider documents a defendant attaches to a motion to dismiss if the documents are "referred to in the complaint and are central to the plaintiff's claims." *Jackson v. City of Columbus,* 194

F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds, Swierkiewicz v. Sorema,* 534 U.S. 506 (2002). The court may also consider public records and matters of which a court may take judicial notice. *Id.* The Court may not consider a plaintiff's arguments regarding factual developments that arise after the filing of a complaint unless the plaintiff seeks and is granted leave to file a supplemental pleading under Rule 15(d). *Blick v. Ann Arbor Pub. Sch. Dist.,* 105 F.4th 868, 876 (6th Cir. 2024).

Under Rule 15, the court considers "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment" before ruling on a motion to amend. *Brumbalough v. Camelot Care Ctrs., Inc.* 427 F.3d 996, 1001 (6th Cir. 2005). A district court's order denying a Rule 15(a) motion to amend is generally reviewed for abuse of discretion. *General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990). A decision solely based on futility is reviewed *de novo. Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986) A proposed amendment is futile if the complaint, as amended, would not withstand a Rule 12(b)(6) motion to dismiss. *Rose v. Hartford Underwriters Ins. Co.,* 203 F.3d 417, 420 (6th Cir. 2000).

## II.   The District Court Properly Denied Plaintiff's Motion To Amend

Plaintiff argues the District Court "abused its discretion" (the improper standard of review) with respect to only two of the additional claims pled in her

15

Amended Complaint – FMLA (Count I) and Title IX (Count VIII). Plaintiff's Brief dedicates no argument or analysis to her claims for Conspiracy to Deprive Plaintiff of Civil Rights (Count X), Invasion of Privacy/False Light (Count XVIII), and Conspiracy (Count XIX). Plaintiff has waived her right to appeal the District Court's decision denying Plaintiff's Motion to Amend and dismissing these claims as futile. *Peterson v. City of Detroit*, 76 Fed. App'x 601 (6th Cir. 2003), *cert denied* 540 U.S. 1108 (2004) (finding waiver of appellate review "because [plaintiff's] appellate brief does not contain any argument as to why the district court's denial of such motion [to amend] was improper"); *United States v. Johnson*, 440 F.3d 832, 846-47 (6th Cir. 2006) ("'[A]n appellant abandons all issues not raised and argued in its initial brief on appeal.'").

## A.    The District Court Properly Dismissed Plaintiff's FMLA Claim as Futile

### 1.    Plaintiff Abandoned Any Interference Claim

On appeal, Plaintiff mentions FMLA interference in a heading but fails to provide any analysis and therefore waives any such appeal. *Johnson, supra,* 440 F.3d at 846-47.  Her argument rests on her retaliation claim. The mention of interference was presumably inadvertent given Plaintiff acknowledges she was restored to her position with better pay and benefits, which renders her claim futile, and both her

16

Motion to Amend and supporting Reply brief concede she was only seeking leave to allege retaliation. *[Motion_R.69_PageID_#1875; Reply_R.73_PageID_#2200].[4]*

### 2.   Plaintiff Failed to State Retaliation

As a threshold matter, any FMLA claim is subject to dismissal as she has suffered no economic damages, and emotional distress and punitive damages are unavailable under the FMLA. *See Brumbalough*, 427 F.3d at 1007-1008; 29 U.S.C. §2617(a)(1)(A) (limiting damages to wages, salary, employment benefits, or other compensation denied or lost to employee or any "actual monetary losses," liquidated damages, and interest on those amounts). Plaintiff's request for sick and vacation days is unavailing as an employer may require employees substitute accrued paid leave to cover any unpaid FMLA entitlement period. *See Motion to Amend Response_R.72_PageID_#2054-55].* While the FMLA allows for equitable relief, such as reinstatement, it does not contemplate the type of symbolic declaratory and injunctive relief Plaintiff seeks. 29 U.S.C. §2617(a)(1)(B).

---

[4] Even if this Court finds Plaintiff preserved an interference claim, an FMLA claim fails "if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (employers permitted to "deny restoration to employment" if they can "show that an employee would not otherwise have been employed at the time reinstatement is requested"). The Amended Complaint does not allege she would not have been placed on paid leave at the time she requested reinstatement had she not taken FMLA leave. Rather, Plaintiff merely alleges HPS "publicly stated" it was investigating misconduct and that the "statement," not the placement on paid leave, was made in retaliation for taking FMLA leave. *[Am. Complaint_R.68_PageID_#1822, ¶ 69].*

17

Even if Plaintiff suffered economic damages, her FMLA claim remains subject to dismissal. To state a FMLA retaliation claim, Plaintiff is required to show: (1) she engaged in an activity protected by the FMLA; (2) the District knew she was exercising her rights under the FMLA; (3) after the District learned of the employee's exercise of FMLA rights, she suffered an adverse employment action; and (4) a causal connection exists between protected FMLA activity and the adverse employment action. *Nieves v. Envoy Air, Inc.*, 760 F. App'x 421, 426–27 (6th Cir. 2019).

To plausibly plead a causal connection, Plaintiff must allege facts permitting an inference that protected FMLA activity was likely the reason for the adverse action. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292 (6th Cir. 2016) ("[A] plaintiff must show some type of retaliatory intent." ); *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 494 (6th Cir. 2015) (emails showed supervisors were naturally concerned with business consequences of unforeseen and unexpected leave, which falls short of retaliatory intent). As described herein, Plaintiff has failed to plausibly state an FMLA claim where she pleads no facts demonstrating Defendants took any adverse action because of her FMLA leave.

Plaintiff avers the District Court erred by requiring Plaintiff to establish a *prima facie* case. However, the District Court did not apply the *McDonnell-Douglas* standard and explicitly denied use of the burden-shifting framework.

18

*[Order_R.82_PageID_#2320].* Further, none of the cases cited by Plaintiff involve the FMLA or find it improper to require Plaintiffs plead facts that can establish the plausibility required to survive a motion to dismiss. *See Swierkiewicz,* 534 U.S. 506 (complaint need not contain specific facts establishing *prima facie* case, but must provide notice of claims and grounds upon which they rest); *Keys v. Humana, Inc.*, 684 F.3d 605 (6th Cir. 2012) (plaintiff is not required to plead *prima facie* case to survive motion to dismiss, but is required to allege "sufficient factual content" to allow the court to draw the reasonable inference that discrimination occurred); *Pedreira v. Kentucky Baptist Homes*, 579 F.3d 722, 610 (6th Cir. 2009), *cert denied* 563 U.S. 935 (2011) (affirming dismissal of discrimination claim where plaintiff failed to allege facts plausibly linking her termination to religious beliefs); *HDC, LLC v. City of Ann Arbor,* 675 F.3d 608, 610 (6th Cir. 2012) (affirming dismissal of Fair Housing Act claim where alleged facts did not support plausible inference of intentional discrimination); *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824 (E.D. Mich. 2017) (making no finding regarding causation as plaintiff alleges, but rather granting summary judgment on discrimination claim).

Plaintiff concedes her claims must still be "plausible." By finding Plaintiff failed to state causation based on her own allegations/pleadings, the District Court's decision falls in line with the plausibility standard. *Swierkiewicz*, 534 U.S. 506, 512; Fed. R. Civ. P. 8(a)(2) (complaint must include "short and plain statement of the

19

claim showing that the pleader is entitled to relief"); *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017) (plaintiff's allegations are implausible if pleadings internally contradict verifiable facts central to her claims). Here, the District Court articulated three separate reasons why Plaintiff's Amended Complaint failed to plead a causal connection between her elective FMLA leave and paid leave.

First, Plaintiff simply alleged "actions were taken in retaliation for taking FMLA leave," but proffered no factual allegations permitting an inference that her leave was likely the reason for these actions. *[Am. Complaint_R.68_PageID_#1823].* Plaintiff argues on appeal that her allegations support plausible FMLA claims, but fails to identify these allegations. Her conclusory allegations did not meet the requisite pleading requirement. *[Order_R.82, PageID_#2324; Giles v. Norman Noble, Inc.,* 88 F. App'x 890, 895 (6th Cir. 2004) ("Rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law."); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997), *cert denied* 523 U.S. 1050 (1998) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Second, Plaintiff's conclusory self-serving allegations are contradicted by other allegations in her Amended Complaint, which suggest Defendants "were disgruntled for reasons other than her FMLA leave."

20

*[Order_R.105_PageID_#2324].* Plaintiff acknowledges Defendants threatened to remove her from her position as Superintendent if she refused to cooperate with their demands regarding the involuntary transfers *before* she took FMLA leave. *[Am. Complaint_R.68_PageID_#1813, 1818, ¶¶40, 52].* Plaintiff also alleges Defendants began to conspire with the Union to terminate her before she took leave, and admits this conspiracy was based on Defendants' efforts to maintain the Union's political and financial support, which had nothing to do with FMLA leave. *[Id. at PageID_#1822-24].* Each paragraph alleging actions were taken due to FMLA retaliation is undercut by the introductory phrase "in furtherance of the [unrelated] conspiracy." *Id.* There is no plausible connection between her FMLA leave and placement on paid leave based on these facts. Plaintiff does not challenge this analysis on appeal.

Third, because FMLA retaliation claims depend on the motive of the employer, the District Court analyzed whether Plaintiff alleged similarly situated employees were treated differently than her. *Nieves,* 760 F. App'x at 427. In determining whether a person is similarly situated, the Court looks to factors such as whether they "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's

21

treatment of them for it." *Santiago v. Meyer Tool Inc.*, 2023 WL 3886405, at \*7 (6th Cir. June 8, 2023).

Here, the District Court properly found Plaintiff's own allegations contradicted any assertion that her alleged comparators – Niczay and Nagi – were similarly situated to her. Plaintiff eliminates any potential inference of retaliation by alleging she involuntarily transferred teachers while facing pressure from the Union and Board to end the practice, but does not allege Niczay operated under the same or similar conditions. Specifically, Plaintiff alleges the District was motivated by the Union's political and financial support and conspired with the Union to remove Plaintiff if she did not terminate the HR Director, negotiate retention bonuses, promote Union members, or stop involuntary transfers. She adds that Niczay transferred teachers prior to the pandemic, a clearly different environment than when Plaintiff delegated the transfers.

Similarly, Plaintiff provides details of Nagi's tenure as interim superintendent that sever any plausible inference of retaliation. Unlike Plaintiff's defiance and continued refusal to cooperate, Plaintiff alleges Nagi "carefully catered to preferences" of Defendants, "even when those preferences were illegal or not in the best interest of the School District or its students." *[Am. Complaint_R.68_PageID_#1826].* Plaintiff's attempts to justify the actions that

22

drew the District's initial concerns differentiate her situation from her alleged comparator. The District Court properly dismissed her FMLA claim as futile.

## B. The District Court Properly Dismissed Plaintiff's Title IX Claim As Futile

Plaintiff concedes she must identify a comparator who is similarly situated to her in all "relevant respects" to avoid dismissal of her Title IX claim for futility. *[Appellant-Brief, p._#48* citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)].* Plaintiff's own allegations outline how her two alleged comparators are not similarly situated to her. First, Plaintiff waives any argument that she and Niczay are comparable by failing to make this argument in her brief. Second, Plaintiff reasons that she was discriminated against because, unlike Nagi (who was also investigated), she was placed on leave, removed from the website, stripped of access, and publicly accused of misconduct. However, Plaintiff alleges that Nagi, who was only serving as an Interim, engaged in very different forms of misconduct and she cites no authority to suggest such wildly different behavior renders them still comparable. *[Am. Complaint_R.68_PageID_#1826-28].* The DOJ even cites case law acknowledging this basic principle. *[DOJ-Brief, p._#28* citing *Jones v. Johnson*, 707 F. App'x 321, 327-28 (6th Cir. 2017) (finding plausible discrimination claim where comparator's prior misconduct was "of comparable severity" to that of plaintiff's)].*

23

And, Plaintiff acknowledges she challenged the Board, where Nagi did not.[5] For these reasons, Plaintiff has failed to plausibly plead Title IX discrimination.[6]

### C.   Plaintiff's Motion to Amend Should Be Denied for Undue Delay, Repeated Failure to Cure Deficiencies, and Prejudice

Although the District Court did not reach this argument, even if Plaintiff's Amended Complaint is not deemed futile, Plaintiffs' Motion to Amend was properly denied as Plaintiff repeatedly failed to cure deficiencies by previous amendments, unduly delayed in alleging new factual allegations and five causes of action, and granting leave would result in undue prejudice to Defendants. *See Response_R.72_PageID_#2065-68.* The District Court likewise denied Plaintiff the ability to amend her complaint with supplemental allegations after her Motion to Amend was denied. *[Order_R.84_Page ID _2347-2348].* Plaintiff's failure to appeal this Order deems any argument to the contrary waived.

---

[5] Plaintiff also fails to allege which Board Members served while she and Nagi were in their respective roles.

[6] Plaintiff abandoned her ELCRA retaliation claim (Count XV) at the motion to amend stage and on appeal. Plaintiff omitted Count XV from her Motion to Amend and provided no argument as to why the District Court should have granted her leave or why amendment was not futile. On appeal, Plaintiff again provides no analysis regarding the claim or any argument as to why the District Court should have addressed a claim she failed to seek leave to add. Even if this Court were to consider Plaintiff's ELCRA retaliation claim, it fails for the same reasons as her other retaliation claims. *See* Section VI.D, *infra.*

### III.    THE DISTRICT COURT PROPERLY DISMISSED ALL CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

Plaintiff's claims against the Individual Defendants fails as a matter of law because she failed to plead facts demonstrating what each named defendant allegedly did to violate her rights. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy [the] minimum standard" that "a complaint give each defendant fair notice of what the plaintiffs claim is and the ground upon which it rests.").

The District Court correctly determined the alleged unlawful acts of the School Board could not be imputed to all Board members, and individual Board members' actions could not be imputed to the Board. *See* HPS Policy Manual, *Bylaws* po0143, "Authority" (citing MCL §380.1201) ("Individual members of the Board of Education do not possess powers that reside in the Board"). Plaintiff's Complaint fails to identify a single action taken by any of the Individual Defendants.[7] The decision to group the Individual Defendants into one collective and fail to state what each defendant did makes it impossible to determine whether

---

[7] Her Amended Complaint is similarly deficient, only identifying action taken by Evan Major in connection with her conspiracy claims, which Plaintiff has abandoned on appeal. *See Section IV.B, supra.  [Am. Complaint_R.68_PageID_#1821, 1825-1826, ¶¶64, 77, 79].*

25

any of the individuals were plausibly responsible for the alleged harm Plaintiff suffered.

Plaintiff attempts to rely on *Heyne v. Metro Nashville Pub. Sch.*, 655 F.3d 556 (2011) but ignores the Court's statement that "[t]his Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did[.]" 655 F.3d at 564 (6th Cir. 2011). Plaintiff also misstates the holding of *Heyne*, which reversed denial of defendants' motion to dismiss where plaintiff offered no factual allegations those two defendants violated his rights. Plaintiff's reliance on *Marcilis* is similarly misplaced. In *Marcilis*, the Court emphasized that individual defendants must be identified with particularity and affirmed dismissal of the complaint due to "categorical references to Defendants." 693 F.3d at 596. Plaintiff is not absolved of this requirement simply because she believes "they acted jointly or in concert." Plaintiff's failure to plausibly allege individual involvement warrants dismissal of her claims against the Individual Defendants.

Plaintiff also did not claim the Individual Defendants were employers under the ADA, Rehab Act, Title VII, or ELCRA and they cannot be sued in their individual capacity under these statutes. *See e.g. Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 (6th Cir. 1997) (an individual who does not otherwise qualify as an

26

employer cannot be held personally or individually liable under Title VII and similar statutory schemes).

## IV.    PLAINTIFF ABANDONED HER TORT CLAIMS AGAINST DEFENDANTS

### A.    The District Court Properly Dismissed Intentional Interference and Defamation, Which Plaintiff Abandoned on Appeal

Plaintiff's argument that the lower court failed to articulate the reasons for dismissal of Counts XII (intentional interference) and XIII (defamation) of the Original Complaint is baseless. Plaintiff ignores the explicit finding that Plaintiff's "threadbare allegations" are not sufficient to maintain a claim for intentional interference or defamation given Plaintiff's failure to plausibly allege that any of the Individual Defendants participated in the acts described in her complaint. *[Order_R.105_PageID_#2967-2969].*

Even assuming arguendo that the District Court failed to adequately articulate reasons for dismissal, these claims remain subject to dismissal as pled. On appeal, Plaintiff provides no argument as to whether Counts XII or XIII were sufficiently pled against the School District Defendants. Instead, Plaintiff dedicates a section of her brief to arguing she stated a viable claim of intentional interference and defamation against the Union only. Indeed, neither Plaintiff's Original nor Amended Complaint identifies interference caused by the School District Defendants nor any alleged false or defamatory statements made by the School District Defendants. By failing to address how these claims were sufficiently pled against Defendants in her

27

brief on appeal, Plaintiff has effectively abandoned them. See *Johnson,* 440 F.3d at 846-47 (6th Cir. 2006) ("'[A]n appellant abandons all issues not raised and argued in its initial brief on appeal.'"); *Blick*, 105 F.4th at 877, 885 (this Court will not consider cases or argument not raised by the parties on appeal).

### B.      Plaintiff Abandoned Any Conspiracy Claim

Plaintiff also abandoned any conspiracy claim, to the extent one was pled in the Original Complaint.[8] The word "conspiracy" appears nowhere in Plaintiff-Appellant's Brief other than the "Statement of the Case" where she merely states claims for Civil Conspiracy and Conspiracy under 42 USC §1985 were newly pled in her Third Amended Complaint. At no point does Plaintiff offer analysis as to how a claim for conspiracy was properly pled. This Circuit cannot consider this claim on appeal and the District Court's holding should be upheld. *See Blick*, 105 F.4th at 877, 885.

### V.      PLAINTIFF'S TORT CLAIMS ARE BARRED BY GOVERNMENTAL IMMUNITY

Under MCL 691.1407(1) "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." In addition, "each officer . . . of a governmental agency . . . and each member of a board . . . of a governmental agency is immune from tort liability . . .

---

[8] Plaintiff's Original Complaint does not identify a cause of action for conspiracy, but the word "conspiracy" is interspersed throughout the complaint.

while in the course of employment." *See* MCL 691.1407(2). School districts and their board members are entitled to governmental immunity. *See Genesee Cty Drain Comm'r v Genesee Cty*, 309 Mich App 317, 326 (2015); MCL 691.1407.

Plaintiff has not pled facts demonstrating the alleged torts occurred outside the exercise or discharge of a governmental function. Plaintiff's tort claims for Intentional Interference, Defamation, Conspiracy to Deprive Plaintiff of Civil Rights, Conspiracy, and Invasion of Privacy/False Light are barred by governmental immunity and subject to dismissal. Plaintiff does not address governmental immunity in her Appellant-Brief despite Defendants raising the defense in their pleadings before the District Court. *[MTD_R.88_PageID_#2467-68].*

## VI. THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS' MOTION TO DISMISS

Because Plaintiff's Motion to Amend was properly dismissed as futile, and because Plaintiff failed to appeal the District Court's Order denying her oral motion to amend her Original Complaint further with supplemental allegations, Plaintiff must rely on the allegations pled in her Original Complaint to support her claims. *[Order_R.84_PageID_#2347-2348].* As described herein, Plaintiff inappropriately attempts to rely on outside allegations, along with new facts, to support the causes of action pled in her Original Complaint. These allegations cannot save her claims on appeal. *See e.g. Stambaugh v. Corrpro Companies, Inc.*, 116 F. App'x 592, 598 (6th Cir. 2004) (district court properly dismissed plaintiff's complaint by analyzing

29

only allegations pled in the complaint where plaintiffs failed to seek leave to amend to add new allegations even if they had, leave would have been denied).

## A. The District Court Properly Dismissed Plaintiff's Disability Discrimination Claims (Counts I-III)

### 1. Plaintiff Failed to Plead a Qualifying Disability

Plaintiff asserts she did not need to identify a specific medical diagnosis or offer medical evidence at the pleading stage, yet offers no legal authority to support that conclusion. Plaintiff then attempts to rely on *Burns v. Coca Cola Enters. Inc.,* 222 F.3d 247, 253 (6th Cir. 2000), yet this Court did not discuss the plausibility requirement in *Burns* as *Burns* involved a motion for summary judgment rather than a 12(b)(6) motion to dismiss.

*Burns* actually supports Defendants' position, as well as the District Court's conclusion, that a plaintiff must identify a qualifying disability in her complaint to survive a motion to dismiss as *Burns* found a plaintiff's ability to show she is disabled is a "threshold requirement." *Id.* Plaintiff's only other legal authority, *Swierkiewicz*, 534 U.S. at 514, speaks to the general pleading "plausibility" standard, but does not address claims of disability discrimination.

While the "plausibility" standard does not require the level of evidence demanded at summary judgment, it does not absolve Plaintiff of the requirement to identify the nature of her disability in her complaint, or at least offer facts from which the disability can be plausibly ascertained. Indeed, Plaintiff concedes this

30

requirement by acknowledging she must "allege facts supporting a plausible inference that the plaintiff has an impairment that substantially limits one or more major life activities." *[Appellant-Brief, p._#32]; see Robbins v. Saturn Corp.,* 532 F. App'x 623, 629 (6th Cir. 2013) (ADA); 29 U.S.C. 705(20)(B) (Rehab Act); *Pernak v. Ashland, Inc.,* 330 F. Supp. 2d 890, 896 (E.D. Mich. 2004) (PWDCRA).

Consistent with the plausibility standard and as demonstrated by the cases cited by the District Court, as well as Defendants, a plaintiff must identify the nature of a disability within the complaint to sufficiently state a claim for disability discrimination and survive a motion to dismiss. *See Fritz v. Michigan,* 747 F. App'x 402, 405 (6th Cir. 2018) (affirming dismissal of plaintiff's ADA and Rehab Act claims for failure to state a claim and finding plaintiff did not "plausibly allege a cognizable disability" where "besides neglecting to give her disability a name, the claim is conclusory and contains no facts that describe the nature of her disability."); *Jenkins v. Foot Locker Inc.,* 598 F. App'x 346, 350 (6th Cir. 2015) (affirming that motion to amend complaint was futile where reworded claim was a mere "threadbare allegation that she was disabled" and was not supported by any facts describing the impact of her alleged disability); *Fulakis v. Columbus Pub. Schs.,* 53 F. App'x 340, 342 (6th Cir. 2002) (affirming dismissal of ADA claim where plaintiff "fails to set forth any facts that would demonstrate that she satisfies the definition of 'disabled' for purposes of the ADA"); *Al-Janabi v. Wayne State Univ.,* 2021 WL 8264677, at

31

*2 (6th Cir. Dec. 15, 2021) (affirming dismissal of ADA and Rehab Act claims where plaintiff's complaint did not identify his disability nor allege his impairments substantially limit a major life activity).

Plaintiff fails to address, let alone rebut, a single case cited by Defendants or the lower court and Plaintiff fails to meet this modest requirement. Plaintiff's Complaint alleges that delegating involuntary transfers and COVID-19 was "stressful," so her physician advised her to take leave "for the sake of her health." *[Complaint_R.1_PageID_#11, ¶39].* While Plaintiff also states she experienced "severe emotional distress," neither "stress" nor "emotional distress" alone are considered disabilities and Plaintiff offers no legal authority to rebut this conclusion. Rather than pleading any facts to describe the nature of her alleged disability or the effect such "stress" or "emotional distress" had on a major life activity, she merely alleges in conclusory fashion that she is a "qualified individual" who is "disabled, perceived to be disabled, or has a record of disability." *[Id. at PageID_#15, ¶¶52-53].* As the District Court properly held, such cursory recitals of the elements of a claim are insufficient to state a claim for disability discrimination.

Plaintiff's argument that the lower court "overlooked factual allegations in the Complaint" is unavailing. After making this statement, Plaintiff inappropriately cites factual allegations from her Amended Complaint. Even if Plaintiff could rely on these allegations, they are the same or similar to the conclusory allegations she pled

in her Original Complaint. *See e.g. Am. Complaint_R.68_PageID_#1835* ("Mrs. Ahmed is a 'qualified individual with a disability' within the meaning of Title II of the ADA").

Plaintiff's attempt to rely on "contemporaneous documentation" from her treating therapist, which was attached to her Response to Defendants' Motion to Dismiss, is equally unavailing. At the motion to dismiss stage, the court is only permitted to consider the complaint, exhibits attached thereto, the public record, items in the record on the case, and certain items attached to the motion to dismiss. *[Order_R.105_PageID_#2973-2974]; Luis v. Zang*, 833 F.3d 619, 632 (6th Cir. 2016). Here, Plaintiff's "contemporaneous documentation" does not fall into any of the aforementioned categories as it was merely attached to her *response* to the motion to dismiss as part of a lengthy impermissible affidavit. *See Galaxy Foods LLC v. Aryz Trading LLC*, 2023 WL 8025818, at *3-4 (E.D. Mich. Nov. 20, 2023) ("A plaintiff 'may not attempt to amend [its] complaint through a response to a motion to dismiss, and affidavits attached to briefs may not properly be considered at the motion to dismiss stage.'"); *Wysocki v. Int'l Bus. Mach. Corp.,* 607 F.3d 1102, 1105 (6th Cir. 2010) (holding additional material clearly outside the pleadings, such as an affidavit attached to a reply brief, cannot be considered unless court converts motion to dismiss into one for summary judgment).

Neither the contemporaneous documentation from Plaintiff's treating therapist nor the diagnoses identified within it are referred to in the Original Complaint. Indeed, there is no way they could have been referenced as the documentation was not signed until April 29, 2024 – nearly two years after Plaintiff filed her Complaint. Plaintiff likewise failed to refer to the documentation or the corresponding diagnoses in each of her failed attempts to amend her complaint. This Circuit is not permitted to rely on this documentation or any other part of Plaintiff's Affidavit. *Sango v. Johnson*, 2014 WL 8186701, at *8 (E.D. Mich. Oct. 29, 2014) ("[I]t is axiomatic that a plaintiff may not amend his complaint through allegations made in response to a motion to dismiss."); *Akno 1010 Mkt. St. St. Louis Mo. LLC v. Pourtaghi*, 2019 WL 3943042 (E.D. Mich. Aug. 21, 2019) (declining to consider affidavit attached to plaintiff's response to defendant's motion to dismiss because neither party referenced the affidavit in its pleadings). Again, Plaintiff ignores the District Court's analysis and the cited case law as to this point.

### 2. Plaintiff Failed to Plead Causation

Even if this Circuit finds Plaintiff sufficiently pled a qualifying disability, Plaintiff's disability discrimination claims are subject to dismissal as she has failed to plead her alleged disability was the "but for" cause of the alleged adverse actions taken against her. *Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312 (6th Cir. 2012). She attempts to rely on the allegations in Paragraph 37 as discriminatory

based on her disability, but this is not plausible as Plaintiff does not allege she was disabled at the time those events occurred.

Under Plaintiff's theory, an individual need only state in conclusory fashion that she "is disabled" and suffered some harm without supporting factual allegations. This is directly contradicted by this Court's precedent. Counts I-III were properly dismissed.

### B.    Plaintiff Fails to State Title II ADA and Rehab Act Claims

Plaintiff fails to differentiate between her disability discrimination claims under Title I and Title II of the ADA. To the extent her Title II claim is not deemed abandoned, it fails as a matter of law because it is not a viable claim for employment discrimination. *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997); *cert denied* 522 U.S. 1084 (1998) (finding employment discrimination is the "exclusive providence of Title I"). Plaintiff's Title II and Rehab Act against the Individual Defendants also fail because neither the ADA nor Rehab Act allows for suits against public officials acting in their individual capacity. *Tanney v. Boles,* 400 F. Supp. 2d 1027, 1044 (E.D. Mich. 2005). Plaintiff addresses neither of these arguments on appeal despite Defendants presenting them in their Motion to Dismiss.

### C.    Plaintiff Abandoned National Origin Discrimination Claims

Plaintiff's counsel consented to the dismissal of her National Origin Discrimination claims (Counts VIII and IX of the Original Complaint) and Plaintiff

35

acknowledged her decision to abandon these claims in her Motion to Amend and Response to Defendants' Motion to Dismiss. *[Motion_R.69_PageID_#1865]; [Response_R.89_PageID_#2639].* Consistent with this acknowledgment, Plaintiff did not reference these claims within her Appellant-Brief. To the extent these claims are not deemed abandoned, they are subject to dismissal for the same reasons as her other discrimination claims. *See Section IV.D, infra.*

> **D.** **The District Court Properly Dismissed Plaintiff's Discrimination and Retaliation Claims Under Title VII, ELCRA, the ADA, Rehab Act, and the PWDCRA (Counts I-IX)**

It is well settled, and undisputed among the parties, that a plaintiff must allege she suffered an adverse action to state a claim of discrimination and retaliation under Title VII, the ELCRA, the ADA, the Rehab Act, and the PWDCRA. *[Appellant-Brief, pgs._#34-35, 38-39]; Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004) (ADA Discrimination), *cert denied* 543 U.S. 817 (2004); *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (ADA Discrimination and Retaliation); *A.C. v. Shelby Cty. Bd. of Educ.,* 711 F.3d 687, 697 (6th Cir. 2013 (ADA and Rehab Act analyzed together); *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 435 (2002) (PWDCRA Retaliation); *Hrdlicka,* 63 F. 4th at 566 (6th Cir. 2023) (ADA and PWDCRA Discrimination); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572, 578 (6th Cir. 2000) (Title VII discrimination and retaliation); *Gardner v. Wayne Cnty.*, 520 F. Supp. 2d 858, 863 (E.D. Mich. 2007) (ELCRA Discrimination and

36

Retaliation). This requirement is further implied by the language of each statute, which requires entities not to "discriminate" against any individual in hiring, firing, compensation, or other terms and conditions of employment. *See* 42 U.S.C. 12112(a) (ADA); 29 U.S.C. 794(a) (Rehab Act); 42 U.S.C. 2000e-2(a) (Title VII); MCL 37.1202(1) (PWDCRA). To plausibly state discrimination, Plaintiff must also allege she was replaced or treated differently than similarly situated non-protected employees. *See e.g. Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572-73 (6th Cir. 2000); *Hazle v. Ford Motor Co.,* 464 Mich. 456, 462-63 (2001).

### 1.    The District Court Properly Analyzed *Muldrow*

As the District Court recognized, while a plaintiff is not required to plead a *prima facie* case of discrimination or retaliation to survive a 12(b)(6) motion to dismiss, "the existence of an adverse employment action is necessary to suggest unlawful discrimination and any harm resulting therefrom." *[Order_R.105_PageID_#2978]; see also James v. Hampton*, 592 F. App'x 449, 461 (6th Cir. 2015) (a plaintiff must allege "sufficient 'factual content' from which a court could 'draw the reasonable inference' of . . . discrimination."). As Plaintiff acknowledges, she must still comply with the "plausibility" standard of *Twombly* and *Iqbal. [Appellant's Brief, pgs. 28-29]*; *see Young v. CSL Plasma, Inc.*, 2016 WL 1259103, at *2-*5 (E.D. Mich. 2016) (granting 12(b)(6) motion to dismiss plaintiff's claims under Title VII and ELCRA because his complaint failed to identify an

37

adverse employment action or that any alleged adverse action was motivated by his race), *aff. by,* 2017 WL 5157230 (6th Cir. May 26, 2017).

Hoping the United States Supreme Court's decision in *Muldrow v. City of St. Louis* will save her discrimination claims from dismissal, Plaintiff highlights its holding that a plaintiff need only plead "some harm" to successfully allege an adverse action and then conjures up facts she believes will save her claims under this new standard. 601 U.S. 346, 350, 354-55 (2024).

As an initial matter, Plaintiff's failure to address the lower court's analysis regarding the existing precedent concerning paid leave is fatal to her claims. In *Blick*, this Circuit elected not to evaluate the plaintiff's claims under *Muldrow*, in part, because she failed to "challenge the existing precedent that paid leave does not qualify as an adverse action." 105 F.4th at 886. The same result applies here. Without any citation or analysis, Plaintiff merely argues this Circuit's prior holdings do not apply because the District Court examined the issue under a different standard. The District Court, however, provided a detailed analysis as to why the pre-*Muldrow* cases on adverse action are still persuasive, which Plaintiff failed to dispute or analyze. *[Order_R.105_PageID_#2979-2987].* As determined in *Blick*, this Circuit can, and should, once again "save *Muldrow's* effect on our caselaw for another day." *Id.*

Even if this Court opts to assess *Muldrow*, Plaintiff's claims remain subject to dismissal. As the District Court recognized, the Supreme Court eliminated any "heightened standard" in Title VII discrimination claims that can be described as "significant," "serious," "substantial," or – in the Sixth Circuit context – "materially adverse." *[Order_R.105_PageID_#2979].* Yet, ultimately, under *Muldrow*, a plaintiff must still show "some harm respecting an identifiable term or condition of employment" to state a Title VII discrimination claim. *Muldrow*, 601 U.S. at 354-55. The District Court assessed Plaintiff's alleged adverse action "with respect to each statute in light of *Muldrow*" given similar language among the statutes and Title VII, as well as the tendency of Michigan courts to interpret state anti-discrimination statutes in accordance with federal case law.[9] *[Order_R.105_PageID_#2980].*

In conducting its *Muldrow* analysis, the District Court acknowledges a lack of Sixth Circuit authority on the issue requires the court to "consider[] afresh whether Plaintiff has shown that she suffered 'some harm' by being placed on paid administrative leave." *[Order_R.105_PageID_#2982-83].* This acknowledgment

---

[9] Only one Michigan case has addressed *Muldrow*. In *Greason, v. Auburn Pharmaceutical Co.,* the Michigan Court of Appeals held that even if the *Muldrow* standard applied, plaintiff failed to show she suffered any injury concerning the terms or conditions of employment where she received raises and was not demoted to a lower position despite allegedly being "accused of poor performance" and being "talked down to and otherwise demeaned by her supervisor." 2025 WL 2649607, at *5 (Mich. Ct. App. Sept. 15, 2025). The court's conclusion in *Greason* supports the District Court's holding that Plaintiff's paid leave is not an adverse action.

39

rebuts Plaintiff's and the DOJ's flawed argument that the court's conclusion relies on pre-*Muldrow* precedent.

To the extent the District Court cites prior precedent, it does so only to provide context for what actions do constitute "some harm" – the very tenet of the *Muldrow* decision. The court cites *Jackson v. City of Columbus* as the employee's circumstances were similar to those of Plaintiff-Appellant. Neither the employee in *Jackson* nor Plaintiff-Appellant suffered "termination of employment, a change in salary, demotion, loss of benefits, decreased workhours, or significantly diminished responsibilities" in conjunction with their paid leave. *[*194 F.3d 737, 752 (6th Cir. 1999); *Order_R.105_PageID_#2984].* Just as these circumstances did not constitute "significant harm" under the prior standard for adverse actions, the District Court determined they do not constitute "some harm" under the new *Muldrow* standard. *See also McNeal v. City of Blue Ash*, 117 F.4th 887, 903 (6th Cir. 2024) (describing disciplinary actions that "likely do not meet the definition of an 'adverse employment action,' including 'documented counseling,' an 'oral reprimand,' and a 'written reprimand' even after *Muldrow*).

Even if *Muldrow* is considered to abrogate this Court's prior law regarding paid leave, the District Court noted that reasons supporting paid leave as a "reasonable carveout in employment discrimination law" remain sound. *[Id. at 2985].* This analysis is limited to paid leave and does not extend to termination as

40

the DOJ disingenuously suggests. In *White v. Burlington*, 2000 WL 35448693 (Nov. 16, 2000) this Circuit acknowledged the Equal Employment Advisory Council's concern that employers must maintain the prerogative to place employees on paid leave pending investigation without facing risk of Title VII liability. 364 F.3d 789, 803 (6th Cir. 2004). While this Circuit noted an employer only faces such risk if there exists sufficient evidence the employer took action based upon illegal termination, it ultimately concluded the council's concerns were allayed by this Circuit's decision in *Jackson* that suspension with pay and benefits is not adverse action. *Id.* As the District Court aptly noted, any finding that paid leave is an adverse action under *Muldrow* would bring this concern back to the forefront and conflicts with this Court's prior conclusions that paid leave does not result in any harm. *[Id. at PageID_#2985-2986].*

Indeed, in *Peltier v. United States,* a case cited by Defendants and the District Court, this Circuit held paid leave is not an adverse action without relying on a "materially adverse" designation or similar characterization of "significant" harm. 388 F.3d 984, 988 (6th Cir. 2004); *see also Ehrlich v. Kovack,* 710 F. App'x 646, 650 (6th Cir. 2017); *Dendinger v. Ohio,* 207 F. App'x 521, 527 (6th Cir. 2006). Plaintiff fails to address the District Court's analysis of the existing precedent entirely.

The DOJ's argument that paid leave (which it incorrectly refers to as a "suspension") inherently respects the terms or conditions of her employment is not dispositive. Even if the ability to "do" the job is considered a "term or condition," *Muldrow* requires an employee to show "*some harm*" with respect to "an identifiable term or condition of employment." As described herein, Plaintiff fails to identify any harm.

### 2. Plaintiff Failed to Plead She Suffered an Adverse Action, Even Under the *Muldrow* Standard

In light of the foregoing, the District Court properly determined Plaintiff's placement on paid leave is not an adverse action under the new "some harm" standard identified in *Muldrow*.[10] As the District Court properly held, "if an employee returns to work with the title, responsibilities, pay, and benefits of employment they held before being placed on leave, *no harm* has been done." *[Order_R.105_PageID_#2985]*. Here, that is exactly what occurred. On January 3, 2022, the District advised Plaintiff that it would place her on paid administrative leave at the conclusion of her voluntary medical leave. *[Complaint_R.1_PageID_#13; MTD-Ex. 3_R.88-4_PageID_#2482-2483]*. She

---

[10] In her Brief, Plaintiff does not argue her election to take medical leave is an adverse action. Nor does she argue any of the other alleged actions identified in the Complaint, with the exception of her placement on paid leave, are adverse. As such, Plaintiff has abandoned any claim for discrimination or retaliation based on any action other than her paid leave. *Johnson*, 440 F.3d at 846-47.

42

does not allege she lost pay or other employment benefits while on either leave, but rather affirms she continued to receive her pay and benefits as underscored by the type of relief requested in her Complaint – "back-pay *if* Defendants succeed in terminating Plaintiff's employment." *[Complaint_R.1_PageID_#37].* (emphasis added).

The District Court's decision in this specific instance, where HPS simply notified the community that Plaintiff, who had earlier disclosed a voluntary leave, was still on leave, supported her with pay and benefits, and later returned her from leave with greater pay and benefits, is also supported by the "de minimis exception that forms the backdrop of all laws." *Threat v. City of Cleveland, Ohio*, 6 F.4th 672, 678–79 (6th Cir. 2021). To suggest otherwise would lower the needle from harm to trifle.

Contrary to Plaintiff's repeated assertions within her Brief, Plaintiff's leave was not indefinite and Plaintiff's Complaint does not indicate as such. Plaintiff returned from leave in February 2023 without any negative findings and the District offered her a more favorable contract with her same title, position (the highest role she can hold within HPS), and responsibilities. *[Response-Ex. A_R.89-1_PageID_#2672-2676].* She pleads no allegations that would allow this Circuit to

43

find she plausibly suffered "some harm" to any term or condition of employment.[11]

She tacitly admits this in her lower court briefing by leaving the court to "imagine" the harm caused by being placed on paid leave. *[Id. at PageID_#2627].*

In an attempt to take advantage of *Muldrow*, Plaintiff refers to various ways she allegedly suffered "some harm," including "a publicly repeated 'minimally effective' rating untethered to actual performance," harm to her professional reputation, and a detrimental impact on her "future career." *[Appellant-Brief, p._#35].* Yet, none of these alleged "harms" are identified in her Original Complaint and she cannot rely on these alleged circumstances to support her claims now. *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) (court evaluating a motion to dismiss must "focus only on the allegations in the pleadings"); *White v. Anchor Motor Freight, Inc.,* 899 F.2d 555, 559 (6th Cir. 1990) ("We review the case presented to the district court rather than a better case fashioned after the district court's order.").

Nor do any of Plaintiff's allegations tie harm toward her professional reputation or career to her placement on paid leave or her discrimination claims. While her Complaint alleges the Board appointed interim superintendents, these appointments were temporary, originated from her elective medical leave, and had

---

[11] The DOJ's argument that Defendants conflate "adversity" with "causation" lacks merit. The court considered the impact of Plaintiff's paid leave, or lack thereof, on her pay, benefits, job title, and responsibilities, not the reasons for the leave.

no impact on her professional development or career opportunities as demonstrated by her return to work to a more favorable contract. *[Pl's Response-Ex. A_R.89-1_PageID_#2648-2682].*  In fact, the Supreme Court has held that even *unpaid* leave has "no direct effect upon either employment opportunities or job status." *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (quoting *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 70–71 (1986)). The alleged "minimally effective" rating is not referenced once in either complaint.

A comparison to the facts of *Muldrow* further highlights the absence of an adverse action in the instant case. In *Muldrow*, the plaintiff was permanently transferred to an entirely different and less desirable position. Although her pay and rank remained the same, she was moved from a plainclothes job in a prestigious specialized division to a uniformed position in which she no longer worked with high-ranking officials and primarily performed administrative work. 601 U.S. at 351, 359. In addition to changing job responsibilities, she was moved to a rotating schedule, often requiring her to work weekends, and lost her FBI status and take-home car. In stark contrast, Plaintiff-Appellant remains in the same position and holds the same responsibilities as when her leave began, but with increased pay and greater benefits, including tuition reimbursement, retention bonus, and payout upon termination for just cause. *[Pl's Response-Ex. A_R.89-1_PageID_#2648-2682].*

Plaintiff's placement on paid leave, and her subsequent reinstatement to a more favorable contract, is not the type of fact pattern the Supreme Court intended to address when it decided *Muldrow* and developed the "some harm" standard. This conclusion is emphasized by the Supreme Court's decision to deny certiorari in the matter of *Davis v. Legal Services of Alabama*. 19 F.4th 1261, 1267 (11th Cir. 2021); 144 S. Ct. 1455 (2024); (holding paid suspension is not an adverse employment action). The Supreme Court's decision not to consolidate *Muldrow* and *Davis* suggests it does not find transfer to be equivalent to paid leave or that long standing precedent regarding paid leave is affected by *Muldrow*. In sum, Plaintiff failed to plead paid leave caused harm to plausibly allege an adverse action and as such, Plaintiff has failed to state a claim for discrimination or retaliation.

### 3. Plaintiff Failed to Plead She Was Treated Differently Than Similarly Situated Employees

To exhaust all arguments and "be sure," the District Court assessed whether Plaintiff plausibly alleged the paid leave was handed out discriminatorily. *Huguley v. General Motors Corp.,* 52 F.3d 1364, 1370 (6th Cir. 1995) (plaintiff required to show employer acted *because* of a protected trait to state disparate treatment claim).

Plaintiff and the DOJ imply she was not required to plead a *prima facie* case of discrimination to survive a motion to dismiss. Yet, the District Court did not find her discrimination claims subject to dismissal for failure to state a *prima facie* case. Rather, the District Court properly determined she did not "make a plausible claim

46

that she was discriminated against by the School District" as she pled no facts demonstrating similarly situated employees were treated differently than her "per the allegations in her Complaint." *[Order_R.105, PageID_#2988]; Jones*, 707 F. App'x 321 at 327-28 (requiring female plaintiff to allege a man engaged in prior misconduct "of comparable severity" to plausibly state Title VII sex discrimination claim); *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 684 (6th Cir. 2011) (reversing order denying motion to dismiss where plaintiff failed to plausibly allege gender-based discrimination by pleading mere legal conclusions that another employee was similarly situated and treated differently without supporting factual allegations).

Plaintiff's only argument against the District Court's analysis is that it applied a stricter comparator standard than Sixth Circuit precedent requires. Plaintiff states comparators must be "similarly situated in all relevant respects," rather than in every conceivable detail. *See Appellant-Brief, p._#39; Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998). Likewise, the DOJ argues the District Court erred by essentially requiring Plaintiff to plead an "exact correlation" between herself and her alleged comparator.

The District Court did not rely on any standard stricter than what has been cited by Plaintiff or this Circuit's precedent. The only alleged comparator identified in her Original Complaint is Niczay – her white, male predecessor. As the court held,

47

Plaintiff failed to allege Niczay was her true comparator as he was not "nearly identical" in "all of the *relevant aspects* of his employment situation." *Order_R.105_PageID_#2988* quoting *Seay v. TVA*, 339 F.3d 454, 479 (6th Cir. 2003) (emphasis added).

Here, while Plaintiff alleges that she and Niczay were involved in involuntarily transferring teachers, that is where the similarities end. Plaintiff also alleges that, unlike Niczay, she:

- Delegated responsibility to involuntarily transfer teachers to the HR Director;

- Upset the teachers and their Union by the actions taken at her discretion, which led to many teacher resignations;

- Insisted on *more* transfers despite the Board's opposition and these resignations;

- Refused to terminate the HR Director as instructed;

- Took a medical leave, which led to Niczay's re-hire; and

- Engaged in misconduct.

*[Complaint_R.1_PageID_#4, 6-7, 11, 13 ¶¶15, 27, 29, 32, 40-41(e), 43].* These distinctions remove any plausible inference that Niczay and Plaintiff were similarly situated.

Plaintiff-Appellant's Brief does not argue she was replaced in connection with her discrimination claims, yet even if she had, she admits Nagi and Lynem were

48

merely "acting" superintendents and Plaintiff remains Superintendent. *[Complaint_R.1_PageID_#12].* Plaintiff has failed to sufficiently plead she was replaced or treated differently than similarly situated employees and fails to state discrimination claims. *Ingram v. Regano*, 2025 WL 488618, at *5 (Feb. 13, 2025) (finding even if plaintiff suffered an adverse action under *Muldrow,* her claims could not survive dismissal as plaintiff could not show she was similarly situated to her male counterpart who did not engage in misconduct).

### 4. Plaintiff Fails to Plead Causation to State Retaliation Claims

Similar to the District Court, Plaintiff does not provide a separate analysis regarding the viability of her discrimination and retaliation claims. Plaintiff thereby waives any argument, as advanced by the DOJ, that the District Court erred in neglecting to conduct a separate analysis for Plaintiff's Title VII retaliation claim. *United States v. State of Mich.*, 940 F.2d 143, 165 (6th Cir. 1991) (affirming amicus curiae is "not an adversary party in interest in the litigation" and cannot raise issues not advanced by the parties themselves).

Even if this Court considers this argument, the District Court's decision to dismiss Plaintiff's retaliation claims remains sound. The District Court determined Plaintiff failed to plead she suffered an adverse action under the "some harm" standard identified in *Muldrow*, which may be considered even less demanding than the "materially adverse" standard applying to retaliation claims. *Burlington*

49

*Northern v. White,* 548 U.S. 53 (2006) (concluding an action is "materially adverse" if it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination"). The District Court's conclusion is consistent with this Circuit's precedent. None of the cases cited by the DOJ hold that paid leave alone constitutes a "materially adverse action" sufficient to state a retaliation claim. *See Michael v. Caterpillar Fin. Servs Corp.,* 496 F.3d 584 (6th Cir. 2007), *cert denied* 552 U.S. 1258 (2008) (placing employee on a performance plan *after* conclusion of paid leave could be considered materially adverse); *Burlington*, 548 U.S. at 70, (finding 37-day suspension *without* pay to be materially adverse); *Davis v. Legal Servs. Ala., Inc.,* 19 F.4th 1261, 1266 n.3 (non-binding authority noting in mere dicta that a paid suspension *may*, but not necessarily, constitute adverse action in retaliation context).

This Court cannot plausibly conclude Plaintiff's paid leave "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" where Plaintiff was paid and received full benefits throughout her leave and then returned to work to a newly negotiated, more favorable contract prior to the original contract's expiration. While Plaintiff also alleges her possessions were placed in a box outside her door, she does not aver how this would deter a reasonable person from making a complaint to plausibly allege material adversity.

Even if this Court finds Plaintiff pled adverse action, Plaintiff failed to plead causation. Neither Plaintiff nor the DOJ analyzed this requirement. As Defendants

50

argued in their Motion to Dismiss, Plaintiff must show not only that she engaged in protected activity and suffered an adverse action, but also a causal connection between the two. *Johnson*, 215 F.3d at 578; *Hurtt v. Int'l Servs., Inc.,* 627 Fed. Appx. 414, 422 (6th Cir. 2015).

Here, Plaintiff's retaliation claim in Count V (ADA and Title VII) is solely related to her EEOC "charge of discrimination," which was filed nearly three months after she was placed on paid leave. Even assuming Defendants became aware of her Charge as of the date she alleges she began the filing process, this was still one day *after* Plaintiff was notified of her placement on paid leave and Nagi would remain Interim Superintendent. The District's January 24, 2022 official statement pertaining to her leave refers to Plaintiff's prior request for leave and does not indicate she was under any investigation. It is axiomatic Plaintiff cannot plausibly establish causation where the EEOC Charge was initiated *after* the alleged retaliatory actions occurred. *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 789 (6th Cir. 2024), *reh'g denied sub nom. Milczak*, 2024 WL 3205990 (6th Cir. June 17, 2024) (plaintiff failed to raise a reasonable inference of causation where he received negative performance evaluations *after* complaining to his manager and filing EEOC Charge).

Plaintiff's retaliation claim in Count IV consists of two conclusory paragraphs. Plaintiff concludes, without pleading facts in support, that she was

51

retaliated for engaging in alleged protected activity. There is nothing to nudge the line to plausible.

### E.    The District Court Properly Dismissed Plaintiff's Due Process Claims

#### 1.    Plaintiff Has Not Alleged a Protected Property Interest

Defendants maintain Plaintiff cannot establish a property interest in her employment as a matter of law due to her status as a non-tenured administrator. *Ryan v. Aurora City Bd. of Ed.,* 540 F.2d 222, 227 (6th Cir. 1976).  For this reason alone, her due process claims fail. *Crawford v. Benzie-Leelanau Dist. Health Dep't Bd. of Health*, 636 F. App'x 261, 266 (6th Cir. 2016) (explaining a plaintiff "must first show that [she] possessed a property interest in [her] continued employment before [she] can prevail on [her] due process claims" against defendants); *Morris v. Metriyakool*, 418 Mich. 423, 451 (1984) (finding there must be a deprivation by the state of a "constitutionally cognizable life, liberty, or property interest" for a due process violation to exist).

Second, as the District Court aptly found, Plaintiff fails to allege facts showing she holds a property interest in her duties as Superintendent, particularly the ability to assign and reassign staff or other duties. *[Order_R.105_PageID_#2992].*  Plaintiff does not directly dispute this conclusion in her Appellant Brief focusing only on the impact her paid leave had on her "continued employment" and thereby waives any argument to the contrary. *[Appellant-Brief, p._#36].* Plaintiff's reliance on *Hopkins*

*v. Canton City Board of Education* is unavailing. 477 F. App'x 349, 363 (6th Cir. 2012). The District Court properly distinguished *Hopkins* on the basis that it involved an action brought against an Ohio school district and board and Ohio law offers different protections to superintendents than Michigan law. *Id.* at 353.

Here, MCL 380.1229(2) provides the School Board "shall prescribe the duties of an individual described in this subsection [including Superintendents and administrators]." The Board outlined Plaintiff's job responsibilities as District Superintendent in her employment contract. *[Pl. Response_R.89-1_PageID_#2674]*. While Plaintiff's contract provides her with authority to "organize, reorganize, or arrange the departments within the School District, including the assignments/reassignments of administrative and supervisory staff," Plaintiff ignores the meaningful limitations placed on this power in the very same provision of the contract. Her contract also states that she "agrees to obey, fulfill, and abide by all the rules, regulations, policies, directives, and decisions of the Board of Education" and that she "shall not contravene the policies or directives of the Board of Education." *[Id.]*. As the District Court properly held, this limitation prevents Plaintiff from having an "absolute entitlement" to assigning and reorganizing staff and there is no Michigan law or statute that prevents the board from imposing this limitation. She holds no property interest in these job responsibilities.

53

### 2. Plaintiff Was Not Deprived of Any Particular Due Process

Even assuming Plaintiff holds a property interest, she still fails to state a claim for due process violations as she has not alleged she was *deprived* of a protected interest. *Prado v. Thomas,* 804 F. App'x 332, 341 (6th Cir. 2020); *Morris v. Metriyakool*, 418 Mich. 423, 451 (1984).

Although this Circuit recently held that "a public employer's decision to pay an employee during a suspension does not create an automatic 'safe harbor' from all due-process scrutiny," Plaintiff ignores this Circuit's ultimate conclusion – "[t]hat said, [a plaintiff] still must show that the suspension deprived her of a state-created property interest." *Blick,* 105 F.4th at 886 (6th Cir. 2024). Similar to the property interest itself, any such deprivation "is defined by the terms of the state document creating the interest." *Kelley v. Shelby Cty. Bd. of Educ.,* 751 F App'x 650, 657 (6th Cir. 2018).[12]

Here, per the terms of Plaintiff's employment contract and at the time Plaintiff was placed on paid leave, the District was not permitted to terminate Plaintiff's contract except for just cause. *[Response-Ex. 2_R.72-3_PageID_#2082, ¶12].* The key word in the contract is "terminate." As the District Court properly determined, a "termination" is distinct from leave. *[Order_R.105_PageID_#2996].* It is not

---

[12] *Hasanaj v. Detroit Pub. Sch. Cmty. Dist.,* 35 F.4th 437, 448 (6th Cir. 2022), *cert denied* 143 S. Ct. 2560 (2023) (Due process under Michigan and US Constitutions is interpreted coextensively).

plausible to infer she was deprived of a property interest in her employment while she continued to earn pay and her other contractual benefits and retained her job title throughout her leave.

The Michigan Court of Appeals' decision in *Mortimer v. Alpena Cty. Prob. Court* is instructive. In *Mortimer,* the court determined that a suspension "does not equate with 'terminated' or 'discharge.'" 2010 WL 2077147 (Mich. App. May 25, 2010 at *3). While the ultimate dispute in *Mortimer* revolved around the applicable statute of limitations to a Whistleblower Protection Act claim, the court needed to determine the date plaintiff was terminated to make this decision, which required the Court to assess whether a suspension is akin to a termination. *Id.* at *2-*3. Here, because Plaintiff was placed on leave, but never terminated, and her contract only prohibited termination without just cause, she has failed to allege any deprivation of a property interest.

Plaintiff mischaracterizes her leave in an attempt to make it seem like she was "functionally terminated" and therefore deprived of a property interest. In her Brief, she describes her leave as "indefinite, isolating, and career-ending," yet failed to plead these circumstances in her Original Complaint. And even if she had, this description of her leave is directly contradicted by Plaintiff's return to work under a more favorable contract. Plaintiff's attempts to distinguish *Mortimer* based on these similar mischaracterizations of her leave are unavailing. The plaintiff in *Mortimer*

55

was placed on an indefinite suspension and the court still found such leave was distinct from her termination. 2010 WL 2077147, at *3.

Plaintiff cites no state law or other binding state document supporting her position that "functional termination" or paid leave constitutes deprivation of a property interest in continued employment or in job responsibilities. Plaintiff's due process claims were properly dismissed.

### 3.     The Individual Defendants Are Entitled to Qualified Immunity Which Also Bars District Liability

The District Court opted not to review Defendants' defense of qualified immunity as it found Plaintiff's federal due process claims were subject to dismissal on other grounds described herein. As this Court reviews Plaintiff's claims *de novo,* Defendants reiterate that Plaintiff must plead facts making out a violation of a constitutional right clearly established in a "particularized sense" to avoid the protections of qualified immunity that government officials enjoy. *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015). (reversing judgment denying defendant's motion to dismiss plaintiff's claim where plaintiff failed to allege facts describing how each defendant's conduct violated a federally protected right under clearly established law). To be considered "clearly established," the law must be 'sufficiently clear" that "all reasonable people would have recognized that their conduct violated the law." *Id.; Blick,* 105 F.4th at 876.

Here, Plaintiff did not analyze qualified immunity. Nor did Plaintiff identify any case law or other authority indicating she held a clearly established right not to be placed on paid administrative leave during the period of her employment contract. *See Blackwell v. Nocerini*, 123 F.4th 479, 491 (6th Cir. 2024) (the test for whether something is clearly established "requires plaintiffs to identify the right with a 'high degree of specificity'"). As such, Plaintiff has failed to establish the existence of a clearly established right and the Individual Defendants are entitled to qualified immunity.[13]

Because Plaintiff has failed to plausibly plead the Individual Defendants violated her constitutional rights, any claim for municipal liability against the District based on an alleged unconstitutional custom or policy, *i.e.* her *Monell* claim, necessarily fails too. *Blick*, 105 F.4th at 884.

## CONCLUSION

Defendants-Appellees respectfully request this Court affirm the District Court's Order Denying Plaintiff's Motion to Amend and affirm the District Court's Order Granting Defendants' Motion to Dismiss, dismissing Plaintiff's Complaint in its entirety with prejudice, and award Defendants-Appellees any other relief this

---

[13] Plaintiff also fails to allege facts plausibly connecting each Individual Defendant to the alleged due process violation. Because Section 1983 does not allow a plaintiff to seek damages from one state actor based on another's constitutional violations, Plaintiff's due process claims fail. *Blackwell*, 123 F.4th at 491.

57

Court deems equitable.

<div style="margin-left: 45%;">

Respectfully submitted,

s/*Anne-Marie V. Welch*
Anne-Marie Vercruysse Welch (P70035)
Stephanie V. Romeo (P83079)
Clark Hill PLC
Attorneys for Defendants-Appellees
220 Park St.-Ste. 200
Birmingham, Michigan 48009
(248) 988-1810
awelch@clarkhill.com
</div>

September 24, 2025                      sromeo@clarkhill.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

### *Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements*

1.      This brief complies with the type-volume limitation of Fed. R.App. P. 32(a)(7)(B) because the brief contains 12,987 words, excluding parts of the brief exempted by Fed. R.App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R.App. P. 32(a)(5) and the type style requirements of Fed. R.App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman style.

Respectfully submitted,

s/*Anne-Marie Vercruysse Welch*
Anne-Marie Vercruysse Welch (P70035)
Stephanie V. Romeo (P83079)
Clark Hill PLC
Attorneys for Defendants-Appellees
220 Park St. Ste. 200
Birmingham, Michigan 48009
(248) 988-1810
awelch@clarkhill.com
sromeo@clarkhill.com

59

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I electronically filed Defendants-Appellees' Brief on Appeal with the Clerk of the Court using the ECF System which will send notification of such filing to all ECF participants of record.

Respectfully submitted,

s/*Anne-Marie Vercruysse Welch*
Anne-Marie Vercruysse Welch (P70035)
Stephanie V. Romeo (P83079)
Clark Hill PLC
Attorneys for Defendants-Appellees
220 Park St. Ste. 200
Birmingham, Michigan 48009
(248) 988-1810
awelch@clarkhill.com
sromeo@clarkhill.com

60

**ADDENDUM – CASE NO. 24-1775**
**Defendants-Appellees' Designation of Relevant District Court Documents**
**[Pursuant to 6 Cir. R. 30(g)(1)]**

| Record Entry# | Date Filed | Description of Document | Page ID # |
|---|---|---|---|
| 1 | 05/23/22 | Complaint | 1-38 |
| 4 | 06/23/22 | Defendant HFT's Motion to Dismiss | 55-196 |
| 10 | 07/13/22 | Plaintiff's Response to Def HFT Motion to Dismiss | 207-228 |
| 12 | 07/20/22 | Defendant HFT's Reply to Response to Motion to Dismiss | 234-243 |
| 15 | 08/15/22 | Plaintiff's Motion to Amend Complaint | 274-374 |
| 18 | 08/23/22 | Defendant HFT's Response to Motion to Amend | 379-390 |
| 19 | 08/26/22 | Defendants HPS' Motion to Dismiss | 495-535 |
| 19-2 | 08/26/22 | Ex.1:  10/11/21 Plaintiff Letter to Hamtramck Community | 539 |
| 19-3 | 08/26/22 | Ex. 2:  10/13/21 Hamtramck BOE Letter to Plaintiff | 541 |
| 19-4 | 08/26/22 | Ex. 3:  01/03/22 HPS Board Trustee Letter to Plaintiff | 543-544 |
| 19-5 | 08/26/22 | Ex. 4:  01/24/22 Hamtramck BOE Letter to Plaintiff | 546 |
| 19-6 – 19-14 | 08/26/22 | Exs. 5-13; Unpublished Decisions | 547-636 |
| 20 | 08/26/22 | Defendants HPS' Response to Plaintiff's Motion to Amend | 637-655 |
| 21 | 08/30/22 | Plaintiff's Reply to Defendants HPS' Response | 703-710 |
| 27 | 09/16/22 | Plaintiff's Response to Defendants HPS' Motion to Dismiss | 813-842 |
| 28 | 09/16/22 | Plaintiff's Reply to Defendants HPS' Response to Motion to Amend | 847-852 |
| 29 | 09/30/22 | Defendants HPS' Reply to Plaintiff's Response to HPS' Motion to Dismiss | 853-863 |
| 30 | 10/06/22 | Mag. Judge's Order Denying Plaintiff's Motion to Amend Complaint | 878-891 |

| Record Entry# | Date Filed | Description of Document | Page ID # |
|---|---|---|---|
| 32 | 10/20/22 | Plaintiff's Motion Objecting to Mag. Judge's Order | 893-913 |
| 33 | 10/27/22 | Defendant HFT's Response to Plaintiff's Motion Objecting Mag. Judge's Order | 914-926 |
| 34 | 11/03/22 | Plaintiff's Reply to HFT's Response to Plaintiff's Motion | 1031-1037 |
| 35 | 11/03/22 | Defendants HPS' Response to Plaintiff's Motion Objecting Mag. Judge's Order | 1038-1052 |
| 36 | 11/11/22 | Plaintiff's Reply to Defendant HPS' Response | 1066-1072 |
| 37 | 11/21/22 | Plaintiff's 2nd Motion to Amend Complaint | 1073-1089 |
| 43 | 12/09/22 | Defendant HFT's Response to Plaintiff's 2nd Motion to Amend | 1252-1273 |
| 44 | 12/13/22 | Defendants HPS' Response to Plaintiff's 2nd Motion to Amend | 1366-1394 |
| 45 | 12/16/22 | Plaintiff's Reply to Defendant HFT's Response to Motion to Amend | 1395-1401 |
| 55 | 03/23/23 | Plaintiff's Amended Complaint | 1437-1488 |
| 56 | 03/24/23 | Plaintiff's Notice of Withdrawal of 2nd Motion to Amend | 1489 |
| 58 | 04/06/23 | Defendants HPS' Motion to Strike Plaintiff's 3rd Amended Complaint | 1493-1522 |
| 61 | 04/26/23 | Plaintiff's Response to Defendants HPS' Motion to Strike | 1669-1689 |
| 62 | 05/03/23 | Defendants HPS' Reply to Plaintiff's Response | 1763-1773 |
| 67 | 11/30/23 | Order granting Defendants HPS' Motion to Strike Plaintiff's 3rd Amended Complaint | 1778-1804 |
| 68 | 12/14/23 | Amended Complaint | 1805-1860 |
| 69 | 12/14/23 | Plaintiff's Motion to Amend | 1861-1886 |
| 71 | 01/11/24 | Defendant HFT's Response to Plaintiff's Motion to Amend | 1889-1917 |
| 72 | 01/12/24 | Defendants HPS' Response to Plaintiff's Motion to Amend | 2037-2069 |
| 72-3 | 01/12/24 | Ex. 2:  2021 Contract | 2080-2083 |
| 73 | 01/29/24 | Plaintiff's Reply to Defendants HPS' Response to Plaintiff's Motion to Amend | 2199-2205 |

| Record Entry# | Date Filed | Description of Document | Page ID # |
|---|---|---|---|
| 74 | 01/29/24 | Plaintiff's Reply to Defendant HFT's Response to Plaintiff's Motion to Amend | 2206-2212 |
| 74-1 | 01/29/24 | Ex. A:  EEOC Charge Documents | 2214-2217 |
| 77 | 02/20/24 | Defendant HFT's Motion to Strike Plaintiff's Reply to Response | 2220-2230 |
| 79 | 03/04/24 | Plaintiff's Response to Defendant HFT's Motion to Strike | 2258-2269 |
| 80 | 03/05/24 | Defendant HFT Reply to Plaintiff's Response to Motion to Strike | 2288-2296 |
| 81 | 03/14/24 | Opinion and Order Denying Defendant HFT's Motion to Strike | 2308-2310 |
| 82 | 03/25/24 | Order Denying Plaintiff's Motion for Leave to file an Amended Complaint | 2311-2345 |
| 84 | 04/11/24 | Order – Scheduling Conference | 2347-2348 |
| 87 | 04/17/24 | Defendant HFT's Motion to Dismiss | 2355-2380 |
| 88 | 04/17/24 | Defendants HPS' Motion to Dismiss | 2435-2475 |
| 88-2 | 04/17/24 | Ex.1:  10/11/21 Plaintiff Letter to Hamtramck Community | 2478 |
| 88-3 | 04/17/24 | Ex. 2:  10/13/21 Hamtramck BOE Letter to Plaintiff | 2480 |
| 88-4 | 04/17/24 | Ex. 3:  01/03/22 HPS Board Trustee Letter to Plaintiff | 2482-2483 |
| 88-5 | 04/17/24 | Ex. 4:  01/24/22 Hamtramck BOE Letter to Plaintiff | 2485 |
| 88-6 | 04/17/24 | Ex. 5:  Plaintiff's EEOC Charge | 2487-2489 |
| 88-7 | 04/17/24 | Ex. 6:  Unpublished Decisions | 2491-2617 |
| 89 | 05/01/24 | Plaintiff's Response to Defendants HPS' Motion to Dismiss | 2618-2646 |
| 89-1 | 05/01/24 | Ex. A:  Ahmed Affidavit | 2648-2682 |
| 90 | 05/01/24 | Plaintiff's Response to Defendant HFT's Motion to Dismiss | 2708-2717 |
| 92 | 05/07/24 | Defendant HFT's Reply to Plaintiff's Response to HFT Motion to Dismiss | 2739-2749 |
| 93 | 05/08/24 | Defendants HPS' Motion to Strike Plaintiff's Ex. A [ECF 89-1] in Response to HPS Motion to Dismiss | 2777-2789 |

63

| Record Entry# | Date Filed | Description of Document | Page ID # |
|---|---|---|---|
| 94 | 05/08/24 | Defendants HPS' Reply to Plaintiff's Response to HPS Motion to Dismiss | 2837-2847 |
| 95 | 05/21/24 | Plaintiff's Response to Defendants HPS' Motion to Strike Plaintiff's Ex. A [ECF 89-1] | 2882-2891 |
| 99 | 06/12/24 | Defendants HPS' Reply to Plaintiff's Response to HPS Motion to Dismiss | 2898-2906 |
| 103 | 07/29/24 | Order Granting Defendant HFT's Motion to Dismiss | 2931-2960 |
| 105 | 08/26/24 | Order Granting Defendants HPS' Motion to Dismiss and Denying the Motion to Strike as Moot | 2963-2997 |
| 106 | 08/26/24 | Judgment | 2998 |
| 108 | 09/10/24 | Notice of Appeal | 3001-3002 |

# ADDENDUM

# UNPUBLISHED

# DECISIONS

Case: 24-1775　　Document: 47　　Filed: 09/24/2025　　Page: 77

Al -Janabi v. Wayne State University, Not Reported in Fed. Rptr. (2021)
2021 WL 8264677

2021 WL 8264677
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Wissam AL-JANABI, Plaintiff-Appellant,
v.
WAYNE STATE UNIVERSITY, Defendant-Appellee.

No. 21-1399
|
FILED December 15, 2021

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

Wissam Al-Janabi, Clinton Township, MI, Pro Se.

Kristen L. Cook, Wayne State University, Detroit, MI, for
Defendant-Appellee.

Before: MOORE, GILMAN, and KETHLEDGE, Circuit
Judges.

ORDER

**\*1** Wissam Al-Janabi, proceeding pro se, appeals the district
court's dismissal of his lawsuit pursuant to Rules 12(b)(1) and
12(b)(6) of the Federal Rules of Civil Procedure. This case has
been referred to a panel of the court that, upon examination,
unanimously agrees that oral argument is not needed. *See* Fed.
R. App. P. 34(a).

Al-Janabi is a former graduate student who pursued a Master
of Public Health degree at the Wayne State University School
of Medicine ("Wayne State") for seven years. According
to Al-Janabi, he received a failing grade on a project that
was assigned to him "by the course director herself without
mutual agreement or discussion." He claimed that, unlike
his colleagues' projects, his project did not conform to the
requirements of his degree, was "extremely vague," "lack[ed]
the essential biostatistical features," and was "based on three
academic papers that each ... [had] a different outcome and
[could not] be compared." He also claimed that his project
advisor was not a biostatistician, and that his twenty-five-
page project paper was graded by a non-independent reader
less than an hour after its submission. Al-Janabi alleged
that the program director refused to provide a reasonable

accommodation for his "vision loss" and an unidentified
"health issue" and that the program director forged documents
post hoc to explain the basis for his failing grade. He further
alleged that when he protested his grade, he was charged with
non-academic misconduct and was not given an opportunity
to defend himself. Lastly, Al-Janabi alleged that Wayne State
"held [his] records hostage for about two weeks."

In September 2020, Al-Janabi filed suit against Wayne State,
alleging violations of the First Amendment to the United
States Constitution; the Equal Educational Opportunities Act
("EEOA"), 20 U.S.C. § 1701, et seq.; the Americans with
Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et
seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.
§ 794; Titles IV and VI to the Civil Rights Acts of 1964,
42 U.S.C. §§ 2000c-6 and 2000d, et seq.; and the Family
Educational Rights and Privacy Act ("FERPA"), 20 U.S.C.
§ 1232g. He also asserted a state-law claim for breach of
contract. He sought $2 million in damages. On Wayne State's
motion, the district court dismissed Al-Janabi's complaint for
lack of subject-matter jurisdiction and for failure to state a
claim under Rules 12(b)(1) and 12(b)(6), respectively.

On appeal, Al-Janabi challenges the district court's dismissal
of his complaint.

The district court concluded that the doctrine of Eleventh
Amendment immunity constituted a jurisdictional bar to
considering Al-Janabi's First Amendment and breach-of-
contract claims, and it therefore dismissed those claims
pursuant to Rule 12(b)(1). *See Russell v. Lundergan-Grimes,*
784 F.3d 1037, 1046 (6th Cir. 2015) ("Eleventh Amendment
issues are jurisdictional in nature."). We review de novo a
district court's order dismissing a complaint under Rule 12(b)
(1) "except that, like the district court, we do not presume
the truth of factual allegations pertaining to our jurisdiction
to hear the case, and the plaintiff still bears the burden of
demonstrating jurisdiction." *Id.* at 1045.

**\*2** The district court properly dismissed Al-Janabi's
constitutional and state-law claims under Rule 12(b)(1).
"[A]bsent waiver by the State or valid congressional override,
the Eleventh Amendment bars a damages action against a
State in federal court." *Kentucky v. Graham,* 473 U.S. 159,
169 (1985). It is well established that 42 U.S.C. § 1983, the
statutory provision creating a private right of action for civil-
rights claims, did not abrogate the Eleventh Amendment's
grant of sovereign immunity. *See Harrison v. Michigan,* 722
F.3d 768, 771 (6th Cir. 2013). Moreover, under the Eleventh

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 78

Al -Janabi v. Wayne State University, Not Reported in Fed. Rptr. (2021)
2021 WL 8264677

Amendment, "the States' constitutional immunity from suit prohibits *all* state-law claims filed against a State in federal court." *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005). Because Wayne State qualifies as an arm of the state of Michigan, *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015), and because Michigan has not waived its Eleventh Amendment protection, *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986), Wayne State "is an institution to which the doctrine of sovereign immunity applies," *Long v. Richardson*, 525 F.2d 74, 79 (6th Cir. 1975). Al-Janabi's First Amendment and breach-of-contract claims are therefore barred.

Moreover, to the extent that Al-Janabi's complaint can be construed as asserting due-process and equal-protection claims under the Fourteenth Amendment, such claims are likewise barred. *See Harrison*, 722 F.3d at 771. And to the extent that Al-Janabi brought his ADA claim under Title I of that statute, Wayne State was entitled to Eleventh Amendment immunity on that claim as well. *See Whitfield v. Tennessee*, 639 F.3d 253, 257 (6th Cir. 2011) (citing *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001)); *see also Murphy v. Nat'l City Bank*, 560 F.3d 530, 535 (6th Cir. 2009) (holding that we may affirm on any basis supported by the record).

The district court dismissed Al-Janabi's remaining claims pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted, a decision that we review de novo. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793 (6th Cir. 2016). In scrutinizing a complaint under Rule 12(b)(6), this court is required to "accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007) (quoting *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002)). A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). As a pro se litigant, Al-Janabi is entitled to a liberal construction of his pleadings. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).

The district court properly dismissed the balance of Al-Janabi's claims under Rule 12(b)(6). First, to the extent that Al-Janabi brought his ADA claim under Title II of that statute, he needed to show that (1) he has a disability; (2) he was otherwise qualified to participate in a public program; and (3) he was excluded from participation in the program or discriminated against by a public entity because of his disability. 42 U.S.C. § 12132; *see Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). Section 504 of the Rehabilitation Act requires the same showing, except that the discrimination must be "solely" because of the disability. 29 U.S.C. § 794; *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-53 (6th Cir. 2008). The ADA and the Rehabilitation Act both define a "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1)(A). Al-Janabi alleged only that he asked his program director to extend his project's deadline "and consider [his] vision loss and [his] known health issue to her from [his] prior emails, but she never agreed." Besides neglecting to identify one of his disabilities, Al-Janabi did not allege that his impairments substantially limit a major life activity. He therefore failed to state a disability claim under either Title II of the ADA or § 504 of the Rehabilitation Act. *See Fritz v. Michigan*, 747 F. App'x 402, 405 (6th Cir. 2018).

**\*3** Moreover, Al-Janabi failed to state a claim under the EEOA because he failed to plead facts showing that the State of Michigan denied him an "equal educational opportunity" "on account of his race, color, sex, or national origin." 20 U.S.C. § 1703. Al-Janabi's failure to plead facts plausibly suggesting either that he was intentionally discriminated against on account of his race, color, or national origin, or that Wayne State is a racially segregated institution, necessarily defeats his claims under Titles IV and VI. *See* 42 U.S.C. §§ 2000c-8, 2000c-9, 2000d; *see also Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). Finally, as the district court correctly determined, Al-Janabi failed to state a claim under the FERPA because that statute does not provide for a private cause of action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002).

Accordingly, we **AFFIRM** the district court's judgment.

**All Citations**

Not Reported in Fed. Rptr., 2021 WL 8264677

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 79

Akno 1010 Market Street St. Louis Missouri LLC v. Pourtaghi, Not Reported in Fed....

2019 WL 3943042
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

AKNO 1010 MARKET STREET **ST**.
**LOUIS** MISSOURI LLC, Plaintiff,
v.
Nahid **POURTAGHI**, Defendant.

2:18-cv-13498
|
Signed 08/21/2019

**Attorneys and Law Firms**

John A. Hubbard, Eric A. Parzianello, Hubbard Snitchler & Parzianello PLC, Plymouth, MI, for Plaintiff.

Adam Garrett Winnie, Brooke Booth, Scott T. Seabolt, Seabolt Law Firm, Livonia, MI, for Defendant.

**ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS**

TERRENCE G. BERG, UNITED STATES DISTRICT JUDGE

**\*1** Defendant Nahid Pourtaghi has moved to dismiss certain claims for fraud and embezzlement brought by Plaintiff Akno 1010 Market Street, St. Louis, Missouri, LLC's ("Akno"). Pourtaghi asserts, first, that Akno's fraud claim was not pled with the particularly required by Rule 9(b) of the Federal Rules of Civil Procedure and, second, that the company's embezzlement claim must be dismissed in accordance with Rule 12(b)(6) because, under Michigan law, claims for embezzlement are subsumed by those for statutory conversion. The Court agrees and will grant Defendant's motion to dismiss without prejudice.

**BACKGROUND**

Plaintiff Akno 1010 Market Street, St. Louis, Missouri, LLC ("Akno") is a limited-liability company doing business in Wayne County, Michigan. ECF No. 1 PageID.2 (Compl.). Defendant Nahid Pourtaghi was formerly designated as an agent of Akno. ECF No. 1 PageID.3. In her capacity as an

agent, Defendant was granted signatory authority for Akno's bank account. ECF No. 1 PageID.3. According to Akno, Defendant understood that her access to that account was authorized for corporate purposes only. ECF No. 1 PageID.3. But Akno claims to have later discovered that Defendant had removed $240,000 from the company's account and transferred it to a bank in Canada without Akno's knowledge or permission. ECF No. 1 PageID.3. Akno alleges only that Defendant made an unauthorized transfer "to a bank account in Canada" and that she did so "to her own benefit." ECF No. 1 PageID.3–4. The Complaint does not say whether the Canadian account belonged to Defendant or to anyone operating on her behalf. Upon learning of the unauthorized transfer, in August 2017 Akno revoked Defendant's access to the bank account and notified her that she was no longer an agent of the company. ECF No. 1 PageID.3. Akno further suggests that Defendant may have transferred additional funds from its bank account without authorization but provides no details. ECF No. 1 PageID.3. After Defendant failed to return the funds, Akno filed the instant litigation on November 9, 2018 asserting claims for statutory conversion in violation of Mich. Comp. Laws § 600.2919(a), fraud, breach of fiduciary duty, embezzlement, and unjust enrichment. *See generally* ECF No. 1.

**DISCUSSION**

Defendant contends that Akno's claim for fraud under Michigan law fails to meet the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure because it lacks sufficient detail. This position is well-taken because Akno's Complaint contains no facts as to *when* Defendant made the alleged misrepresentations or unauthorized transfers of company funds, and no details concerning the nature of the misrepresentations. Consequently, the Court will grant this portion of Defendant's motion and dismiss Akno's claim for fraud without prejudice. [1]

**\*2** Under Michigan law, the elements of fraud are: (1) the defendant made a material misrepresentation; (2) that was false; (3) defendant made the misrepresentation knowing it was false, or made it recklessly, without any knowledge of its truth, and as a positive statement; (4) she made it with the intention that it should be acted upon by plaintiff; (5) plaintiff indeed relied upon it; and (6) plaintiff thereby suffered injury. *Harbor Thirteen Mile-20600 LLC v. Emp. Ret. Plan of Consol. Elec. Distrib., Inc.*, No. 15-14066, 2016 WL 1665158, \*2 (E.D. Mich. Apr. 27, 2016) (citing *Hi-Way*

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 80

Akno 1010 Market Street St. Louis Missouri LLC v. Pourtaghi, Not Reported in Fed....

*Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976)). Even where a plaintiff alleges fraud in violation of state law only, Rule 9(b)'s particularity requirement applies if the claims are asserted in federal court. *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, No. 13-13804, 2015 WL 3541905, at *3 (E.D. Mich. Apr. 30, 2015).

The Rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Courts have interpreted this language to mean that a claim for fraud typically meets Rule 9(b)'s requirements if it alleges: "(1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1003 (E.D. Mich. 2017) (internal quotations omitted) (quoting *Wall v. Mich. Rental.* 952 F.3d 492, 496 (6th Cir. 2017)). At a minimum, to meet Rule 9(b)'s particularity pleading requirements the Sixth Circuit requires that a plaintiff "must allege the time, place and contents of the misrepresentations upon which they relied." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (citing *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984)). Another court in this district, for example, dismissed a claim for fraud where the plaintiff identified the time and place of the alleged misrepresentations, but not their "specific content." *S.E.C. v. Conaway*, No. 2:05-CV-40263, 2009 WL 1606655, *2 (E.D. Mich. June 8, 2009).

Here, Akno alleges generally that, while in the Eastern District of Michigan, Defendant, an agent of Akno's with signatory authority on the company's bank account, "transferred $240,000 to a bank account in Canada that was not authorized by Plaintiff." ECF No. 1 PageID.2–3. Akno further asserts that "Defendant improperly transferred additional funds from [Akno's] Account" and that she knowingly "made [false] representations of fact to [Akno] that she would not use [Akno] Account funds for her personal use." ECF No. 1 PageID.3, 5. Nowhere in the Complaint does Akno allege *where* or *when* Defendant made these alleged misrepresentations, nor does Plaintiff specify when the funds were improperly transferred, or to whom. ECF No. 1 PageID.3. Further, the Complaint fails to specify whether these alleged unauthorized transactions took place over a period of time, or all on the same date. The only general time referenced in the Complaint is Akno's revocation of

Defendant's status as the company's agent, which occurred in August 2017. ECF No. 1 PageID.3.

Likewise, the Complaint fails to provide any detail about the contents or context of Defendant's alleged misrepresentations. The Sixth Circuit has instructed that, to satisfy Rule 9(b), a plaintiff must "specify the statements that the plaintiff contends were fraudulent" and "state where and when the statements were made" as well as "explain why the statements were fraudulent." *Bowlers' Alley, Inc.*, 2015 WL 3541905 at *3. The only facts about the alleged misrepresentation described in the Complaint are that Defendant said "she would not use 1010 Account funds for her personal use." ECF No. 1. PageID.5. No information is provided about the context of this statement, including when or where Defendant made it. Likewise, the Complaint contains no allegations about what specifically Defendant said, or to whom at Akno she addressed such fraudulent statements. Because the Complaint does not specify the time or place of the alleged misrepresentations or the unauthorized transfers and provides only spare allegations about content of Defendant's claimed misrepresentations, it falls short of Rule 9(b)'s particularity requirements.

**\*3** Additionally, as pointed out by Akno, under Michigan law "an action for fraud must be predicated upon a false statement relating to a past or existing fact; promises regarding the future are contractual and do not support a claim for fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (citing *Hi-Way Motor Co.*, 247 N.W.2d at 815). Again, the only misrepresentation described in the Complaint is that Defendant said that "she would not use 1010 Account funds for her personal use." ECF No. 1. PageID.5. And, as explained by another court in this district, "fraud [under Michigan law] cannot be predicated upon statements promissory in their nature and relating to future actions, nor upon the mere failure to perform a promise." *Bye v. Nationwide Mut. Ins. Co.*, 733 F. Supp. 2d 805, 820 (E.D. Mich. 2010). Defendant's alleged misrepresentation is indeed a statement about a promised future action or omission. Michigan courts, however, have carved out a bad-faith exception to this prohibition on promissory statements serving as the basis for fraud liability. Under the exception, a claim for "fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Travis v. ADT Sec. Services, Inc.*, 884 F. Supp. 2d 629, 640 (E.D. Mich. 2012) (quoting *Hi-Way Motor Co.*, 247 N.W.2d at 816). Akno, in its Complaint, asserted that "Defendant knew that the representations made to Plaintiff were false

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 81

Akno 1010 Market Street St. Louis Missouri LLC v. Pourtaghi, Not Reported in Fed....

when they were made." ECF No. 1 PageID.5. Because the absence of any timeline of Defendant's actions, as well as the dearth of information about the contents of her alleged misrepresentations, are themselves sufficient bases for the Court to find noncompliance with Rule 9(b), the Court at this time need not decide whether Akno's allegations, in their current form, pass muster under the bad-faith exception. Regardless, more detailed allegations would be helpful both to provide proper notice to the Defendant, and to flesh out the Court's understanding of Akno's fraud claim.

Defendant next moves to dismiss Akno's claim for embezzlement under Michigan law on the basis that it is duplicative of, and necessarily subsumed by, Akno's claim for statutory conversion under Mich. Comp. Laws § 600.2919a. Because Akno's potential remedy for embezzlement is rooted in the state's civil remedy for statutory conversion, the Court will dismiss the embezzlement claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Consideration of a motion to dismiss under Rule 12(b)(6) is confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). In evaluating a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true and determine whether the plaintiff undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)). Though this standard is liberal, it requires a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" in support of her grounds for entitlement to relief. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under *Ashcroft v. Iqbal*, the plaintiff must also plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. 662, 678 (2009) (citation omitted). A plaintiff falls short if she pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Albrecht*, 617 F.3d at 893 (quoting *Iqbal*, 556 U.S. at 678–679).

In Michigan, "[e]mbezzlement is a statutory offense, not an offense at common law." *Cabala v. Allen*, No. 305250,

2012 WL 4465164, *2 (Mich. Ct. App. Sep. 27, 2012) (citing *People v. Bergman*, 224 N.W. 375 (Mich. 1929)). The Michigan Court of Appeals, in *Cabala v. Allen*, explained that the plain language of Michigan's embezzlement statute, Mich. Comp. Laws § 750.174(1), "contains no indication that a civil remedy is available for violation of [the statute]." 2012 WL 4465164 at *2. Instead, the state legislature provided a method of recovery for civil embezzlement "cloaked in the conversion statute," Mich. Comp. Laws § 600.2919a. Because the remedy for a state-law embezzlement claim is the same as that for a conversion claim asserted under Mich. Comp. Laws § 600.2919a, "[u]nder Michigan law, the tort of conversion encompasses the tort of embezzlement." *In re B & P Baird Holdings, Inc.*, 591 F. App'x 434, 439 (6th Cir. 2015).

**\*4** Akno's reliance on *Aroma Wines & Equip., Inc. v. Columbian Distrib. Serv., Inc.* is inapposite. 871 N.W.2d 136 (Mich. 2015). In that 2015 case, the Michigan Supreme Court indeed held that "[a]lthough its language is rooted in common-law conversion, the tort [of statutory conversion] established in MCL 600.2919a(1) is not the same as common-law conversion." *Id.* at 149. Though it could be that Akno's claim for embezzlement would not be subsumed by a claim for *common-law* conversion under Michigan law, as opposed to *statutory* conversion, the Complaint plainly asserts a claim for statutory conversion, not common-law conversion. ECF No. 1 PageID.4 (labelling Count I of the Complaint "Statutory Conversion" and specifically referencing Mich. Comp. Laws § 600.2919a, the statutory conversion law). Because, under Michigan law, embezzlement claims are subsumed by those for statutory conversion, Akno's embezzlement claim will be dismissed.

## CONCLUSION

For these reasons, Defendant Nahid Pourtaghi's Motion to Dismiss Counts II and IV of Plaintiff's Complaint is **GRANTED**. Those claims will be dismissed without prejudice. If Plaintiff Akno 1010 Market Street St. Louis Missouri, LLC wishes to amend its Complaint, it must seek leave of the Court to do so within 30 days.

## All Citations

Not Reported in Fed. Supp., 2019 WL 3943042

## Footnotes

1   The Court will not consider the Affidavit of Nahid Pourtaghi, attached as an exhibit to Akno's response to Defendant's motion to dismiss, because neither party referenced the affidavit in its pleadings. ECF No. 9-1. *Cf. Weiner v. Klais and Co.,* 108 F.3d 86, 89 (6th Cir. 1997) (explaining that, in deciding a Rule 12(b)(6) motion, courts may consider documents attached to a complaint or to the defendant's motion "if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim.").

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 83

**Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)**
2023 WL 8025818

2023 WL 8025818
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

GALAXY FOODS LLC, Plaintiff,

v.

ARYZ TRADING LLC, Defendant.

Case No. 23-cv-11476
|
Signed November 20, 2023

**Attorneys and Law Firms**

Rima H. Elzein, Law Offices of Rima K. Elzein PC, Dearborn, MI, for Plaintiff.

Hattem A. Beydoun, EPIC Law PLLC, Detroit, MI, for Defendant.

**OPINION AND ORDER DENYING DEFENDANT ARYZ TRADING LLC'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) (ECF NO. 11)**

Paul D. Borman, United States District Judge

**\*1** This is an action asserting trademark infringement and unfair competition under federal and state law arising out of Defendant Aryz Trading LLC's alleged unauthorized importing, distributing, and selling of Klatchi Nut products in violation of Plaintiff Galaxy Foods LLC's federally registered trademarks for "Klatchi Nuts."

Now before the Court is Defendant Aryz Trading LLC's Motion to Dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 11). The motion has been fully briefed. The Court does not believe that oral argument will aid in its disposition of this motion; therefore, it is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

For the reasons discussed below, the Court denies Defendant's Motion to Dismiss.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Relevant Facts

For the purposes of a motion to dismiss, the Court takes the factual allegations in Plaintiff's Amended Complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

According to Plaintiff's Amended Complaint, Plaintiff Galaxy Foods LLC is a wholesale food company that imports special food products into the United States and distributes them to its customers. (ECF No. 3, First Amended Compl. (FAC) ¶ 1.) Plaintiff owns the trademarks for "Klatchi Nuts" in the United States, USPTO Registration Numbers 5943338 and 5959407. (*Id.* ¶ 2, citing Trademark Registrations at Ex. A, PageID.31-32.)

Plaintiff alleges that Defendant Aryz Trading LLC has been intentionally and illegally importing, distributing, and selling Klatchi nut products in the United States and in violation of Plaintiff's trademarks. (*Id.* ¶ 4, citing https:// aryzwholesale.com/ and https://aryzwholesale.com/search? q=klatchi% 20 at Ex. B, PageID.34-35.)

On May 17, 2023, Plaintiff sent Defendant a cease and desist letter. (*Id.* ¶ 5, citing 5/17/2023 Letter at Ex. C, PageID.37-38.) In the letter, Plaintiff informs Defendant that Plaintiff owns the trademarks for "Klatchi Nuts" in the United States, USPTO Registration Numbers 5943338 and 5959407, and that Defendant "ha[s] been intentionally and illegally importing and distributing Klatchi nut products into the US and in violation of [Plaintiff's] intellectual property, i.e., trademarks." (*Id.* PageID.37-38.) Plaintiff states that Defendant's "unauthorized and intentional interference of [Plaintiff's] trademarks and its business relationships constitutes unfair competition,[ ] gives rise to civil claims in tort," and "constitutes trademark infringement, false designation of origin and unfair competition." (*Id.*) Plaintiff demands, among other things, that Defendant cease and desist its illegal importation, sale, and distribution of Klatchi Nuts in the United States and that Defendant agree to never register for any mark containing Klatchi Nuts and provide an accounting of all revenues generated as a result of sales of products containing Klatchi Nuts. (*Id.*)

Defendant did not respond to the cease and desist letter and did not stop importing, distributing, and selling Klatchi Nut products in the United States. (ECF No. 3, FAC ¶¶ 6, 18.)

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 84

Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)
2023 WL 8025818

### B. Procedural History

**\*2** On June 21, 2023, Plaintiff Galaxy Foods LLC filed its original Complaint against Defendant Aryz Trading LLC. (ECF No. 1, Compl.) On June 22, 2023, the Court struck that Complaint because the type size used did not comply with E.D. Mich. LR 5.1(a)(3). (ECF No. 2.)

On June 27, 2023, Plaintiff filed its Amended Complaint against Defendant. (ECF No. 3, FAC.) Plaintiff asserts three claims: (1) Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114; (2) False Designation of Origin under the Lanham Act, 15 U.S.C. § 1125(a); and (3) Common law Trademark Infringement and Unfair Competition under Michigan law. (*Id.*)

On August 25, 2023, Defendant filed its Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 11, Def. Mot.) Defendant contends that the manufacturer and owner of the "Klatchi Nuts" mark is a company located in Lebanon called Universal Need, and that Defendant and Plaintiff both purchase and distribute the exact same goods from that manufacturer. Defendant argues that Plaintiff's claims fail because Plaintiff merely imports and distributes Klatchi Nuts and has no ownership or right to the "Klatchi Nuts" mark, and that Plaintiff's registration of the mark is at odds with its actual ownership.

On September 7, 2023, Plaintiff filed a Response in opposition to Defendant's Motion to Dismiss. (ECF No. 15, Pl. Resp.) Plaintiff contends that it is the legitimate owner of the Klatchi Nuts mark, relying on a signed, but not notarized, "affidavit" of Tarek Abou-Harb, the "owner of Galaxy Foods LLC." (*Id.* citing Abou-Harb Aff. at PageID.93-95.) Abou-Harb avers that he came up with the name for Klatchi nuts in 2015 and that he contacted a "facilitator in Lebanon" named Ammar Richani, to find a local factory to package the Klatchi Nuts products. (ECF No. 15, Abou-Harb Aff., PageID.93-95.) Over the next three years, Richani first used a factory called Al Amira in Koura, Lebanon to pack Klatchi canned nuts, and then used another unnamed factory after that. (*Id.*) Abou-Harb then stopped working with Richani, and in June 2019 Abou-Harb applied to trademark Klatchi Nuts and the Klatchi Nuts logo in the United States, which marks were registered in December 2019. (*Id.*) Abou-Harb states that he is currently investing money into marketing, producing, and expanding the Klatchi Nut products in factories in Turkey, but that he believes a company in Lebanon called Universal Need is

producing nut products and labelling them Klatchi Nuts and selling them to importers in the United States. (*Id.*)

Defendant filed a Reply brief in support of its Motion to Dismiss on September 21, 2023. (ECF No. 18, Def. Reply.) Defendant contends that the Abou-Harb statement attached to Plaintiff's Response should be stricken because it is missing a proper assertion under penalty of perjury and is undated, and thus fails to comply with the requirements of a declaration under 28 U.S.C. § 1746. Defendant also argues that, on a motion to dismiss under Rule 12(b)(6), the Court cannot consider matters extraneous to the pleadings, such as the Abou-Harb statement. Finally, Defendant contends that the Abou-Harb Statement, even if considered, reinforces Defendant's argument that Plaintiff is not the owner of the Klatchi mark because the Statement indicates that manufacturers are no longer producing Klatchi nuts.

**\*3** On September 25, 2023, Plaintiff filed a Second Affidavit of Tarek Abou-Harb. (ECF No. 19, Second Aff. of Tarek Abou-Harb.) This Second Affidavit is mostly similar to the affidavit attached in support of Plaintiff's Response brief, but also "swear[s] under oath that the statements in this affidavit contain the truth, the whole truth and nothing but the truth," and that Plaintiff "ha[s] continuously used the Klatchi nuts [mark] in commerce since 2016." (*Id.*) The Second Affidavit is dated September 25, 2023, signed by Tarek Abou-Harb, and that signature is notarized. (*Id.*)

### II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.' " *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). The court "need not accept as true a legal conclusion couched

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 85

Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8025818

as a factual allegation, or an unwarranted factual inference." *Id.* at 539 (internal citations and quotation marks omitted); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). In other words, a plaintiff must provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56, 127 S.Ct. 1955; *see also Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) ("To survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). It is the defendant who "has the burden of showing that the plaintiff has failed to state a claim for relief." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

In ruling on a motion to dismiss, the Court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings .... [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings).

### III. ANALYSIS

**A. The Court Will Not Consider Additional Documents That Are Not Attached To The Pleadings**

**\*4** Plaintiff attached an undated, unnotarized "affidavit" to his Response brief, and then subsequently separately filed a signed, dated, and notarized Second Affidavit. (ECF No. 15, Abou-Harb Aff., PageID.93-95) (ECF No. 19, Abou-Harb Second Aff., PageID.105-08.) Defendant argues that the Court is not permitted to consider matters outside the pleadings, like these affidavits, when considering a Rule 12(b)(6) motion.

Defendant is correct. When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must not consider matters outside of the pleadings. *Excel Homes, Inc. v. Locricchio*, 7 F. Supp. 3d 706, 710 (E.D. Mich. 2014). In addition, "a plaintiff may not amend his complaint by adding factual allegations as a part of a response in opposition to a motion to dismiss." *Becton v. Corrections Corp. of Am.*, No. 3:16-2282, 2017 WL 1461632, at \*2 (M.D. Tenn. Mar. 28, 2017), *report and recommendation adopted by* 2017 WL 1450604 (M.D. Tenn. Apr. 24, 2017); *see also Sango v. Johnson*, No. 13-12808, 2014 WL 8186701, at \*8 (E.D. Mich. Oct. 29, 2014) ("[I]t is axiomatic that a plaintiff may not amend his complaint through allegations made in a response to a motion to dismiss.") (citing *Jocham v. Tuscola Cnty.*, 239 F. Supp. 2d 714, 732 (E.D. Mich. 2003)), *report and recommendation adopted by* 2015 WL 1245969 (E.D. Mich. Mar. 18, 2015). This means that a plaintiff "may not attempt to amend [its] complaint through a response to a motion to dismiss, and affidavits attached to briefs may not properly be considered at the motion to dismiss stage." *Cole v. Mauldin*, No. 14-11325, 2015 WL 806908, at \*6 (E.D. Mich. Feb. 26, 2015) (citing *Jocham*, 239 F. Supp. 2d at 731); *see also Rudd v. City of Norton Shores*, No. 18-CV-124, 2018 WL 3751399, at \*4 (W.D. Mich. Aug. 8, 2018) (refusing to consider an affidavit filed in support of a Rule 12(b)(6) motion despite movant's argument that "a court may consider an affidavit that merely 'clarifies' facts alleged in a complaint" because doing so "would obliterate the distinction between a Rule 12(b)(6) motion to dismiss and a Rule 56 motion for summary judgment."), *aff'd in part, rev'd in part and remanded on other grounds*, 977 F.3d 503 (6th Cir. 2020).[1]

---

[1] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The Court declines to consider the extraneous documents and, therefore, need not convert the present motion to dismiss to a

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 86

**Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)**
2023 WL 8025818

motion for summary judgment pursuant to Fed. R. Civ. P. 56.

Plaintiff fails to cite any authority which would allow this Court to consider either of the Abou-Harb affidavits at this stage of the litigation. Thus, the Court will not consider either Abou-Harb's original undated, unnotarized "affidavit" included with his Response brief or his subsequently filed Second affidavit. *See Excel Homes*, 7 F. Supp. 3d at 710. Plaintiff's arguments in its Response brief rest entirely on the inadmissible assertions in Abou-Harb's "affidavit," and thus that Response is in effect is a non-response to Defendant's Motion to Dismiss.

However, even treating Defendant's Motion to Dismiss as essentially unopposed, the Court must still address the merits of Defendant's motion and will not grant the motion solely because it is unopposed. *See Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991) (holding that, instead of granting an unopposed motion to dismiss simply because it is unopposed, the court must determine whether the movant has discharged its burden); *see also Green v. City of Southfield, Michigan*, 759 F. App'x 410, 417 (6th Cir. 2018) (stating "*Carver* simply instructs that where the adverse party has not responded to a motion to dismiss, the district court must consider the evidence presented and make a determination accordingly.").

**\*5** Accordingly, the Court will next consider whether Defendant has met its "burden of showing that the plaintiff has failed to state a claim for relief." *See Wesley*, 779 F.3d at 428.

### B. Whether Plaintiff's Amended Complaint States a Claim for Trademark Infringement, 15 U.S.C. § 1114(1)(a) (Count I)

Section 1114(1) of the Lanham Act imposes liability on any entity that "use[s] in commerce any ... colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). A trademark is "any word, name, symbol, or device, or any combination thereof ... [used] to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. "To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used

the mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

Defendant first argues that Plaintiff fails to state a claim for trademark infringement because it claims that "Plaintiff has no ownership or rights to the 'Klatchi Nuts' mark" and that Plaintiff instead "merely imports and distributes Klatchi Nuts." (ECF No. 11, Def. Mot., PageID.65-67.) Defendant further contends that because the Amended Complaint does not allege that the Klatchi Nuts Defendant imports and sells are counterfeit, there cannot be consumer confusion because customers are getting exactly what they bargained for – Klatchi Nuts. (*Id.* at PageID.67-68.)

The Court will address each of those arguments in turn.

### 1. Ownership and use

Defendant first argues that, contrary to Plaintiff's assertion in its Amended Complaint that it is the owner of the marks at issue, Plaintiff "merely imports and distributes Klatchi Nuts" and that the "manufacturer [of Klatchi Nuts] in Lebanon, Universal Need, applied their mark ("Klatchi Nuts") to the packaging of the nuts that they manufacture and process, thereby controlling the nature and quality of their goods." (ECF No. 11, Def. Mot., PageID.67.) The Court finds Defendant's arguments about the validity of Plaintiff's trademark registrations and ownership of the subject mark unpersuasive at this stage of the litigation for the following reasons.

First, Defendant's assertion in its Motion that the alleged manufacturer of Klatchi Nuts is a company called Universal Need located in Lebanon, besides being wholly unsupported, is new evidence, not contained in Plaintiff's Amended Complaint and thus not properly before the Court on a motion to dismiss. "[I]t is black-letter law that, with a few ... exceptions, a court evaluating a motion for judgment on the pleadings (or a motion to dismiss) must focus only on the allegations in the pleadings." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). As discussed above, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay*, 695 F.3d at 538. A motion to dismiss is not the proper place for presenting new evidence, and unless Defendant points to evidence in the pleadings or in other

Case: 24-1775　　Document: 47　　Filed: 09/24/2025　　Page: 87

**Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)**
2023 WL 8025818

sources that the Court can consider at this stage, that new evidence cannot be considered by the Court. Defendant fails to make such a showing.

**\*6** Second, under the Lanham Act, registration of a trademark is prima facie evidence of the mark's validity and the registrant's ownership and exclusive right to the mark. 15 U.S.C. § 1115(a); *Iancu v. Brunetti*, 588 U.S. ——, 139 S. Ct. 2294, 2297, 204 L.Ed.2d 714 (2019); *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001). Further, selling an item that displays a trademark constitutes use of that mark in commerce. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381 (6th Cir. 2006) ("[W]e can think of no clearer 'use' of goods 'in commerce' than offering them for sale.").

Plaintiff here expressly alleges in its Amended Complaint that it is the owner of the "Klatchi Nuts" trademark, and it attaches as an Exhibit to that Amended Complaint copies of its USPTO Trademark Registrations. (ECF No. 3, FAC ¶ 2, citing Trademark Registrations at Ex. A, PageID.31-32.) Plaintiff further alleges that Defendant "has been intentionally and illegally importing, distributing and selling Klatchi nut products in the US." (*Id.* ¶ 4.) These allegations must be accepted as true on a motion to dismiss.

In trademark infringement suits, "grants of a motion to dismiss are the exception, not the rule." 6 J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 32:121.50 (5th ed. 2023). The Court finds, accepting as true the facts as alleged in Plaintiff's Amended Complaint, that Plaintiff has plausibly alleged that it is the owner of the "Klatchi Nuts" mark and that Defendant has used that mark in commerce. Whether there is a genuine issue of disputed fact as to the truth those allegations can be tested on a motion for summary judgment, not at the motion to dismiss stage.

### 2. Confusingly similar

Defendant also disputes whether Plaintiff's Amended Complaint properly alleges likelihood of customer confusion. "The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Bliss Collection, LLC v. Latham Companies, LLC*, 82 F.4th 499, 508 (6th Cir. 2023) (quotation marks omitted, quoting *Hensley Mfg.*, 579 F.3d at 613).

Courts consider the following eight factors (sometimes called the *Frisch* factors) when making the "likelihood of confusion" determination: (1) the strength of the plaintiff's mark; (2) the relatedness of the goods or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing of channels used; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion in selecting the mark. *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 869 (6th Cir. 2022) (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)). "These factors are meant to be 'helpful guides rather than rigid requirements.' " *Bliss Collection*, 82 F.4th at 509 (quoting *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013) (citation omitted)). "The 'ultimate question' in assessing likelihood of confusion is 'whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Dassault Systemes, SA v. Childress*, 828 F. App'x 229, 250 (6th Cir. 2020) (quoting *Interactive Prods. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 695 (6th Cir. 2003)).

**\*7** However, the Sixth Circuit Court of Appeals recently reiterated that " '[g]enerally, dismissal for failure to state a claim upon which relief can be granted is appropriate in only the most *extreme* trademark infringement cases, such as where goods are unrelated as a matter of law, since the likelihood of confusion is generally a question of fact.' " *Bliss Collection*, 82 F.4th at 508 (quoting *Hensley*, 579 F.3d at 613 (emphasis added, citation and quotation omitted)). The Court finds here, accepting Plaintiff's well-pleaded factual allegations as true, that this is not such an "extreme" case.

Defendant fails to address the eight *Frisch* factors in its Motion to Dismiss, and instead contends only that because the Amended Complaint does not allege that the Klatchi Nuts Defendant imports and sells are counterfeit, there cannot be consumer confusion because customers are getting exactly what they bargained for – Klatchi Nuts. (ECF No. 11, Def. Mot., PageID.67-68.) This cursory argument is insufficient to meet Defendant's burden on a motion to dismiss.

"[Plaintiff] is not required to allege facts supporting all of the relevant factors in order to proceed" in this case. *See Sadieboo, Inc. v. MJ Tools Corp.*, 526 F. Supp. 3d 285, 291 (W.D. Mich. 2021) (noting "[a]t this stage, it is enough that [Plaintiff's] complaint alleges facts from which to reasonably infer a likelihood of consumer confusion."). Plaintiff's Amended Complaint alleges that Plaintiff possesses

Case: 24-1775  Document: 47  Filed: 09/24/2025  Page: 88

Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)
2023 WL 8025818

Trademark Registrations that are presumptively valid, the parties' word marks are similar, the parties' products and services are similar, and the parties offer and sell their products through convergent marketing channels, including brick and mortar retail/wholesale stores, the Internet, and through social media. Plaintiff contends that all of this is likely to cause and increase consumer confusion regarding the "origin, sponsorship or approval" of the goods offered by the parties "because [consumers] are likely to believe that the Klatchi Nuts being sold on Defendant's website are identical to, or affiliated with, those of Plaintiff." (ECF No. 3, FAC ¶¶ 2, 7, 19, 26, 32, 40.)

The Court finds that these factual allegations are sufficient to state a plausible claim under the Lanham Act. *See Sadieboo, 526 F. Supp. 3d at 291* (finding that the plaintiff's allegations that defendant "possesses trademark registrations that are presumptively valid; the parties' word marks are similar; the parties' products and services are similar; and the parties' businesses are located in the same state" "are sufficient to state a viable claim under the Lanham Act."). "Evidence of actual confusion is not necessary at this stage of the case." *Id.* (further noting that "the absence of such evidence 'is rarely significant' at any stage.") (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997)).

Plaintiff's allegations in its Amended Complaint must be accepted as true when deciding Defendant's motion to dismiss, and whether Plaintiff can ultimately prove such a claim is another matter, and not before the Court at this time. The Court finds that Plaintiff has sufficiently set forth allegations leading to a plausible inference of liability on Defendant's part in using Plaintiff's trademark in commerce in a way likely to cause confusion.

Accordingly, Defendant's motion to dismiss Count I of Plaintiff's Amended Complaint is denied.

### C. Plaintiff's False Designation of Origin under 15 U.S.C. § 1125(a) Claim and Common Law Trademark Infringement/Unfair Competition Claim (Counts II and III)

**\*8** Plaintiff also asserts claims against Defendant for False Designation of Origin under the Lanham Act, 15 U.S.C. § 1125(a) (Count II) and Common Law Trademark Infringement and Unfair Competition under Michigan law (Count III.) (ECF No. 3, FAC, ¶¶ 31-43.)

Defendant's entire argument with respect to these two claims is that "False designation of origin, common law trademark infringement, and unfair competition are analyzed under the same standard as Plaintiff's federal trademark infringement claim," and that these claims should be dismissed for the same reasons as Defendant's federal trademark claim under 15 U.S.C. § 1114. (ECF No. 11, Def. Mot., PageID.68.)

The Sixth Circuit uses the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin – the likelihood of confusion between the two marks. *See Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006); *see also Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 484 (6th Cir. 2023) (stating that the test for relief for trademark and unfair competition claims under both the Lanham Act and Michigan common law is the same "likelihood of confusion" standard) (citations omitted); *Wigs For Kids, Inc. v. Wigs 4 Kids of Michigan, Inc.*, No. 17-11471, 2017 WL 6539271, at *9 (E.D. Mich. Dec. 21, 2017) ("Plaintiff's common law infringement, and unfair competition claims are analyzed similarly to an infringement action brought under the Lanham Act[.]").

For the reasons discussed in the previous section and the Court's finding that Plaintiff has sufficiently set forth allegations of a likelihood of confusion, the Court finds that Defendant has not met its burden to show that Plaintiff has not stated a plausible claim for relief for its claims of False Designation of Origin under the Lanham Act and common law trademark infringement and unfair competition under Michigan law.

Accordingly, Defendant's motion to dismiss Counts II and III of Plaintiff's Amended Complaint therefore is denied.

### IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendant's Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 11).

The Court **FURTHER DENIES** Plaintiff's request that it be awarded attorneys' fees of $1,500.00 for having to file a Response.

The Court **FURTHER ORDERS** Defendant Aryz Trading LLC to file an Answer to Plaintiff's Amended Complaint within **14 days**, or by **December 4, 2023**.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 89

**Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)**

2023 WL 8025818

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8025818

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Galaxy Foods LLC v. Aryz Trading LLC, Not Reported in Fed. Supp. (2023)**

2023 WL 8025818

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2649607
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

*If this opinion indicates that it is "FOR
PUBLICATION," it is subject to revision until
final publication in the Michigan Appeals Reports.*
UNPUBLISHED
Court of Appeals of Michigan.

MONICA GREASON, Plaintiff-Appellant,

v.

AUBURN PHARMACEUTICAL
COMPANY, Defendant-Appellee.

No. 371734
|
September 15, 2025

Oakland Circuit Court LC No. 2022-197571-CD

Before: Letica, P.J., and Rick and Bazzi, JJ.

**Opinion**

Per Curiam.

**\*1** In this employment-discrimination action brought under
the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101
*et seq.*, plaintiff appeals as of right the order granting
defendant partial reconsideration and dismissing plaintiff's
remaining claims under MCR 2.116(C)(10) (no genuine
issue of material fact). In a previous order, the trial court
granted defendant's motion for summary disposition, in part,
under MCR 2.116(C)(7) (statute of limitations), disposing of
plaintiff's claims under the ELCRA that "accrued prior to
December 1, 2019," but denied the motion in part under MCR
2.116(C)(10) for the ELCRA claims that "accrued between
December 1, 2019[,] and December 20, 2019," and the claim
for constructive discharge. After defendant moved for partial
reconsideration, the trial court granted defendant's motion for
summary disposition in its entirety. We affirm.

I. BASIC FACTS AND PROCEDURAL BACKGROUND

This matter stems from plaintiff's employment as a part-
time puller and packer (also known as picker and packer)

at defendant's warehouse. Plaintiff, a Black woman, was
approximately 55 years old when she started working
for defendant in August 2017, and she was trained by
defendant as a puller and packer. Plaintiff worked on weekday
afternoons from about 3:00 p.m. until 6:00 p.m. When
performing pulling functions, plaintiff was required to locate
and remove medicine from shelves according to order forms
and then place the medicine in bins to be processed. When
packing, plaintiff reviewed order forms and medicine that
were in the bins and packed the medicine to be shipped.
On average, there were about 25 to 30 employees in the
warehouse daily. Defendant primarily hired high school and
college students, as well as retired individuals in their 50s and
60s, as part-time pullers and packers.

The warehouse was supervised by a warehouse manager and
an assistant manager. The manager monitored the premises
and assigned staff to various functions on a daily basis.
Assignments were made "on an ad hoc and as needed
basis between pulling and packing functions based upon
the workflow demands in the warehouse." During the latter
part of plaintiff's tenure, the warehouse manager was Bill
Legendre. Legendre served as plaintiff's supervisor between
April 2019 and December 2019.

Plaintiff did not apply for any other full-time or part-
time positions while employed with defendant. Legendre
conducted a review of plaintiff's performance on January 22,
2019. In the review, Legendre remarked, "Accuracy when
[pulling] orders is well below average," and, "Has been
resistant at times when assigned to order [pulling]." Plaintiff's
"attendance and punctuality" score was 4, or "very good."
Plaintiff's overall performance score was "satisfactory."
Plaintiff received two pay increases during her employment:
an increase of 50 cents per hour in January 2018, and an
increase of $1.35 per hour in February 2019. Defendant never
demoted plaintiff.

On an unspecified date, plaintiff "asked [Legendre] if they
were hiring any full[-]time [people] for the warehouse" and
informed Legendre that she was "interested in full[-]time."
Plaintiff alleged that she was never advised of any openings.
However, plaintiff's primary complaint was that Legendre
assigned her too frequently to perform the pulling function
instead of the packing function. On March 6, 2019, plaintiff
was pulling and "lifted or twisted wrong," which resulted in a
"sharp" pain. Plaintiff requested instructions from Legendre
regarding the filing of an accident report. The following
day, plaintiff was reassigned to pulling. Plaintiff protested to

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 91

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

defendant's Director of Human Resources, Christine Walker, when plaintiff felt the work was too strenuous. On April 24, 2019, plaintiff disclosed to Walker that pulling was "too hard." Plaintiff further reported to Walker that Legendre "doesn't accept feedback well," and Legendre stated to plaintiff that "everything you say is negative."

**\*2** On other occasions, plaintiff expressed to Legendre she did not want to perform either the pulling or packing function. Legendre responded that "age doesn't matter when it comes to pulling." Plaintiff repeatedly informed Walker that pulling and packing was "hard on her body" and she "wanted to do something other than that," including on May 9, 2019, and June 12, 2019. At one instance, after sharing with Legendre that she did not wish to perform either the pulling or packing function, plaintiff was moved to the shipping-function section. Plaintiff "periodically asked to perform [ ] other warehouse functions," such as inventory scanning, which were not as physically demanding as pulling and packing. Plaintiff stated Legendre "never let [her] learn how to scan," and he solely permitted "the white girls [and] ladies" to perform the scanning function.

Plaintiff complained about Legendre's behavior and conduct. [1] Plaintiff visited Walker "several times about how [Legendre] treats [her] different and talks to [her] disrespectful[ly]." Plaintiff described Legendre's management style as "authoritative, directive, get-stuff-done kind of way," and contended that Legendre was sometimes impatient. Plaintiff further asserted that Legendre did not "show[ ] compassion," used a specific "tone" with plaintiff, and never agreed with her. On May 9, 2019, plaintiff disclosed to Walker that Legendre "doesn't speak harshly to those he likes[:] the older men [and] young white girls." Plaintiff stated that Legendre was "prejudiced against Black people," including plaintiff.

At another juncture in September 2018 or October 2018, plaintiff had an incident with Paige Pierce, a 20-year-old white warehouse employee. After the episode, Pierce "started making [plaintiff's] job hard" by "pull[ing] up the invoices before we would pick, and [Pierce] would purposely put large orders in the basket for [plaintiff] to stop and go pull." After Pierce gave plaintiff a "big" order for the second or third time, plaintiff informed Legendre that Pierce "needs to give them to someone else." Plaintiff lamented to Legendre about how Pierce did not "do the stocking" because "she knew that was the aisle that [plaintiff] was going to pull." Plaintiff alleged

that Legendre's attitude toward plaintiff "changed" after the incident because Legendre and Pierce "were tight." [2]

Plaintiff met with Walker on approximately a weekly basis to discuss her issues with Legendre and Pierce. Plaintiff reported to Walker on May 9, 2019, that Legendre "treats [her] different since that incident [with] [Pierce]." Plaintiff "periodically complained about various interpersonal issues with other warehouse employees, both at and outside of work." Legendre "counseled" plaintiff to contact Walker "to address her various complaints and issues." Walker could not recall whether plaintiff disclosed that any employee was attempting to make plaintiff quit. Plaintiff additionally criticized the physical toll of her position to Walker "quite a few times." During her last five months of employment with defendant, plaintiff pulled about 70% of the time. Plaintiff quit her position with defendant in December 2019. Plaintiff purportedly quit "in part" to move to Indiana, and because of her inability to acquire full-time employment with defendant and Legendre's behavior toward her.

On December 1, 2022, plaintiff filed a complaint alleging a hostile work environment, wrongful discharge, and age, race, and sex discrimination claims in violation of the ELCRA. Defendant subsequently moved for summary disposition under MCR 2.116(C)(7) and (C)(10), advancing that the majority of plaintiff's claims were barred under the three-year statute of limitations, specifically any allegations concerning defendant's alleged conduct before December 1, 2019. Following a motion hearing, the trial court granted defendant's motion for summary disposition, in part, on statute-of-limitations grounds under MCR 2.116(C)(7), and it partially denied the motion for summary disposition under MCR 2.116(C)(10). The court entered an order providing that summary disposition was proper under MCR 2.116(C)(7) "regarding all claims brought under the [ELCRA] that accrued prior to December 1, 2019," but improper "regarding claims brought under the [ELCRA] that accrued between December 1, 2019[,] and December 20, 2019[,] and the claim for constructive discharge," under MCR 2.116(C)(10).

**\*3** Defendant moved for partial reconsideration of the trial court's order concerning summary disposition, requesting that the trial court grant summary disposition under MCR 2.116(C)(10) for plaintiff's remaining ELCRA claims arising in the interval between December 1, 2019, and December 20, 2019, and the constructive discharge claim. After a hearing, the court granted defendant's motion for partial

Case: 24-1775   Document: 47   Filed: 09/24/2025   Page: 92

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

reconsideration, and it further granted defendant's motion for summary disposition "in its entirety." The trial court opined:

> The bullet points that the [trial court] referenced are bullet points, if you will, of [defendant] giving [plaintiff] a shipping assignment in her physical condition, negative performance reviews, and generalized talking down. Singularly reviewing them, collectively reviewing them, and collectively reviewing them among or amidst or against the backdrop of the entire factual allegations. All three views, all three bullet points, and from all three perspectives, if you will, there is no evidence, respectfully, of civil rights violation, age, race, gender discrimination. And the [trial court], as I've said, reverses itself and grants comprehensive motion for summary disposition.

In June 2024, the court entered an order consistent with its statements on the record, dismissing the underlying action. This appeal ensued.

## II. STANDARD OF REVIEW

"This Court reviews a trial court's decision to grant or deny a motion for reconsideration for an abuse of discretion." *Farm Bureau Ins Co v TNT Equip, Inc*, 328 Mich App 667, 672; 939 NW2d 738 (2019). "A trial court abuses its discretion if it chooses an outcome outside the range of principled outcomes." *Id*.

This Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A de-novo review means [this Court] review[s] the legal issue independently, without deference to the lower court." *Bowman v Walker*, 340 Mich App 420, 425; 986 NW2d 419 (2022) (quotation marks and citation omitted). A motion for summary disposition under MCR 2.116(C)(10) "tests the *factual sufficiency* of a claim." *El-Khalil*, 504 Mich at 160. As explained by the Michigan Supreme Court:

> When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id*. (quotation marks and citations omitted).]

Specifically,

> the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. [*Quinto v Cross and Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996) (citations omitted).]

"The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion." *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). "Statutory interpretation is a question of law, which this Court also reviews de novo."

*O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 493; 791 NW2d 853 (2010).

## III. ANALYSIS

**\*4** Plaintiff argues that the trial court erroneously granted defendant's motion for summary disposition in its entirety. Plaintiff specifically contends that her ELCRA claims for the time period between December 1, 2019, and December 20, 2019, and for constructive discharge, were improperly dismissed under MCR 2.116(C)(10). We disagree. [3]

## A. EMPLOYMENT DISCRIMINATION

Plaintiff first argues that the trial court wrongfully disposed of plaintiff's employment-discrimination claims on the basis of age, race, and sex, related to the interval between December 1, 2019, and December 20, 2019. Under MCL 37.2202(1)(a), as amended by 2023 PA 31, [4] an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." "The courts have recognized two broad categories of claims under this section: disparate treatment and disparate impact claims." *White v Dep't of Transp*, 334 Mich App 98, 107; 964 NW2d 88 (2020) (quotation marks and citation omitted). As detailed by the Michigan Supreme Court:

> A claim of age discrimination may be shown under ordinary principles of proof by the use of direct or indirect evidence. Alternatively, many courts, including this one, have used the prima facie test articulated by the United States Supreme Court in [*McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)] as a framework for evaluating age-discrimination claims. Originally applied to cases of race discrimination, the test has been modified to accommodate cases of age and sex discrimination. [*Town v Mich*

*Bell Tel Co*, 455 Mich 688, 694-695; 568 NW2d 64 (1997) (footnotes and citations omitted).]

Because there is "no direct evidence of impermissible bias," plaintiff's claims are required to proceed under the *McDonnell Douglas* burden-shifting framework. *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). Under this framework, a plaintiff must establish a rebuttable prima facie case by presenting evidence that she is "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Town*, 455 Mich at 695. This prima facie test is designed "to force the employer to articulate a nondiscriminatory reason for the discharge." *Id*. "Once the employer produces evidence of a nondiscriminatory reason for the discharge, even if that reason later turns out to be incredible, the presumption of discrimination evaporates." *Id*. "[T]he evidence and inferences that properly can be drawn from the evidence presented during the plaintiff's prima facie case may be considered in determining whether the defendant's explanation is pretextual." *Id*. at 696 (quotation marks, footnote, and citation omitted).

**\*5** "Once the presumption drops out of the case, the plaintiff retains the ultimate burden of proving discrimination." *Id*. "To prevail, the employee must submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge and that the plaintiff's [membership in a protected class] was a motivating factor in the employer's decision." *Id*. at 697. "Thus, the employee must prove that the employer's explanation was a pretext for discrimination." *Id*. A plaintiff can establish pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Campbell v Human Servs Dep't*, 286 Mich App 230, 241; 780 NW2d 586 (2009) (quotation marks and citation omitted).

"The proofs offered in support of the prima facie case may be sufficient to create a triable issue of fact that the employer's stated reason is a pretext, as long as the evidence would enable a reasonable fact-finder to infer that the employer's decision had a discriminatory basis." *Town*, 455 Mich at 697. "Ultimately, the plaintiff will have the burden of producing

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 94

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

evidence, whether direct or circumstantial, that proves that discrimination was a determining factor in the employer's decision." *Id*. On summary disposition, "when viewed in the light most favorable to the plaintiff, the evidence must create a material issue of fact on which reasonable minds could conclude that the employer's stated reason is a pretext for discrimination for summary judgment to be precluded." *Id*. at 698.

Regarding what constitutes an adverse employment action, this Court has stated:

> There is no exhaustive list of what constitutes adverse employment actions. And what might constitute an adverse employment action in one employment context might not be actionable in another employment context .... Nevertheless, regardless of the employment context, in order to be actionable, an employment action must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. In addition, there must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling. Materially adverse employment actions are akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. [*Chen v Wayne State Univ*, 284 Mich App 172, 201-202; 771 NW2d 820 (2009) (quotation marks and citations omitted).]

In the present case, the pertinent time frame for plaintiff's discrimination claims between December 1, 2019 and December 20, 2019. Notably, plaintiff does not provide any references to specific examples of alleged discrimination

because of her age, race, or sex during this period, on appeal. Rather, plaintiff broadly contends that it is undisputed plaintiff was a member of a protected class and she was qualified for her position. Plaintiff limits her appellate argument to whether she suffered an adverse employment action, and she does not address the fourth element required to establish a prima facie case of discrimination, or whether "others, similarly situated and outside the protected class were unaffected by the employer's adverse conduct." *Town*, 455 Mich at 695. Plaintiff summarily asserts her discrimination claims are viable because she suffered the following adverse employment actions: (1) assignment to "more physical aspects of the job far more frequently tha[n] other employees"; (2) assignment to "roles outside of picker-packer only when they were more physically demanding"; (3) being "talked down to and otherwise demeaned by her supervisor"; and (4) being "accused of poor performance."

 **\*6**  First, even assuming plaintiff was assigned to physically-intense functions in the relevant time period, this does not constitute an adverse employment action. Plaintiff did not provide any evidence to support her claim that defendant, via Legendre, assigned plaintiff to physically taxing job functions because of her age, sex, or race. On the contrary, plaintiff was employed as a part-time puller and packer and, although pulling was more physically demanding than packing, she acknowledged that both functions required performing physical tasks. Plaintiff informed Walker and Legendre that she was too frequently assigned to pulling, and she wished to be assigned more regularly to packing because "people [her] age" were assigned to perform packing functions. Plaintiff asserted that she was assigned to pull "all day, every day," but she lagged behind the "younger" employees. Plaintiff further contended that she performed pulling functions about 70% of the time she worked in her final five months. Plaintiff noted Legendre "doesn't put anyone else my age on pulling[.]" Legendre, however, stated that he assigned plaintiff to perform both functions because she was "hired and trained" to perform either. Further, plaintiff acknowledged that Legendre had no obligation to honor her requests to perform more packing. Rather, plaintiff understood both functions were her responsibility.

Plaintiff's notes indicate, "Someone said that they asked [Legendre] why I was on pulling, and he said [Legendre] told her that 'they're stronger,' meaning that I am Black," but she does not note who shared this allegation. Plaintiff additionally wrote a list of employees who were "around [her] age, but they were always on packing[ ] [and] never had

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 95

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

to pull in the [two years] that [she] worked there." At the end of the list, plaintiff stated that "most times there were [two or three] young ladies packing" and they "were white." Notwithstanding that these allegations are unsubstantiated, we note that Legendre expressed that his primary focus in managing the warehouse was "getting employees to perform their job duties," which included assigning and reassigning employees "on an ad hoc and as needed basis between pulling and packing functions based upon the workflow demands in the warehouse." The evidence also suggested that defendant hired high school and college students, in conjunction with retired individuals in their 50s and 60s, as part-time pullers and packers.

The record is absent of any indication that Legendre exclusively assigned older employees to packing when they were hired to perform both functions. Moreover, employees were assigned to various functions daily on the basis of how many orders were received and how many employees were available, which plaintiff recognized. To the extent plaintiff alleges that she was assigned more physically-demanding functions "despite known hardships," plaintiff fails to provide any evidence that she notified defendant, in writing, that she was unable to pull. Plaintiff lacks any documentation that she was physically unable to perform the pulling function, or that she required any accommodations to perform pulling less frequently. Further, plaintiff's January 22, 2019 performance review provided that plaintiff's accuracy "when [pulling] orders [was] well below average" and plaintiff was "resistant at times when assigned to order [pulling]." Plaintiff conceded that accuracy was "critically important" to ensure medicine was supplied and shipped correctly. There is no indication that plaintiff's assignment to pulling more than packing was "materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities." *Chen*, 284 Mich App at 201. While plaintiff disagreed with Legendre's distribution of assignments, the presented evidence demonstrated that Legendre maintained discretion to make assignments on a daily basis. There were no alterations to plaintiff's job responsibilities when she was assigned to perform functions that she was specifically hired to complete. Further, plaintiff received two pay raises, in 2018, and 2019, and she never applied for alternate positions.

Second, plaintiff's assignment to "roles outside of picker-packer only when they were more physically demanding" did not amount to an adverse employment action. Plaintiff does not substantiate the claim that Legendre assigned her to more physically-intense job functions outside of pulling and packing on the basis of her age, sex, or race. Plaintiff neglects to identify what the other functions were, when they occurred, or if they fell within the designated time frame. The record establishes, in addition to asking Legendre to be assigned to perform more packing, there were occasions when plaintiff informed Legendre and Walker that she did not want to perform either packing or pulling. At an unascertained date, Legendre assigned plaintiff to perform shipping functions. Plaintiff, however, did not "catch on" to this function, and she found it to be "more physical" than pulling and packing. Again, there is no evidence that the assignment was made because of plaintiff's race, sex, or age. Instead, it was in response to plaintiff's request to not pull or pack. To the extent plaintiff contends that she was not permitted to perform less physically-intense functions, such as inventory scanning, Legendre stated plaintiff had not been "hired or trained to do so," and that function was "reserved" for "full-time and/or long-term employees." Plaintiff's assertion suggesting such assignments were premised on race because allegedly only "white girls [and] ladies" were allowed to scan is additionally unsupported.

*\*7* Third, plaintiff allegedly being "talked down to and otherwise demeaned by her supervisor" did not qualify as an adverse employment action, as plaintiff does not cite to any instances involving actionable conduct. The record featured broad accusations against Legendre, including an occasion during which Legendre called plaintiff "negative," after she reported an incident involving employees who were name-calling one another. Plaintiff further contended that Legendre was not compassionate toward plaintiff, maintained a "tone of voice," and spoke disrespectfully to plaintiff. Plaintiff asserted that she was a victim of Legendre's "bigotry" and "would have tears in [her] eyes[ ] knowing [she] was going to have to deal with [Legendre's] [ ] racism[.]" Yet, plaintiff simultaneously advanced that Legendre managed in a "authoritative, directive, get-stuff-done kind of way." In her notes, plaintiff expressed, "One of the ladies that had over 20 years told me that [ ] [Legendre] doesn't talk to the women like he talks to the men. He talks at the women, but he talks to the men with respect." Aside from these speculative contentions, there is no evidence suggesting Legendre targeted plaintiff due to her age, sex, or race, and while plaintiff advances that Legendre tried to "belittle" other employees, she does not cite to any precedent indicating that such conduct is unlawful.

Fourth, plaintiff being "accused of poor performance" is not deemed an adverse employment action. The record provides that, on one occasion, Legendre informed plaintiff

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 96

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

that she "did a good job packing." Plaintiff's January 22, 2019 performance review resulted in a "satisfactory" rating. Plaintiff's "quality of work" was rated a score of 2, or "needs improvement," and the review detailed, "Accuracy when [pulling] orders is well below average." Plaintiff's "productivity" rating was 3, or "satisfactory," but plaintiff was "resistant at times when assigned to order [pulling]." The performance review further provided that plaintiff arrived "on time ready to work" and "worked extra hours when requested to do so." Plaintiff does not elaborate as to how she was "accused of poor performance" or how such would constitute an adverse employment action. Further, there were no consequences for her alleged subpar performance, given that plaintiff received raises and she was not demoted to a lower position.

Plaintiff argues this Court must consider the United States Supreme Court's opinion in *Burlington Northern and Santa Fe Ry Co v White*, 548 US 53, 69; 126 S Ct 2405; 165 L Ed 2d 345 (2006) (quotation marks and citation omitted), for the proposition that "a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others." In *White*, the United States Supreme Court examined the antiretaliation provision of Title VII, which "refer[red] to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective," and it concluded "that Title VII's substantive provision and its antiretaliation provision are not coterminous." *Id*. at 67-70. Yet, plaintiff broadly argues this Court's opinion in *White*, 334 Mich App at 98, dictates that the United States Court of Appeals for the Sixth Circuit and "Michigan courts" do not limit adverse actions to a list, and discrimination claims are analyzed similar to retaliation claims. "[W]hile we are not bound by Title VII caselaw, Michigan courts regularly look to it for guidance in interpreting ELCRA." *Id*. at 116. However, this Court in *White* acknowledged, "The antiretaliation provisions of both ELCRA and Title VII differ from their respective antidiscrimination provisions in that the antiretaliation provisions bar retaliation or discrimination with no limitation on the type of acts that would be considered unlawful." *Id*. at 116-117. Further, this Court "adopt[ed] the reasonable-employee standard for determining whether an employer has committed a retaliatory adverse employment action under ELCRA." *Id*. at 120-121. "Given that the antiretaliation provision does not contain the limiting language used in the substantive discrimination provision, there is no basis in MCL 37.2701(a) to limit retaliatory acts under ELCRA to those affecting the terms and conditions

of employment such as pay, hiring, and firing." *Id*. at 121. Stated alternatively, this analysis does not apply to claims of discrimination.

**\*8** Plaintiff additionally contends that she must show "only some injury respecting her employment terms or conditions," citing the United States Supreme Court's decision in *Muldrow v City of St Louis, Missouri*, 601 US 346, 359; 144 S Ct 967; 218 L Ed 2d 322 (2024). Even assuming this standard applies, there is no evidence that plaintiff suffered any injury concerning the terms or conditions of her employment. Plaintiff also lists guidelines as to various forms of adverse actions listed by the Equal Employment Opportunity Commission, but provided no caselaw or other authority suggesting these guidelines are binding on this Court.

Plaintiff does not establish that she suffered any adverse employment actions, which is an essential element underlying her claims of discrimination in violation of the ELCRA. Plaintiff does not address the fourth element under the *McDonnell Douglas* framework, or allege that other employees who were similarly situated and outside her protected class were unaffected by any adverse conduct. See *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 361; 597 NW2d 250 (1999) ("Circumstances give rise to an inference of discrimination when the plaintiff was treated differently than persons of a different class for the same or similar conduct.") (Quotation marks and citation omitted). Accordingly, the trial court properly granted defendant's motion for summary disposition under MCR 2.116(C)(10) regarding plaintiff remaining employment-discrimination claims.

## B. HOSTILE WORK ENVIRONMENT

Plaintiff similarly contends that her hostile work environment claims arising in the time period between December 1, 2019, and December 20, 2019, were inappropriately dismissed. The elements necessary to establish a prima facie case of a hostile work environment are:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of [her protected status]; (3) the employee was

subjected to unwelcome ... conduct or communication [involving her protected status]; (4) the unwelcome ... conduct was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. [*Quinto*, 451 Mich at 368-369 (alterations in original; quotation marks and citation omitted).]

The existence of a hostile work environment is dependent on "whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke v Everett*, 442 Mich 368, 394; 501 NW2d 155 (1993). Evidence containing "mere conclusory allegations" that are "devoid of detail" do not "permit the conclusion that there was such conduct or communication of a type or severity that a reasonable person could find that a hostile work environment existed." *Quinto*, 451 Mich at 371-372. Thus, plaintiff was required to demonstrate that Legendre's comments to her "were sufficiently severe or pervasive to create a hostile work environment." *Id*. at 369.

Rather than advancing any argument related to any of the five elements required to establish a hostile work environment claim, plaintiff merely restates that she suffered the adverse employment actions previously detailed. Plaintiff provides no examples or analysis regarding how Legendre talked down to plaintiff or demeaned her during the relevant time interval. Moreover, plaintiff does not assert that any of Legendre's comments or broader conduct was related to any of her protected statuses. Instead, plaintiff accuses defendant of not presenting "any legal argument as to why Plaintiff's hostile work environment claims should be dismissed" during the trial court proceedings.

 **\*9**  Nonetheless, our review of the lower court record does not reveal any incidents of sexist, racist, or ageist comments supporting an inference of a hostile work environment in the pertinent time period. Plaintiff broadly concludes that Legendre created a hostile work environment by advancing discriminatory remarks against her, and plaintiff was mentally and physically stressed because of Legendre's behavior.

Plaintiff described Legendre as authoritative and sometimes impatient, but she acknowledged that Legendre exhibited a similar disposition to other employees. Plaintiff's primary contention was that Legendre was not compassionate to her, spoke to her disrespectfully, and never agreed with her. More generally, in her notes, plaintiff alleged that there was a hostile work environment and she was a victim of Legendre's bigotry. On May 9, 2019, plaintiff reported to Walker that Legendre "doesn't speak harshly to those he likes[:] the older men [and] young white girls." Plaintiff also asserted that Legendre was "prejudiced against Black people," including plaintiff and two other women not fully identified. Plaintiff disclosed, "I would come to work stressed knowing that I had to deal with [Legendre's] [racist and sexist] personality."

As for specific examples, on December 5, 2018, plaintiff informed Legendre "the aisles are not stocked," and Legendre responded, "[D]on't tell me that Maria doesn't stock her aisle" and that plaintiff was "always negative." On January 3, 2019, plaintiff had to "make a lot of boxes," and Legendre replied, "Now I have to take time to move the boxes." On January 7, 2019, plaintiff had a "big" order at the "end of the night," but Legendre did not "ask anyone to help [her]" and instead "let everyone leave." On April 24, 2019, plaintiff informed Walker that Legendre was not accepting her feedback and, instead, reiterated that "everything [she] [said] is negative." Plaintiff stated in her notes, on the first day she was assigned to perform the shipping function, Legendre commented "having f*****g fun." Plaintiff further alleged that certain "ladies that were getting close to retirement age told [her] that they couldn't wait to retire" and "a couple of them told [her] they feel like [Legendre] is [sexist] and that he definitely caters to the men." Legendre purportedly "lets the men stand around and talk more so than the women." Plaintiff additionally asserted, "The women say that [Legendre] favors the men and I feel like he favors men [and] whites over African American[s] [and] Chaldeans." On one occasion, plaintiff believed that Legendre had "animosity" toward Black persons because when employees were playing music by Kanye West, Legendre stated, "I hate him." Plaintiff asked Legendre: "How do you hate someone you don't know?" Legendre answered, "Well, I mean his music." Legendre directed the "the young people," that "if you guys turn back to that station, we just won't be listening to a radio." On days when rap music was playing, Legendre "would just turn it completely off and tell them not to turn it back on."

Plaintiff further detailed an incident she had with a coworker, Pierce, in September 2018, or October 2018, which resulted

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 98

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

in Pierce making plaintiff's job more difficult, including giving plaintiff larger orders to pull. Plaintiff noted that Legendre's attitude toward her changed after the incident because Legendre and Pierce were close. In her notes, plaintiff speculatively stated: "[A]fter a few months, [Pierce] and [Legendre] seem like they were buddies, so then she started making my job harder for me on pulling. I really believe the [two] of them were trying to get me to quit my job." On unknown dates, Pierce "put a cart order on the line" intentionally or she did not stock an aisle when plaintiff was assigned to it.

Setting aside her interpersonal issues with Pierce and other coworkers, plaintiff did not include any examples of Legendre himself making her job more difficult. Plaintiff did not sufficiently explain how Legendre's conduct or comments were predicated on plaintiff belonging to a protected class. Further, although the record indicated that Legendre's management style was authoritative, this does not warrant the conclusion that there was "such conduct or communication of a type or severity that a reasonable person could find that a hostile work environment existed." *Quinto*, 451 Mich at 372. Most critically, the contested conduct did not occur during the relevant time period. Consequently, the trial court did not err by dismissing plaintiff's hostile work environment claims.

## C. RETALIATION

**\*10** Plaintiff further argues that she presented viable retaliation claims related to the time period between December 1, 2019, and December 20, 2019. MCL 37.2701(a) prevents persons from discriminating or retaliating "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." This Court has provided:

> To establish a prima facie case of retaliation, a plaintiff must show: (1) that he [or she] engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the

adverse employment action. [*Major v Village of Newberry*, 316 Mich App 527, 552-553; 892 NW2d 402 (2016) (quotation marks and citation omitted).]

On appeal, plaintiff does not address the first element or otherwise assert she engaged in a protected activity. However, in her complaint, plaintiff alleged the protected activity at issue in her age-based retaliation claim included plaintiff disclosing "complaints about the discriminatory and age-biased tasks she was given." Concerning the sex-based retaliation claim, plaintiff contended that the protected activity was sharing "complaints about discrimination because she was a woman." As for the race-based retaliation claim, plaintiff asserted that the protected activity was reporting "the racial discriminations she was continually experiencing." In her appellate brief, plaintiff reiterates that she suffered the previously detailed adverse employment actions. For the reasons stated above, the cited conduct did not constitute an adverse employment action. The record provides that plaintiff complained to Walker about Legendre's behavior, in addition to her dissatisfaction with pulling more frequently than packing. Even assuming plaintiff engaged in a protected activity by regularly expressing her grievances to Walker, the evidence does not indicate that defendant took any adverse action against plaintiff. Accordingly, the trial court appropriately dismissed plaintiff's remaining retaliation claims.

## D. CONSTRUCTIVE DISCHARGE

Plaintiff lastly argues that her wrongful discharge, or constructive discharge claim, brought "in violation of Michigan Public Policy," was sufficient. Plaintiff fails to cite any authority on this issue, and she merely restates that she "has support and a basis for the only contested element of adverse action." See *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 374; 761 NW2d 353 (2008) ("Because this issue was not properly briefed on appeal, [the party] has abandoned any claim of error in that regard.") Rather, plaintiff broadly contends Legendre mistreated her and put her "on a demanding job," which "caused her to leave."

As explained by this Court:

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 99

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

[C]onstructive discharge is not in itself a cause of action but, rather, a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily. A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign. A question of fact exists when reasonable people could reach different conclusions as to whether these elements were established. [*Jewett v Mesick Consol Sch Dist*, 332 Mich App 462, 471-472; 957 NW2d 377 (2020) (alteration in original; quotation marks and citations omitted).]

**\*11** While plaintiff was dissatisfied with her assignment to the pulling function more frequently than the packing function, she was employed and trained to perform both roles.

Plaintiff never notified defendant in writing that she was unable to perform the pulling task or that she required any accommodations. Moreover, the record indicates that plaintiff quit her position "in part" to move to Indiana, rather than as a result of Legendre's alleged conduct or her inability to obtain a full-time position with defendant. Walker noted that plaintiff "had been saying that she was going to move to Indiana anyway to be with one of her children." Plaintiff additionally never applied for different positions with defendant or for external employment. Thus, her wrongful or constructive discharge claims were properly dismissed.

Ultimately, the trial court's decision to grant defendant's motion for partial reconsideration did not constitute an abuse of discretion. The trial court properly determined that summary disposition regarding plaintiff's remaining claims under MCR 2.116(C)(10) was warranted.

Affirmed.

Anica Letica

Michelle M. Rick

Mariam S. Bazzi

**All Citations**

Not Reported in N.W. Rptr., 2025 WL 2649607

---

**Footnotes**

1      Plaintiff approached the individual who preceded Legendre as warehouse manager about Legendre "a couple of times."

2      Plaintiff maintained issues with Legendre before and after the incident with Pierce.

3      We note that in the facts portion of her brief, plaintiff contends that the trial court abused its discretion by granting defendant's motion for partial reconsideration because defendant's bases for moving for partial reconsideration were predicated on improper theories, including (1) the fact the trial court had indicated the case could be resolved on a directed verdict, (2) defendant's false claims of misrepresentations made by plaintiff during the summary disposition proceedings, and (3) defendant's attempts to mischaracterize plaintiff's deposition testimony. However, these issues are not cited in plaintiff's statement of questions presented, *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 404; 628 NW2d 86 (2001), nor expounded upon in the argument section of plaintiff's appellate brief, *Johnson Family Ltd Partnership v White*

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 100

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

2025 WL 2649607

*Pine Wireless, LLC,* 281 Mich App 364, 374; 761 NW2d 353 (2008). Accordingly, we decline to address these issues.

4    We rely on the version of the statute in effect at the time of plaintiff's employment. MCL 37.2202 has since been amended to specify protections for individuals on the basis of sexual orientation, gender identity, and gender expression, which are inapplicable in the instant case.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 100

MONICA GREASON, Plaintiff-Appellant, v. AUBURN..., Not Reported in N.W....

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 101

**Ingram v. Regano, Not Reported in Fed. Rptr. (2025)**
2025 WL 488618

2025 WL 488618
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Meribethe R. INGRAM, Plaintiff-Appellant,
v.
Jared J. REGANO, Administrator of the
Estate of Joseph V. Regno, deceased;
Fred E. Bolden, II, Defendants-Appellees.

Case No. 24-3761
|
FILED February 13, 2025

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF OHIO

**Attorneys and Law Firms**

Kasey T. Ingram, Law Office, Solon, OH, for Plaintiff-Appellant.

Sara Ravas Cooper, Maria Fair, Kathryn I. Perrico, Weston Hurd, Cleveland, OH, for Defendants-Appellees.

Before: SUTTON, Chief Judge; SUHRHEINRICH and SILER, Circuit Judges.

OPINION

SUTTON, Chief Judge.

**\*1** After a school district found that Meribethe Ingram harassed the teacher for whom she volunteered, officials prohibited her from continuing to work at that school. Two additional internal investigations left that decision intact. Ingram sued, challenging the district's investigatory process. Both parties moved for summary judgment. The district court granted the school officials' motion and denied Ingram's motion. We affirm.

I.

Beginning in August 2016, Ingram volunteered at Lewis Elementary to be a reading aide in Randy Davis's second-grade classroom. Her children went to the same school. After Ingram sent Davis inappropriate emails during the school year as well as during the start of the next school year, Davis

complained to the principal. In October 2017, the principal told Ingram to cease contact with Davis and warned that her failure to comply would prevent her from volunteering at the school. When she emailed Davis again in December to tell him she had "reason to believe that perhaps [he] would like to discuss" their situation, R.111-24 at 1, Davis forwarded the message to the principal, and the school district prohibited Ingram from working at Lewis Elementary anymore.

Ingram persisted. That same December, she wrote Davis again, saying that "[o]f course," she was "attracted to" him, that her husband thought Davis was "a threat to his marriage," and that she could not "understand why [he] shared [their] emails with" school officials. R.111-26 at 2–6. At that point, Ingram complained to the school, claiming that Davis had harassed her.

In January 2018, the school district investigated both claims—that Ingram had harassed Davis and that Davis had harassed her. The superintendent, Joe Regano, and assistant superintendent, Fred Bolden, led the effort. Regano issued a 28-page report on behalf of the school district in March 2018. The report deemed Ingram the harasser and upheld her restriction from volunteering or otherwise working at the school.

Meanwhile, as the first investigation proceeded, Ingram filed a new complaint with the school district. This time, she trained her sights on Bolden and Regano instead of Davis, alleging that they restricted her from working at the school in retaliation for reporting Davis. The school district hired an independent investigator, attorney Katie Clifford, to handle the investigation. After interviewing 28 witnesses, Clifford concluded—in a 42-page report—that no retaliation had occurred. She found that Ingram's ban on working at Lewis Elementary stemmed from her failure to comply with the principal's directive that she stop communicating with Davis. The school district adopted those findings in the spring of 2018.

That did not end matters. Between December 2018 and January 2019, Ingram filed five more complaints alleging that the investigations violated the school district's sexual-harassment policies. In response, the school district hired another independent investigator, this time the Taft Stettinius & Hollister law firm. After re-interviewing witnesses and re-examining the relevant evidence, Taft concluded that only one "technical misstep" from school policy occurred when officials failed to memorialize Davis's verbal complaint

Case: 24-1775  Document: 47  Filed: 09/24/2025  Page: 102

Ingram v. Regano, Not Reported in Fed. Rptr. (2025)
2025 WL 488618

of harassment. R.111-37 at 180. Otherwise, it found no policy violations in the harassment investigation, and found Clifford's findings credible.

**\*2** Ingram turned to the courts. In 2019, she sued Regano and Bolden in federal court. Discovery ensued over three claims: (1) retaliation under Title VII and Ohio law; (2) sex discrimination under the Equal Protection Clause of the U.S. Constitution, Title VII, and Ohio law; and (3) tortious civil conspiracy under Ohio law. Ingram moved for partial summary judgment, while Regano and Bolden moved for summary judgment on all of the claims. The district court granted Regano and Bolden's motion and denied Ingram's motion, entering a final judgment. This appeal—now the third time this court has considered Ingram's case—followed. *Ingram v. Regano,* No. 21-3342, 2022 WL 320216 (6th Cir. Feb. 3, 2022); *Ingram v. Regano*, No. 23-3222, 2023 WL 6634262 (6th Cir. Oct. 12, 2023) (per curiam).

II.

We review the district court's summary judgment ruling afresh, asking whether Ingram's claims present a "genuine dispute as to any material fact," or whether Regano and Bolden are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In answering these questions, we draw all reasonable inferences of fact in Ingram's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A.

*Retaliation under Title VII and Ohio law.* Ingram claims that Regano and Bolden retaliated against her for filing a complaint against them in February 2018. Title VII prohibits employers from retaliating against employees who file complaints against them. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013). Ohio's Fair Employment Practices Act does likewise. Ohio Rev. Code Ann. § 4112.02(I). We analyze both claims under the same framework, *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003), which proceeds in three steps. We start by asking whether Ingram has made out a prime facie case of retaliation: that (1) she engaged in a protected activity, (2) Regano and Bolden knew about the protected activity, (3) the pair then took an adverse action against her, and (4) the protected activity caused the adverse action. *Rogers v. Henry Ford Health Sys.*, 897 F.3d

763, 775 (6th Cir. 2018). If Ingram makes that showing, we ask whether Regano and Bolden have articulated a legitimate, non-retaliatory reason for their actions. *Id.* at 777. If they do, we ask whether Ingram has met her burden of showing that the explanation is pretextual. *Id.*

Ingram points to two alleged acts of retaliation: (1) Regano's March 2018 report siding with Davis in the initial sexual harassment investigation and (2) Regano and Bolden's involvement in the Clifford investigation despite their status as named parties to the relevant complaint. Both parties use many bytes of briefing to debate whether Ingram has made out a prima facie case. We need not resolve those arguments. Even if we assume that Ingram has made that initial showing, Regano and Bolden have articulated legitimate, non-retaliatory reasons for both actions—and Ingram has not created a material fact dispute over pretext.

Ingram's first theory, recall, goes like this. After she filed her February complaint against Regano and Bolden, Regano allegedly retaliated by deeming her the harasser in his March report. But Regano provided a legitimate, non-retaliatory reason for his action in his March report—namely, that all of the evidence before him supported the conclusion that she harassed Davis, not the other way around. The email traffic—most of which Regano's report summarized, and none of which Ingram disputes—makes that clear. At first Davis enthusiastically expressed his appreciation for Ingram's help. But that enthusiasm waned, then turned to reticence, when Ingram started to send more personal emails: emails describing prior romantic relationships in other teaching jobs, revealing her "weakness for friendships with male educators," and acknowledging that her "motives" could be "easily misconstrued." R.111-12 at 2–4. When Davis rejected Ingram's offer to volunteer for his class in the next school year, she called him "difficult," R.111-4 at 1, "arrogant," and "ungrateful." R.111-16 at 1. She hypothesized that Davis was "attracted to [her]" and that this emotion "turned to guilt and dislike." R.111-16 at 1. After Davis reported Ingram to the school principal, and after the principal directed Ingram to stop emailing Davis, she persisted. As Regano recognized, and as independent investigators confirmed, this record provided an ample non-retaliatory reason to suspend Ingram.

**\*3** In trying to fend off this conclusion, Ingram uses several emails to try to establish pretext. She points to an email that she sent to Davis, in which she said that she was not attracted to him but suspected that he felt differently.

Case: 24-1775   Document: 47   Filed: 09/24/2025   Page: 103

Ingram v. Regano, Not Reported in Fed. Rptr. (2025)
2025 WL 488618

She guesses that, from this email, he suspected she might complain about his behavior so decided to complain about hers as a "preemptive strike." Appellant's Br. 37. She points to an email from Davis in which he expressed fear that school officials would rule against him, calling "the whole thing ... hurtful fiction." R.118-5 at 1. From this, she claims that school officials were going to rule against him, at least before Regano caught wind of her complaint against him. She also points to the deposition of one board member, who vaguely recalled a letter Ingram supposedly sent to Davis "about her past conquests." Appellant's Br. 41. Because the board member couldn't identify the exact letter during her deposition, she claims that someone must have shredded the document.

All of this comes up short. To show that Regano's rationale was pretextual, Ingram had to provide more than conclusory assertions. *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005). Her responses do just that and are unreasonable to boot. Summary judgment "does not allow, much less require, that we draw strained and unreasonable inferences in favor of the nonmovant." *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006) (quotation and emphasis omitted). Ingram cannot show a triable issue of fact that way.

Ingram pivots to temporal proximity. She claims that, because the district's first investigatory report came two weeks after she filed her retaliation complaint, Regano's stated motivations for the report must be pretextual. In some settings, it is true, suspect timing along with other suspicious circumstances may support an inference of retaliation. *Maben v. Thelen*, 887 F.3d 252, 268 (6th Cir. 2018). But "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). At all events, there is nothing remotely suspicious about promptly evaluating two complaints by two teachers against each other. That is all that happened.

She insists that Regano's motive must be questionable because he deprived her of notice of the allegations against her before she saw his report. But because the school district gave Ingram notice of Davis's complaint, which she confirmed over email, and interviewed her in January, no reasonable juror could make that inference.

Ingram argues that Regano's factual findings are so baseless that his stated reasons must be pretextual. But the only argument she makes—that the principal gave her permission to email Davis again—has nothing to do with Regano's decision-making, which is the crux of this claim. Ingram's

second theory of retaliation fails, too. Ingram proposes that, due to her February 2018 complaint against them, Regano and Bolden retaliated by improperly participating in, and thus clouding with bias, Clifford's investigation into the complaint. But all of the challenged actions taken by Regano and Bolden plainly had reasonable bases.

Recall how the two of them became involved. Clifford explained that, even though she controlled the investigation and chose whom to interview, she typically needs "a liaison" to help her schedule interviews and reserve space to conduct them. R.102-1 at 16. Bolden assumed that role. Bolden helped coordinate her interview schedule, and managed exhibits by turning over "every" available document that Clifford requested without "any resistance." R.102-1 at 31. In the words of the Taft law firm (which reviewed the Clifford investigation after Ingram's additional complaints), Bolden served as a "logistics point of contact." R.111-37 at 74. Regano took part in this investigation only by telling Bolden to handle communications with Clifford.

Both officials provided non-retaliatory reasons for their actions. As Bolden put it, when a "bus" or "computer is not working," everyone calls him, "the guy who fixes things." R.112-5 at 37–38. When Clifford needed assistance from different employees, private space for her 28 interviews, documents, emails, and other information, Bolden thus helped —not because of Ingram or her complaint—but because he is "the guy who gets the things done." R.112-5 at 38. The same is true for Regano, who stated that he delegated this work to Bolden due to his "talent" and demonstrated success as an administrator, not because of Ingram or her complaint. R.112-20 at 3–4.

**\*4** Ingram frames her only response in terms of the causation element of a prima facie case, not in terms of pretext. It fails either way. She claims that "no other reason exists" for the pair's involvement aside from her naming them in her complaint. Appellant's Br. 26. A different school official (say, the school district's compliance officer), she points out, could have provided Clifford with necessary logistical support. Because that official did not handle these ministerial and administrative tasks, she claims, Regano and Bolden must have "deliberately kept [her] away from the investigation." Appellant's Br. 27. That is a stretch. It is an unreasonable inference given Bolden's track record of handling these kinds of tasks. No record evidence supports it anyway. The district court correctly held that no triable issue remains on this claim.

Case: 24-1775   Document: 47   Filed: 09/24/2025   Page: 104

Ingram v. Regano, Not Reported in Fed. Rptr. (2025)
2025 WL 488618

B.

*Sex discrimination under the Fourteenth Amendment of the U.S. Constitution, Title VII, and Ohio law.* Ingram claims that Regano and Bolden discriminated against her based on sex under the federal Equal Protection Clause, Title VII, and Ohio law. As she sees it, gender bias infected the investigation of Ingram's and Davis's sexual harassment complaints and explains Regano's March 2018 decision against her.

In evaluating all three claims, we use the same test, the one used to assess Title VII sex-discrimination claims. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) (Equal Protection); *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (Ohio law). To make out a prima facie case, Ingram must show (among other things) that the challenged actions give "rise to an inference of unlawful discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). One way to meet this requirement—and the only way Ingram pursues—is to show that the school district treated her similarly situated male counterpart "more favorably." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quotation omitted). Because she has not shown that officials treated her differently from Davis, her claim fails.

School officials followed the same investigatory process for the complaints by Davis and Ingram. Recall that Regano emailed Ingram a week before her interview to tell her that Davis "shared some of his concerns" about the incident and that the school district intended "to conduct a thorough investigation" of "both" complaints. R.111-28 at 1. Ingram replied by thanking him for the "notice of [the] investigation." R.111-28 at 1. Before that meeting, Ingram submitted a preliminary statement. Likewise, school officials told Davis about the meeting in advance, but he chose not to submit a preliminary statement. In their interviews, officials followed the same general format.

Each teacher had the chance to tell his or her side of the story. Ingram claimed, for instance, that Davis had become "extremely angry" with her and "glared" at her. R.111-40 at 10. Davis explained, for instance, that, after he asked Ingram to stop communicating with him, she "started sending more emails." R.111-39 at 2. Both Ingram and Bolden responded to the other side's allegations: Davis by asserting that there was "[n]ever a single time [he] was inappropriate," R.111-39 at 6, Ingram by asserting that she sent him her "big email,"

in which she confessed her attraction to Davis (and to which he never replied) to "trick him" and prompt an investigation, R.111-40 at 13. Both parties had the opportunity to propose resolutions for the dispute. Davis wanted Ingram to "go away," R.111-39 at 6, and Ingram wanted to keep working at the school. Through all of this process, Ingram has not identified any material ways in which the officials subjected her to worse, or for that matter different, investigatory processes than those Davis received.

Ingram resists this conclusion on the grounds that a triable issue remains as to whether Regano investigated harassment allegations made by female employees in a different way from the approach he used for allegations by male employees. As evidence, she points to a 2012 email from a female employee resigning due to "harassing" conduct and a 2017 email from another female employee claiming that Bolden yelled at her about a curriculum disagreement. R.115-59 at 1. She claims that both complaints went unaddressed. True or not, this allegation does not tell us anything about what happened here. The relevant question is how the school district treated Ingram. The undisputed evidence shows that the school district respected Ingram's serial complaints in more ways than one. Regano and Bolden investigated her initial complaint. Clifford, an independent investigator, looked at her second complaint. And the Taft law firm, another independent investigator, looked at her next five complaints. Ingram cannot prove that she suffered a biased investigation on the ground that the complaints of two employees over the past several years allegedly failed to trigger an investigatory process.

**\*5** Ingram adds that "no one ever told male employees" to "soothe the ego[ ]" of another employee, as she claims the principal instructed her to do for Davis. Appellant's Br. 50. But that (alleged) statement came from the principal, not from Regano or Bolden. True or not, it thus does not give rise to an inference of unlawful discrimination by these two defendants. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000).

Ingram separately attempts to revive an adverse-action theory of liability that we rejected on preclusion grounds in the last appeal. *Ingram*, 2023 WL 6634262, at \*3. She claims that we may now consider this theory—that the relevant adverse action stemmed not from investigatory bias but from her restriction from the school—because the Supreme Court recently lowered the bar for how much harm a Title VII plaintiff must show to establish an adverse action. *See*

Ingram v. Regano, Not Reported in Fed. Rptr. (2025)

2025 WL 488618

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). This argument, too, falls short. Even if *Muldrow* permitted us to embrace her theory of adverse action, *see Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885 (6th Cir. 2024) (noting that *Muldrow* calls our precedent "into doubt"), Ingram could not show that she was similarly situated to Davis, who (unlike Ingram) did not engage in misconduct and who (unlike Ingram) came out of the investigation free of work restrictions. *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1029 (6th Cir. 2010) (finding "no evidence of disparate treatment" where a plaintiff failed "to show that the other employees' acts were of comparable seriousness to his own infraction" (quotation omitted)).

### C.

*Tortious civil conspiracy under Ohio law.* Ohio courts have defined a tortious civil conspiracy as a "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins.*, 650 N.E.2d 863, 866 (Ohio 1995) (quotation omitted). Ohio law does not recognize civil conspiracy as an independent cause of action. *Burgess v. Fischer*, 735 F.3d 462, 483 (6th Cir. 2013). To prevail, Ingram must show the "existence of an unlawful [tortious] act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000). Because Ingram's claims of unlawful retaliation and sex discrimination fail and because she offers no theory of tort liability, she cannot do so.

For these reasons, we affirm.

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 488618

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 106

Mllczak v. General Motors, LLC, Not Reported in Fed. Rptr. (2024)
2024 WL 3205990

2024 WL 3205990
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Douglas MLLCZAK, Plaintiff - Appellant
v.
GENERAL MOTORS, LLC, Defendant - Appellee

Case No. 23-1462
|
Filed: June 17, 2024
|
Issued: June 17, 2024

**Attorneys and Law Firms**

Eric I. Frankie, Law Offices, Detroit, MI, for Plaintiff - Appellant.

Donald Campbell Bulea, Mami Kato, Ogletree Deakins Ogletree, Deakins, Nash, Smoak & Stewart, PLLC, Birmingham, MI, for Defendant - Appellee.

Amos Blackman, Tara S. Patel, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae Equal Employment Opportunity Commission.

BEFORE: SILER, Circuit Judge; MATHIS, Circuit Judge; BLOOMEKATZ, Circuit Judge;

**ORDER**

 **\*1** Upon consideration of the petition for rehearing filed by the appellant,

It is **ORDERED** that the petition for rehearing be, and it hereby is, **DENIED.**

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 3205990

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2077147
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Jane **MORTIMER**, Plaintiff–Appellant,
v.
**ALPENA** COUNTY PROBATE COURT
and **Alpena** County, Defendants–Appellees.

Docket No. 290958.
|
May 25, 2010.

Alpena Circuit Court; LC No. 08–002309–CD.

Before: WHITBECK, P.J., and SAWYER and BORRELLO,
JJ.

**Opinion**

PER CURIAM.

 **\*1** Plaintiff Jane Mortimer appeals as of right the trial court's
order granting defendants Alpena County Probate Court
and Alpena County summary disposition Pursuant to MCR
2.116(C)(7) on Mortimer's claim under the Whistleblowers'
Protection Act. [1] We reverse and remand for further
proceedings. We have decided this appeal without oral
argument. [2]

I. BASIC FACTS AND PROCEDURAL HISTORY

Mortimer was employed as the probate register for the Alpena
County Probate Court. She averred that she was terminated
in retaliation for challenging a judge's practice of appointing
"standby" guardians in adult guardian proceedings, which
she claimed violated the Estates and Protected Individual's
Code. [3]

It is undisputed that Mortimer was suspended with pay on
May 19, 2008, and that on that date she cleaned out her office
and never returned to work. Further, it is undisputed that on
that date, Mortimer was advised that she would no longer be

serving as probate register and that she would be given until
June 9, 2008, to sign an employment departure agreement
that would allow her to resign with certain financial benefits
but subject to certain conditions. The period to accept the
employment departure agreement was extended pursuant to
Mortimer's request. When the deadline passed, a June 23,
2008 letter notified Mortimer that she had been terminated,
effective June 21, 2008.

Mortimer filed her Whistleblower's violation complaint
on September 11, 2008. However, defendants moved for
summary disposition, arguing that Mortimer's claim actually
accrued on May 19, 2008, and that, therefore, the applicable
90–day statute of limitations period had expired. Mortimer
countered that her complaint was timely because she filed
her complaint within 90 days of June 21, 2008. The trial
court agreed with defendants, stating that Mortimer was told
she was being terminated on May 19, 2008, and was simply
given additional time to determine whether her departure
would be by resignation or termination. Accordingly, the trial
court granted summary disposition in favor of defendants.
Mortimer now appeals.

II. STATUTE OF LIMITATIONS

A. STANDARD OF REVIEW

Under MCR 2.116(C)(7), a party may move for summary
disposition on the ground that a claim is barred by the statute
of limitations. Neither party is required to file supportive
material; any documentation that is provided to the court,
however, must be admissible evidence. [4] The plaintiff's well-
pleaded factual allegations must be accepted as true and
construed in the plaintiff's favor, unless contradicted by
documentation submitted by the movant. [5] Absent disputed
issues of fact, we review de novo whether the cause of action
is barred by a statute of limitations. [6]

B. ANALYSIS

The Whistleblowers' Protection Act provides:

> An employer shall not discharge,
> threaten, or otherwise discriminate

against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [7]

**\*2** An employee seeking to bring a claim for violation of the above provision, however, is subject to a 90–day statute of limitations: "A person who alleges a violation of this act may bring a civil action for appropriate injunctive relief, or actual damages, or both within 90 days after the occurrence of the alleged violation of this act." [8]

In *Parker v. Cadillac Gage Textron, Inc,* [9] the plaintiffs were notified that they would be laid off as part of a reduction in force on December 3, 1990. Their last day of work was December 21, 1990, but the employer's records showed that January 7, 1991, was their effective date of separation. [10] The *Parker* Court held that the date of discharge was the last day worked, stating:

A claim of discriminatory discharge accrues on the date the plaintiff is discharged. The last day worked is the date of discharge. Subsequent severance or vacation pay does not affect the date of discharge. In this case, [the] plaintiffs filed their case more than three years after the date they were discharged. Despite the fact that January 7, 1991, may have been [the] plaintiffs' "effective" date of separation, it is undisputed that the last day they actually worked was December 21, 1990. Even if we accept the mistaken notation in [the] defendant's records that January 4, 1991, was the last day worked, the three-year statute of limitations [ 11 ] bars [the] plaintiffs' suit. [ 12 ]

In *Collins v. Comerica Bank,* [13] the plaintiff was investigated for employee misconduct and was suspended, apparently for failing to cooperate with the investigation. She was subsequently terminated, and filed suit within three years of her termination date. [14] The *Collins* Court held:

Properly understood, *Parker's* "last day worked" holding is limited to situations where a discriminatory discharge claim has already surfaced. We agree with *Parker's* holding because the "effective date of separation" there was not the date of discharge. Rather, where a plaintiff has already been subjected to an alleged discriminatory termination, a cause of action naturally accrues on the last day an employee worked.

However, if a discharge has yet to occur, it cannot be said that the last day worked represents the discharge date. Simply put, a claim for discriminatory discharge cannot arise until a claimant has been discharged. Accordingly, the "last day worked" cannot represent the date of discharge, as held in *Parker,* where a claimant's last day actually worked precedes the discharge.

In the present case, even though [the] plaintiff was suspended on September 5, 1996, and in retrospect that date represents the last day she *actually worked,* it was not until September 25, 1996 that she was *actually discharged,* or terminated, from employment. Unlike the plaintiffs in *Parker* who knew on the last day they worked that their employment had been terminated and that they were being discharged as employees on that date, on September 5, 1996, [the] plaintiff in this case only knew that she had been suspended indefinitely. [ 15 ]

**\*3** Here, Mortimer was advised on May 19, 2008, that she would be *suspended* with pay from her employment and that this was non-negotiable. However, unlike the plaintiff in *Parker,* it had not yet been determined that Mortimer would be *terminated.* " 'Suspended' does not equate with 'terminated' or 'discharged.' Thus, being suspended does not create a cause of action for discharge or termination." [16] Moreover, as of the last day Mortimer worked, she still had the option of resigning. Thus, while action had been taken against her, the actual discharge had yet to occur. Since "a claim for discriminatory discharge cannot arise until a claimant has been discharged," [17] we conclude that Mortimer's claim accrued on the effective date of her termination, June 21, 2008. Accordingly, Mortimer's complaint filed on September

11, 2008, within 90 days of the effective date of termination, was timely.

We reverse and remand for proceedings consistent with this opinion. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W.2d, 2010 WL 2077147

---

**Footnotes**

1       MCL 15.361 *et seq.*

2       MCR 7.214(E).

3       MCL 700.5301 *et seq.*

4       *Maiden v. Rozwood,* 461 Mich. 109, 119; 597 NW2d 817 (1999).

5       MCR 2.116(G)(5); *Maiden,* 461 Mich. at 119; *Gortney v. Norfolk & W.R. Co,* 216 Mich.App 535, 538–539; 549 NW2d 612 (1996).

6       *Colbert v. Conybeare Law Office,* 239 Mich.App 608, 609 NW2d 208 (2000).

7       MCL 15.362.

8       MCL 15.363(1).

9       *Parker v. Cadillac Gage Textron, Inc,* 214 Mich.App 288, 289; 542 NW2d 365 (1995).

10      *Id.*

11      Referring to MCL 600.5805(8), which sets forth a three-year period of limitations for claims brought under the Civil Rights Act, MCL 37.2101 *et seq.*

12      *Parker,* 214 Mich.App at 290 (internal citations omitted).

13      *Collins v. Comerica Bank,* 468 Mich. 628, 629; 664 NW2d 713 (2003).

14      *Id.* at 630.

15      *Id.* at 633.

16      *Id.* at 634.

17      *Id.* at 633.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🏴 KeyCite Yellow Flag

Distinguished by   Gibbs v. Tennessee Department of Corrections, M.D.Tenn.,   August 28, 2025

2014 WL 8186701
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Robert SANGO, Plaintiff,
v.
Daphne JOHNSON, et al., Defendants.

Civil Action No. 13–12808.
|
Signed Oct. 29, 2014.

**Attorneys and Law Firms**

Robert Sango, Ionia, MI, pro se.

Allan J. Soros, Emily L. Jones, Mark E. Donnelly, Michigan Department of Attorney General, Lansing, MI, for Defendants.

***REPORT AND RECOMMENDATION TO GRANT DEFENDANTS JOHNSON, RUSSELL AND MACEACHERN'S MOTION TO DISMISS [92], GRANT DEFENDANTS CABALLERO, COLE, DELL, ELLISON, GUTHRIE, HOGAN, HUGHES, MCDAID, PEEL, RIVARD, ROWELY, SCHNEIDER AND SHAWLTZ'S MOTION FOR SUMMARY JUDGMENT [153], GRANT DEFENDANT MCCLELLAND'S MOTION TO DISMISS [160], GRANT DEFENDANT STEVE BENN'S MOTION TO DISMISS [162], DENY PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT [188, 196] AND DENY PLAINTIFF'S MOTIONS TO "DENY DEFENSE" [157, 171, 177]***

DAVID R. GRAND, United States Magistrate Judge.

**I. RECOMMENDATION**

**\*1** Before the Court are numerous dispositive motions.[1] Defendants Daphne Johnson, Richard Russell and Kenneth MacEachern (hereinafter referred to as the "Oaks Defendants") have filed a motion to dismiss Plaintiff Robert Sango's amended complaint against them, and Sango has

filed two motions for summary judgment against the Oaks Defendants. [92, 188, 196]. Defendants Dustin Caballero, Andrew Cole, John Dell, Andrew Ellison, Nick Guthrie, "First Name Unknown" Hogan (identified by Defendants as James Hogan), Kelly Hughes, Joseph McDaid, "First Name Unknown" Peel (identified by Defendants as Bradley Peet), Steven Rivard, David Rowley, L. Schneider and "First Name Unknown" Shawltz's (identified by Defendants as Ray Sholtz) (hereinafter referred to as the "St. Louis Defendants") have filed a motion for summary judgment for failure to exhaust administrative remedies. [153]. Defendant Janet McClelland has filed a motion to dismiss for failure to state a claim upon which relief can be granted. [160]. Finally, Defendant Steve Benn has filed a motion to dismiss, or in the alternative for summary judgment. [162]. Sango has responded to the latter three motions with motions of his own, styled as "motions to deny" the various defendants' motions. [157, 171, 177]. This case has been referred to the undersigned for all pretrial proceedings pursuant to 28 U.S.C. § 631(b)(1)(A) and (B). [60]. For the following reasons, the Court RECOMMENDS that: the Oaks Defendants' motion [92] be GRANTED; the St. Louis Defendants' motion [153] be GRANTED; McClelland's motion [160] be GRANTED; Benn's motion [162] be GRANTED; and that Sango's motions to deny Defendants' motions and his motions for summary judgment [157, 171, 177, 188, 196] be DENIED.

1    Sango previously moved to recuse the undersigned from this case .[163]. He also has filed a judicial misconduct complaint against the undersigned with the Sixth Circuit Court of Appeals related to the handling of this case. On October 7, 2014, the undersigned issued an order denying Sango's motion, and explaining why no reasonable, objective person, knowing all of the circumstances in this matter would question the undersigned's impartiality or conclude that the undersigned harbors any bias against Sango. [182]. For the same reasons as stated in the Court's order, Sango's recent filing of a civil action in the Eastern District of Michigan against the undersigned and his case manager (No. 14–14060) does not compel this Court to recuse itself.

**II. REPORT**
**A. Factual Background**

Sango filed his original complaint in this action on June 27, 2013.[1]. On February 6, 2014, the Magistrate Judge then

assigned to the action issued an order requiring Sango to file an amended complaint containing "all of his claims and factual allegations against all defendants in one document" by March 6, 2014.[34]. The case was referred to the undersigned on March 27, 2014, and at that time no amended complaint had been filed. [60]. The Court held a telephonic status conference on the matter on April 29, 2014, wherein Sango alleged that he had not received a copy of the Order requiring the filing of his amended complaint. On the same date, the Court entered an order giving Sango until May 13, 2014, to file his amended complaint, and making clear that he was required to "identif[y] each defendant he is suing, the specific claim(s) made against each defendant, and the facts which support each of those claims." [83]. On May 8, 2014, Sango filed an amended complaint against the above defendants. [90].[2]

[2]  Claims against two other defendants, Jeffrey Davis and Inspector First Name Unknown Olson, who have not been properly served in this action [123, 124], are dealt with in a separate Report and Recommendation filed on today's date.

### 1. Oaks Defendants[3]

[3]  Although, per the Federal Rules of Civil Procedure, an amended complaint supersedes an original complaint such that the allegations in the original complaint are no longer actionable, the Court, given Sango's *pro se* status, refers on occasion to certain allegations in his original complaint, only to the extent that those allegations are necessary to give context to his amended claims (for instance, to identify the job description of a defendant as previously alleged).

Sango alleges that while he was being housed at the Kinross Correctional Facility ("KCF"), unspecified "staff" there "had an inmate stab [him]" in retaliation for him filing prior litigation in the Western District of Michigan against certain MDOC employees. Sango alleges that he was transferred to the Oaks Correctional Facility ("OCF") in Manistee, Michigan, and advised the Oaks Defendants[4] of the alleged "hit," but that they failed to conduct an investigation and pursue a "Step III" grievance he had filed. He claims he was given an improper security classification and then transferred from the Oaks Correctional Facility to the St. Louis Correctional Facility ("SLF") in St. Louis, Michigan to "break [him] from continuing [his Western

District of Michigan litigation]." He further alleges that the Oaks Defendants' actions constitute deliberate indifference and negligence.

[4]  Defendant Johnson is the head of legal affairs for the Michigan Department of Corrections ("MDOC") and is responsible for litigation related to, among other things, grievances and appeals. Defendant Russell is the Manager of the Grievance Section of MDOC and responsible for coordination and investigation of grievances. Defendant MacEachern is the Manger of Internal Affairs for MDOC and is legally responsible for conducting or directing investigations of alleged employee misconduct.

### 2. St. Louis Defendants

**\*2** Sango also alleges retaliation by the St. Louis Defendants. He alleges that, while housed at the St. Louis facility, defendant Corrections Officer ("C/O") Sholtz began to harass him, closed the cell door on his hands and solicited other inmates to stab him. He alleges that he reported this conduct to defendant Assistant Resident Unit Supervisor ("ARUS") Kelly Hughes and that no investigation was conducted. He further alleges that ARUS Hughes then stopped calling Sango out for receipt of legal mail. He alleges that Hughes's conduct was due, in part, to a conspiracy with defendant Johnson to pressure Sango into terminating his pending litigation.

Sango alleges that on June 20, 2013, he filed his original action against the Oaks Defendants, and that on June 23, 2013, defendant Andrew Cole (identified by Sango as a lieutenant, but identified by defendants as a captain) used an emergency procedure to transfer Sango between units. Upon his arrival in his new unit, defendant C/O L. Schneider allegedly told a gang leader that Sango was transferred because he was having trouble with that same gang in his old unit. Sango alleges that these rumors were dispelled when the gang members of both units conferred with each other and discovered there was no such trouble. Sango claims that he obtained written statements of these gang members regarding how they became aware of the alleged dispute resulting in his transfer.

Sango alleges that on June 26, 2013, a search was conducted of his cell by defendant C/O Nick Guthrie and that at the time of the search, Sango was in possession of these gang member witness statements, which were sitting in plain view in his cell. Sango alleges that such searches were conducted

to harass and retaliate against him and resulted in destruction of his personal property. Sango alleges that he left his cell as ordered for the search, and that Guthrie confronted him on his return, upset with the content of the witness statements. Guthrie allegedly brought up the issue of the litigation against defendant Johnson and grabbed Sango from behind, attempted to spray pepper spray in his mouth, took him to the floor and yelled at him to stop resisting. At this point, Sango alleges that defendant C/O Dustin Caballero approached and called Sango a name, discharged his pepper spray at Sango while he and Defendant Guthrie were still on the floor, sprayed himself instead and ran away screaming. Sango alleges that defendant ARUS James Hogan arrived and grabbed Sango's penis. Then defendant C/O Rowley arrived and deployed his Taser on Sango, striking him in the spine, and stated, "Shit he will probably never walk again after that much juice to the spine. Isn't that law guy ... I wanted to hit him right at the back of the neck, that last one, but I didn't want to get you Nick."

Sango alleges that he was then taken to segregation. On the way, defendant Captain Cole approached and allegedly told defendants Sergeant Andrew Ellison, C/O John Dell, C/O Rowley and C/O Joseph McDaid that Sango was going "in on his head." Sango alleges these defendants picked him up by his arms and legs and slammed his head into the shower wall. Two hours later, defendant Schneider secured Sango's property and informed him that she found a razor on a toothbrush. Sango alleges that the weapon was not his, but was pinned on him either by another inmate or by defendant Schneider herself. Sango further alleges that numerous pieces of his personal property went missing after the search, including books, photographs, and legal documents, as well as the gang member witness statements.

**\*3** Sango alleges that defendant Ellison authored a critical incident report documenting the incident that included allegedly false statements that Sango had tried to run out of the unit during the search and that he attempted to take defendant Guthrie "down."[5] Sango alleges that "[d]uring this entire controversy" he continued to notify defendant Warden Steven Rivard but that Rivard failed to investigate, either by viewing a video that allegedly existed documenting the incident or interviewing any witnesses. Sango charges the various St. Louis Defendants with a number of different causes of action, including civil conspiracy under § 1983, retaliation, negligence, malicious prosecution, violation of free exercise of religion, cruel and unusual punishment,

illegal search and seizure, deliberate indifference and abuse of process.

[5]    Sango was charged criminally for his alleged conduct, though he recently was found not guilty by a jury. [201].

### 3. Defendant Steve Benn

Sango alleges that defendant Sergeant Steve Benn failed to properly investigate the incident at the St. Louis facility, including failing to question Sango's witnesses or review the crime scene or video. He alleges that at one point, when he was "gaining ground" in the criminal case that was brought as a result of the incident, Benn and other St. Louis correctional staff "furnished" a new eye witness to support the officers' story in order to pressure Sango to plead guilty. He also claims that the eye witness' statement contradicts defendant Guthrie's story. Sango charges Benn with civil conspiracy and abuse of process.

### 4. Defendant Janet McClelland [6]

[6]    Sango identified one defendant only as the "Director of the Michigan Civil Service Commission." Apparently, however, there is no such position within the State of Michigan, which led this defendant to be identified as Janet McClelland, the State Personnel Director, who is vested with the administration of the Civil Service Commission's powers. [159, 185].

Sango's amended complaint alleges that he informed McClelland of the fact that prison cell searches were being conducted to harass and retaliate against him, as well as to destroy his personal property, and that despite being so informed, McClelland failed to investigate or take corrective action. Sango charges McClelland with negligence.

### B. The Parties' Motions

The Oaks Defendants argue that Sango fails to state a claim against them since his allegations all surround their alleged failure to investigate past conduct. They argue that a mere failure to investigate cannot be the basis of a Section 1983 claim, because a plaintiff must allege specific affirmative conduct on the part of a defendant. Sango responds that he has alleged personal involvement in that the Oaks Defendants were notified of incidents of his physical harm and failed to investigate. He asserts that by doing so

they "authorized, approved, and knowingly acquiesced" in the physical harm he allegedly suffered. He further argues that the Oaks Defendants' "deliberate" failure to perform their duties eviscerates their defense of qualified immunity. Finally, he argues that the Oaks Defendants purposefully hindered his ability to continue litigation against MDOC and its officers. Sango also affirmatively moves for summary judgment against the Oaks Defendants, adding a number of facts not contained in his complaint, and arguing that the Oaks Defendants had a duty to protect him and investigate his claims. [188, 196].

**\*4** The St. Louis Defendants move for summary judgment against Sango, arguing that he failed to exhaust his administrative remedies against them, as the only grievance he filed while at the St. Louis facility was a Step Three grievance, which was returned to Sango as being incomplete, and was never resubmitted according to MDOC's records. Sango responds to the St. Louis Defendants' motion by arguing that summary judgment is premature as he has not been given an opportunity to conduct discovery. [157].

Defendant McClelland moves to dismiss Sango's complaint against her, arguing that he fails to state a claim upon which relief can be granted because he fails to allege a federal claim against her, fails to allege any facts that amount to McClelland's personal involvement in any of the above alleged actions, and fails to allege the factors required of a negligence claim. She argues that his claims against her also fail because her alleged failure to investigate is not sufficient to state a claim under Section 1983, and she is immune from suit in her official capacity under the Eleventh Amendment. Sango responds that federal jurisdiction exists here where the claims against McClelland allegedly form part of the same case and controversy as the other claims in his complaint. [166]. He further argues that her official duties necessarily make her the one responsible for employment issues at MDOC and thus her inaction in this regard in the face of his repeated complaints constitutes actionable conduct under Section 1983. [*Id.*]. Finally, Sango argues that the facts he pleads are sufficient to overcome McClelland's motion. [177].

Defendant Benn moves to dismiss and/or for summary judgment against Sango, arguing that he is immune from suit in his official capacity under the Eleventh Amendment, that Sango has failed to allege more than bare legal conclusions against him, and that even if his allegations are considered true and sufficient, Benn is entitled to qualified immunity.

Sango responds the same way he responded to the St. Louis Defendants' motion, that summary judgment is premature prior to commencement of discovery. [171].

The Court notes that Sango's "Motions" to deny the defendants' dispositive motions are more "responses" than "motions." [157, 171, 177].

### C. Legal Standards

#### 1. Motion to Dismiss

A motion to dismiss pursuant to Fed. R. of Civ. P. 12(b)(6) tests a complaint's legal sufficiency. Under Fed.R.Civ.P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly,* 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly,* 550 U.S. at 556. Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007) (emphasis in original) (citing *Twombly,* 550 U.S. at 555–56).

**\*5** In deciding whether a plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Id.; see also Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). That tenet, however, "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to sufficiently comport with basic pleading requirements. *Iqbal,* 129 S.Ct. at 1949. *See also, Twombly,* 550 U.S. at 555; *Howard v. City of Girard, Ohio,* 346 Fed. Appx. 49, 51 (6th Cir.2009). Furthermore, a court is not required to "create a claim which [a plaintiff] has not spelled out in his pleading." *Clark v. Nat'l Travelers Life Ins. Co.,* 518 F.2d 1167, 1169 (6th

Cir.1975). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1949.

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers. *See Thomas v. Eby,* 481 F.3d 434, 437 (6th Cir.2007). Nonetheless, "[t]he leniency granted to pro se [litigants] ... is not boundless," *Martin v. Overton,* 391 F.3d 710, 714 (6th Cir.2004), and "such complaints still must plead sufficient facts to show a redressable legal wrong has been committed." *Baker v. Salvation Army,* No. 09–11424, 2011 WL 1233200, at *3 (E.D.Mich. Mar.30, 2011).

### 2. Motion for Summary Judgment/Failure to Exhaust

The St. Louis Defendants have moved for summary judgment on Sango's claims against them on the basis of his failure to exhaust administrative remedies. Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, before a prisoner may bring an action challenging his prison conditions, he must first exhaust available administrative remedies. 42 U.S.C. § 1997e(a). *See also Jones v. Bock,* 549 U.S. 199, 220, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). A prisoner must exhaust available administrative remedies even if he may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter,* 534 U.S. at 520; *Booth,* 532 U.S. at 734. "This requirement is a strong one. To further the purposes behind the PLRA, exhaustion is required even if the prisoner subjectively believes the remedy is not available, even when the state cannot grant the particular relief requested, and even where the prisoner[ ] believes the procedure to be ineffectual or futile." *Napier v. Laurel County, Ky.,* 636 F.3d 218, 222 (6th Cir.2011 (internal quotations and citations omitted)).

In *Jones v. Bock,* the Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." 549 U.S. at 216. The burden is on the defendant to show that a plaintiff failed to properly exhaust his administrative remedies. However, when faced with a motion to dismiss or for summary judgment based on a failure to exhaust, a prisoner cannot just sit on his laurels, but must offer competent and specific evidence showing that he indeed exhausted his remedies, or was otherwise excused from doing

so. The Supreme Court reiterated that "no unexhausted claim may be considered." 549 U.S. at 220.

**\*6** In order to exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *Jones,* 549 U.S. at 218–19. In *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), the Supreme Court held that the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90; *see also Scott v. Ambani,* 577 F.3d 642, 647 (6th Cir.2009). Thus, when a prisoner's grievance is not filed within the prescribed period, or is incomplete, his claim is not "properly exhausted" for purposes of filing a section 1983 action in federal court. 548 U.S. at 90–93; *Siggers v. Campbell,* 652 F.3d 681, 692 (6th Cir.2011); *see also* 42 U.S.C. § 1997e(a).

### D. Analysis

Sango's allegations all generally relate to alleged retaliation by Defendants stemming from his filing grievances and, ultimately, a civil action related to the alleged stabbing that took place at KCF.[7] Retaliation against a prisoner in response to his exercise of a constitutional right violates the Constitution. *See Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, Sango must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that protected conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* The Sixth Circuit has also specifically held that a plaintiff must prove that the exercise of a protected right was not only part of the motivation, but a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell,* 250 F.3d 1032, 1037 (6th Cir.2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

[7]     Presumably, Sango is claiming that these alleged acts of retaliation by the Defendants violated the First Amendment, though he does not specifically claim a First Amendment violation.

As to the adverse action requirement, the plaintiff must also show that it actually resulted in an injury or consequence to him. *See Wurzelbacher v. Jones–Kelley,* 675 F.3d 580,

584 (6th Cir.2012) (where adverse action resulted in no consequences for plaintiff and where only allegation of injury was emotional, court found allegations insufficient to state a claim for First Amendment retaliation). Generally, whether an adverse action is sufficient to deter a person of ordinary firmness is a question of fact. *Id.* at 583–84. However, "[t]he analysis of this factor must be tailored to the circumstances such that prisoners might have to endure more than public employees, who in turn might have to endure more than the average citizen." *Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 724 (6th Cir.2010). "[T]rivial inconveniences and minor slights will not amount to an adverse action." *Hazel v. Quinn,* 933 F.Supp.2d 884, 890 (E.D.Mich.2013).

### 1. Eleventh Amendment

**\*7** Sango's amended complaint makes clear that he is suing all Defendants in both their official and individual capacities. [90 at 1]. All of Sango's claims for damages against Defendants in their official capacities are barred by Eleventh Amendment immunity. The Eleventh Amendment bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Michigan has not consented to civil rights suits in federal court. *Johnson v. Dellatifa,* 357 F.3d 539, 545 (6th Cir.2004). A suit against a state officer in his or her official capacity is simply another way of pleading an action against the state. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *VIBO Corp. v. Conway,* 669 F.3d 675, 691 (6th Cir.2012). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *Will,* 491 U.S. at 71. Accordingly, Defendants are entitled to dismissal with prejudice of all Sango's claims for monetary damages against them in their official capacities.

### 2. Oaks Defendants

Sango alleges that in August 2012, he contacted defendants MacEachern and Johnson "asking for an investigation into" his allegations that staff at KCF had coerced another inmate to stab him. [90 at ¶ 1]. He claims they failed to investigate the allegations, though he admits he was transferred to OCF. He further alleges that he sent a Step Three Grievance regarding the issue to defendant Russell, but that Russell falsely denied, in an affidavit in another case, ever receiving the grievance, and failed to submit the grievance to Internal Affairs as he was required by policy to do .[8] Finally, he alleges that his transfer

from the Oaks Correctional Facility to the St. Louis Facility was a "strategy devised by" defendant Johnson "to break me from continuing my civil action" regarding the stabbing, and that this is evidenced by the fact that he was being held and was transferred as a Level IV prisoner when he was actually not a level IV prisoner.[9]

[8] It does not appear that Sango is specifically alleging the falsification of testimony in this case. Rather, he appears to be merely citing this information as background for his claims that he provided notice to defendant Russell of his and other officers' failings in investigating Sango's claims, to no avail. Indeed, the section about Russell is merely incorporated as a "Note" to the complaint. [90 at ¶ 1].

[9] Sango attempts to supplement these bare allegations through his supplemental response to the Oaks Defendants' motion to dismiss. [111]. In that supplement, he adds further specificity to his allegations against defendant Johnson, stating that he was originally a level II security threat, but was sent to the Oaks Facility from KCF as a level IV due to a lack of bed space. When he began complaining about being held as a Level IV, noting that two Level II units had opened up at the Oaks Facility since his transfer, he alleges that Johnson "sent word" to him that if he ended his litigation, he would be returned to his proper security level. *Id.* at 2. He argues that his security level was arbitrarily increased prior to his transfer to St. Louis to "justify" a "lateral" security level transfer. *Id.* He alleges that St. Louis does not provide his religious meal, which he alleges was intentionally done in violation of his right to freedom of religion. *Id.* at 2–3. Finally, he alleges that his security level was reduced after transfer back to a level II on a "corrected" security screen, but that his holding level remained at a level IV in order to "break him from litigating." *Id.* at 2. His allegations regarding his security classifications at the various points in time (although not the reasons for those classifications) are corroborated by documents he attaches to this response, namely the security screen worksheets. [111 at 5–7]. However, none of these worksheets was completed or approved by any of the Oaks Defendants. *Id.*

First, to the extent Sango alleges claims against the Oaks Defendants premised upon their alleged failure to investigate the prior conduct of others, his claims fail. It is well-settled that a civil-rights plaintiff must allege the personal involvement of a defendant to state a claim under 42 U.S.C. § 1983. *See, e.g., Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that § 1983 liability cannot be based upon a theory of *respondeat superior* ); *Taylor v. Michigan Dep't of Corr.,* 69 F.3d 76, 81 (6th Cir.1995) (explaining that a plaintiff must allege facts showing that the defendant participated, condoned, encouraged, or knowingly acquiesced in alleged misconduct to establish liability). Any assertion that the Oaks Defendants did not properly respond to calls for investigation of alleged misconduct by other officials is insufficient to state a claim under § 1983. *See Poe v. Haydon,* 853 F.2d 418, 429 (6th Cir.1988).

**\*8** In *Poe,* the plaintiff worked as a janitor for the Commonwealth of Kentucky. She allegedly had complained to her supervisor that another janitor was physically and sexually harassing her on the job. The supervisors took certain measures to address the allegations, but did not change Poe to the day shift, as she had requested. She then filed a Section 1983 lawsuit in which "she argued principally that the [supervisors] were aware of the hostile and abusive work environment caused by [her colleague's] sexual harassment, but failed to take immediate action to correct the situation, including an adequate investigation of the matter ... [and that they had therefore] acquiesced in, condoned and ratified the [hostile work environment] ..." *Id.* at 422. The Sixth Circuit found these allegations did not support a claim under Section 1983 because Poe did not aver "that 'any of the supervisory officials ... actively participated in or authorized any harassment' by [her colleague]. At best, she has merely claimed that the [supervisors] were aware of alleged harassment, but did not take appropriate action. This is insufficient to impose liability on supervisory personnel under § 1983." *Id.* (internal citations omitted). *See also, e.g., Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999) (supervisory official's mere awareness of a complaint of allegedly illegal conduct, and her subsequent failure to take corrective action, is insufficient to trigger § 1983 liability because "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.' ") (internal citation omitted). Similarly, Sango's claims that the Oaks Defendants failed to properly investigate his allegations amount to nothing more than an alleged "mere failure to act" for which § 1983 liability does not lie.

Accordingly, those claims should be dismissed, and Sango's motion for summary judgment [188] should be denied. [10]

[10]     The Court also notes that Sango has not alleged facts showing that any injury he suffered is the result of a policy or regulation, or that any improper conduct arose from a deliberate failure to adequately investigate employees. *See Ellis v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir.2006) (setting forth three-part test for such claims).

To the extent Sango claims that his transfer between prisons was based on a strategy devised by defendant Johnson, he has similarly failed to state a claim for relief. Generally, inmates have no inherent constitutional right to avoid transfer from one prison to another. *Olim v. Wakinekona,* 461 U.S. 238, 245–46, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). However, the Sixth Circuit has held that, despite this general principle, prison officials may not transfer a prisoner "as a means of retaliating against him for exercising his First Amendment rights ." *Hill v. Lappin,* 630 F.3d 468, 473 (6th Cir.2010). In *Hill,* the Sixth Circuit noted that prison transfers can constitute adverse action where the transfer "would result in foreseeable, negative consequences to the particular prisoner." *Id.* at 475 (citing *Siggers-el v. Barlow,* 412 F.3d 693, 701–702 (6th Cir.2005).

It should be noted first that Sango's complaint, standing alone, fails to allege any negative consequences that resulted from his transfer. [90]. While he has attempted to supplement the allegations in his amended complaint with those from his response brief, it is axiomatic that a plaintiff may not amend his complaint through allegations made in a response to a motion to dismiss. *See Jocham v. Tuscola County,* 239 F.Supp.2d 714, 732 (E.D.Mich.2003) (plaintiff may not amend his complaint through arguments in his brief in opposition to motion). While Sango is proceeding *pro se,* and is thus is entitled to some leniency, he is still required to be aware of, and abide by, the rules and procedures of this Court. *Spruce v. Chase Bank,* No. 13–10711, 2014 U.S. Dist. LEXIS 116064 (E.D.Mich. July 14, 2014) *adopted by* 2014 U.S. Dist. LEXIS 5449 (E.D.Mich. Aug. 20, 2014) (*pro se* plaintiffs, "no less than attorneys, are expected to comply with procedural rules."). Further, it is relevant that Sango is not just any *pro se* litigant, but has frequently litigated in the Eastern and Western Districts, and thus is more familiar with such basic federal court pleading requirements than other *pro se* prisoners might be . [11] Finally, this Court specifically instructed Sango, on

two occasions, to file an amended complaint that contained all claims against all Defendants, including the factual support for those claims, in one document. [34, 83]. The Court will not countenance Sango's failure to follow the Federal Rules' pleading requirements and this Court's instructions by permitting him to further amend his complaint through his response to the Defendants' dispositive motion. *Jocham,* 239 F.Supp.2d at 732.

11    *See e.g. Sango v. Bell,* No. 08–10514, 2008 U.S. Dist. LEXIS 17567 (E.D.Mich. Mar. 7, 2008) (complaint dismissed for failure to pay filing fee or petition to proceed *in forma pauperis* ); *Sango v. Harpst,* No. 08–12709, 2008 U.S. Dist. LEXIS 94952 (E.D.Mich. Nov. 14, 2008) (adopting R & R granting summary judgment in favor of defendants regarding retaliation for litigation); *Sango v. Riggs,* No. 12–1179, 2013 U.S. Dist. LEXIS 16381 (W.D.Mich. Feb. 7, 2013) (complaint dismissed for failure to pay filing fee or petition to proceed *in forma pauperis* ); *Sango v. Dennis,* No. 12–332, 2013 U.S. Dist. LEXIS 111707 (W.D.Mich. Aug. 8, 2013) (overruling objections and adopting R & R dismissing complaint on summary judgment); *Sango v. Grambau,* No. 12–1199, 2014 U.S. Dist. LEXIS 41798 (W.D. Mar. 28, 2014) (overruling objections and adopting R & R dismissing complaint on summary judgment); *Sango v. Rowley,* No. 14–10904, 2014 U.S. Dist. LEXIS 33976 (E.D.Mich. Mar. 17, 2014) (denying motion for temporary restraining order and preliminary injunction against officer); *Sango v. Novak,* No. 14–343, 2014 U.S. Dist. LEXIS 56078 (Apr. 23, 2014) (dismissing complaint at screening stage pursuant to 42 U.S.C. § 1915, and finding claims to be frivolous); *Sango v. Ault,* No. 14–345, 2014 U.S. Dist. LEXIS 59804 (W.D.Mich. Apr. 30, 2014) (dismissing all but one defendant on motions to dismiss); *Sango v. Hammond,* No. 14–283, 2014 U.S. Dist. LEXIS 62184 (W.D.Mich. May 6, 2014) (dismissing complaint at screening stage pursuant to 42 U.S.C. § 1915); *Sango v. Miniard,* No. 14–344, 2014 U.S. Dist. LEXIS 78421 (W.D. Mich. June 10, 2014) (same); *Sango v. Huss,* No. 14–2, 2014 U.S. Dist. LEXIS 79912 (W.D. Mich. June 12, 2014) (same); *Sango v. Lewis,* No. 14–342, 2014 U.S. Dist. LEXIS 97464 (W.D.Mich. July 18, 2014).

Indeed, Sango has filed so many complaints that he has recently been barred from proceeding *in forma pauperis* by the "Three Strikes" rule of 28 U.S.C. § 1915(g). *See Sango v. Wakley,* No. 14–703, 2014 U.S. Dist. LEXIS 92194 (W.D.Mich. July 8, 2014) (denying leave to proceed *in forma pauperis* because at least three complaints dismissed for failure to state a claim); *Sango v. Curtis,* No. 14–823, 2014 U.S. Dist. LEXIS 112655 (W.D.Mich. Aug. 14, 2014) (same).

**\*9** However, even if the Court were to consider Sango's additional allegations, his claim against defendant Johnson would still fail. In neither his complaint nor his supplement does he do more than assert the bare conclusion that his transfer was part of a "strategy" devised by defendant Johnson to stop him from litigating his case. He offers no additional facts to support this theory, and the documents he attaches to his supplement belie any personal involvement of Johnson, as she was not the one classifying or approving his security level classification or transfer status. Since Sango's allegations in this respect do no more than "create speculation or suspicion of a legally cognizable cause of action," they fail to state a claim upon which relief can be granted. *See Bredesen,* 500 F.3d at 527; *Novak,* 2014 U.S. Dist. LEXIS 56078 at \*7–8 (mere allegations of "ultimate fact of retaliation, supported only by cursory descriptions" are insufficient to state claim for retaliation under § 1983). Accordingly, the Oaks Defendants' motion to dismiss [92] should be granted and Sango's claims against them should be dismissed.

### 3. St. Louis Defendants

The St. Louis Defendants move for summary judgment against Sango on the basis of his failure to exhaust administrative remedies. They argue that Sango's only grievance filed while at the St. Louis facility was a Step Three grievance, which was returned to him for being incomplete and which he never resubmitted in complete form. The St. Louis Defendants' arguments are supported by the affidavit of grievance coordinator defendant Russell, who avers that he searched the MDOC database for Sango's grievances and only located one grievance on file during his time at the St. Louis facility, the one noted above (while also averring that the date on that grievance is incorrect and should read September 1, 2013 instead of September 1, 2012, given the grievance identifier number assigned to it). [153 Ex. B]. Sango does not counter this evidence with either contrary evidence or even argument. Instead, he merely argues that summary judgment is premature when he has not yet been permitted to take

discovery. However, he does not specify what discovery he needs in order to properly respond to this motion.

MDOC Policy Directive 03–02–130 (effective July 9, 2007) sets forth the applicable grievance procedures. The following is an overview of the grievance process. [153, Ex. A]. Inmates must first attempt to resolve a problem within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his control. *Id.* at ¶ P. If the mandatory pre-grievance attempt at resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted resolution. *Id.* The Policy Directive also provides the following directions for completing Step I grievance forms: "The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places, and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The inmate submits the grievance to a designated grievance coordinator who makes an initial determination whether it should be rejected under MDOC policy or assigns it to a respondent. *Id.* at ¶¶ W, X. If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. The respondent at Step II is designated by the policy. The Step II respondent is generally the warden or the warden's designee. *Id.* at ¶ DD. If the inmate is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶ FF. The Step III appeal form must be sent to the Grievance and Appeals Section within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the Step III respondent. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ S. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing." *Id.* Ordinarily, a prisoner must pursue appeals of his grievance through Step III of the administrative process.

**\*10** Here, the uncontroverted testimony of defendant Russell, along with the printout of the MDOC grievance database, reveals that the only grievance received at the St. Louis correctional facility during Sango's incarceration there was a Step Three grievance received on September 1, 2013. [153, Ex. B ¶¶ 7–9]. That grievance was returned to Sango on October 11, 2013, because it had not been preceded by a Step I (or presumably, Step II) grievance as is required per the above-described policy, and had not been resubmitted by him in complete form. [*Id.*]. [12]

[12]    According to MDOC's records, Sango did not file another grievance until December 2013, when he was housed at the Ionia Correctional Facility. *Id.* at 4.

Sango's response does not even purport to dispute this evidence. While Sango argues that he needs additional discovery in order to properly respond, he does not identify what that discovery might be or what conclusions could be drawn from it. This is insufficient to rebut a properly supported motion for summary judgment. *See Dennis,* 2013 U.S. Dist. LEXIS 111707 at \*4–5 ("The Sixth Circuit has held that 'nebulous assertions' that more discovery time will produce evidence to defeat summary judgment are unavailing") *citing Lanier v. Bryant,* 332 F.3d 999, 1006 (6th Cir.2003). Moreover, the Court notes that Sango's own amended complaint is consistent with Russell's testimony that he skipped Steps I and II of the grievance process. [90 at ¶ 1(b) ("I wrote to [Defendants Johnson and MacEachern], and sent a Step III grievance ...") ].

Because Sango has failed to raise a material question of fact that he did not properly complete the MDOC grievance procedure through Step III, and has failed to argue, much less show, how additional discovery would alter that finding, he has not exhausted his administrative remedies, and therefore his claims against the St. Louis Defendants should be dismissed, without prejudice. *See Payette v. Gerth,* No. 10–256, 2011 U.S. Dist. LEXIS 86553, \*12 (W.D.Mich. July 14, 2011) *adopted by* 2011 U.S. Dist. LEXIS 86565 (W.D.Mich. Aug. 5, 2011) (finding administrative remedies unexhausted where prisoner failed to resubmit grievance after it was returned for being incomplete). Therefore, the St. Louis Defendants' motion for summary judgment [153] should be granted, and Sango's counter-motion [157] should be denied.

#### 4. Defendant Benn

Sango charges defendant Benn with civil conspiracy and abuse of process. Sango alleges that Benn, after receiving the critical incident report relating to the alleged incident

between Sango and several correctional officer defendants, failed to investigate the matter and, instead, fabricated new "eye-witness" testimony of an inmate, to buttress the story of defendant Guthrie. To the extent Sango alleges Benn's liability is premised on his failure to investigate his allegations, the Court has already explained why such claims fail. *See supra* at 14–16.

To the extent Sango claims that Benn fabricated testimony of an inmate in order to buttress defendant Guthrie's story, and to attempt to coerce Sango into pleading guilty to the criminal charges against him arising out of the altercation, he has failed to state a claim for relief. Even if the allegations Sango claims are true, he has not pleaded beyond threadbare conclusions that this conduct constituted retaliation, [13] nor has he pleaded any facts that permit this Court to infer that the conduct was part of the conspiracy he claims defendant Benn was a part of. [14] Sango fails to allege facts to support his conclusion that Benn's alleged conduct was taken in retaliation for any protected conduct Sango engaged in, or even that Benn was aware of Sango's engagement in protected conduct. Therefore, Sango's claims against defendant Benn should be dismissed for failure to state a claim upon which relief can be granted. Correspondingly, Sango's counter-motion [171] should be denied.

[13] Alleging merely the ultimate fact of retaliation is insufficient. *Murphy v. Lane,* 833 F.2d 106, 108 (7th Cir.1987). "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.' " *Harbin–Bey v. Rutter,* 420 F.3d 571, 580 (6th Cir.2005) (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1538–39 (6th Cir.1987)); *see also Skinner v. Bolden,* 89 Fed. Appx. 579, 579–80 (6th Cir.2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive); *Murray v. Unknown Evert,* 84 Fed. Appx. 553, 556 (6th Cir.2003) ("Conclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie,* 20 Fed. Appx. 457, 459 (6th Cir.2001) ("bare allegations of malice on the defendants' parts are not enough to establish retaliation claims"); *Desmone v. Adams,* 1998 U.S.App. LEXIS 24030, 1998 WL 702342 at *3 (6th Cir., Sep.23, 1998) ("[a] claim of retaliation

must include a chronology of events from which retaliation may plausibly be inferred").

[14] To prevail on a conspiracy claim asserted under § 1983, Sango must establish: (1) there existed a "single plan"; (2) the conspirators "shared a conspiratorial objective to deprive [plaintiff] of [his] constitutional rights; and (3) an overt act in furtherance of the conspiracy was committed." *Faith Baptist Church v. Waterford Twp.,* 522 Fed. Appx. 322 (6th Cir., Apr.11, 2013) (citation omitted).

### 5. Defendant McClelland

**\*11** Sango alleges that Defendant McClelland committed negligence by failing to investigate the cell searches that he claims were being used to harass and retaliate against him. [90 at ¶ 6]. Negligence is a state law claim, and Sango does not appear to allege any federal claim against Defendant McClelland. [15] Further, the Court has recommended dismissing Sango's claims against the officers allegedly responsible for the searches, for Sango's failure to exhaust his administrative remedies. Because Sango's state law claim against McClelland arises out of that transaction, and because the Court has recommended dismissing the related federal claims, it recommends granting McClelland's motion to dismiss [160] with prejudice as to any federal claims raised against her, and without prejudice as to the state law negligence claim. *Experimental Holdings, Inc. v. Farris,* 503 F.3d 514, 521 (6th Cir.2007) (citing *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). [16] For the same reasons, Sango's motion to deny McClelland's motion [177] should be denied.

[15] To the extent Sango intended to assert a claim against McClelland for this alleged negligence under Section 1983, that claim would fail for the same reasons that his other "failure to investigate" claims fail. *See supra* at 14–16.

[16] "Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply,* 465 F.3d 719, 728 (6th Cir.2006). Consequently, where a district court has exercised jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims

are dismissed prior to trial, the state law claims should be dismissed without reaching their merits. *See Landefeld v. Marion Gen. Hosp.,* 994 F.2d 1178, 1182 (6th Cir.1993); *Faughender v. City of N. Olmsted,* 927 F.2d 909, 917 (6th Cir.1991); *Coleman v. Huff,* No. 97–1916, 1998 U.S.App. LEXIS 18242, 1998 WL 476226, at *1 (6th Cir. Aug.3, 1998); *Sango v. Ault,* No. 14–345, 2014 U.S. Dist. LEXIS 59804, *30–31 (W.D.Mich. Apr. 30, 2014) (dismissing state law claims against certain individual defendants where federal claims against those defendants were also dismissed, while retaining federal claims against other individual defendants).

### 7. Qualified Immunity

Because the Court is recommending dismissal of Sango's claims against the Defendants for the reasons discussed above it need not address the issue of qualified immunity.

### 8. Supplemental Jurisdiction

In addition to his federal claims, Sango also alleges various state law claims against Defendants. As the Court is recommending dismissal of Sango's federal claims against the Defendants, it also recommends declining to exercise supplemental jurisdiction over any of Sango's remaining state law claims against them. *See supra,* fn. 16. Accordingly, Sango's state law claims against all Defendants should be dismissed without prejudice.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS GRANTING** the Oaks Defendants' motion to dismiss **[92], GRANTING WITHOUT PREJUDICE** the St. Louis Defendants' motion for summary judgment **[153], GRANTING** defendant McClelland's motion to dismiss **[160],** and **GRANTING** defendant Benn's motion to dismiss and/or for summary judgment. **[162].** The Court further **RECOMMENDS DENYING** Sango's motions "to deny" the Defendants' dispositive motions [157, 171, 177] and **DENYING** Sango's motions for summary judgment. **[188, 196].**

### All Citations

Not Reported in F.Supp.3d, 2014 WL 8186701

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 35448693
Only the Westlaw citation is currently available.
United States District Court,
W.D. Tennessee, Western Division.

Sheila **WHITE**, Plaintiff,

v.

The **BURLINGTON** NORTHERN AND
SANTA FE RAILWAY COMPANY, Defendant.

No. 99-2733 M1/BRE.
|
Nov. 16, 2000.

ORDER GRANTING PLAINTIFF'S MOTION FOR
AWARD OF ATTORNEY FEES, COSTS, & EXPENSES

MCCALLA, J.

**\*1**  Before the Court is Plaintiff's Motion For Award Of Attorney Fees, Costs, and Expenses filed on October 2, 2000. The parties presented this Title VII case to a jury, and the jury returned a verdict for the Plaintiff on the claim of retaliation. Plaintiff now requests an award of attorney fees, costs, and expenses pursuant to 42 U.S.C. § 2000e-5(k) (1994). For the reasons stated below, the Court GRANTS Plaintiff's motion and AWARDS attorney's fees in the amount of $54,285.00.

Plaintiff has stated that the 'lodestar' [1] amount in this case is $67,856.25. Defendant does not contest this figure. Because Plaintiff was not wholly successful on all of her claims, Plaintiff suggests that the lodestar amount should be reduced by twenty percent (20%) to $54,285.00. Defendant contends that the appropriate reduction is much greater and that Defendant should only be liable for $9,839.16.

During trial, Plaintiff presented two claims against Defendant for violation of Title VII: gender discrimination through a hostile work environment and retaliation. While Plaintiff did not succeed on the claim of gender discrimination, the jury did render a verdict in favor of Plaintiff on the claim of retaliation. The jury awarded Plaintiff compensatory damages for medical expenses and pain and suffering in the amount of $43,500.00. Thus, Plaintiff was successful on the claim of retaliation.

As Plaintiff asserts in her brief, both of the claims presented at trial arose from a common set of facts. It would have been difficult, if not impossible, for Plaintiff to argue in favor of one claim without simultaneously considering and presenting arguments relating to the other. This characteristic of the case makes it difficult to divorce work done on one claim from work done on the other.

Nevertheless, the lodestar amount must be reduced to account for the lack of success on the hostile work environment claim. The Court determines that Plaintiff's requested downward adjustment of twenty percent (20%) is reasonable. Therefore, the Court awards Plaintiff eighty percent (80%) of the $67,856.25 lodestar amount, or $54,285.00. A judgment in that amount will be entered pursuant to this Order. To award a lesser amount would inadequately reflect the reasonable work done in relation to the claim of retaliation and would be contrary to the public policy concerns underlying § 2000e-5(k).

Entered this *15* day of November, 2000.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 35448693

---

**Footnotes**

1    A 'lodestar' amount is the proven number of hours reasonably expended on a case by an attorney, multiplied by his court-ascertained hourly rate. *Adcock-Ladd v. Sec'y of Treasury,* 227 F.3d 343, 349 (6th Cir.2000). Plaintiff has submitted affidavits supporting the proposition that a reasonable hourly rate is $250.00 per hour for Mr. Donati and $125.00 for Mr. Ryan. Defendant does not contest the reasonableness of these rates. Plaintiff has shown that Mr. Donati expended 167 hours on this case and that Mr. Ryan expended 208.85 hours. When these hours are multiplied by the respective rates, the total is $67,856.25.

End of Document                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 123

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)
93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

⚑ KeyCite Yellow Flag

Abrogation Recognized by  Podkovich v. Glazer's Distributors of Iowa, Inc.,
N.D.Iowa,   August 10, 2006

364 F.3d 789
United States Court of Appeals, Sixth Circuit.

Sheila WHITE, Plaintiff–Appellee/Cross–Appellant,

v.

BURLINGTON NORTHERN & SANTA FE
RAILWAY CO., Defendant–Appellant/Cross–Appellee.

Nos. 00–6780, 01–5024
|
Argued June 11, 2003.
|
Decided and Filed April 14, 2004.
|
Rehearing En Banc Denied April 26, 2005.

**Synopsis**
**Background:** Employee brought action against railroad,
claiming unlawful discrimination based on sex and unlawful
retaliation. The United States District Court for the Western
District of Tennessee, Jon P. McCalla, J., entered judgment
on jury verdict for employee on retaliation claim and against
employee on sexual harassment and punitive damages claims
and denied railroad's motion for judgment as a matter of law.
Upon cross-appeals, the Court of Appeals, 310 F.3d 443,
reversed in part and remanded.

**Holdings:** On rehearing en banc, the Court of Appeals,
Gibbons, Circuit Judge, held that:

[1] suspension of railroad employee without pay, followed
thirty-seven days later by a reinstatement with back pay, was
an "adverse employment action" for Title VII purposes;

[2] transferring railroad employee from her forklift operator
job to a standard track laborer job was an "adverse
employment action";

[3] court did not abuse its discretion in awarding railroad
employee eighty percent of her attorney fees; and

[4] appropriate burden of proof on a claim for punitive
damages under Title VII was a preponderance of the evidence,
not clear and convincing evidence.

Affirmed and remanded.

Clay, Circuit Judge, filed concurring opinion in which Martin,
Daughtrey, Moore, and Cole, Circuit Judges, joined.

Sutton, Circuit Judge, filed opinion concurring in part
and dissenting in part in which Boggs, Chief Judge, and
Krupansky, Batchelder, and Rogers, Circuit Judges joined.

**Procedural Posture(s):** On Appeal; Motion for Judgment as
a Matter of Law (JMOL)/Directed Verdict.

West Headnotes (12)

[1]    **Federal Courts**  ☞ Taking case or question
       from jury;  judgment as a matter of law
       Denial of post-trial motion for judgment as a
       matter of law is reviewed de novo. Fed.Rules
       Civ.Proc.Rule 50(b), 28 U.S.C.A.

       26 Cases that cite this headnote

[2]    **Federal Courts**  ☞ Taking case or question
       from jury;  judgment as a matter of law
       **Federal Courts**  ☞ Taking case or question
       from jury;  judgment as a matter of law
       Inquiry for resolving a motion for judgment as
       a matter of law is the same as the inquiry for
       resolving a motion for summary judgment; court
       reviews all of the evidence in the record in the
       light most favorable to the nonmoving party
       and determines whether there was a genuine
       issue of material fact for the jury. Fed.Rules
       Civ.Proc.Rule 50(b), 28 U.S.C.A.

       45 Cases that cite this headnote

[3]    **Civil Rights**  ☞ Adverse actions in general
       Employment actions that are de minimis are
       not actionable under Title VII. Civil Rights Act
       of 1964, § 704(a), as amended, 42 U.S.C.A. §
       2000e–3(a).

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 124

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

22 Cases that cite this headnote

[4]    **Civil Rights** 🔑 Adverse actions in general

A mere inconvenience or an alteration of job responsibilities or a "bruised ego" is not enough to constitute an adverse employment action for Title VII purposes. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e–3(a).

193 Cases that cite this headnote

[5]    **Civil Rights** 🔑 Promotion, demotion, and transfer

Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims; however, a reassignment without salary or work hour changes may be an adverse employment action if it constitutes a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e–3(a).

186 Cases that cite this headnote

[6]    **Civil Rights** 🔑 Adverse actions in general

For Title VII purposes, an "adverse employment action" is a tangible employment action which constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Civil Rights Act of 1964, §§ 703(a)(1), 704, as amended, 42 U.S.C.A. §§ 2000e–2(a)(1), 2000e–3.

273 Cases that cite this headnote

[7]    **Civil Rights** 🔑 Particular cases

**Civil Rights** 🔑 Compensation and benefits

Suspension of railroad employee without pay, followed thirty-seven days later by a reinstatement with back pay, was an

"adverse employment action" for Title VII purposes; "ultimate employment decision" standard was not the appropriate standard in determining whether employer discriminated against employee. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e–3(a).

68 Cases that cite this headnote
More cases on this issue

[8]    **Civil Rights** 🔑 Promotion, demotion, and transfer

Transferring railroad employee from her forklift operator job to a standard track laborer job was an "adverse employment action" for Title VII purposes; while the standard track laborer job paid the same as the forklift operator position, employee's new position was more arduous and "dirtier," and forklift operator position required more qualifications, which is an indication of prestige. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e–2(a)(1).

31 Cases that cite this headnote
More cases on this issue

[9]    **Civil Rights** 🔑 Questions of law or fact

In light of contradictory evidence from railroad's own officers, jury was entitled to find that railroad's asserted legitimate reasons for taking adverse employment actions against employee were false and were pretext for unlawful retaliation. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e–3(a).

10 Cases that cite this headnote
More cases on this issue

[10]    **Federal Courts** 🔑 Costs and attorney fees

Court reviews a district court's determination regarding the amount of an award of attorney fees under Title VII for an abuse of discretion. Civil Rights Act of 1964, § 706(k), 42 U.S.C.A. § 2000e–5(k).

2 Cases that cite this headnote

Case: 24-1775   Document: 47   Filed: 09/24/2025   Page: 125

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

**[11]** **Civil Rights** 🔑 Services or activities for which fees may be awarded

**Civil Rights** 🔑 Amount and computation

District court did not abuse its discretion in awarding railroad employee eighty percent of her attorney fees under Title VII; although employee, who brought sex discrimination and retaliation claims, prevailed only on retaliation claim, both of those claims arose from a common set of facts, and it would be difficult to divorce work done on one claim from work done on the other. Civil Rights Act of 1964, § 706(k), 42 U.S.C.A. § 2000e–5(k).

4 Cases that cite this headnote
More cases on this issue

**[12]** **Civil Rights** 🔑 Exemplary or Punitive Damages

Appropriate burden of proof on a claim for punitive damages under Title VII was a preponderance of the evidence, not clear and convincing evidence. 42 U.S.C.A. § 1981a(b)(3).

16 Cases that cite this headnote

**Attorneys and Law Firms**

**\*791** Bryan P. Neal (argued and briefed), Thompson & Knight, Dallas, TX, for Appellant.

William B. Ryan (argued and briefed), Donati Law Firm, Memphis, TN, for Appellee.

Ralph T. Gibson (briefed), Bateman Gibson, Memphis, TN, for Appellant.

Donald A. Donati (briefed), Donati Law Firm, Memphis, TN, for Appellee.

Ann E. Reesman, Robert E. Williams (briefed), McGuiness, Norris & Williams, Washington, D.C., Jenifer M. Bosco (briefed), National Employment Lawyers Association, San Francisco, CA, Ralph E. Lamar IV (briefed), Collegeville, PA, Jennifer S. Goldstein, Equal Employment Opportunity Commission, Washington, DC, for Amici Curiae.

Before: BOGGS, Chief Judge; MARTIN, KRUPANSKY, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, and COOK, Circuit Judges.

GIBBONS, J., announced the judgment and majority opinion of the en banc court on all issues. The entire en banc court joined Parts I (Background) and III (Attorney's Fees) of the majority opinion. Part II (Adverse Employment Action) of the majority opinion was joined by BOGGS, C. J., and KRUPANSKY, BATCHELDER, GILMAN, ROGERS, SUTTON, and COOK, JJ., and Part IV (Punitive Damages) was joined by MARTIN, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, and COOK, JJ. CLAY, J. (pp. 808–17), filed a separate concurring opinion joining Parts I, III, and IV of the majority opinion and writing separately as to Parts II and V, in which he was joined by MARTIN, DAUGHTREY, MOORE, and COLE, JJ. SUTTON, J. (pp. 817–42), filed an opinion concurring in Parts I–III and dissenting from Parts IV and V, in which he was joined by BOGGS, C. J., and KRUPANSKY, BATCHELDER, and ROGERS, JJ.

**Opinion**

GIBBONS, Circuit Judge.

In this appeal, the *en banc* court addresses the meaning of "adverse employment action" for purposes of Title VII. We decide that a thirty‑seven day suspension without pay constitutes an adverse employment action regardless of whether the suspension is followed by a reinstatement with back pay. We also address several other issues raised by this appeal.

Sheila White brought this action against her employer, Burlington Northern & Santa Fe Railway Company (Burlington Northern), alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2(a)(1), 2000e–3. The jury returned a verdict in favor of Burlington Northern on the sex discrimination claim and in favor of White on the retaliation claim. The jury awarded White compensatory damages but no punitive damages. After the trial, the district court denied Burlington Northern's motion for judgment as a matter of law on the retaliation claim and granted White's motion for attorney's fees.

Burlington Northern appeals from the denial of its motion for judgment as a matter of law and from the award of attorney's

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 126

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

fees to White. White cross-appeals, challenging the district court's jury instruction regarding punitive damages. For the reasons set forth below, we affirm the district court's denial of Burlington Northern's motion for judgment as a matter of law and the district court's award of attorney's fees to White. We conclude, however, that the district court erred in instructing the jury on the issue of punitive damages, and therefore we remand the case for further proceedings consistent with this opinion.

### *792  I. BACKGROUND

Before June 1997, Ralph Ellis operated the stationary forklift for Burlington Northern at its Tennessee Yard in Memphis. In June 1997, Ellis resigned from the forklift position in order to work on a mobile track gang, in which position Ellis earned more pay than he would have if he had continued working in the forklift position. Marvin Brown, roadmaster of the Tennessee Yard, interviewed White for a job with Burlington Northern and expressed interest in White's experience operating a forklift. On June 23, 1997, Burlington Northern hired White to work in its Maintenance of Way department at its Tennessee Yard, and following White's hire, Brown assigned her to operate the forklift at the Tennessee Yard.

White was the only female working in the Maintenance of Way department at the Tennessee Yard. White's immediate supervisor was foreman Bill Joiner. Joiner had never supervised a woman before, and he admitted at trial that he treated White differently because of her gender. He also admitted that he did not believe that the Maintenance of Way department was an appropriate place for women to work. According to White, Joiner repeatedly expressed this belief to her while she was working under his supervision. According to Joiner, several other Burlington Northern employees also expressed the belief that women should not work on a railroad. Another Burlington Northern employee agreed at trial that there was "a general anti-woman feeling" among Burlington Northern employees at the Tennessee Yard.

Despite concerns about the propriety of a woman working on the railroad, the evidence was uncontradicted that White did not have difficulty performing her job. According to Brown, he never received a complaint regarding White's performance operating the forklift. Joiner testified that White had no problems performing her job. Furthermore, another Burlington Northern foreman testified that no one expressed

concern about White's ability to get along well with others in the workplace or about anything specific to White other than her gender.

On September 16, 1997, White complained to Brown and other company officials about specific incidents of alleged sexual harassment committed by Joiner. The company investigated. Following the investigation, Burlington Northern suspended Joiner for ten days and ordered him to attend a training session regarding sexual harassment.

On September 26, 1997, Brown met with White to inform her that Joiner had been disciplined pursuant to her complaint. He also, however, told her that the company had learned during the investigation of several complaints about her working in the forklift position. According to Brown, the complaints did not relate to her performance but related to the fact that the forklift position was a less arduous and cleaner job than other track laborer positions. Brown testified that other employees, including Ellis, complained about a junior employee being allowed to work the forklift instead of "a more senior man." Other witnesses testified that the forklift job was generally considered a physically easier and cleaner job than other track laborer positions, although it required more qualifications. Joiner testified that other track laborers complained about White being allowed to hold the position instead of a male employee.

During the September 26 meeting regarding the resolution of White's internal sexual discrimination complaint, Brown informed White that he was removing her from the forklift position and assigning her to a standard track laborer position because **\*793** of her coworkers' complaints. Her pay and benefits remained the same, but her new job was, by all accounts, more arduous and "dirtier" than the forklift position. Brown replaced White with Ellis, the only other employee qualified to perform the forklift job. Brown admitted at trial that he had heard complaints about White being allowed to work the forklift before she complained of discrimination but that he did not remove her from the position until after she complained of discrimination.

Brown's trial testimony is inconsistent with Burlington Northern's interrogatory response. In that response, the railroad stated that it removed White from the forklift position because a more senior employee claimed the job according to the collective bargaining agreement. Brown, however, testified at trial that the forklift job was not governed by

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 127

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)
93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

the collective bargaining agreement and that he had the discretion to place anyone he chose in that position regardless of seniority. Moreover, neither the union, nor anyone else, initiated a grievance about White's operation of the forklift. A union official testified that the union's records did not reflect any complaints regarding White's assignment to the forklift position. Only White and Ellis were qualified to perform the forklift position. Ellis, who had voluntarily resigned from the forklift job for a higher-paying job, testified that he did not complain to Brown or anyone else about White operating the forklift and that he did not request that he be returned to the position.

On October 10, 1997, White filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging sex discrimination and retaliation. She filed a second charge with the EEOC on December 4, 1997, alleging retaliation. In her second EEOC charge she alleged that Brown had placed her under surveillance and was checking on her daily activities. Her second EEOC charge was mailed to Brown on December 8, 1997.

On December 11, 1997, White was working in Blytheville, Arkansas, supporting a regional tie gang. She was working under the supervision of Burlington Northern foreman Percy Sharkey. At some point during the day, Sharkey instructed White to ride in a truck with another foreman, James Key. Sharkey instructed another track laborer, Greg Nelson, to ride with him in his vehicle. According to White, when she approached Key he told her that she had to ride with Sharkey because Key wanted Nelson to ride with him. Against Sharkey's order, Nelson rode away with Key. White testified that Sharkey became very upset when she returned and told him that Nelson had ridden away with Key and that she would have to ride with him. Contrary to White's testimony, Sharkey testified that White refused to ride with Key, claiming that she had seniority over Nelson and insisting upon riding with Sharkey.

According to Sharkey, he called Brown to discuss the situation and Brown told him that, based on Sharkey's description of events, White had been insubordinate and should be removed from service immediately. On the afternoon of December 11, Sharkey informed White that she was suspended. Although Sharkey had the authority to suspend White himself, Sharkey testified that Brown made the decision to suspend White. Brown testified that Sharkey made the decision. White testified that Sharkey told her at the time that Brown had instructed him to suspend her. In a

letter to the EEOC, Burlington Northern stated that Brown made the decision, but Brown testified that this letter was incorrect. Nelson received no discipline, although Sharkey acknowledged at trial that Nelson had disobeyed his direct order.

**\*794**  White testified that Sharkey had told her at some point before her suspension that Brown considered White a "troublemaker." Sharkey acknowledged at trial that he had told White that the railroad was trying to "get rid" of her.

The decision to suspend White occurred seven days after White filed her second EEOC charge and three days after the charge was mailed to Brown. The suspension took effect immediately and was without pay. According to company policy, the suspension without pay would automatically become a termination if White did not file a grievance with her union appealing the decision within fifteen days. White timely filed such a grievance and also filed another EEOC charge on December 15, 1997, alleging retaliation.

While her grievance was pending, White was without a job and without income and she did not know if or when she would be allowed to return to work. During this period, White sought medical treatment for emotional distress and incurred medical expenses. The grievance remained pending through the end of December and the first half of January 1998. After an investigation and a hearing, the hearing officer, who was a Burlington Northern manager, found that White had not been insubordinate and that she should not have been suspended. After being suspended without pay for thirty-seven days, White was reinstated to her position with full back pay on January 16, 1998.

After exhausting her avenues for relief before the EEOC, White filed this action against Burlington Northern in the district court, alleging sex discrimination and retaliation in violation of Title VII. A jury trial was conducted from August 29, 2000, to September 5, 2000. The jury returned a verdict in favor of Burlington Northern on White's sex discrimination claim and a verdict in favor of White on her retaliation claim. The jury awarded White $43,500 in compensatory damages, including $3,250 in medical expenses, on her retaliation claim. The jury found against White on her claim for punitive damages. After the trial, pursuant to Federal Rule of Civil Procedure 50(b), Burlington Northern filed a renewed motion for judgment as a matter of law on the retaliation claim, which the district court denied. White filed a motion for an award of attorney's fees pursuant to 42 U.S.C. § 2000e–5(k), and

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 128

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

the district court awarded White $54,285, which represented eighty percent of White's total attorney's fees.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

**[1]  [2]**  We first review the district court's denial of Burlington Northern's post-trial motion for judgment as a matter of law pursuant to Rule 50(b). Our standard of review is *de novo*. *Gray v. Toshiba Am. Consumer Prods., Inc.,* 263 F.3d 595, 598 (6th Cir.2001). The inquiry for resolving a motion for judgment as a matter of law pursuant to Rule 50 is the same as the inquiry for resolving a motion for summary judgment pursuant to Rule 56. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). We review all of the evidence in the record in the light most favorable to the nonmoving party and determine whether there was a genuine issue of material fact for the jury. *Gray,* 263 F.3d at 598.

We must affirm the jury verdict unless there was "no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party." Fed.R.Civ.P. 50(a). We draw all reasonable inferences in favor of the prevailing party, and we do not make any credibility determinations or weigh the evidence. *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097. Therefore, we "must disregard all evidence favorable to the moving party that the jury is not required **\*795** to believe." *Id.* at 151, 120 S.Ct. 2097. "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Burlington Northern contends that it is entitled to judgment as a matter of law on White's retaliation claim because, according to Burlington Northern, neither White's transfer from the forklift job to a standard track laborer job nor her suspension without pay for thirty-seven days constitutes an adverse employment action for purposes of Title VII. In the alternative, Burlington Northern contends that there was insufficient evidence for the jury to conclude rationally that Burlington Northern's asserted legitimate, non-discriminatory reasons for transferring and suspending White were pretexts for retaliation.

In determining whether Burlington Northern is entitled to judgment as a matter of law, we first discuss the meaning of "adverse employment action" for purposes of Title VII. Then we discuss whether White's transfer and suspension were adverse employment actions. Finally we address whether there was sufficient evidence for the jury to rationally find that Burlington Northern's asserted legitimate reasons were pretexts for unlawful retaliation.

### A. Defining Adverse Employment Action

**[3]**  Title VII's anti-retaliation provision provides:

> (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
>
> It shall be an unlawful employment practice for an employer to *discriminate against* any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (section 704(a) of Title VII) (emphasis added). Title VII does not define the phrase "discriminate against," which is repeated in Title VII's other anti-discrimination provisions, but courts have made clear that not just any discriminatory act by an employer constitutes discrimination under Title VII. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (citing cases requiring a "tangible employment action" to support a Title VII claim). Employment actions that are *de minimis* are not actionable under Title VII. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir.2000). "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno,* 190 F.3d 765, 767 (6th Cir.1999). To prevent lawsuits based upon trivial workplace dissatisfactions, we require that a plaintiff prove the existence of an "adverse employment action" to support a Title VII claim. *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir.1999) (defining "adverse employment action" as a "materially adverse change in the terms and conditions of [plaintiff's] employment"). [1] This **\*796** case requires us to clarify further the meaning of "adverse employment action" for purposes of Title VII.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 129

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

The first time this court required a plaintiff to prove the existence of an "adverse employment action" as part of a Title VII claim was in *Geisler v. Folsom,* 735 F.2d 991 (6th Cir.1984). In *Geisler,* the plaintiff alleged that her employer violated Title VII's anti-retaliation provision by discriminating against her for filing a sex discrimination charge with the EEOC. After a bench trial, the district court found that "[p]laintiff failed to show any adverse employment action in response to her EEOC charge or any other protected activity. While additional tension arose after others became aware of [plaintiff]'s charge, such 'predictable tension' is not 'the type of adverse employment action prohibited by Title VII's retaliation clause.' " 735 F.2d at 994 (quoting the district court). This court affirmed, stating:

> We agree with the district judge that a general increase of tension in the workplace would be expected to follow revelation that a claim of discrimination in employment had been filed. However, evidence of such an increase should be considered, and any discrete act or course of conduct which could be construed as retaliation must be examined carefully. After such examination we conclude that the finding that no 'adverse employment action' resulted from the filing of the EEOC charge is not clearly erroneous, particularly in view of the contrary evidence....

735 F.2d at 996 (quoting the district court's use of the phrase "adverse employment action").

A few months after deciding *Geisler,* this court stated that to support a claim for retaliation under Title VII a "plaintiff must establish: (1) that he engaged in activity protected by Title VII; (2) that he was the subject of adverse employment action; and (3) that there exists a casual [sic] link between his protected activity and the adverse action of his employer." *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 375 (6th Cir.1984). The *Jackson* court did not cite *Geisler* as a basis for including "adverse employment action" among the elements of a Title VII retaliation claim; instead it relied upon cases from the Fifth, Tenth, and Eleventh Circuits. *Id.*

(citing *Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982); *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir.1982); *Whatley v. Metro. Atlanta Rapid Transit Auth.,* 632 F.2d 1325, 1328 (5th Cir.1980)). The cases cited by *Jackson,* like *Jackson* itself, each involved a termination of employment, and so none of these cases addressed the issue of what types of employment actions short of termination constitute adverse employment actions. [2]

**\*797** Ever since *Geisler* and *Jackson,* the adverse-employment-action element has remained a part of a Title VII claim in this circuit. After *Geisler,* the first time that this court decided a case based on the adverse-employment-action element was in *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987). In *Yates,* this court reversed a district court's factual finding of retaliation, holding that it was clear error for the district court to find that a temporary job reassignment that resulted in no pay or benefits reduction was an adverse employment action cognizable under Title VII's anti-retaliation provision. For this holding, the *Yates* court relied solely upon a district court decision from Delaware. *Id.* (citing and endorsing *Ferguson v. E.I. duPont deNemours and Co.,* 560 F.Supp. 1172, 1201 (D.Del.1983), which held that a job reassignment is not an adverse employment action if it is only temporary and results in no reduction in pay or benefits).

**[4]**    After *Yates,* it was almost ten years before we had another opportunity to develop the definition of adverse employment action. In *Kocsis v. Multi–Care Management Inc.,* this court considered the definition of adverse employment action in the context of a discrimination claim under the Americans with Disabilities Act. 97 F.3d 876, 885–87. Relying in part upon the Seventh Circuit's definition, this court held that a plaintiff claiming employment discrimination must show that she suffered "a materially adverse change in the terms of her employment." *Id.* at 885 (citing *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883 (7th Cir.1989), which involved an age discrimination claim). A "mere inconvenience or an alteration of job responsibilities" or a "bruised ego" is not enough to constitute an adverse employment action. *Id.* at 886 (citing *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993), and *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 456 (7th Cir.1994)).

**[5]**    Furthermore, according to *Kocsis,* "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Id.* at 885 (citing *Yates,* 819 F.2d at 638, which applied to "temporary" reassignments). A

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 130

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

reassignment without salary or work hour changes, however, may be an adverse employment action if it constitutes a demotion evidenced by "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 886 (citing *Crady,* 993 F.2d at 136).

[6]    In this circuit, *Kocsis* is the seminal case for defining adverse employment action.[3] The Supreme Court in *Burlington Industries v. Ellerth* relied upon *Kocsis* **\*798** and several decisions from other circuits when it stated that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Supreme Court also observed that:

> A tangible employment action in most cases inflicts direct economic harm.... Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors.

*Id.* at 762, 118 S.Ct. 2257. *But see Ray v. Henderson,* 217 F.3d 1234, 1242 n. 5 (9th Cir.2000) (rejecting the contention that *Burlington Industries* set forth a standard for adverse employment actions in the retaliation context).

In this appeal, White and the EEOC, which has filed an *amicus curiae* brief on White's behalf, urge us to revise our definition of adverse employment action for purposes of Title VII retaliation cases and adopt the interpretation included in the EEOC Guidelines. The EEOC has interpreted "adverse employment action" in the context of a Title VII retaliation claim to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter a charging party or others from engaging in protected activity." EEOC Compliance Manual § 8, "Retaliation," ¶ 8008 (1998). Although EEOC Guidelines are not binding on

the courts, they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

The EEOC claims that this court's development of the adverse-employment-action element has been unfaithful to the letter and purpose of Title VII's anti-retaliation provision. According to 42 U.S.C. § 2000e 3(a), it is unlawful for an employer to "discriminate against" an employee for engaging in protected conduct. The EEOC contends that the most natural reading of this language is that it prohibits "any form of discrimination" against an individual for opposing discrimination or filing a charge. The Ninth and Seventh Circuits have also embraced a broad interpretation of Title VII's anti-retaliation provision. *See Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir.2000) ("This provision does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination."); *Knox v. State of Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint.").[4]

**\*799**    Despite the EEOC's contention that "any form of discrimination" falls within the most natural reading of the statute, the EEOC acknowledges in its brief that its definition of adverse employment action excludes "petty slights and trivial annoyances" and anything that is not reasonably likely to deter employees from engaging in protected activity. The EEOC does not explain how it justifies excluding such discriminatory acts under its strictly literal reading of the statute, which prohibits discrimination without any explicit textual limitation regarding the type of discrimination or level of severity required. Therefore, the EEOC admits that a strictly literal reading of "discriminate against" is not a fair interpretation of Title VII since it is unlikely that Congress intended to authorize Title VII claims over trivial matters.

We developed the adverse-employment-action element to prevent the kind of claims based upon trivial employment actions that a strictly literal reading of Title VII's anti-retaliation provision would allow. Because the language of Title VII does not explicitly provide any limit on the types of discriminatory acts prohibited, the language of Title VII does not favor the EEOC's proposed limitations over the limitations this court has developed during the last twenty

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 131

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

years of defining the adverse-employment-action element of a Title VII claim.

The EEOC argues that the purpose of Title VII's anti-retaliation provision supports its definition. "In enacting section 2000e–3, Congress unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation." *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 543 (6th Cir.1993). While the EEOC's proposed definition more overtly incorporates the purpose of Title VII's anti-retaliation provision, this court's definition, properly interpreted, also accomplishes the goal while appropriately counterbalancing the need to prevent lawsuits based upon trivialities. Instead of requiring district courts to determine on a case-by-case basis what actions by an employer are reasonably likely to deter an employee from engaging in protected activity, we have over the last twenty years given some shape to the definition by describing the kinds of material adverse employment actions that rise above the level of trivial. As we recognized in *Kocsis,* however, it is impossible to list every possible employment action that falls into the definition of adverse employment action and a court must consider "indices that might be unique to a particular situation." *Kocsis,* 97 F.3d at 886.

In addition, this court's definition has the benefit of applying equally to all Title VII discrimination claims, not only to retaliation claims. Having a different standard for different provisions of Title VII would be burdensome and unjustified by the text of the statute, which uses the same phrase "discriminate against" in each of its anti-discrimination provisions. *See Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 791–92 (6th Cir.2000) (applying rules of statutory construction to hold that "discriminate against" means the same thing each time it appears in Title VII); *Mattei v. Mattei,* 126 F.3d 794, 806 (6th Cir.1997) (presuming that Congress intended the phrase "discriminate against" to have the same basic meaning each time it is used in a statute).[5]

**\*800** We therefore reject White's and the EEOC's request that we adopt a new definition of adverse employment action for purposes of Title VII retaliation cases, and we reaffirm the definition that we have developed in cases such as *Kocsis* and its progeny. Since the adverse-employment action element developed by this Circuit is an exception to a broad, strictly literal reading of Title VII's anti-discrimination provisions, we will continue to define the exception narrowly so as not to frustrate the purpose of Title VII while deterring lawsuits over trivial matters.

## B. Suspension Without Pay

**[7]**    We now apply our definition of adverse employment action to the actions at issue in the present case. We consider the suspension first. Burlington Northern argues that a suspension without pay, followed thirty-seven days later by a reinstatement with back pay, is not an adverse employment action. For this argument, Burlington Northern primarily relies upon *Dobbs–Weinstein v. Vanderbilt University,* 185 F.3d 542 (6th Cir.1999).

In May 1994, a Vanderbilt University dean denied tenure to Professor Dobbs–Weinstein and advised her that her teaching appointment at Vanderbilt would end on August 31, 1995. *Id.* at 543. Dobbs–Weinstein filed an internal grievance with Vanderbilt, alleging gender and national-origin discrimination among other things, and in May 1995, she filed an action under Title VII. *Id.* On August 31, 1995, her employment contract with Vanderbilt ended. *Id.* at 544. In November 1995, while her lawsuit was still pending, the Vanderbilt Board of Trustees reversed the decision of the dean and rehired her as a tenured professor. *Id.* The board also granted her back pay to account for the delayed promotion and the period of unemployment. *Id.* Dobbs–Weinstein persisted with her lawsuit, however, seeking interest on the back pay and compensation for emotional distress and injury to reputation. *Id.*

Despite the facts that she was initially denied tenure and her employment ended temporarily, this court held that Dobbs–Weinstein had not suffered an adverse employment action cognizable under Title VII. *Id.* at 545. We recognized that " 'tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally.' " *Id.* (quoting **\*801** *Zahorik v. Cornell Univ.,* 729 F.2d 85, 92–93 (2d Cir.1984)). We relied upon the fact that Vanderbilt reversed the decision of its dean and granted Dobbs Weinstein back pay as the result of its internal grievance procedure. *Id.* This reversal, we reasoned, was the "ultimate employment decision." *Id.* We held that "intermediate" tenure decisions that are appealable through a tenure review process cannot form the basis of a Title VII claim. *Id.* We did not, however, cite any section of Title VII that requires exhaustion of internal grievance procedures before one files a lawsuit.[6] Instead, we relied upon a decision from the Fourth Circuit, *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981), which we interpreted as holding that Title VII applies only to "ultimate employment decisions

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 132

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

such as hiring, granting leave, discharging, promoting, and compensating." *Id.* Neither the Fourth Circuit nor the *Dobbs–Weinstein* court, however, cited a statutory provision that limits Title VII's application to ultimate employment decisions.

Since deciding *Page,* the Fourth Circuit has retreated from the "ultimate employment decision" standard. *Von Gunten v. Maryland,* 243 F.3d 858, 865, 866 n. 3 (4th Cir.2001) (limiting *Page* and holding that " 'ultimate employment decision' is not the standard in this circuit"). Furthermore, the majority of other circuits have either implicitly or explicitly rejected a standard limiting Title VII's reach to ultimate employment decisions. *See id.* at 864, 866 n. 4 (citing cases). Indeed, the only other circuits where this standard even arguably has any viability are the Fifth and the Eighth. *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (applying the "ultimate employment decision" standard); *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997) (same).

The Fifth Circuit, however, has questioned whether the "ultimate employment decision" standard survived the Supreme Court's pronouncements in *Burlington Industries* regarding the definition of tangible employment action. *Fierros v. Texas Dep't of Health,* 274 F.3d 187, 192–93 & n. 2 (5th Cir.2001) (pretermitting question); *but see Hernandez v. Crawford Bldg. Material Co.,* 321 F.3d 528, 531 (5th Cir.2003) (applying "ultimate employment decision" standard without discussing *Burlington Industries* or *Fierros* ). And while the Eighth Circuit has ostensibly adopted the "ultimate employment decision" standard, it has consistently applied a broader standard. *See, e.g., Manning v. Metro. Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997) (ultimate employment decision includes "tangible change in duties or working conditions that constituted a material employment disadvantage"); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1060 (8th Cir.1997) (ultimate employment decision includes reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, "papering" of an employee's file with negative reports and reprimands even though employee was "not discharged, demoted, or suspended").

We now join the majority of other circuits in rejecting the "ultimate employment decision" standard.[7] First and foremost, **\*802** it is contrary to the plain language of Title VII, which provides that an employer must not "discriminate against" an employee based upon a prohibited classification. As this court has found, the words "discriminate against"

literally mean "*any kind* of adverse action." *Mattei,* 126 F.3d at 805. Congress could have provided that employers shall not "discriminate against an employee when making ultimate employment decisions," but instead it chose to use the words "discriminate against" with no such qualifier.

Second, the employment action taken in the present case (suspension without pay for thirty-seven days) is not the type of employment action that this court developed the adverse-employment-action element to filter. The adverse-employment-action element is a warranted judicial interpretation of Title VII intended to deter discrimination lawsuits based on trivial employment actions, such as those that cause a "mere inconvenience" or a "bruised ego." *Kocsis,* 97 F.3d at 886. But as an exception to the strictly literal reading of the statute, the adverse-employment-action element of a Title VII lawsuit must not be interpreted too broadly. Taking away an employee's paycheck for over a month is not trivial, and if motivated by discriminatory intent, it violates Title VII. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 223–24 (2d Cir.2001) (holding that a suspension without pay for one week was an adverse employment action even though the employee was later reimbursed for lost wages because the employee "suffered the loss of the use of her wages for a time").

Third, the "ultimate employment decision" standard contravenes "the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). While the standard ensures that a wrongfully suspended employee eventually receives back pay, it allows an employer unilaterally to cut off the employee's claims for other damages, which have been explicitly authorized by Title VII since the Civil Rights Act of 1991, such as interest on the back pay, attorney's fees, emotional suffering, and punitive damages. 42 U.S.C. §§ 1981a(b); 2000e–5(g), (k). Although Burlington Northern argues that it made White whole when it granted her back pay, Congress has declared that part of making a Title VII plaintiff whole is compensating her for interest on the back pay, attorney's fees, and emotional suffering. In this case, the jury found that White had suffered $43,500 in damages other than back pay due to Burlington Northern's retaliation.

Lastly, the "ultimate employment decision" standard is in tension with Supreme Court cases holding that the statute of limitations on a Title VII claim is not tolled during the

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 133

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)
93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

pendency of an internal grievance process. *See, e.g., Int'l Union of Elec. Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 236, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). According to the Supreme Court, a Title VII claim arises on the date the alleged discriminatory decision occurs, even though an employee has challenged the decision via an internal grievance process. *Id.* at 234, 97 S.Ct. 441. The Supreme Court has rejected the argument that the pendency of an internal grievance process renders the employment decision "tentative" or "non-final" for purposes of **\*803** Title VII. *Id.* The Supreme Court has also rejected the argument that "the danger of possible conflict between the concurrent pursuit of both collective-bargaining and Title VII remedies should result in tolling the limitations period for the latter while the former proceeds to conclusion." *Id.* at 239, 97 S.Ct. 441. The alleged discriminatory decision in the present case was the suspension without pay. White's election to challenge this decision through an internal grievance process does not render the decision not actionable under Title VII.

The Equal Employment Advisory Council (the EEAC) argues in its *amicus curiae* brief on behalf of Burlington Northern that employers must maintain the prerogative to suspend summarily employees suspected of wrongdoing pending an investigation without facing the risk of Title VII liability. Otherwise, according to the EEAC, employers will be faced with the dilemma of either allowing potentially dangerous or disruptive individuals to remain in the workplace or suspending them pending an investigation, thereby risking Title VII liability.

In response to the EEAC's concerns, we initially note that an employer taking an adverse employment action against an employee, including a suspension without pay, only risks Title VII liability if there exists sufficient evidence to prove that the employer took the action based upon illegal discrimination. To the extent the EEAC's concerns for an employer's risk of Title VII liability are valid, however, they are allayed by *Jackson v. City of Columbus*, which holds that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action. 194 F.3d 737, 752 (6th Cir.1999). In *Jackson,* we held that there was no adverse employment action when a mayor effectively suspended with pay a police chief for four days pending an investigation of the police chief's alleged improper conduct in office. *See id.* at 744 (noting that the mayor referred to the suspension with pay of the police chief as a reassignment "to his residence").[8]

## C. Job Transfer

 **[8]**    Next we consider whether the job transfer at issue in the present case was an adverse employment action. Burlington Northern appeals the district court's decision that transferring White from her forklift operator job to a standard track laborer job was an adverse employment action. We agree with the district court.

While the standard track laborer job paid the same as the forklift operator position, White's new position was by all accounts more arduous and "dirtier." Furthermore, the forklift operator position required more qualifications, which is an indication of prestige. *See Kocsis,* 97 F.3d at 886–87 (finding that the plaintiff had failed to show an adverse employment action because, among other things, her job reassignment did not entail any loss in prestige). According to Burlington Northern's own witnesses, the transfer occurred because the forklift operator position was objectively considered a better job and the male employees resented White for occupying it. In essence, as the district court found, the reassignment was a demotion evidenced by "indices ... unique to [the] particular situation." *Kocsis,* 97 F.3d at 886; *see also Burlington Indus., Inc.,* 524 U.S. at 761, 118 S.Ct. 2257 (defining "tangible employment action" for purposes of Title VII liability as **\*804** including a job "reassignment with significantly different responsibilities"); *Mattei,* 126 F.3d at 808 (stating that transferring an employee at the same salary to "some wretched backwater" is "clearly" actionable in a retaliation claim).

## D. Evidence of Pretext

 **[9]**    Having rejected Burlington Northern's arguments that there was no adverse employment action taken against White, we now address Burlington Northern's alternative argument in support of reversing the district court's denial of its motion for judgment as a matter of law. Burlington Northern appeals the district court's decision that there was sufficient evidence from which the jury reasonably concluded that Burlington Northern's asserted legitimate, non-discriminatory reasons for removing White from the forklift position and then suspending her were pretexts for unlawful retaliation. We agree with the district court.

White presented to the jury substantial evidence to contradict Burlington Northern's asserted legitimate reasons, including contradictory statements from Burlington Northern's own officers. Burlington Northern asserted one reason for transferring White in its interrogatory response, but then

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 134

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

Brown, the official who made the decision to transfer White, asserted a different, contradictory reason at trial. Furthermore, Brown testified that he transferred White in part based upon complaints from Ellis, but at trial Ellis denied complaining about White. Regarding the suspension, the evidence was not even consistent regarding who made the decision, much less the motivation for the decision. Brown testified that Sharkey made the decision to suspend White, while Sharkey testified that Brown made the decision. Burlington Northern asserts that Brown suspended White for insubordination, but another Burlington Northern official who served as a hearing officer for White's internal grievance concluded that White had not been insubordinate. White's second EEOC charge accused Brown of violating Title VII, and White was suspended three days after this charge was mailed to Brown.

Based upon all the evidence, including the contradictory evidence from Burlington Northern's own officers, the jury was entitled to find that Burlington Northern's asserted legitimate reasons were false and were pretext for unlawful retaliation. *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 (holding that a jury is entitled to treat a party's dishonesty about a material fact as evidence of culpability).

### III. ATTORNEY'S FEES

Burlington Northern's last issue on appeal is a challenge to the amount the district court awarded White in attorney's fees. The district court awarded White eighty percent of her attorney's fees based on her degree of success in the lawsuit. Burlington Northern argues that White was not as successful as the district court found and that her attorney's fee award should be reduced.

 **[10]**    We review a district court's determination regarding the amount of an award of attorney's fees under Title VII for an abuse of discretion. *Scales v. J.C. Bradford and Co.,* 925 F.2d 901, 909 (6th Cir.1991). "This deference, 'is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.' " *Id.* (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Under Title VII, a district court has discretion to award a prevailing party "a reasonable attorney's fee." 42 U.S.C. § 2000e–5(k). In determining what constitutes a reasonable attorney's **\*805**  fee, the degree of success achieved in the lawsuit is a crucial factor. *Scales,* 925 F.2d at 910.

 **[11]**    Although we may have awarded a different amount if we were considering the issue *de novo,* we do not find that the district court abused its discretion in awarding White eighty percent of her attorney's fees. White brought two claims in this lawsuit (sex discrimination and retaliation) but only prevailed on one (retaliation). As the district court correctly stated in its written decision, however, both of these claims arose from a common set of facts, and it would be difficult to divorce work done on one claim from work done on the other. In light of this consideration and others addressed by the district court in its decision, we find that the district court did not abuse its discretion in awarding White eighty percent of her attorney's fees.

### IV. PUNITIVE DAMAGES

 **[12]**    In her cross-appeal, White asserts that the district court erred in charging the jury on punitive damages. The district court instructed the jury that punitive damages may be considered if White showed by "clear and convincing" evidence that Burlington Northern acted "either intentionally, recklessly, maliciously, or fraudulently." The jury did not award White punitive damages. White contends that the appropriate burden of proof on a claim for punitive damages under Title VII is a preponderance of the evidence, not clear and convincing evidence. White is correct.

According to Title VII, "[a] complaining party may recover punitive damages under this section against a respondent ... if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see also Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (discussing what a plaintiff must prove to recover punitive damages under Title VII). Title VII is silent concerning the evidentiary standard for demonstrating malice or reckless indifference for purposes of a punitive damages claim. In the absence of more specific guidance, "[c]onventional rules of civil litigation generally apply in Title VII cases, and one of these rules is that parties to civil litigation need only prove their case by a preponderance of the evidence." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 253, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality decision) (internal citation omitted); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2154, 156 L.Ed.2d 84 (2003) (holding that

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 135

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

Title VII's silence with respect to an evidentiary standard suggests that a conventional preponderance of the evidence standard applies).

Other circuits have reached this same conclusion with respect to punitive damages claims generally, *see Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277, 282–83 (2d Cir.1990) (declining to apply a higher standard of proof than preponderance of the evidence for punitive damages award in products liability case because "such a change is best left for Congress or for higher judicial authority"); *In re Exxon Valdez,* 270 F.3d 1215, 1232 (9th Cir.2001) (applying preponderance standard to award of punitive damages in maritime case because Congress has not legislated a higher standard), and with respect to punitive damages in Title VII suits, *see Karnes v. SCI Colorado Funeral Servs., Inc.,* 162 F.3d 1077, 1080–82 (10th Cir.1998) (concluding that a preponderance of the evidence standard is applicable to claims for punitive damages under Title VII); *Notter v. N. Hand Prot.,* 89 F.3d 829, 1996 WL 342008, at *10–11 (4th Cir. June 21, 1996) **\*806** (rejecting argument that the standard of proof for punitive damages in Title VII case is clear and convincing evidence because "[i]n discrimination cases brought under federal law, punitive damages need be proven only by a preponderance of the evidence").

The dissenting opinion states that punitive damages are an unconventional form of relief and therefore deserve a heightened standard of proof. Unquestionably, punitive damages serve a different purpose than compensatory damages. The requirement that punitive damages be awarded only when a defendant acts maliciously or recklessly recognizes this difference in purpose and ensures that punitive damages will be awarded only in the most egregious cases. Punitive damages are not, however, unconventional in the sense that they are a new or nontraditional form of relief. In fact, punitive damages have a long history in American civil litigation, where the traditional standard of proof has been "preponderance of the evidence." *See generally Jury Determination of Punitive Damages,* 110 Harv. L.Rev. 1513, 1531–32 (1997) (recognizing that preponderance of the evidence is the traditional civil standard of proof). *Cf. Smith v. Wade,* 461 U.S. 30, 53–56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (noting that "[t]here has never been any general common-law rule that the threshold for punitive damages must always be higher than that for compensatory liability" and rejecting actual malicious intent requirement for punitive damage award in § 1983 cases, even when

underlying standard of liability for compensatory damages is recklessness).

The dissent, unable to point to any precedent imposing a higher standard of proof for Title VII punitive damages claims than preponderance of the evidence, also relies on authority not directly germane to the issue at hand. For instance, the dissent notes that, in recent years, public policy concerns, primarily about excessive punitive damage awards, have prompted many states to adopt a "clear and convincing" standard of proof for punitive damages. Trends at the state level, however, do not inform our consideration of punitive damages claims under the federal Title VII statute. In fact, the dissent's statistics indicate that, while many states applied a heightened standard of proof to state punitive damage claims at the time that Title VII was amended to permit such claims in 1991, a *majority* of states at that time chose not apply a heightened standard.

Moreover, to the extent that concerns about excessive punitive damage awards prompted the adoption of heightened standards of proof before or after 1991, those concerns do not exist under the Title VII statutory scheme. Under Title VII, damage awards—both compensatory and punitive— are capped, with $300,000 being the largest sum that can be awarded to a claimant against the largest employers, those with 500 or more employees. [9] 42 U.S.C. § 1981a(b) (3)(D). The $300,000 limit is imposed on the sum of the compensatory and punitive damage awards; there is no separate limit for each type of damages. 42 U.S.C. § 1981a(b) (3). Thus, Title VII's own quite substantial restrictions on punitive damage awards guard against excessive awards.

Besides identifying trends at the state level, the dissent also cites cases that involve due process challenges to the application of a preponderance of the evidence standard of proof. Some of these cases concern situations wholly unrelated to punitive damages claims. *See Addington v. Texas,* 441 U.S. 418, 431–33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (resolving, in the **\*807** face of a due process challenge, the standard of proof required in a civil commitment hearing); *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (determining the standard of proof that due process demands in the context of a parental rights termination proceeding). Other cases cited by the dissent implicate a due process challenge to large punitive damage awards. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19, 111 S.Ct.

Case: 24-1775 Document: 47 Filed: 09/24/2025 Page: 136

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

1032, 113 L.Ed.2d 1 (1991). While the Supreme Court has found excessive punitive damages awards to be violative of due process, *State Farm,* 123 S.Ct. at 1526, the Court has specifically rejected the notion that the Due Process Clause requires a higher standard of proof for punitive damages claims than preponderance of the evidence. *Pacific Mut. Life Ins.,* 499 U.S. at 23 n. 11, 111 S.Ct. 1032. The sole bit of assistance derived from any of these cases is the Court's direct rejection in *Pacific Mutual* of the notion that the Constitution requires a standard of proof any higher than preponderance of the evidence for punitive damages claims.

The only case relied on by the dissent that could be instructive is *Woodby v. INS,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), where the Supreme Court considered the standard of proof for a deportation hearing. As in the instant case, the Court in *Woodby* was confronted with determining the standard of proof when "Congress has not addressed itself to the question of what degree of proof is required...." *Id.* at 284, 87 S.Ct. 483. In *Woodby,* the Court held that for deportation proceedings, the standard of proof was "clear, unequivocal, and convincing evidence," *id.* at 286, 87 S.Ct. 483, which the dissent apparently references for the proposition that we should apply the same standard of proof here. While *Woodby* is helpful in its reminder that the judiciary has traditionally resolved the question of the proper standard of proof under a federal statute when Congress has not addressed the issue, *id.* at 284, 87 S.Ct. 483, it gives us no direction in this case. Its reasoning is based on the immediate hardship of deportation. Deportation, as an outcome of an administrative and judicial proceeding, bears little similarity to an award of damages, particularly an award under Title VII, which Congress has carefully restricted to limit its potential harm to employers.

Accordingly, in determining the proper standard of proof for a punitive damage claim under Title VII, we receive no specific guidance from the statutory language of the Act. Supreme Court precedent offers some assistance, however. Deriving that guidance from *Price Waterhouse* and *Desert Palace*— both of which specifically discuss standards of proof in Title VII cases—is more appropriate than looking to the Supreme Court's views on the standard of proof in dissimilar contexts or its stray comments about state or federal standards of proof in the course of deciding other issues. While there have been developments concerning the standard of proof for punitive damages claims at the state level, these trends do not support the conclusion that the "clear and convincing" standard applies to federal punitive damage claims under Title VII, which has its own limitations on punitive damage awards.

Furthermore, as this case does not implicate a due process challenge to the size of a punitive damages award, or to the standard of proof used in civil commitment hearings, hearings terminating parental rights, or in the context of deportation, we do not find the dissent's cited authority to be persuasive. Rather—in deciding the standard of proof to be applied to plaintiff's claim for punitive damages under Title VII— we choose to follow **\*808** the guidance provided by the Supreme Court that "[c]onventional rules of civil litigation generally apply in Title VII cases." *Price Waterhouse,* 490 U.S. at 253, 109 S.Ct. 1775.

Therefore, the district court erred when it instructed the jury that White must prove her case for punitive damages by clear and convincing evidence. The district court, however, also erred when it instructed the jury that White only needed to prove that Burlington Northern acted "either intentionally, recklessly, maliciously, or fraudulently." As noted above, a plaintiff seeking punitive damages under Title VII must prove that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." This standard requires a plaintiff to prove more than merely intentional discrimination. *Kolstad,* 527 U.S. at 536–37, 119 S.Ct. 2118 (explaining standard). In addition, the Supreme Court has stated that only under certain conditions may an employer be vicariously liable for punitive damages under Title VII. *Id.* at 545, 119 S.Ct. 2118 (specifying conditions).

Finally, the dissent questions whether plaintiff has presented sufficient evidence to submit the punitive damages issue to a jury under either standard and would resolve the issue in defendant's favor without remand. While defendant argues generally that plaintiff's evidence was insufficient to permit an award of punitive damages, the parties did not analyze the evidence with any specificity under either potentially applicable standard of proof in their briefing to this court. Nor have we focused on the sufficiency of the evidence to permit a punitive damage award, since this was not the reason we granted an *en banc* hearing. We cannot find that the evidence is insufficient on a damage issue simply because judicial officers may disagree on an issue relating to liability, as the dissent suggests. Rather, in order to decide whether a trier of fact could award punitive damages in this case, a careful examination of the entire record is required. This exercise is most appropriately undertaken in the first instance by the district court. If the district court determines on remand that the evidence is sufficient to support a claim for punitive damages under the standard announced by the Supreme Court

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 137

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

in *Kolstad,* then the district court should conduct a new trial on the issue of punitive damages only.

## V. CONCLUSION

For all these reasons, we affirm the district court's denial of Burlington Northern's motion for judgment as a matter of law and the district court's award of attorney's fees to White. We conclude, however, that the district court erred in instructing the jury on the issue of punitive damages, and therefore we remand the case for further proceedings consistent with this opinion.

CLAY, Circuit Judge, concurring.

I join Parts I, III, and IV of the majority opinion. I also agree with Part II insofar as it rejects the untenable "ultimate employment action" doctrine, concludes that Sheila White's removal from her forklift position and her thirty-seven-day suspension constitute adverse employment actions within the meaning of Title VII, and affirms the district court's denial of Burlington's Rule 50 motion. Although the majority properly rejected the "ultimate employment action" doctrine this court embraced in *Dobbs–Weinstein v. Vanderbilt Univ.,* 185 F.3d 542, 545–46 (6th Cir.1999), I would be remiss if I failed to point out that such an express rejection of the "ultimate employment action" doctrine effectively overrules *Dobbs–Weinstein.* I write separately, however, because **\*809** I disagree with the rule the majority today embraces with respect to what constitutes an adverse employment action within the meaning of Title VII's anti-retaliation provision, 42 U.S.C.2000e–3(a). Instead, I believe that the appropriate standard is the one articulated in the Ninth Circuit and advocated by the EEOC; i.e., an employer's retaliatory action is sufficiently adverse for § 704(a) purposes if it would be "reasonably likely to deter [employees] from engaging in protected activity." *Ray v. Henderson,* 217 F.3d 1234, 1242–43 (9th Cir.2000). The "reasonably likely to deter" standard is more consistent with § 704(a)'s statutory language and congressional intent, as well as Supreme Court case law.

### A. Why the "Reasonably Likely to Deter" Rule is the Appropriate Standard for a Retaliation Case

### 1. Statutory and Case Law Support

The Supreme Court has repeatedly instructed courts, as a first step in interpreting a statute, "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808, (1997). The inquiry is at an end "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Id.* (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). It is readily apparent from a reading of § 704(a) that Congress placed no limitations on the reach of the anti-retaliation provision.

Section 704(a) states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... under this subchapter." 42 U.S.C. § 2000e–3(a). The word "discriminate," in turn, is not defined in Title VII, but the scope is impliedly quite broad. A review of other Title VII provisions is revealing, inasmuch as § 703(a) prohibits employers from "fail [ing] or refus[ing] to hire or to discharge any individual, or otherwise *to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). Thus, both §§ 703(a) and 704(a) use the term "discriminate," but only the general discrimination provision (§ 703(a)) places limitations on the word "discriminate." Congress chose not to place any limitations on "discriminate" within the meaning of § 704(a). Thus, a straightforward reading of the § 704(a)'s plain text makes clear that there is no statutory support for the idea that a decision to undertake retaliatory action must materially affect the terms and conditions of employment in order to violate its proscriptions. Indeed, the most natural reading of this language is that it prohibits any form of discrimination against an individual for opposing discrimination or filing a charge, regardless of whether that discrimination takes the form of, for example, termination, suspension, lateral transfer, harassment, or discipline. At least some of the circuits have expressly agreed. *Smith v. Sec'y of Navy,* 659 F.2d 1113, 1119 n. 56 (D.C.Cir.1981) (noting that the language of the anti-retaliation provision "speaks unconditionally" and is not "limit[ed] to acts causing particular harms such as the loss of a particular job or promotion"); *Ray,* 217 F.3d at 1243 (noting that language of the anti-retaliation provision "does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination"); **\*810** *Knox v. State of Indiana,* 93 F.3d 1327, 1334 (7th

Case: 24-1775 Document: 47 Filed: 09/24/2025 Page: 138

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

Cir.1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory acts that might be visited upon an employee....").

Incorporating by reference the limitations placed on "discriminate" in § 703(a) into "discriminate" in § 704(a) is altogether inappropriate. Such incorporation by reference is appropriate only when it is consistent with Congress' expressed intent. Section 704(a)'s legislative history is scant, and therefore we are left to look to its plain legislative text. Congress could quite easily have placed the same limitation on § 704(a) as it did on § 703(a), yet it chose not to do so. Congress' legislative intent, by all indications, was to remove all obstacles from an employee's ability to defend his or her Title VII rights by filing EEOC charges.

The Supreme Court, in *Russello v. United States,* confirmed its view against narrowly construing the meaning of a statute when the plain language unambiguously expressed its legislative purpose and intent. 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). In determining the proper applicability of the word "interest" as used in 18 U.S.C. § 1963(a)(1) in the context of a RICO case, the Supreme Court held that " '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello,* 464 U.S. at 23, 104 S.Ct. 296 (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)). Specifically, in discussing the particular statutory provision at issue, the Court noted that "[t]he argument for a narrow construction of § 1963(a)(1) is refuted by the language of the succeeding subsection (a)(2). The former speaks broadly of 'any interest ... acquired,' while the latter reaches only 'any interest in ... any enterprise which [the defendant] has established[,] operated, controlled, conducted or participated in the conduct of in violation of section 1962.' " *Id.* (quoting 18 U.S.C. § 1962). The Court went on to express its belief that if Congress had intended to restrict § 1963(a)(1), it presumably would have done so expressly as it did in the immediately following subsection. *Id.*

Contrary to the majority opinion, this Court has already embraced this logic. In *Lynch v. Johns–Manville Sales Corp.*, we held that when looking to stay proceedings in a Chapter 11 bankruptcy context, a solvent co-defendant may not use the automatic stay provision in 11 U.S.C. § 362(a), when the said provision facially stays proceedings "against the debtor," and fails to suggest that these rights may be invoked by any one

other than the defendant. 710 F.2d 1194, 1198 (6th Cir.1983). The Court noted "[it] is a fundamental rule of statutory construction that inclusion in one part of a congressional scheme of that which is excluded in another part reflects a congressional intent that the exclusion was not inadvertent." *Id.* at 1197.

The Supreme Court case, *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), views § 704(a)'s legislative intent in this manner. In *Robinson,* the plaintiff sued his former employer, alleging that it had retaliated against him by giving him a negative employment reference to a potential employer. *Id.* There was no allegation that the former employer itself had made an ultimate employment decision, or that it took any adverse action that materially altered the plaintiff's job responsibilities. (Indeed, it could not have done so, given that the plaintiff was no longer working for the employer at the time.) Nevertheless, a unanimous Court allowed the plaintiff's claim to proceed after holding that former **\*811** employees may challenge retaliatory actions. *Id.* at 346, 117 S.Ct. 843. Although *Robinson* dealt specifically with the issue of determining who is an "employee" for purposes of Title VII's anti-retaliation provision (as opposed to what constitutes an adverse employment action), its reasoning is pertinent: a former employee counts as an employee within the meaning of § 2000e–3(a), because otherwise an employee could be fired in retaliation and not be able to sue. In so holding, the Court noted that an alternative statutory interpretation would have undermined or vitiated one of Title VII's most important purposes—maintaining "unfettered access to statutory remedial mechanisms." *Id.*

In line with the teachings of *Robinson* and the Supreme Court's view that § 704(a) should not be limited in its construction, this Court, in *EEOC v. Ohio Edison,* also interpreted § 704(a) to be a broad anti-retaliation provision that should reach as far as its intended protections allow. 7 F.3d 541, 545–46 (6th Cir.1993) (holding that Title VII's protections against retaliation extended to situations where an employee was discriminated against because his representative opposed an unlawful employment practice). In reaching this result, we stated that "[i]n enacting section 2000e–3, Congress unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation." *Id.* at *543.* We relied, in part, on the Supreme Court's analysis of statutory interpretation in *NLRB v. Scrivener,* which held that "the language of a statute should not be read strictly, but

Case: 24-1775   Document: 47   Filed: 09/24/2025   Page: 139

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

should 'be read more broadly' if such a reading was also consistent with the 'purpose and objective' of the prohibition made illegal by the statute." *Id.* at 545 (quoting *NLRB v. Scrivener,* 405 U.S. 117, 122, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972)).

Additionally in *Mattei v. Mattei,* this Court once again chose to interpret the Title VII's anti-retaliation provision broadly, as to prohibit *any kind* of adverse action. 126 F.3d 794, 798 (6th Cir.1997). There, we were asked to give meaning to the concept of discrimination as it is used in the Employee Retirement Income Security Act ("ERISA"). *Id.* The ERISA provision at issue was § 510 which made it unlawful, under certain circumstances, to "discriminate against" a participant or beneficiary. *Id.* at 797 (quoting 29 U.S.C. § 1140). The majority found guidance in Title VII's and the ADEA's interpretive use of the phrase "discriminate against," noting that neither of these Acts defined this phrase, but rather their respective provisions "are consistently interpreted ... to forbid an employer to take *any kind* of adverse action against an individual because he has engaged in [ ] protected activity...." *Id.* at 806 (emphasis in original). We concluded that because the ERISA anti-retaliation provision at issue used the same phrase ("discriminate against") as the Title VII and ADEA provisions, and was enacted after them, it was proper to assume that Congress intended for the ERISA provision "to have the same basic meaning." *Id.* at 806.

Even more recently, the Supreme Court has cautioned courts against unwarranted limitations on otherwise unambiguous statutory text. In *Desert Palace, Inc. v. Costa,* the Supreme Court rejected the approach of many circuits to limit a Title VII plaintiff's ability to receive a mixed-motive jury instruction in cases where direct evidence of discrimination had not been submitted at trial, determining that a "direct evidence" requirement "is inconsistent with the text of [42 U.S.C. § 2000e–2(m)]." 539 U.S. 90, 123 S.Ct. 2148, 2153, 156 L.Ed.2d 84 (2003). The Court reasoned, in pertinent part, that the § 2000e–2(m) "unambiguously states that a plaintiff need **\*812** only 'demonstrat[e]' that an employer used a forbidden consideration with respect to 'any employment practice.' " *Id.* On its face, "the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence." *Id.* The Court was further persuaded by a review of the term "demonstrates," which Title VII, as amended in the 1991 Civil Rights Act, defined as "to 'mee[t] the burdens of production and persuasion.' " *Id.* at 2154 (citing 42 U.S.C. § 2000e(m)). The Court added, "If Congress intended the term 'demonstrates' to require that the 'burdens

of production and persuasion' be met by direct evidence or some other heightened showing, it could have made that intent clear by including language to that effect in § 2000e(m). Its failure to do so is significant, for Congress has been unequivocal when imposing heightened proof requirements in other circumstances, including in other provisions of Title 42." *Id.* at 2154. *Desert Palace* is instructive, inasmuch as it cautioned courts not to read limitations into statutory language, particularly where Congress expressly limited such terms in other provisions of the same title yet declined to do so in the presently reviewed statutory provision. We are faced with precisely the same situation. Section 703(a) expressly limited the scope of "discriminate" to actions relating to the employee's "compensation, terms, conditions, or privileges of employment." Section 704(a) could just as easily have limited its scope of "discriminate," yet chose not to do so. It is abundantly clear that the lessons of *Desert Palace* dictate that we not read such limitations into § 704(a) now.

## 2. Administrative Agency Support

In addition to support from the statutory text and Supreme Court case law, there is administrative agency support for the "reasonably likely to deter" view, inasmuch as the EEOC has interpreted 42 U.S.C. § 2000e–3 in this manner. While it is true that the EEOC Compliance Manual on Retaliation is not binding authority, the guidelines nevertheless "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). It is persuasive authority. According to the EEOC, an "adverse employment action" means "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998). Under this approach, a number of retaliatory actions which are not expressly encompassed in a "materially adverse" standard would fall into the ambit of a § 704(a) violation, so long as they are reasonably likely to deter employees from engaging in protected activity. The EEOC's test is not unlimited however, for instance, "petty slights and trivial annoyances are not actionable, as they are not likely to deter protected activity." EEOC Compliance Manual Section 8, "Retaliation," 8–14. As the Ninth Circuit observed, the focus is not on the "ultimate effects of each employment action," but rather on the "deterrent effects." *Ray,* 217 F.3d at 1243. Given the primary purposes of Title

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 140

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

VII's anti-retaliation provision, this is where the emphasis properly lies.

### 3. Policy Considerations

From a policy (and logical) perspective, many factors support an interpretation of adverse employment action that extends beyond the boundaries of an employment decision that materially affects the terms and conditions of employment.

As noted above, a "materially adverse" standard would undermine the driving **\*813** force behind § 704(a), which is to maintain "unfettered access to statutory remedial mechanisms." *Robinson,* 519 U.S. at 346, 117 S.Ct. 843. This Court has similarly observed that Congress, in enacting Title VII's anti-retaliation provision, " 'unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation.' " *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 543 (6th Cir.1993).

Indeed, the "materially adverse" rule would allow many types of retaliatory actions to go completely unaddressed and unpunished. For instance, the D.C. Circuit has held that negative job references to prospective employers and cancelling public events honoring an employee constitute retaliatory behavior, even though such retaliatory actions do not affect the terms and conditions of one's employment. *Passer v. Am. Chem. Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991). The "materially adverse" rule does not make clear whether such adverse behavior on an employer's part would fall within the ambit of § 704(a). It also seems to leave open the issue of retaliatory harassment. *See Causey v. Balog,* 162 F.3d 795, 803 (4th Cir.1998) (recognizing the validity of a § 704(a) retaliatory harassment claim).

Contrary to the majority's position, the Ninth Circuit's "reasonably like to deter" standard adequately addresses the many varied forms of retaliation while safeguarding against a slippery slope effect by disallowing employees from litigating trivial annoyances. The inquiry would not be whether any adverse action has been taken but whether, as a matter of law, the adverse action would deter a reasonable employee from engaging in protected activity. This ferrets out suits alleging frivolous harms, while maintaining suits for very deleterious actions such as supervisor harassment. Moreover, there are no indications that the broad rules still employed in the Ninth, Tenth, and Eleventh Circuits [1] have opened unmanageable floodgates to aggrieved Title VII plaintiffs.

### B. Why the Majority Opinion Incorrectly Rejected the "Reasonably Likely to Deter" Rule

Notwithstanding legislative, Supreme Court, and administrative support for a broad rule, the majority rejects the "reasonably likely to deter" standard, citing reasons that are less than persuasive. The majority suggests that the "reasonably likely to deter" standard is too broad. Yet the rule is no broader than the statutory language requires; nor is it any broader than that which is utilized in tort cases, which often involves a "case-by-case" analysis when compelling courts to employ a "reasonable person" standard in determining what constitutes a duty of care. The reasonable person standard is readily understandable, is not burdensome and is commonly used in legal discourse. [2]

 **\*814** In fact, this Court, in *Thaddeus–X v. Blatter*, previously embraced such an objective standard which the majority now claims to be unreasonable. 175 F.3d 378, 396 (6th Cir.1999) (en banc). In *Thaddeus–X*, a case involving a § 1983 action brought by the state inmates against prison officials based on alleged retaliation, we adopted an objective standard in determining what constitutes an "adverse action." *Id.* at 396. In determining "whether actions of lesser severity merit being deemed 'adverse' for purposes of a retaliation claim, we adopt[ed] the standard suggested by Judge Posner in *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982), that an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Id.* We reasoned that "[t]he benefits of such a standard are that it is an objective inquiry, capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening [out] the most trivial of actions from constitutional cognizance." *Id.* at 398.

Moreover, The Ninth, Tenth, and Eleventh Circuits all employ such an objective standard, specifically in the Title VII context, and by so doing, none of the Circuits appear to have had any difficulty in determining what is adverse and what is frivolous. *See, e.g., Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1449 (11th Cir.1998) (taking an "objective approach" to its case-by-case standard).

Furthermore, retaliation requires a broad rule because retaliation can take many forms, perhaps more than Congress at the time of its drafting could think of or reasonably anticipate. Nevertheless, it is not the function of this Court to graft its own policy values onto a statute; rather, it is this

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 141

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

Court's responsibility to discern Congress' legislative intent in enacting the statute. In other words, we must determine whether Congress, not this Court, would envision a plaintiff like Sheila White receiving relief from the retaliatory actions allegedly perpetrated against her by Burlington Northern. Congress' intent is manifest: to provide employees who have been victimized by discrimination with access to appropriate statutory remedies under Title VII. *Robinson,* 519 U.S. at 346, 117 S.Ct. 843.

The majority's approach would utilize the same standard for §§ 703 and 704 so that it would not be necessary to undertake individual reviews under the separate sections of the statute when cases arise. This approach similarly is unavailing since Title VII's statutory language indicates that Congress *intended* for courts to treat general discrimination differently than retaliatory discrimination. Indeed, the recent Supreme Court case of *Desert Palace* emphasized the importance of statutory construction and the significance of statutory language as the starting point for a court's analysis. 123 S.Ct. at 2153. Moreover, different purposes are involved here and it is logical that the two sections would be treated differently. Section 703(a) of Title VII never expected to shield protected groups from every little slight they encounter; its purpose was to assist in getting discriminated-against plaintiffs into the American workforce and to keep them there. As far as retaliation is concerned, congressional intent was clear: to provide **\*815** "unfettered access to statutory remedial mechanisms." *Robinson,* 519 U.S. at 346, 117 S.Ct. 843.

Contrary to the majority's suggestion, the rule on adverse employment actions to which the majority opinion adheres is quite ambiguous. In an attempt to obviate the need for a court's case-by-case determination of what actions by an employer would be "reasonably likely to deter" an employee from engaging in protected activity, the majority points to this Court's case law regarding what constitutes a "material adverse employment action." The majority relies on *Kocsis v. Multi–Care Management, Inc.,* which requires courts to look to "indices unique to a particular situation," when considering whether or not an employment action is materially adverse. 97 F.3d 876, 886 (6th Cir.1996). This approach ultimately requires a case-by-case review to determine what is "unique" and what is not in each "particular situation." Accordingly, if the goal is to provide guidance while making individual review obsolete, it would be more advantageous to utilize a better defined inquiry than that of *Kocsis* "indices unique to a particular situation." This is particularly so when there is an alternative approach available which would also advance

Title VII's goal of equal access to its protections under the law. In the present case, the majority opinion concluded that the forklift transfer constituted an adverse employment action by classifying Burlington Northern's action as an example of "indices unique to a particular situation." While that may satisfactorily dispose of the present case, the majority opinion leaves unclear what other types of adverse actions would fall within the ambit of this category, absent a better delineation of the category. As a result, employers like Burlington Northern could continue to hide behind mere technicalities and claim that other deleterious harms not encompassed in today's ruling, such as employer-sanctioned retaliatory harassment, do not qualify as adverse employment actions when the employee does not experience a demotion or a material change of duties.

The majority suggests that the EEOC's position, in advocating the "reasonably likely to deter" standard, is inconsistent with its concession that legally cognizable adverse action should not encompass trivial slights. Yet no inconsistency is apparent. It is logical that a person pursuing solutions prescribed by EEOC standards would reasonably expect some backlash, in the form of a limited number of negative consequences, some unhappy colleagues and perhaps even some ostracism. The EEOC's recommendation, however, allows redress only for those plaintiffs who can show that such retaliatory actions would reasonably deter the charging party from engaging in protected activity. EEOC Compliance Manual § 8, "Retaliation," ¶ 8008 (1998). The majority essentially seeks to dismiss the EEOC's approach because it supposedly lacks safeguards against trivial and petty allegations; however, by purporting to exclude trivial and unsubstantiated allegations in order to define the "adverse-employment-action element" narrowly so as not to frustrate the purpose of Title VII, the majority actually impedes Title VII's effectiveness.

Moreover, the majority suggests that the "materially adverse" requirement, "properly interpreted ... accomplishes [§ 704(a)'s purposes] while appropriately counterbalancing the need to prevent lawsuits based upon trivialities" and that the "indices ... unique to a particular situation" standard accurately captures all other non-trivial actions taken against the employee. Yet *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir.1999), which utilized the "materially adverse" standard, rejected the employee's argument that her unwarranted negative job evaluation constituted **\*816** an adverse employment action simply because it was not accompanied by monetary loss or anything else falling into

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 142

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

the penumbra of adverse actions listed in *Kocsis,* 97 F.3d at 886. In other words, the "materially adverse" standard was ineffective in *Hollins,* because a negative job evaluation is *not* trivial; it is tangible. It is a black mark on one's record that can have severe future consequences for an employee, inasmuch as an employer can use the unwarranted negative job evaluation to deny the employee future promotions. Similarly, it leaves unaddressed such other deleterious harms such as employer-sanctioned retaliatory harassment. The *Hollins* court made no attempt to utilize the "unique indices" category in order to afford the plaintiff relief. 188 F.3d at 662.

What the majority evidently intends (but fails to state expressly) is that it is unwilling to consider actionable a wide variety of non-trivial, tangible adverse employment actions in order to limit the number of legitimate, legally cognizable claims that can be filed by aggrieved employees. There is no other apparent reason for its analysis.

Finally, the majority also attempts to rely in part on the Supreme Court decision, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). However, such reliance is also misplaced. In *Burlington,* the Supreme Court, in devising an agency principle to govern employer liability for a supervisor's harassment of an employee, observed that an employer is always liable for a discriminatory "tangible employment action." The Court distinguished tangible employment actions from actions not obviously attributable to the employer, defining tangible employment actions as "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Id.* at 762, 118 S.Ct. 2257. A tangible employment action "requires an official act of the enterprise, a company act," and would include such acts "as discharge, demotion, or undesirable reassignment." *Id.* at 765, 118 S.Ct. 2257. Elsewhere in the opinion the Court observed that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington,* 524 U.S. at 761, 118 S.Ct. 2257. However, *Burlington* addressed Title VII's § 703(a), not § 704(a) and, as discussed earlier, the respective scopes of § 703(a) and 704(a) necessarily differ. [3]

**C. Conclusion**

In 1999, a panel of this Court held that an adverse employment action, for purposes of a Title VII retaliation claim, must materially affect the terms and conditions of the plaintiff's employment. *Hollins,* 188 F.3d at 662. Our grant of the petition for rehearing *en banc* provided this Court with an opportunity to reconsider the validity of *Hollins'* unreasoned importation of § 703(a)'s definition of an "adverse employment action" into § 704(a) and to clarify what actions are sufficiently adverse with respect to retaliation claims. A traditional statutory analysis and recognition of Title VII's legislative intent does not dictate the majority's continuing adherence to the "materially adverse" standard, and the rule set forth by the majority fails to provide **\*817** the clarity desperately needed in this pervasive area of litigation. The lack of clarity in the majority's approach could result in more court decisions against true victims of § 704(a) retaliation because the employer's retaliatory actions conveniently manage to elude the confines of the "materially adverse" definition. Instead of following the majority approach, I would hold that the retaliatory actions Burlington Northern took against White constituted adverse employment actions because such actions are reasonably likely to deter an employee from engaging in protected activity.

SUTTON, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's treatment of "adverse employment actions" under Title VII, and accordingly join Parts I–III of its opinion in full. I respectfully dissent, however, from the majority's resolution of the punitive damages issues, and accordingly write separately to explain my disagreement with Parts IV–V of the Court's opinion.

At the trial in this case, the district court instructed the jury that it may award punitive damages under Title VII only if the plaintiff proved that she was entitled to them by "clear and convincing" proof. In arguing that the district court erred in this respect and in contending that a punitive damages claim may be proved by a "preponderance" of the evidence under Title VII, the plaintiff relies on two United States Supreme Court decisions and one court of appeals decision. Whether considered together or singly, however, these cases do not support the plaintiff's position.

The first case, *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), holds that "circumstantial" evidence, in addition to "direct" evidence, may be used to prove discrimination in a Title VII mixed-motive case. That holding, however, does not answer today's

Case: 24-1775   Document: 47   Filed: 09/24/2025   Page: 143

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

question since circumstantial evidence may be used to prove facts in cases that require a preponderance of the evidence *and* cases that require proof beyond a reasonable doubt, including criminal cases. *See id.* at 2154 ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."). In reaching its circumstantial-evidence conclusion, it is true, *Desert Palace* noted that Congress's "failure" to specify that only "direct" evidence could be used to prove discrimination was "significant, for Congress has been unequivocal when imposing heightened proof requirements in other circumstances, including in other provisions of Title 42." *Id.* But that mode of analysis bears on our inquiry only if punitive damages represent a form of conventional relief in the same way that circumstantial evidence represents a form of conventional proof. In my view, that is not the case and accordingly *Desert Palace* does not advance the point. If punitive damages are not a conventional remedy, Congress's "failure" to speak to the question would suggest that the burden of proof traditionally applied to unconventional remedies in general or punitive damages in particular should be used.

Two months before the Court decided *Desert Palace,* it made clear that punitive damages are not a conventional remedy. In *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003), the Court explained that punitive damages and compensatory damages "serve different purposes," that punitive damages "are aimed at deterrence and retribution" and "serve the same purposes as criminal penalties," and that special constitutional rules of review apply to such awards. If there is a lesson to be drawn **\*818** from *Desert Palace* and *State Farm,* it would seem to be that a punitive damages claim represents an unconventional form of relief, which deserves a heightened rather than a run-of-the-mill standard of proof.

The two other cases upon which the plaintiff relies are no more helpful in establishing that a preponderance standard applies to punitive damages claims. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion), also concerned an issue of conventional relief (namely, the quantum of proof in Title VII mixed-motive cases), not an issue related to punitive damages. *Id.* at 253, 109 S.Ct. 1775 ("Only rarely have we required clear and convincing proof where the action defended against seeks only conventional relief."). In saying that "[c]onventional rules of civil litigation generally apply in Title VII cases," *id.,* the plurality of course did not

establish that these conventional rules apply to requests for unconventional relief, and if anything suggested just the opposite.

*Karnes v. SCI Colorado Funeral Services, Inc.,* 162 F.3d 1077 (10th Cir.1998), is even less helpful. In that case, the defendant argued that the higher burden of proof for punitive damages claims *under Colorado law* should apply to Title VII claims. The court disagreed, concluding that state law does not control the answer to the question, then summarily (and mistakenly) relied on *Price Waterhouse* to say that a preponderance standard applies. *Id.* at 1080–81.

It is one thing, I recognize, to say that the cited cases do not answer the question; it is another to determine the answer. In the plaintiff's defense, the statute does not give us a lot to work with in determining what Congress meant. As an initial matter, the statute itself fails to specify a burden of proof, stating only that a plaintiff may recover punitive damages if she "demonstrates" that the defendant intentionally engaged in discriminatory practices. 42 U.S.C. § 1981a(b)(1). In a later subchapter, Congress defines "demonstrates" unhelpfully to mean "meets the burdens of production and persuasion," *id.* § 2000e(m), a definition that chases the tail of the initial inquiry. Nor does the context in which the relevant words appear or the legislative history to the Civil Rights Act of 1991 offer any other insights into the appropriate burden of proof. Pub.L. No. 102–166, § 102, 105 Stat. 1072.

Under these circumstances, it is appropriate to consider other indicators of statutory meaning, analogous Supreme Court precedents and relevant state laws predating the legislation. *See Steadman v. SEC,* 450 U.S. 91, 95, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) ("Where Congress has not prescribed the degree of proof which must be adduced ... this Court has felt at liberty to prescribe the standard, for '[i]t is the kind of question which has traditionally been left to the judiciary to resolve.' ") (quoting *Woodby v. INS,* 385 U.S. 276, 284, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)); *see also North Star Steel Co. v. Thomas,* 515 U.S. 29, 34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995) ("[I]t is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [our] precedents ... and that it expect[s] its enactment[s] to be interpreted in conformity with them.") (citations and quotations omitted); *Nishikawa v. Dulles,* 356 U.S. 129, 135, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958) (requiring a clear and convincing standard of proof for voluntary expatriation in the absence of congressional guidance and in the light of analogous Supreme Court precedents); *cf. Santosky v.*

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 144

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

*Kramer,* 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("A majority of the States have concluded that a 'clear and convincing evidence' standard of proof strikes a fair balance [in parental-rights termination cases]. We hold that such a standard adequately **\*819** conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process."); *Addington v. Texas,* 441 U.S. 418, 431–32, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ("We note that 20 states, most by statute, employ the standard of 'clear and convincing' evidence; 3 states use 'clear, cogent, and convincing' evidence; and 2 states require 'clear, unequivocal and convincing' evidence.") (footnotes and emphasis omitted).

By 1991, when Congress authorized punitive damages in Title VII claims, two Supreme Court cases had intimated that a clear and convincing standard ought to apply to punitive damages claims. In *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), decided before Congress amended Title VII, the Court noted that "[t]here is much to be said in favor of a State's requiring, as many do, a standard of 'clear and convincing evidence' or, even, 'beyond a reasonable doubt' " for punitive damages. *Id.* at 23 n. 11, 111 S.Ct. 1032 (citations omitted). Two years earlier, Justice Brennan noted that exceptions exist to the preponderance of the evidence standard "when the government seeks to take unusual coercive action—action more dramatic than entering an award of money damages or other *conventional relief." Price Waterhouse,* 490 U.S. at 253, 109 S.Ct. 1775 (plurality opinion) (emphasis added).

In analogous settings before 1991, the Supreme Court also had adopted a clear and convincing evidence standard for civil cases involving unconventional relief—in the face of congressional silence about the appropriate burden of proof. In *Woodby v. INS,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), the Supreme Court observed that "Congress ha[d] not addressed itself [in the Immigration and Nationality Act] to the question of what degree of proof is required in deportation proceedings," then observed that this is "the kind of question which has traditionally been left to the judiciary to resolve." *Id.* at 284, 87 S.Ct. 483. Reasoning that deportation proceedings fall somewhere between ordinary civil litigation and criminal litigation, the Court held that "clear, unequivocal, and convincing evidence" must support a deportation order—the same burden used in analogous cases involving civil fraud, expatriation, adultery, illegitimacy, lost wills and oral contracts. *Id.* at 285 & n. 18, 87 S.Ct. 483. *Compare Nishikawa,* 356 U.S. at 135, 78 S.Ct. 612

(holding that, in the face of congressional silence on the question, proof of an act of expatriation must be by clear and convincing evidence), *with Vance v. Terrazas,* 444 U.S. 252, 265, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980) (upholding a preponderance of the evidence standard specified by Congress after *Nishikawa* ).

Supreme Court decisions analogizing punitive damages to criminal penalties also suggest that a higher burden of proof ought to apply here. *See State Farm,* 123 S.Ct. at 1519–20 ("[P]unitive damages ... are aimed at deterrence and retribution," and "serve the same purposes as criminal penalties."); *id.* at 1521 ("It should be presumed that a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability ... is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor.").

For like reasons, the factual predicate for a punitive damages award—that the defendant acted with "malice" or "reckless indifference," *see* 42 U.S.C. § 1981a(b)(1)—has a stigmatizing effect **\*820** that deserves more evidentiary certainty than the preponderance standard provides. *See State Farm,* 123 S.Ct. at 1521 ("[P]unitive damages should only be awarded if the defendant's culpability is [ ] *reprehensible.*") (emphasis added); *Addington,* 441 U.S. at 424, 99 S.Ct. 1804 ("One typical use of the [clear and convincing] standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant ... [to] reduce the risk to the defendant of having his reputation tarnished erroneously."); *see also Haslip,* 499 U.S. at 54, 111 S.Ct. 1032 (O'Connor, J., dissenting) ("[P]unitive damages are quasi-criminal punishment. Unlike compensatory damages ... punitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible. Hence, there is a stigma attached to an award of punitive damages that does not accompany a purely compensatory award.").

By 1991, the supreme courts or legislatures of 29 States had directly addressed the issue whether punitive damage claims required a heightened burden of proof. Of those States, 20 of them chose the clear and convincing standard for all punitive damages claims, one State (Colorado) applied the

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 145

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

beyond a reasonable doubt standard to these claims and two States (Florida and Oklahoma) applied the clear and convincing standard when the punitive award was a specific multiple of the actual damages in the case. *See* App. A (identifying the burden of proof in each State with respect to punitive damages in 1991). *See also* Michael Rustad & Thomas Koenig, *The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers,* 42 Am. U.L.Rev. 1269, 1278 n. 63 (1993) (identifying States with a clear and convincing standard in 1993).

When Congress addressed this issue in 1991, it also was doing so in the context of a modern trend in favor of the higher standard—a trend that was well underway before the 1991 amendments to Title VII. The American Bar Association recommended the higher standard in 1986. *See* Special Committee on Punitive Damages, *Punitive Damages: A Constructive Examination,* 1986 A.B.A. Sec. Litig. 33 ("Because one of the purposes of punitive damages is punishment ... [t]he committee concludes [ ] that the 'clear and convincing' burden of proof is appropriate for an award of punitive damages. This is the standard often used in fraud cases, to which there is some analogy."). The American Law Institute did the same in 1991. *See* 2 American Law Institute, *Reporters' Study: Enterprise Responsibility for Personal Injury* 264 (1991) ( "An enterprise should be liable for punitive damages only when there is clear and convincing evidence of reckless disregard for the safety of others in the decisions made by management officials or other senior personnel."). As of today, the supreme courts or legislatures from 34 States have addressed the burden of proof issue, with 31 now requiring a heightened burden of proof. *See* App. B (identifying the burden of proof for punitive damages in each State as of 2004).

The States within the Sixth Circuit, moreover, are nearly uniform in applying a clear and convincing standard. By 1991, Ohio and Kentucky had established the standard by statute, and Tennessee did so by court decision in 1992. *See* App. A. Although the Michigan courts have not directly addressed the issue, at least one state appeals court has approved, without discussion, a jury instruction requiring proof by a preponderance of the evidence for an award of exemplary damages. *Green v. Evans,* 156 Mich.App. 145, 401 N.W.2d 250, 252 (1985). *But see Kewin v. Mass. Mut. Life Ins. Co.,* 409 Mich. 401, 295 N.W.2d 50, 55 (1980) (noting that exemplary **\*821** damages serve only to compensate plaintiffs for "humiliation, sense of outrage, and indignity"— and may not serve as punishment to the defendant).

While there may not be a Rosetta Stone to guide us here, Supreme Court precedents concerning punitive damages and comparable forms of relief, as well as relevant state-law practices, suggest that a clear and convincing standard of proof ought to govern these claims. A claim for punitive damages, in a nutshell, is more akin to claims concerning fraud, deportation and expatriation, oral contracts and illegitimacy than it is to more conventional civil claims. Accordingly, the heightened burden of proof associated with these claims and traditionally associated with punitive damages claims in general ought to apply.

The additional citations identified by the majority in support of the plaintiff's position do not alter this analysis. *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), deals with whether actual malice is required to obtain punitive damages under § 1983, not with the preponderance/clear and convincing debate raised here. *Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277 (2d Cir.1990), involved a products liability claim under New York law, in which the defendant argued that the Due Process Clause of the United States Constitution *requires* a clear and convincing standard. In rejecting that argument, the court "acknowledg[ed] the force of the argument that since punitive damages are awarded primarily to punish a defendant for past conduct and to deter it and others from similar conduct in the future, a standard of proof appropriate for 'quasi-criminal wrongdoing' should be required." *Id.* at 282.

*In re Exxon Valdez,* 270 F.3d 1215 (9th Cir.2001), is an admiralty-law decision in which the Ninth Circuit concluded that the district court did not "abuse its discretion" in applying a preponderance standard to a punitive damages claim. *Id.* at 1232–33. Again, the primary debate in the case was whether the Due Process Clause required a higher standard. Moreover, if like the Ninth Circuit we applied an abuse of discretion to this issue (which we do not), it no doubt would be a very different question whether the district court in this case abused its discretion in imposing the higher standard of proof. The Fourth Circuit's decision in *Notter v. North Hand Protection,* 89 F.3d 829, 1996 WL 342008 (4th Cir. June 21, 1996), besides being unpublished, rejects only one argument by the employer in that case— that the higher burden of proof for punitive damages claims *under state law* should control the Title VII inquiry. *Id.* at \*10. And the Harvard Law Review piece supports the employer's position in this case. In addition to approving "measures that guide and direct juries toward appropriate

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 146

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

[ ] determinations," it notes that "the widespread acceptance of the clear and convincing evidence standard demonstrates [the] states' acknowledgment of the retributive function of punitive damages." *Jury Determination of Punitive Damages,* 110 Harv. L.Rev. 1513, 1532–33, 1536 (1997).

Nor does the cap on punitive damages claims under Title VII advance plaintiff's argument. While a cap on punitive damages addresses one issue in this area (the outer limits of awards), it does not account for the other issues in this area—the appropriate quantum of proof required (1) before a jury may attach a "reprehensibility" label to another's conduct, *State Farm,* 123 S.Ct. at 1521, or (2) before a jury may award punitive damages that have a significant ratio to the underlying compensatory award. In ascertaining the constitutional limits of punitive damages, it is the ratio of the two awards, not the size of the punitive damages award, that the Supreme Court **\*822** considers in measuring the award's compliance with Due Process—which is why awards under $300,000 may still violate the Constitution and why they still deserve the prevailing burden of proof for punitive damages claims in this country, namely clear and convincing evidence. *See id.* at 1524 (ratios involving "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, or, in this case, of 145 to 1") (citation omitted); *see also Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1049 (8th Cir.2002) (reducing punitive damages award from $120,000 to $60,000 to correct constitutional deficiency); *Tyson Foods, Inc. v. Stevens,* 783 So.2d 804, 810 (Ala.2000) ("In this case, the punitive-damages award of $75,000 is 30 times the compensatory-damages award of $2,500. Considering the facts before us, we find the ratio of 30:1 to be unreasonable."); *Employees' Benefit Ass'n v. Grissett,* 732 So.2d 968, 979 (Ala.1998) ("The punitive award of $150,000 is 170 times the compensatory award of $880. That 170:1 ratio is unacceptable.").

But that is not the most significant problem with invoking the damages cap in this instance. All agree that Congress did not give the courts particularly helpful guidance here, requiring us to answer what the burden of proof for a federal punitive damages claim should be in the face of congressional silence. An answer that says punitive damages claims receive a preponderance standard when the award is under $300,000 but receive a clear and convincing standard when the award is some higher amount to be named later does not seem very helpful. Neither do I understand how the damages cap could make a difference in the outcome of this case. If, in this

instance, the Court had concluded that a clear and convincing standard generally applies to punitive damages claims in the face of congressional silence, the existence of a cap of this sort by itself could not alter the presumption. If instead the Court had concluded that a preponderance standard generally applies in this setting, the existence of a damages cap would make no difference at all. Either way, in other words, the outcome would be unaffected by the existence of the cap.

I have one other qualm with the majority's decision on this point—which is reaching the burden of proof issue at all. I do not understand how White could prevail on remand in a punitive-damages-only trial, no matter what the burden of persuasion is. Because we required an en banc hearing to decide whether White suffered an adverse employment action and, notably, to determine whether this Circuit embraced the ultimate-employment-decision test, it would not seem possible for a jury to conclude that Burlington Northern acted with reckless disregard for White's federally-protected rights in imposing the *suspension. See* 42 U.S.C. § 1981a(b)(1) (requiring proof that the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual"); *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) ("The terms 'malice' or 'reckless indifference' pertain to the employer's *knowledge* that it may be acting in *violation of federal law,* not its awareness that it is engaging in discrimination.") (emphasis added); *id.* at 537, 119 S.Ct. 2118 (recognizing that imposing punitive damages would be inappropriate when "[t]he underlying theory of discrimination [is] novel or otherwise poorly recognized").

A punitive damages claim with respect to the *transfer* count is even harder to imagine. Until now, no Sixth Circuit case (to my knowledge) has found a cognizable Title VII claim arising from a lateral transfer, let alone a transfer *within* an **\*823** employee classification and without a loss in pay. *See Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996) ( "[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims.") (citing *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987)). While the opinion concludes that this transfer count is cognizable under Title VII, its reasons for doing so could not support a finding that Burlington Northern acted with "malice" or "reckless indifference" to White's rights.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 147

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

For these reasons, I respectfully dissent from Parts IV and V of the Court's opinion.

## APPENDIX A

State Burdens of Proof for Punitive Damages in 1991

By 1991, the supreme courts or legislatures of the following States had adopted a higher burden of proof for awarding punitive damages:

| | |
|---|---|
| Alabama | Ala. Code § 6-11-20(a) (1991) (clear and convincing evidence). |
| Alaska | Alaska Stat. § 09.17.020 (1991) (clear and convincing evidence). |
| Arizona | *Linthicum v. Nationwide Life Ins. Co.,* 723 P.2d 675, 680–81 (Ariz. 1986) ("[W]hile a plaintiff may collect compensatory damages upon proof by a preponderance of the evidence of his injuries due to the tort of another, we conclude that recovery of punitive damages should be awardable only upon clear and convincing evidence of the defendant's evil mind."). |
| California | Cal. Civ. Code § 3294(a) (1991) (clear and convincing evidence). |
| Colorado | Colo. Rev. Stat. § 13-25-127(2) (1991) (beyond a reasonable doubt). |
| Florida | Fla. Stat. Ann. § 768.73(1)(b) (1991) (punitive damages exceeding three times actual damages must be proved by clear and convincing evidence). |
| Georgia | Ga. Code Ann. § 51-12-5.1(b) (1991) (clear and convincing evidence). |
| Hawaii | *Masaki v. Gen. Motors Corp.,* 780 P.2d 566, 575 (Haw. 1989) ("[F]or all punitive damage claims we adopt the clear and convincing standard of proof."). |

**\*824**

| | |
|---|---|
| Indiana | Ind. Code § 34-4-34-2 (1991) (clear and convincing evidence). |
| Iowa | Iowa Code § 668A.1(1)(a) (1991) (clear and convincing evidence). |
| Kansas | Kan. Stat. Ann. § 60-3702(c) (1991) (clear and convincing evidence). |
| Kentucky | Ky. Rev. Stat. Ann. § 411.184(2) (1991) (clear and convincing evidence). |
| Maine | *Tuttle v. Raymond,* 494 A.2d 1353, 1363 (Me. 1985) ("[W]e hold that a plaintiff may recover exemplary damages based upon tortious conduct only if he can prove by clear and convincing evidence that the defendant acted with malice."). |
| Minnesota | Minn. Stat. § 549.20(1)(a) (1991) (clear and convincing evidence). |
| Montana | Mont. Code Ann. § 27-1-221(5) (1991) (clear and convincing evidence). |
| Nevada | Nev. Rev. Stat. 42.005(1) (1991) (clear and convincing evidence). |
| North Dakota | N.D. Cent. Code § 32-03.2-11 (1991) (clear and convincing evidence). |
| Ohio | Ohio Rev. Code Ann. § 2315.21(C)(3) (1991) (clear and convincing evidence). |
| Oklahoma | Okla. Stat. tit. 23 § 9.1.A (1991) (punitive damages exceeding the amount of actual damages must be proved by clear and convincing evidence). |
| Oregon | Or. Rev. Stat. § 41.315(1) (1991) (clear and convincing evidence). |

**\*825**

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 148

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

| South Carolina | S.C. Code Ann. § 15-33-135 (1991) (clear and convincing evidence). |
| Utah | Utah Code Ann. § 78-18-1(1)(a) (1991) (clear and convincing evidence). |
| Wisconsin | *Wangen v. Ford Motor Co.*, 294 N.W.2d 437, 458 (Wis. 1980) ("We hold that the [clear, satisfactory and convincing evidence] burden of proof shall apply to punitive damages claims hereafter."). |

By 1991, the supreme courts or legislatures of the following States had rejected a higher burden of proof for awarding punitive damages:

| Connecticut | *Freeman v. Alamo Mgmt. Co.*, 607 A.2d 370, 375 (Conn. 1992) ("We disagree . . . with the . . . conclusion . . . that clear and convincing proof is an appropriate standard of proof whenever claims of tortious conduct [such as those involving punitive damages] have serious consequences or harsh or far-reaching effects on individuals or require the proof of willful, wrongful and unlawful acts."). |
| Idaho | Idaho Code § 6-1604(1) (1991) (preponderance of the evidence). |
| Mississippi | *Gaylord's of Meridian, Inc. v. Sicard*, 384 So. 2d 1042, 1045 (Miss. 1980) ("Although the damages are by way of penalizing the defendant against whom they are sought, the proof is by a preponderance of the evidence rather than beyond a reasonable doubt.") *overruled on other grounds by C & C Trucking Co. v. Smith*, 612 So. 2d 1092, 1105–06 (Miss. 1992); *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1188 (Miss. 1990) ("[T]he law requires a finding of 'bad faith-*plus*'—based upon a preponderance of the evidence—before punitive damages may be awarded."). |

**\*826**

| Missouri | *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 75 (Mo. 1990) ("The defendant argues that punitive damage submissions should require 'clear and convincing' evidence. This requirement is contrary to our normal requirements in the submission of civil cases. We are not disposed so to hold, or to follow cases from other jurisdictions so holding."). |
| New Mexico | *United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 709 P.2d 649, 654 (N.M. 1985) ("It is the general rule . . . that issues of fact in civil cases are to be determined according to the preponderance of the evidence . . . . We are not convinced that the degree of proof should be changed [to require clear and convincing evidence] in punitive damage areas."). |
| South Dakota | *Flockhart v. Wyant*, 467 N.W.2d 473, 475 (S.D. 1991) ("[S.D. Codified Laws § 21-1-4.1] does *not* establish a clear and convincing evidence standard but merely requires clear and convincing evidence to show a *reasonable* basis [to believe the defendants committed acts warranting punitive damages]. The clear and convincing language merely modifies the 'reasonable basis' language to make a prima facie showing that punitive damages *may* be in order."). |

By 1991, the supreme courts and legislatures of the following States had yet to address the question whether claims for punitive damages require a heightened burden of proof, though (as noted below) some lower courts had addressed the issue and some supreme courts had mentioned, without discussing, jury instructions requiring a preponderance of the evidence:

**\*827**

| Arkansas | *Nat'l Bank of Commerce v. McNeill Trucking Co., Inc.*, 828 S.W.2d 584, 591 (Ark. 1992) (Dudley, J., concurring) ("I would hope that the possible changes discussed in this opinion [*i.e.* the adoption of a clear and convincing standard for punitive damages] might be brought before this court in an adversarial manner . . . . It is a matter which we have never addressed."). |
| Delaware | *Cloroben Chem. Corp. v. Comegys*, 464 A.2d 887, 891–92 (Del. 1983) ("We now turn to Cloroben's contention that the jury improperly awarded punitive damages in that they were not supported by a preponderance of the evidence . . . . Our review of the record indicates that there is sufficient evidence to support a finding . . . [and] we must reject the argument that there was insufficient evidence to support an award of punitive damages."); *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709, 715 (Del. Super. Ct. 1967) (instructing the jury that "[p]unitive damages may be awarded only if the jury finds by a preponderance of the evidence that the defendants' actions were motivated by some form of malice."). |
| Illinois | *Illinois Terminal R.R. Co. v. Thompson*, 71 N.E. 328, 333 (Ill. 1904) (approving a jury instruction that "left it to the discretion of the jury to impose whatever damages they might choose, even to the extent of allowing punitive damages" by a preponderance of the evidence). |

**\*828**

| Louisiana | *Galjour v. Gen. Am. Tank Car Corp.*, 764 F. Supp. 1093, 1100–01 (E.D. La. 1991) ("In fact, there are no Louisiana cases which specifically discuss the appropriate burden of proof for exemplary damages . . . . The defendants' argument that a heightened burden of proof should apply to exemplary damages is not without merit, as shown by recent legislative enactments in other jurisdictions, but it is not the law in Louisiana. Until the Louisiana legislature takes action to raise the burden, the law is that the burden of proof for exemplary damages is by a preponderance of the evidence.") (footnote omitted); *see also Int'l Harvester Credit Corp. v. Seale*, 518 So. 2d 1039, 1041 (La. 1988) ("Under Louisiana law, punitive or other 'penalty' damages are not allowable unless expressly authorized by statute."). |
| Maryland | *Gorman v. Sabo*, 122 A.2d 475, 479 (Md. 1956) ("There is no doubt that punitive damages may be recovered in [this] case . . . . The applicable law was correctly put to the jury by the trial court in his charge. He told them the Sabos must prove their case 'by a fair preponderance of the evidence.'") (citation omitted); *Thorne v. Contee*, 565 A.2d 102, 108 (Md. Ct. Spec. App. 1989) ("In order for the issue of punitive damages to go to the jury, Thorne must have produced sufficient evidence of Contee's wanton or reckless conduct to meet the preponderance of the evidence test."), *cert. denied*, 569 A.2d 643 (Md. 1990); 569 A.2d 1242 (Md. 1990). |

**\*829**

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 149

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

| | |
|---|---|
| Massachusetts | *Santos v. Chrysler Corp.*, No. 921039, 1996 WL 1186818, at *3 (Mass. Super. Ct. Sept. 18, 1996) ("Chrysler contends that the court erred because it failed to instruct the jury that they must find by clear and convincing evidence that Chrysler was grossly negligent before they could award punitive damages. The contention is meritless. Under Massachusetts law the burden of proof in civil proceedings of this kind is satisfied 'by a fair preponderance of the evidence.'") (citation omitted), *aff'd in part and remanded on other grounds*, 715 N.E.2d 47 (Mass. 1999). |
| Michigan | *Green v. Evans*, 401 N.W.2d 250, 252 (Mich. Ct. App. 1985) (approving, without discussing the burden of proof, a jury instruction stating: "Such exemplary damages only are recoverable if the Plaintiff has proven by a preponderance of the evidence, malice, willful and wanton misconduct or negligence so great as to indicate reckless disregard of the rights of another."). *But see Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980) (noting that exemplary damages only serve to compensate plaintiffs for "humiliation, sense of outrage, and indignity"—exemplary damages may not serve as punishment to the defendant). |
| Nebraska | *Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989) ("[P]unitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction."). |
| New Hampshire | New Hampshire has not addressed the burden of proof for punitive damages. *See* N.H. Rev. Stat. Ann. § 507:16 (2004) ("No punitive damages shall be awarded in any action, unless otherwise provided by statute."). |

**\*830**

| | |
|---|---|
| New Jersey | *Fischer v. Johns-Manville Corp.*, 512 A.2d 466, 482 (N.J. 1986) (refusing to address the burden of proof in punitive damages cases because "the parties have not briefed or argued the issue, nor have the courts below addressed it"); *see also Jackson v. Consol. Rail Corp.*, 538 A.2d 1310, 1321 n.5 (N.J. Super. Ct. App. Div. 1988) ("Defendant also attacks the punitive damage verdict because the court in its charge did not place the burden on plaintiff to prove same by 'clear and convincing' evidence. However, that is not the present standard applicable in New Jersey."). |
| New York | *Greenbaum v. Handelsbanken*, 979 F.Supp. 973, 982 (S.D.N.Y. 1997) ("[T]he Court determines that until . . . higher authorities elect[] to address the question, the preponderance of the evidence standard should apply to punitive damages deliberations."). |
| North Carolina | *Caudle v. Benbow*, 45 S.E.2d 361, 362 (N.C. 1947) (approving, without discussing, a jury instruction requiring the jury to "first find by the preponderance of the evidence the presence of actual malice"). |

**\*831**

| | |
|---|---|
| Pennsylvania | *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1098 n.14 (Pa. 1985) (Hutchinson, J., delivering the judgment of the court and an opinion joined by only one of the five remaining justices) (recognizing that many jurisdictions have adopted a clear and convincing standard and concluding: "We believe the goal of limiting punitive damage awards in the context of products liability litigation is best served by focusing on the nature of the defendant's conduct instead of increasing the plaintiff's burden of persuasion."); *Rizzo v. Michener*, 584 A.2d 973, 979 (Pa. Super. Ct. 1990) ("The trial judge must determine in the first instance whether the plaintiff has presented sufficient evidence to support a punitive damage claim, which requires evidence on which the jury might reasonably conclude that outrageous conduct has been established by a preponderance of the evidence."), *appeal denied*, 596 A.2d 159 (Pa. 1991). |
| Rhode Island | Rhode Island has not addressed the burden of proof for recovering punitive damages. |
| Tennessee | Tennessee first addressed the burden of proof for punitive damages in 1992 in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 900–01 (Tenn. 1992), and held that the clear and convincing standard applies to all claims for punitive damages. |
| Texas | *Lawson-Avila Const., Inc. v. Stoutamire*, 791 S.W.2d 584, 594 (Tex. Ct. App. 1990) ("We . . . continue to follow the Texas precedent established by the Courts of this State and hold that the burden of proof in cases involving . . . exemplary damages is by a preponderance of the evidence [and not clear and convincing evidence].") (internal quotations omitted), *writ of error denied* (Dec. 12, 1990). |

**\*832**

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 150

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

| Vermont | Vermont has not addressed the burden of proof for recovering punitive damages. |
|---|---|
| Virginia | *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227 n.3 (Va. 1981) (approving, without discussing the burden of proof, a jury instruction stating: "[I]f you believe from a preponderance of the evidence that the defendant acted wantonly, oppressively, or with such recklessness as evinced a conscious disregard of the rights of others, or with such malice as implied a spirit of mischief, or criminal indifference to civil obligations, you may award the plaintiff such additional sum as punitive damages."). |
| Washington | *Sintra, Inc. v. City of Seattle,* 935 P.2d 555, 566 (Wash. 1997) (holding, without addressing the burden of proof, that the trial court properly instructed the jury that it could award punitive damages on the 42 U.S.C. § 1983 claim 'only if you find [by a preponderance of the evidence] that the conduct of an individual defendant was malicious or taken in reckless disregard of plaintiffs' rights'") (alteration in original). *But see Dailey v. North Coast Life Ins. Co.*, 919 P.2d 589, 590 (Wash. 1996) ("Since its earliest decisions, this court has consistently disapproved of punitive damages as contrary to public policy."). |
| West Virginia | *Goodwin v. Thomas*, 403 S.E.2d 13, 16 (W. Va. 1991) (reinstating an award of punitive damages, without discussing the burden of proof, based on the following jury instruction: "[I]f you find from a preponderance of all the evidence in this case, that the actions of the Defendants in evicting the Plaintiff were in total disregard of the Plaintiff's rights as a lessee in the leased premises and that such actions were willful and wanton then you may award the Plaintiff punitive damages."). |
| Wyoming | *Campen v. Stone*, 635 P.2d 1121, 1127 (Wyo. 1981) (approving, without discussing the burden of proof, a jury instruction stating: "Punitive damages can properly be awarded . . . only if, one of the following [acts] has been proven by a preponderance of the evidence.") (internal quotations omitted). |

**\*833**  APPENDIX B

## APPENDIX B

State Burdens of Proof for Punitive Damages in 2004

As of today, the supreme courts or legislatures from the following States have adopted the higher burden of proof for awarding punitive damages:

| Alabama | Ala. Code § 6-11-20(a) (2004) (clear and convincing evidence). |
|---|---|
| Alaska | Alaska Stat. § 09.17.020(b) (2004) (clear and convincing evidence). |
| Arizona | *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 680–82 (Ariz. 1986) ("[W]hile a plaintiff may collect compensatory damages upon proof by a preponderance of the evidence of his injuries due to the tort of another, we conclude that recovery of punitive damages should be awardable only upon clear and convincing evidence of the defendant's evil mind."); *Saucedo ex rel. Sinaloa v. Salvation Army*, 24 P.3d 1274, 1277 (Ariz. Ct. App. 2001) ("In Arizona, to recover punitive damages, a plaintiff must prove by clear and convincing evidence that a 'defendant's wrongful conduct was guided by evil motives or wilful or wanton disregard of the interests of others.'") (citation omitted), *review denied* (Oct. 3, 2001). |
| California | Cal. Civ. Code § 3294(a) (2004) (clear and convincing evidence). |
| Colorado | Colo. Rev. Stat. § 13-25-127(2) (2004) (beyond a reasonable doubt). |
| Florida | Fla. Stat. Ann. § 768.725 (2004) (clear and convincing evidence). |

**\*834**

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 151

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

| | |
|---|---|
| Georgia | Ga. Code Ann. § 51-12-5.1(b) (2004) (clear and convincing evidence). |
| Hawaii | *Schefke v. Reliable Collection Agency, Ltd.*, 32 P.3d 52, 71 (Haw. 2001) ("Clear and convincing evidence of 'some wilful misconduct or . . . entire want of care which would raise presumption of a conscious indifference to consequences' supports an award of punitive damages.") (internal quotations omitted). |
| Idaho | Idaho Code § 6-1604(1) (2004) (clear and convincing evidence). |
| Indiana | Ind. Code § 34-51-3-2 (2004) (clear and convincing evidence). |
| Iowa | Iowa Code § 668A.1(1)–(2) (2004) (clear and convincing evidence). |
| Kansas | Kan. Stat. Ann. § 60-3702(c) (2004) (clear and convincing evidence). |
| Kentucky | Ky. Rev. Stat. Ann. § 411.184(2) (2004) (clear and convincing evidence). |
| Maine | *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 818 A.2d 995, 1001 (Me. 2002) ("'[I]n order to recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with malice.'") (quoting *Tuttle v. Raymond*, 494 A.2d 1353, 1354 (Me. 1985)). |
| Maryland | *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 657 (Md. 1992) ("[I]n *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages."); *Carter v. Aramark Sports and Entm't Servs., Inc.*, 835 A.2d 262, 287 (Md. Ct. Spec. App. 2003) ("The 'clear and convincing' standard of proof applies to make out a claim for punitive damages."). |

**\*835**

| | |
|---|---|
| Minnesota | Minn. Stat. § 549.20(1)(a) (2004) (clear and convincing evidence). |
| Mississippi | Miss. Code Ann. § 11-1-65(1)(a) (2004) (clear and convincing evidence). |
| Missouri | *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. 1996) ("For common law punitive damage claims, the evidence must meet the clear and convincing standard of proof."); *Hoskins v. Bus. Men's Assurance*, 116 S.W.3d 557, 564 (Mo. Ct. App. 2003) ("Punitive damages are properly submitted in a negligence [or strict liability] case only if there is clear and convincing evidence that 'at the time of the negligent act, the defendant[s] knew or had reason to know that there was a high degree of probability that the action would result in injury.'") (citation omitted). |
| Montana | Mont. Code Ann. § 27-1-221(5) (2004) (clear and convincing evidence). |
| Nevada | Nev. Rev. Stat. 42.005(1) (2004) (clear and convincing evidence). |
| New Jersey | N.J. Stat. Ann. § 2A:15-5.12(a) (2004) (clear and convincing evidence). |
| North Carolina | N.C. Gen. Stat. § 1D-15(b) (2004) (clear and convincing evidence). |
| North Dakota | N.D. Cent. Code § 32-03.2-11(1) (2004) (clear and convincing evidence). |
| Ohio | Ohio Rev. Code Ann. § 2315.21(C)(2) (2004) (clear and convincing evidence). |
| Oklahoma | Okla. Stat. tit. 23, § 9.1.B–.D (2004) (clear and convincing evidence). |

**\*836**

| | |
|---|---|
| Oregon | Or. Rev. Stat. § 18.537(1) (2004) (clear and convincing evidence). |
| South Carolina | S.C. Code Ann. § 15-33-135 (2004) (clear and convincing evidence). |
| Tennessee | *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992) ("[A] plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence."); *Barnett v. Lane*, 44 S.W.3d 924, 928 (Tenn. Ct. App. 2000) ("[A]n award [of punitive damages] is only appropriate when the necessary conduct has been shown 'by clear and convincing evidence.'"). |
| Texas | Tex. Civ. Prac. & Rem. Code Ann. § 41.003(b) (2004) (clear and convincing evidence). |
| Utah | Utah Code Ann. § 78-18-1(1)(a) (2004) (clear and convincing evidence). |
| Wisconsin | *Wangen v. Ford Motor Co.*, 294 N.W.2d 437, 458 (Wis. 1980) ("We hold that the [clear, satisfactory and convincing evidence] burden of proof shall apply to punitive damages claims hereafter."); *City of West Allis v. Wis. Elec. Power Co.*, 635 N.W.2d 873, 881 (Wis. Ct. App. 2001) ("The evidence [supporting a punitive damages award] must also be 'clear and convincing.'"), *pet. for review denied*, 643 N.W.2d 93 (Wis. 2002). |

**\*837**

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 152

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

As of today, the supreme courts or legislatures from the following States have rejected a higher burden of proof for awarding punitive damages:

| | |
|---|---|
| Connecticut | *Freeman v. Alamo Mgmt. Co.*, 607 A.2d 370, 375 (Conn. 1992) ("We disagree . . . with the . . . conclusion . . . that clear and convincing proof is an appropriate standard of proof whenever claims of tortious conduct [such as those involving punitive damages] have serious consequences or harsh or far-reaching effects on individuals or require the proof of willful, wrongful and unlawful acts."). |
| New Mexico | *United Nuclear Corp. v. Allendale Mut. Ins.*, 709 P.2d 649, 654 (N.M. 1985) ("It is the general rule . . . that issues of fact in civil cases are to be determined according to the preponderance of the evidence . . . . We are not convinced that the degree of proof should be changed [to require clear and convincing evidence] in punitive damages areas."). |
| South Dakota | *Flockhart v. Wyant*, 467 N.W.2d 473, 475 (S.D. 1991) ("[S.D. Codified Laws § 21-1-4.1] does *not* establish a clear and convincing evidence standard but merely requires clear and convincing evidence to show a *reasonable* basis [to believe the defendants committed acts warranting punitive damages]. The clear and convincing language merely modifies the 'reasonable basis' language to make a prima facie showing that punitive damages *may* be in order."). |

**\*838**

As of today, the supreme courts and legislatures from the following States have yet to address the question whether claims for punitive damages require a heightened burden of proof, though (as noted below) some lower courts have addressed the issue and some supreme courts had mentioned, without discussing, jury instructions requiring a preponderance of the evidence:

| | |
|---|---|
| Arkansas | *Nat'l Bank of Commerce v. McNeill Trucking Co., Inc.*, 828 S.W.2d 584, 590 (Ark. 1992) (Dudley, J., concurring) ("I would hope that the possible changes discussed in this opinion [*i.e.* the adoption of a clear and convincing standard for punitive damages] might be brought before this court in an adversarial manner . . . . It is a matter which we have never addressed."). |
| Delaware | *Cloroben Chem. Corp . v. Comegys*, 464 A.2d 887, 891–92 (Del. 1983) ("We now turn to Cloroben's contention that the jury improperly awarded punitive damages in that they were not supported by a preponderance of the evidence . . . . Our review of the record indicates that there is sufficient evidence to support a finding . . . [and] we must reject the argument that there was insufficient evidence to support an award of punitive damages."); *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709, 715 (Del. Super. Ct. 1967) (instructing the jury that "[p]unitive damages may be awarded only if the jury finds by a preponderance of the evidence that the defendants' actions were motivated by some form of malice."). |
| Illinois | *Illinois Terminal R.R. Co. v. Thompson*, 71 N.E. 328, 333 (Ill. 1904) (approving a jury instruction that "left it to the discretion of the jury to impose whatever damages they might choose, even to the extent of allowing punitive damages" by a preponderance of the evidence). |

**\*839**

| | |
|---|---|
| Louisiana | *Hill v. Sampson*, 628 So. 2d 81, 84 (La. Ct. App. 1993) ("While this argument has theoretical appeal, we are not inclined by these judicial means to establish 'clear and convincing evidence' as the standard of proof for exemplary damages under [Louisiana's DUI law]. In our view, had the legislature intended a higher standard of proof than that of a preponderance of the evidence, it would have clearly so indicated."); *Rivera v. United Gas Pipeline Co.*, 697 So. 2d 327, 335 (La. Ct. App. 1997) (holding that earlier interpretation of Louisiana's hazardous substance handling statute "says nothing of creating a 'clear and convincing' burden of proof, and this Court is not prepared to create one . . . . Ergo, until the Louisiana legislature takes direct action, the burden of proof for exemplary damages is by a preponderance of the evidence."), *cert. denied*, 704 So. 2d 1196, 1197 (La. 1997). |
| Massachusetts | *Santos v. Chrysler Corp.*, No. 921039, 1996 WL 1186818, at \*3 (Mass. Super. Ct. Sept. 18, 1996) ("Chrysler contends that the court erred because it failed to instruct the jury that they must find by clear and convincing evidence that Chrysler was grossly negligent before they could award punitive damages. The contention is meritless. Under Massachusetts law the 'burden of proof in civil proceedings of this kind is satisfied 'by a fair preponderance of the evidence.'"), *affirmed in part and remanded on other grounds*, 715 N.E.2d 47 (Mass. 1999). |

**\*840**

| | |
|---|---|
| Michigan | *Green v. Evans*, 401 N.W.2d 250, 252 (Mich. Ct. App. 1985) (approving, without discussing the burden of proof, a jury instruction stating: "Such exemplary damages only are recoverable if the Plaintiff has proven by a preponderance of the evidence, malice, willful and wanton misconduct or negligence so great as to indicate reckless disregard of the rights of another"). *But see Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980) (noting that exemplary damages only serve to compensate plaintiffs for "humiliation, sense of outrage, and indignity"—exemplary damages may not serve as punishment to the defendant). |
| Nebraska | *Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989) ("[P]unitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction."). |
| New Hampshire | New Hampshire has not addressed the burden of proof for punitive damages. *See* N.H. Rev. Stat. Ann. § 507:16 (2004) ("No punitive damages shall be awarded in any action, unless otherwise provided by statute."). |

**\*841**

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

| | |
|---|---|
| New York | *Greenbaum v. Svenska Handelsbanken*, 979 F. Supp. 973, 978–82 (S.D.N.Y. 1997) ("[T]he Court determines that until . . . higher authorities elect[] to address the question, the preponderance of the evidence standard should apply to punitive damages deliberations."). *Compare Munoz v. Puretz*, 753 N.Y.S.2d 463, 466 (N.Y. App. Div. 2003) ("In order to recover punitive damages, a plaintiff must show [certain conduct] by 'clear, unequivocal and convincing evidence.'") (citation omitted), *with In re Seventh Judicial Dist. Asbestos Litig.*, 593 N.Y.S.2d 685, 686–87 (N.Y. App. Div. 1993) ("The trial court properly instructed the jury that the evidentiary standard for proving entitlement to punitive damages is preponderance of the evidence, not clear and convincing evidence."). |
| Pennsylvania | *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1098 n.14 (Pa. 1985) (Hutchinson, J. delivering the judgment of the court and an opinion joined by only one of the five remaining justices) (recognizing that many jurisdictions have adopted a clear and convincing standard and concluding: "We believe the goal of limiting punitive damage awards in the context of products liability litigation is best served by focusing on the nature of the defendant's conduct instead of increasing the plaintiff's burden of persuasion."); *Rizzo v. Michener*, 584 A.2d 973, 979 (Pa. Super. Ct. 1990) ("The trial judge must determine in the first instance whether the plaintiff has presented sufficient evidence to support a punitive damage claim, which requires evidence on which the jury might reasonably conclude that outrageous conduct has been established by a preponderance of the evidence."), *appeal denied*, 596 A.2d 159 (Pa. 1991). |
| Rhode Island | Rhode Island has not addressed the burden of proof for recovering punitive damages. |

**\*842**

| | |
|---|---|
| Vermont | Vermont has not addressed the burden of proof for recovering punitive damages. |
| Virginia | *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227 n.3 (Va. 1981) (approving, without discussing the burden of proof, a jury instruction stating: "[I]f you believe from a preponderance of the evidence that the defendant acted wantonly, oppressively, or with such recklessness as evinced a conscious disregard of the rights of others, or with such malice as implied a spirit of mischief, or criminal indifference to civil obligations, you may award the plaintiff such additional sum as punitive damages."); *RF & P Corp. v. Little*, 40 S.E.2d 908, 914 (Va. 1994) (holding that a preponderance of the evidence standard applies to a knowing and willful violation of a statute resulting in a civil fine, and the clear and convincing evidence standard applies only "to certain cases that are equitable in nature, such as suits involving fraud and misrepresentation, undue influence, [or] estoppel."). |
| Washington | *Sintra, Inc. v. City of Seattle*, 935 P.2d 555, 566 (Wash. 1997) (stating, without addressing the burden of proof, that the trial court properly instructed the jury that it could award punitive damages on a 42 U.S.C. § 1983 claim "only if you find [by a preponderance of the evidence] that the conduct of an individual defendant was malicious or taken in reckless disregard of plaintiffs' rights.") (quotation omitted and alteration in original). *But see Dailey v. North Coast Life Ins. Co.*, 919 P.2d 589, 590 (Wash. 1996) ("Since its earliest decisions, this court has consistently disapproved of punitive damages as contrary to public policy."). |
| West Virginia | *Goodwin v. Thomas*, 403 S.E.2d 13, 16 (W. Va. 1991) (finding sufficient evidence to support an award of punitive damages, without discussing the burden of proof, based on the following jury instruction: "[I]f you find from a preponderance of all the evidence in this case, that the actions of the Defendants in evicting the Plaintiff were in total disregard of the Plaintiff's rights as a lessee in the leased premises and that such actions were willful and wanton."). |
| Wyoming | *Campen v. Stone*, 635 P.2d 1121, 1127 (Wyo. 1981) (approving, without discussing the burden of proof, a proposed jury instruction stating: "Punitive damages can properly be awarded . . . only if, one of the following [acts] has been proven by a preponderance of the evidence."). |

**All Citations**

364 F.3d 789, 93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633, 2004 Fed.App. 0102P

---

**Footnotes**

1    Although this court and most other courts use the term "adverse employment action," some courts, including the Supreme Court, use the term "tangible employment action" or some other variation for the same concept. *See, e.g., Burlington Indus.,* 524 U.S. at 761, 118 S.Ct. 2257 ("tangible employment action"); *Bowman*, 220 F.3d at 461 n. 5 ("Courts use the terms 'tangible employment detriment' and 'materially adverse employment action' interchangeably.").

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 154

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

As the one alternative to showing the existence of an adverse employment action, a plaintiff may support a Title VII claim by showing that "plaintiff was subjected to severe or pervasive retaliatory [or other discrimination based] harassment by a supervisor." *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir.2000). What constitutes severe or pervasive harassment is not at issue in this appeal.

2    The decisions cited by *Jackson* from the Tenth and Eleventh Circuits, *Burrus* and *Jones,* both cite *Smalley v. City of Eatonville,* 640 F.2d 765, 769 (5th Cir.1981), which in turn cites *Whatley* as the basis for including "adverse employment action" among the elements of a Title VII claim. *Whatley* cites a treatise published in 1976. 632 F.2d at 1328 (citing B. Schlei & P. Grossman, Employment Discrimination Law, Ch. 15 (1976)). It appears that the inclusion of "adverse employment action" as an element of a Title VII claim originated with the treatise cited by *Whatley. See Williams v. Boorstin,* 663 F.2d 109, 120 (D.C.Cir.1980) (J. Bazelon, concurring) (stating that "adverse employment action" is among the elements of a Title VII retaliation claim under "the standard found in B. Schlei & P. Grossman, Employment Discrimination Law 436 (1976)"). The first reported case in the nation to include "adverse employment action" as an element of a Title VII claim was decided the year after publication of the treatise. *EEOC v. Locals 14 and 15 Int'l Union of Operating Eng'rs,* 438 F.Supp. 876, 881 (S.D.N.Y.1977).

3    For instance, in *Hollins v. Atlantic Co.,* this court relied upon *Kocsis* to decide that an employee had not suffered an adverse employment action when she received lower ratings in a performance evaluation. 188 F.3d 652, 662 (6th Cir.1999). The *Hollins* court held that lower ratings were not enough in the absence of "evidence to show that the lowered performance ratings actually had an effect on her wages such that a court may conclude that there was a materially adverse employment action." *Id.* In *Bowman v. Shawnee State University,* this court relied upon *Kocsis* and *Hollins* to hold that the temporary removal of a university instructor from his position as the Coordinator of Sports Studies did not rise to the level of an adverse employment action. 220 F.3d 456, 461–62 (6th Cir.2000). The *Bowman* court focused on the facts that the removal was for only ten days, the employee maintained his position as a full-time university instructor, and he never lost any income. *Id.*

4    We have recognized that the dictionary definition of "discriminate" is "to distinguish; to make distinctions in treatment; show partiality or prejudice." *Mattei v. Mattei,* 126 F.3d 794, 804 (6th Cir.1997) (quoting Webster's New World Dictionary); *see also* Oxford English Dictionary (2d ed.1989) ("to discriminate against: to make an adverse distinction with regard to; to distinguish unfavorably from others").

5    Although both § 2000e–2(a)(1) and § 2000e–3(a) use the phrase "discriminate against," the former specifies that the prohibited discrimination must be "with respect to his compensation, terms, conditions, or privileges of employment," while the anti-retaliation provision contains no such language. The parties dispute whether this additional language is a limitation or an expansion of the conduct prohibited. We have never before distinguished between the types of conduct prohibited in the different provisions, and we do not do so here. We find it untenable to interpret the additional language as an expansion of prohibited conduct because "with respect to" is a phrase commonly used to limit. *But cf. Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 709 (5th Cir.1997) ("The anti-retaliation provision speaks only of 'discrimination'; there is no mention of the vague harms contemplated in § 2000e–2(a)(2). Therefore, this provision can only be read to exclude such vague harms, and to include only ultimate employment decisions."). The D.C. Circuit and the United States District Court for the Northern District of Ohio have written well-reasoned opinions that conclude that the absence of the additional language from the anti-retaliation provision means that an employer is prohibited from retaliating in materially adverse ways, regardless of whether the retaliatory acts affect employment. *Passer v. American Chem. Soc.,* 935 F.2d 322, 330–31 (D.C.Cir.1991) (holding that an employer's cancellation of a major public symposium in former employee's honor could be an act of retaliation under a statute that parallels Title VII's anti-retaliation provision); *EEOC v. Outback Steakhouse of Florida, Inc.,* 75 F.Supp.2d 756, 758–60 (N.D.Ohio 1999) (holding that Title VII's anti-retaliation provision is not limited to discrimination affecting

Case: 24-1775  Document: 47  Filed: 09/24/2025  Page: 155

White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789 (2004)

93 Fair Empl.Prac.Cas. (BNA) 1011, 85 Empl. Prac. Dec. P 41,633...

employment). It is unnecessary for us to resolve the question addressed in *Passer* and *Outback Steakhouse* because the actions at issue in the present case (job transfer and suspension) clearly affect employment.

6    In fact, as will be mentioned again below, the Supreme Court has pointed out to this court before that internal grievance procedures and an action under Title VII are "legally independent" such that the statute of limitations on a Title VII claim is not tolled during the pendency of an internal grievance process. *Int'l Union of Elec. Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 236, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976) (reversing a Sixth Circuit decision).

7    We recognize that our decision in *Dobbs–Weinstein* was based in part upon the unique nature of "tenure decisions in an academic setting." 185 F.3d at 545. Other circuits also have acknowledged the unique nature of tenure decisions. *See Tanik v. S. Methodist Univ.,* 116 F.3d 775, 776 (5th Cir.1997); *Brousard–Norcross v. Augustana Coll. Ass'n,* 935 F.2d 974, 976 (8th Cir.1991); *Kumar v. Bd. of Trs., Univ. of Mass.,* 774 F.2d 1, 11 (1st Cir.1985); *Zahorik,* 729 F.2d at 92–93 (2d Cir.1984). Because we are not presented here with a denial of tenure, we do not decide to what extent our holding in *Dobbs–Weinstein* survives our decision in this case.

8    The National Employment Lawyers Association in its *amicus curiae* brief on behalf of White concedes that a suspension with pay pending a timely, good-faith investigation does not constitute an adverse employment action and recommends this course to employers concerned about possible misconduct.

9    The limits are lower for smaller employers, with the lowest limit being $50,000 for employers with 15–100 employees. 42 U.S.C. § 1981a(b)(3)(A)-(D).

1    *See Hashimoto v. Dalton,* 118 F.3d 671 (9th Cir.1997) (holding that negative job references are actionable under § 704(a)); *Ray,* 217 F.3d at 1243; *Jeffries v. Kansas,* 147 F.3d 1220, 1231–32 (10th Cir.1998) (holding that, "[i]n recognition of the remedial nature of Title VII, the law in this circuit liberally defines adverse employment action" and "takes a case-by-case approach to determining whether a given employment action is 'adverse' "); *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984–86 (10th Cir.1996) (construing Title VII's anti-retaliation provision to protect an employee from a malicious prosecution action brought by a former employer); *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998) (holding that negative job evaluations, demotions, suspensions, disadvantageous transfer and toleration of harassment may be actionable as a retaliation claim).

2    *Cf. Morris v. Wal-Mart Stores, Inc.,* 330 F.3d 854 (6th Cir.2003) (holding, under Tennessee law, that the reasonable person standard is utilized to determine whether or not sufficient evidence exists when contemplating a directed verdict motion in a res ipsa loquitur negligence case); *U.S. v. Jones,* 335 F.3d 527 (6th Cir.2003) (employing a reasonable person standard when adjudicating the presence of apparent authority to determine whether entry was consensual in a Fourth Amendment context); *FiveCAP, Inc., v. National Labor Relations Board,* 294 F.3d 768, 786 (6th Cir.2002) (employing the objective "reasonable person" standard when determining whether or not work conditions are so "unbearable" as to violate § 8(a)(3) of the National Labor Relations Act).

3    The Ninth Circuit in *Ray v. Henderson* found defendant's reliance on *Burlington* similarly misplaced when advocating that Title VII qualifies the type of employment actions that would constitute an "adverse" action. 217 F.3d at 1242, n. 5. The Court stated that *Burlington* did not set forth a standard for adverse employment actions in the anti-retaliation context. *Id.*

---

End of Document                                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1775   Document: 47   Filed: 09/24/2025   Page: 156

Young v. CSL Plasma Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1259103

2016 WL 1259103
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

LaShawn M.YOUNG, Plaintiff,
v.
CSL PLASMA INC., et al, Defendants.

Case Number 15-cv-10080
|
Signed 03/31/2016

**Attorneys and Law Firms**

LaShawn M. Young, Southfield, MI, pro se.

Gillian P. Yee, Iveory N. Perkins, Michelle J. LeBeau, Joshua Paul Lushnat, Ogletree Deakins Nash Smoak & Stewart, PLLC, Birmingham, MI, for Defendants.

**ORDER GRANTING MOTION TO DISMISS MORE DEFINITE COMPLAINT (DOC. 34) AND MOOTING OTHER MOTIONS (DOCS. 14, 36, 41, 44)**

Honorable Denise Page Hood, Chief United States District Judge

## I. INTRODUCTION

**\*1** Defendants filed a motion to dismiss Plaintiff's "More Definite Complaint" **(Doc. 34, filed June 5, 2015)**. The Motion is fully briefed; the Court **GRANTS** the Motion.

## II. BACKGROUND

Plaintiff was employed by Defendant CSL Plasma, Inc. ("CSL"), and was terminated on March 21, 2014. Plaintiff filed a Complaint against Defendants on January 9, 2015. Plaintiff made the following allegations against Defendants in the Complaint: (1) Violation of public policy for wrongful termination in retaliation for filing whistleblower complaints with federal agencies; (2) Intentional Infliction of Emotional Distress (IIED); (3) Defamation and Slander; and (4) "Mental Anguish, Pain and Suffering, Lost Wages, etc." In his Complaint, Plaintiff alleges that despite contacting Defendant Tasiemsk and Defendant CSL multiple times during his medical leave absence, Plaintiff was terminated. Plaintiff also alleges that Defendant Tasiemsk reported false information to Defendant CSL in an effort to have Plaintiff terminated.

Plaintiff subsequently sought leave to amend his Complaint, and on April 10, 2015, the Court granted Plaintiff leave to file an Amended Complaint by April 22, 2015 **(Doc. 20, filed April 20, 2015)**. Plaintiff filed an Amended Complaint on April 22, 2015 **(Doc. 26, filed April 22, 2015)**. The Amended Complaint alleged additional facts and changed the claims against Defendants. Plaintiff brought the following claims against Defendants in the Amended Complaint: (1) Violation of 42 U.S.C. §§ 1981 and 1983; (2) violation of Elliott-Larsen Civil Rights Act (ELCRA); (3) employment discrimination pursuant to 29 U.S.C. §§ 2000e-3 and 215; (5) IIED; (6) vicarious liability and respondeat superior; (7) slander and defamation; and (8) negligence in hiring.

On May 6, 2015, the Court entered a Stipulated Order Requiring Plaintiff to File a More Definitive Statement **(Doc. 29, filed May 6, 2015)**. The Stipulated Order required Plaintiff to identify each cause of action being asserted against each Defendant, and assert the laws, along with the factual basis, Plaintiff believes actually apply to those specific causes of action.

Plaintiff filed a "More Definite Complaint" **(Doc. 32, filed May 21, 2015)**, in which he alleges the following claims against Defendants: (1) violation of 42 U.S.C. § 1981; (2) violation of public policy-retaliation; (3) violation of Elliott-Larsen Civil Rights Act (ELCRA); (4) violation of Title VII of the Civil Rights Act of 1964; (5) IIED; (6) vicarious liability and respondeat superior; (7) slander and defamation; (8) negligence in hiring; and (9) perjury.

## III. STANDARD OF REVIEW

In general, a complaint requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ...claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, as a result of *Twombly*, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**\*2** Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When a complaint is challenged under Rule 12(b)(6), a court must construe the complaint "in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 157

Young v. CSL Plasma Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1259103

it to relief." *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010). Although the court primarily considers the allegations in the complaint, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir.2001).

Dismissal under Rule 12(b)(6) is warranted "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

**IV. DISCUSSION**

Young filed a "more definite" Complaint. The Court instructed Young to identify which causes of action were being asserted against each Defendant, and provide the supporting factual basis. **(Doc. 29, filed May 6, 2015)**. Young has had multiple opportunities to rectify the inadequacies of his Complaint, but has failed to do so. Plaintiff fails to identify which causes of action are being asserted against each Defendant. Plaintiff fails to assert the laws he believes actually apply to those specific causes of action and improperly added two claims without leave from the court to amend the complaint a second time.

The factual allegations he does provide do not support the claims he asserts. While it is true that pleadings drafted by *pro se* litigants are held to a less stringent standard than formal pleadings drafted by lawyers, a court must still examine a *pro se* complaint to determine whether it fails to state a claim upon which relief could be granted. *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991). As demonstrated below, Young has failed to plausibly establish his claims.

**A. Race Discrimination Claims**

Young asserts that he was discriminated against due to his race. Specifically, he alleges violations of Title VII, ELCRA, and § 1981. Title VII racial discrimination, and racial discrimination under Michigan Civil Rights Act. The standard that governs Title VII cases and that governs Michigan's Civil Rights Act are the same. The same is true for analyzing a claim under 42 U.S.C. § 1981. Accordingly, the Court will analyze all racial discrimination claims, both federal and state, together. *Kuhn v. Washtenaw Cty.*, No. 10-11191, 2012 WL 1229890, at *6 (E.D. Mich. Apr. 12, 2012) aff'd, 709 F.3d 612 (6th Cir. 2013).

Race discrimination cases apply the burden shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972). The approach requires the plaintiff to establish a prima facie case and create a presumption of discrimination by showing by a preponderance of the evidence: (1) that he belongs to a protected class; (2) that he was subjected to an adverse employment action; (3) that he was qualified for the job; and (4) that he was treated differently from similarly situated employees from a nonprotected class. *McDonnell Douglas*, 411 U.S. at 802; *Talley v. Bravo Pitinio Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995); *Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich.App. 347, 361, 597 N.W.2d 250 (1999). Alternatively, a plaintiff could establish a prima facie case by presenting credible, direct evidence of discriminatory intent.*Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111 (6th Cir. 1987).

**\*3** If a plaintiff proves a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802–803. Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were merely pretext for discrimination. *Id*.; *Ang v. Proctor Gamble Co.*, 932 F.2d 540, 548 (6th Cir.1991). The plaintiff may meet this burden by showing: (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; or (3) the stated reasons were insufficient to explain the employer's actions. *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991). The burden of persuasion always, however, remains with the plaintiff.

When a plaintiff claims race discrimination, the plaintiff must show that he suffered an adverse employment action. *Kuhn v. Washtenaw Cty.*, No. 10-11191, 2012 WL 1229890, at *6. An adverse employment action is an action by the employer that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 767-68 (6th Cir. 2008) *quoting Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998). Young cannot establish that he suffered an adverse employment actions, or that the adverse employment actions were motivated by his race.

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 158

Young v. CSL Plasma Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1259103

### 1. Failure to Train

Young states:

> Plaintiff was repeatedly denied additional job training in favor of white employees who had numerous attendance and performance problems... When plaintiff inquired about said disparities, Mr. Tasiemski stated that additional training was granted at his discretion, while repeatedly denying plaintiff's request for additional training.

**(Doc. 31, filed May 2, 2015)**. The "mere denial of a supplemental training, even if other employees were allowed to attend the training, is not an adverse employment action, " unless "failure to attend the training would result, or has resulted, in any demotion, loss of pay, loss of responsibility, or other materially adverse effect." *Creggett v. Jefferson Cty. Bd. of Educ.*, 491 F. App'x 561, 567 (6th Cir. 2012). Young failed to allege that CSL's denial of training to him resulted in an adverse employment action, such as a loss of pay, demotion, or loss of responsibility. Accordingly, this claim cannot sustain this discrimination claim.

### 2. Failure to Promote

Young alleges that he was discriminated against in violation of ELCRA, Title VII, and Section 1981 because he was wrongfully denied a promotion in favor or Mr. James. Failure to promote constitutes an adverse employment action. To establish a prima facie case of racial discrimination based upon a failure to promote, the plaintiff must demonstrate: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000).

Young cannot sustain his discrimination claim based on failure to promote because he cannot make out a prima facie case because he failed to establish the fourth element. The fourth element states employees "not members of the protected class received promotions." *Id*. Here, Defendant identifies Mr. James as an African American, which means a member of Young's class was given the promotion. Accordingly, Young cannot establish the fourth element for a prima facie case regarding failure to promote.

### *4  3. Remaining Claims Adverse Employment Claims.

The rest of Young's factual claims fail to establish a claim for race discrimination because they are not adverse employment actions. As noted, an adverse employment action involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 767-68 (6th Cir. 2008). Young states that he was discriminated against on the basis of his race because: (1) he did not receive his requested work schedule; (2) he did not receive a work transfer; (3) Mr. Tasiemski and Mr. James solicited Young's coworkers to write notes about him making it appear as if he was "a problem employee"; and (4) Mr. Tasiemski wrote up Young for violating an "obscure" work rule and refused to retract the written warning.

None of these factual scenarios rise to the level of a an adverse employment action. Taken as true, none of these facts implicate that Young suffered a significant change in employment status amounting to an adverse employment action. For instance, Young failed to plausibly explain how failing to obtain his preferred work schedule caused him to suffer an adverse employment action. See also, *Blake v. Potter*, 247 F. App'x 673, 675 (6th Cir. 2007) ("plaintiff has provided no evidence whatsoever that the denial of these discretionary schedule changes is in any way comparable to termination of employment, a demotion evidenced by decrease in wage or salary.") (internal quotations omitted). Nor does Young show how CSL's denial of a work transfer, or comments from his coworkers about him resulted in a significant change in employment status or benefits. *Lindsey*, 295 F. App'x 767-68. And finally, Young did not explain how his violation of an "obscure" work rule resulted in adverse employment action because he failed to identify the rule, or how his violation of the rule adversely impacted his employment.

Case: 24-1775 Document: 47 Filed: 09/24/2025 Page: 159

Young v. CSL Plasma Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1259103

#### 4. Termination

Young claims he was terminated in violation of his civil rights. Termination does constitute an adverse employment action. *Id.* However, to sustain a claim for race discrimination the claimant must show that the termination was motivated by race. "A complaint that includes only conclusory allegations of discriminatory intent without supporting factual allegations does not sufficiently show entitlement to relief." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012). Instead, "a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Sam Han v. Univ. of Dayton*, 541 F. App'x 622, 626 (6th Cir. 2013) citing *Twombly*, 550 U.S. at 562.

Young's Complaint does not provide any factual content that demonstrates race was the motivation behind his termination, or that CSL intended to discriminate against Young on the basis of his race. Young's Complaint states:

> Plaintiff was wrongfully terminated from CSL Plasma on 3/21/14, while on medical leave of absence due to overwhelming stress caused by hostile, discriminatory, retaliatory and defamatory actions of Mr. Tasiemski & CSL. In addition to race, defendant's adverse actions were retaliation for plaintiff's efforts to improve safety for customers and employees via plaintiff's reports to Mr. Tasiemski & CSL and whistleblower complaints to the FDA, OSHA, etc....To protect plaintiff's health due to overwhelming stress caused by the aforementioned events, plaintiff took a medical leave of absence from 1/13/14 to 3/21/14 when plaintiff was wrongfully terminated. During plaintiff's medical leave, plaintiff complied with all of defendant's rules...However, defendant was aware that plaintiff filed a whistleblower complaints with various government agencies such as the FDA and OSHA.

> In retaliation, plaintiff was wrongfully terminated.

**\*5 (Doc. 32 at 2,4, filed May 21, 2015)**. Young's Complaint does not provide any factual content that allows the Court to infer that race was behind any adverse employment action. There is no direct or indirect factual allegation that supports his claims. His claims regarding the termination are filled with conclusions rather than facts. For instance, Young states, "Plaintiff was wrongfully terminated from CSL Plasma on 3/21/14, while on medical leave of absence due to overwhelming stress caused by hostile, discriminatory, retaliatory and defamatory actions of Mr. Tasiemski & CSL." *Id*. That is a conclusion, not a statement of facts that leads one to plausibly believe Young's conclusion that he was subjected to discriminatory or hostile actions. The Sixth Circuit has noted, although a "complaint need not present 'detailed factual allegations,' it must allege sufficient 'factual content' from which a court, informed by its 'judicial experience and common sense,' could draw the reasonable inference that Defendants discriminated against Plaintiff with respect to his race." *Sam Han*, 541 F. App'x at 626. Aside from Young's conclusory statements that he was discriminated against on the basis of race, the Court cannot identify any other factual content that supports his contention. Young's subjective belief, as demonstrated by his conclusory statements, that he was terminated as a result of his race is insufficient to sustain his claim. Plaintiff's claim of race discrimination is dismissed.

#### B. WHISTLEBLOWER PROTECTION ACT AND PUBLIC POLICY CLAIMS

Young claims he was terminated in retaliation for his reports to Mr. Tasiemski and CSL, and his whistleblower complaints to the FDA and OSHA. Young labels these claims as "public policy" claims. Defendant contends that this claim is actually a claim under the Michigan Whistleblower Protection Act, and it is time barred because he asserted the claim long after the 90-days statute of limitations.

After examining the contents of his claim, the Court construes Young's public policy claim as a claim under the Michigan Whistleblower Protection Act ("WPA"), M.C.L. § 15.362. The WPA protects employees against retaliation who report, or plan to report, suspected violations of laws, rules, or regulations to a public body. *Id*. The WPA "preempts common-law public-policy claims arising from the same activity." *Anzaldua v. Neogen Corp.*, 292 Mich. App. 626, 631

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 160

Young v. CSL Plasma Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1259103

(2011). Under the Act "a person who alleges a violation of this act may bring a civil action for appropriate injunctive relief, or actual damages, or both within 90 days after the occurrence of the alleged violation of this act." M.C. L.§ 15.363. Therefore, the WPA has a 90-day statute of limitations that begins to run on the date an employer commits a wrongful act and not when a plaintiff suffers damages. *Foster v. Judnic*, 963 F. Supp. 2d 735, 763 (E.D. Mich. 2013). A plaintiff cannot evade the 90–day statute of limitations by simply recasting the claim as a public-policy claim. *Anzaldua v. Neogen Corp.*, 292 Mich. App. 626, 631-32 (2011).

Young cannot establish a WPA claim. CSL allegedly terminated Young on March 21, 2014, for filing complaints and suspected violations to various government agencies, such as OSHA and the FDA. **(Doc. 32 at 2,4, filed May 21, 2015)**. Young did not file his suit until January 9, 2015. Young's WPA/Public Policy claim is dismissed based on the statute of limitations.

In regards to Young's remaining public policy claims; they fail as well. A discharge violates public policy if: (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment. *Suchodolski v. Michigan Consol. Gas Co.,* 412 Mich. 692, 695-696 (1982).

Young alleges that he was terminated because he was written up for a work rule violation, denied a transfer, denied unemployment benefits for four months due to Mr. Tasiemski's alleged lie that Young did not communicate with him while Young was on leave, harassed by a CSL employee via threatening letters because Young posted a Youtube video. **(Doc. 32, filed May 21, 2015)**. The Court does not find that any of the reasons, if true, amount to a violation of the public policy standard set forth in *Suchodolski.*

**\*6** Consequently, Plaintiff's remaining public policy claims are dismissed for failing to state a claim.

### C. M.C.L. 600.2911 SLANDER AND DEFAMATION CLAIM

Young asserts a defamation claim. He claims CSL defamed him by having coworkers fabricate and submit false statements to portray him as a problem employee. He also alleges Mr. Tasiemski wrote up Young for violating an obscure work rule and refused to retract the written warning. Young did not identify or explain the alleged "obscure" rule. He also claims that Mr. Tasiemski and CSL lied by stating Young was fired because he failed to communicate while on leave, and stated at an unemployment appeal hearing that Young never contacted him during June 11, 2014 to July 23, 2014.

To sustain a defamation claim, a plaintiff must show: (1) a false and defamatory statement about the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) actionability of the statement irrespective of special harm (defamation *per se*) or the existence of special harm caused by publication. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 527 (6th Cir. 2014). A plaintiff must be specific when alleging a defamation claim; he cannot rely on general and conclusory statements. *Williams v. Detroit Bd. of Educ.*, 523 F. Supp. 2d 602, 606 (E.D. Mich. 2007). Instead, a plaintiff "must specifically identify the statements alleged to be defamatory." *Williams v. Detroit Bd. of Educ.*, 523 F. Supp. 2d 602, 606 (E.D. Mich. 2007).

Young failed to sufficiently plead his defamation claim. Young states in general terms that he was defamed. For example, Young states Defendants prompted his "co-workers to fabricate and submit false statements about plaintiff, in a attempt to portray plaintiff as a problem employee." **(Doc. 32 at 3, filed May 21, 2015)**. He fails to provide the specific content of the alleged false and defamatory statements. *Rondigo, LLC v. Twp. of Richmond, Mich.*, No. 08-CV-10432, 2012 WL 1021726, at \*7 (E.D. Mich. Mar. 27, 2012). See also *Ledl v. Quik Pik Food Stores, Inc.*, 133 Mich. App. 583, 590 (1984) ("plaintiff's complaint failed to set forth with specificity the necessary elements of a defamation cause of action: the defamatory words complained of, the connection of the defamatory words with plaintiff, and the publication of the alleged defamatory words."). To the extent that Young asserts a defamation claim regarding testimony given by Mr. Tasiemski during the unemployment appeal hearing, any statements made during those proceedings are considered privileged and immune from a claim of defamation. See *Oesterle v. Wallace*, 272 Mich. App. 260, 265 (2006) ("statements made by judges, attorneys, and witnesses during the course of judicial proceedings are absolutely privileged if they are relevant, material, or pertinent to the issue being tried...'Judicial proceedings' may include any hearing before a tribunal or administrative board that performs a judicial

function."). Because Young has failed to specifically plead defamation his claim is dismissed.

#### D. PERJURY

**\*7** Young's Complaint contains a count for perjury. He claims Mr. Tasiemski alleged lied during an unemployment appeal hearing when he said Young was fired because he failed to communicate with Mr. Tasiemski or CSL from January 13, 2014 to March 21, 2014. According to Young, he was denied unemployment benefits as a result of this lie, and Mr. Tasiemski committed perjury. "There is no private cause of action for perjury in Michigan, or in federal court." *Harrison v. Conlin*, No. CIV. 14-13490, 2015 WL 1646653, at \*3 (E.D. Mich. Apr. 14, 2015). Young's perjury claim is dismissed.

#### E. NEGLIGENT HIRING

Young asserts a negligent hiring claim against CSL. It appears he alleges: (1) Desomond James was promoted instead of Plaintiff. James is allegedly a friend of Mr. Tasiemski and the boyfriend of Mr. Tasiemski's manager, LaTosha Ford.; (2) James and Tasiemski retaliated against Young when he inquired as to why he was not promoted; (3) Tasiemski wrote up Young for violating a work rule, Young did not identify the rule, and Tasismski refused to retract it; (4) Tasiemski allegedly lied about the reason Young was terminated.

The elements of negligent hiring are: (1) a duty, (2) a breach of that duty, (3) proximate causation, and (4) damages. *Hamameh v. Gilson*, No. 317232, 2014 WL 6679261, at \*9 (Mich. Ct. App. Nov. 25, 2014). "An employer may be held directly liable for its employee's tortious or illegal conduct when it knew or should have known of the employee's propensities...especially [if] the employer is aware of past acts of such conduct and yet hires or retains the employee." *Hamameh v. Gilson*, No. 317232, 2014 WL 6679261, at \*9 (Mich. Ct. App. Nov. 25, 2014).

Young's negligent hiring claim fails. None of his factual allegations fulfill any of the elements for negligent hiring. For instance, he does not plead any duty CSL owed to Plaintiff, a breach of that duty owed, or causation. He does not claim that any CSL employee engaged in any illegal activity, which CSL knew about or should have known about. Accordingly, CSL would not be on notice of any illegal conduct of its employers. Young's negligent hiring claim is dismissed.

#### F. INTENTIONAL INFLICTION EMOTIONAL DISTRESS ("IIED")

Young asserts a claim for IIED. He claims as a result of the racial discrimination retaliation, and his termination he suffered stress and mental anguish. Under Michigan law, to establish a IIED claim a plaintiff must show: (1) extreme and outrageous conduct; (2) Intent or recklessness; (3) causation; and (4) severe emotional distress. *Hall v. State Farm Ins. Co.*, 18 F. Supp. 2d 751, 770 (E.D. Mich. 1998) aff'd, 1 F. App'x 438 (6th Cir. 2001). A plaintiff demonstrates extreme and outrageous when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hall v. State Farm Ins. Co.*, 18 F. Supp. 2d 751, 770 (E.D. Mich. 1998) aff'd, 1 F. App'x 438 (6th Cir. 2001).

While Young may have suffered distress, the Court does not find Defendants' conduct to rise to the level of being "utterly intolerable in a civilized community." The standard for IIED is a very high standard and Young has failed to establish plausible elements of the claim for it to survive. The claim is dismissed. See *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 777 (6th Cir. 1996) citing *Joumas v. Maryland Casualty Co.*, 698 F.Supp. 675, 679 (E.D.Mich.1988) ("wrongful discharge/ELCRA discrimination case in which conduct alleged did not satisfy 'particularly strict standard' for the tort of intentional infliction of emotional infliction of emotional distress").

#### G. VICARIOUS LIABILITY/ RESPONDEAT SUPERIOR CLAIM

**\*8** Young asserts a claim for vicarious liability and respondeat superior. Vicarious liability occurs when one is indirectly responsible for the acts of another. *Theophelis v. Lansing Gen. Hosp.*, 430 Mich. 473, 483 (1988). "A principal...cannot be held liable if the agent having primary responsibility is not liable." *Lincoln v. Gupta*, 142 Mich. App. 615, 622 (1985). Since the Court is dismissing Young's claims against CSL and its agents, this claim must fail as well.

#### IT IS ORDERED

that the Motion to Dismiss Plaintiff's More Definite Complaint is (**Doc 34, filed June 5, 2015**) is **GRANTED**. Plaintiff's Complaint is (**Doc. 32, filed May 21, 2015**) is **DISMISSED WITH PREJUDICE**.

2016 WL 1259103

**IT IS FURTHER ORDERED** that **(Doc. 14, filed March 24, 2015)**; **(Doc. 36, filed June 17, 2015)**; **(Doc. 41, filed July 7, 2015)** and **(Doc. 44, filed July 21, 2015)** are **DENIED AS MOOT**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1259103

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Document By **WESTLAW**

2017 WL 5157230
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Lashawn M. YOUNG, Plaintiff–Appellant,

v.

CSL PLASMA INC., aka CSL Behring, aka CSL Limited; Daniel Tasiemski, Defendants–Appellees.

No. 16–1570
|
FILED May 26, 2017

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

Lashawn M. Young, Southfield, MI, pro se.

Gillian Pei–Lin Yee, Joshua Paul Lushnat, Ogletree Deakins Nash Smoak & Stewart, Birmingham, MI

Before: COLE, Chief Judge; BOGGS and MOORE, Circuit Judges.

ORDER

**\*1** LaShawn Young, a Michigan resident proceeding pro se, appeals the district court's dismissal of his complaint raising claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 ("Title VII"); Michigan's Elliott–Larsen Civil Rights Act ("ELCRA"); 42 U.S.C. §§ 1981 and 1983; and various state laws. This case has been referred to a panel of the court that, upon examination, unanimously agrees that oral argument is not needed. See Fed. R. App. P. 34(a).

Young, who identifies himself as a black male, was employed as a Medical Staff Associate at CSL Plasma Inc.'s plasma-collection facility in Lincoln Park, Michigan. In his initial complaint against CSL Plasma and Daniel Tasiemski, Young alleged that he was wrongfully terminated on March 21, 2014, in retaliation for having filed whistleblower complaints with the Federal Drug Administration and the federal

Occupational Safety and Health Administration. He asserted that Tasiemski lied about the basis for his termination during his unemployment hearings, stating that Young never contacted him or CSL Plasma during his medical leave of absence. He further alleged that Tasiemski defamed and slandered him by reporting false and misleading information about him to CSL Plasma "in an effort to portray [him] as a problem employee."

Young filed an amended complaint, in which he alleged additional facts to support his claim. He alleged that he "was wrongfully terminated ... while on medical leave of absence due to overwhelming stress caused by the hostile, discriminatory, retaliatory and defamatory actions of Mr. Tasiemski and CSL." Specifically, Young alleged that: (1) he was repeatedly denied additional job training in favor of two white employees who had attendance and performance problems; (2) these two white employees were granted preferential work schedules; (3) he was denied consideration for a promotion in favor of Desmond James, a personal friend of Tasiemski; (4) Tasiemski and James retaliated against him for having asked about being denied the promotion by prompting his coworkers to make false statements about his performance; (5) Tasiemski retaliated against him by wrongfully issuing him a final written warning on January 10, 2014, for allegedly having used medical equipment to treat a medical emergency without authorization; (6) CSL Plasma denied his request for a transfer and refused to retract the final written warning; (7) attorney Michael Tricarico, on behalf of Tasiemski and CSL Plasma, harassed and traumatized him by sending threatening letters demanding that he take down a YouTube video exposing Tasiemski's perjury at his unemployment hearing; and (8) MetLife, acting on behalf of CSL Plasma, wrongfully denied his claim for short-term disability benefits.

In May 2015, the district court entered a stipulated order requiring Young to file a more definite statement of the allegations included in his amended complaint. Young then filed a "More Definite Complaint," in which he asserted the following claims: (1) violation of 42 U.S.C. § 1981; (2) violation of public policy—retaliation; (3) violation of the ELCRA; (4) violation of Title VII; (5) intentional infliction of emotional distress; (6) vicarious liability and respondeat superior; (7) slander and defamation; (8) negligence in hiring; and (9) perjury.

**\*2** The defendants then filed a motion to dismiss Young's "More Definite Complaint," pursuant to Federal Rule of

Case: 24-1775    Document: 47    Filed: 09/24/2025    Page: 164

Young v. CSL Plasma Inc., Not Reported in Fed. Rptr. (2017)
2017 WL 5157230

Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted. The district court granted the motion and dismissed Young's complaint. First, the court held that Young failed to state a claim of race discrimination under federal or state law because he failed to establish that he suffered an adverse employment action or that the defendants were motivated by race. Second, the court concluded that Young's claim of retaliation under the Michigan Whistleblower Protection Act ("MWPA") was time-barred. Third, the court dismissed Young's defamation claim because he failed to specifically identify the allegedly false statements and, to the extent the claim was based on testimony given at his unemployment hearing, such statements are privileged and immune from a claim of defamation. The court next dismissed Young's perjury claim because there is no private cause of action for perjury. Finally, the court held that Young failed to sufficiently plead a claim for negligent hiring or intentional infliction of emotional distress and that his claim for vicarious liability and respondeat superior failed because all of the underlying claims had been dismissed.

Young now appeals. In his opening brief, he argues that the defendants lacked credibility. He contends that the district court should not have held that he failed to state a claim upon which relief may be granted because he proved that the defendants committed numerous instances of perjury. In support of this argument, he lists instances of alleged perjury by the defendants. The only claim arguably preserved by such arguments is Young's claim of perjury, which was properly dismissed because there is no private cause of action for perjury in Michigan. *See Meyer v. Hubbell*, 324 N.W.2d 139, 141 (Mich. Ct. App. 1982). Nowhere in his opening brief does Young address the district court's rulings that he failed to allege an adverse employment action or facts to establish a racial motivation on the part of the defendants, that the statute of limitations barred his retaliation claim under the MWPA, that he failed to specifically allege false statements

by the defendants to support his defamation claim, or that the allegedly false statements made at his unemployment hearing could not support a defamation claim. Nor does he address the court's rulings on his intentional-infliction-of-emotional-distress, negligent-hiring, or vicarious-liability claims. Because Young has failed to adequately address the district court's rulings on these claims, he has waived any challenge to the dismissal of his complaint. *See Clanton v. Comm'r*, 491 Fed.Appx. 610, 611 (6th Cir. 2012) (finding that appellant waived review of issues on appeal because his pleadings were "entirely conclusory, lack[ed] factual specificity, and d[id] not clearly explain the basis of his claims"); *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (holding that appellant waived her right to appeal district court's denial of injunctive relief because she "wholly fail[ed] to address this issue in her appellate brief"), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc); *Wright v. Knox Cty. Bd. of Educ.*, 23 Fed.Appx. 519, 520 (6th Cir. 2001) (concluding that pro se appellant abandoned her appeal because her "brief ignore[d] the reason her suit was dismissed").

In addition to arguing that the defendants lacked credibility, Young raises new allegations in his brief about the defendants' alleged failure to comply with provisions of the CSL Plasma employee handbook. Because Young did not assert these allegations in the district court, he may not now do so on appeal. *See United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006); *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 328–29 (6th Cir. 2006).

Accordingly, we **AFFIRM** the district court's judgment.

**All Citations**

Not Reported in Fed. Rptr., 2017 WL 5157230

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.